1  ZEIGER, TIGGES & LITTLE LLP
   Marion H. Little, Jr., Esq. (admitted *pro hac vice*)
2  Michael R. Reed, Esq. (admitted *pro hac vice*)
   3500 Huntington Center
3  41 South High Street
   Columbus, OH 43215
4  Telephone:    (614) 365-9900
   Facsimile:    (614) 365-7900
5  Email: reed@litohio.com

6  SQUIRE, SANDERS & DEMPSEY L.L.P.
   Joseph A. Meckes (State Bar No. 190279)
7  Daniel T. Balmat (State Bar No. 230504)
   One Maritime Plaza, Suite 300
8  San Francisco, CA 94111-3492
   Telephone: +1.415.954.0200
9  Facsimile: +1.415.393.9887
   Email: jmeckes@ssd.com
10 Email: dbalmat@ssd.com

11 Attorneys for Plaintiff
   THE O.N. EQUITY SALES COMPANY
12
                    UNITED STATES DISTRICT COURT
13
                   NORTHERN DISTRICT OF CALIFORNIA
14
                          (SAN JOSE DIVISION)
15

16 THE O.N. EQUITY SALES COMPANY,          Case No.  C07-03303 JF (RS)
   an Ohio Corporation,
17                                          The Honorable Jeremy Fogel
                      Plaintiff,
18                                          **(Filed via ECF/PACER)**
            vs.
19                                          **PLAINTIFF'S NOTICE OF MOTION AND**
   THOMAS NEMES, INDIVIDUALLY               **MOTION FOR PRELIMINARY**
20 AND AS TRUSTEE OF THE THOMAS             **INJUNCTION; MEMORANDUM OF**
   NEMES TRUST, and MICHAEL J.              **POINTS AND AUTHORITIES**
21 BENKERT, INDIVIDUALLY AND ON
   BEHALF OF SHORE 2 SHORE
22 ENTERPRISES, INC., and JERRY J.          [E-Filed concurrently with [Proposed] Order]
   THOMAS, INDIVIDUALLY AND AS
23 TRUSTEE OF THE JERRY J. THOMAS
   AND NANCY M. THOMAS 1998 INTER
24 VIVOS TRUST, and NANCY M.
   THOMAS, INDIVIDUALLY AND AS             Date:         TBD
25 TRUSTEE OF THE JERRY J. THOMAS          Time:         TBD
   AND NANCY M. THOMAS 1998 INTER          Courtroom:    3, 5th Floor
26 VIVOS TRUST.

27                    Defendants.

28                                          Complaint Filed:    June 22, 2007

SQUIRE, SANDERS &
DEMPSEY L.L.P.
One Maritime Plaza, Suite 300
San Francisco, CA 94111-3492

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION                    Case No. C07-03303 JF (RS)

1    TO THE COURT AND ALL PARTIES AND THEIR COUNSEL OF RECORD:

2    PLEASE TAKE NOTICE THAT that, at a date and time to be determined by the parties

3  and the Court, in the courtroom of the Honorable Jeremy Fogel, located at 280 South 1st Street,

4  Fifth Floor, San Jose, California 95113, Plaintiff the O.N. Equity Sales Company ("ONESCO")

5  will and hereby does move the Court pursuant to Rule 65 of the Federal Rules of Civil Procedure

6  for a preliminary and permanent injunction enjoining Defendants Thomas Nemes, individually,

7  and as Trustee of the Thomas Nemes Trust ("Nemes"); Michael J. Benkert, individually, and on

8  behalf of Shore 2 Shore Enterprises, Inc. ("Benkert"); and Jerry J. and Nancy M. Thomas,

9  individually, and as Trustees of the Jerry J. Thomas and Nancy M. Thomas 1998 Inter Vivos

10  Trust (the "Thomases"), from taking any further action with respect to Case No. 07-01378 filed

11  with the National Association of Securities Dealers in or about April 2007, and amended on May

12  2, 2007.

13    ONESCO is filing concurrently its Motion to Consolidate Preliminary Injunction Hearing

14  with Trial on the Merits, and it Motion for an Order Authorizing the Parties to Engage in

15  Immediate Discovery, both to be heard on October 5, 2007.  In addition, the instant motion for

16  preliminary injunction requests that the parties be allowed a reasonable time before the hearing of

17  the preliminary injunction motion to conduct discovery into the issues identified.  ONESCO

18  believes that an appropriate time and date for the hearing on this motion can and should be

19  determined by the Court and the parties after the Court has considered the Motion to Consolidate.

20  Consequently, and after conferring with the Clerk of the Court on this issue, this motion has not

21  been noticed for hearing on a specific time and date.

22    This motion is based on the memorandum of points and authorities in support hereof, the

23  exhibits attached to this motion, the pleadings, records and papers on file herein and such other

24  and further evidence and argument as may be presented at or before the hearing.

25  Dated: August 31, 2007        ZEIGER, TIGGES & LITTLE LLP

26        By:_____/s/_____

27              Michael R. Reed
                Attorneys for Plaintiff
28           THE O.N. EQUITY SALES COMPANY

**TABLE OF AUTHORITIES**

**Page**

*Pacific Investment Co. v. Townsend,*
58 Cal.App.3d 1 (Ct. App. 1976) .................................................................. 12

*Securities and Exchange Commission v. Megafund Corporation,*
Case No. 3:05-CV-1328-L (N.D. Texas) ...................................................... 5, 7

**FEDERAL CASES**

*AT&T Tech., Inc. v. Communications Workers of America,*
475 U.S. 643 (1986) ................................................................................ 12, 13

*Asdar Group v. Pillsbury, Madison & Sutro,*
99 F.3d 289 (9th Cir. 1996) ........................................................................... 2

*First Options of Chicago, Inc. v. Kaplan,*
514 U.S. 938 (1995) ................................................................................ 13, 15

*Gruntal & Co., Inc. v. Steinberg,*
854 F.Supp. 324 (D.N.J. 1993) ................................................................. 3, 18

*Hornor, Townsend & Kent, Inc. v. Hamilton,*
218 F.Supp.2d 1369 (N.D. Ga. 2002) ..................................................... 10, 18

*Hornor, Townsend & Kent, Inc. v. Hamilton,*
2004 WL 2284503 (N.D. Ga. 2004) ............................................. 3, 17, 18, 19

*Hornor, Townsend & Kent, Inc. v. Hamilton,*
Case No. 1:01-CV-02979 (N.D. Ga. 2005) ................................................. 3, 19

*Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship,*
41 F.3d 861 (2d. Cir. 1994) ......................................................................... 14

*LAWI/CSA Consolidators,*
849 F.2d 1236 (9th Cir. 1988) ................................................................ 13, 19

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,*
501 U.S. 350 (1991) ....................................................................................... 2

*Litton Fin. Printing Div. v. Nat'l Labor Relations Bd.,*
501 U.S. 190 (1991) ..................................................................................... 13

*MONY Sec. Corp. v. Bornstein,*
390 F.3d 1340 (11th Cir. 2004) ............................................................... 16, 17

*MONY Sec., Inc. v. Vasquez,*
238 F.Supp.2d 1304 (M.D. Fla. 2002) ......................................................... 19

*Malhotra v. Equitable Life Assurance Society of the United States,*
364 F.Supp.2d 299 (E.D.N.Y. 2005) ............................................................. 19

*Md. Cas. Co. v. Realty Advisory Bd.,*
107 F.3d 979 (2nd Cir. 1991) ....................................................................... 13

*Merrill Lynch Investment Managers v. Optibase, Ltd.,*
337 F.3d 125 (2nd Cir. 2003) ....................................................................... 19

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985) ..................................................................................... 13

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

v                                           -iii-

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION                Case No. C07-03303 JF (RS)

1

## TABLE OF AUTHORITIES (Continued)

2

**Page**

3    *Multi-Financial Sec. Corp. v. King,*
     386 F.3d 1364 (11th Cir. 2004) ....................................................................... 16

4    *Northwestern Human Services, Inc. v. Panaccion,*
5    2004 WL 2166293 (E.D. Pa. 2004) ................................................................... 19

     *Perry v. Thomas,*
6    482 U.S. 483 (1987) ......................................................................................... 14

7    *Prudential Sec., Inc. v. Dusch,*
     1994 WL 374425 (S.D. Cal. 1994) .............................................................. 3, 17

8    *Ryan, Beck & Co. v. Fakih,*
     268 F.Supp.2d 210 (E.D.N.Y. 2003) ............................................................... 17

9    *Sands Bros. & Co., Ltd. v. Alba Perez Ttee Garcia Revocable Trust,*
10   2004 WL 2186574 (S.D.N.Y. 2004) ................................................................ 17

     *Sands Bros. & Co., Ltd. v. Ettinger,*
11   2004 WL 541846 (S.D.N.Y. 2004) .................................................................. 17

12   *Sanford v. Memberworks, Inc.,*
     483 F.3d 956 (9th Cir. 2007) ........................................................................... 13

13   *Six Clinics Holding Corp. v. Cafcomb Systems, Inc.,*
     119 F.3d 393 (6th Cir. 1997) ........................................................................... 13

14   *Textile Unlimited, Inc. v. A..BMH and Co. Inc.,*
15   240 F.3d 781 (9th Cir. 2001) .................................................................. 3, 12, 13

     *Three Valleys Mun. Water Dist. v. E.F. Hutton & Co., Inc.,*
16   925 F.2d 1136 (9th Cir. 1991) ......................................................................... 13

17   *United Offshore Co. v. Southern Deepwater Pipeline Co.,*
     899 F.2d 405 (5th Cir. 1990) ........................................................................... 13

18   *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.,*
     984 F.2d 113 (4th Cir. 1993) ........................................................................... 13

19   *Volt Information Sciences, Inc. v. Stanford University,*
20   489 U.S. 468 (1989) ......................................................................................... 13

     *Wheat, First Sec., Inc. v. Green,*
21   993 F.2d 814 (11th Cir. 1993) .................................................... 2, 15, 16, 17, 18, 19

22   *Wiepking v. Prudential-Bache Sec., Inc.,*
     940 F.2d 996 (6th Cir. 1991) ........................................................................... 13

23   *World Group Sec. v. Ko,*
     2004 1811145 (N.D. Cal. 2004) ....................................................................... 17

24

25

26

27

28

1

## TABLE OF AUTHORITIES (Continued)

2

**Page**

3

4

## STATUTES

5

Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* .......................................................... 11, 12

6

F.R.C.P. Rule 65 .................................................................................................................. 1

NASD Rule 10201 ............................................................................................................ 17

7

NASD Rule 12200 ...................................................................................................... 14, 15

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION                    Case No. C07-03303 JF (RS)

# MEMORANDUM IN SUPPORT

## I.    INTRODUCTION

*"[NASD customer status for purposes of arbitrability should] be determined as of the time of the occurrence of events that constitute the factual predicate for the causes of action contained in the arbitration complaint. ... We cannot imagine that any NASD member would have contemplated that its NASD membership would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer."*

[*Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993) (emphasis added).]

This holding applies with equal force to the instant case. Defendants, who invested in a private placement unrelated to ONESCO, seek to arbitrate claims against ONESCO before the National Association of Securities Dealers, Inc. ("NASD"). Yet Defendants do not have a written agreement to arbitrate any dispute between themselves and ONESCO and, indeed, had no business relationship with ONESCO at all. Defendants' only conceivable grounds for arbitration are that they entered into investment transactions with a trust whose trustee *later* – after the transactions were completed – became an "associated person" with ONESCO. But applying the NASD Rules to the facts of this case, Defendants cannot compel arbitration.

As *Wheat* and other cases consistently hold, NASD "customer" status for purposes of bringing claims in arbitration is determined "as of the time of the occurrence of the events that constitute the factual predicate for the causes of action." *Wheat*, 993 F.2d at 820. In a securities action based on alleged misrepresentations or omissions, the factual predicate is the material misrepresentation or omission that induces the investments in question – not subsequent payments or additional transactions premised on the same original misrepresentations. *See, e.g.*, *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 364 (1991) (concluding that statute of repose for a Rule 10b-5 claim starts from the date of the alleged misrepresentation inducing a sale, not from the date of sale itself); *Asdar Group v. Pillsbury, Madison & Sutro*, 99 F.3d 289, 294-95 (9th Cir. 1996) ("the statute ordinarily begins to run … when a person commits the act that gives rise to liability under that section").

1    Here, although Defendants assert a number of state and federal causes of action, their

2    NASD statement of claim reveals that all of their claims are fundamentally based on alleged

3    material misrepresentations and omissions that induced their respective decisions to invest in the

4    Lancorp Fund. For instance, in paragraph 41 of their first amended statement of claim,

5    Defendants allege that "Respondent ONESCO, acting through Lancaster, _recommended_ that

6    Claimants invest in … [an] unregistered, fraudulent investment …" [_See_ First Amended

7    Statement of Claim, at 17 (emphasis added) (Doc. No. 1, Exh. K).] At paragraph 42, Defendants

8    allege that "Respondent ONESCO, acting through Lancaster, made numerous false

9    representations to Claimants concerning this Lancorp Financial Fund Business Trust … and

10   Megafund Corporation … investment." [_Id._ at 18] And in paragraphs 43 to 47, Defendants

11   accuse ONESCO, acting through Lancaster, of making numerous other misrepresentations or

12   omissions with respect to the risks associated with and operations of the Lancorp Fund. [_Id._ at

13   18-20.]

14       As the Northern District of Georgia explained in a recent case, "if the sale occurred at a

15   time when [the associated person] was not employed by [the member], the latter cannot be hauled

16   into an arbitration proceeding … ." _Hornor, Townsend & Kent, Inc. v. Hamilton_, 2004 WL

17   2284503, at *3 (N.D. Ga., Sept. 30, 2004) (Exh. N). This is because an NASD member "could

18   not have supervised [the associated person] at a time before [the associated person] became

19   employed with" the NASD member. _Hornor, Townsend & Kent, Inc. v. Hamilton_, Case No.

20   1:01-cv-02979 (N.D. Ga., Sept. 6, 2005) (slip op., at 12) (Exh. O). _Accord: Prudential Sec., Inc._

21   _v. Dusch_, 1994 WL 374425 (S.D. Cal., Mar. 28, 1994) (Exh. P) (enjoining arbitration brought by

22   investor over transactions occurring before investor became the customer of an NASD member);

23   _Gruntal & Co., Inc. v. Steinberg_, 854 F. Supp. 324, 340 (D.N.J. 1994) (same).

24       Simply put, at the time of the occurrence of events giving rise to their claims, Defendants

25   were not dealing with an "associated person" of ONESCO. As a result, they may not avail

26   themselves of the right to arbitrate under the NASD Rules. Injunctive relief is appropriate

27   because, as the Ninth Circuit has held, a party is irreparably harmed if it is forced to arbitrate a

28   dispute where it had no contractual obligation to do so. _See, e.g., Textile Unlimited, Inc. v._

1    *A..BMH and Co. Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).  ONESCO therefore respectfully

2    requests this Court to schedule this matter for a preliminary injunction hearing after a reasonable

3    time for the parties to conduct discovery into this matter, and thereafter enjoin Defendants from

4    proceeding further in NASD Case No. 07-01378.

## II.    STATEMENT OF FACTS

### A.    Brief Overview of ONESCO and Non-Party Lancaster.

7    ONESCO is a full service retail broker-dealer registered in all 50 states.  ONESCO,

8    through its more than 1,000 registered representatives, offers a variety of investment products,

9    including standard brokerage services; mutual funds; variable insurance products; and Section

10    529 plans.

11    Non-party Gary Lancaster ("Lancaster") was a registered representative with ONESCO,

12    on an independent contractor basis, from March 23, 2004 to January 3, 2005.  [*See* Exh. A, Form

13    U-5 for Gary Lancaster; Exh. B, Affidavit of Jeffrey Bley, ("Bley Aff'd").]  Prior to his affiliation

14    with ONESCO, Lancaster was an experienced insurance salesman and investment representative.

15    He had prior experience as a registered representative with BA Investment Services, Inc., Piper

16    Jaffray, Inc., and Quick & Reilly, Inc.[1]  As Lancaster's Central Registration Depository statement

17    ("CRD") makes clear, his record was free of regulatory issues before he joined ONESCO as an

18    independent contractor.  Exh. A ("Lancaster CRD").

19    At the inception of his relationship with ONESCO, Lancaster disclosed his involvement

20    with two other businesses unrelated to the business of ONESCO.  First, Lancaster disclosed his

21    position as an Account Executive with Universal Underwriters Group.  [*See* Exh. C, Other

22    Business Disclosure Reporting Page.]  He described the nature of this business as "property –

23    casualty, Life and Health Sales-Service."  [*Id.*]  Second, Lancaster disclosed his position as

24    President of Lancorp Financial Group, LLC.  [*Id.*]  Again, Lancaster described his role with this

---

[1]    Lancaster was involuntarily terminated by Piper Jaffray, and its parent company, U.S. Bancorp, in September 2002; however, the Form U-5 submitted by that firm expressly states that his termination was "*not sales practice related*."  [*See* Lancaster CRD, at 13.]

1   entity as "sales and service life, health, annuities." [*Id.*]  These disclosures were reviewed by

2   ONESCO's Contracting and Licensing group.

3       During his tenure as an independent contractor with ONESCO, Lancaster failed to

4   generate any business for ONESCO.  In fact, he generated no commission revenue during his

5   entire ten-month relationship with ONESCO.  As a result, ONESCO terminated its relationship

6   with Lancaster on January 3, 2005, pursuant to a firm policy that requires representatives to

7   generate at least $10,000 in annual commission revenue.

8       **B.       The Lancorp Financial Fund Business Trust Transactions.**

9       The genesis of this case is Defendants' investments, through Lancaster, in a *private*

10  *placement* offered by the Lancorp Financial Fund Business Trust (the "Lancorp Fund"), a Nevada

11  Business Trust unaffiliated with ONESCO.[2]  Lancaster served as Trustee of the Lancorp Fund.

12  *As the NASD expressly recognized in its August 10, 2006 Letter of Acceptance, Waiver and*

13  *Consent Agreement with Lancaster, Lancaster never disclosed his involvement with the Lancorp*

14  *Fund to ONESCO.*  [*See* Letter of Acceptance, No. 20050034080-01, Exh. D.]

15      As part of this private placement offering, the Lancorp Fund prepared a detailed Private

16  Placement Memorandum, a copy of which is attached to the Complaint as Exhibit A.  Prior to

17  investing in Lancorp, all potential investors, *including Defendants*, were required to review this

18  Memorandum and execute a Subscription Agreement.

19      The Private Placement Memorandum stated that the Lancorp Fund was "an unregistered,

20  closed-end non-diversified management investment company."  [Lancorp Private Placement

21  Memorandum, at introduction.]  Its investment objective involved "the issuance of Forward

22  Commitments ... to large financial institutions relating to debt securities bearing interest or sold

23  at a discount ...."  [*Id.*]  From records recovered from the court appointed receiver in *Securities*

24  *and Exchange Commission v. Megafund Corporation*, Case No. 3:05-CV-1328-L (N.D. Texas), it

25  appears Lancaster invested significant dollars from the Lancorp Fund in Megafund, later revealed

26

27  [2]     The information set forth herein relating to the Lancorp Fund, Defendants, and Lancaster is based,
        in part, on the investigation conducted to date.

28

1    as a Texas-based Ponzi scheme.  As a result of these investments, many of the Lancorp Fund

2    investors suffered significant losses, and the Lancorp Fund was placed in receivership.

3         Investors in the Lancorp Fund, including Defendants, were not customers of ONESCO,

4    and their investments in the Lancorp Fund were not the type of investments offered by ONESCO

5    through its registered representatives.  In fact, the Lancorp Fund's Private Placement

6    Memorandum reveals, in numerous respects, that Defendants were sophisticated investors who

7    *knew* that the Lancorp Fund investments were not sold by ONESCO; that such investments were

8    not registered with the Securities and Exchange Commission; and that Lancaster, in selling such

9    investments, was not acting on behalf of or with the authorization of ONESCO.

10              **1.    Defendants Were Accredited or Sophisticated Investors.**

11        In order to invest in the Lancorp Fund, each investor was *required* to certify and

12   demonstrate that he or she qualified as either an "accredited" investor, or as a "sophisticated,

13   well-informed investor."  To qualify as an "accredited investor," an investor in the Lancorp Fund

14   had to demonstrate, in pertinent part, that he or she:

> is a natural person whose individual net worth, or joint net worth
> with that person's spouse, at the time of his purchase exceeds
> $1,000,000; [or] … is a natural person who had an individual
> income in excess of $200,000 in each of the two most recent years
> or joint income with that person's spouse in excess of $300,000 in
> each of those years and has a reasonable expectation of reaching the
> same income level in the current year; [or] … any trust, with total
> assets in excess of $5,000,000, not formed for the specific purpose
> of acquiring the securities offered, whose purchase is directed by a
> sophisticated person …

21   [Placement Memorandum, at 9 (*citing* Regulation D, 1933 Securities Exchange Act).]

22        To qualify as a "sophisticated, well-informed investor," the investor had to provide the

23   Lancorp Fund with "reasonable grounds to believe":

- That he is a sophisticated, well-informed investor and is able to understand and utilize the information contained herein, or is represented by a Purchaser Representative;

- That he or his Purchaser Representative has knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of the investment in the Trust;

- That he has financial strength and experience in investment

1   transactions and is able to bear the economic risk of the
    investment in the Trust; and

2

3   •   That he understands the necessity of compliance with the
        foregoing.

4   [Private Placement Memorandum, at p. i.]

5   Of the maximum 100 investors permitted in the Lancorp Fund, no more than 35 were to be "non-

6   accredited," but otherwise *sophisticated* investors.  [Id. at 9.]

7       As "accredited" or "sophisticated" investors, each investor also certified his or her

8   knowledge of the inherent risks involved with this private placement transaction.  Specifically,

9   they acknowledged that:

10  •   The [Lancorp Fund] is newly organized and has limited
        development capital and experience.

11

12  •   This investment is suitable only for investors having substantial
        financial resources and who desire at least a one-year
        investment.

13

14  •   Except for certain redemption rights, the Investor Shares will
        not be transferable.

15  •   The Investor Shares will have limited voting rights as specified
        in the Declaration of Trust and Bylaws.

16

17  [Private Placement Memorandum, at p. i.]

18      In other words, the investors were well aware of the risks associated with their

19  investments in the Lancorp Fund private placement.  This is reflected in the related transactional

20  paperwork.  Defendant Nemes, purportedly signing as "Trustee," certified that he was an

21  accredited investor, with a net worth of $4.5 million, either individually or jointly with his spouse,

22  and/or that he had an income of at least $200,000 individually or $300,000 jointly with his spouse

23  in each of the preceding two years, with a reasonable expectation of reaching the same income

24  level in the current year.  [Exh. E, Nemes' "Subscriber's Data Sheet"; Exh. F, Nemes'

25  "Accredited Investor's Letter".]  Defendant Benkert certified that he was an accredited investor

26  with a net worth of $1.9 million, either individually or jointly with his spouse, and/or that he had

27  an income of at least $200,000 individually or $300,000 jointly with his spouse in each of the

28  preceding two years, with a reasonable expectation of reaching the same income level in the

current year.  [Exh. G, Benkert's "Subscriber Data Sheet"; Exh. H, Benkert's "Accredited Investor's Letter".]  Defendant Jerry Thomas certified that he was an accredited investor with a net worth of $5 million, either individually or jointly with his spouse (Defendant Nancy Thomas). [Exh. I, Jerry Thomas' "Subscriber Data Sheet"; Exh. J, Jerry Thomas' "Accredited Investor's Letter".]  Defendant Nancy Thomas certified, in executing a subscription agreement, that she "has made other risk capital investments or other investments of a speculative nature, … by reason of [her] business and financial experience" and "has carefully evaluated [her] financial resources and investments and acknowledges that [s]he is able to bear the economic risks of this investment."  [Exh. K "Subscription Agreement," executed on August 14, 2003.]

### 2.  The Lancorp Fund Expressly Disclaimed Any Relationship With A Broker-Dealer, In Numerous Instances.

As accredited or sophisticated investors who executed their respective copies of the Private Placement Memorandum before Lancaster was affiliated with ONESCO, Defendants also acknowledged that the Lancorp Fund was managed exclusively by its Trustees and that it had no relationship of any kind with a broker-dealer or other investment advisor.  As stated at page 7 of the Memorandum, "[t]he Trust will not be managed like a typical closed-end investment company.  The Trust will be internally managed by the Trustees and *will not have any separate investment advisor*."

More importantly, the Private Placement Memorandum emphasized, in two separate instances, that investments in the Lancorp Fund were offered and sold *without the assistance of any broker-dealer or other selling agent*.  First, at page 4, the Memorandum expressly stated:

> This offering is a "best efforts" and "minimum-maximum" offering by the Trust, *without the assistance of any broker-dealer or any other selling agent*. . . .

[Private Placement Memorandum, at p. 4 (emphasis added).]

Then, at page 12, the Memorandum re-emphasized this specific point:

**No Broker-Dealer**

> The Investor Shares will be sold on a "best efforts" *by the Trust without the assistance of any broker-dealer or selling agent* subject to our right to reject any offer to purchase an Investor Share in

1    whole or in part.  There is no firm commitment on the part of the
2    Trust or any other party to purchase any of the Investor Shares not
     otherwise sold in this offering.

3    [Private Placement Memorandum, at p. 12 (emphasis added).]

4    In fact, if the investors sought the assistance of their own purchaser representative in

5    evaluating the merits of investing in the Lancorp Fund, they were required to:

6    complete and return to the Trust a Purchaser Representative
     Questionnaire … The Trust will [then] evaluate the qualifications of
7    each proposed Purchaser Representative and will notify the
     prospective investor as to the acceptability of such person as a
8    Purchaser Representative.  Each Purchaser Representative will be
     required to disclose to the prospective investor whom he represents
9    any past, present or proposed future relationship of such Purchaser
     Representative with the Trust or any of its subsidiaries, or any other
10   party of this offering.

11   [Private Placement Memorandum, at p. 9.]

12   It is evident from these numerous, express disclosures (all of which were made prior to

13   Lancaster's affiliation with ONESCO) that Defendants were aware that their investment in the

14   Lancorp Fund was sold directly by the Fund.  And Defendants were clearly aware that no broker-

15   dealer or any other selling agent had _any involvement_ in the sale of such investments.

16   **3.    Defendants Knew That Lancaster Was Not Acting On Behalf Of
         ONESCO.**
17

18   Also noteworthy are Lancaster's personal disclosures in the Private Placement

19   Memorandum, which made clear he was not affiliated with ONESCO.  Lancaster, as Trustee of

20   the Lancorp Fund, described himself in the following manner:

21   Gary L. Lancaster has spent the majority of his professional career
     in the specialized field of trust administration, financial consulting,
22   and asset management. He has been the Fund's Trustee since its
     formation on December 9, 2002. From 1995 to 1996, Mr. Lancaster
23   was a planning officer and retirement specialist handling
     investments, estate planning, and trusts with First Interstate Bank -
24   Wells Fargo/Stephens, Inc. From 1997 to 1999, he was an
     insurance specialist in investments, estate planning and trusts for
25   BA Financial Services, Inc. _Since 1999 Mr. Lancaster has been_
     _employed as a vice president of financial services and a financial_
26   _consultant of U.S. Bancorp, an affiliate of the Escrow Agent under_
     _this memorandum. Since June 1996, Mr. Lancaster has been the_
27   _owner of Lancorp Financial Group, LLC. Mr. Lancaster is an_
     _investment adviser registered with the Commission under the_
28   _Investment Advisers Act of 1940, as amended._

1  [Private Placement Memorandum, at p. 15 (emphasis added).]

2  Noticeably absent from this disclosure is *any mention of ONESCO*, or Lancaster's relationship

3  therewith. Indeed, at this point there was no such relationship.

4       Simply put, Defendants, who executed copies of the Private Placement Memorandum, had

5  no indication and, thus, *no reason to believe* that ONESCO had anything to do with the Lancorp

6  Fund or Lancaster's sale of investments therein. To the contrary, the above provisions reveal that

7  Defendants knew that their investment in the Lancorp Fund was a private placement, offered

8  directly by the Lancorp Fund and Lancaster as its Trustee, *without the assistance or authorization*

9  *of any broker-dealer, including ONESCO*.

10      **C.    Defendants' Purchases.**

11      Of course, Defendants never established any form of contractual or customer relationship

12  with ONESCO. Rather, all of their dealings were solely with Lancorp Fund. Moreover,

13  significantly, the information recovered to date by ONESCO reveals that Defendants entered into

14  the Subscription Agreements *prior to* Lancaster becoming an "associated person" of ONESCO.

15  Lancaster's registration with ONESCO was from March 23, 2004 to January 3, 2005, but the

16  Defendants executed their subscription agreements well before then.[3]

17      Defendant Nemes, purportedly signing in his capacity as Trustee of the Thomas Nemes

18  Trust, executed a subscription agreement with Lancorp Fund on or about July 15, 2003 – more

19  than eight months before Lancaster became affiliated with ONESCO. [Exh. L (Nemes

20  Subscription Agreement).] Defendant Benkert, purportedly signing as President and on behalf of

21  Shore 2 Shore Enterprises, Inc., executed a subscription agreement with Lancorp Fund on or

22  about June 23, 2003 – nine months before Lancaster became affiliated with ONESCO. [Exh. M

---

23  [3]    The First Amended Statement of Claim filed with the NASD avoids any mention of the events

24  occurring on or before March 23, 2004. This is not the first time a claimed event date in an NASD
   action pursued by Defendants' counsel has turned out to be wrong. In *Hornor, Townsend & Kent, Inc.*

25  *v. Hamilton*, 218 F. Supp. 2d 1369 (N.D. Ga. 2002), the same law firm representing Defendants in this
   case represented investors attempting to force arbitration against an NASD member. In the opinion

26  cited, the investors secured an order from the court denying a motion by Hornor Townsend, the
   plaintiff broker-dealer, for an injunction and allowing arbitration to proceed. The court's decision was

27  based on a sworn statement by the defendant investors that a transaction the investors claimed was
   subject to arbitration had occurred on October 1, 1999 – three weeks after the sales representative with

28  whom they had dealt became associated with Hornor Townsend.

1   (Benkert Subscription Agreement).] Defendants Jerry Thomas and Nancy Thomas, purportedly

2   signing in their capacities as Trustees of the Jerry J. Thomas and Nancy M. Thomas 1998 Inter

3   Vivos Trust, executed a subscription agreement with Lancorp Fund on or about August 14, 2003

4   – more than seven months before Lancaster became affiliated with ONESCO. [Exh. K (Thomas

5   Subscription Agreement).]

6         Under the terms of their respective contracts, Defendants' tendering of funds into escrow

7   operated to make their commitment to purchase shares "irrevocable" as of that date.

8   [Subscription Agreements, § 1(d).] It logically follows that any alleged material representations

9   that induced Defendants' execution of the subscription agreements (*i.e.*, their irrevocable

10  commitments to purchase) must have occurred on or before that date.

11        ONESCO's preliminary review reveals some activity post-execution of the Subscription

12  Agreements. Based on information recovered to date, however, the Defendants' subsequent

13  actions were premised on the same alleged misrepresentations and omissions that led to their pre-

14  March 23, 2004, contractual commitments, including the written materials and disclosures

15  received well before March 2004. At this point, ONESCO submits that Defendants' claims

16  relating to the pre-March 23, 2004, subscription agreements and the alleged misrepresentations

17  that induced Defendants' execution of them are not arbitrable under any circumstances, and

18  evidence that will be offered at hearing will demonstrate that any subsequent activity was

19  predicated on conduct pre-dating the execution of the Subscription Agreements. Specifically,

20  ONESCO anticipates that evidence to be gathered through discovery and offered at hearing will

21  demonstrate that subsequent representations, if any, were not new or material with respect to the

22  Defendants' investment decisions. Thus, as explained below, ONESCO has no obligation to

23  arbitrate these claims.

24        **D.     Defendants' Arbitration Action.**

25        On or about May 2, 2007, non-party Scott Walls and other Claimants, including

26  Defendants, filed an amended statement of claim as part of an action initiated with the National

27  Association of Securities Dealers, Inc. against ONESCO (Case No. 07-01378), wherein the

28  Claimants seek to hold ONESCO responsible for the alleged misrepresentations Lancaster made

1  in the Private Placement Memorandum, and other alleged misrepresentations and/or omissions

2  on the grounds that, generally, Lancaster was associated with ONESCO, and ONESCO

3  negligently supervised Lancaster.  Claims are brought under federal and state securities law, state

4  consumer protection statutes, and for breach of contract, common law fraud, breach of fiduciary

5  duty, and negligence and gross negligence.

6  ### III.    LAW AND DISCUSSION

7  In an action seeking to enjoin an arbitration proceeding, the traditional equitable criteria

8  for granting injunctive relief apply.  These factors are: "(1) a strong likelihood of success on the

9  merits; (2) the possibility of irreparable injury to the plaintiffs if injunctive relief is not granted;

10  (3) a balance of hardships favoring the plaintiffs; and (4) advancement of the public interest."

11  *Textile Unlimited, Inc. v. A..BMH and Co. Inc.*, 240 F.3d 781, 786 (9th Cir. 2001).  We address

12  each of these elements:

13  ### A.    ONESCO Has A Strong Likelihood Of Success On The Merits.

14  ####    1.    Arbitration Is Solely A Matter Of Contract, And Parties May Not
15  Be Forced To Arbitrate Disputes They Did Not Agree To Arbitrate.

16  The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.*, governs arbitration disputes

17  involving interstate commerce.  Although the public policy embodied in the FAA favors

18  arbitration in resolving disputes, above all:

19  > [A]rbitration is a matter of contract, and a party cannot be required
20  > to submit to arbitration any dispute which he has not agreed to so
>    submit.

21  [*AT&T Tech., Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986).][4]

22  Because arbitration is, at its core, a matter of contract, courts must take care to ensure that

23  they do not force a party to arbitrate a dispute that it never agreed to arbitrate.  "[T]he first task of

24  a court asked to compel arbitration of a dispute is to determine whether the parties agreed to

25

26  _____

27  [4]    California law is identical.  See *Pacific Investment Co. v. Townsend*, 58 Cal.App.3d 1, 9 (Ct. App. 1976) ("Arbitration is a matter of contract and a party cannot be required to arbitrate a dispute he has not agreed to submit.").

28

1  arbitrate that dispute." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,

2  626 (1985).

3       In *Volt Info. Sciences, Inc. v. Stanford Univ.*, 489 U.S. 468, 469 (1989), the United States

4  Supreme Court squarely recognized that "[a]rbitration under the act is a matter of consent, not

5  coercion, and parties are generally free to structure their arbitration agreements as they see fit …

6  [and] they may limit by contract the issues which they will arbitrate." *Accord*: *First Options of*

7  *Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995) ("Arbitration is simply a matter of contract between

8  the parties; it is a way to resolve disputes – but only those disputes – the parties have agreed to

9  submit to arbitration."); *Sanford v. Memberworks, Inc.*, 483 F.3d 956, 962 (9th Cir. 2007) ("It is

10  axiomatic that … a party cannot be required to submit any dispute which he has not agreed so to

11  submit."); *Wiepking v. Prudential-Bache Sec., Inc.*, 940 F.2d 996, 998 (6th Cir. 1991) ("An

12  agreement to arbitrate is a contract … [I]t does not prevent parties from agreeing to exclude

13  matters from arbitration if they so desire."). Thus, if one party seeks to force another to arbitrate

14  a dispute the parties did not agree to submit to arbitration, the proper remedy is to enjoin the

15  arbitration.[5]

16       **2.    Whether An Agreement To Arbitrate Exists Is For The Court To
            Decide.**

17

18       The question of "whether or not a company is bound to arbitrate, as well as what issues it

19  must arbitrate, is a matter to be determined by the Court." *Litton Fin. Printing Div. v. Nat'l*

20  *Labor Relations Bd.*, 501 U.S. 190, 208 (1991). *See also AT&T Tech.*, 475 U.S. at 649

21  (determining whether a contract creates a duty to arbitrate a particular matter is an issue for the

22  courts to decide); *Sanford v. Memberworks, Inc.*, 483 F.3d at 962 ("[C]hallenges to the *existence*

23  *of a contract as a whole* must be determined by the court … ."); *Three Valleys Mun. Water Dist.*

24  *v. E.F. Hutton & Co., Inc.*, 925 F.2d 1136, 1141 (9th Cir. 1991) ("The court must determine

---

25  [5]    In each of the following cases, for example, the courts issued injunctions to preclude arbitration
where the disputes at issue were not arbitrable. *Textile Unlimited*, 240 F.3d 781 (9th Cir. 2001); *LAWI/CSA*

26  *Consolidators*, 849 F.2d 1236 (9th Cir. 1988); *Six Clinics Holding Corp. v. Cafcomb Systems, Inc.*, 119
F.3d 393 (6th Cir. 1997); *Md. Cas. Co. v. Realty Advisory Bd.*, 107 F.3d 979 (2nd Cir. 1997); *Va. Carolina*

27  *Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113 (4th Cir. 1993); *United Offshore Co. v. Southern*
*Deepwater Pipeline Co.*, 899 F.2d 405 (5th Cir. 1990).

28

1  whether a contract *ever* existed; unless that issue is decided in favor of the party seeking

2  arbitration, there is no basis for submitting a question to an arbitrator.") (citation omitted).

3     **3.    No Agreement Exists Between the Parties To Arbitrate Their Disputes.**

4

5  As an initial point, Defendants do not contend – nor can they – that they have an express

6  agreement with ONESCO to arbitrate any disputes between them.

7     **4.    Defendants' Claims Are Not Arbitrable Under NASD Rules Because Defendants Were Not Customers Of ONESCO Or Any Of Its Associated Persons At The Time Of The Events Giving Rise To Their Claims.**

8

9

10     **a.    Defendants' Only Claimed Basis For Arbitrability Of This Dispute Lies In The NASD Rules.**

11  The only possible grounds for arbitration is that ONESCO is an NASD member and

12  Lancaster was an associated person with ONESCO between March 23, 2004, and January 3,

13  2005.  Under certain circumstances, the NASD Code of Arbitration Procedure can bind its

14  members to arbitrate claims with third parties. *See Kidder, Peabody & Co. v. Zinsmeyer Trusts*

15  *P'ship*, 41 F.3d 861, 863-64 (2d Cir. 1994).  To determine whether the Code governs this dispute

16  between Defendants and ONESCO, the Court must interpret the Code as it would a contract

17  under applicable state law, giving effect to the ordinary meaning of the language used. *See Perry*

18  *v. Thomas*, 482 U.S. 483, 492 n.9 (1987).

19  The applicable provision is Rule 12200 of the NASD Code, which governs whether a

20  matter is required to be arbitrated even in the absence of an express arbitration agreement:

21  Parties must arbitrate a dispute under the Code if:

22      • Arbitration under the Code is either:

23          (1) Required by a written agreement, or

24          (2) Requested by the customer;

25

26      • The dispute is between a customer and a member or associated person of a member; and

27

28      • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving

1    the insurance business activities of a member that is also an
     insurance company.

2

3    This section, like its predecessor Section 10301(a), "contain[s] two prerequisites before an

4    NASD member can be compelled to arbitrate. First, a complaining party must be a "customer" of

5    either the NASD member or an "associated person" of that member, and, second, the "dispute,

6    claim or controversy" must have arisen "in connection with the business of such member." *See,*

7    *e.g., Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 820 (11th Cir. 1993); *Gruntal & Co., Inc. v.*

8    *Steinberg*, 837 F. Supp. 85 (D.N.J. 1993) (same). Defendants cannot satisfy either of these two

9    prerequisites.

10                      b.     **Defendants Were Not Customers Of ONESCO, Nor Do**
                               **Their Claims Arise "In Connection With" The Business Of**
11                             **ONESCO.**

12   As against ONESCO, Defendants satisfy neither part of the two-prong test to arbitrate

13   their claims under Rule 12200.

14   *First*, they were not "customers" of ONESCO. In short, they kept no accounts, signed no

15   contracts, filled out no applications, indeed, had no contact whatsoever with ONESCO.

16   *Next*, because the first prong is not satisfied, the second prong of the test is not even

17   reached with respect to ONESCO. *See Wheat*, 993 F.2d at 820-21 (finding that because investors

18   were not Wheat First customers, "we do not reach the question of whether [the investors'] claims

19   arose 'in connection with the business' " of Wheat First). Nevertheless, *even if* the Court were to

20   consider the second prong, Defendants cannot satisfy it because there is simply no nexus between

21   Defendants' claims and the business of ONESCO. The Private Placement Memorandum

22   expressly states that the securities were not offered through a broker-dealer. ONESCO played

23   absolutely no role in the transactions in question. ONESCO did not authorize the transactions or

24   otherwise have any knowledge of the transactions before they occurred. None of the transactions

25   were effectuated through ONESCO. ONESCO is not identified anywhere in the Private

26   Placement Memorandum or in any of the written materials provided to Defendants by Lancaster.

27   Defendants' only contact was with Lancaster. There is no evidence Lancaster ever made any

28

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA 90017-5554

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION                    Case No. C07-03303 JF (RS)

representation, whether oral or written, concerning ONESCO to Defendants.  And, of course,

ONESCO received no compensation for any of the transactions.

Courts narrowly construe the second prong of the test, the "in connection with"

requirement, and they reject the notion that an investor may arbitrate _all_ of his or her transactions

with any NASD member, including those not made in connection with the member's business.

As the Eleventh Circuit explained in a recent case, "in the universe of member-customer disputes,

only a portion will arise in connection with the member's business and only those satisfy the

Code's arbitration provisions."  _Multi-Financial Sec. Corp. v. King_, 386 F.3d 1364, 1370 (11th

Cir. 2004).

**c.  Defendants Were Not Customers Of A Person Associated With ONESCO At The Time Of The Events Giving Rise To Their Claims.**

So, Defendants are forced to argue that they had a relationship with Lancaster.  It is not

enough, however, to allege having entered into a transaction with someone who was "associated"

with an NASD member at some other time.  Rather, as first held in _Wheat, First Securities, Inc. v._

_Green_, there must be a relationship between the investor and the member or associated person _at_

_the time_ of the relevant events or occurrences giving rise to the investor's claims.  "Customer

status" under the NASD Rules "must be determined as of the time of the events providing the

basis for the allegations of fraud."  993 F.2d at 820 ("customer" status for purposes of

arbitrability "_should be determined as of the time of the occurrence of events that constitute the_

_factual predicate for the causes of action contained in the arbitration complaint_").  As the _Wheat_

court explained: "We cannot imagine that any NASD member would have contemplated that its

NASD membership would require it to arbitrate claims which arose while a claimant was a

customer of another member merely because the claimant subsequently became its customer. …"

_See MONY Sec. Corp. v. Bornstein_, 390 F.3d 1340 (11th Cir. 2004) (Eleventh Circuit reaffirmed

that " 'customer status for purpose of' the NASD is 'determined as of the time of the events

providing the allegations.' "  _Id._ at 1345 (_citing Wheat_ at 820)).[6]

---

[6]    The _Bornstein_ court distinguished this case on its facts because "here, the investor was a customer at the time the events took place."  _Id._ at 1346.

SQUIRE, SANDERS & DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA  90017-5554

PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION                    Case No. C07-03303 JF (RS)

1  In *Wheat, First*, because the claimants "were not customers of Wheat First at the time of

2  the allegedly fraudulent … stock transactions," the court held they could not "invoke the NASD

3  Code to compel Wheat First to arbitrate." *Id.*  As a result, the court affirmed summary judgment

4  on Wheat First's declaratory judgment action, finding that Wheat First could not be compelled to

5  arbitrate. *Id.* at 815.

6  This legal proposition has been adopted by every court that has considered this issue,

7  including the Southern District of California in *Prudential Sec., Inc. v. Dusch*, 1994 WL 374425

8  (S.D. Cal., Mar. 28, 1994) (Exh. P).[7]  On point with the instant case is *Hornor, Townsend & Kent,*

9  *Inc. v. Hamilton*, 2004 WL 2284503 (N.D. Ga., Sept. 30, 2004) (Exh. N), where the court granted

10  summary judgment to the NASD member, holding that it could not be compelled to arbitrate

11  claims based on investors' transactions with a sales agent that were premised on alleged

12  _____

13  [7]  In *Duscsh*, the investor made investments in accounts established with another NASD member
while her stockbroker (the associated person) was associated with that NASD member. Later, Prudential

14  acquired the assets of that NASD member, and the associated person with whom the investor had been
dealing moved to Prudential, along with the investor's accounts. Then, additional transactions were

15  made. The court agreed with Prudential that it was not required to arbitrate claims based on investments
made before the investor's accounts were moved to Prudential. Following Wheat, the court held that these

16  claims were not arbitrable because they arose when the investor was not yet a customer of Prudential. *Id.*
at *2. *cf.* *World Group Sec. v. Ko*, 2004 1811145, at *6 (N.D. Cal., Feb. 11, 2004) (holding under similar

17  NASD Rule 10201 that an associated person had no claim against member from based on contractual
relationship and events occurring before the person was associated with the member).

18  Other courts have reached this same conclusion. In *Sands Bros. & Co., Ltd. v. Ettinger*, 2004 WL

19  541846 (S.D.N.Y., Mar. 19, 2004) (Exh. R), the investor sought to arbitrate claims against an NASD
member based on the conduct of an associated person with whom she had dealt. But the investor's

20  problem was that the transactions occurred *before* the associated person was associated with the member
against whom arbitration was sought. The court followed *Wheat* and concluded that, "Ettinger cannot

21  compel Sands to arbitrate her losses stemming from activity in her account before the account was
acquired by Sands. To the extent [the associated person with whom the investor had dealt] engaged in

22  misconduct with respect to her account while at [predecessor brokerages], Ettinger cannot require Sands to
arbitrate that claim under the theory that she became a 'customer' of Sands thereafter." *Id.* at *3. *See also*

23  *Sands Bros. & Co., Ltd. v. Alba Perez Ttee Garcia Revocable Trust*, 2004 WL 2186574, at *4 (S.D.N.Y.,
Sept. 28, 2004) (Exh. S) (same result as to a different claimant).

24  And in *Ryan, Beck & Co. v. Fakih*, 268 F. Supp. 2d 210 (E.D.N.Y. 2003), the Eastern District of
New York rejected an investor's attempt to arbitrate over a transaction that took place *after* the investor

25  ceased to be a customer of the NASD member, Ryan Beck. There, the investor had terminated his
investment relationship with a brokerage that was the predecessor to Ryan Beck. Later, after Ryan Beck

26  acquired the assets of that brokerage, the investor sought to arbitrate claims against Ryan Beck based on
transactions occurring in his account while it was with the previous brokerage.

1    misrepresentations that occurred before the agent became associated with the member.  In

2    *Hornor*, the facts showed that the investors had made a securities transaction based on alleged

3    representations made at least <u>*two months*</u> before the agent became associated with Hornor

4    Townsend, the NASD member.  Claims arising from those events, therefore, were held not

5    arbitrable.  The court explained that, "if the sale occurred at a time when [the associated person]

6    was not employed by [the member], the latter cannot be hauled into an arbitration proceeding …

7    ."  *Id.* at *3 (citing 2003 WL 23832424, at *4 (earlier ruling in same action)).

8            In another case involving similar facts, *Gruntal & Co., Inc. v. Steinberg*, 854 F. Supp. 324

9    (D.N.J. 1994), the court applied *Wheat* to enjoin arbitration, concluding that the investors who

10   were pursuing arbitration were not customers for purposes of an NASD arbitration.  There, as

11   here, the pertinent events occurred before the investors became customers of the broker-dealer.

12   "Like the acts of fraud involved in *Wheat*," the court reasoned, "<u>*the misconduct which is the*</u>

13   <u>*subject of the Arbitration Proceedings took place, in its entirety at least two months before the*</u>

14   <u>*Steinbergs became customers of Gruntal*</u>."  *Id.* at 340 (emphasis added).

15           The *Gruntal* court added that the second prong of the arbitrability test also could not be

16   met:  "The claims at issue in the Arbitration Proceedings, moreover, did not arise 'in connection

17   with the business of' Gruntal, as is required by the NASD Code of Arbitration Procedure.  As

18   indicated, the Arbitration Proceedings relate to acts and omissions occurring over two months

19   before Gruntal had any relationship to the Steinbergs."  *Id.* at 341.

20                      d.      **Applying The Settled Rule Of *Wheat* To The Facts,**
                             **Defendants May Not Arbitrate Their Claims Against**
21                             **ONESCO.**

22           Applying the rule of <u>Wheat</u> and its progeny to the facts of this case produces exactly the

23   same result:  Defendants irrevocable commitments to purchase all occurred well before March 23,

24   2004, and were premised on alleged misrepresentations and/or omissions that occurred before that

25   date – before Lancaster became an "associated person" of ONESCO.

26           ONESCO submits that any activity after Defendants' execution of their respective

27   Subscription Agreements appears to have been based on the same operative facts relating to the

28   Subscription Agreements and any misrepresentations prior thereto – or what the <u>Wheat</u> court

SQUIRE, SANDERS &
DEMPSEY L.L.P.
801 South Figueroa, 14th Floor
Los Angeles, CA  90017-5554

described as the same "*occurrence of events that constitute the factual predicate for the causes of action*." 993 F.2d at 820. *See also Malhotra v. Equitable Life Assurance Society of the United States*, 364 F. Supp.2d 299, 305-06 (E.D.N.Y. 2005) (subsequent investment decisions, for purposes of claims premised on fraud and misrepresentation, do not constitute relevant events or occurrences – for purposes of timeliness – unless premised on "*new and materially different*" omissions) (emphasis added); *Northwestern Human Services, Inc. v. Panaccion*, 2004 WL 2166293, at *18 (E.D. Pa. Sept. 24, 2004) ("As a matter of simple logic, any misrepresentation of omission must have occurred on or before the date of sale.") (Exh. T).

In summary, ONESCO "cannot be hauled into an arbitration proceeding" based on the occurrence of events (specifically, alleged misrepresentations by Lancaster) that occurred before he became associated with ONESCO. *Hornor*, 2004 WL 2284503, at *3. Indeed, an NASD member "could not have supervised [the associated person] at a time before [the associated person] became employed with" the NASD member. *Hornor, Townsend & Kent, Inc. v. Hamilton*, Case No. 1:01-cv-02979 (N.D. Ga., Sept. 6, 2005) (slip op., at 12) (Exh. O). As *Wheat* reasoned, "we cannot imagine that any NASD member would have contemplated that its NASD membership would require it to arbitrate claims … merely because the claimant subsequently became its customer." 993 F.2d at 820.

### B. ONESCO Would Suffer Irreparable Harm If Forced To Arbitrate A Dispute It Has Not Agreed To Arbitrate, And Defendants Can Show No Countervailing Hardship.

The Ninth Circuit has clearly spoken that a party is caused irreparable harm if it is forced to arbitrate a dispute where it had no contractual obligation to do so. *See LAWI/CSA Consolidators, Inc. v. Wholesale & Retail Food Distribution, Teamsters Local 63*, 849 F.2d 1236, 1241 n.3 (9th Cir. 1988) (holding that party was entitled to injunctive relief once it established that it was not under a contractual duty to arbitrate). *Accord*: *Merrill Lynch Investment Managers v. Optibase, Ltd.*, 337 F.3d 125, 129 (2nd Cir. 2003) (unless arbitration is enjoined, movant would suffer irreparable harm by being forced to expend time and resources arbitrating an issue that is not arbitrable and as to which any award would not be enforceable); *MONY Sec., Inc. v. Vasquez*, 238 F. Supp. 2d 1304, 1308 (M.D. Fla. 2002) ("This Court has continuously held that irreparable

1  harm is present if a party is compelled to arbitrate a claim absent an agreement between the

2  parties to arbitrate).

3          In light of this law, the balance of hardships tips completely in ONESCO's favor, because

4  if Defendants have no right to an arbitration, they will suffer no hardship at all by having to

5  litigate their disputes in court like every other litigant who lacks an agreement to arbitrate.

6     **C.**     **The Public Interest Is Advanced By Not Forcing Parties To Arbitrate Their**
       **Disputes Where They Never Agreed To Arbitrate.**
7

8          Although it is often said that public policy favors arbitration of disputes, that is true only if

9  the parties have agreed to arbitrate in the first instance.  Arbitration is a creature of contract, and

10  if the parties never had a contract to arbitrate their disputes, then no public interest is advanced by

11  compelling them to arbitrate.  Where a court finds that no agreement to arbitrate exists, they do

12  not linger on this factor for even a moment because the public interest is obviously served when a

13  party is not forced to arbitrate a dispute that it never agreed to arbitrate.

14               **IV.     CONCLUSION**

15          For the foregoing reasons, ONESCO seeks preliminary injunctive relief (1) enjoining the

16  Defendants from further proceedings in the NASD actions; and (2) enjoining the Defendants from

17  filing any arbitration claims before the National Association of Securities Dealers, Inc. against

18  ONESCO relating to the Lancorp Fund, and requests that the Court schedule a hearing on

19  ONESCO's preliminary injunction motion at a date and time which will allow the parties to

20  conduct reasonable discovery into these issues prior to the hearing.

21

22                              Respectfully submitted,

23  Dated: August 31, 2007        ZEIGER, TIGGES & LITTLE LLP

24

25                              By:_____/s/_____
                                          Michael R. Reed
26

27                              Attorneys for Plaintiff
                                THE O.N. EQUITY SALES COMPANY
28

1

## PROOF OF SERVICE
(Pursuant to Federal Law)

2

3    The undersigned certifies and declares as follows:

4    I, Kim Nhung Phan, am a resident of the State of California and over 18 years of age and am not a party to this action. My business address is One Maritime Plaza, Suite 300, San Francisco, California 94111-3492, which is located in the county where any non-personal service described below took place.

5

6

7    On August 31, 2007, a copy of the following document(s):

8    **PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES**

9    were served via United States District Court Electronic Filing Service on the party(ies) as set forth below:

10

11    Joel A. Goodman
      Goodman & Nekvasil, P.A.
      Email: gn.law@verizon.net

12

13    Richard Angelo Kutche
      Law Offices of Richard A. Kutche
14    Email: rakutche@pacbell.net

15    Attorneys for all Defendants.

16

17    I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. Executed on August 31, 2007, at San Francisco, California.

18

19                                    */s/  Kim Nhung Phan*
                                      KIM NHUNG PHAN

20    SANFRANCISCO/229480.4

21

22

23

24

25

26

27

28