Exhibit 2

1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3        *HONORABLE JOHN F. WALTER, U.S. DISTRICT JUDGE*

4                    - - -

5    THE O.N. EQUITY SALES COMPANY,        )
                                           )
6                         Plaintiffs,      )   Case No.
                                           )
7             vs.                          )   CV-07-3170-JFW
                                           )
8    DEAN K. STEINKE, et al.,              )
                                           )
9                         Defendants.      )
     _____ )

10

11

12

13

14              *REPORTER'S TRANSCRIPT OF*
                **SCHEDULING CONFERENCE**
15              *MONDAY, JULY 16, 2007*
                     *8:30 A.M.*
16              *LOS ANGELES, CALIFORNIA*

17

18

19

20

21

22

23        ***VICTORIA L. VALINE, CSR 3036, RMR, CRR***
             FEDERAL OFFICIAL COURT REPORTER
24          312 NORTH SPRING STREET, ROOM 440
            LOS ANGELES, CALIFORNIA  90012
25              PHONE:  (213) 625-1580
              victoria.valine@sbcglobal.net

1                        *APPEARANCES OF COUNSEL:*

2


3     *FOR THE PLAINTIFFS:*

4              ZEIGER, TIGGES & LITTLE, LLP
               Attorneys at Law
5              BY:  Michael R. Reed, Esq.
               3500 Huntington Center
6              Columbus, Ohio  43215
               (614) 365-9900     (614) 365-7900 Fax
7
               SQUIRE SANDERS
8              Attorneys at Law
               BY:  Michael T. Purleski, Esq.
9              555 South Flower Street, Suite 3100
               Los Angeles, California  90071-2300
10             (213) 689-5149     (213) 623-4581 Fax

11


12


13    *FOR THE DEFENDANTS:*

14             GOODMAN & NEKVASIL, P.A.
               Attorneys at Law
15             BY:  Joel A. Goodman, Esq.
               14020 Roosevelt Boulevard, Suite 808
16             Clearwater, Florida  33762
               (727) 524-8486     (727) 524-8786 Fax

17


18


19


20


21


22


23


24


25


UNITED STATES DISTRICT COURT

```
 1            LOS ANGELES, CALIFORNIA;  MONDAY, JULY 16, 2007

 2                         8:30 A.M.

 3                           - - -

 4            THE CLERK:  Calling item 1, CV-07-3170-JFW, The

 5    O.N. Equity Sales Company versus Dean K. Steinke, et al.

 6            Counsel, please state your appearance.

 7            MR. REED:  For plaintiff, it's Michael Reed, and

 8    I have with me this morning Mike Purleski.

 9            MR. GOODMAN:  Good morning, your Honor.  Joel

10    Goodman representing the defendants, the investors,

11    Steinke, et al.

12            THE COURT:  All right.  Good morning to all.

13    This matter is on the Court's calendar for a scheduling

14    conference.

15            I have reviewed the joint report that has been

16    filed by the parties.  It seems to me -- and I'll hear

17    from the plaintiff -- that the defendants' position in

18    this case, at least at this point in time, is appropriate

19    and well-taken.  And, that is that this is an action that

20    seeks to restrain the arbitration that has been instituted

21    or filed before the NASD.

22            I understand the plaintiffs' position, that they

23    had nothing to do with the investment.  The investment was

24    made by the various investors, or defendants in our case,

25    based upon a private placement memorandum that
```

1    Mr. Lancaster, I believe his name is, is the registered

2    rep, and the plaintiffs had no involvement in that private

3    placement memorandum.  And, it appears that after the

4    funds were raised by Mr. Lancaster, he invested them in

5    a -- in what's referred to as something -- as a Ponzi

6    scheme, and I assume that by that reference that all of

7    those investor funds were lost.

8         So, I don't know why -- and it's an interesting

9    issue, and I have -- the issue being whether or not this

10   matter is ultimately going to be arbitrated before the

11   NASD.  I couldn't find any Ninth Circuit cases, but I did

12   find a Fourth Circuit case, the Washington Square

13   Securities versus -- the last name is spelled A-U-N-E --

14   which upheld the District Court decision in that case to

15   permit an arbitration under the NASD.

16        The facts are remarkably similar to this case.

17   The same allegation was made by the broker/dealer, and

18   that was the broker/dealer didn't have anything to do with

19   the investment, but unfortunately, the registered rep, as

20   in this case, was associated with the plaintiff.

21        So, it seems to me that the best procedure -- and

22   I don't know why counsel haven't already filed it -- is

23   the plaintiff wants to file a motion for a preliminary

24   injunction, and the defendant wants to file a motion to

25   compel arbitration.  And, it seems to me that it's a

1   question of law for the Court to decide.  And, those

2   motions, if they haven't already been filed -- and I

3   haven't seen any evidence that they have been -- should be

4   filed immediately so we can have a resolution of the

5   issue.  I suggest that you have -- set them for hearing on

6   the same date.

7          What I intend to do is continue the scheduling

8   conference in this case to the date for the hearing on

9   respective motions for preliminary injunction and to

10  compel arbitration.  So, that's my view.

11         And, I don't think there's any discovery that

12  needs to be done for the Court to decide either of these

13  motions.  If I decide the motion to compel arbitration,

14  obviously the motion for preliminary injunction is going

15  to be -- is going to be moot.

16         So, that's my view.

17         MR. REED:  Thank you, your Honor.

18         We will be filing a motion for preliminary

19  injunction today or tomorrow at the latest.  We have it in

20  the hopper.

21         The defendants did file a motion to compel

22  arbitration, I believe, this past Friday.

23         MR. GOODMAN:  July 12th, yes, sir.

24         MR. REED:  And, the two motions, as the Court has

25  recognized, are basically the flip side of the same coin

1    and they should be decided together.

2          THE COURT:  Well, you haven't filed yours yet.

3    What's your hearing date?

4          MR. GOODMAN:  We picked the first hearing date --

5          MR. REED:  October 1st, I think.

6          MR. GOODMAN:  October 1st, may I say.

7          THE COURT:  Why is October 1st the first hearing

8    date?

9          MR. GOODMAN:  Only because -- I'd be happy to do

10   it tomorrow.  I only -- we only picked it -- and I'm happy

11   to advance it any date the Court can hear it.

12         THE COURT:  I can hear it any Monday.  I don't

13   know why you think that -- as long as you give the

14   statutorily required notice, I can -- I can hear it.

15   There's no magic to -- certainly no magic to October.  I

16   think it's in everybody's interest to have the issue

17   resolved immediately so that -- what's the status of the

18   arbitration?

19         MR. GOODMAN:  The -- if you will, we actually had

20   what's called a scheduling conference this past Friday, I

21   believe, and the arbitration has been set with

22   discovery -- discovery hearings are set for -- is it

23   October?  I think it's a date in October -- a discovery

24   pre-hearing conference, coupled with a final trial date, I

25   believe it was in May -- the first week in May; am I

1    right, Mike?

2         MR. REED:  I think they had two, May and June.

3         MR. GOODMAN:  We set aside two weeks, but we

4    believe -- both sides believe that is in May.

5         So, the progress -- the arbitrators have been

6    appointed, discovery within that, arbitration has already

7    been initiated, with an actual hearing date in October for

8    discovery, followed by other dates, but with a final trial

9    date in May, certainly.

10         THE COURT:  Have you read this Fourth Circuit

11    case?

12         MR. REED:  Um -- your Honor, I recognize the

13    name.  When -- and they had just filed -- I don't know if

14    it was in his papers, you mention that in that case the

15    customer was not a customer of the broker/dealer, but was

16    a customer of the affiliated representative?

17         THE COURT:  Well, customer is the, I guess a --

18    the term of art.  He certainly -- as I understand the

19    issue, it's really your client had nothing to do with this

20    investment.

21         The allegation is:  What did your client do,

22    pursuant to the various requirements of your client when

23    you have a registered representative, in terms of

24    supervision -- I guess there's a negligent hiring claim,

25    whether or not he parked his license, what he was doing

1    when he wasn't selling on behalf of your client, and all

2    those issues.  I understand it has nothing to do with the

3    investment, but it seems to me that those were the same

4    issues -- and I don't want to -- I don't remember because

5    I read the case yesterday -- I don't remember if they were

6    a quote customer or not, but it was the same situation

7    where the registered rep, apparently, was out on his own

8    doing something and they sought to tag the broker/dealer

9    with responsibility for that which this registered rep

10   did, because of his status as a registered rep.

11        So, it seemed to me, based upon that case and the

12   analysis that the District Court went through, and

13   certainly the Fourth Circuit went through, that -- that it

14   was -- and I couldn't find any -- well, you filed your

15   motion; did you find any Ninth Circuit cases?

16        MR. GOODMAN:  No.  Not directly on point, but,

17   may I say, I was on that Aune case, I was the counsel for

18   the investors.  The Eleventh Circuit, *Multi-Financial vs.*

19   *King*, K-I-N-G, that citation, your Honor, is -- I've got

20   it here 386 F. 3d 1364 --

21        THE COURT:  Well, you don't have to give them to

22   me, I assume they're all in your motion.

23        MR. GOODMAN:  They are.

24        THE COURT:  What I didn't understand about the

25   Fourth Circuit case, they said these are issues of first

1    impression in the circuit.  And, as the District Court

2    noted, federal courts are divided over the ability to

3    arbitrate these disputes between NASD member and investors

4    who conduct transactions through an associated person of

5    the member, and they go through and cite a Second Circuit

6    case, a Sixth Circuit case, a Fifth Circuit case, and a

7    District Court case in Florida, but they all hold that

8    arbitration was appropriate.  So, I don't know what the

9    conflict is.

10            MR. GOODMAN:  Actually, respectfully, because our

11    firm has done so many of these, the Second Circuit case

12    which is, *John Hancock vs. Wilson* --

13            THE COURT:  Right.

14            MR. GOODMAN:  -- as well as the Fourth Circuit

15    case, the *Herron* case in the Fifth Circuit, I've mentioned

16    the Fourth Circuit, the Eleventh Circuit in

17    *Multi-Financial*, without -- without any exception, every

18    circuit so far -- and we have not come out to the Ninth

19    Circuit as yet --

20            THE COURT:  Well, welcome to the land of the

21    Ninth Circuit.

22            MR. GOODMAN:  Well, we --

23            THE COURT:  Because, whatever happens -- in any

24    event, welcome to the land of the Ninth Circuit.

25            MR. REED:  We're happy to be here, your Honor.

UNITED STATES DISTRICT COURT

1          One thing I would say, your Honor, those cases

2     deal with a situation where the time period when the

3     investment was made, was during the time period that the

4     broker/dealer had the associated person with them.

5          In this case, these people signed the

6     subscription agreement and representations were made to

7     them regarding the investment before Mr. Lancaster was

8     with Onesco -- with my client.  He came in -- so, what

9     we're saying is, everything that occurred that the

10     defendants relied on in making their investment and they

11     signed the subscription agreement, all that occurred

12     before Lancaster was an Onesco person.  So, therefore, we

13     could not be held responsible for that.

14          And, also under the NASD rule requiring

15     arbitration along the lines of the case law that you said

16     where -- even though they are not a customer of the

17     broker/dealer, if they dealt with an associated person,

18     you still must arbitrate those claims -- the negligent

19     hiring, lack of supervision, those types of issues.

20     However, if the investment in the representations in the

21     conduct giving rise to the claim occurred prior to the

22     person becoming associated with the broker/dealer, then it

23     would not be covered by the NASD rules.  That is our

24     theory.

25          THE COURT:  When did he lose the money, after he

1    became a registered rep or before?

2        Were the investments -- were the investments

3    made, or were the -- yeah, were the investments made by

4    the investors and he turned around and invested in

5    whatever it was -- this mega fund or something, was that

6    investment made -- was he -- as I understand, he was

7    acting as trustee of whatever this entity was that he had

8    created, or someone created, for purposes of the private

9    placement memorandum that raised the funds from these

10   investors.  So in terms of timing, I understand your

11   position that the private placement memorandum was

12   delivered, the investors signed up, and they made their

13   investment presumably before he became associated with

14   your client.

15       Did he also lose the money that he had taken from

16   those investors before he came to your shop -- or your

17   client's shop, or was it during the course of time that he

18   was employed there?

19       MR. GOODMAN:  During --

20       MR. REED:  Your Honor, it would have been

21   their -- I believe it was, the investment was made before

22   he became the customers' investment.  As far as what he

23   did with the money, that is not as clear to me.  But, I

24   think probably he made the second investment in the mega

25   fund entity after he became involved with us.

1          MR. GOODMAN:  Your Honor --

2          THE COURT:  In any event, I -- I know we're going

3     to be -- it's an interesting issue, and I'm sure that

4     the -- the briefing on the issue will be -- will be

5     enlightening.  But, it seems to me that -- you have --

6     sounds like you have a pretty good defense in the

7     arbitration, why not just -- why not just defend the

8     case?

9          MR. GOODMAN:  Actually, your Honor, that's --

10    you've hit the nub of what the point is.  While we have

11    specific documents signed by the investors, we can call

12    them -- in April 2004 when he was licensed, we attached

13    it, it was signed, people can get their money back, and

14    they were asked for it because it was a complete -- the

15    investment changed its nature one hundred percent, and

16    it's in a letter sent, and asked each investor to

17    acknowledge, did they want their money back or not, that

18    was during the time.

19          You've hit the nail on the head.  We have alleged

20    events that occurred during -- including supervision that

21    occurred during the time he was an associated person

22    licensed by Onesco, that's just a fact objectively.

23          THE COURT:  What kind of disclosure would have to

24    be made -- I forget -- it's been so long, what the form is

25    that the --

1      MR. GOODMAN:  The --

2      THE COURT:  When he signs up with the

3   broker/dealer, the disclosures, aren't there -- aren't

4   there disclosure -- wouldn't this be an item that should

5   have been disclosed on that form?

6      MR. GOODMAN:  Actually, it was -- it's called an

7   outside business disclosure form to be blunt.  There were

8   two of them -- we attached it to our motion to compel --

9   one of which announced that he's running a company called

10  Land Corp., and he was authorized by Onesco to go ahead

11  and do it.  He then created something called Land Corp.

12  Fund which is the investment involved here, which he

13  filled out and said hey, I've got to fill out a form,

14  where do I get this.  He filled it out, sent it in to

15  Onesco.  Now, that's -- we have, including a declaration

16  from Lancaster saying I sent it in.  They never said don't

17  do it, so naturally, I assumed I could do it.  If there

18  were, otherwise, if they simply -- and he says if they

19  told me don't do it, I would have given everybody's money

20  back and I wouldn't.  So, they had the opportunity, and

21  that's our case, so --

22      THE COURT:  What do you mean he would give

23  everybody's money back?

24      MR. GOODMAN:  He said literally if he was told,

25  I'm about to do this thing --

1           THE COURT:  Oh, I see.  Before he invested in the

2    Ponzi scheme, he was -- okay.  I understand.

3           MR. GOODMAN:  So, the whole point --

4           MR. REED:  And, your Honor --

5           MR. GOODMAN:  -- of the crux of the case boils

6    down to events that occurred during the time he was

7    licensed, and then what happened thereafter, that's an

8    issue of liability.  Remember, you heard the

9    responsibility word from Mr. Reed, that's an issue of

10   liability not arbitrability.  The cases --

11          THE COURT:  No.  I understand that.

12          MR. REED:  I'm sorry.

13          THE COURT:  I understand the -- I have --

14          MR. GOODMAN:  I'm just going to add --

15          THE COURT:  -- in my prior life handled -- not

16   many, but several of these NASD arbitrations.

17          MR. GOODMAN:  We can pick a date earlier, and

18   I'll speak to Mr. Reed.

19          THE COURT:  How many arbitrators are they using?

20          MR. GOODMAN:  Three.

21          MR. REED:  Three.

22          THE COURT:  Still three.  Where is the location?

23          MR. GOODMAN:  Seattle.

24          THE COURT:  You're from?

25          MR. REED:  Columbus, Ohio.

1          THE COURT:  So, where's the center?

2          MR. GOODMAN:  Seattle, Washington is where the

3     hearing is.

4          MR. REED:  Your Honor, there are about 13, 14, 15

5     arbitrations Mr. Goodman has filed all across the country

6     dealing with various --

7          MR. GOODMAN:  Wait.  No, there are --

8          THE COURT:  Wait a minute.  Don't interrupt him.

9          MR. GOODMAN:  I'm sorry, your Honor.

10          MR. REED:  -- with various investors, numerous

11     arbitrations have been filed.  If I may briefly, your

12     Honor --

13          THE COURT:  What are we talking about in terms of

14     the total loss on this -- do all these different

15     arbitrations relate to the Lancaster investment?

16          MR. REED:  Yes.

17          MR. GOODMAN:  Every one.

18          THE COURT:  What's the total loss?

19          MR. GOODMAN:  Total dollars of everybody?

20          THE COURT:  Yes.

21          MR. GOODMAN:  I would estimate in the range of 10

22     and $15 million, sir.

23          MR. REED:  Through Lancaster?

24          MR. GOODMAN:  Through Lancaster.

25          THE COURT:  Pales by comparison, compared to what

1    the Arch Diocese is paying as a settlement.

2         MR. REED:  Your Honor, if I could --

3         THE COURT:  Sure.

4         MR. REED:  -- please.  Mr. Goodman had said that

5    the investment had changed one hundred percent, I think he

6    said in April.  And, what happened, there was some

7    insurance issue where it was just substituted, it was not

8    a hundred percent change, it was just a different entity

9    came in and provided, supposedly, insurance coverage for

10   these people.

11        Also, on the disclosures, there was the U4 that

12   was filed, and what Mr. Lancaster told Onesco was that he

13   would oversee fund manager and CPA firm, which is hardly

14   full and fair disclosure of what he was doing out there.

15        THE COURT:  Where is Mr. Lancaster now?

16        MR. REED:  He, I believe, is still in Washington.

17   Mr. Goodman will know better --

18        MR. GOODMAN:  Physically -- I believe he is in

19   Washington, that's correct.

20        THE COURT:  Has he filed for bankruptcy?

21        MR. GOODMAN:  Not that I'm aware of.

22        THE COURT:  Does he have any money?

23        MR. GOODMAN:  Not that I'm aware of.

24        THE COURT:  Is he working with your investors?

25        MR. GOODMAN:  Actually, no.  He has provided,

1    initially, documents to Onesco's attorney, Mr. Reed and

2    his firm first, and then we later contacted him and he

3    provided the same documents, which included this

4    April 2004 critical document that we believe actually was

5    the actual nature of the investment itself -- and we have

6    case law on that point, but to answer your question, he

7    is --

8         THE COURT:  All right.  I'm going to rely on

9    counsel to -- to coordinate the hearing dates.  And, when

10   you -- when you -- the plaintiff filed their -- your

11   motion for preliminary injunction, don't set it for an

12   October date, set it for an earlier date that's consistent

13   with the notice requirements, and then enter into a

14   stipulation advancing your motion to compel arbitration to

15   the same date, because I don't want to look at this twice.

16        MR. REED:  Sure.

17        THE COURT:  And then, it seems to me we'll -- and

18   you can put it on any Monday, and I'll -- I'll review it

19   and make a ruling, and then you'll either be here -- I

20   guess you won't be here -- so what -- what do you want the

21   investors to do?

22        Do you want them to sue you and you want an

23   opportunity to litigate that outside the -- the NASD

24   arbitration?

25        I thought that the NASD arbitration -- the

UNITED STATES DISTRICT COURT

1    arbitrators, in my experience, had always been fairly

2    friendly to the -- to the broker.  To me it's a better

3    forum than coming into, for example, this court and having

4    a jury determine -- determine the case because it's --

5    these are tough cases.  You want somebody in the industry

6    who understands.

7         MR. REED:  Yes, your Honor.  I -- we would trust

8    the Court to decide this issue if the defendants decide

9    they have not put any merit issues before the Court at

10   this time, but certainly we would -- we would trust the

11   Court to make the proper decision on this.

12        THE COURT:  I'm certainly going to make the

13   proper decision consistent with what the Ninth Circuit

14   tells me ultimately I did or I didn't do.  But, I'm going

15   really beyond what's before me, and that is that I'm

16   trying to understand -- maybe NASD arbitrations have

17   changed since I participated in them, but I represented a

18   broker and we were -- I can't remember one that we lost.

19   And, we were -- always wanted to be in front of those

20   arbitrators who had experience in the securities industry,

21   who had some -- some degree of familiarity.

22        Don't they -- these are all industry members,

23   right?

24        MR. GOODMAN:  No.

25        MR. REED:  No, just one.

UNITED STATES DISTRICT COURT

1          MR. GOODMAN:  Two public, one industry, your

2     Honor, customer case.  In an industry, broker versus firm

3     or vice-versa, that it would be three industry; but, in a

4     customer, there would be two public arbitrators, one

5     industry-related.

6          THE COURT:  Because we had one involving a

7     broker/dealer who's -- one of his offices was in Northern

8     California -- or its offices in Northern California were

9     raided by another -- another company, and I remember we

10    had -- we had three gentlemen who were in the industry,

11    and they -- I thought they were excellent since --

12         MR. REED:  Sure.

13         THE COURT:  -- since we prevailed in the case.

14         MR. REED:  Your Honor --

15         THE COURT:  Yes.

16         MR. REED:  -- also, real briefly.  As far as the

17    discovery issue goes, we would like just limited discovery

18    focused and limited solely on the issue of arbitrability

19    in this case.

20         THE COURT:  To me it's a matter of law.  I can

21    decide it -- if, after you file your motion, you can --

22    you can apply to the Court to -- or you can apply now to

23    the Court and set out for me exactly what the discovery is

24    that you want to take, and I'll decide, but I just don't

25    see that any discovery, based upon -- I -- I spent some

1    time with the file yesterday and understand the issue

2    that's being presented.  It seems to me that it's an issue

3    of law that I can decide.

4        So, I'm not going to -- I'm not inclined to -- in

5    fact, I am not going to allow you to conduct any

6    discovery.  I'm going to look at these motions, and then

7    if I see if there is any need for any discovery that I

8    can't -- that I don't feel I can properly resolve these

9    motions without any discovery, then I'll reconsider.  But,

10   right now let's gin up the motions and I'll take a look at

11   them.

12       And, include in your motion what it is you think

13   you need discovery on.  And then I'll -- in connection

14   with looking at the motion, I'll consider that request.

15       MR. REED:  You would like that folded into the

16   motion?  Or should we file --

17       THE COURT:  No.  Fold it into the motion.  Go

18   ahead and file the motion and indicate in the motion if

19   you were allowed the discovery, you would -- you would

20   present evidence of such and such, but to me there are

21   really no issues that are a secret.  All of the

22   documents -- I assume now that the arbitration has been

23   instituted, are available to everyone and it's just going

24   to be a legal argument.

25       MR. GOODMAN:  Thank you, your Honor.  Thank you

1    for your time, sir.

2         THE COURT:  All right.  So, we will continue the

3    scheduling conference to the date that ultimately is the

4    date for the hearing on the motion for preliminary

5    injunction and the motion to compel arbitration.  And,

6    you'll get together and put it on for as early as

7    statutorily required notice, and then we'll decide it, and

8    we'll go on from there.

9         MR. GOODMAN:  Thank you.

10        MR. REED:  Very well, your Honor.

11        MR. GOODMAN:  Thank you very much.

12        MR. REED:  Thank you.

13        (The matter concluded at 8:58 a.m.)

14                       --o0o--

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3    COUNTY OF LOS ANGELES    )
                              )
4    STATE OF CALIFORNIA      )

5

6                    I, VICTORIA L. VALINE, FEDERAL OFFICIAL

7    REALTIME COURT REPORTER, REGISTERED MERIT REPORTER, IN AND

8    FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL

9    DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO

10   SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

11   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

12   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

13   ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT

14   IS IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL

15   CONFERENCE OF THE UNITED STATES.

16

17   DATE:  July 17, 2007

18

19

20   _____

21   VICTORIA L. VALINE, CSR No. 3036, RMR, CRR

22   FEDERAL OFFICIAL COURT REPORTER

23

24

25