**Copy of Transcript**

NASD ARBITRATION

JEFFREY L. PRACHT, JOHN BLANDI,
individually and as trustees to TTEE
to the WHITE HORSE TRUST, et al.,

    Claimants,

    vs.                          FILE NO. 07-00948

O.N. EQUITY SALES COMPANY
commonly know as ONESCO,

    Respondent.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED ARBITRATION HEARING

February 5, 2008
9:00 a.m.

Midtown Proscenium Center
1170 Peachtree Street, Suite 1200
Atlanta, Georgia

Melinda M. Ross, RPR, CCR-2614

**EXHIBIT**

**A**

# BROWN & GALLO

LLC

Telephone  (404) 495-0777  (404) 876-8979
Toll Free    (877) 495-0777  (800) 637-0293
Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

# Excerpt of

# Direct Examination of

# Gary Lancaster

# By

# Kalju Nekvasil, Esq.

Hearing                                          February 5, 2008

Page 22

1  David Bazell for you?
2  A. Gary McDuff found David Bazell.
3  Q. Gary?
4  A. Right.
5  Q. Okay. Now, explain to -- explain -- and I take
6  it that it's your position -- by the way, is Tricom a
7  brokerage firm that one can find on the Internet today?
8  A. Yes.
9  Q. Okay. So, if, for example, you want -- if you
10  Google -- want to Google and type in Tricom, you could
11  find this broker/dealer; is that fair to say?
12  A. Yes.
13  Q. Now, was Lance Rosenburg the president of Tricom?
14  A. President and principle principal owner.
15  Q. Did you enter into any kind of condition to
16  opening an account directly with Tricom? Did you enter
17  into any kind of agreement with Tri -- with Mr.
18  Rosenburg on behalf of Tricom that your money would
19  be -- that the investor monies would be kept safely
20  there?
21  A. Yes.
22  Q. Did David Bazell play any role in negotiating
23  that agreement?
24  A. No.
25  Q. Now, if David Bazell had no right to access the

Page 23

1  money in the account at all, how could that money be
2  used by him to fund trading?
3  A. It was not going to be used by him. Nobody would
4  have access to the money at Tricom but me.
5  Q. Okay. Explain to me mechanically, because I
6  don't understand, mechanically how was the trading
7  supposed to work.
8  A. The trading was supposed to work by David Bazell
9  and he had a connection with the UK group that was
10  supposed to be part of Secured Clearing. They were
11  going to be the ones who generated the paper that would
12  be brought to Tricom that would be traded on.
13  Q. Who would -- who would actually -- if he had no
14  power over the account; who would be the one doing the
15  trading of the paper at Tricom?
16  A. Lance Rosenburg. He was the only one that had
17  authority.
18  Q. He had authority over your money?
19  A. No. He was the only one who could do the
20  transaction.
21  Q. Okay. So if David Bazell brought paper to Tricom
22  and if Tricom bought and sold it using it's money, how
23  do the Lancorp Financial Fund Business Trust investors
24  benefit? In other words, why would Lance Rosenburg, if
25  he's got -- had bought some paper from Bazell and sold

Page 24

1  it to a third party and made a profit, why would he
2  share that money with the Lancorp Financial Fund
3  Business Trust investors if their money wasn't being
4  used and if they weren't exposed to any risk?
5  A. Because they were getting a commission for
6  executing the trade.
7  MR. CHAIRMAN: Tricom was getting your
8  commission?
9  THE WITNESS: Correct.
10  MR. CHAIRMAN: I guess he's -- I think he's
11  asking why would Tricom share any of that money with
12  your group.
13  THE WITNESS: Because the understanding was
14  that all of that -- the paper that was even brought to
15  Tricom was for the purpose of being able to execute the
16  Lancorp funds.
17  MS. WRIGHT: But who -- so did you make
18  those decisions as to whether or not this paper was
19  accepted or -- or did Lance Rosenburg make those
20  decisions and did he, therefore, have discretion over
21  the funds?
22  THE WITNESS: Well, he didn't have
23  discretion without clearing it with me first.
24  MS. WRIGHT: So he would call you and say we
25  have this deal and you said, yes, go ahead and do it?

Page 25

1  THE WITNESS: Yes. But only if it's
2  conformed.
3  MS. WRIGHT: Exactly.
4  MR. CHAIRMAN: What was going to happen if
5  the trade lost money? Who was going to take the loss?
6  THE WITNESS: Well, it was supposed to be a
7  scenario where there would be a simultaneous buy and
8  sell to another purchaser. So there was no holding of
9  the bond. It was supposed to be a same-day trade.
10  BY-MR. NEKVASIL:
11  Q. Now, did any of these trades -- I mean, when you
12  answered the question for the arbitrator about these
13  phone calls, are you speaking practically or
14  theoretically? In other words, did any trades actually
15  happen at that point?
16  A. No trades occurred.
17  Q. So Mr. Rosenburg never called you and said I want
18  to -- what about buying this paper or buying that paper?
19  A. Correct.
20  Q. The money was at Tricom for -- didn't you open
21  the account in March 2004?
22  A. I believe that's correct.
23  Q. And you closed it in December 2004?
24  A. Yes.
25  Q. No trades occurred?

Hearing                                    February 5, 2008

Page 26

1    A. No trades occurred.
2    Q. The money just sat there?
3    A. Yes.
4    Q. And it was returned to your Bank of America
5  account in West Linn, Oregon?
6    A. Correct.
7        MR. NEKVASIL: If the panel will please turn
8  out -- turn to Volume -- pull out Volume 1, Tab B, B-74.
9        MR. CHAIRMAN: 74?
10       MR. NEKVASIL: Yes, sir.
11  BY-MR. NEKVASIL:
12   Q. Before I ask you questions about this document,
13  B-74, why did you move the money back from Tricom to
14  your Bank of America account?
15   A. Because it became apparent that no trades were
16  going to occur. I talked to Lance Rosenburg and he
17  didn't think any were going to occur either.
18   Q. What was the basis --
19       MR. CHAIRMAN: I'm sorry. He didn't
20  think --
21       THE WITNESS: He didn't think that there was
22  going to be any paper -- he didn't think there was going
23  to be any executable trades either.
24  BY-MR. NEKVASIL:
25   Q. What was the basis -- tell the panel discussions

Page 27

1  with them. What led to that conclusion?
2    A. Well, nothing was occurring. No trades were
3  taking place, didn't appear that any were going to.
4  Investors wanted to know what was happening. I had to
5  tell them nothing was happening, and so I just requested
6  to have the money sent back.
7        MS. WRIGHT: Were you earning interest on
8  that account.
9        THE WITNESS: I thought I was, but I
10  earned -- the interest that was supposed to be earned on
11  it never occurred.
12  BY-MR. NEKVASIL:
13   Q. So the answer is no?
14   A. Correct. There was no interest earned on it.
15   Q. Did you ever meet this David Bazell?
16   A. No.
17   Q. Did you ever talk to him on the phone?
18   A. Yes.
19   Q. How many times?
20   A. Numerous.
21   Q. Did he ever provide you with any documentation of
22  the strategy that he had intended to employ with the
23  investor funds?
24   A. No.
25   Q. Now, did you -- did you in this offering -- this

Page 28

1  is the offering memorandum that you gave to all of the
2  investors in the Lancorp Financial Fund Business Trust,
3  this offering memorandum that appears beginning on B-74;
4  is that fair to say?
5    A. Yes.
6    Q. That would include all the claimants in this
7  case?
8    A. Yes.
9    Q. Is it anywhere in this memorandum discussed that
10  you have a -- that you had a business relationship with
11  Gary McDuff who was a convicted felon?
12   A. No.
13   Q. Does Gary McDuff's name appear at all in this
14  offering memorandum?
15   A. No.
16   Q. Does it at all disclose in this offering
17  memorandum that you were going to pay money that would
18  be routed to McDuff and to the referring agents that he
19  found for you?
20   A. No.
21   Q. Is it discussed -- and I take it this is the same
22  convicted felon McDuff who ultimately found MegaFund for
23  you; is that fair to say?
24   A. Yes.
25   Q. Is it all discussed at all in this offering

Page 29

1  memorandum that your investment strategy really consists
2  of having this convicted felon, Mr. McDuff, find a
3  trader for you?
4    A. No.
5    Q. Isn't that the reality that that was your
6  investment strategy?
7    A. Yes. He was responsible for finding the
8  investments.
9        MR. GOODMAN: Can you keep your voice up,
10  sir?
11  BY-MR. NEKVASIL:
12   Q. Finding the investments?
13   A. Right.
14   Q. So Mr. McDuff found the -- this convicted felon
15  found the referring agents for you and he found the
16  investments for you?
17   A. Correct.
18   Q. Wouldn't that be material information? Won't
19  that be important for the investors to know, sir?
20   A. Yes.
21   Q. If you were an investor, wouldn't you want to
22  know that information?
23   A. Yes.
24   Q. Why didn't you disclose it to these claimants,
25  sir?

92704abc-2cec-41b9-9ed4-b5b0716e0182

Page 82

1    Q. Go back to Page 75 and 76, please, same Tab J.
2  This is the letter that you received from a Pauline
3  Jones identified as a supervisor in ONESCO's contracting
4  and license department, right?
5    A. Looks like it.
6    Q. Okay. It says on the top of Page 2, "Annual
7  requirements for ONESCO representatives," do you see
8  that?
9    A. On top of where?
10    Q. On top of page -- on top of the second page of
11  the letter, you're right, which is Bates stamped page
12  J-76. Do you see where this, "Annual requirements for
13  ONESCO representatives"?
14    A. Yes.
15    Q. One of the items it says is, "compliance
16  meeting"?
17    A. Yes.
18    Q. Did you ever attend an ONESCO compliance meeting?
19    A. No.
20    Q. This CLE course you took, that was an NASD
21  requirement; is that not fair to say?
22    A. Yes.
23    Q. So it was not a training program by the firm?
24    A. Correct.
25    Q. Did ONESCO ever offer you any type of training?

Page 83

1    A. Not that I remember.
2    Q. Maybe I should ask it clearer. Did you ever
3  receive any type of training --
4    A. No.
5    Q. -- on compliance matters while you were at
6  ONESCO?
7    A. No.
8      MS. WRIGHT: Did you receive the compliance
9  manual?
10      THE WITNESS: No.
11      MS. WRIGHT: Well, then can you explain on
12  Page 124 of that same section this compliance manual
13  questionnaire?
14      THE WITNESS: What part?
15      MR. NEKVASIL: 124 and 125.
16      THE CHAIRMAN: Same letter J. 125.
17      THE WITNESS: Okay. And what was the
18  question?
19      MS. WRIGHT: The question is: Can you
20  explain how you were able to complete this questionnaire
21  if you had not received the compliance manual?
22      THE WITNESS: No. I don't remember
23  receiving a manual.
24      MS. WRIGHT: Is that your handwriting and
25  your signature?

Page 84

1      THE WITNESS: That is my handwriting and my
2  signature, yeah.
3      MR. LUKOWSKI: Would you have any source of
4  information with which to put in these responses other
5  than the compliance manual?
6      THE WITNESS: Not that I'm aware of, no.
7  This is, again, one of my points. I don't remember
8  receiving a manual. I don't have one that I can find,
9  but clearly I had to have received it to complete this.
10      MR. NEKVASIL: In that regards, may I?
11  BY-MR. NEKVASIL:
12    Q. Leave that page open and turn to Volume 5, Tab Q.
13  Volume 5, Tab Q, Pages 114 and 115. Actually, if you
14  start with Page 102 first.
15      MR. LUKOWSKI: This is a document that was
16  produced by ONESCO?
17      MR. NEKVASIL: Right. Yes.
18      MR. LUKOWSKI: What's the date on that?
19  BY-MR. NEKVASIL:
20    Q. Do you see where it says on Q-102, it says,
21  "ONESCO Compliance Operations Manual," do you see that?
22    A. Yes.
23    Q. Dated February 2004, do you see that?
24    A. Yes.
25    Q. Several months before you completed this

Page 85

1  questionnaire?
2    A. Yes.
3    Q. Okay. Do you see in the top of the
4  questionnaire, left corner it actually says, "The
5  following questions are based on information contained
6  in the ONESCO Compliance and Operations Manual," do you
7  see that?
8    A. Where are you talking about?
9    Q. Back to J-124.
10    A. Okay.
11    Q. Wouldn't you agree that in J-124 in the first
12  paragraph it refers to the -- exactly to the same
13  manual, the compliance operations manual?
14    A. Yes.
15    Q. And, now, I direct your attention to item
16  number -- where it says Section 3.09. I think it's on
17  Q. This is on -- we're still on J-124, item number --
18      MR. NEKVASIL: It's the fourth bullet, Mr.
19  Chairman, Section 3.09.
20  BY-MR. NEKVASIL:
21    Q. Do you see that?
22    A. I don't know where you're at.
23    Q. J-124, look at the --
24      MR. CHAIRMAN: This is on the compliance
25  manual questionnaire.

Hearing                                              February 5, 2008

Page 86

1        MR. NEKVASIL: Yeah.
2    BY-MR. NEKVASIL:
3        Q. Do you see where it references Section 3.09,
4    "provides examples of prior three transactions;" do you
5    see that?
6        A. Yes.
7        Q. If you compare that to Q-114, if you look under
8    3.09, the second paragraph, it looks like what you've
9    done is basically copied verbatim what's in the second
10   paragraph of 3.09, would you agree?
11       A. 3.09, oh, I see. Yes.
12       Q. Does this refresh your recollection that you must
13   have received this ONESCO compliance operations manual
14   dated February 2004?
15       A. Yes. And I think I already said that.
16       Q. Now that your memory is refreshed, did you
17   actually read the manual or simply go to the sections of
18   the questionnaire and fill out what you're supposed to?
19       A. I don't recall ever having read the manual
20   completely. So I can only presume that I must have gone
21   to the appropriate section to complete the form.
22       MR. LITTLE: Let me object. The witness has
23   already testified he has no recollection as to what he
24   did or did not do. And so it's inappropriate for him to
25   simply make these presumptions at this point.

Page 87

1        MR. NEKVASIL: Mr. Chairman, actually all I
2    did was refresh his recollection.
3        MR. CHAIRMAN: You said -- that's right, but
4    go to the next question.
5        MR. NEKVASIL: Yeah.
6    BY-MR. NEKVASIL:
7        Q. Now, did you understand -- if you look at Section
8    3.09, now let's just focus on Q-114. You can put the
9    questionnaire aside.
10       Do you understand, looking at this document now,
11   that it forbids all selling away transactions that are
12   affected without getting a written approval from the
13   firm?
14       A. Yes.
15       Q. Did you understand that back in February 2004?
16       A. I never even thought about it.
17       Q. Well, this -- looking at this 3.09, does this
18   forbid you solely from engaging in private securities
19   transactions on approval with people who have accounts
20   with ONESCO or does it forbid you from selling
21   unapproved securities to anybody?
22       MR. LITTLE: Let me object to the form of
23   the question because it gives it a one or two and there
24   may be a three. Also, object in this particular area to
25   leading examination. I think if he wants to get answers

Page 88

1    from the witness on this type of examination, he needs
2    to ask open-ended questions.
3        MR. NEKVASIL: Mr. Chairman, I'm asking him
4    for his knowledge, what the rules says.
5        MR. CHAIRMAN: Just ask him if he knows what
6    the rule says about a certain topic.
7        MR. NEKVASIL: Okay.
8    BY-MR. NEKVASIL:
9        Q. What is this section telling you about private
10   securities transactions and what you're forbidden from
11   doing?
12       MR. LITTLE: I'll object to the extent that
13   you're asking him to do anything other than read it.
14       MR. NEKVASIL: No. I'm asking him what his
15   understanding of what 3.09 is.
16       MR. LITTLE: No.
17       MR. NEKVASIL: I'm asking him what his
18   understanding of --
19       MR. CHAIRMAN: Let him finish his objection.
20       MR. LITTLE: Yeah. Stop interrupting me for
21   a moment. Okay.
22       One of the things that has happened here is
23   he's now had the witness testify -- he's impeached his
24   own witness as to whether he ever received the
25   compliance manual, and now the position they're taking

Page 89

1    is that they want him to interpret something he doesn't
2    even remember reading, and that's inappropriate.
3        MR. NEKVASIL: Let's take it step by step.
4    Mr. Chairman, I have to respond. He said, first of all,
5    I'm impeaching my own witness.
6        He was an ONESCO agent who we have
7    subpoenaed here to appear. He is here not voluntarily,
8    but pursuant to a subpoena. He is not our own witness.
9    What you see now is another effort to somehow take their
10   agent and make him somehow an agent of my law firm or an
11   agent of claimants', which is contrary to their
12   supervisory responsibility back then, and it's a
13   strategy. So I object to these continued very careful
14   studied characterizations of this person here under
15   subpoena as claimant's witness. That's just false and
16   he knows it.
17       Secondly, I'm asking him -- now I have a
18   right to impeach him, and I plan to continue impeaching
19   him, this former ONESCO broker. I hope -- you know, I
20   hope to continue impeaching him. I'm asking him -- I
21   have impeached him. I'll be planning to frankly to
22   (inaudible) those questions before the panel member
23   asked him, which is fine. I was going to impeach him
24   about the manual, and I'm going to ask him about what
25   his understanding of the rule is now and what is his

Excerpt of

Cross-Examination of

Gary Lancaster

By

Marion H. Little, Jr., Esq.

Hearing                                                February 5, 2008

Page 154

1    earlier, so let's go to Respondent's Exhibit 11, please.
2         Is this a letter of -- excuse me, a fax of
3    February 7th, 2003 from you to Norman Reynolds?
4    A.  Yes.
5    Q.  And, again, he's the attorney who was assisting
6    both with respect to the People's Avenger Fund as well
7    as ultimately Lancorp Business Fund Trust?
8    A.  Correct.
9    Q.  If we look at the second page of the exhibit
10   there and the Bates stamp 07051, this is a proposed
11   escrow agreement for the People's Avenger Fund Business
12   Trust, is it not?
13   A.  Correct.
14   Q.  And the trust agreement would have been with U.S.
15   Bancorp?
16   A.  Yes.
17   Q.  This is after a date, I take it, in February 2003
18   in which you had been terminated from Piper Jaffray?
19   A.  Yes.
20   Q.  And if I understand it, at least through February
21   7, 2003, you are continuing to make efforts as it
22   relates to move forward with the People's Avenger Fund
23   trust?
24   A.  Correct.
25   Q.  And is it fair to say that through roughly

Page 155

1    November of 2003 -- excuse me, 2002, through at least
2    February of 2003 the efforts to go forward with that
3    trust were ongoing?
4    A.  Correct.
5    Q.  Now, if we could then look at Respondent's
6    Exhibit Number 12. At some point in time the decision
7    was made to no longer go forward with the -- a publicly
8    registered trust?
9    A.  Yes.
10   Q.  And the decision was to go forward with a
11   nonregistered trust?
12   A.  Correct.
13   Q.  And the nonregistered trust would be the Lancorp
14   Financial Fund Business Trust, correct?
15   A.  Correct.
16   Q.  And am I right that Respondent's Exhibit 12
17   reflects that that trust was formed in the State of
18   Nevada on March 3, 2003?
19   A.  Yes.
20   Q.  And that was your intention to form it at that
21   particular point in time?
22   A.  Yes.
23   Q.  Now, if you could look at Respondent's Exhibit
24   13, please.
25   A.  13?

Page 156

1    Q.  Yes, please.
2    A.  Okay.
3    Q.  That is a copy of a declaration of trust for the
4    Lancorp Financial Fund Business Trust March 3, 2003, is
5    it not?
6    A.  Yes.
7    Q.  And if we look at the very last page of the
8    document that bears the Bates stamp Lancaster 1471, that
9    is your signature, correct?
10   A.  Yes.
11   Q.  And you are characterized as the initial trustee
12   for this particular trust document?
13   A.  Yes.
14   Q.  Is it fair to say that at all points in time you
15   were the only trustee of the Lancorp Financial Fund
16   Business Trust?
17   A.  Yes.
18   Q.  And that is true from March 3, 2003 until it's --
19   to the date it finally expired?
20   A.  Yes.
21   Q.  Now, in addition to serving as the trustee, you
22   were also an employee of the trust, were you not?
23   A.  Yes.
24   Q.  And if we could -- before we go on to the next
25   exhibit, still looking at Respondent's Exhibit 13

Page 157

1    turning to Page Lancaster 1455, do you have that page in
2    front of you?
3    A.  I do.
4    Q.  In terms of the management of the trust, it says,
5    "The business and affairs of the trust shall be managed
6    by or under the discretion of the trustees," correct?
7    A.  Yes.
8    Q.  And so in terms of who would have the
9    responsibility for the business and affairs of the
10   Lancorp Business Fund Trust, that would have been you?
11   A.  Correct.
12   Q.  And if we could then turn to Respondent's Exhibit
13   14, is that a copy of a March 5, 2003 consent of board
14   of trustees in lieu of a special meeting of the board of
15   trustees for the Lancorp Financial Fund Business Trust
16   that you signed?
17   A.  Yes.
18   Q.  And as part of this, there was a resolution by
19   which you were elected as the chairman, president and
20   chief executive officer of the trust?
21   A.  Correct.
22   Q.  And then Larry Lancaster -- I take it, who is
23   your brother?
24   A.  Yes.
25   Q.  Was elected as the vice president and secretary

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                    February 5, 2008

Page 158

1  of the trust?
2     A.  Correct.
3     Q.  Other than yourself and your brother, were there
4  any other officers or trustees associated with the
5  Lancorp Financial Fund Business Trust at any point in
6  time?
7     A.  No.
8     Q.  If you could please then turn to Respondent's
9  Exhibit 15.  One of the other documents that would have
10 been created with respect to the going forward on the
11 Lancorp Financial Fund Business Trust was a certificate
12 of trust?
13    A.  Yes.
14    Q.  And if we look to see -- what is the business
15 address that is provided for the trustee in Paragraph 3?
16    A.  400 West 8th Street, Suite 204, Vancouver,
17 Washington.
18    Q.  And the later documents then made it clear it
19 should be in what state?
20    A.  Washington.
21    Q.  So at all points in time and all the documents
22 that were created with respect to the Lancorp Business
23 Fund Trust, did you use an address other than your
24 personal residence?
25    A.  I don't think so.

Page 159

1     Q.  Look at Exhibit 16, please, Respondent's Exhibit
2  16.  You also would have had bylaws of the Lancorp
3  Financial Fund Business Trust created?
4     A.  Yes.
5     Q.  And this is a copy of such bylaws?
6     A.  Yes.
7     Q.  Now, is it fair to say that incidental to you
8  moving forward in the Lancorp Business Fund Trust, that
9  in addition to an attorney, you would have engaged other
10 professionals?
11    A.  Yes.
12    Q.  So if we look at Respondent's Exhibit 17, can you
13 tell us whether that is a March 11, 2003 correspondence
14 by which you as the trustee are entering into an
15 engagement letter with an accounting firm?
16    A.  Yes.
17    Q.  And this would have been with respect to the
18 audit of the financial statements of Lancorp Financial
19 Fund Business Trust?
20    A.  Correct.
21    Q.  Because those audited financial statements would
22 have been attached to the private placement memorandum?
23    A.  Yes.
24    Q.  If we then look at Respondent's Exhibit 18, is
25 that a copy of the independent auditor's report that

Page 160

1  Lancorp Financial Fund Business Trust received for the
2  trust as of March 10, 2003?
3     A.  Yes.
4     Q.  I take it, then, in terms of moving forward, by
5  March of 2003 the Lancorp Financial Fund Business Trust
6  was, from your perspective, prepared to move forward in
7  accepting subscription agreements?
8     A.  Yes.
9     Q.  And if we look at Respondent's 19, this is a copy
10 of the private placement memorandum for the Lancorp
11 Financial Fund Business Trust, is it not?
12    A.  Correct.
13    Q.  If we look in the very bottom of the page, it
14 says -- does it say the effective date of this
15 memorandum is March 17th, 2003?
16    A.  Yes.
17    Q.  And was that your understanding as to when the
18 trust was effective?
19    A.  Yes.
20    Q.  Now, if we could then look to see a couple things
21 relating to the activities of the trust.  If you look at
22 the second page, it's marked 002, the concept of the
23 trust here is there would be no more than 100 investors?
24    A.  Yes.
25    Q.  And of those 100 investors no more than 35 could

Page 161

1  be nonaccredited?
2     A.  Correct.
3     Q.  Did you make efforts to track whether you had the
4  number of accredited versus nonaccredited investors?
5     A.  Yes.
6     Q.  And during the time in which you were managing
7  the trust, can you tell us whether or not that
8  proportionality was maintained?
9     A.  Yes.
10    Q.  Now, if we look at the last -- second to the last
11 full paragraph on Page 2 of Respondent's Exhibit 19,
12 does that set forth the expectations as to the investors
13 who would be purchasing an interest in this trust?
14    A.  The highlighted portions at the bottom here?
15    Q.  Yes.
16    A.  Yes.
17    Q.  So to the extent a person was not an accredited
18 investor, did they, as part of the subscription process,
19 have to represent to you that they were sophisticated
20 and a well-informed investor?
21    A.  Yes.
22    Q.  And they were able to understand and utilize the
23 information contained in the private placement
24 memorandum?
25    A.  Yes.

Hearing                                                    February 5, 2008

Page 162

1    Q. And that they would have the knowledge and
2  experience and financial and business matters to
3  evaluate the merits and the risk of this investment?
4    A. Yes.
5    Q. And they would also have to represent to you that
6  they had the financial strength and experience in the
7  transactions of this nature, correct?
8    A. Correct.
9    Q. To the extent an investor was unwilling to make
10  those representations, did you accept their subscription
11  agreements?
12    A. If they were unwilling?
13    Q. Yes.
14    A. No.
15    Q. So all the investors who purchased an interest in
16  the Lancorp Business Fund Trust made those
17  representations and you accepted them?
18    A. Correct.
19    Q. And that would include the claimants in this
20  case?
21    A. Yes.
22    Q. Now, if we could then turn to what is marked as
23  Page 12, Bates stamped Page 12 of Respondent's Exhibit
24  19, we'll go back to that in a moment. Excuse me.
25    If you will turn your attention, then, first to

Page 163

1  Page 41 of Respondent's Exhibit 19, as part of the
2  private placement memorandum, there were a number of
3  attachments that were provided to each of the
4  prospective investors?
5    A. Yes.
6    Q. And one of them would have been a subscriber data
7  sheet?
8    A. Correct.
9    Q. And then the introductions to the subscribers?
10    A. Yes.
11    Q. The purchase -- purchaser representative
12  questionnaire?
13    A. Yes.
14    Q. And accredited investor letter?
15    A. Yes.
16    Q. And a subscription agreement?
17    A. Yes.
18    Q. Would you have had the expectation of each the --
19  excuse me -- each of the investors returning those
20  documents to you as part of the purchase process?
21    A. Yes.
22    Q. And then if we could turn -- just to walk the
23  panel through this, turn to Page 43 of Respondent's
24  Exhibit 19, this is a example of the subscriber's data
25  sheet that you expected the investors to complete to

Page 164

1  reflect their financial status?
2    A. Yes.
3    Q. And then if we went -- excuse me -- turn to Page
4  45 of the same exhibit. One of the additional exhibits
5  here is -- excuse me -- enclosures is the instructions
6  of subscribers on how to specifically fill out these
7  forms?
8    A. Yes.
9    Q. And then if we turn to Page 47, 47 and 48 of
10  Respondent's Exhibit 19 is a two-page document that
11  would reflect or would require to the investors to
12  answer certain questions?
13    A. Yes.
14    Q. Exhibit -- excuse me, Page 50 of the same exhibit
15  would have been an accredited investor letter that to
16  the extent someone satisfied certain financial
17  requirements and had achieved the status of an
18  accredited investor, they could sign this letter?
19    A. Yes.
20    Q. And then that would be something that you would
21  factor in in terms of monitoring the ratios of the
22  investors in the particular trust?
23    A. Correct.
24    Q. And then, finally, if we look at the pages marked
25  52 through 56, that is the subscription agreement that

Page 165

1  the investors would have to execute as a requirement to
2  purchasing an interest in the Lancorp Financial Fund
3  Business Trust?
4    A. Correct.
5    Q. Were there any exceptions made for the investors?
6    A. Exceptions?
7    Q. That is, did every investor have to execute this
8  document?
9    A. Yes.
10    Q. Were there any exceptions to that?
11    A. Not to my knowledge.
12    Q. And, to your knowledge, was -- were the terms of
13  this subscription agreement as found in Respondent's
14  Exhibit 19 ever amended and modified?
15    A. No.
16    Q. The interest that would have been purchased by
17  the customers would have been an interest in the Lancorp
18  Financial Fund Business Trust, correct?
19    A. Correct.
20    Q. Not any type of limited liability company?
21    A. No.
22    Q. Okay. And if we look at the first page of the
23  subscription agreement, the address that they would have
24  sent this information would have been where?
25    A. 400 West End Street in Vancouver.

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                      February 5, 2008

---

Page 166

1    Q. Okay. And if we look in Section 1 under
2  "Subscription," the last sentence it says, "The shares
3  are being offered by the trust subject to the terms and
4  conditions of this confidential memorandum."
5        MR. CHAIRMAN: Page?
6        MR. LITTLE: I'm sorry, 52.
7        MR. CHAIRMAN: Okay.
8        MR. LITTLE: First paragraph.
9  BY MR. LITTLE:
10    Q. "The shares are being offered by the trust
11 subject to the terms and conditions of the confidential
12 memorandum in the subscription agreement, the
13 undersigned hereby here revoke with offers to purchase,"
14 then there's a blank, "shares and therefore tenders to
15 the trust," and then there's A through D.
16        Was it your expectation that when the investors
17 executed this agreement, that they would honor it?
18    A. Yes.
19    Q. Was it your expectation when the investors
20 executed this document, that they were making an
21 irrevocable agreement to purchase the shares listed in
22 the subscription agreement?
23    A. Yes.
24    Q. Now, let's then turn to Exhibit 20-A, please.
25 Again, your understanding is this was going to be

---

Page 167

1  treated as an unregistered trust?
2    A. Yes.
3    Q. And it was your intention to file the requisite
4  Form D notice with the Securities Exchange Commission to
5  advise of a trust existence?
6    A. Correct.
7    Q. And at least initially you would have had Counsel
8  involved in that?
9    A. Yes.
10    Q. And the counsel involved would have been Norm
11 Reynolds?
12    A. Correct.
13    Q. If we look at the first page of 20-A, and that is
14 a copy of a letter you were copied on by Norm Reynolds
15 to the United States Securities and Exchange Commission?
16    A. Correct.
17    Q. Showing that the Form D for the Lancorp Financial
18 Fund Business Trust was submitted some time in May of
19 2003?
20    A. Yes.
21    Q. Now, if we could just look at the Form D that
22 follows that letter, and I'd like you to first turn to
23 the last page. Does that -- sorry. The third to the
24 last page. The one that's marked Lancaster 2870.
25    A. Yes.

---

Page 168

1    Q. And we see there that the issuer will be Lancorp
2  Financial Fund Business Trust, correct?
3    A. Correct.
4    Q. And the date you signed this was April 3, 2003?
5    A. Yes.
6    Q. Right?
7        Now, if we turn to Exhibit 20-B, another Form D,
8  is it clear there, if you look at the third page marked
9  Receiver 1780, that your signatures appear on this
10 document that's dated now May 9, 2003?
11    A. Yes.
12    Q. And, finally, if we look at Respondent's Exhibit
13 20-C, and turn to the third to the last page, which is
14 marked Receiver 1785, does that also bear your
15 signature, but it's dated May 16th, 2003?
16    A. Yes.
17    Q. Now, after one or more of these documents is
18 submitted to the Securities and Exchange Commission, I
19 take it, then, that you would have also caused your
20 counsel or done it yourself to file the Form Ds with the
21 various state divisions of securities?
22    A. Correct.
23    Q. So if we turn to Exhibit 21-A, is 21-A a copy of
24 a letter by your counsel, Norm Reynolds, in which you're
25 copied on to the State of New York Department of Law

---

Page 169

1  Bureau of Investor Protection Securities, and in that
2  letter enclosing the original two copies of a Form 99
3  and a Form D?
4    A. Correct.
5    Q. And this would have been for the Lancorp
6  Financial Fund Business Trust?
7    A. Correct.
8    Q. I take it that from your prior testimony, to the
9  extent a purchaser in a particular state bought an
10 interest in a Lancorp Business Fund Trust, you would
11 have made a similar filing in each -- in every state?
12    A. Yes.
13    Q. So to the extent there was an investor in the
14 State of Pennsylvania you would have, in fact, made a
15 similar filing in the State of Pennsylvania?
16    A. Yes.
17    Q. With the Pennsylvania Division of Securities?
18    A. Correct.
19    Q. Now, if we could identify for the record a few
20 more exhibits. Turning to Exhibit 21-B, is this a copy
21 of your counsel's letter, that is, Norm Reynolds, dated
22 April 7th, 2003 to the Department of Corporations in the
23 State of California, once again, enclosing the Form D?
24    A. Yes.
25    Q. And then if we turn to 21-C, is that a similar

---

Page 170

1 letter by your counsel dated April 7th, 2003, this time
2 to the Florida Department of Financial Securities?
3     A.  Yes.
4     Q.  Just so we're clear, your counsel didn't submit
5 all these, but, rather, at some point in time you
6 started submitting them on your own?
7     A.  Yes.
8     Q.  Let's look at 21-D, then.  Is this a copy of the
9 Form D that your counsel would have submitted to the
10 Arkansas Securities Department in or about April 17th,
11 2003?
12     A.  I see the letter, but I don't see the filing.
13     Q.  Oh, I'm sorry.  Is this a copy of the cover
14 letter?
15     A.  Yeah.
16     Q.  Okay.  And then if we look at 21-E, is this a
17 copy of your counsel's letter to the Illinois Securities
18 Department dated April 7th, 2003, again, forwarding a
19 copy of the Form D for the Lancorp Financial Business
20 Fund Trust?
21     A.  Yes.
22     Q.  Looking at 21-F and G and H and I and J, are
23 those all letters by your counsel submitting these Form
24 Ds to various state divisions of securities?
25     A.  Yes.

Page 171

1     Q.  Now, if we turn back we look -- excuse me -- and
2 we look at Exhibit 22-A -- have you found 22-A?
3     A.  Uh-huh.  Oh, 22, okay.
4     Q.  On some occasions the divisions of securities for
5 the various states had questions, did they not?
6     A.  Yes.
7     Q.  And what 22-A is a copy of an April 16th, 2003
8 letter from your counsel, again, in which you're copied
9 on responding to certain questions raised by the Oregon
10 Department of Consumer and Business Services; do you see
11 that?
12     A.  Yes.
13     Q.  At any point in time, did any of the state
14 divisions of securities shut you down in any way?
15     A.  No.
16     Q.  Did any of them indicate that you could not do
17 business in their state?
18     A.  No.
19     Q.  Did the State of Maryland indicate that to you?
20     A.  I didn't -- yeah, something was -- there was
21 something about Maryland.  It was -- I don't remember
22 what it was.  It seemed to me like I also have a
23 subscription agreement from one state, and maybe it was
24 Maryland, that I rescinded and sent back.
25     Q.  Okay.  And let's go ahead and look at, if you

Page 172

1 would, to yourself, 22-B, C, D, E, F and G, and if you
2 could verify for the panel these are copies of letters
3 sent by your counsel in which you're copied on to
4 various state divisions of securities reflecting
5 communications regarding the Lancorp Financial Fund
6 Business Trust.
7     A.  Yes.
8          MR. LUKOWSKI:  So B is from the Arkansas
9 Securities Department?
10 BY-MR. LITTLE:
11     Q.  Or correspondence from the agency to your
12 counsel?
13     A.  Yes.
14     Q.  Is that what those all are?
15     A.  Correct.
16     Q.  Now, at the time -- let's go back to Exhibit 19
17 for a moment.  The private placement memorandum, in
18 March of 2003, you were not -- you did not have your
19 license associated with any broker/dealer, did you?
20     A.  No.
21     Q.  And you did not believe you needed to be
22 associated with a broker/dealer to participate in this
23 private placement memorandum when it was issued in March
24 of 2003?
25     A.  Correct.

Page 173

1     Q.  And I take it from your testimony you did not
2 believe you needed to be associated with a broker/dealer
3 at any point in time in order to participate in a
4 Lancorp Financial Fund Business Trust?
5     A.  Correct.
6     Q.  It's fair to say that when we look at
7 Respondent's Exhibit 19, that ONESCO's name does not
8 appear anywhere in that document?
9     A.  Correct.
10     Q.  And it's fair to say that in each of the
11 subscription agreements that the investors would have
12 executed, ONESCO's name does not appear?
13     A.  That's correct.
14     Q.  And it's also fair to say that at no point in
15 time did you share any form of documentation with any
16 investor that contained ONESCO's name, did you?
17     A.  I did not.
18     Q.  Now, if we look at Page 12 of the private
19 placement memorandum under "Internal Management," it
20 indicates "The trust will not be managed like a typical
21 closed-in investment company.  The trust will be
22 internally managed by the trustees and will not have a
23 separate investment advisor," correct?
24     A.  Correct.
25     Q.  And, in fact, if we then turn to the page that is

Hearing                                          February 5, 2008

Page 174

1 marked 17, in Respondent's Exhibit 19, the private
2 placement memorandum, it's made very clear at the top
3 that there will be no broker/dealer associated with this
4 private placement, correct?
5    A. Correct.
6    Q. And you never would have suggested to the
7 investors something different than what's set forth in
8 black and white in this private placement memorandum,
9 right?
10    A. Correct.
11    Q. You never would have suggested to them at any
12 time that there was a broker/dealer involved, correct?
13    A. Correct.
14    Q. You never would have suggested to them at any
15 point in time that ONESCO was involved in any way, would
16 you?
17    A. Correct.
18    Q. Now, if we then look, for example, at your
19 description on Page 20 of the private placement
20 memorandum, when we have the description that is found
21 there as to your professional background, is it fair to
22 say that you do not identify yourself as being currently
23 associated with any broker/dealer, do you?
24    A. I do not.
25    Q. In fact, what you emphasize in your description

Page 175

1 is your experience in the banking industry; is that
2 correct?
3    A. Correct.
4    Q. And I take it that to the extent you spoke to any
5 investors, you didn't emphasize to them any of your past
6 licenses with the -- excuse me -- the NASD, did you?
7    A. No.
8    Q. Did you at any point in time ever indicate to a
9 broker that you were associated with the NASD?
10    A. No.
11    Q. Or that you held a license with the NASD?
12    A. No.
13    Q. Did any investor ever ask you whether you had a
14 license with the NASD?
15    A. No.
16    Q. None of the investors ever suggested to you that
17 it made any difference in their mind whether or not you
18 were associated with a broker/dealer, did they?
19    A. No.
20    Q. Now, if we look at -- going back to the People's
21 Avenger Fund, Tab 1, we'll just put it in contrast, and
22 turning to the -- the page with Bates stamp Receiver
23 03248, again, to put this in contrast, this is a
24 situation in which you anticipated having a
25 broker/dealer involved, right?

Page 176

1    A. Correct.
2    Q. But when we flip back to Exhibit 19 in the
3 private placement memorandum for the Lancorp Business
4 Fund Trust, no such expectation?
5    A. Correct.
6    Q. If we then turn then back to 20-A, the Form D
7 filings, we have three different ones. Looking at
8 Exhibit 20-A, turning to the page marked 2867, Lancaster
9 2867, who do you identify as the broker/dealer
10 associated with this Reg D filing?
11    A. Not applicable.
12    Q. So when the federal form asked you to identify a
13 broker/dealer, your answer was there was none?
14    A. Correct.
15    Q. If we look at the preceding page marked 2866,
16 this particular documentation identifies you as the
17 promoter -- beneficial owner, executive officer and
18 director of the Lancorp Fund Business Trust, does it
19 not?
20    A. Yes.
21    Q. It does not indicate that the L.L.C. is
22 associated with the trust in any way, does it?
23    A. No.
24    Q. And if we then turn, please, to 20-B, again,
25 let's look at the page marked Receiver 1 -- 01779, on

Page 177

1 this different -- the form is dated on a different date.
2 Again, you have not identified any broker/dealer, have
3 you?
4    A. I have not.
5    Q. Look at 20-C, looking at the page marked Receiver
6 01784, again, no broker/dealer is identified?
7    A. That would have been consistent on every filing.
8    Q. And, in fact, in every filing made with the SEC,
9 you've held yourself out as being the chief executive
10 officer, the promoter, the beneficial owner, the agent
11 and the employee of this trust, did you not?
12    A. Correct.
13    Q. And, in fact, when all of these Reg Ds were then
14 sent out to the various state regulators, you would have
15 made the same representation, first, there's no
16 broker/dealer involved, correct?
17    A. Correct.
18    Q. And, two, you were the promoter, originator,
19 beneficial owner, employee and chief executive officer
20 of that trust?
21    A. Yes.
22    Q. Now, let's then turn our attention, please, to
23 Respondent's Exhibit 23. Is that a copy of an August
24 12th, 2004 correspondence that you sent to a Glenn
25 Mitchell in Maryland?

45 (Pages 174 to 177)

Hearing                                    February 5, 2008

Page 178

1     A. Yes.
2     Q. And Mr. Mitchell, I take it, from the text of the
3  letter, had, in fact, previously purchased an interest
4  in the trust?
5     A. Yes.
6     Q. And what you're saying is when you had received a
7  notification from the securities division of the State
8  of Maryland that there must be a broker/dealer or
9  issuing agent that will effect transactions of the
10  securities in the State of Maryland, correct?
11     A. Yes.
12     Q. So what Maryland communicated to you is, you
13  could not sell any units in this trust in the State of
14  Maryland unless there was a broker/dealer involved?
15     A. Correct.
16     Q. And what you understood at that point in time is
17  that you had no broker/dealer involved?
18     A. Correct.
19     Q. And because you had no broker/dealer involved,
20  you told Mr. Mitchell you had to return his money?
21     A. Correct.
22     Q. And so we're clear, the date in which you told
23  him that there was no broker/dealer involved was August
24  12th, 2004?
25     A. Correct.

Page 179

1     Q. And that's a time in which you were associated
2  with ONESCO?
3     A. Yes.
4     Q. So at the time you were associated with ONESCO it
5  was your belief that at no point in time would ONESCO
6  have any association with this trust, correct?
7     A. Correct.
8     Q. Is it fair to say that at no point in time did
9  you submit to ONESCO any of the subscription agreements
10  that had been executed by the investors?
11     A. Correct.
12     Q. And at no point in time did you remit to ONESCO
13  any of the monies you had collected with respect to
14  these investments?
15     A. Correct.
16     Q. And at no point in time did you open up any
17  customer accounts with ONESCO for the benefit of any of
18  the investors who purchased a unit in this trust?
19     A. Correct.
20     Q. One of the things that you would have at ONESCO
21  is something called a new customer account form?
22     A. Yes.
23     Q. And to the extent a customer was going to have a
24  relationship with ONESCO, you understood that the
25  customer would have to complete this customer account

Page 180

1  form?
2     A. Yes.
3     Q. And that to the extent a security was being
4  transacted through ONESCO, you understood that
5  transaction would, in fact, have to be recorded first on
6  your blotter [phonetic] and then on the books and
7  records of ONESCO, did you not?
8     A. Yes.
9     Q. And none of the investors who purchased any
10  interest in the Lancorp Business Fund Trust ever
11  completed an ONESCO -- an ONESCO application, did they?
12     A. Correct.
13     Q. They never completed any type of suitability
14  determination that ONESCO would have otherwise required?
15     A. Correct.
16     Q. And they otherwise did not remit any monies made
17  payable to ONESCO?
18     A. Correct.
19     Q. All of the checks that would have been issued
20  would have been in the name, that is, by the issuer,
21  would have been in the name of the trust; is that
22  correct?
23     A. Yes.
24     Q. You can't think of any single reason why the
25  investors who bought an interest in this trust would

Page 181

1  have any reason to believe ONESCO was involved, correct?
2        MR. NEKVASIL: I can't think of any single
3  reason why the investors would believe that. I asked --
4  I asked lots of questions about the investors' beliefs.
5  He objected. You sustained.
6        It's unfair for Respondent to object to
7  questions that I asked and then when you ask them -- and
8  then asked the same questions himself. I just want a
9  level playing field, Mr. Chairman.
10        MR. CHAIRMAN: What's the question again?
11        MR. LITTLE: It's a different question.
12        MR. NEKVASIL: Mr. Chairman, he said --
13        MR. CHAIRMAN: Just let him answer.
14        MR. LITTLE: It's a different question. He
15  would -- he kept asking questions about an investor's
16  state of mind, and I'm asking the question about whether
17  he's aware of any information that would have given rise
18  to that understanding or impression.
19        MR. NEKVASIL: He said --
20        MR. CHAIRMAN: Well, he rephrased the
21  question.
22        MR. NEKVASIL: Well, actually giving rise to
23  it, he's asking -- he's still asking about state of
24  mind. Is there anything that you would have done that
25  would have given rise to a state of mind --

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                                    February 5, 2008

Page 182

1    MR. GOODMAN: In somebody else's --
2    MR. NEKVASIL: In somebody else's -- in the
3  name of that -- that they were dealing with ONESCO.
4    Mr. Chairman, my problem is he --
5    MR. CHAIRMAN: I won't sustain it so be
6  quiet.
7    Go to the next question.
8  BY-MR. LITTLE:
9    Q. Sir, did you ever give anyone any reason to
10 believe ONESCO was associated in any way with the
11 business fund trust?
12   MR. NEKVASIL: I'm not -- I'm going to -- I
13 don't mind -- I object again. I don't mind if he says
14 did you tell anybody that you were with ONESCO or to say
15 did you give anyone any reason to believe. You're still
16 asking about their beliefs. Any question asking about
17 the third -- the other party's state of mind is
18 inappropriate and he specifically objected -- sir, he --
19   MR. CHAIRMAN: I'm going to let him go with
20 this one.
21   MR. LITTLE: I think your last answer was --
22 he answered the question, but the answer was that --
23   THE WITNESS: The answer was no.
24 BY-MR. LITTLE:
25   Q. You gave them no reason?

Page 183

1    A. I gave them no reason to --
2    MR. GOODMAN: If I could move to strike, and
3  I'll tell you why.
4    MR. LITTLE: Excuse me. Excuse me. One
5  attorney per witness.
6    MR. CHAIRMAN: This is an arbitration.
7  There's no strike. You've got your objection on the
8  record.
9    MR. GOODMAN: Yeah. Well, one point is that
10 he, meaning Mr. Lancaster, has testified. He said to
11 people if he was a securities salesman. Now, how that's
12 interpreted by other people is --
13   MR. CHAIRMAN: Take it down and
14 cross-examine on it.
15   MR. GOODMAN: Okay. But he's already
16 testified to that. So it's not fair to say did he give
17 any. And, in fact, I agree, obviously, that he's now
18 asking for state of mind of other people and what was
19 said.
20   MR. NEKVASIL: I accept your ruling, Mr.
21 Chairman. It's just not fair for Respondent to ask for
22 one playing field when I'm questioning the witness and
23 then move it over to the other. If you grant it --
24   MR. CHAIRMAN: I'm going to try to be
25 balanced, but --

Page 184

1    MR. NEKVASIL: I know you're trying to. I
2  know you're trying to be balanced.
3    MR. CHAIRMAN: You can -- you can be as --
4  you can argue all of these points thoroughly in your
5  closing or, if necessary, before.
6    MR. LITTLE: And I assume the rule is that
7  the attorney who is conducting the examination should
8  make the objections so we don't have a tag team routine.
9    MR. CHAIRMAN: We're not going to do tag
10 team, for the most part. This isn't federal court here.
11 BY-MR. LITTLE:
12   Q. Okay. And without responding to the
13 characterization, is it fair to say that you can't think
14 of anything you did, Mr. Lancaster, which would have
15 left anyone with the belief --
16   MR. CHAIRMAN: Why don't you say, would you
17 please, given him any -- did he have any intention to
18 give anybody any --
19   MR. LUKOWSKI: You've already asked the
20 question.
21   MS. WRIGHT: The question is asked and
22 answered.
23   MR. LUKOWSKI: Let's move on.
24   MR. LITTLE: I was trying to get his answer,
25 but that's fine.

Page 185

1  BY-MR. LITTLE:
2    Q. Sir, did ONESCO ever give you business cards?
3    A. No.
4    Q. Did you ever have any ONESCO signage?
5    A. No.
6    Q. Did you ever have any ONESCO correspondence?
7    A. No.
8    Q. Did they give you anything with the ONESCO
9  letterhead?
10   A. No.
11   Q. You were asked about all the documentation that
12 you maintained at your home office. Did you ever
13 invest -- excuse me -- invite any of the investors to
14 your home office?
15   A. No.
16   Q. So at no point in time did anyone go into your
17 home and see anything with the name ONESCO on it?
18   A. Correct.
19   Q. Let's then turn to Respondent's Exhibit 24,
20 please. Is this a summary of investments that started
21 in April of -- excuse me -- April 2003?
22   A. Yes.
23   Q. And so just so we understand the time frame or
24 timeline, a Francis Benio [phonetic] would have
25 purchased an interest in the trust in April of 2003?

Hearing                                           February 5, 2008

---

Page 186

1   A. Correct.
2   Q. And then the amount would have been $175,000?
3   A. Yes. It wouldn't necessarily have been a single
4   purchase at this point. It could have been an
5   accumulative purchase because there were a number of
6   investors who purchased additional shares along the way.
7   Q. Okay. Does that reflect that Mr. -- or I'm
8   sorry -- France Benio would have accumulated that amount
9   of purchases by April 8th, 2003?
10  A. Correct.
11  Q. So the date shows at least the last day by which
12  an investor would have purchased his or her interest in
13  an -- in the Lancorp Business Fund Trust?
14  A. Correct.
15  Q. And in the right-hand column does that show the
16  accumulative total?
17  A. Yes.
18  Q. So if we turn to the next page, please --
19        MR. LUKOWSKI: Can I just ask you one
20  question? I'm looking at Page 909 and, for instance, I
21  see two investments by the same investor. One on 56 and
22  one on 510, Mihalivitch [phonetic].
23        Is that consistent with what you just
24  described, Mr. Lancaster?
25        THE WITNESS: As I recall, keeping qualified

Page 187

1   money and nonqualified money separate was something I
2   did accounting wise. But, no, if it was not a qualified
3   account, it would not be consistent that I would have
4   two entries.
5   BY MR. LITTLE:
6   Q. Did you have a number of investors who had both
7   qualified and nonqualified accounts?
8   A. Yes.
9   Q. Okay. And just so we know, looking at the page
10  marked 908, how much did you -- how much had you
11  collected by February 2nd, 2004?
12  A. Looks like 2,855,000.
13  Q. And that's roughly when -- if you go down a
14  couple entries, you see Norman Prinz [phonetic], also
15  February 2nd, 2004?
16  A. Yes.
17  Q. Is it fair to say that you had at that point in
18  time received purchases from the investors that totalled
19  a little bit in excess of $3 million?
20  A. Correct.
21  Q. In February 2004 is when you would have submitted
22  your registration application to ONESCO?
23  A. Yes.
24  Q. If we then look to March 3, 2004, which is
25  roughly -- we'll go through it in a moment -- when you

Page 188

1   executed the electronic U-4 with ONESCO --
2   A. Yes.
3   Q. -- how much had been accumulated in investors
4   money by that point the time?
5   A. $3,575,000.
6   Q. Okay. Now, if you could then turn to 25-A,
7   please. What does this summary depict for the panel?
8   A. It depicts the investor's share amount and in
9   some cases crediting of earnings.
10  Q. If you look at Page 1232 of the exhibit and you
11  look in the column under "From the State," do you see
12  where it says, "PA," Page 1232?
13  A. Yes, okay.
14  Q. PA would signify Pennsylvania?
15  A. Uh-huh.
16  Q. And this would show the various Pennsylvania
17  investors?
18  A. Yes.
19  Q. And so Christopher Charters would have been an
20  investor out of the State of Pennsylvania?
21  A. Yes.
22  Q. And Henrietta Charters?
23  A. Correct.
24  Q. And then there appears to be a number of members
25  of the Charters' family, do you see that?

Page 189

1   A. Yes.
2   Q. And if we go to -- if we look at the dates in
3   which the deposits are identified here taking
4   Christopher Charters at the top, you see a July 9, 2004
5   deposit?
6   A. Yes.
7   Q. Does that mean that in terms of your Form D
8   filings you would have at some point in time submitted
9   that to the Pennsylvania Division of Securities?
10  A. Yes.
11  Q. And you would have done that before or
12  contemporaneously with the purchase?
13  A. Yes.
14  Q. If -- if we could please then turn to 25-B. Is
15  that a transaction summary with respect to the
16  investors?
17  A. Yes.
18  Q. And if we look under transaction descriptions,
19  there is referencing -- references to quarter earnings?
20  A. Uh-huh.
21  Q. What is that?
22  A. That was the distribution of earnings that was
23  paid to investors.
24  Q. So if we turn to the page Bates stamped Lancaster
25  1247 and if you go to Michael Benkurt [phonetic] and you

Hearing                                        February 5, 2008

Page 190

1  go across and see a transaction of 9-30-2003?
2    A. Uh-huh.
3    Q. Do you see that?
4    A. Yes.
5    Q. What's the transcription -- what's -- excuse
6  me -- what is the transaction that occurred on
7  9-30-2003?
8    A. 9-30, it's an interest payment.
9    Q. So I take it that prior to your registration with
10 ONESCO you would have also, in addition to having
11 collected nearly $3 and a half million from the
12 investors, also would have been paying them interest on
13 their purchases?
14   A. Correct.
15   Q. Now, let's change notebooks for a moment. If I
16 could have you look at Volume 2 of Respondent's
17 Exhibits.
18       MR. LITTLE: Excuse me for a second,
19 Mr. Chairman.
20 BY-MR. LITTLE:
21   Q. I take it that before you sought employment with
22 ONESCO, you had already secured certain security
23 licenses, had you not?
24   A. Yes.
25   Q. And prior to submitting your registration

Page 191

1  application, you held a Series 6 and 7?
2    A. Yes.
3    Q. But also a 63 and 65?
4    A. Correct.
5    Q. Did you also hold various licenses with state
6  departments of insurance?
7    A. Yes.
8    Q. And would that be in Oregon and Washington?
9    A. Yes.
10   Q. Were there other states in which you were
11 licensed as well?
12   A. For short periods of time California, Idaho, and,
13 I think, Nevada, but I'm -- I can't remember for sure.
14   Q. Okay. And at some time in the fall of 2003 you
15 also secured employment from Universal Underwriters?
16   A. Correct.
17   Q. If you could turn to Respondent's Exhibit 27-A,
18 please. Is that an application that you submitted to
19 Universal Underwriters Group on or about October 13th,
20 2003?
21   A. Yes.
22   Q. And you were seeking an account executive
23 position with that company?
24   A. Correct.
25   Q. Excuse me -- Universal Underwriters Group is

Page 192

1  based in Kansas City?
2    A. Correct.
3    Q. And that is a company that, among other things,
4  sells casualty insurance to automotive industry
5  companies?
6    A. Correct.
7    Q. One of the things that you would have had to
8  disclose if you look at Page 3 of the exhibit is your
9  past employment record?
10   A. Yes.
11   Q. And I believe -- I take it that when you
12 submitted this application you believed it was accurate
13 in all respects?
14   A. Yes.
15   Q. Now, if we look, then, at Exhibit 27-B, please, I
16 take it that this is a copy of an October 21, 2003
17 letter from Universal Underwriters Group confirming your
18 acceptance of a position of employment?
19   A. Correct.
20   Q. And you're -- under their system, you're going to
21 be paid a bi-weekly rate of compensation of $1,000 and
22 some change, if you will?
23   A. Correct.
24   Q. And then you would be eligible for commissions?
25   A. Right.

Page 193

1    Q. And your start date with that company was going
2  to be October 27th, 2003?
3    A. Correct.
4    Q. I take it that before they extended an offer to
5  you, you were subject to an interview process?
6    A. Yes.
7    Q. And I take it that before the extended offer to
8  you, you were also subject to a psychological
9  examination, were you not?
10   A. Yes.
11   Q. If you look at the second page of the exhibit,
12 did you also have to confirm to Universal that you had
13 received a copy of the code of business ethics and
14 conduct?
15   A. Yes.
16   Q. Now, if we could then turn to page -- excuse
17 me -- Exhibit 27-C, Universal also had you sign off on
18 acknowledgement indicating your receipt of its handbook?
19   A. Correct.
20   Q. And the expectation communicated to you what you
21 were expected to review that handbook and comply with
22 it, correct?
23   A. Yes.
24   Q. Look at Respondent's Exhibit 27-D. Is that a
25 copy of an employment agreement you signed with

49 (Pages 190 to 193)

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                        February 5, 2008

Page 194

1   Universal on or about October 27th, 2003?
2       A. Yes.
3       Q. And your signature appears on the second page of
4   the document?
5       A. Yes.
6       Q. Now, you continued, then, with Universal from the
7   end of October of 2003 until roughly November 1, 2004?
8       A. Yes.
9       Q. And if we look at 27-E, just to confirm this,
10  27-E would have reflected your resignation e-mail,
11  correct?
12      A. Correct.
13      Q. They didn't terminate you, did they?
14      A. No.
15      Q. You voluntarily resigned from Universal?
16      A. Correct.
17      Q. Did you give Universal any reason to doubt you in
18  any way?
19      A. No.
20      Q. And until you resigned, if I understand your
21  testimony, you would have worked full-time for that
22  company?
23      A. Yes.
24      Q. Trying to sell casualty insurance?
25      A. Correct.

Page 195

1       Q. Now, if we turn to Exhibit 27-F, is it also fair
2   to say that in conjunction with your employment with
3   Universal, you also maintained various licenses with the
4   Oregon Division of Securities -- excuse me -- Oregon
5   Department of Insurance?
6       A. Yes.
7       Q. And is 27-F a form that you prepared on or about
8   April 2004 and submitted to the Oregon [inaudible] and
9   consumer and Business Services?
10      A. Yes.
11      Q. And on the form that you would have submitted to
12  Oregon, you understood you had an obligation to provide
13  honest and accurate information as to your business
14  activities, correct?
15      A. Yes.
16      Q. In addition, if we look at 27-G, in addition to
17  having your license renewed in Oregon during the same
18  time frame, you would have had your license renewed in
19  the State of Washington, correct?
20      A. Correct.
21      Q. Your expectation was when you were at Universal
22  is that you would be selling insurance?
23      A. Yes.
24      Q. Okay. You did not go to Universal to simply have
25  a place to say I work, but I'm not doing anything?

Page 196

1       A. No.
2       Q. Okay. And, in fact, when you were at Universal
3   you also applied so that you could sell the products of
4   various insurance companies, did you not?
5       A. Yes.
6       Q. So if we look at Exhibit 27-H, one of the
7   companies that you would have sought approval from would
8   have been Fortis, correct?
9       A. Yes.
10      Q. And if you look at the second page of that
11  document, that bears your signature on April 15th, 2004,
12  correct?
13      A. Correct.
14      Q. That's a company, then, that you were authorized
15  to place insurance sales for?
16      A. Correct.
17      Q. Was it also fair to say if we look at 27-I, that
18  you would have been authorized to sell insurance for
19  Blue Cross Blue Shield?
20      A. Yes.
21      Q. And is it true that in terms of your ability to
22  sell these insurance products, that would have been true
23  during the entire time frame you were registered with
24  ONESCO with the exception of your termination on
25  November 1, 2004 for Universal?

Page 197

1       A. Correct.
2       Q. Now, just a couple more before we have to break
3   for the tape.
4          If you look at 27-J, 27-K, and 27-L, are those
5   additional companies that you also were authorized to
6   sell insurance for?
7       A. Yes.
8       Q. And so that would have been Pacific Life. It
9   would have been -- and MetLife as well?
10      A. Yes.
11         MR. LITTLE: Mr. Chairman, I have been told
12  the tape is nearly exhausted, so if we could stop here.
13         MR. CHAIRMAN: Sure. Why don't we take a
14  10-minute break so we can change that.
15         VIDEOGRAPHER: The time is 2:38 p.m. this
16  concludes Tape Number 3. We're now off the video
17  record.
18         (Thereupon, a break was taken.)
19         VIDEOGRAPHER: The time is 2:57 p.m. This
20  begins Tape Number 4. We're now on the video record.
21         MR. CHAIRMAN: Please proceed.
22         MR. LITTLE: Thank you, Mr. Chairman.
23  BY-MR. LITTLE:
24      Q. Before we broke, Mr. Lancaster, we were chatting
25  about your status with Universal prior to February 2004

92704abc-2cec-41b9-9ed4-b5b0716e0182

Page 198

1  I take it that prior to submitting your registration
2  with ONESCO you owned a company that is an L.L.C. called
3  Lancorp Financial Group, L.L.C.?
4      A. Correct.
5      Q. And that is a company from which you had
6  historically sold insurance, correct?
7      A. Correct.
8      Q. As well as serviced various 401K plans?
9      A. And the sale of annuities.
10     Q. And the sale of annuities.
11         And you needed a securities license for you to
12  continue some of those lines of business, did you not?
13     A. No. Not outside -- not for Lancorp, no.
14     Q. Okay. To the extent that you were successful in
15  selling a 401K product to a commercial client that you
16  were servicing at Universal, you thought it would be
17  beneficial to have a securities --
18     A. Yes.
19     Q. And the reason, in fact, you did submit your
20  registration to ONESCO is in order to allow you to sell
21  401K plans and life to commercial clients, correct?
22     A. Correct.
23     Q. You also -- if we look at Respondent's Exhibit
24  33, would have -- excuse me, I misspoke. Respondent's
25  Exhibit 28, would have completed an application and

Page 199

1  submitted it to the Ohio National -- excuse me -- Ohio
2  National Financial Services, correct?
3      A. Yes.
4      Q. And if we look in the upper right-hand corner,
5  where it says, "The Ohio National Life Insurance
6  Company," do you see that?
7      A. Yes.
8      Q. And if we work our way down in the right column
9  where it says, "for the sell of life and annuity
10  products only"?
11     A. Yes.
12     Q. Do you see that?
13     A. Yes.
14     Q. Do you understand your application was for the
15  sale of life and annuity products only?
16     A. Yes.
17     Q. Okay. And I take it that when you submitted this
18  on or about February 2nd, 2004, your intention was to be
19  as honest and forthright with the companies as possible?
20     A. Yes.
21     Q. As part of the registration process with ONESCO,
22  ONESCO requested that you complete a number of
23  documentations?
24     A. Yes.
25     Q. And you understood that ONESCO would be reviewing

Page 200

1  the materials that you completed?
2      A. Yes.
3      Q. You understood that ONESCO would be relying upon
4  the accuracy of what you submitted?
5      A. Yes.
6      Q. And at no point in time did you give ONESCO cause
7  to believe that the information that you were submitting
8  as part of the registration application process was
9  inaccurate?
10     A. Correct.
11     Q. And given that you held securities licenses
12  already, you did not have to apply for newer licenses --
13  excuse me -- new licenses through ONESCO, did you?
14     A. I did not.
15     Q. You had already successfully prepared for and
16  passed a number of tests through the NASD?
17     A. Correct.
18     Q. And you had no reason to believe you had not been
19  properly licensed by the NASD?
20     A. Correct.
21     Q. And you never suggested to ONESCO that you were
22  incapable or competent to perform the responsibilities
23  of someone who held the licenses that you did with the
24  NASD?
25     A. Correct.

Page 201

1      Q. And at no point in time did you give ONESCO
2  reason to believe that -- strike that.
3         At the time you submitted your registration
4  application with ONESCO, you had not been subject to any
5  type of customer complaint, had you?
6      A. Had not.
7      Q. And that's true both before the NASD as well as
8  with respect to your insurance licenses, correct?
9      A. Correct.
10     Q. And no one had ever suggested to you that you had
11  committed any sales practice violation?
12     A. Correct.
13     Q. And you had never been suspended by any
14  regulatory body; is that correct?
15     A. Correct.
16     Q. And that includes the state departments of
17  insurance, right?
18     A. Correct.
19     Q. That included the NASD, correct?
20     A. Correct.
21     Q. You had never been censored or reprimanded by any
22  governmental or self-regulatory body?
23     A. Correct.
24     Q. And you never disclosed any information to ONESCO
25  that suggested that you're incapable or unable to

92704abc-2cec-41b9-9ed4-b5b0716e0182

Page 202

1  fulfill the obligations of a licensed rep?
2      A. Correct.
3      Q. Or that you were incapable or unwilling to comply
4  with the rules and regulations as promulgated by ONESCO?
5      A. Correct.
6      Q. Now, when we look, then, at Respondent's Exhibit
7  33, this is the outside business activity disclosure
8  page that you completed on or about February 11th, 2004?
9      A. Correct.
10      Q. You understood this was a mandatory document that
11  you had to execute as part of your registration
12  application?
13      A. Correct.
14      Q. And that you understood as part of your
15  historical licensing a registered representative had an
16  affirmative duty to disclose broker/dealer -- excuse
17  me -- disclose outside business activity to the
18  broker/dealer, correct?
19      A. Correct.
20      Q. If we look at Question 13, you see at the top
21  where it says, "Are you currently engaged in any other
22  business either as proprietor, partner, officer,
23  director, employee, trustee, agent or otherwise," do you
24  see that?
25      A. Yes.

Page 203

1      Q. And you disclosed two entities, did you not?
2      A. Yes.
3      Q. The first one was Universal Underwriters Group?
4      A. Correct.
5      Q. And you indicated there that you were engaged in
6  full-time employment, did you not?
7      A. Correct.
8      Q. The second one that you disclosed was the Lancorp
9  Financial Group, L.L.C., correct?
10      A. Correct.
11      Q. And at no point -- excuse me -- on this document
12  you did not disclose the existence of the trust that had
13  been formed a year earlier of which you served as the
14  president and was an employee of as well as the fact
15  that it had raised $3 and a half million?
16      A. Correct.
17      Q. Is it fair to say that at no point in time during
18  the registration process did you disclose to ONESCO the
19  existence of something called the Lancorp Business Fund
20  Trust?
21      A. Correct.
22      Q. And at no point in time during that process did
23  you indicate to them that you were engaged in any type
24  of securities transaction?
25      A. Correct.

Page 204

1      Q. Now, if we look then -- and that's February 11th,
2  2004. If you would turn your attention to Exhibit 44,
3  did you receive a letter from ONESCO on or about March
4  3, 2004 requesting that you complete your U-4 on-line?
5      A. Yes.
6      Q. And what you were to do was to review the U-4 to
7  ensure its accuracy and then once accepted it -- excuse
8  me -- if accurate, then go through and approve the form?
9      A. Correct.
10      Q. If we look, then, at Respondent's Exhibit 45,
11  this is a copy of the electronic U-4 that you would have
12  reviewed and approved as part of this process?
13      MR. NEKVASIL: Mr. Chairman, this is the
14  form that you would have looked at and approved as part
15  of the process. Now, we're on to important testimony
16  here, and aside from the fact that it's a compound --
17  it's a compound and leading question. You either looked
18  at it and approved and all asking for a yes or no
19  answer, Mr. Chairman. I realize he's questioning him
20  second.
21      MR. CHAIRMAN: Why don't you just break it
22  up for us.
23  BY-MR. LITTLE:
24      Q. Sir, is this a form that you reviewed?
25      A. Yes.

Page 205

1      Q. And did you approve it?
2      A. Yes.
3      Q. And if you look at the second to the last page of
4  the exhibit, the one with Bates stamped ONN119. Do you
5  see your signature on the document?
6      A. Yes.
7      Q. And the date of approval would have been -- of
8  your approval of the document would have been March 4th,
9  2004?
10      A. Correct.
11      Q. Now, when you disclosed the L.L.C. on Exhibit 33,
12  just keep your hand for a moment on 45. If you look at
13  Exhibit 33, then, when you described the Lancorp
14  Financial Group, L.L.C., you did not disclose this
15  entity as participating in any type of private
16  securities transaction, did you?
17      A. I did not.
18      Q. You did not disclose it as having any type of
19  affiliation or association with the Lancorp Business
20  Fund Trust, did you?
21      A. Correct.
22      Q. And I take it that at no point in time in the
23  preparation of Exhibit 33 or the preparation of Exhibit
24  45, would you have disclosed the existence of the trust,
25  correct?

92704abc-2cec-41b9-9ed4-b5b0716e0182

Page 206

1    A. Correct.
2         MR. CHAIRMAN: Not would he have, but did
3    he?
4    BY-MR. LITTLE:
5    Q. Did you. Excuse me.
6         And, in fact, it was never your intention as part
7    of the process of executing Respondent's Exhibit 33 and
8    45 to disclose the existence of the trust to ONESCO, was
9    it?
10   A. Correct.
11   Q. If we look at -- going back to Exhibit 45, and
12   looking at the page in the lower right-hand corner
13   marked 113 -- go one page before that. You're on 114.
14   A. Oh.
15   Q. If we turn to 113, you see there's the question
16   again, "Are you currently engaged in any other business
17   either as proprietor, partner, officer, director,
18   employee, trustee, agent or otherwise, do you see that?
19   A. Yes.
20   Q. And, again, when you approve the U-4, the only
21   descriptions provided is "I am president of Lancorp
22   Financial Group, L.L.C. LFG receives commissions from
23   existing life insurance annuities and 401K plans
24   (additions, rollovers, etc.), address 1382 Lane Court,
25   West Linn, Oregon 97068." And then, "LFG was previously

Page 207

1    a sole proprietor, DBA, Lancaster Insurance established
2    in 1973," do you see that?
3    A. Yes.
4    Q. In fact, this L.L.C. preexisted the formation of
5    the trust, did it not?
6    A. It did.
7    Q. And, in fact, it preexisted the existence of the
8    trust by over a decade?
9    A. Yes.
10   Q. And you also said that "Approximately 10 hours
11   per year devoted to LFG none of which is conducted
12   during securities training hours, duties including
13   reviewing annual statements and monitoring insurance
14   companies, submission statements to the 401K
15   administrators annually and completing documents for
16   additions, rollovers, et cetera." Do you see that?
17   A. Yes.
18   Q. That's the type of activity that, to the extent
19   you can sell a 401K plan to a commercial client, it
20   would have been helpful for you to have your license
21   with ONESCO, correct?
22   A. Yes.
23   Q. And I take it that in providing that description
24   there, you never intended to communicate that somehow
25   the L.L.C. was associated in any way with a trust that

Page 208

1    was engaged in an unregistered securities offering?
2    A. Correct.
3    Q. Now, if we then turn to Exhibit 46, Respondent's
4    Exhibit 46, this is the handwritten U-4 that you
5    prepared for a prior employer back in 2000, correct?
6    A. Yes.
7    Q. And if we look at the third -- excuse me -- the
8    page marked PJ-047, you'll see where that bears your
9    signature?
10   A. Yes.
11   Q. And, in fact, when we go to the last -- second to
12   the last page, PJ-049, there is a description of the
13   L.L.C. provided that I think you confirmed earlier is
14   identical to that found on the ONESCO electronic version
15   that you approved?
16        MR. CHAIRMAN: Mr. Little, I know you're
17   trying to be very efficient, but is it possible to skip
18   the documents we've already been over? I think we've
19   talked about this one before.
20        MR. LITTLE: I think we did as part of their
21   case. I certainly have not talked about it.
22        MR. CHAIRMAN: Well, if it's been -- it
23   doesn't sound like you're bringing out any differences,
24   bringing more emphasis to the same question. If I'm
25   wrong, go ahead. If not, try to skip over it.

Page 209

1         MR. LITTLE: Yeah. We'll continue to try to
2    move forward as quickly as possible.
3    BY-MR. LITTLE:
4    Q. So in terms of the description you provided of
5    the L.L.C., you had been consistent in 2000 to 2004,
6    correct?
7    A. Correct.
8    Q. And at each point in time you never suggested
9    that it was involved in any type of private securities
10   transaction?
11   A. Correct.
12   Q. Will you look at Respondent's Exhibit 47, please
13   Is it fair to say that when you were associated with
14   Piper Jaffray that that company also would have
15   required, from a compliance standpoint, for you to
16   prepare certain documentation?
17   A. Yes.
18   Q. And is the first page of Respondent Exhibit 47 a
19   document that you received from compliance from U.S.
20   Bancorp on or about September 22nd, 2000?
21   A. Yes.
22   Q. And then if you could turn to the next page,
23   please, PJ-030, one of the things compliance provided
24   you in September 22nd of 2000, and this is compliance
25   for Piper Jaffray, was a document that enclosed your

Hearing                                          February 5, 2008

Page 210

1  U-4, correct?
2      A. Yes.
3      Q. And it would have required you to update it to
4  the extent that there were any changes?
5      A. Right.
6      Q. And they also would have provided you a copy of
7  their compliance manual via the Internet, correct?
8      A. Correct.
9      Q. And you understood it was your obligation to read
10  that and understand it?
11      A. Yes.
12      Q. Now, is it fair to say that when you were
13  associated with Quick & Reilly in December of 2002, you
14  did not disclose to Quick & Reilly the existence of the
15  People's Avenger Trust?
16      A. Correct.
17      Q. And so you would have not have prepared an
18  outside business disclosure report and submitted it to
19  Quick & Reilly disclosing that there was a trust form
20  that you were serving both as the trustee of as well as
21  a -- the president and CEO?
22      A. Correct.
23      Q. And is it fair to say that to the extent their
24  activities undertaking for Lancorp Business Fund Trust
25  in that same time frame, you likewise would not have

Page 211

1  disclosed that to Quick & Reilly?
2      A. Correct.
3      Q. Now, if we look back, then, at Respondent's
4  Exhibit 28, the application you submitted on the -- for
5  the Ohio National Financial Services --
6      A. Uh-huh.
7      Q. If you turn -- just looking at the first page
8  marked 30?
9      A. Yes.
10      Q. And it says, "Give a complete business" -- excuse
11  me. "Give complete business experience with your last
12  four employers or for the last 10 years." Did you see
13  that?
14      A. Yes.
15      Q. And when you filled that out, for example, you
16  would have identified you had been employed by U.S. Bank
17  and had been -- your last compensation would have been
18  $200,000, right?
19      A. Correct.
20      Q. But when we look at it, what you say is the basis
21  for your separation was bank takeover?
22      A. Yes.
23      Q. And you indicated that your supervisor was no
24  longer there, correct?
25      A. Correct.

Page 212

1      Q. It's fair to say that when you filled out this
2  form, you did not disclose that at that point in time
3  you were serving as the president and employee of the
4  Lancorp Business Fund Trust as well, did you?
5      A. Correct.
6      Q. Now, when we look at Exhibit 27-A, your
7  application to Universal Underwriters, turning to the
8  page marked UU-27 where once again you were asked in
9  October of 2003 to disclose your present or last
10  employer. And it says, "Include" in some caps, "all
11  work." And, again, you didn't disclose to Universal
12  that you had association with the Lancorp Business Fund
13  Trust, did you?
14      A. Correct.
15      Q. Now, if we look, then, back at Respondent's
16  Exhibit 27-D, your employment agreement with Universal,
17  please, Paragraph 4, do you see where it says,
18  "Exclusive Services"?
19      A. What page?
20      Q. 27-D?
21      A. 27.
22      MR. CHAIRMAN: Respondent's Exhibit 27-D or
23  UU-30?
24      MR. LITTLE: 27-D.
25  BY-MR. LITTLE:

Page 213

1      Q. Okay. And if you look at Paragraph 4, do you see
2  where it says, "Employees shall devote his entire
3  business activity to the business of employer. Any and
4  all insurance business at any time or times procured by
5  employee while employed by employer is and shall be the
6  permanent and exclusive property for employer for
7  employer's exclusive benefit. Without the written
8  consent of employer employee shall not, during the term
9  of this agreement, engage in any other business activity
10  whether or not such business activity is pursued for a
11  gain, profit or other advantage or act as an employee,
12  officer, director or consultant for any other insurance
13  company, agency or brokerage firm," do you see that?
14      A. Yes.
15      Q. Now, you understood that Universal approved your
16  association with ONESCO, correct?
17      A. Correct.
18      Q. But, to your knowledge, at no point in time did
19  Universal approve you engaging in any form private
20  securities transaction, did they?
21      A. Correct.
22      Q. At no point in time did Universal approve you in
23  any way of serving as an employee or a trustee of the
24  Lancorp Business Fund Business Trust, correct?
25      A. Correct.

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                     February 5, 2008

Page 214

1    Q. And at no point if time prior to your separation
2  from Universal did you disclose your involvement with
3  respect to the trust, did you?
4    A. Correct.
5    Q. And so you proceeded during the course in 2004 in
6  violation of your employment agreement with Universal,
7  did you not?
8    A. Correct.
9    Q. Look at Exhibit 27-F again, please. The form
10 submitted with the Department of Consumer and Business
11 Services for the State of Oregon. If you look, then, at
12 the page marked UU-66, Item Number 7, "Account for all
13 of your" -- excuse me. "Account for all of your time
14 employed, unemployed and as a full-time student during
15 the past five years." This is Question 7. Again, you
16 didn't disclose to the State of Oregon that you were
17 engaged with respect to this trust, did you?
18   A. Correct.
19   Q. And then if we could turn to 27-H, your
20 application with Fortis. If we turn to the second page
21 marked UU-166, the question is posed, are you engaged in
22 any business other than or in addition to selling
23 insurance, and what was your answer?
24   A. No.
25   Q. And the date you signed this form was April 15th,

Page 215

1  2004?
2    A. Correct.
3    Q. And so the information you provided to Fortis as
4  part of this application process was, in fact,
5  inaccurate, wasn't it?
6    A. Yes.
7    Q. It was inaccurate because you were engaged in the
8  trust activities?
9    A. Correct.
10   Q. And so we can agree that as part of the time
11 frame of 2000 to 2004 you failed to make adequate
12 disclosures on your application to Ohio National
13 Financial Services, right?
14   A. Yes.
15   Q. You failed to make adequate disclosures on your
16 application to Universal?
17   A. Yes.
18   Q. And you failed to make adequate disclosures to
19 the state of Oregon, did you not?
20   A. Yes, sir.
21   Q. Now, let's then turn, please, to Exhibit 34,
22 Respondent's Exhibit 34. You understood that the
23 document entitled "General Prohibitions" was another
24 document that ONESCO required that you execute as part
25 of the registration process?

Page 216

1    A. Yes.
2    Q. And you understood that unless you executed this
3  document to -- your registration application would not
4  be approved?
5    A. Correct.
6    Q. And if you look at the third page, again, the
7  date of that document is February 11th, 2004?
8    A. Correct.
9    Q. Now, when we look at the first page -- oh, I'm
10 sorry. If you look at the last page over the signature,
11 that is Page 5406, the date is February 11th, 2004. And
12 right above that it says, "Acknowledgement and
13 Acceptance of the ONS -- ONESCO General Prohibitions,"
14 right?
15   A. Yes.
16   Q. And you understood that by signing this document,
17 you were acknowledging to ONESCO both your review of
18 this documentation as well as to the acceptance of the
19 terms?
20   A. Yes.
21   Q. Now, one of the terms when we look on the first
22 page of Respondent's Exhibit 34, Paragraph 1, is that
23 you would not engage in a securities transaction with
24 members of the public except on behalf of ONESCO, right?
25   A. Correct.

Page 217

1    Q. And, in fact, it says, "A registered rep may not
2  sell any securities to any members of the public unless
3  the sales are placed through ONESCO." Do you see that?
4    A. Yes.
5    Q. All the sales that you made to the investors in
6  the Lancorp Business Fund Trust were, in fact, placed
7  outside of ONESCO, were they not?
8    A. Yes.
9    Q. And, in fact, you had engaged in security
10 transactions with members of the public outside of
11 ONESCO?
12   A. Correct.
13   Q. And you did so then in violation of General
14 Prohibition Number 1, did you not?
15   A. Yes.
16   Q. Number 2 says, "You will not guarantee a customer
17 against loss in any securities account." Do you see
18 that?
19   A. Yes.
20   Q. That was one of the other obligations you had
21 agreed to undertake?
22   A. Yes.
23   Q. I take it that as part of the private placement
24 memorandum where it talks about preservation and
25 principle, the representation you made to the investors

92704abc-2cec-41b9-9ed4-b5b0716e0182

Page 218

1  is that their principle was always safe?
2    A. Correct.
3    Q. And that there would never be a loss in their
4  account, correct.
5    A. Correct.
6    Q. And so you violated Number 2 of the General
7  Prohibition set forth in Respondent's Exhibit 34, did
8  you not?
9    A. Yes.
10   Q. Number 3, you would not receive any form of
11 payment, et cetera, et cetera, of any kind from any
12 source other than ONESCO without prior written approval
13 of ONESCO. And in response to the chair's question, you
14 already agreed that you never received any prior written
15 approval from ONESCO for you to engage in any private
16 securities transaction, correct?
17       MR. GOODMAN: I object. Mr. Lukowski had
18 said, don't preface it with the questions that if the
19 chair asked it or not -- you said earlier.
20       MR. CHAIRMAN: It's been one time out of an
21 hour.
22       MR. GOODMAN: Right. And I'm just saying
23 hopefully that is going to be the same for both sides.
24       MR. LITTLE: Hopefully the next objection
25 will be from the attorney handling the --

Page 219

1        MR. NEKVASIL: Well, it's just a matter of
2  fairness.
3        MR. CHAIRMAN: Don't argue with him. Talk
4  to me. Not him.
5        But go ahead.
6  BY-MR. LITTLE:
7    Q. Sir, we're clear that you never received written
8  approval from ONESCO?
9    A. Correct.
10   Q. In fact, you never received any form of approval
11 whether it's verbal or written, correct?
12       MR. CHAIRMAN: Would it be fair to state
13 that -- and can y'all stipulate that he did not disclose
14 this trust relationship with anybody except with people
15 he was telling it to about any of these other employers
16 or entities that we've been talking about all day so we
17 don't have to go through each one of these individually?
18       MR. NEKVASIL: Well, Mr. Chairman, we can't
19 stipulate that he did not send that May form that's
20 dated May 2004 to ONESCO. He has given varying
21 testimony on that point as to whether --
22       MR. CHAIRMAN: Where is that document?
23       MR. NEKVASIL: It's the -- it's the second
24 outside business disclosure form.
25       MR. CHAIRMAN: Well, except for that, can

Page 220

1  you --
2        MR. GOODMAN: 4-H. Sir, it was this one.
3        MR. NEKVASIL: That's the one of
4  controversy.
5        MR. CHAIRMAN: This is the one they don't
6  admit they had received?
7        MR. NEKVASIL: Yeah. That's the one that
8  there's been a lot of testimony about. Remember, I took
9  him to the SEC testimony, NASD and all that. Other than
10 the --
11       MR. CHAIRMAN: Except for this?
12       MR. NEKVASIL: Except for this form.
13       MR. GOODMAN: Stipulate to what?
14       MR. NEKVASIL: We can reform the stipulation
15 so we don't have to go through every document, every
16 entity if they don't do a disclosed information to -- is
17 there a way from there?
18       MR. LITTLE: I've covered those already.
19       MR. GOODMAN: On the other hand, sir -- on
20 the other hand, sir, he did -- see, he did. On
21 September -- he did -- it says and they received it, the
22 Lancorp.
23       MR. LITTLE: We'll get to that in a moment.
24       MR. CHAIRMAN: Okay.
25 BY-MR. LITTLE

Page 221

1    Q. Sir, if we look, then, at the General
2  Prohibitions where it says in Number 4, "Do not publish,
3  circulate or broadcast any advertisements related to the
4  securities business without the prior written approval
5  of ONESCO," is it fair to say that when you distributed
6  the copies of the private placement memorandum and the
7  subscription agreement to investors, you did not first
8  seek ONESCO's written approval?
9    A. Correct.
10   Q. And so you violated Rule Number 5 of the General
11 Prohibitions?
12   A. Yes.
13   Q. And when we look at Number 6, it says, "Not
14 distribute correspondence to clients that pertains to
15 solicitation or execution of securities transactions
16 without first receiving written approval from an
17 appropriately designated ONESCO principal." I take it
18 that when you sent correspondence to -- and you've seen
19 some of it in claimant's notebooks. When you sent
20 correspondence to an investor, you did not first seek
21 the approval of ONESCO before transmitting that
22 correspondence?
23   A. Correct.
24   Q. And so you violated Rule 6?
25   A. Yes.

Hearing                                    February 5, 2008

Page 222

1    Q. Number -- turning to the next page, 5405, the
2    next prohibition Item Number 13 says you will not open
3    discretionary accounts. I take it that -- and we
4    established this earlier, I believe, but as the trustee
5    you, in fact, exercised 100 percent discretion over the
6    funds in the trust, did you not?
7    A. Yes.
8    Q. And in the capacity of exercising 100 percent
9    discretion you violated Rule 13 of the General
10   Prohibitions, did you not?
11   A. Yes.
12   Q. If we look at Number 22, which says, "Not use any
13   form of general solicitation or general advertising in
14   connection with offers to sell sales of or solicitations
15   of offers to purchase any unit interest in any direct
16   participation program approved by ONESCO, other than the
17   original memorandum and materials specifically approved
18   by ONESCO or private sponsors to the ONESCO product
19   availability list," you would agree that rule as well
20   was violated by your conduct as it related to the trust?
21   A. Yes.
22   Q. Looking at 26 where it says, "Not maintained
23   other employment, received other forms of compensation
24   without giving advance written notice to ONESCO." Is it
25   fair to say that you had, in fact, occupied such

Page 223

1    positions with the trust without providing the
2    appropriate notice to ONESCO?
3    A. Yes.
4    Q. Let's turn from the next page, please, Paragraph
5    29 says, "You will not participate in any private
6    transactions of a nature which could be interpreted in
7    any manner to involve the creation to sell or marketing
8    a security without having first obtained written
9    approval and the consent of ONESCO."
10       Sir, is it fair to say that you violated that
11   rule as well?
12   A. Yes.
13   Q. Is it fair to say that with respect to each of
14   the General Prohibitions we've just covered and set
15   forth in Respondent's Exhibit 34, you violated it during
16   the entire time you were associated with ONESCO?
17   A. Yes.
18   Q. Now, let's look, then, at Respondent's Exhibit
19   53, please. Is this a copy of the representative sales
20   contract that you signed with ONESCO?
21   A. Yes.
22   Q. And if we look at the first page of the document,
23   where we see that the name is Gary Lancaster, right? It
24   says Overland Park?
25   A. Yes.

Page 224

1    Q. Now, when you signed the document you didn't
2    notice that that error had been made in terms of your
3    location?
4    A. No.
5    Q. Okay. But it shows your effective date was going
6    to be March 23, 2004, correct?
7    A. Correct.
8    Q. And it identifies, in fact, your resident sales
9    coordinator as Kerry Lawing, does it not?
10   A. Correct.
11   Q. Now, was there ever a point in time in which you
12   sought information from Lawing -- Mr. Lawing that he
13   failed to provide it to you?
14   A. No.
15   Q. Okay. And at no point in time you contacted him
16   and said I have a question as to whether what I'm doing
17   is appropriate or not?
18       MR. CHAIRMAN: Don't we have testimony that
19   there's no contact at all?
20       MR. LITTLE: I'm asking him whether he
21   initiated the contact.
22       MR. CHAIRMAN: Well -- and nobody was on the
23   other end of the phone; is that what you mean?
24       MR. LITTLE: Well, the question is
25   initiation.

Page 225

1        MR. NEKVASIL: Well, the testimony that I
2    was shut off during -- once --
3        THE WITNESS: I initiated no contact with
4    Lawing, whatsoever.
5    BY-MR. LITTLE:
6    Q. Let's look at the second page of the exhibit, the
7    one bearing the stamp ONESCO 0101. If you would,
8    please, turn to Paragraph 6 where it says in the last
9    sentence, "The representative shall not solicit
10   securities through or otherwise make business use of
11   mailings, advertisements or other media relating to
12   securities unless the contents there have previously
13   been approved in writing by ONESCO;" do you see that?
14   A. Yes.
15   Q. You violated that provision of your contract, did
16   you not?
17   A. Yes.
18   Q. If you look at the next page, the one that's
19   bearing the Bates stamp 0102, looking at Subparagraph
20   8-C where it says, "The representative shall not
21   directly or indirectly participate in securities sales
22   activities for any person, firm or corporation other
23   than ONESCO without first obtaining ONESCO's written
24   consent." Do you see that?
25   A. Yes.