Hearing                                February 5, 2008

Page 226

1   Q. You violated that provision of your contract as
2   well, did you not?
3   A. Yes.
4   Q. And at no point in time did you communicate to
5   ONESCO that it was your intention to violate your
6   contract, did you?
7   A. No.
8   Q. At no point in time did you disclose to them that
9   you were violating your contract, did you?
10  A. Correct.
11  Q. Or that you were violating the general
12  prohibitions?
13  A. Correct.
14  Q. Now, if we could look, then, at Respondent's
15  Exhibit 54. This was a compliance manual questionnaire
16  that you were asked questions about earlier?
17  A. Yes.
18  Q. And another document that ONESCO specifically
19  required that you complete?
20  A. Correct.
21  Q. And we are in agreement, then, you did, in fact,
22  receive from ONESCO the compliance manual?
23  A. Yes.
24  Q. And at no point in time did you contact ONESCO
25  saying I don't understand the provisions of the

Page 227

1   compliance manual?
2   A. No.
3   Q. And if we look at Respondent's Exhibit 54 that is
4   written out in your own handwriting, you never suggested
5   to ONESCO that you did not understand the questionnaire
6   that you were completing?
7   A. Correct.
8   Q. Including the provision on the first page,
9   Section 309, where you identified a private placement
10  memorandum as an example of a private securities
11  transaction, right?
12  A. Right.
13  Q. Now, let's go back, if we could then, to
14  Respondent's Exhibit 35. One of the other documents
15  that ONESCO asked you to complete as part of the
16  registration process was a personal brokerage account
17  disclosure?
18  A. Yes.
19  Q. And so the ones marked Exhibit 35 is your
20  disclosure of an account with U.S. Bancorp Piper
21  Jaffray, isn't it?
22  A. Correct.
23  Q. The account you disclosed did not have any
24  association, whatsoever, with the trust, did it?
25  A. Correct.

Page 228

1   Q. In fact, that was a retirement account?
2   A. Yes.
3   Q. And you understood that ONESCO would then have
4   the options, should it so elect, to request copies of
5   duplicate statements for your retirement, correct?
6   A. Yes.
7   Q. Now, if we look, then, at Respondent's Exhibit
8   36, please, this is another form of personal brokerage
9   account statement -- excuse me -- disclosure forms that
10  you executed in or about February 2004, and this one is
11  with respect to Scott Trade, correct?
12  A. Correct.
13  Q. Once again, it is your personal account?
14  A. Yes.
15  Q. And this was a qualified fund, was it not?
16  A. Correct.
17  Q. And this qualified fund that you disclosed did
18  not have any association with the trust, did it?
19  A. Correct.
20  Q. Is it fair to say that as part of the
21  registration process you did not disclose to ONESCO any
22  accounts anywhere in which monies were being held as
23  part of the trust activities?
24  A. Correct.
25  Q. Sir, let's turn to Volume 3, and that would be

Page 229

1   Exhibit 81, Volume 3, please. So, sir, Respondent's
2   Exhibit 81 is a copy of the May 3, 2004 other business
3   disclosure recording page that we discussed earlier?
4   A. Yes.
5   Q. And at the top this one -- and I take it the
6   dates you would have executed would have been May 3,
7   2004, right?
8   A. Correct.
9   Q. You wouldn't have executed it in July and then
10  just backdated it to May 3, 2004?
11  A. No.
12  Q. And here is the -- the description includes a
13  Lancorp Financial Fund Business Trust, does it not?
14  A. Yes.
15  Q. Okay. Now, at the top it says, "Initial." Do
16  you see where there's a box marked?
17  A. Yes.
18  Q. Okay. And we are clear that you are not
19  submitting this form to say, oh, the L.L.C. I disclosed
20  earlier, in fact, described the trust activity, correct?
21  A. Correct.
22  Q. And, in fact, when we looked at the February 2,
23  2004 outside business disclosure reporting page, we can
24  both agree that there's nothing in that disclosure that
25  from your standpoint would have revealed any

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                          February 5, 2008

Page 230

1  relationship between the L.L.C. and the trust, correct?
2     A. Correct.
3     Q. And there's nothing in that disclosure that would
4  have suggested that you engaged in any inappropriate
5  conduct?
6     A. Correct.
7     Q. And there's nothing in that disclosure that from
8  your vantage point would have given ONESCO any reason to
9  have pause?
10    A. Correct.
11    Q. Now, when we look at this particular form, if you
12 note in the -- let me ask you this: We heard your
13 testimony yesterday and today. Can you tell the panel
14 whether, in fact, you ever sent this to ONESCO?
15    A. I cannot say that for a fact that I did. It was
16 in my file and that's why this was provided because it
17 was in my file.
18    Q. So you wouldn't have a recollection of who, if
19 anyone, you would have sent this to and the manner in
20 which you would have sent it?
21    A. No.
22    Q. We'll talk about the affidavits in a moment, but
23 your one affidavit says the reason that you signed this
24 is because you had attended a seminar conducted by the
25 NASD, correct?

Page 231

1     A. That's what I said, yes.
2     Q. What happens as part of your regulatory
3  requirement is that periodically you will go to an NASD
4  facility, walk up to a computer and you have to take a
5  test?
6     A. Correct.
7     Q. And what you indicated in your affidavit is that
8  because you took that test, that's what caused you to
9  then submit this form, right?
10    A. That's what I said, yes.
11    Q. And the statement found in your affidavit is, in
12 fact, inaccurate?
13    A. That's correct.
14    Q. You, in fact, took this NASD test in June of
15 2004?
16    A. Yes.
17    Q. And if you had taken it in June of 2004, we're in
18 agreement it could not have caused you to execute a
19 document on May 3, 2004?
20    A. Correct.
21    Q. So in terms of the elimination of the
22 possibilities, we know it was not anything that was done
23 with the NASD or as part of any continuing education,
24 which would have prompted you to submit this form?
25    A. Correct.

Page 232

1     Q. Is it also fair to say that looking at the center
2  of this document, very bottom, you were asked questions
3  about where it says in the lower left-hand corner
4  "ONESCO 160, Revision 5-2002;" do you see that?
5     A. Yes.
6     Q. And you were asked about that, but in the center
7  of the document it says Page 7, doesn't it?
8     A. Oh, yes.
9     Q. Okay. And keeping that open, let's look back at
10 Exhibit 33 for a moment, in Volume 2. And it's fair to
11 say that when you look at that version in this former
12 document, it does not have a Page 7 in the middle, does
13 it?
14    A. It does not.
15    Q. In fact, it has a completely different document
16 number?
17    A. It does.
18    Q. In the lower left-hand corner?
19    A. Correct.
20    Q. Okay. And when we look at -- back at Exhibit
21 81 --
22       MR. CHAIRMAN: Can you restate that last
23 question about the different document number?
24       MR. LITTLE: Sure can.
25       If you go back to Exhibit 33 --

Page 233

1        MR. CHAIRMAN: Same number, just a different
2  date; is that correct?
3        MR. LITTLE: Yeah. It says one is
4  ONESCO160RAV502. The second one is ONESCO160RAV1102.
5        MR. CHAIRMAN: Yeah.
6  BY-MS. LITTLE:
7     Q. And one document has a Page 7. That's Exhibit
8  81, right?
9     A. Correct.
10    Q. And Respondent's Exhibit 33 does not have a page
11 number. And do you recall questions as to whether or
12 not you would have completed this form after receiving
13 the annual compliance questionnaire?
14    A. Yes. That's what my thinking was that this --
15 that was -- must have been what caused me to complete
16 the form.
17    Q. Let's look at Respondent's Exhibit 109-A, which
18 is in Volume 3. And you were asked questions about the
19 same version of this document in the claimant's file.
20 But what is the date in which this memo is issued
21 indicating here's your copy of the 2004 ONESCO
22 compliance questionnaire?
23    A. July 9th, 2004.
24    Q. So assuming the memo is July 9, 2004, we can
25 agree that you would not have received a copy of the

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                    February 5, 2008

Page 234

1  annual compliance questionnaire until some date after
2  that?
3      A. Correct.
4      Q. And, in fact, let's look at the second bullet of
5  this July 9th, 2004 memo. It says, "The personal
6  brokerage account disclosure form." It says Page 6, and
7  the other business disclosure reporting form, Page 7,
8  are included for those who have any new information to
9  disclose; do you see that?
10     A. Yes.
11     Q. And so we can agree that if you, in fact, filled
12  out that form, based upon the compliance questionnaire,
13  you did it after July 9th and you went back and
14  backdated the date you signed, what has been marked as
15  Respondent's Exhibit 81?
16     A. That would appear to be correct.
17     Q. And if we just look at an example --
18         MR. CHAIRMAN: Do you have any recollection
19  one way or the other or are you just going by the
20  documents?
21         THE WITNESS: I'm just going by the
22  documents. It was speculation on my part as to what
23  would have inspired me to complete this form at this
24  time.
25  BY-MR. LITTLE:

Page 235

1      Q. And, in fact, sir, as you sit here today, after
2  having seen this document, you don't have any reason to
3  believe that it was the annual compliance manual that
4  would have caused you to complete that form?
5      A. Correct.
6      Q. If we look at 109-D, an example of the ONESCO
7  annual compliance questionnaire for 2004, if you could
8  turn to Page 7.
9         MR. GOODMAN: I apologize, what tab?
10         MR. LITTLE: D.
11         MR. GOODMAN: D, as in David?
12         MR. LITTLE: Yes.
13  BY-MR. LITTLE:
14     Q. And if you turn to Page 7, do you see an example
15  of another business disclosure reporting page?
16     A. Yes.
17     Q. And, in fact, the lower left-hand corner and the
18  page number is identical to the one that has been marked
19  as Respondent's Exhibit 81, correct?
20     A. Correct.
21     Q. Sir, isn't it fair to say that some time in
22  December of 2005 you had received an inquiry from the
23  NASD about a customer complaint being made relating to
24  the Lancorp Business Fund Trust?
25     A. I don't remember the dates.

Page 236

1      Q. Let's look at a couple documents and see if they
2  refresh your memory.
3         If you would, please, look at Respondent's
4  Exhibit 99 --
5      A. Okay.
6      Q. -- which is a December 14th, 2005 letter to
7  ONESCO. And what it references is if you look at the
8  third page of the exhibit, a copy of a complaint that
9  was submitted by a John and Carolyn Claisia [phonetic]
10  relating to the Lancorp Financial Fund Business Trust --
11     A. Yes.
12     Q. -- did you receive a copy of that some time in
13  late 2005?
14     A. Yes.
15     Q. And, in fact, was that the first customer
16  complaint you had received or had been advised by a
17  regulator had been received relating to the Lancorp
18  Business Fund Trust?
19     A. Yes.
20     Q. Now, if we look at Exhibit 101-A --
21         MS. WRIGHT: 101-A?
22         MR. LITTLE: 101-A, please.
23  BY-MR. LITTLE:
24     Q. Okay. This is a letter that you sent to Jody
25  Larson, the special investigator for the NASD?

Page 237

1      A. Yes.
2      Q. And it's regarding a customer complaint by John
3  and Carolyn Claisia, that's what you referenced at the
4  top?
5      A. Yes.
6      Q. And what you said in the first paragraph was the
7  fund did not engage in any solicitation of potential
8  investors, correct?
9      A. Correct.
10     Q. That is, the investors were referred to the fund
11  by Secured Clearing Corporation who had been the primary
12  referring source for a previous fund that shared a
13  similar investment strategy and it was directly involved
14  in the creation of Lancorp Fund, correct?
15     A. Correct.
16     Q. And investment advisors with whom they had had a
17  previous relationship also (inaudible) potential
18  investors?
19     A. Correct.
20     Q. And you referenced Mr. Reese, right?
21     A. Yes.
22     Q. And Mr. Reese, in fact, had been the principle
23  referral source for investors in this fund, correct?
24     A. Correct.
25     Q. It was Mr. Reese, according to your letter to the

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                    February 5, 2008

Page 238

1   NASD, that was responsible for conducting the
2   solicitations?
3      A. Correct.
4      Q. And if we look back, then, at Respondent's
5   Exhibit 25-C in Volume 1, please -- are you looking at
6   25-C?
7      A. Yes.
8      Q. Okay. 25-C is a summary you procured, which
9   identifies the referral source for the investors?
10     A. Correct.
11     Q. And so looking at the first page of 25-C under
12  the heading "Referred By," we you see where we have the
13  name Reese, Reese, Reese, and it goes on. And then we
14  have a fellow by the name of McDuff and Herring
15  [phonetic], for example, on the first page?
16     A. Yes.
17     Q. If we look at the second page, the soliciting
18  person is --
19        MR. GOODMAN: I object. The heading -- he's
20  misreading. The heading, if you look on Page 1, it
21  says, "Referred By." He's misreading. He's putting a
22  word there that didn't. He said solicited -- soliciting
23  body and, you know, it says what it says, and I think he
24  should refer to what it says.
25        MR. CHAIRMAN: Be precise.

Page 239

1        MR. LITTLE: I was being precise, and have
2   we figured out which counsel is going to object now.
3        MR. NEKVASIL: We have not been tag teaming
4        MR. CHAIRMAN: You really should let him do
5   it since he's been conducting the examination.
6   BY-MR. LITTLE:
7      Q. Looking at the second page, again, across the
8   board it's Mr. Reese, is it not?
9      A. Correct.
10     Q. And looking at the third page, it's Mr. Reese
11  with the exception of someone at the bottom named Don,
12  right?
13     A. Yes.
14     Q. And you can leap through the rest of the pages,
15  but for the most part, the person you identified as the
16  referral source for these investors was Mr. Reese?
17     A. Correct.
18     Q. And you understood as you represented to the NASD
19  that it was Mr. Reese who was serving as the advisor who
20  solicited these clients?
21     A. Correct.
22     Q. Now, if we look at Number 3, it says, "I called
23  O.N. Equity Sales Company and inquired as to what I
24  needed to do to disclose my activity in the fund;" do
25  you see that?

Page 240

1      A. Yes.
2      Q. And then it goes on, it says, "I spoke to Heather
3   Renfro who indicated that she would find out and provide
4   me with the necessary information. After a period of
5   time I was sent a one-page form to complete and return.
6   The date shows May 3, 2004. I did not receive any
7   further communications."
8         Do you see where it says, "I was sent a one-page
9   form to complete and return"?
10     A. Yes.
11     Q. You didn't say you actually returned it, did you?
12     A. No.
13     Q. And, in fact, you didn't return it?
14     A. Apparently not.
15     Q. At the time that you were responding to the NASD,
16  is it fair to say that MegaFund had already imploded?
17     A. Yes.
18     Q. And at this point in time you had been subject to
19  no less than two depositions by the SEC?
20     A. Yes.
21     Q. And at that point in time you understood that the
22  receiver was instituting various civil actions?
23     A. Yes.
24     Q. And, in fact, various criminal actions, criminal
25  prosecutions were being undertaken --

Page 241

1      A. Correct.
2      Q. -- were they not?
3      A. Correct.
4      Q. And you were insecure as to whether or not you
5   would have a criminal indictment rendered against
6   yourself, weren't you?
7      A. Yes.
8      Q. To the point that you went back and completed
9   what was marked as Respondent's Exhibit 81, didn't you?
10     A. It appears to be so.
11     Q. You, in fact, did not execute that on May 2nd,
12  but you executed that at a much later date only after
13  the MegaFund transaction imploded, right?
14     A. That's correct.
15        MS. WRIGHT: I want to hear that again,
16  please, your question.
17        MR. LITTLE: Isn't it fair to say that the
18  May 2, 2004 outside business disclosure form that is
19  marked as Respondent's Exhibit 81 was executed by you
20  only after the MegaFund transaction imploded?
21        MS. WRIGHT: Which date was --
22        MR. LITTLE: July 2005.
23  BY-MR. LITTLE:
24     Q. And, in fact, what your --
25        MR. CHAIRMAN: You think that's correct?

61 (Pages 238 to 241)

Page 242

1     THE WITNESS: I think that's probably
2 correct.
3     MR. CHAIRMAN: Do you have any memory of it?
4     THE WITNESS: Only vaguely, and I don't
5 remember sending the form in.
6     MR. CHAIRMAN: But you think you completed
7 it, to the best you can remember?
8     THE WITNESS: Best I can remember.
9 BY-MR. LITTLE:
10    Q. You completed it after the fact?
11    MR. NEKVASIL: He actually said he did not
12 know.
13    MS. WRIGHT: I want him to say it. That's
14 why I asked him.
15    MR. LUKOWSKI: Let's just testify and not
16 have Counsel, you know, say what he said and you can ask
17 him in cross-examination on the record.
18    MR. LITTLE: Thank you.
19 BY-MR. LITTLE:
20    Q. Sir, did you post date that document after the
21 fact?
22    A. I can't remember specifically, but I think I
23 probably did.
24    Q. And the reason you did is because you were
25 fearful of a criminal prosecution, right?

Page 243

1     A. I don't specifically recall thinking that, no.
2     Q. You were fearful that something was going to
3 happen to you, right?
4     A. Yes.
5     Q. And, in fact, the NASD ultimately disagreed with
6 the information you provided in what's marked as Exhibit
7 101-A, didn't they?
8     A. I don't know what you're referring to.
9     Q. Well, let's look then at --
10    A. 101-A?
11    Q. Excuse me. Let's look at Respondent's Exhibit
12 106.
13    MR. NEKVASIL: Mr. Chairman, we're going to
14 object to his -- the question which says the NASD
15 disagreed with what you said. Because nowhere in this
16 document does it say whether he submitted that form or
17 he didn't submit that form. This document is enforcing
18 action against him for not disclosing the transactions.
19 And do you recall that opposing counsel made a point in
20 saying in his opening that if you wanted to do the
21 transaction it's not sufficient to disclose that form.
22 You've got to disclose the specific transactions you
23 want to execute and get approval.
24    So this disciplinary action does not
25 constitute a statement by the -- conclusion by the NASD

Page 244

1 whether or not he submitted that form. It represents
2 the conclusion that he did not give the firm the proper
3 notice under the rule, which is stipulated, which would
4 be here are the names of the people I want to set the
5 trade for. Here's the dollar amount. Here's the date,
6 et cetera, et cetera. So for that we disagree with that
7 question.
8     MR. LITTLE: We'll go through the document.
9     MR. CHAIRMAN: We'll let the document speak
10 for itself and rephrase the question.
11 BY-MR. LITTLE:
12    Q. If we look at the second to the last page of the
13 document that is marked Respondent's Exhibit 106, your
14 signature appears on that document?
15    MR. CHAIRMAN: What's the ON number?
16    MR. LITTLE: 17, excuse me.
17    THE WITNESS: Yes.
18 BY-MR. LITTLE:
19    Q. And you signed that on August 10, 1996?
20    MR. CHAIRMAN: 2006.
21    MR. LITTLE: Excuse me, 2006, sorry.
22    THE WITNESS: Yes.
23 BY-MR. LITTLE:
24    Q. And what reads above that is, "I certify that I
25 have read and understand all the provisions of this AWC

Page 245

1 and have been given a full opportunity to ask questions
2 about it and that no offer, threat, inducement or
3 promise of any kind other than the terms set forth in
4 here has been made to induce me to submit it," correct?
5     A. Yes.
6     Q. And if we look, then, at Bates Page 12, the one
7 having the caption NASD letter of acceptance, waiver and
8 consent; do you see that?
9     A. Yes.
10    Q. Looking at Paragraph 3 where it says, "If
11 accepted"?
12    A. Yes.
13    Q. You understood that if this form was accepted by
14 the NASD, it would become part of your permanent
15 disciplinary record, did you not?
16    A. Yes.
17    Q. And that it would be available through the NASD
18 public disclosure program?
19    A. Yes.
20    Q. And the NASD could make public announcements
21 concerning this agreement?
22    A. Yes.
23    Q. And that you would not take any action or make or
24 permit to be made any public statements including in
25 regulatory filings and otherwise is (inaudible) direct

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                          February 5, 2008

---

Page 246

1  or indirect in any finding in the AWC or create the
2  impression that the AWC is without factual basis"?
3      A. Correct.
4      Q. Is that what you agreed to?
5      A. Yes.
6      Q. Look at the next page, please, bearing page
7  Number 13?
8      A. Okay.
9      Q. And it's fair to say what it listed was accurate
10  that you had entered the securities industry in June of
11  1996, right?
12      A. Yes.
13      Q. That you were associated with ONESCO from March
14  23, 2004 through January 3, 2005?
15      A. Yes.
16      Q. And at the time of this you did not have any
17  association with any other broker/dealers, did you?
18      A. Correct.
19      Q. And, in fact, where it says, "Lancaster has not
20  been the subject to prior disciplinary history by the
21  NASD," that was accurate as well, correct?
22      A. Correct.
23      Q. Let's look at the next page, Page 14 with the
24  heading "Private Securities Transactions, NASD Conduct
25  Rules 2010 and 3040;" do you see that?

---

Page 247

1      A. Yes.
2      Q. And it says that from March 23, 2004 through
3  January 3, 2005, Lancaster participated in the sales of
4  a little bit less than $5 million worth of shares in
5  Lancorp Financial Fund Trust through a private placement
6  memorandum, correct?
7      A. Correct.
8      Q. And that was accurate, wasn't it?
9      A. Yes.
10      Q. If we then look at the page that is marked
11  "ONESCO 16," Item Number 2, it says, "Lancaster failed
12  to provide written notice of his participation in the
13  securities transactions to O.N. Equity," right?
14      A. Correct.
15      Q. And that was accurate?
16      A. Yes.
17      Q. And you understood that the punishment that you
18  received by entering into this stipulation was that you
19  were permanently barred from having any association with
20  any NASD member in any capacity?
21      A. Yes.
22      Q. And I take it that you took this very seriously
23  at the time you entered into this agreement?
24      A. Absolutely.
25      Q. You did not take it lightly because you

---

Page 248

1  understood that from never -- forevermore you would
2  never have association as a licensed member with any
3  other broker/dealer?
4      A. Correct.
5      Q. You also understood that this would become part
6  of a public record that would be available to anyone who
7  checked your CRD record, correct?
8      A. Yes.
9      Q. Now, you were asked some questions about whether
10  or not the location of your address had been properly
11  disclosed, that is, where your ONESCO office was, and I
12  believe you testified it was in Oregon, correct?
13      A. Correct.
14      Q. Is it fair to say that at no point in time did
15  any of the investors profess confusion to you in terms
16  of how to locate you?
17      A. No.
18      Q. Is it fair to say that in all of the documents
19  that you provided the investors, you identified your
20  Oregon home address as your location?
21      A. Yes.
22      Q. Did the NASD indicate that they had any issues
23  and problems in locating you?
24      A. No.
25      Q. Did the SEC indicate that they had any problems

---

Page 249

1  or issues in locating you?
2      A. No.
3      Q. Did the receiver appointed by the court indicate
4  there were any problems in contacting you?
5      A. No.
6      Q. Did anyone ever indicate that they were somehow
7  disadvantaged by the clerical error that occurred in
8  identifying what your address was on the --
9      A. No.
10      MR. NEKVASIL: Mr. Chairman, we move to
11  strike the question -- the answer because of the
12  question which characterizes a clerical error.
13      MR. CHAIRMAN: We'll just note that you, you
14  know, object and there's no striking in an arbitration
15  record anyway.
16      MR. NEKVASIL: That's fine.
17  BY MR. LITTLE:
18      Q. And, sir, the document that identified
19  incorrectly your address was, in fact, a document you
20  signed?
21      A. Yes.
22      Q. That is the form that said here's the wrong
23  address was signed by you?
24      A. Correct.
25      Q. And you just didn't catch it either, did you?

---

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                                    February 5, 2008

Page 250

1     A. Correct.
2     Q. And if you had caught it, you would have told
3  someone?
4     A. Yes.
5        MR. CHAIRMAN:  Do you have an estimate of
6  how much more time you need?
7        MR. LITTLE:  I have plenty of questions.  I
8  was just trying to find the next exhibit.  Sorry to
9  disappoint you.
10        MR. CHAIRMAN:  How about planning a break in
11  about 15 minutes?
12        MR. LITTLE:  That's fine.
13  BY-MR. LITTLE:
14     Q. Is it fair to say, sir, that with respect to --
15  just so we're clear, you represented to the NASD that
16  you did not solicit the investors, correct?
17     A. Correct.
18     Q. And what you understood the way the system worked
19  is others would solicit the investors and bring them to
20  you?
21     A. Correct.
22     Q. And that you would then manage the monies in the
23  account?
24     A. Correct.
25     Q. And so it was up to Gary McDuff or Mr. Reese to

Page 251

1  make the solicitations?
2     A. Correct.
3     Q. And in terms of Mr. Reese, is it fair to say that
4  you did not know much, if anything, about his
5  background?
6     A. Correct.
7     Q. You understood that he sold insurance?
8     A. Yes.
9     Q. And did some financial planning?
10     A. He had clients that he advised in some capacity.
11     Q. Okay.  But other than that you were not familiar
12  with his background?
13     A. Correct.
14     Q. To the extent Mr. Reese made presentations to
15  customers, is it fair to say that you would not have
16  participated in those presentations?
17     A. Correct.
18     Q. To the extent that he was sending literature to
19  the investors, that's not something you would have been
20  copied on?
21     A. Correct.
22     Q. Okay.  And is it fair to say that what you really
23  expected Mr. Reese to do is that to the extent he
24  solicited any investors, that he was to do so consistent
25  with the private placement memorandum?

Page 252

1     A. Yes.
2     Q. And that given that the private placement
3  memorandum indicated there was no broker/dealer
4  involved, you had every reason to believe that Mr. Reese
5  would not disclose to any investors that there was a
6  broker/dealer involved?
7     A. Correct.
8     Q. And, to your knowledge -- did Mr. Reese ever
9  contact you and say, oh, by the way, I'm telling people
10  that there's a broker/dealer involved?
11     A. No.
12     Q. Or that people were relying upon your licenses?
13     A. No.
14     Q. Let's then, if we could, turn to Exhibit 82-A.
15  One of the accounts that you would have held would have
16  been one at Piper Jaffray in your name, correct?
17     A. Yes.
18     Q. And if we look at 82-A, in the middle where it
19  says, "name of current employer," it actually identifies
20  the O.N. Equity Sales Company, do you see that?
21     A. Yes.
22     Q. And this is the account -- that was your
23  retirement account, wasn't it?
24     A. Yes.
25     Q. So if we look, then, at Exhibit 82-B, and, again,

Page 253

1  we're talking about Account 5562, if we look at
2  account -- your June 2004 statement, it shows that in
3  Account 5562 this is how much you had in your retirement
4  plan?
5     A. Correct.
6     Q. And this is the type of account statement you
7  anticipated would be provided to Lancaster as a result
8  of the -- excuse me -- to ONESCO as a result of the
9  February 2004 disclosure of the existence of this
10  account?
11     A. Correct.
12     Q. If we then turn to what's marked as 82-C, again,
13  this shows no activity, does it?
14     A. Correct.
15     Q. And if you would go, then, through 82-D, E, F, G,
16  H, and confirm for us that these are the account
17  statements for your personal retirement plan statement
18  that you anticipated would be given to ONESCO?
19     A. Correct.
20     Q. And none of the trust funds for those
21  statements -- none of the trust funds would have been
22  transferred through this account?
23     A. Correct.
24     Q. Now, let's, then, look at Exhibit 83.  And
25  turning to Exhibit 83-A, you also had an account in the

Hearing                                              February 5, 2008

Page 254

1  name of the Lancorp Financial Group, L.L.C.?
2      A.  Yes.
3      Q.  And the account number at the top just for
4  shorthand was 8898, correct?
5      A.  Yes.
6      Q.  And your signature is found at Page 148 of 838,
7  isn't it?
8      A.  Yes.
9      Q.  Now, this particular account does not disclose
10  that you had any association with another broker/dealer,
11  does it?
12      A.  No.
13      Q.  And this is not an account statement that you
14  anticipated would have been sent to ONESCO, right?
15      A.  Correct.
16      Q.  If we look at 83-B in the typed out provision --
17  or version of the account profile and look in the middle
18  of the page where it says, "NASD class," and, in fact,
19  it says, "Not an employee of a brokerage firm or a
20  relative one or in another class monitored by the NASD,"
21  right?
22      A.  Correct.
23      Q.  Now, if we then look at 83-D --
24      A.  I guess I don't have a tab for that.  What is it?
25      Q.  83-D?

Page 255

1      A.  I don't have a D tab.  So what --
2      Q.  I'm sorry.  It's 174.
3      A.  Okay.
4      Q.  That is a December 2000 account statement for the
5  Lancorp Financial Group, L.L.C. bearing the stamp 8898?
6          MR. NEKVASIL:  Mr. Chairman, I'm going to
7  object.  First of all, the minor technical one they said
8  December 2000 and it's December 2002.
9          The second, Mr. Chairman, I want to object
10  to this whole line of questioning because unlike the IRA
11  account this account was opened years before he joined
12  ONESCO.  So, of course, he's not going to put on the
13  account in 2002 that he's affiliated with ONESCO because
14  this account, Mr. Chairman, was open in 2002.  So
15  they -- I know there's no intent on his part to mislead
16  the panel, but I don't understand (inaudible) the
17  question.  If you go back to page --
18          MR. CHAIRMAN:  What's the relevance of this?
19          MR. LITTLE:  I'm going to walk you through
20  the account statements and show you the flow of the
21  money.
22          MR. NEKVASIL:  Okay.  But, Mr. Chairman, I
23  object to the line of questions.  Is he asking
24  specifically -- I asked him a series of questions on
25  this about not disclosing to ONESCO.  That's got nothing

Page 256

1  to do with the flow of money and this account was opened
2  in December of 2002.
3          MR. CHAIRMAN:  Okay.  Your point is taken.
4  Let's get on with --
5          MR. LITTLE:  We're going to get there --
6          MR. CHAIRMAN:  Well, try to get there fast.
7          MR. LITTLE:  -- if we can make our way.
8  BY-MR. LITTLE:
9      Q.  This particular account -- in fact, if we look at
10  83-E, which has the Bates stamp 180, was, in fact,
11  opened for a very short period of time because the money
12  was transferred out, wasn't it?
13      A.  Yes.
14      Q.  And then -- so let's turn to 84-A.  This is an
15  account statement -- and by the way, the amount in the
16  last account was $41,000?
17      A.  Correct.
18      Q.  Let's look at 84-A.  This account has the name
19  Lancorp Financial Fund Business Trust, right?
20      A.  Yes.
21      Q.  And the account number there is 5560 up in the
22  upper right-hand corner?
23      A.  Yes.
24      Q.  Now, this one, the date is March 31, 2003, right?
25      A.  Yes.

Page 257

1      Q.  And just so we're clear, in the middle of it,
2  again, not an employee of a brokerage firm or
3  (inaudible) of another class monitored by --
4          MR. NEKVASIL:  Mr. Chairman, in March 2003
5  he was not affiliated with a broker/dealer.  I, again,
6  object to this questioning.  This has nothing to do with
7  paper flow.  He's trying to plant in your mind some
8  insinuation that he disclosed this IRA account in 2004,
9  but didn't disclose these two accounts with them when
10  they were opened and closed before he joined ONESCO.
11  Remember the testimony --
12          MR. CHAIRMAN:  Mr. Little, why don't you
13  tell us where you're trying to go with this.
14          MR. LITTLE:  Well, I'm going to ask him the
15  next question, did he ever amend that.
16          MR. CHAIRMAN:  Ever amend this?
17          MR. LITTLE:  Amend the disclosure
18  (inaudible) he was associated with a broker/dealer.
19          MR. NEKVASIL:  Mr. Chairman, I object to
20  that.  Because I believe this is the account that the
21  testimony is that was closed in August of 2003 after the
22  compliance director for U.S. Bancorp Piper Jaffray saw
23  on the Internet an issue with Gary Lancaster and the
24  Avenger Fund, and he did not join ONESCO until March
25  2004.  This is misleading.

Hearing                                                    February 5, 2008

---

Page 258

1    MR. CHAIRMAN: Is that right?
2    MR. LITTLE: It's not misleading.
3    MR. CHAIRMAN: No. About the facts, about
4  the opening and closing. I didn't mean --
5    MR. LITTLE: No. I'm walking -- there were
6  several accounts. We have to walk you through them so
7  you can see them.
8    MR. NEKVASIL: I object. He's walking them
9  through this account. I'm sorry. He's walking through
10 this account.
11   MR. LITTLE: He can do his
12 cross-examination --
13   MR. NEKVASIL: No. But, Mr. Chairman,
14 that's misleading to you --
15   MR. CHAIRMAN: Hang on. Hang on.
16   MR. LITTLE: I understand he's excited on
17 this, but I'd like to get through the examination. I
18 sat patiently as he went through this.
19   MR. CHAIRMAN: I don't need that. I don't
20 need that. Just tell me what this is about and where
21 you're going with it.
22   MR. LITTLE: Yeah. As on this particular
23 one -- excuse me. As on this particular one, again,
24 we're going to show the movement of money from this
25 account, and it goes up to -- let me get the date for

Page 259

1  you. We're up to a million dollars.
2    MR. CHAIRMAN: Go to where?
3    MR. LITTLE: In July of 2003.
4    MR. CHAIRMAN: Why don't you go to where it
5  moves.
6    MR. NEKVASIL: Mr. Chairman, he doesn't mean
7  moves. What he really means is -- he means to say that
8  he actually wanted to show you how the account grew to a
9  million before it was closed at the request of the
10 compliance department, which is already in evidence. I
11 don't have an objection. If he repeats that testimony
12 with you during an objection and saying, well, you don't
13 disclose that he was with a -- you were with a
14 broker/dealer. You don't amend that disclosure knowing
15 that the account was closed in 2003. The only basis for
16 those two questions is to plant a thought in your
17 mouth -- mind that he should have disclosed that.
18   MR. LUKOWSKI: Why don't you also assume for
19 the fact that we're reasonably sophisticated and that we
20 understand difference in dates and that you can
21 certainly point those out to us, and I think my personal
22 preference that would be --
23   MR. NEKVASIL: I mean no insinuations on the
24 contrary.
25   MR. CHAIRMAN: I'm sure you will be able to

Page 260

1  articulate your explanation very well.
2    MR. NEKVASIL: The idea is to get the facts
3  to you, though.
4    MR. CHAIRMAN: I know.
5    MS. WRIGHT: It's not putting anything in my
6  mind. I'm -- you know, I can figure out what's going
7  on. Let him go through what he wants to do.
8  BY-MR. LITTLE:
9    Q. Sir, looking for the exhibits that are behind
10 Exhibit 84, does that show that that account grew from
11 roughly $5,000 until we get to roughly a million dollars
12 in August of 2003?
13   A. Correct.
14   Q. And then those monies were transferred out, were
15 they not?
16   A. Yes.
17   Q. Then look at --
18   MR. LUKOWSKI: Stop for a second, please.
19 On 84-A, there's -- you've got boxes checked, over $5
20 million. What does that have to do with anything?
21   MR. LITTLE: I don't have those boxes
22 checked.
23   MR. LUKOWSKI: On 84-A?
24   MR. LITTLE: No. That's not my checks.
25   MR. LUKOWSKI: I know. I'm saying that it's

Page 261

1  on the original document.
2    MR. LITTLE: Okay.
3    MR. LUKOWSKI: I'm not saying it's anything
4  you did.
5    MR. LITTLE: You want me to ask the question
6  with the witness, then?
7    MR. LUKOWSKI: Please.
8  BY-MR. LITTLE:
9    Q. Okay. Sir, it was anticipation that there would
10 be money from the trust flowing into the -- this
11 particular account?
12   A. Correct.
13   Q. That is, the money for the account was going to
14 be held in an account name actually in the name of the
15 trust?
16   A. Correct.
17   MR. LITTLE: Is that sufficient?
18   MR. LUKOWSKI: Yes. Thank you.
19 BY-MR. LITTLE:
20   Q. Okay. By the way, Counsel asked -- or maybe
21 commented reason this account was shut down is because
22 Piper Jaffray took issue with the activity that was
23 being engaged in.
24   MR. NEKVASIL: I object, Mr. Chairman. I --
25 didn't -- the witness testified -- he said Counsel said.

Hearing                                   February 5, 2008

Page 262

1  The witness testified right before the lunch break
2  that -- I asked him why was -- was it his expectation to
3  keep this account open until it reached 5 million, yeah.
4  Well, obviously it changed and closed in August of 2003.
5  Why? He said because the compliance department asked
6  the brokers to shut it down because they saw something
7  on the Internet --
8          MR. CHAIRMAN: Okay. Well, let's -- he just
9  said you repeated that.
10         MR. LITTLE: He just repeated it five
11 minutes ago.
12         MR. CHAIRMAN: He didn't say you gave
13 testimony. He said you repeated that and that's what he
14 had testified to.
15 BY-MR. LITTLE:
16 Q. Sir, did Piper Jaffray amend your U-5 at any
17 point in time to disclose the activity associated with
18 the Lancorp Financial Fund Business Trust?
19 A. Not to my knowledge.
20         MR. LITTLE: I understand the tape is about
21 out. We need to take a break.
22         MR. CHAIRMAN: You need a tape break?
23         MR. LITTLE: Yeah.
24         VIDEOGRAPHER: The time is 4:13 p.m. This
25 concludes Tape Number 4. We're now off the video

Page 263

1  record.
2          (Thereupon, a break was taken.)
3          VIDEOGRAPHER: The time is 4:30 p.m. This
4  begins Tape Number 5. We're back on the video record.
5  BY-MR. LITTLE:
6  Q. Would you turn to Respondent's Exhibit 85-A,
7  please. And there's a reference there to Lancorp
8  Financial Group, L.L.C., counselor, FBO, International
9  Capital Institute. What's the International Capital
10 Institute?
11 A. I don't know.
12 Q. If you look at the account statement 85-B -- I'm
13 sorry, the account profile, again, there's a reference
14 to International Capital Institute. Do you know what
15 that is?
16 A. I don't. It must be just a description of a kind
17 of an account it is.
18 Q. Look at 85-D, does that show that this particular
19 account was -- had $5 million transferred into it in the
20 month of May 2003?
21         MR. CHAIRMAN: B or D?
22         MR. LITTLE: D, as in David.
23 BY-MR. LITTLE:
24 Q. Now, what I'm trying to understand is the last
25 account that was in Series 84 that was closed out in

Page 264

1  August 2003, in terms of moving of money, that's 2003.
2  You add another account in Piper Jaffray that would have
3  then contained another $5 million?
4  A. Yes.
5  Q. And if we look at 85-F, did you sign 85-F?
6  A. Yes.
7  Q. And it says, "As per our conversation, please
8  wire 100 percent of the funds from account 49748902 to
9  the International Capital Institute account at Salomon,
10 Smith Barney"?
11 A. Yes.
12 Q. And then it gives an account number?
13 A. Correct.
14 Q. Does that refresh your recollection as to what
15 that account was?
16 A. It does.
17 Q. And what was that account?
18 A. This was an account set up specifically for a
19 contact, if you will, of Gary McDuff who was going to
20 participate in the trading. There was a specific bond
21 trader who was with one of the big east coast firms who
22 came out, and I forgot his name now. He was actually
23 going to execute the trade. This was a custody account
24 set up for him to do that.
25 Q. Was this pre Tricom?

Page 265

1  A. Yes.
2  Q. Okay. And was this a broker/dealer in terms of
3  it was maintained at Smith Barney?
4  A. The -- the account that the money came into U.S.
5  Bank was Smith Barney -- in the Smith Barney account
6  owned by International Capital Institute. That's the
7  client.
8  Q. Did you contain to -- continue to maintain
9  control of the monies placed in the Smith Barney
10 account?
11 A. No. No trading occurred. The guy didn't get it
12 done and so the client requested his money back, and I
13 already had the money sent back to his account.
14         MS. WRIGHT: Excuse me. I'm having a hard
15 time hearing because this fan is on. Did you say the
16 money that went into this account, this 5 million or so,
17 was from a potential client?
18         THE WITNESS: It was from a client who
19 wanted to participate who transferred his money into the
20 account and in anticipation of the trading would begin
21 to occur that was -- a bond trader from -- and I forget
22 now -- one of the big named broker/dealers on the east
23 coast who actually came out and who I met with who was
24 going to actually do the trading for them, the
25 client. It never happened. The money sat in the

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                    February 5, 2008

Page 266

1  account. He then said, well, if nothing's going to
2  happen, then send the money back.
3          MR. LUKOWSKI: Does this have anything to do
4  with Lancorp Business Trust?
5          THE WITNESS: No.
6          MR. CHAIRMAN: So this is an independent
7  separate $5 million.
8          THE WITNESS: Totally separate transaction.
9          MR. CHAIRMAN: And the money went in and
10 out, no loss, no gain?
11         THE WITNESS: Nothing happened. The guy
12 said give it back so I sent it back to him.
13 BY MR. LITTLE:
14     Q. And when did you send the money back?
15     A. I ordered it on this date, so I didn't --  I
16 didn't send it.
17     Q. Oh, I'm sorry. So the money originally came from
18 Smith Barney --
19     A. Came from Smith Barney into this account. It sat
20 there for a period of time. When nothing happened, he
21 asked for it back and I requested to have the funds sent
22 back to the original Smith Barney account that it came
23 from.
24     Q. Fine.
25         Now, let's look then, if we could, at

Page 267

1  Respondent's Exhibit 86. And that's the document
2  entitled, "Personal Brokerage Account Disclosure Form"?
3      A. Yes.
4      Q. That you signed on or about September 24th, 2004?
5      A. Correct.
6      Q. Now, was it your testimony earlier that this also
7  came from the annual compliance questionnaire?
8      A. That is what I'm thinking. I can't say that with
9  absolute certainty.
10     Q. If you look at the middle of the page, did you
11 see there's no Page 6?
12     A. Correct.
13     Q. And you can confirm for your own benefit, but if
14 you go back at 109-D and look at the personal brokerage
15 account disclosure form bearing the Bates stamp 10412,
16 do you see the Page 6 there? It's 10412.
17     A. Under what tab?
18     Q. Behind Tab 109-D.
19     A. 109-D.
20     Q. Turn to Page 6 of that.
21     A. What's the ON number?
22     Q. 10412?
23     A. 412, okay.
24     Q. Okay. Do you have that?
25         And that's a copy of a Personal Brokerage Account

Page 268

1  Disclosure Form?
2      A. Yes.
3      Q. And this particular version has a Page 6?
4      A. Yes.
5      Q. The one that was distributed with the compliance
6  manual. But the one you filled out in September did
7  not, in fact, have that?
8      A. Correct.
9      Q. Now, is it fair to say that the Lancorp Financial
10 Fund Business Trust was not a personal account of yours?
11     A. Correct.
12     Q. And if we look at Rule 3050 behind Respondent's
13 Exhibit 88, looking at the -- turning to the second
14 page, sir. We're looking at 3050, Subparagraph C where
15 it says, "Obligations of associated persons concerning
16 an account with a member." Do you see that language?
17     A. Yes.
18     Q. And it says, "A person associated with a member
19 prior to opening an account are placed in an initial
20 order for the purchase or sale securities with another
21 member shall notify both the employer member and the
22 executing member in writing of his or her association
23 with the other member provided however that if the
24 account was established prior to the association of the
25 person with the employer member, the associated person

Page 269

1  shall notify both members in writing promptly after
2  becoming so associated;" do you see that?
3      A. Yes.
4      Q. And, sir, is it fair to say that when we look at
5  Exhibit 86 again, that, in fact, the Tricom account that
6  you described as not being personal in nature, had
7  actually been opened prior to September of 2004?
8      A. Yes.
9      Q. In fact, if we could look at what's been marked
10 as Exhibit 87-B, is this a copy of a March 18th, 2004
11 fax that you sent to Australia regarding this new
12 account?
13     A. Correct.
14     Q. And attached to what you provided was the client
15 and account details?
16     A. Yes.
17         MR. NEKVASIL: What number was that? I'm
18 sorry.
19         MR. LITTLE: This is Exhibit 87-B.
20         MR. NEKVASIL: Okay. I missed the B. I
21 apologize.
22         MR. CHAIRMAN: And that's a fax to
23 Australia?
24 BY MR. LITTLE:
25     Q. Is that a fax to Australia?

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                        February 5, 2008

Page 270

1   A. Yes.
2   Q. It reflects your fax stamp at the top, does it
3   not?
4   A. Yes.
5   Q. And it shows that you faxed it on March 18, 2004?
6   A. Correct.
7   Q. And the account name you put was Lancorp
8   Financial Fund Business Trust?
9   A. Correct.
10  Q. Okay. If we then look at the last page of the
11  document, does that bear your signature?
12  A. It does.
13  Q. And on the second to the last page of the
14  document, does it show the agreements March 18th, 2004?
15  A. Yes.
16  Q. This is the time in which you would have just
17  started your registration with ONESCO?
18  A. Correct.
19  Q. And is it fair to say you did not disclose the
20  existence of this account at the time it was created in
21  March of 2004?
22  A. Correct.
23  Q. If we then, please, look at what's been marked as
24  Exhibit 87-A. Take a moment and look through those
25  statements and confirm for us that those are the account

Page 271

1   statements for the Tricom account you maintained in
2   Australia.
3   A. They are.
4   Q. And those account statements show activity
5   occurring prior to September 2004, do they not?
6   A. Yes.
7   Q. And, in fact, if we then go to Respondent's
8   Exhibit 101-B, that's the letter to the NASD you dated
9   January 6th, 2006, where in Paragraph 5 you itemized the
10  monies being sent starting in April 2004 to Tricom?
11  A. Correct.
12  Q. And it looks like with the exception of the last
13  two installments -- excuse me, with the exception of the
14  October 7, 2004 payment, or transfer, all of the money
15  placed in Tricom account had been sent there prior to
16  your execution of the personal disclosure
17  brokerage/dealer form; is that right?
18  A. Which was what date?
19  Q. September 24.
20  A. Correct.
21  Q. And, sir, when you filled out the Lancorp
22  Financial Fund Business Trust -- excuse me -- when you
23  filled out Respondent's Exhibit 86, it was not your
24  intention to disclose that as a private securities
25  transaction, was it?

Page 272

1   A. No.
2   Q. And, in fact, it was not your intentions to ask
3   ONESCO to basically approve all the activity occurring
4   in that account, correct?
5   A. Correct.
6   Q. What you did is disclose in the account simply
7   the existence of the account?
8   A. Correct.
9   Q. And as you sat here today, is it your testimony
10  you don't understand why you would have submitted it
11  during that time frame some six months after the fact?
12  A. I don't remember what initiated me to send it.
13  Q. But in terms of your intent, you did not view
14  this as a request to ONESCO to approve any type of
15  private securities transaction?
16  A. No.
17  Q. Now, is it -- sir, is it fair to say that with
18  respect to the Tricom account, those monies would have
19  been moved in December of 2004?
20  A. That sounds correct.
21  Q. And if we could go back, please, to -- before we
22  do that, you were shown some letters previously about
23  the Pennsylvania Division of Securities making some
24  inquiries?
25  A. Yes.

Page 273

1   Q. And just so we're clear on the dates, if you turn
2   to Respondent's Exhibit 93, it says September 3, 2004 on
3   that letter from Pennsylvania?
4   A. Yes.
5   Q. And then if you turn to the next one -- I'm
6   sorry -- Respondent's Exhibit 95, another letter from
7   Pennsylvania Division of Securities with a date of
8   September 15th, 2004, is it your testimony that you did
9   not submit that form on September 24 because you had
10  been contacted by the Pennsylvania Division of
11  Securities?
12  A. Yes. I would have remembered that.
13  Q. Sir, is it fair to say that --
14         MS. WRIGHT: I'm sorry. I did not hear that
15  answer.
16         THE WITNESS: I said I would have remembered
17  that.
18         MS. WRIGHT: Okay.
19  BY-MR. LITTLE:
20  Q. But you don't otherwise have any explanation as
21  to why you submitted that form on September 24?
22  A. I did not.
23  Q. Sir, with respect to Pennsylvania, when you
24  submitted the Form D to Pennsylvania's division of
25  securities, did they at any point in time tell you that

Hearing                                                  February 5, 2008

Page 274

1  notice filing was insufficient or inadequate in any way?
2    A. Not that I recall.
3    Q. And do you have any recollection of Pennsylvania
4  advising you that you could not move forward with this
5  unregistered securities sales within the state?
6    A. No.
7    Q. At any point in time did they contact you and say
8  we're investigating you with respect to the activities
9  of the Lancorp Business Fund Trust?
10   A. No.
11   Q. And so they never issued any type of cease and
12 desist letter to you?
13   A. No.
14   Q. Or otherwise took any action against you,
15 whatsoever?
16   A. Not that I know of.
17   Q. Did Pennsylvania ever indicate to you that they
18 had received a customer complaint concerning you?
19   A. Did they notify me of that?
20   Q. Yes.
21   A. Not that I remember.
22       MR. NEKVASIL: Can he -- can we make sure
23 the witness keeps speaking up. I'm having a problem
24 hearing him.
25       MS. WRIGHT: It's this fan thing that's on.

Page 275

1  It's difficult.
2        MR. CHAIRMAN: And I know you don't want to
3  shout in his ear, but --
4        THE WITNESS: I don't remember receiving
5  anything from Pennsylvania.
6  BY-MR. LITTLE:
7    Q. Okay. Let's -- if we could go back to Volume 1,
8  please.
9        MR. CHAIRMAN: Page?
10 BY-MR. LITTLE:
11   Q. If you would turn to Exhibit 26-A, please. Is
12 this a letter of December 6th, 2004 that you would have
13 sent to all of the investors?
14   A. Yes.
15   Q. And if we look at the second paragraph of the
16 letter it says, "As of Friday December 3rd, it has been
17 confirmed that the information that has been provided to
18 me by the syndication group of which Lancorp Financial
19 Fund is a participant has been misleading and, in fact,
20 not accurate relative to Lancorp.
21     The fact is that Lancorp Financial Fund may not
22 have participated in the underwriting activity of the
23 syndicating group during the third quart ending in
24 September 30, 2004. It is recently certain that Lancorp
25 Financial Fund would not have participated in any

Page 276

1  underwriting activity in the syndicating group during
2  the fourth quarter ending December 31, 2004."
3      Is the reference there to the money that was
4  being held at Tricom?
5    A. Yes.
6    Q. And what you communicated to the investors is
7  that, in fact, Lancorp Financial Business Fund Trust had
8  received misleading information as to what was going on
9  with respect to that investment?
10   A. Yes.
11   Q. And, in fact, that is something you would have
12 communicated to each investor?
13   A. Yes.
14   Q. And I take it, you were disappointed with the
15 fact that you personally had been mislead?
16   A. Yes.
17   Q. And you thought that was inappropriate?
18   A. Correct.
19   Q. And did you -- if you look, then, at the second
20 page, the one bearing the Bates stamp Lancaster 4076.
21 The first paragraph says, "The news is not all bad,
22 however, I have made contact with the principal of a
23 major securities firm with who I have a previous
24 relationship and have reached an agreement to be a
25 participant with that firm.

Page 277

1      Part of that agreement is the guarantee of full
2  participation in all the underwriting activities. I
3  expect the necessary documents to be executed during the
4  month of December with this fund participation to begin
5  in January 2005;" do you see that?
6    A. Yes.
7    Q. What was the broker/dealer you were referring to
8  there?
9    A. That was a broker/dealer called the Aurora Group
10 in the UK.
11       MR. CHAIRMAN: The what?
12       THE WITNESS: It was a group called -- I
13 forget what the original company name was. They were
14 taking over -- I think it was Jackson Baton [phonetic]
15 and they were taken over by another company that was
16 called the Aurora Group and they were a broker/dealer in
17 the UK.
18       MR. NEKVASIL: I'm having a problem hearing.
19 Is it Aurora? I'm sorry.
20       MR. CHAIRMAN: Aurora Group. How do you
21 spell that name?
22       THE WITNESS: I think it was A-U-R-O-R-A.
23 BY-MR. LITTLE:
24   Q. Now, if we look at the next paragraph, it says,
25 "As an investor, you now have the following choices:

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                          February 5, 2008

Page 278

1  Remain in the fund and redeem your shares"?
2      A. Yes.
3      Q. So after you advised the investors that there had
4  been some inappropriate conduct with respect to the
5  disposition of the funds, you gave them the option?
6      A. Yes.
7      Q. And was that option granted to each of the
8  investors?
9      A. Yes.
10     Q. So if we look at Exhibit 26-B, is this simply a
11  form of the type of letter you would have sent to each
12  of the investors describing the same information found
13  in 26-A?
14     A. Yes.
15     Q. Now, some of the investors accepted your
16  invitation, did they not?
17     A. They did.
18     Q. So if we look at 26-C?
19         MR. GOODMAN: 26?
20         MR. LITTLE: 26-C, please.
21         MR. GOODMAN: Excuse me.
22  BY-MR. LITTLE:
23     Q. Is this a request by one of the investors in
24  December of 2004 to withdraw funds?
25     A. Yes.

Page 279

1      Q. And just so we're clear, if you look at 26-D,
2  also it's dated in September 2004, it appears this is
3  another investor who has elected to withdraw the funds?
4      A. Yes.
5      Q. Did some of the investors actually withdraw their
6  funds and put them back in?
7      A. Yes. I don't remember how many, but some, yes.
8      Q. Let's look at Exhibit 26-E. And this is a
9  request from someone -- one of the investors, I take it,
10  on December 17th --
11     A. Yes.
12     Q. -- 2004 asking for the return of the money?
13     A. Yes.
14     Q. And after that you would have sent -- if we look
15  at 26-F, a letter of January 18th, 2005 to all
16  investors, right?
17     A. Yes.
18     Q. And January 18 is after you had been terminated
19  from ONESCO?
20     A. Yes.
21     Q. Okay. And this says, "I hope this communication
22  finds it all as well with you. As promised, this is an
23  update from my last letter. I still do not have an
24  adequate explanation as to why the funds did not
25  participate in the earnings activity in the last two

Page 280

1  quarters of 2004. At this point I do not have an
2  expectation of receiving one.
3      Further, I have no expectation the fund will
4  receive any earnings that should have been paid to the
5  fund."
6      And then the next paragraph, "I am currently
7  waiting for the first contracts, which are expected to
8  be received soon, I am requiring direct written
9  contracts so there will not be a reoccurrence of the
10  previous issues going forth."
11     When you say the "direct written contracts,"
12  that's the written direct contract with MegaFund, isn't
13  it?
14     A. No.
15         MR. CHAIRMAN: With who?
16         THE WITNESS: This was the --
17         MR. CHAIRMAN: I didn't hear who was --
18         MR. LITTLE: I said it was MegaFund.
19         MR. CHAIRMAN: MegaFund.
20         MR. LITTLE: And he said no.
21         THE WITNESS: No. This was the anticipation
22  of having an agreement drawn up with the Aurora Group,
23  and I was going to demand in writing the same kind of
24  guarantees that I had from Tricom.
25  BY-MR. LITTLE:

Page 281

1      Q. You never did receive that, did you?
2      A. No.
3      Q. So what was proposed in December and January of
4  2005 never occurred?
5      A. That's correct.
6      Q. And what the investors know, though, is that in
7  January 2005 you still have not secured a viable
8  investment alternative for them?
9      A. Correct.
10     Q. And when you're communicating this in January
11  2005, it is after you have left ONESCO?
12     A. Yes.
13     Q. Now, if you look at 26-H, please. So it
14  continues after you left ONESCO that investors are
15  asking for the return of the money such as 26-H?
16     A. Yes.
17     Q. Where we have someone on January 24, 2005, a
18  Kerry Robertson asking for the return of their money?
19     A. Yes.
20     Q. And you returned it, did you not?
21     A. Correct.
22     Q. And if you look at 26-I, a Lisa Hoffman
23  [phonetic], January 24th, 2005, returning -- requesting
24  the return of the money?
25     A. Yes.

71 (Pages 278 to 281)

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                                    February 5, 2008

Page 282

1     Q. That identical -- identical document, it is then
2  sent by Louise Robrez [phonetic] in 26-J, correct?
3     A. Yes.
4     Q. And then if we look at 26-P, as in Paul, after
5  you left a message, these investors, some of them, just
6  the ones we identified, made an election to come back
7  into the fund?
8     A. Correct.
9     Q. Did they not?
10    A. Yes.
11    Q. So 26-P is an example of investors who had
12 previously withdrew their funds but elected to come back
13 in?
14    A. Yes.
15    Q. And it's fair to say that what you wanted the
16 investors to do when you communicated that there had
17 been this inappropriate conduct, was to make a choice.
18 Stay in or stay out?
19    A. Correct.
20    Q. And if they told you they were out, they were
21 out, right?
22    A. Yes.
23    Q. And if they stayed in, they were in?
24    A. Correct.
25    Q. Now, what occurred between February 11th, 2005

Page 283

1  when people were getting back in and the correspondence
2  of January is that at that point in time you entered
3  into an agreement with MegaFund?
4     A. Yes.
5     Q. So if we go to 26-L, please, and -- I'm sorry, I
6  should have a better copy. Go to 26-N. I apologize.
7        MS. WRIGHT: Excuse me?
8        MR. LITTLE: 26-N, as in Nancy.
9  BY-MR. LITTLE:
10    Q. What happened is that you received a letter from
11 the -- it was represented to be the general counsel of
12 MegaFund making certain representations to you, correct?
13    A. Correct.
14    Q. And that's February 5, 2005?
15    A. Correct.
16    Q. And then after you received that is when you
17 entered into the joint venture agreement that was
18 discussed earlier?
19    A. Correct.
20    Q. And under that joint venture agreement, all of
21 the monies that you currently had as well as collected
22 in the future for the investors were to be placed in
23 MegaFund?
24    A. Correct.
25    Q. And then you would have the special compensation

Page 284

1  arrangement that you described in which a maximum of 20
2  percent of the returns would be sent to the trust with
3  the balance split between you and Secured Clearing?
4     A. Correct.
5     Q. And then the bank in Mexico?
6     A. And subsequent to the bank.
7     Q. So after you secured that deal, if you look at
8  26-O, you say, "It is my belief that good communication
9  is important for a good relationship."
10       This is a letter you would have sent to all of
11 your investors, right?
12    A. Uh-huh.
13       MR. CHAIRMAN: Can you verbalize your
14 response?
15       THE WITNESS: Yes.
16 BY-MR. LITTLE:
17    Q. "With that in mind, even though my last letter
18 indicated I would notify you only if the documents were
19 not executed by the end of January, I wanted to let you
20 know that, in fact, the necessary documents are in place
21 and Lancorp Fund is now prepared to engage in the
22 investment activity as was anticipated," correct?
23    A. Correct.
24    Q. And then if you turn to 26-Q, this is the
25 confirmation letter from Stan Lightner [phonetic] to you

Page 285

1  indicating that there has been a confirmation of the
2  execution of a joint venture agreement in which $5
3  million will be placed in MegaFund?
4     A. Correct.
5     Q. And after the MegaFund investment, then you have
6  investors, for example, if you turn to 26-R, 26-F, that
7  elect to come back into the fund?
8     A. Yes.
9        MS. WRIGHT: So was there communication with
10 the investors between 2-17-05 and, for example, that
11 letter of February 22nd regarding -- the 2-17-05 letter
12 from MegaFund talks about the return --
13       MR. CHAIRMAN: It's Q.
14       MR. LITTLE: 26-Q.
15       MS. WRIGHT: 26-Q. And this letter, for
16 example, from Louis Robrez was dated February 22nd, '05,
17 was there communication --
18       THE WITNESS: No.
19       MS. WRIGHT: -- between that date and when
20 he elected to come back in?
21       THE WITNESS: No.
22 BY-MR. LITTLE:
23    Q. The communication had been in the 26-O letter of
24 February 8th, 2005.
25       MS. WRIGHT: February what?

92704abc-2cec-41b9-9ed4-b5b0716e0182

Page 286

1    MR. LITTLE: 8th. That's 26-O?
2    MR. NEKVASIL: That's O. That's the ones --
3  the MegaFund letter was just to Lancorp, not to the
4  investors.
5    MS. WRIGHT: Okay.
6  BY-MR. LITTLE:
7    Q. So if we then turn -- so in terms of the -- just
8  keeping this straight -- if we go to 26-T. When you say
9  the joint venture, this is the joint venture agreement
10  that was signed, correct?
11    A. Correct.
12    Q. "This joint venture is hereby entered into by and
13  between the Lancorp Financial Group, L.L.C. in MexBank,"
14  right?
15    A. Correct.
16    Q. And that's February 2, 2005?
17    A. Right.
18    Q. What you decided to do in February 2005 is use
19  the L.L.C. as the mechanism for entering into the
20  special fee agreement with MegaFund, correct?
21    A. Correct.
22    Q. Okay. And previously you had not used the L.L.C.
23  for that purpose?
24    A. Correct.
25    Q. Prior to this, the L.L.C. had not been used with

Page 287

1  respect to the activities of the trust?
2    A. Correct.
3    Q. It's only after you left the employment -- excuse
4  me -- the registration and association with ONESCO that
5  you used the Lancorp Financial Group, L.L.C. in any
6  capacity with the trust?
7    A. Correct.
8    Q. Now, is it fair to say that you would have
9  concluded that there was something wrong with the
10  MegaFund investment in May, as early as May of 2005?
11    A. Yes.
12    Q. And the SEC action was July of 2005?
13    A. Yes.
14    Q. And you would have received calls from the
15  investors who saw press releases about the SEC's
16  lawsuit?
17    A. Yes.
18    Q. And I take it that you did not immediately
19  contact the investors regarding the concerns you had
20  with the ability to recover the MegaFund investment?
21    A. No.
22    Q. You did not, right?
23    A. I did not.
24    Q. And, in fact, you delayed contacting the
25  investors for a period of time, correct?

Page 288

1    A. Yes.
2    Q. And what you decided to do is even though there
3  was an issue with MegaFund and there had been a
4  receivership filed you continued to accept money from
5  investors?
6    A. Yes.
7    Q. And so even though you were put on notice that
8  there were issues, that did not stop you from moving
9  forward, did it?
10    A. No.
11    MR. CHAIRMAN: Where did that money go?
12    THE WITNESS: That money was in Bank of
13  America.
14    MR. CHAIRMAN: So it never got to MegaFund?
15    THE WITNESS: It never got to MegaFund.
16    MR. CHAIRMAN: Was it returned to the
17  investors?
18    THE WITNESS: It was turned over to the
19  receiver.
20  BY-MR. LITTLE:
21    Q. And just so -- for the benefit of the chair, the
22  $2 million -- how much was it, $2 million that was
23  collected after MegaFund's investments?
24    A. Yes.
25    Q. And that $2 million was placed actually in an

Page 289

1  account that you were not exercising control over it,
2  was it?
3    A. Correct. But I didn't know that.
4    Q. What you found out is you had put the money in
5  another bank account that was being controlled by
6  someone you did not control?
7    A. Correct.
8    Q. And that money was in jeopardy, wasn't it?
9    A. Yes.
10    Q. And after the SEC appointed a receiver, the
11  receiver had to go back and recover that $2 million?
12    A. Yes.
13    Q. And when the $2 million was recovered by the
14  receiver, it was not paid back to the particular
15  individuals who had put the money in after MegaFund, was
16  it?
17    A. No.
18    Q. The money that was put in at that point in time
19  was then put in a pot for distribution to all of the
20  investors of the trust, was it not?
21    A. Correct.
22    Q. And so for those people who had put in the $2
23  million after MegaFund, what they received back as a
24  result of the receivership's -- receiver's action, was
25  simply a partial return of the money that had been lost?

92704abc-2cec-41b9-9ed4-b5b0716e0182

Hearing                                        February 5, 2008

---

Page 290

1    A. Yes.
2    Q. Is it also fair to say that somewhat soon after
3  the receiver -- excuse me, the SEC had filed its suit
4  you were contacted by the receiver?
5    A. Yes.
6    Q. And the receiver asked you questions about what
7  had happened with these funds?
8    A. Yes.
9    Q. And despite the contact with the receiver, you
10  continued to take money from the investors?
11    A. I don't remember specifically those dates.
12    Q. Is it fair to say that you continued to accept
13  money from investors at least through August of 2005?
14    A. I don't know the exact date, but that sounds like
15  it's probably correct.
16    Q. Let's look at Exhibit 25-D for a moment.
17    MR. CHAIRMAN: I'm sorry?
18    MR. LITTLE: 25-D, as in dog.
19  BY-MR. LITTLE:
20    Q. Is that another schedule that you prepared?
21    A. Yes.
22    Q. And what it reflects is that as to those investor
23  monies that you still had after the money was returned
24  from Tricom, you identified as the new effective date
25  for the investment activity as February 1, 2005?

---

Page 291

1    A. Yes.
2    Q. And that's when the MegaFund activity occurred?
3    A. Correct.
4    Q. And that's after the investors had to make a
5  decision as to whether they wanted to stay in or get
6  out?
7    A. Correct.
8    Q. Now, if you then look at Exhibit 25-A, please --
9  which was identified earlier to describe dates in which
10  funds were received, if you turn to the page marked
11  Lancaster 1237 and you look at the bottom four lines --
12  that is four lines from the bottom where it says Peter
13  Weiss [phonetic]?
14    A. Yes.
15    Q. And if you look to see what the date is for
16  Mr. Weiss' deposit we see a date of -- is it 8-16, 2005?
17    A. Yes.
18    Q. Is that one of the investors who you would have
19  continued to receive -- or excuse me, take money from
20  after the disclosure of the issues with MegaFund?
21    A. Yes.
22    Q. And after the SEC lawsuit had been filed?
23    A. Yes.
24    Q. In fact, what you had done in the time frame of
25  the summer of 2005 if we look at 26-G, you had -- excuse

---

Page 292

1  me. I'm sorry.
2    MS. WRIGHT: 26-G?
3    MR. LITTLE: G.
4    THE WITNESS: 26-G is one of the filings.
5  BY-MR. LITTLE:
6    Q. This is for Form D for Lancorp Financial Fund
7  Business Trust, Roman Numeral II, right?
8    A. Correct.
9    Q. And so what had happened is that you had already
10  satisfied the -- that is, at some point in the summer of
11  2005, you were moving forward with actually developing a
12  second fund?
13    A. Correct.
14    Q. That would then have additional investors?
15    A. Correct.
16    Q. In fact, you continued with respect to the
17  Lancorp Financial Fund Business Trust to activity after
18  the SEC action was filed?
19    A. Yes.
20    MR. LUKOWSKI: What is the date of this
21  document?
22    MR. LITTLE: I don't have a -- it's not
23  signed.
24  BY-MR. LITTLE:
25    Q. But just so we're clear, from your standpoint,

---

Page 293

1  this is activity that is occurring in the summer of
2  2005?
3    MR. CHAIRMAN: Mr. Lancaster, I think he's
4  directing that to you.
5    THE WITNESS: Oh, yes.
6  BY-MR. LITTLE:
7    Q. And, sir, just so we're clear, what ultimately
8  shut down --
9    MR. NEKVASIL: Mr. Chairman, I'm going to
10  object because if you take a look -- he can ask him any
11  question he wants about what happened when, but if you
12  look at this Document G, if you go to Page 972, you can
13  see that this document -- if you look at Page 973 -- it
14  appears on the date of January 18th, 2005.
15    Now, he can get the witness to say even
16  though it says January 18th, 2005, I sent it out
17  yesterday, but the documents speaks for itself in terms
18  of the date. So I object for him to rely upon this
19  document as a basis for testimony about Lancorp Fund
20  II's activities in the summer of 2005.
21    MR. LITTLE: Well, look at the page marked
22  971. Sir, that also has a December 13th, 2007 date on
23  it.
24    MR. NEKVASIL: Sir, we don't mind him asking
25  about the December 13th, 2007 date because he asked the

---

74 (Pages 290 to 293)

92704abc-2cec-41b9-9ed4-b5b0716o0182

**Copy of Transcript**

ARBITRATION TRIBUNALS OF THE
NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.

In the Matter of the Arbitration Between:
JEFFREY L. PRACHT, JOHN
BLANDI, INDIVIDUALLY AND
AS TRUSTEE OF THE WHITE
HORSE TRUST, AND LONNIE L.
GIBSON,

        Claimants,

    vs.                             Case No. 07-00948

THE O.N. EQUITY SALES
COMPANY,

        Respondent.

~~~~~~~~~~~~~~~~~~~~~~~

**VIDEOTAPED ARBITRATION HEARING**

**VOLUME III**

February 6, 2008
9:00 a.m.

Suite 1200, Midtown Proscenium Center
1170 Peachtree Street
Atlanta, Georgia

Kelly S. Lawrence, CCR-B-1625



BROWN & GALLO
                             LLC

Telephone  (404) 495-0777   (404) 876-8979
Toll Free    (877) 495-0777   (800) 637-0293
        Fax (404) 495-0766

101 Marietta Street, Suite 2700
Atlanta, GA 30303

1740 Peachtree Street, NW
Atlanta, GA 30309

www.galloreporting.com

Excerpt of

Cross-Examination of

Gary Lancaster

By

Marion H. Little, Jr., Esq.

Arbitration Hearing - Volume III                    February 6, 2008

## Page 2

APPEARANCES OF COUNSEL

On behalf of the Claimants:
GOODMAN & NEKVASIL, P.A.
KALJU NEKVASIL, Esq.
JOEL A. GOODMAN, Esq.
Suite 808
14020 Roosevelt Boulevard
P.O. Box 17709
Clearwater, Florida 33762
727.524.8486
727.524.8786 Fax
gn.law@verizon.net; jag.gn@verizon.net

On behalf of the Respondent:
ZEIGER, TIGGES & LITTLE, LLP
MARION H. LITTLE, Esq.
3500 Huntington Center
Columbus, Ohio 43215
614.365.9900
614.365.7900 Fax
little@litohio.com

OHIO NATIONAL FINANCIAL SERVICES
WILLIAM C. PRICE, Esq.
One Financial Way
Cincinnati, Ohio 45242
513.794.6078
513.794.4645 Fax
william_price@ohionational.com

Also Present:
Mr. Jeffrey L. Pracht
Mr. John Blandi
Mr. Lonnie L. Gibson
Mr. John Pinto
Mr. Jay Bley

Videographer:
Mr. Adam C. Kowzun

## Page 3

1    Arbitration Hearing Volume III
2        February 6, 2008
3
4        THE VIDEOGRAPHER: This is tape number one
5    in the matter of the arbitration between Jeffrey
6    L. Pracht, John Blandi, individually and as
7    trustee of the White Horse Trust, and Lonnie L.
8    Gibson, claimants, versus The O.N. Equity Sales
9    Company, respondent.
10       This is being taken Wednesday, February
11   6th, 2008. The time is 9:13 p.m. We're now on
12   the video record.
13       CHAIRMAN LEITCH: A.m., I hope.
14       THE VIDEOGRAPHER: A.m. Sorry.
15       CHAIRMAN LEITCH: It's all right.
16       THE VIDEOGRAPHER: We're now on the video
17   record.
18       CHAIRMAN LEITCH: Go for it. Back to
19   Mr. Little, please.
20       MR. LITTLE: Thank you, Mr. Chairman.
21       GARY L. LANCASTER, having been previously duly
22   sworn, was examined and testified as follows:
23       CROSS-EXAMINATION
24   BY-MR.LITTLE:
25   Q.   Mr. Lancaster, if you would, look back at

## Page 4

1    Respondent's Exhibit 25-D, which is found in volume
2    one of respondent's exhibits, please.
3    A.   Okay.
4    Q.   D as in dog.
5    A.   Oh.
6        MR. NEKVASIL: Numbers what?
7        MR. LITTLE: 25-D, D as in dog.
8        THE WITNESS: Yes.
9    Q.   (By Mr. Little) Just a moment so that
10   everyone else can catch up.
11       When we broke yesterday, we were
12   discussing, in part, the effective date for the
13   investment which coincided with your placement of the
14   funds in February of 2005 in Megafund, remember that?
15   A.   Yes.
16   Q.   And I take it that as of February 1, 2005,
17   none of the monies that had been invested in Lancorp
18   Business Fund Trust had been lost at that point?
19   A.   Correct.
20   Q.   And the losses ultimately all arose as a
21   result of the Megafund investments?
22   A.   Correct.
23   Q.   That occurred after February 1, 2005?
24   A.   Correct.
25   Q.   If I could then have you please look at

## Page 5

1    volume two of respondent's exhibits, and turn your
2    attention, please, to Respondent's Exhibit 64.
3    A.   Yes.
4    Q.   And I believe we spoke earlier that you
5    had tendered your resignation to Universal
6    Underwriters in October of 2004?
7    A.   Correct.
8    Q.   And then you received, if we look at
9    Respondent's Exhibit 64, a termination notice from
10   ONESCO on or about January 6, 2005, correct?
11   A.   (Witness nods head affirmatively.)
12   Q.   Is it fair to say that you were not
13   surprised by your termination?
14   A.   Correct.
15   Q.   You anticipated that once you severed your
16   relationship with Universal your relationship with
17   ONESCO would likewise be terminated?
18   A.   Yes.
19   Q.   You were asked some questions by counsel
20   on examination as to whether or not there had been a
21   request by ONESCO for you to return any
22   ONESCO-related materials.
23       Could I direct your attention to the third
24   paragraph of Respondent's Exhibit 64. Do you see the
25   language where it says, "Please return all ONESCO

Arbitration Hearing - Volume III                    February 6, 2008

Page 6

1  items, including forms, manuals, stationery, and
2  business cards, to your resident sales coordinator or
3  directly to our office"?
4      A.    Yes.
5      Q.    And do you understand as you see that now
6  that, in fact, ONESCO had requested that you return
7  all ONESCO-related materials at the time of your
8  termination?
9      A.    Yes.
10     Q.    And if you look at the very bottom,
11 there's some handwriting.  But do you recall having a
12 conversation without any -- excuse me, with anyone at
13 ONESCO in which you confirmed for them that you
14 would, in fact, return ONESCO-related materials?
15     A.    Yes.  My handwriting is at the bottom.
16 Apparently, I talked to Pauline somebody.
17     Q.    And, sir, is it fair to say that by the
18 end of January 2005 you had, in fact, returned all
19 materials relating to ONESCO?
20     A.    Correct.
21     Q.    Is it also fair to say then that the
22 effective date for the investments, February 2nd,
23 2005, occurred after your separation of registration
24 with ONESCO?
25     A.    Yes.

Page 7

1      Q.    And that the losses that occurred with
2  respect to the claimants in this case all occurred
3  after your separation from ONESCO?
4      A.    Yes.
5      MR. LITTLE:  Now, if I can have the
6  panel's indulgence, I'm going to try to do this
7  without stretching the microphone.
8      CHAIRMAN LEITCH:  If you want that on the
9  video, why don't you bring it closer to him.  If
10 you don't, it's okay.
11     MR. LITTLE:  I don't think -- I don't
12 think we can get it on the video because of the
13 head shot.  It's fairly tight.
14     CHAIRMAN LEITCH:  He can move it in or out
15 wherever you want it, so it's just up to you
16 whether you want it.
17     PANELIST LUKOWSKI:  The videographer
18 indicates that he could pull out so that you can
19 get both Mr. Lancaster and the chart in the
20 frame.
21     MR. LITTLE:  Let me see if I can try that.
22 Can you hear me without the microphone?
23     THE COURT REPORTER:  Yes.
24     MR. LITTLE:  The question is:  Can you
25 hear me on the video?

Page 8

1      THE VIDEOGRAPHER:  She's listening to the
2  video, as well.
3      THE COURT REPORTER:  Yes.
4      MR. LITTLE:  Oh, okay.
5      THE VIDEOGRAPHER:  I just don't have as
6  good of headphones as she does.
7      (Discussion off the record from 9:18 a.m.
8  to 9:19 a.m.)
9      MR. LITTLE:  Let's just take a moment to
10 see if that even comes on the video.  Does it or
11 is it just too small?
12     THE VIDEOGRAPHER:  I can see it, but I
13 don't know how well you'd be able to read it on
14 a TV.
15     MR. LITTLE:  Okay.
16     CHAIRMAN LEITCH:  Can you focus and just
17 go back and forth?
18     THE VIDEOGRAPHER:  Yeah, I can do that.
19 can go back and forth.
20     MR. LITTLE:  Why don't you just focus on
21 the board for five seconds, ten seconds.
22     THE VIDEOGRAPHER:  (Complies with
23 request.)
24     MR. LITTLE:  Okay.  Thank you.
25     Q.    (By Mr. Little)  And, Mr. Lancaster, I

Page 9

1  believe we confirmed that you signed the AWC with the
2  NASD on September 5, 2006?
3      A.    Yes.
4      Q.    And you would have signed an affidavit
5  that was tendered to you by claimants' counsel in
6  June of 2007?
7      A.    Yes.
8      Q.    Let's look at claimants' exhibits, volume
9  three, tab G.
10     PANELIST LUKOWSKI:  Tab?
11     MR. LITTLE:  Tab G.
12     PANELIST LUKOWSKI:  That's under 82?
13     MR. LITTLE:  Volume three of claimants'
14 notebook, tab G.  It says, "The Declaration of
15 Gary Lancaster."
16     CHAIRMAN LEITCH:  Tab G.  Wrong color.
17 Wrong color.
18     PANELIST LUKOWSKI:  No, I'm in three.
19     CHAIRMAN LEITCH:  Go to respondent's.
20     PANELIST LUKOWSKI:  Claimants'.
21     CHAIRMAN LEITCH:  Claimants'.  I'm sorry.
22     MR. LITTLE:  Tab G.
23     PANELIST LUKOWSKI:  Right.
24     Q.    (By Mr. Little)  And the pages that are
25 Bates stamped one through three reflect a declaration

Arbitration Hearing – Volume III                    February 6, 2008

Page 10

1  that you signed on or about June 18, 2007?
2      A.   Yes.
3      Q.   And to whom did -- who prepared this for
4  you?
5          CHAIRMAN LEITCH:  Well, tell us how it
6  came about to be, how it came to be.
7          THE WITNESS:  It came to be.  I was called
8  by claimants' attorneys and asked if I would
9  provide a statement of fact on specific items,
10  which were reduced to writing and sent to me.
11      Q.   (By Mr. Little)  And if we look at
12  paragraph eight of the June 18, 2007, affidavit, and
13  you see the language in the second sentence: "When I
14  knew that the Lancorp Fund offering would be going
15  forward, I called ONESCO to determine how to disclose
16  this information.  I received a one-page form from
17  ONESCO, which I returned to ONESCO in May 2004.  I
18  told ONESCO on this disclosure form that I would be
19  starting Lancorp Fund as a private placement fund on
20  May 14, 2004."
21          Sir, we are in agreement now that that
22  statement is, in fact, inaccurate?
23      A.   Yes.
24      Q.   And if we then turn to the third page of
25  the affidavit, paragraph nine, where it says, "The

Page 11

1  Lancorp offering became effective on May 14, 2004;"
2  do you see that language?
3      A.   Yes.
4      Q.   In fact, sir, the offering first became
5  effective in March of 2003, did it not?
6      A.   Oh, yes.
7      Q.   So that statement was inaccurate?
8      A.   That is inaccurate, correct.
9      Q.   And, in fact, the investment that
10  ultimately gave rise to the losses sustained by the
11  investors, that particular investment became
12  effective in February of 2005?
13      A.   Correct.
14      Q.   And that information is not included in
15  the affidavit of June 18, 2007, is it?
16      A.   Correct.
17      Q.   If we look -- the reference to -- there is
18  a specimen, Exhibit F, attached to the affidavit.
19  And if we could turn to specimen F as it related to
20  the affidavit.
21          CHAIRMAN LEITCH:  Can you give us a Bates
22  number because I don't see --
23          MR. LITTLE:  It's 19.
24          PANELIST WRIGHT:  19.  19.
25          CHAIRMAN LEITCH:  Thank you.

Page 12

1          MR. LITTLE:  Page 19.
2          THE WITNESS:  We're in tab F?
3      Q.   (By Mr. Little)  I'm sorry.  It's -- if
4  you go to page 19 of that same tab.
5      A.   Oh, okay.
6      Q.   The reference in this June 14, 2004,
7  letter that was marked as Exhibit F to the June
8  declaration is referring to the activity that
9  occurred in the Tricom account?
10      A.   Yes.
11      Q.   And that's the activity for which there
12  was no loss?
13      A.   Correct.
14      Q.   Now, if we then go to what is marked as
15  Exhibit B to the declaration and has the Bates stamp
16  number five, this is the letter that was sent to the
17  investors with respect to the insurance, correct?
18      A.   Correct.
19      Q.   And if I recall your testimony on direct
20  examination, the investors had a choice of choosing
21  to have insurance for this particular fund?
22      A.   Correct.
23      Q.   And only about a third of them elected
24  that type of coverage?
25      A.   Yes.

Page 13

1      Q.   And, in fact, that coverage never existed?
2      A.   Correct.
3      Q.   And what you communicated in April 2004
4  is, in fact, there would be no coverage?
5      A.   Correct.
6      Q.   As a practical matter, what you told the
7  investors in this letter is that even though there
8  would be no insurance coverage, you alternatively
9  would have security through the bank, the bank
10  holding the monies?
11      A.   Correct.
12      Q.   So in terms of preserving principal, there
13  was no material difference in what had existed prior
14  to April 5, 2004, and what occurred after April 5,
15  2004?
16      A.   Correct.
17      Q.   And so, functionally, in terms of what the
18  representations were to the investors as to the
19  preservation of the principal, it was -- it was the
20  same at all points in time during the relationship?
21      A.   Correct.
22          MR. NEKVASIL:  Mr. Chairman, I just want
23  to note something for the record.  It's not an
24  objection.  He asked him that it was -- whether
25  it was material or not, and he said no, which

Arbitration Hearing - Volume III                February 6, 2008

Page 14

1    means he asked him for an opinion about
2    materiality. Yesterday, when I asked him
3    about --
4        CHAIRMAN LEITCH: That's for us to decide.
5        MR. NEKVASIL: Well, no. Well, no, that's
6    not my point, actually.
7        CHAIRMAN LEITCH: Okay.
8        MR. NEKVASIL: Yesterday, when I asked him
9    whether he considered certain terms to be
10   material, opposing counsel objected; and the
11   objection was sustained. Now, I'll follow his
12   rules.
13       The point is since he's asked him about
14   materiality, when I question him again and say
15   is something material, I don't want opposing
16   counsel to say I object, how would he know
17   whether it's material or not, okay?
18       So I'm -- I guess I'm alerting you to that
19   sequence so we don't have to go back in the
20   record.
21       MR. LITTLE: No. My objection yesterday
22   was he was asking as to the state of mind of
23   investors, not as to this witness. That's a
24   different type of question.
25       MR. NEKVASIL: That was a separate issue.

Page 15

1        CHAIRMAN LEITCH: Wait. Let's not argue
2    about it. Just go ahead with the questions.
3        MR. LITTLE: Thank you.
4    Q.   (By Mr. Little) And as a -- excuse me, I
5    have to think where I was now.
6        So as a practical matter, the only
7    difference between the preservation of principal
8    element to the offering that existed between April --
9    excuse me, prior to April 5, 2004, and what existed
10   after April 5, 2004, is that the investors no longer
11   had to pay for it?
12   A.   Correct.
13   Q.   Now, if we could then turn to -- there was
14   a second affidavit.
15       And just to summarize, with respect to the
16   June 2007 declaration that you signed as it was
17   submitted to you by counsel for the claimants, we
18   would -- you would agree with me that it is
19   inaccurate?
20   A.   Correct.
21       MR. NEKVASIL: I ask -- I ask that he
22   clarify exactly where he --
23       CHAIRMAN LEITCH: I think it would be
24   appropriate that if you're going to ask that
25   question to make the general parts of it that

Page 16

1    you're asking are inaccurate --
2        MR. NEKVASIL: Yeah, because I don't
3    want --
4        CHAIRMAN LEITCH: I don't think he's -- I
5    don't think you mean, nor do I think he would
6    testify, that it's all inaccurate. But if I'm
7    wrong, clarify it.
8        THE WITNESS: No. That one -- that one
9    provision at the time I completed that, to the
10   best of my recollection, I believe that to be
11   accurate.
12       During the course of providing this
13   information, it has given me rise to question my
14   memory on what exactly occurred with that
15   document and when -- that, in fact, the document
16   may have not ever even been sent, but it was in
17   my file. And anything that went in my file,
18   typically, was a copy of something that I would
19   have submitted.
20   Q.   (By Mr. Little) Let's -- thank you for
21   that clarification. But as you -- as -- just so
22   we're clear, we would agree that paragraph eight is
23   inaccurate of the declaration?
24   A.   I believe that --
25       MR. NEKVASIL: Mr. Chairman, I object.

Page 17

1    He's asking --
2        MR. LITTLE: That's what he just
3    testified.
4        MR. NEKVASIL: -- about the first sentence
5    of paragraph eight.
6        CHAIRMAN LEITCH: Well, he just asked
7    about the whole paragraph; and if he's going to
8    answer --
9        MR. NEKVASIL: Okay. I'm going to ask
10   that the witness --
11       CHAIRMAN LEITCH: Hang on a second. Hang
12   on a second. You'll have to cross-examine him
13   on that. That was a specific enough question
14   for him to answer if he knows.
15       MR. LITTLE: Yeah.
16   Q.   (By Mr. Little) And let's break it down.
17   Let's break it down.
18       PANELIST LUKOWSKI: Where is it again?
19   Q.   (By Mr. Little) Looking at paragraph
20   eight of the June 2007 declaration, we can agree that
21   the reference: "I became a registered representative
22   of The O.N. Equity Sales Company (ONESCO) in March
23   2004," is, in fact, an accurate statement?
24   A.   Yes.
25   Q.   The statement, next, "Before being hired,

a1362ec4-94f2-4742-bd6e-35ff8f1f3ec6

Arbitration Hearing - Volume III                    February 6, 2008

## Page 18

1  I told ONESCO in February of 2004 that I had an
2  outside business, Lancorp Financial Group, LLC, that
3  sold annuities and insurance," is accurate?
4      A.   Correct.
5      Q.   What is inaccurate is the sentence that
6  follows: "When I knew that the Lancorp Fund offering
7  would be going forward, I called ONESCO to determine
8  how to disclose this information.  I received a
9  one-page form from ONESCO, which I returned to ONESCO
10  in May 2004.  I told ONESCO on this disclosure form
11  that I would be starting the Lancorp Fund as a
12  private placement fund on May 14, 2004."  That's
13  inaccurate?
14     A.   Correct.
15     Q.   Now, go back then to paragraph nine.
16     A.   (Witness complies with request.)
17     Q.   The sentence, "The Lancorp offering became
18  effective on May 14, 2004," is, in fact, inaccurate?
19     A.   It is.  That was an oversight on my part.
20         CHAIRMAN LEITCH:  Pardon?
21         THE WITNESS:  That was an oversight on my
22  part on that date.
23         CHAIRMAN LEITCH:  Okay.  I just -- thank
24  you.
25     Q.   (By Mr. Little)  And if we then go to

## Page 19

1  paragraph four of your June 2007 affidavit where it
2  says, "During 2003 and early 2004, changes in the
3  insurance industry prevented Lancorp from obtaining
4  this insurance and prevented Lancorp from going
5  forward."  Do you see that?
6      A.   Yes.
7      Q.   And can you tell us what the changes were
8  in the insurance industry that prevented Lancorp from
9  obtaining insurance?
10     A.   Well, I was told that they were no longer
11  insuring this kind of activity and, basically,
12  because they could not get a reinsurer to pick up the
13  shortfall, Lloyd's of London and the like, nobody
14  wanted to deal with it anymore.
15     Q.   And who would have provided that
16  information?
17     A.   That would have came from -- I forget now
18  who it was.  Somebody who was doing the investigation
19  for acquiring it that had access to AIG.
20     Q.   And is it fair to say that you would have
21  not had firsthand -- firsthand information as to the
22  accuracy of that statement?
23     A.   That's correct.
24     Q.   So when we look at paragraph five, it
25  says, "In April 2004, I notified all the Lancorp

## Page 20

1  investors that a material condition or term of their
2  investment had changed."  Do you see that?
3      A.   Yes.
4      Q.   "I explained to them that Lancorp had
5  replaced the insurance on their proposed investment
6  with a new bank or broker-dealer obligation that
7  would instead guarantee their investment."  Do you
8  see that language?
9      A.   Yes.
10     Q.   Sir, in fact, because there was no real
11  change in terms of the security being provided prior
12  to April and after April 2004, you can't accurately
13  describe that as a material change, can you?
14     A.   I guess not.  It just -- it seemed like a
15  significant change, particularly for those who wanted
16  the assurance that they had bought insurance to
17  protect their investment.
18     Q.   And what you told them is that they didn't
19  even have to pay for the insurance because they would
20  have the preservation?
21     A.   Correct.
22     Q.   And so for those people, they basically
23  received all the preservation they had been promised
24  prior to purchasing their interest without having the
25  additional cost?

## Page 21

1      A.   Correct.
2      Q.   Now, let's turn to the affidavit of July
3  4, 2007, which is found in claimants' notebook three,
4  tab G, page 20.  And that is a one-page declaration
5  that you signed on July 4, 2007?
6      A.   Yes.
7      Q.   And, again, to put it in the terms that
8  the chairman asked, how was this -- how did you get
9  from point A to point B in executing this
10  declaration?
11     A.   Again, request by plaintiffs' attorneys to
12  verify these facts.
13     Q.   Did you type up the information that's
14  contained in the declaration?
15     A.   No.
16     Q.   Who typed it?
17     A.   It was prepared for by counsel.
18     Q.   Okay.  Did -- and when it was sent to you,
19  did you revise it in any way?
20     A.   No.
21     Q.   Okay.  And when you were providing these
22  declarations to claimants' counsel, did you withhold
23  any documents from them?
24     A.   No.
25     Q.   To the extent they asked for documents,

Page 22

1   you provided them to them?
2       A.   Absolutely.
3       Q.   Let's look at the second paragraph of the
4   July 4, two seven -- excuse me, 2007 declaration. It
5   says, "Throughout the time I was associated and
6   licensed with The O.N. Equity Sales Company, I was
7   never advised of the identity of my ONESCO
8   supervisor."
9            And then the next sentence says, "ONESCO
10  never provided me with any of the firm's internal
11  rules or regulations, such as the firm's procedures
12  or compliance manuals." Do you see that?
13      A.   Yes.
14      Q.   Can we agree that that second sentence is,
15  in fact, inaccurate?
16      A.   Again, I now know that that is an
17  inaccurate statement. Also, again, at the time that
18  I executed this, that was my recollection. And I see
19  now that that's incorrect.
20      Q.   And when we look at the previous sentence,
21  it says, "I was never advised of the identify of my
22  ONESCO supervisor." It is fair to say that you
23  were -- it was disclosed to you in the regional sales
24  contract that, in fact, Mr. Lawing was your
25  residential sales coordinator, correct?

Page 23

1       A.   Yes. That was on that form, correct.
2       Q.   Now, let's turn to the last affidavit, the
3   one of December 2007 that is found in volume three,
4   tab G at page 22 of claimants' materials. And this
5   is a two-page declaration that you signed on or about
6   December 3, 2007?
7       A.   Yes.
8       Q.   And, again, would you explain to the panel
9   the mechanics by which this document was prepared and
10  executed?
11      A.   Again, request and preparation by
12  plaintiffs' counsel.
13      Q.   And, again, did you physically type this
14  up?
15      A.   I did not.
16      Q.   Was there a particular attorney that you
17  worked with in preparing these declarations?
18      A.   No.
19      Q.   Who was it that you did have contact with?
20      A.   My only contact was with plaintiffs'
21  attorney.
22      Q.   Which one?
23      A.   I was in contact with both of them, but I
24  think Joel was the primary contact.
25      Q.   Okay. Let's look then at the declaration

Page 24

1   of December 3, 2007, and focus your attention first
2   on paragraph five where it says, "In approximately
3   May 2004, I took an on-line CLE compliance course
4   arranged for by ONESCO." Do you see that?
5       A.   Yes.
6       Q.   And you know that's inaccurate because the
7   records that have been produced show that that course
8   was taken in June?
9       A.   Correct.
10      Q.   Correct?
11      A.   Yes.
12      Q.   And then --
13           CHAIRMAN LEITCH: Well, let me ask. Is
14  the only inaccuracy then the date? Did you
15  actually take the course?
16           THE WITNESS: Yes, I took the course.
17           CHAIRMAN LEITCH: But it was --
18           THE WITNESS: But I just didn't remember
19  when.
20           CHAIRMAN LEITCH: So it was in June of
21  2004?
22           THE WITNESS: Correct.
23           PANELIST WRIGHT: We've got copies.
24           PANELIST LUKOWSKI: Yeah, we've already
25  got that.

Page 25

1            MR. LITTLE: Yeah, you've got that
2   document. But it's --
3            CHAIRMAN LEITCH: It's already in the
4   record.
5            MR. LITTLE: Right.
6            CHAIRMAN LEITCH: I just want to nail it
7   down.
8       Q.   (By Mr. Little) Let's focus on the next
9   one. "The study materials led me to believe that my
10  outside business disclosure should be more explicit.
11  Based upon -- excuse me, based on the warnings in the
12  study materials, I wanted to play it safe and make
13  absolutely certain that ONESCO was aware of Lancorp's
14  involvement with Lancorp Financial Fund."
15           "Accordingly, I called Heather A. Renfro,
16  who was working for Lawing Financial Group in
17  Overland Park, Kansas. I explained to Renfro that
18  Lancorp was involved with the Lancorp Financial Fund
19  investment offering. I asked her how I should report
20  this to the firm. She then sent me another blank
21  copy of the other business disclosure reporting page,
22  which is an ONESCO form."
23           "On or about May 3, 2004, I completed this
24  form, disclosing my involvement with Lancorp
25  Financial Fund Business Trust. I either e-mailed

Arbitration Hearing – Volume III                          February 6, 2008

Page 26

1  this form back to Renfro or mailed it to her office."
2  Do you see that?
3      A.   Yes.
4      Q.   And we can agree that because the form, at
5  least as it was -- it's marked, is May 3, 2004, a --
6  the study materials that you received in June could
7  not have prompted you to have completed that form?
8      A.   That's correct.
9      Q.   And so the second and third sentence of
10  paragraph five of the December 3, 2007, declaration
11  is, in fact, untrue?
12      A.   I know now that -- I now know that to be
13  correct.
14      Q.   And, in fact, based upon our discussions,
15  we understand that the balance of paragraph five is
16  inaccurate?
17      A.   Effective on that date.
18      Q.   Right.  You understand that -- we're in
19  agreement that you did not send the outside business
20  disclosure reporting --
21      A.   Yes.
22      Q.   -- page to ONESCO?
23      A.   But the portion where I talked to Heather
24  Renfro and explained, that part is correct.
25      Q.   So your testimony is --

Page 27

1      CHAIRMAN LEITCH:  Just say that louder,
2  please.
3      THE WITNESS:  I had a conversation with
4  Heather Renfro about what form I needed.  That
5  portion is correct.  But the -- but the --
6      Q.   (By Mr. Little)  Go ahead, please.
7      A.   The date is incorrect.
8      Q.   And, in fact, the statement that you
9  actually sent it is incorrect?
10      A.   Yes.
11      Q.   If we go to paragraph two of your
12  affidavit where it says, "I was terminated by U.S.
13  Bancorp in 2002 for not disclosing the extent of my
14  involvement with Lancorp Financial Group, LLC."  Did
15  you see that?
16      A.   Yes.
17      Q.   And if I understood your testimony
18  correctly yesterday, in fact, your termination from
19  U.S. Bancorp had nothing to do with Lancorp Financial
20  Group, LLC, did it?
21      A.   That was part of their rationale.
22      Q.   Oh, I'm sorry.  Just so we're clear, your
23  termination from U.S. Bancorp had nothing to do with
24  the Business Trust?
25      A.   Correct.

Page 28

1      Q.   Okay.
2      MR. NEKVASIL:  That's fine.
3      Q.   (By Mr. Little)  And so when we look at
4  the balance of paragraph two, at the time of your
5  termination, it says there was a trading program
6  similar to Lancorp Financial Fund Business Trust.  In
7  fact, the only discussion you would have been having
8  at that point in time, if any, would have been with
9  the People's Avengers Trust, right?
10      A.   Okay.  I'm -- I guess I'm not following
11  you.
12      Q.   Let me try to clarify it, please.
13      MR. NEKVASIL:  Mr. Chairman, I know he's
14  on cross, but on this issue I would ask that he
15  not be leading, particularly since the testimony
16  is, from the witness, that he did not get
17  involved with People's Avengers Trust until
18  after he was fired by U.S. Bank, and that's what
19  the chronology -- that's --
20      CHAIRMAN LEITCH:  Hang on in case it's
21  something actually for us.
22      MR. NEKVASIL:  Mr. Chairman, the testimony
23  has been that McDuff had this program he
24  proposed that was similar to Lancorp -- similar
25  to Lancorp Financial Fund Business Trust.  He

Page 29

1  was fired because he didn't disclose the extent
2  of his involvement with it and he disobeyed
3  their instructions.  Afterwards, end of 2002,
4  beginning of two thousand -- he got involved
5  with People's Avengers Trust.
6      Now he's trying to him in one leading
7  question:  So, really, this related to People's
8  Avengers Trust.  I would ask that he not ask --
9  if he answers it yes, I'll have to take him
10  through all the documents again and refresh his
11  memory.
12      So I'd ask on this point that he not use
13  leading questions and ask him what did -- what
14  did this involve because he's -- he's attempting
15  to ask leading questions that basically
16  eliminate -- they're factually inaccurate and
17  eliminate six hours of questioning which would
18  require me on redirect to take him through all
19  the documents that his lawyer -- the lawyer took
20  him through yesterday showing the time frame,
21  showing when his first discussions with People's
22  Avengers were, showing that they were after he
23  was fired by U.S. Bank.  I'll do it if you want,
24  but it's unfair to use the vehicle of a leading
25  question to solicit that kind of a misleading