# Exhibit 2

```
                      1

                NASD ARBITRATION

JEFFREY L. PRACHT, JOHN BLANDI,
individually and as trustees to TTEE
to the WHITE HORSE TRUST, et al.,

          Claimants,   FILE NO. 07-00948

          vs.

O.N. EQUITY SALES COMPANY
commonly know as ONESCO,

          Respondent.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
          VIDEOTAPED ARBITRATION HEARING

          February 4, 2008
          9:25 a.m.

          Midtown Proscenium Center
     1170 Peachtree Street, Suite 1200
          Atlanta, Georgia

     Melinda M. Ross, RPR, CCR-2614
```

```
                      2

1              APPEARANCES OF COUNSEL
2
3    On behalf of the Claimants:
4    GOODMAN & NEKVASIL, P.A.
5    KALJU NEKVASIL, ESQ.
     JOEL A. GOODMAN, ESQ.
6       14020 Roosevelt Boulevard, Suite 808
        P.O. Box 17709
7       Clearwater, Florida  33762
        727.524.8486
8       727.524.8786 FAX
9
10   On behalf of the Respondent:
11   ZEIGER, TIGGES & LITTLE, L.L.P.
12   MARION H. LITTLE, ESQ.
13      3500 Huntington Center
14      Columbus, Ohio  43215
15      614.365.9900
16      614.365.7900
17      little@litohio.com
18
19   Also Present:
20      JAY LUKOWSKI - ARBITRATOR
21      ROBERT LEITCH - ARBITRATOR
22      JENNIE WRIGHT - ARBITRATOR
23      JAY BLEY
24      JOHN PINTO
25      BILL PRICE
```

```
                      3

1         VIDEOTAPED ARBITRATION HEARING
2              February 4, 2008
3
4         MR. CHAIRMAN:  Okay.  This is the -- we can
5    officially get started.  This is the NASD -- excuse
6    me -- FINRA, F-I-N-R-A, dispute resolution File No.
7    07-00948, Jeffrey Pracht, John Blandi, individually and
8    its trustees or TTEE to the White Horse Trust, et al.
9    versus the O.N. Equity Sales Company commonly know as
10   ONESCO.
11        I'm Bob Leitch, the chair of the panel.  I'm
12   going to ask the two panel members to introduce
13   themselves and I'll ask each of you to introduce
14   yourselves for the record with name and what your role
15   is in the -- in the hearing.  Then I'll go through some
16   other formal remarks and procedures that I'm sure the
17   attorneys are quite familiar with before we actually get
18   started.
19        MR. LUKOWSKI:  I'm Jay Lukowski.
20        MS. WRIGHT:  I'm Jennie Wright.
21        MR. CHAIRMAN:  Start around here, I guess,
22   to my right.
23        MR. NEKVASIL:  Yeah.  My name is Kalju
24   Nekvasil.  I'm with the law firm of Goodman & Nekvasil,
25   and we represent the claimants in this matter.
```

```
                      4

1         MR. GOODMAN:  I'm Mike Joel Goodman,
2    likewise, from Goodman & Nekvasil, representing the
3    plaintiffs.
4         Do you want me to just introduce them, if I
5    might?
6         MR. CHAIRMAN:  That's fine.
7         MR. GOODMAN:  To my immediate right is
8    Mr. Blandi and next to him is Mr. Pracht and next to him
9    is Mr. Gibson, Lonnie Gibson, the three claimants in
10   this case.
11        MR. CHAIRMAN:  Yes, sir.  On the end.
12        MR. PINTO:  John Pinto, Washington D.C.,
13   consultant.
14        MR. BLEY:  Jay Bley, chief compliance
15   officer at ONESCO.
16        MR. PRICE:  Bill Price, attorney for the
17   O.N. Equity Sales Company.
18        MR. LITTLE:  May it please the panel, Marion
19   Little with the law firm of Zeiger, Tigges & Little out
20   of Columbus, Ohio representing ONESCO.
21        MR. CHAIRMAN:  Okay.  Let me ask if the
22   arbitrators have any additional disclosures to make?
23        MR. LUKOWSKI:  None.
24        MS. WRIGHT:  None.
25        MR. CHAIRMAN:  And none from myself.
```

## 169

1    VIDEOGRAPHER:  This is Tape Number 1 in the
2  video deposition of Gary Lancaster taken Monday,
3  February 4th, 2008.  The time is 2:55 p.m. in the case
4  of Jeffrey L. Pracht, John Blandi, individually, and as
5  TTEE to White Horse Trust, et al. versus the O.N. Equity
6  Sales Company.  The Case No. 07-00948.
7    Will all attorneys please introduce
8  themselves and their affiliations for the record.
9    MR. NEKVASIL:  Do you want us to do that?
10   MR. CHAIRMAN:  If you don't want to do it
11 you don't have to.
12   MR. NEKVASIL:  Can we just proceed with the
13 case?
14   MR. CHAIRMAN:  Yes.
15   VIDEOGRAPHER:  Will the court reporter
16 please swear in the witness.
17   GARY LANCASTER, having been first duly sworn, was
18 examined and testified as follows:
19   EXAMINATION
20 BY-MR. NEKVASIL:
21   MR. CHAIRMAN:  This is Bob Leitch for the
22 chair.  Just let me make one minor correction.  This is
23 an arbitration hearing, FINRA or formally known as NASD
24 arbitration as opposed to a deposition.
25   MR. GOODMAN:  And may I assume, Mr.

## 170

1  Chairman, just for the record, that we have agreed, the
2  parties have agreed claimants' counsel, Nekvasil,
3  myself, Joel Goodman and Mr. Marion Little on behalf of
4  respondent, O.N. Equity, that the videotaped testimony
5  of Mr. Gary Lancaster would be admissible for all
6  purposes and in all cases that investors have against
7  O.N. Equity concerning the Lancorp investment, and we've
8  done that by agreement.  We are splitting the cost of
9  that as well.
10   Have I said that accurately, Mr. Little?
11   MR. NEKVASIL:  There's actually a proviso
12 that if one portion of it, of the transcript is read
13 into the record, the entire transcript should be shown
14 to the panel.  I think that was a condition that you
15 asked for, Mr. Little, and --
16   MR. LITTLE:  There are a number of
17 conditions to our stipulations set forth in a written
18 letter, but the anticipation is that this transcript and
19 the video would be available in subsequent hearings,
20 that it would be available for showing and when shown,
21 it would be shown in its entirety.  It would be viewed
22 by each of the arbitrators with the counsel and the
23 parties present as opposed to on weekends or in evening,
24 so there's a number of those types of stipulations, but
25 they're all set forth in a letter agreement among us.

## 171

1    MR. GOODMAN:  I agree with that.
2    MR. CHAIRMAN:  Okay.  Certainly it would be
3  allowed.  There's a stipulation there.  However, as an
4  arbitrator, I will give you a suggestion as to using it
5  in other hearings.  If you can avoid using the whole
6  thing and just each side pick out parts that are
7  appropriate for their testimony of which forewarning, of
8  course, to the other side, the panel will appreciate it
9  because it will be brief and more to the point.
10   MR. NEKVASIL:  I can imagine.  And, I mean,
11 that's a concern of mine.  I could imagine that it's
12 very tedious.
13   MR. CHAIRMAN:  But that's up to y'all to
14 decide.  So that's an off the record, if you will,
15 suggestion.
16   MR. NEKVASIL:  The good news is you don't
17 have to worry about it in this case.
18   MR. CHAIRMAN:  Right.  I won't have to hear
19 it.  But I've had other testimony like that where it was
20 wonderful where they did just pull out the excerpts that
21 they wanted us to hear.  Both sides did it, and it was
22 very efficient and very helpful because the video
23 testimony is clearly a whole lot better than anything
24 else except live testimony.
25   MR. NEKVASIL:  Mr. Chairman, may claimants

## 172

1  proceed with their cross -- cross slash direct
2  examination of Mr. Lancaster?
3    MR. CHAIRMAN:  Please, go ahead.
4  BY-MR. NEKVASIL:
5    Q.  Mr. Lancaster, I'm going to hand you a -- yeah,
6  please identify yourself for the record, please.
7    A.  Gary Lancaster.
8    Q.  Okay.  Is your middle name Lynn?
9    A.  Yes.
10   Q.  Okay.  And, please, don't take shortcuts.
11   A.  Okay.
12   Q.  When I say identify yourself, I'd like your whole
13 legal name.
14   And what's your current address?
15   A.  1910 Bergeron [phonetic] Court, Vancouver,
16 Washington.
17   Q.  Okay.  I'm going to hand you a document here.
18   MR. NEKVASIL:  And, Mr. Little, your copy of
19 that which was put on top of your box is over there,
20 with our exhibits.
21   MR. LITTLE:  What's the exhibit number,
22 please?
23   MR. NEKVASIL:  It's a CRD.  It has no
24 exhibit number.  It's the Lancaster CRD.
25   MR. LITTLE:  Are we going to mark it as an

---

173

1  exhibit?
2          MR. NEKVASIL:  Yeah.  We can mark this as
3  Claimant's Exhibit Number 1.
4          Mr. Chairman, this is a document that we
5  inadvertently did not -- yeah, most of the exhibits we
6  have, ma'am, will be in our books so it will be easier
7  to work with, but this is just an off-book exhibit.
8  Turns out it didn't make it in the book in the legible
9  fashion that I wanted it to.
10         MR. LITTLE:  Do you want to mark it Number 1,
11  then, or do you already have something --
12         MR. NEKVASIL:  Claimant's Exhibit Number 1.
13  Thank you.
14         MR. CHAIRMAN:  It may be a duplicate to a
15  Number 1 in the notebook, but that's not important, I
16  don't think, since we know that this is a separate
17  exhibit.
18         MR. NEKVASIL:  Yeah.
19  BY-MR. NEKVASIL:
20     Q.  Mr. Lancaster, this is a copy of your CRD.  Have
21  you seen a CRD report, a printout before?
22     A.  Yeah.  But not for a long time.
23     Q.  Okay.  If you turn to Page 2, this CRD printout
24  indicates that you were licensed with the O.N. Equity
25  Sales Company, which I will refer to as ONESCO --

---

174

1     A.  Okay.
2     Q.  -- from March 23, 2004 until January 3, 2005.
3          Is that consistent with your recollection?
4     A.  Yes.
5          MR. LITTLE:  Mr. Chairman, let me interpose
6  with an initial objection.  Counsel is starting his
7  inquiry in indicating it would be the direct and
8  cross-examination of Mr. Lancaster.  This is their
9  witness.  This particular witness has to date sign four
10  different declarations or affidavits for the benefits of
11  the claimants in these respective cases.  He is not a
12  hostile witness and it would be inappropriate for them
13  to be able to cross-examine this witness during the
14  course of this case.
15         MR. NEKVASIL:  Mr. Chairman, he is their
16  former agent, never hired by our firm or by claimants as
17  a securities agent that they had to supervise.  He was
18  their agent.  He has been cooperating with all parties.
19  What opposing counsel chose not to disclose to you is
20  that they contacted Mr. Lancaster, and I'll get it out
21  from him through questioning, and he voluntarily
22  provided them with thousands of pages of documents in
23  this case.  Okay.
24         So he's -- to call him our witness, frankly,
25  is an effort to disassociate the firm from

---

175

1  responsibility for their agent.  He's not, quote, "our
2  witness."  And he is adverse.  We'll be questioning him,
3  frankly, asking him a lot of -- he is an adverse
4  witness.
5          MR. LITTLE:  Well, that's -- let me respond,
6  Mr. Chairman, because that's -- that's inaccurate.  And
7  the question is whether or not in calling a witness it
8  is a hostile witness.  And the answer is this witness
9  is not hostile to these particular claimants, again, not
10  when you sign four separate affidavits on their behalf.
11  And I assume, although we can make inquiries, as to the
12  level of preparation this witness has had with counsel
13  prior to today for purposes of his testimony.  That may
14  be a question that the chair wants to ask, but he is not
15  a hostile witness for purposes of cross-examination.
16         Now, he simply can ask him all the questions
17  he wants, but they have to be in a direct form.
18         MR. NEKVASIL:  Sir, actually, we have
19  alleged in our statement of claim that Mr. Lancaster
20  defrauded our clients by urging them to invest in a
21  Ponzi scheme, which he alleged to be safe, and that
22  these gentlemen, ONESCO, his firm did not supervise him.
23  He is an adverse witness.
24         MR. CHAIRMAN:  Why don't you go ahead, and
25  we'll -- if we think there's a problem, we may do it

---

176

1  directly, but go ahead.
2          MR. NEKVASIL:  Okay.
3  BY-MR. NEKVASIL:
4     Q.  Is this consistent with your recollection,
5  Mr. Chairman, that you -- Mr. Lancaster, that you were
6  licensed with the ONESCO between March 23, 2004 and
7  January 3, 2005?
8     A.  Yes.
9     Q.  What led you to ONESCO?
10    A.  My employment with Universal Underwriters signing
11  commercial property casualty insurance.  I had asked if
12  anyone there knew anyone associated that we might be
13  able to utilize for our securities license.  I received
14  a referral from one of the other employees at Universal
15  Underwriters that there was an association of some kind
16  that allowed for or us to place our licenses with Lawing
17  Financial.
18    Q.  Okay.  Now, your most recent -- was your most
19  recent prior employment with Quick & Reilly?
20         Let me rephrase that.  Was the last broker/dealer
21  you were with before ONESCO, was that Quick & Reilly?
22    A.  I believe so.  Yes.
23         MR. CHAIRMAN:  You can explain your answer.
24  Go ahead.
25         THE WITNESS:  Well, I on -- American

177

1  Fidelity, I do not -- it's listed here, but I don't
2  recall having submitted an application for my securities
3  licenses to be transferred to there.  So I'm not sure
4  why that's on there.  Is that what you mean?
5  BY-MR. NEKVASIL:
6     Q.  No.  Let me see if I can ask the question a
7  little slower.
8         Prior to joining ONESCO, was the last
9  broker/dealer --
10    A.  Oh, okay.
11    Q.  -- you were employed with -- was that Quick &
12 Riley?
13    A.  I understand, yes.
14    Q.  And you were there for four days; is that fair to
15 say?
16    A.  Correct.
17    Q.  Was that from December 16th, 2002 to December
18 19th, 2002?
19    A.  Yes.
20    Q.  Were you aware in 2004 that if you did not
21 renew -- if you did not join -- move your securities
22 license to a different brokerage firm in 2004 that they
23 would expire?
24    A.  Yes.
25    Q.  Was that a concern of yours when you asked

178

1  Universal Underwriters for a broker/dealer to refer you
2  to?
3     A.  Yes.
4         MR. LITTLE:  Objection.  Leading.
5         MR. NEKVASIL:  Mr. Chairman, is that a
6  concern of yours?
7         MR. CHAIRMAN:  Go ahead.
8         MR. LITTLE:  Well, I need to make an
9  objection because the agreement here was to allow this
10 video to be used in subsequent cases.  I have not agreed
11 that we would waive all the objections, and it's one
12 thing to ask a leading question in order to set up a
13 series of other questions, but what he is doing now is
14 he's making a series of leading questions, and then
15 rather than -- when he gets to the point of asking
16 something important in an open form, as he should, he is
17 now leading the witness, and that's inappropriate given
18 that he has called the witness.
19        MR. NEKVASIL:  Sir, we obviously degree with
20 that.
21        MR. CHAIRMAN:  I know, but the other part
22 I've heard is you've got a risk.  You have the other
23 arbitrators you're going to face, and they may agree
24 with him, because some of them are more like a courtroom
25 than sometimes I do.  So I think you probably ought to

179

1  follow that advice.
2         MR. NEKVASIL:  Yes.  I guess, Mr. Chairman,
3  with all due respect, that we disagree strongly with him
4  that that's -- that that's leading.
5         MR. CHAIRMAN:  It's just that you run that
6  risk.
7         MR. NEKVASIL:  We understand that.  Just
8  like -- okay.
9  BY-MR. NEKVASIL:
10    Q.  I think I believe I asked you earlier was that a
11 concern of yours?
12        MR. LITTLE:  Same objection.
13        MR. CHAIRMAN:  It's on the record.
14        THE WITNESS:  Yes.
15 BY-MR. NEKVASIL:
16    Q.  And you testified that you were led -- that you
17 were directed to Lawing Financial; is that correct?
18    A.  Correct.
19    Q.  Would that have been in early 2004?
20    A.  Yes.
21    Q.  What happened next?
22    A.  I was given a name and a phone number for Lawing
23 Financial.  I subsequently called and received a return
24 call and application to complete.
25    Q.  Who called you back?

180

1     A.  I can't recall the name at the moment.
2     Q.  That's okay.
3     A.  I would recognize it.
4     Q.  Okay.  I appreciate that.
5         Let me see if I can refresh your recollection.
6         MR. NEKVASIL:  Obviously, Mr. Chairman, I
7  would be directing the panel to a number of exhibits in
8  the case.
9         THE WITNESS:  I think it was Heather Renfro.
10 BY-MR. NEKVASIL:
11    Q.  Okay.  By the way, by me turning you to a
12 document doesn't mean you're saying anything accurate or
13 inaccurate.  It's just helpful for the record to refresh
14 your memory.
15        MR. NEKVASIL:  If the panel would please
16 turn to Volume 4, Tab J.
17        MR. CHAIRMAN:  Do you want the witness to
18 look at this, too?
19        MR. NEKVASIL:  Yeah.  I'll be having --
20        MR. GOODMAN:  Mr. Lancaster --
21 BY-MR. NEKVASIL:
22    Q.  You see where the volumes are and Volume 4?  I
23 need you to kind of work with me on that and my law
24 partner will help you if it's a problem.
25        Do you have tab -- and you have tab -- you have

---

181

1  tabs and you have letters -- go to J, and if you go to
2  the bottom of the page, you'll see Bates stamped
3  numbers.
4          MR. GOODMAN:  Bottom right.
5  BY-MR. NEKVASIL:
6      Q.  Bottom right.  And I'll direct your attention to
7  Page 183.  It's the last page of this tab.
8          MR. LUKOWSKI:  I have a question.  Is
9  this -- this has something on both sides of the page.
10 Is that --
11         MR. NEKVASIL:  It's not connected.  It's
12 just two-side copying.
13         MS. WRIGHT:  Right.  The last paper of the
14 tab.  Not the last page.
15         MR. CHAIRMAN:  Yeah.
16         MS. WRIGHT:  Page 183.
17         MR. NEKVASIL:  Yeah.  It's the front of the
18 last page -- the front of the last paper.
19         MR. LUKOWSKI:  Paper --
20         MR. CHAIRMAN:  You see the bottom right?
21         MS. WRIGHT:  You see the 183?
22         MR. LITTLE:  I think we have a stipulation
23 that what is on the back of what's Bates stamped 183 is
24 something different than what is on the front page.
25         MR. CHAIRMAN:  Correct.  It's a different

---

182

1  page number as well.
2          MR. NEKVASIL:  And we also have an
3  understanding that we have multi-sided copies here, so
4  this would not be an infrequent occurrence.  If opposing
5  counsel needs assistance because it's confusing to him,
6  I'll be happy to explain.
7          MR. CHAIRMAN:  That was unnecessary.
8          MR. NEKVASIL:  Okay.
9          MR. LITTLE:  I do think it's confusing to
10 the witness, obviously, and I think may be confusing to
11 the panel, so I do appreciate that, Mr. Chairman, and I
12 think the most important thing is that the witness
13 understands what document we're at and is not misled in
14 to thinking that there's something else connected to it
15 because of the way in which the documents were copied by
16 Counsel.
17         MR. CHAIRMAN:  Mr. Lancaster, do you
18 understand that we're just talking about this one
19 letter --
20         THE WITNESS:  I do.
21         MR. CHAIRMAN:  -- on the single side of the
22 page?
23         THE WITNESS:  Yes.
24         MR. CHAIRMAN:  Okay.
25 BY-MR. NEKVASIL:

---

183

1      Q.  Take a second and read the letter.  You don't
2  have to read it out loud, but I'm going to ask you
3  whether it refreshes your recollection.  You indicated
4  that you believe that the --
5      A.  Yes.
6          MR. CHAIRMAN:  He's answered the question.
7  Go ahead.
8  BY-MR. NEKVASIL:
9      Q.  Okay.  And did you receive this letter from Ms.
10 Renfro?
11     A.  Yes.
12     Q.  And did this letter include the paperwork that
13 you were to complete to join ONESCO?  I think that's
14 what you testified to a minute ago?
15     A.  I had some paperwork, and then I had subsequent
16 instructions for on-line enrollment.
17     Q.  Was it on-line completion of the U-4 --
18     A.  Of the U-4, correct.
19     Q.  Okay.  By the way, at the time you received this
20 paperwork, you had been licensed at some prior broker
21 dealers; is that fair to say?
22     A.  Yes.
23     Q.  Had you ever in your life ever actually effected
24 a securities transaction on behalf of a customer?
25     A.  No.

---

184

1          MR. LITTLE:  Objection to the form of the
2  question.
3          MR. CHAIRMAN:  Go ahead.
4  BY-MR. NEKVASIL:
5      Q.  If you will now turn -- okay.
6          Did you complete the paperwork that was included
7  with this letter from Ms. Renfro?
8      A.  I did.
9          MR. NEKVASIL:  If the panel will go back to
10 page -- same tab, Page 59, and I'm going to direct your
11 attention to Pages 59 through 62.
12 BY-MR. NEKVASIL:
13     Q.  And, Mr. Lancaster, just, you know, only review
14 the pages, the Bates stamped pages that I've directed
15 you to.  No other pages.
16         MR. LUKOWSKI:  Is that a single document?
17         MR. NEKVASIL:  No.  It's several.  I'm going
18 to ask him, several -- it's actually three documents.
19         MR. LUKOWSKI:  Okay.
20 BY-MR. NEKVASIL:
21     Q.  I'm going to ask you -- my question to you is:
22 Pages J59 through J62, is that paperwork that you
23 received from Ms. Renfro with her February 2004
24 correspondence?
25     A.  Yes.

---

185

1    Q. If you turn to Page J60 -- let me preface you
2  to -- J59 says on the top left, "ONESCO transferred
3  transmittal form."
4       Do you that language on the top left corner of
5  J59?
6    A. Uh-huh.
7    Q. If you turn to Page J60, I'm going to ask you is
8  that your signature on that page?
9    A. Yes.
10   Q. And I'm going to ask you if you could turn back
11 to J59 it indicates office information. Do you see
12 that? And you see where it says, "Applicant's office
13 location," and it gives an address of 11020 King Street,
14 Suite 325, Overland Park, Kansas; do you see that?
15   A. Yes.
16   Q. Do you see where it says, "Office location if
17 different from mailing address, 7045 College Boulevard,
18 Overland Park, Kansas"?
19   A. Yes.
20   Q. Is that in your handwriting?
21   A. No.
22   Q. Did you ever indicate to ONESCO that you planned
23 to work for them in an office in Overland Park, Kansas?
24   A. No.
25   Q. Did you ever work for ONESCO in an office in

---

186

1  Overland Park, Kansas?
2    A. No.
3    Q. Have you ever visited ONESCO's OSJ in Overland
4  Park, Kansas?
5    A. No.
6    Q. During the period between March 23, 2004, and
7  January 2 -- 3, 2005, what office were you working out
8  of? Where was the office that you were working out of?
9    A. Relative to my securities license?
10   Q. Yes.
11   A. At my residence.
12   Q. Would that be West Linn, Oregon?
13   A. Correct.
14   Q. Is that the entire period in which you were
15 licensed with ONESCO?
16   A. Yes.
17   Q. Now, during the period of time that you were with
18 ONESCO, were you -- I take it, after this you became
19 licensed with ONESCO. You sent this paperwork and you
20 became licensed; is that fair to say?
21   A. Yes.
22   Q. During the entire period of time that you were
23 with ONESCO, was your home office ever
24 inspected by ONESCO?
25   A. No.

---

187

1    Q. During the entire period of time that you were
2  licensed with ONESCO, were you ever told the name of
3  your ONESCO supervisor who would be supervising you?
4    A. No.
5    Q. If you go to Page 60, the record will show
6  through other evidence that the signature under yours is
7  that of Kerry Lawing.
8       Do you see where your signature is on --
9    A. Yes.
10   Q. Okay. Did you ever meet Mr. Lawing during the
11 period of your association with ONESCO from March 23,
12 2004 to January 3, 2005?
13   A. No.
14   Q. Let me back up. During the period between
15 February -- you would agree this paperwork began to be
16 completed in February of 2004; is that fair to say?
17   A. Uh-huh.
18   Q. During the period between February 2004 and the
19 termination of your license with ONESCO, did you ever
20 meet Mr. Lawing?
21   A. No.
22      MR. LITTLE: Just to make a note, you need
23 to revise your responses. You had a couple times in
24 which you've sort of uh-huh.
25      THE WITNESS: Okay.

---

188

1       MR. LITTLE: The court reporter may not pick
2  that up properly.
3       THE WITNESS: Okay.
4       MR. NEKVASIL: Have you had a problem
5  picking up the answer so far?
6       THE WITNESS: I --
7       MR. NEKVASIL: Okay. If you could please
8  speak louder, but the court reporter has been picking up
9  your responses and I've heard them fine.
10      THE WITNESS: Okay.
11      MR. LITTLE: I'm not so sure the
12 stenographer can pick up uh-huhs.
13      MR. NEKVASIL: I believe the stenographer --
14      MR. CHAIRMAN: Don't argue about it. As
15 best you can, please use yes or no as opposed to uh-huh.
16      THE WITNESS: Okay.
17 BY-MR. NEKVASIL:
18   Q. Have you ever, prior to today, met Mr. Lawing?
19   A. No.
20   Q. During the period that you were licensed with
21 ONESCO, which is from March 23, 2004 to January 3, 2005,
22 did you ever speak to Mr. Lawing?
23   A. No.
24   Q. Let's backtrack to the prehiring process,
25 February 2004 when you filled out the paperwork in March

---

189

1    2004.
2        During that period did you ever speak to
3    Mr. Lawing?
4        A. No.
5        Q. Have you ever in your life spoken to Mr. Lawing?
6        A. No.
7        Q. During the entire period of time that you were
8    licensed with ONESCO, did you ever speak to anybody in
9    the Overland Park, Kansas office of ONESCO other than
10   Heather Renfro?
11       A. Not that I remember.
12       Q. During your entire life, have you ever spoken to
13   anyone in ONESCO's OSJ office in Overland Park, Kansas
14   other than Heather Renfro?
15       A. No.
16       Q. Where was ONESCO headquartered?
17       A. In Kansas.
18           ONESCO itself?
19       Q. Yeah.
20       A. In Ohio.
21       Q. In Ohio.  Okay.
22           Cincinnati Ohio, I believe?  Okay.  We have a
23   stipulation, Cincinnati, Ohio?
24           MR. LITTLE:  I'm sorry.  You're mumbling
25   over the witness, and I'd like to hear the witness

---

190

1    answer the question before the next question is asked.
2            MR. CHAIRMAN:  I think he answered Ohio.  If
3    you want to make it more specific.
4    BY-MR. NEKVASIL:
5        Q. Would you agree that it was in Cincinnati, Ohio,
6    if you know?
7        A. Yes.
8        Q. Did you ever visit ONESCO's headquarters in
9    Cincinnati, Ohio?
10       A. No.
11       Q. Did you understand that ONESCO had a compliance
12   department in Cincinnati, Ohio?
13       A. Yes.
14       Q. Is that where you e-mailed the U-4 to?
15       A. Yes.
16       Q. So if I understand the process, you call Heather
17   Renfro, she sends you the paperwork.  Do you send the
18   paperwork back to her?
19       A. I sent it to wherever the envelope that was
20   included was from.
21       Q. Okay.  And was --
22           THE COURT:  And she provided you with a
23   return envelope, and you stuck it in there and sent it
24   to wherever it was addressed to?
25           THE WITNESS:  Yeah.

---

191

1            MR. CHAIRMAN:  Okay.
2    BY-MR. NEKVASIL:
3        Q. And the next step for you, I take it, was to
4    complete the U-4 by -- through the Internet system; is
5    that correct?
6        A. Correct.
7        Q. Did you ever visit ONESCO's compliance department
8    in Cincinnati, Ohio?
9        A. No.
10       Q. Did you ever visit ONESCO's headquarters in
11   Cincinnati, Ohio?
12       A. No.
13       Q. Did anyone from ONESCO's office in Cincinnati,
14   Ohio ever inspect your office?
15       A. No.
16           MR. CHAIRMAN:  I've got a couple global
17   questions.  Did you ever talk to anybody at ONESCO
18   except for Heather Renfro?
19           THE WITNESS:  Not that I remember.
20           MR. CHAIRMAN:  Anybody from anywhere at
21   ONESCO ever come and visit your office in Overland, West
22   Linn, Oregon?
23           THE WITNESS:  No.
24   BY-MR. NEKVASIL:
25       Q. Have you ever in your life, prior to today, met

---

192

1    anyone in person from ONESCO?
2        A. No.
3            MR. LITTLE:  Let me just object.  This is
4    all duplicative.
5            MR. NEKVASIL:  Mr. Chairman, that's not.  We
6    never --
7            MR. CHAIRMAN:  Don't argue with him.  Just
8    keep on going.
9            MR. NEKVASIL:  Okay.
10   BY-MR. NEKVASIL:
11       Q. I'm sorry.  Was your answer no?
12       A. Correct.
13       Q. Did you transfer a Series 7 license to ONESCO?
14       A. Yes.
15           MR. NEKVASIL:  If the panel will look at the
16   CRD, Page 2 of it --
17           MR. CHAIRMAN:  Is it going to confirm it?
18           MR. NEKVASIL:  Yeah.
19           MR. CHAIRMAN:  Okay.
20           MS. WRIGHT:  When did you first receive your
21   Series 7 license?
22           THE WITNESS:  It was during my employment
23   with Bank of America, 19 -- I can't remember exactly.
24   '98.
25           MS. WRIGHT:  That's close enough.

### 193

1    MR. CHAIRMAN:  Go ahead.
2  BY-MR. NEKVASIL:
3    Q.  By February 2004 when you filled out this
4  paperwork, were you involved with Lancorp Financial Fund
5  Business Trust?
6    A.  Repeat the question.
7    Q.  By February -- at the time -- in February of
8  2004, were you involved in any way with Lancorp
9  Financial Fund Business Trust?
10   A.  Yes.
11   Q.  Okay.  What were you doing on behalf of Lancorp
12  Financial Fund Business Trust in February 2004?
13   A.  Taking care of all the organizational papers and
14  distributing prospectus.
15   Q.  Isn't it true that by February 2004 you had
16  already received millions of dollars in investor monies
17  to invest in Lancorp Financial Fund Business Trust?
18   A.  I believe so.  I don't know the exact amount.
19   Q.  And the subscription paperwork, was it sent to
20  your office in West Linn, Oregon?
21   A.  Correct.
22   Q.  That's the same office we were talking about
23  earlier?
24   A.  Correct.
25   Q.  The same location as your ONESCO office; is that

### 194

1  fair to say?
2    A.  Correct.
3    MR. CHAIRMAN:  Is that the only office you
4  operated out of?
5    THE WITNESS:  Regarding a securities
6  license, yes.
7    MR. CHAIRMAN:  And regarding Lancorp or
8  any --
9    THE WITNESS:  Regarding -- all of Lancorp
10  was all at my residence.
11   MR. CHAIRMAN:  And all the related entities
12  to Lancorp?
13   THE WITNESS:  Yes.
14   MR. LUKOWSKI:  Did you have any other
15  offices in this 2003, 2005 time period?
16   THE WITNESS:  No.
17   MR. LUKOWSKI:  Okay.
18  BY-MR. NEKVASIL:
19   Q.  And the investor monies, was this sent to you?
20  We talked about subscription agreements.  Now, we're on
21  investor monies.  Was this sent to you in -- to your
22  office in West Linn, Oregon?
23   A.  Correct.
24   Q.  Was it stored there?  Did you have investor files
25  set up?

### 195

1    A.  Yes.
2    Q.  I know it was a global question.  I apologize.
3    You received subscription agreements in the -- in
4  your West Linn office and you stored them; is that fair
5  to say?
6    A.  Yes.
7    Q.  Did you have the -- was this Lancorp Financial
8  Fund Business Trust, was there a private placement
9  memorandum executed in connection with that -- prepared
10  with that offering?
11   A.  Yes.
12   Q.  Were those maintained in your --
13   MR. LITTLE:  I'm sorry.  Could I have the
14  last question read back please?
15   MR. CHAIRMAN:  My guess is you need to say
16  those kinds of documents or organizations a bit slower
17  because you don't want somebody to not be able hear it.
18   MR. NEKVASIL:  Okay.
19   MR. CHAIRMAN:  It's important for her to get
20  all of it down.  I think you were asking which entity
21  you were asking about.
22   MR. LITTLE:  No.  He said that a private
23  placement memorandum was signed, and I don't think he
24  meant to say that because that would not have been
25  signed by the investors.

### 196

1    MR. NEKVASIL:  Yeah.  I did not say signed.
2    MR. CHAIRMAN:  Why don't you restate the
3  question you meant whether it was exactly the same or
4  not.
5    MR. NEKVASIL:  Yeah.  Let me speak a little
6  slower and more precise.  Mr. Chairman, I agree.  I have
7  to constantly remember that we have this eternal record
8  being created that we might need to use again.
9  BY-MR. NEKVASIL:
10   Q.  Was an offering memorandum prepared in connection
11  with the sale of investments in Lancorp Financial Fund
12  Business Trust?
13   A.  Yes.
14   Q.  Was that offering memorandum dated some time in
15  2003?
16   A.  Yes.
17   Q.  Was that offering memorandum -- were copies of
18  that offering memorandum stored in your home office?
19   A.  Yes.
20   Q.  When investors were referred to you, did you send
21  copies of the offering memorandum out to them?
22   A.  Yes.
23   MR. LITTLE:  Objection.  Leading.
24  BY-MR. NEKVASIL:
25   Q.  Were investors referred to you?

197

1    A. Yes.
2    Q. Did you also have correspond -- send and receive
3  correspondence from investors relating to Lancorp other
4  than the offering memorandum and the subscription
5  agreements from your office?
6    A. Yes.
7    Q. So is it fair to say that in your office as of
8  February 2004 you had records showing subscription
9  agreements for Lancorp investors, you had offering
10  memoranda for this product?
11    A. Yes.
12    Q. And you also had correspondence back and forth
13  with investors?
14    A. Yes.
15        MR. LITTLE: Objection to the form.
16  BY-MR. NEKVASIL:
17    Q. Did you also maintain on a computer records that
18  you used to keep track of investor contributions?
19    A. Yes.
20    Q. Was this investment in Lancorp connect -- was it
21  stock? Were you selling an equity interest? Were they
22  getting shares?
23    A. They were getting shares, yeah.
24    Q. They were getting shares, okay.
25        If you can turn with me to the same --

198

1        MR. NEKVASIL: We'll be in this volume for a
2  while, Mr. Chairman. And no sooner than I say that, if
3  you could put the volumes to the side, please, and pull
4  out Volume 3. Volume 3, Tab F.
5        MR. LUKOWSKI: F, did you say?
6        MR. NEKVASIL: Yes.
7  BY-MR. NEKVASIL:
8    Q. I'm going to take you through some pages, if you
9  don't mind. If you turn to page F-6. Again, it's the
10  same principle. You can ignore the multi-colored pages.
11  You should look at the bottom right corner for the Bates
12  stamp.
13    Did you send this letter to Colorado Division of
14  Securities regarding Lancorp Financial Fund Business
15  Trust in August of 2004?
16    A. Yes.
17    Q. And is this from the same business location that
18  you -- that you were using for ONESCO, which is 1382
19  Leigh Court, West Linn, Oregon?
20    A. Yes.
21    Q. Did you maintain a copy of this correspondence at
22  that office?
23    A. Yes.
24    Q. Did you file at that time a Form D for Lancorp
25  Financial Fund Business Trust with the State of

199

1  Colorado?
2    A. Yes.
3    Q. Turn to Page 34. Did you send this letter to the
4  State of Michigan in August of 2004?
5    A. Yes.
6    Q. Were you licensed at that time with ONESCO?
7    A. Yes.
8    Q. Did you -- did you file with the State of
9  Michigan at that time a Form D for this Lancorp
10  Financial Fund Business Trust offering?
11    A. Yes.
12    Q. Did you keep a copy of this correspondence in
13  your West Linn, Oregon office?
14    A. Yes.
15        MR. CHAIRMAN: I hope you're not going to go
16  through every one. Just ask him globally to look
17  through them and see if there is any reason to believe
18  that he did not send these documents and would keep them
19  in his office.
20        MR. NEKVASIL: Okay. Okay.
21        MR. CHAIRMAN: Mr. Lancaster, would you go
22  ahead and page through Tab F and see if those documents
23  look familiar to you.
24        MR. LITTLE: Well, there's different types
25  of documents within Tab F.

200

1        MR. NEKVASIL: Maybe I can make it more --
2  maybe I can be quicker, Mr. Chairman.
3  BY-MR. NEKVASIL:
4    Q. If you go to Page 21, please. This is a
5  certification from Georgia that you filed a registration
6  statement for Lancorp Financial Fund Business Trust on
7  August 17th, 2004. Do you see where I'm on Page 21?
8    A. Yes.
9    Q. Would you have sent a letter along with this from
10  your West Linn, Oregon office -- a transmittal letter
11  form your West Linn, Oregon office address?
12    A. Yes.
13        MR. LITTLE: Let me object to Counsel's
14  representation as to the document, because a question
15  was as if the witness submitted this, but at the top it
16  says, "Requested by the Goodman Law Firm." I assume the
17  representation to the witness is that Counsel obtained
18  this document.
19        MR. NEKVASIL: Sir, actually, he totally
20  misunderstood my questioning.
21        MR. CHAIRMAN: What is it supposed to --
22        MR. NEKVASIL: My first question was did
23  he -- did he -- I said this is a certification from the
24  State of Georgia that you registered the Lancorp
25  Financial Fund Business Trust offering on August 17th,

## 201

1  2004, do you see that.  Answer, yes.
2        Next question, did you send a letter to
3  them, an August 2004 transmittal letter forwarding the
4  Form D.  Answer, yes.  I didn't say anything about --
5        MR. CHAIRMAN:  Whether or not he asked it
6  that way is the form or right now.  But he restated it.
7        MR. LITTLE:  Well, I think the problem is
8  that Counsel is making a declaratory statement and then
9  following it up with a question.  If he wants to ask a
10 series of questions, that's fine.  Obviously you're
11 allowing him to lead the witness at this point.
12       MR. CHAIRMAN:  I do think you
13 mischaracterized this document to start with.  Just be
14 careful how you phrase it.
15       MR. NEKVASIL:  Okay.  I apologize,
16 Mr. Chairman.
17 BY-MR. NEKVASIL:
18    Q.  Did you send a transmittal letter in August of
19 2004 to the State of Georgia with the Form D for Lancorp
20 Financial Fund Business Trust?
21    A.  Yes.
22       Maybe I can save some time by saying that in
23 every state in which I received a request to have a
24 private placement memorandum sent of filing a letter
25 from my West Linn office was made and a subsequent fee.

## 202

1     Q.  And did you keep copies of that letter --
2     A.  I have all of those.
3     Q.  -- in your West Linn office?
4     A.  Correct.
5     Q.  And do you have any reason to doubt, and if MR.
6  CHAIRMAN wants me to do the longer way, I will.  But if
7  you look at the front page of F-1, I'm looking at -- if
8  you look at Georgia, Iowa and Massachusetts, Michigan,
9  Minnesota, Missouri, New Jersey, Virginia, Washington,
10 West Virginia, were these all filings made with letters
11 sent in 2004?
12    A.  Yes.
13       MR. LITTLE:  Objection.  The document itself
14 says they weren't filed in 2004.  They were filed in
15 2003 and 2004.
16       MR. NEKVASIL:  Mr. Chairman, actually, I
17 read certain specific states to him.
18       MR. CHAIRMAN:  Why don't you --
19       MR. LUKOWSKI:  Who prepared this document?
20       MR. NEKVASIL:  This is a summary -- this is
21 summary page that we had prepared and in an interest --
22 I asked MR. CHAIRMAN whether we can just summarize it.
23 I was very careful to read the ones in 2004.
24       MR. LUKOWSKI:  I'm not arguing about that.
25       MR. NEKVASIL:  Yeah.

## 203

1        MR. CHAIRMAN:  Go over them again so we can
2  be clear which ones you were trying to get at.  You said
3  Georgia and then what after that?
4  BY-MR. NEKVASIL:
5     Q.  Georgia, Iowa, Massachusetts, Michigan,
6  Minnesota, Missouri, New Jersey, Virginia, Washington
7  and West Virginia.  With, respect to all of those
8  states, did you file Form Ds with those particular
9  states in 2004?
10    A.  To the best of my knowledge, I can't remember off
11 of the top of my head.  If you have copies of the
12 filings, then, yes.
13    Q.  Okay.  And would you have kept copies of the
14 transmittal letters in your West Linn office?
15    A.  Absolutely.  You bet.
16    Q.  What about the -- did you also make some filings
17 in 2003?
18    A.  Yes.
19    Q.  Did you also keep -- did you keep copies of the
20 transmittal letters?
21    A.  Yes.
22    Q.  For the 2003 filings in your West Linn office?
23    A.  Yes.
24       MR. LUKOWSKI:  He's already said that he
25 kept copies of all the filings in his West Linn office.

## 204

1        MR. NEKVASIL:  Okay.
2  BY-MR. NEKVASIL:
3     Q.  Would that include copies of all the Form D
4  filings?
5     A.  Yes.
6     Q.  Okay.  Go to Volume 4, Tab H, Page 1.  Did you
7  complete this form?
8     A.  I did.
9     Q.  Is this is -- is the entirety of this form in your
10 handwriting?
11    A.  It is.
12    Q.  Did you submit this form, which is H-1, to ONESCO
13 with the other paperwork that you completed in February
14 2004?
15    A.  Yes.
16    Q.  You described two outside businesses in this
17 form, would you agree?
18    A.  Yes.
19    Q.  One is Universal Underwriters Group and one is
20 Lancorp?
21    A.  Correct.
22    Q.  Would you agree that both of those -- both of
23 those -- both of those -- would you agree that this form
24 has a question with respect to both of those businesses,
25 it asks:  "Is this an investment-related business"?  Do

## 205

1  you see the question?
2      A.  Yes.
3      Q.  Do you see where it has one for Universal
4  Underwriters Group?
5      A.  Yes.
6      Q.  And you put down no?
7      A.  Correct.
8      Q.  Was Universal Underwriters Group a -- is it a
9  commercial property casualty company?
10      MR. CHAIRMAN:  Why don't you just ask him
11  what it is.
12  BY-MR. NEKVASIL:
13      Q.  Okay.  What is it?
14      A.  Universal Underwriters is a commercial property
15  and casualty company.
16      Q.  For Lancorp Financial Group, L.L.C., did you
17  answer the question, investment-related business
18  differently than you answered it for Universal
19  Underwriters Group?
20      A.  Yes.
21      Q.  How did you answer it?
22      A.  I answered it, yes.
23      Q.  Why?
24      A.  To cover any of the investment-related activities
25  that Lancorp would be conducting.

## 206

1      Q.  In your mind, did that include Lancorp Financial
2  Fund Business Trust?
3      MR. LITTLE:  Objection.  Leading.
4  BY-MR. NEKVASIL:
5      Q.  What did that include, in your mind?
6      A.  It included all of the activities that I was
7  doing, which included trying to put together the trust.
8      MR. CHAIRMAN:  What other activities were
9  you involved in under Lancorp at that time?
10      THE WITNESS:  There were none at that time,
11  but I sold life insurance, health insurance and
12  annuities and the like.
13      MR. CHAIRMAN:  And was any of that under
14  Lancorp or was that separate?
15      THE WITNESS:  All of that was under Lancorp.
16  All my -- I have my appointments and all of the
17  commissions that were paid, and the sale of those
18  products were all paid to Lancorp.
19      MR. CHAIRMAN:  And that's the same Lancorp
20  Financial Group, L.L.C.?
21      THE WITNESS:  Correct.
22      MS. WRIGHT:  Were those annuities fixed
23  annuities and variable annuities?
24      THE WITNESS:  They were all fixed annuities.
25      MR. CHAIRMAN:  You can go ahead.

## 207

1  BY-MR. NEKVASIL:
2      Q.  If -- if -- did anyone from ONESCO ask you about
3  this form?
4      A.  No.
5      Q.  I take it that -- that by your answer -- is it
6  also fair to say no one from ONESCO had asked you about
7  your yes answer under investment-related business for
8  Lancorp Financial Business Group?
9      MR. CHAIRMAN:  I think it's included.
10      MR. NEKVASIL:  Okay.
11      THE WITNESS:  Correct.
12  BY-MR. NEKVASIL:
13      Q.  If anyone had asked -- from ONESCO had asked you
14  about it, would you have disclosed your involvement with
15  Lancorp Financial --
16      MR. CHAIRMAN:  Just what would you have told
17  them.
18      THE WITNESS:  I would have told them
19  everything that I was doing.  Everything that Lancorp
20  was involved in, I would have disclosed.
21      MR. CHAIRMAN:  Go ahead and recite what that
22  would have been then.
23      THE WITNESS:  That would have been my life
24  insurance, health insurance, property casualty
25  insurance, annuity business, the activity at that point

## 208

1  of Lancorp Financial Trust, it was two things then.
2  Activity in People's Avenger Fund, which was a --
3      MR. CHAIRMAN:  Avenger?
4      THE WITNESS:  Yes.  And the Lancorp
5  Financial fund Business Trust.
6      MR. CHAIRMAN:  Okay.
7      Well, I'll ask the question other people may
8  be thinking.  Any reason you didn't list all of those
9  under Number 3?
10      THE WITNESS:  None that I can remember.
11  BY-MR. NEKVASIL:
12      Q.  Lancorp Financial Fund Business Trust, what was
13  its business?  What was its -- what were you planning to
14  do with the money that was raised?
15      A.  The investment profile behind the trust was to
16  buy and sell investment grade bonds.
17      Q.  Was there any risk associated with the
18  investment?
19      A.  There was not supposed to be any risk to the
20  investment.  It was intended to be a completely secured
21  investment.
22      Q.  Turning to I-1, it's not disputed, Mr. Lancaster,
23  that ONESCO received this letter, I-1, from the State of
24  Pennsylvania in September 2004.
25      Did ONESCO notify you in September 2004 that it

209

1  received this letter from Pennsylvania?
2     A. No.
3     Q. Did anyone from ONESCO ever contact you to
4  discuss an investigation by Pennsylvania?
5     A. No.
6     Q. In the period, let's say, between September 3,
7  2004 and September 15th, 2004, did anyone from ONESCO
8  contact you and ask you about your outside business
9  activities?
10    A. No.
11       MR. CHAIRMAN: I thought he said he has had
12  no contact with ONESCO period --
13       THE WITNESS: Correct.
14       MR. CHAIRMAN: -- any time during his life
15  except that one lady in Kansas City.
16       MR. NEKVASIL: Okay. We're also trying
17  to -- okay. Trying to make a point for future record.
18       MR. CHAIRMAN: It's going to be the same
19  record for the next people, too.
20       MR. NEKVASIL: Okay.
21       MR. NEKVASIL: If they never talked to him,
22  they never talked to him.
23       MR. NEKVASIL: Okay.
24  BY-MR. NEKVASIL:
25    Q. I-4. Okay. Actually, if we can back up to I-2,

210

1  please.
2       Did you ever receive a copy of this response
3  letter from ONESCO to the State of Pennsylvania?
4     A. No.
5       MR. CHAIRMAN: What, if anything, did you
6  know about this Pennsylvania Securities Commissions's
7  activity in regard to you?
8       THE WITNESS: Nothing.
9       MR. CHAIRMAN: Did you ever find anything
10  out about it until this claim was made?
11       THE WITNESS: No.
12       MR. CHAIRMAN: Okay.
13  BY-MR. NEKVASIL:
14    Q. If you turn to -- if you look at I-2, you see the
15  representation in I-2 that your activities as present of
16  Lancorp Financial Group, L.L.C. were approved by ONESCO?
17       MR. LUKOWSKI: It doesn't say that.
18       MS. WRIGHT: It doesn't say that.
19       MR. NEKVASIL: I'm looking at -- I'm looking
20  at the bottom of Page 2 of that last paragraph. "ONESCO
21  reviewed and subsequently approved the above mentioned
22  activities."
23       MR. LUKOWSKI: Are you looking at four now?
24       MR. NEKVASIL: Two, I-2.
25       And, Mr. Chairman, if I can read my question

211

1  back. My question was --
2       MS. WRIGHT: That's okay.
3       MR. NEKVASIL: I'm sorry if I've directed
4  you to the wrong page.
5       MR. LUKOWSKI: You've said fine. My error.
6       MR. NEKVASIL: No. I probably did the wrong
7  page.
8  BY-MR. NEKVASIL:
9     Q. Did you believe in 2004 that your activities as
10  president of Lancorp Financial Group, L.L.C. --
11       MR. LITTLE: Objection. Objection.
12  BY-MR. NEKVASIL:
13    Q. -- were approved?
14       MR. NEKVASIL: I'm asking him what his
15  belief was.
16       MR. CHAIRMAN: Let him finish his objection.
17       MR. LITTLE: Now, if he's going to ask
18  questions like that, he ought to ask the witness his
19  understanding as to why he was doing what he was doing
20  as opposed to leading him through this. Which is an
21  unfair --
22       MR. NEKVASIL: He's asking me now -- I'm
23  sorry. I thought you were finished.
24       MR. CHAIRMAN: I think you ought to ask a
25  more open-ended question as well.

212

1       MR. NEKVASIL: Okay.
2  BY-MR. NEKVASIL:
3     Q. Did you believe -- by disclosing to ONESCO in
4  your outside business activities with respect to Lancorp
5  Financial Group, L.L.C. in February 2004 and not
6  receiving -- not hearing back from them, what you have
7  already testified to, did you believe you had approval
8  from them?
9       MR. LITTLE: Objection. Objection.
10  Leading.
11       MR. NEKVASIL: Mr. Chairman, I have a right
12  to ask him whether believed he had approval from the
13  firm. I mean, I --
14       MR. CHAIRMAN: Do you know, what, if
15  anything, you had approval for from ONESCO to do?
16       THE WITNESS: Quite frankly, I never even
17  considered what was approved, per se. If there was
18  something wrong that they didn't like I was accustomed
19  to being told if there was an issue and then I would
20  have to deal with it.
21       MR. CHAIRMAN: Were you ever given any
22  specific approval for anything.
23       THE WITNESS: I was not given any specific
24  approval. I guess the presumption is when you submit
25  the applications for licensing and the like and your

---

213

1  disclosures are made, unless you hear the otherwise, the
2  presumption is that everything's fine.
3      MR. CHAIRMAN:  Did you ever disclose to them
4  of this -- well, I guess Lancaster Libations.
5      THE WITNESS:  I must you have.  But it
6  was --
7      MR. LUKOWSKI:  Yeah.
8      MR. CHAIRMAN:  He disclosed Libations?
9      MR. LUKOWSKI:  Yeah.
10     MS. WRIGHT:  Uh-huh.
11     THE WITNESS:  But that was a significant
12  incidental activity.
13     MR. CHAIRMAN:  Did you disclose to them
14  about the trust?
15     THE WITNESS:  Not specifically, no.
16     MR. LUKOWSKI:  Why didn't you disclose
17  anything about the trust?
18     THE WITNESS:  I didn't think it was
19  necessary.  It never even occurred to me.
20     MR. CHAIRMAN:  Well, help me out.  If you
21  disclosed the fact -- minor liquor operation, why not
22  the trust if you've got millions of dollars?
23     THE WITNESS:  Well, I guess, the way I was
24  looking at it at the time was that the trust was not
25  even going to be become effective to be able to do

---

214

1  anything until it accumulated $5 million, and that was
2  going at such a slow pace that it appeared as if the
3  trust never would come to fruition.
4  BY-MR. NEKVASIL:
5      Q.  In February of 2004 -- and maybe I can --
6      MR. NEKVASIL:  If the panel would go back to
7  H-1.  H-1.
8  BY-MR. NEKVASIL:
9      Q.  In February 2004, had Lancorp Financial Fund
10  Business Trust become effective?
11     A.  In what date?
12     Q.  February 2004.
13     A.  Yes.
14     Q.  It had already become effective, Lancorp
15  Financial -- the offering had already been concluded as
16  of February 2004?
17     A.  I don't remember the exact date.  I sent out a
18  letter when they -- when it actually went effective.
19     Q.  Okay.
20     MR. LUKOWSKI:  Where is -- where does the
21  description that's on I-003 come from?
22     MR. CHAIRMAN:  You're looking at I, Page 3?
23     MR. LUKOWSKI:  Yeah.  Page 3.
24     Is this the U-4 that was electronically
25  filed or part of the U-4?

---

215

1      MR. CHAIRMAN:  Do you recognize where that
2  came from?
3      THE WITNESS:  I don't.  But that -- that is
4  information I would have disclosed.
5      MR. CHAIRMAN:  Do you believe all that's
6  accurate?
7      THE WITNESS:  Yes.
8  BY-MR. NEKVASIL:
9      Q.  I asked you earlier when did the Lancaster --
10  when did the Lancorp Financial Fund Business Trust
11  become effective and you indicated that you did not
12  remember the exact date, but you did send out a letter?
13     A.  Correct.
14     MR. NEKVASIL:  If you'll turn -- we're going
15  to go back to this page, Mr. Chairman.  If you will turn
16  to Volume 3, Page E, 377.
17     MR. LUKOWSKI:  Did you say E?
18     MR. NEKVASIL:  E like in egg, 377.
19     MR. LUKOWSKI:  Thank you.
20     MR. CHAIRMAN:  Do you recognize that letter?
21     THE WITNESS:  Yes.
22     MR. CHAIRMAN:  Does that refresh your
23  memory?
24     THE WITNESS:  It does.
25     MR. CHAIRMAN:  Can you answer his question

---

216

1  now?
2      THE WITNESS:  It became effective on May
3  14th, 2004.
4  BY-MR. NEKVASIL:
5      Q.  Was this letter sent to Mr. Gibson?
6      A.  It was.
7      Q.  So is it fair to say that if you look back at
8  H-1, as of February 11, 2004, had the Lancorp Financial
9  Fund Business Trust become effective?
10     A.  As of February 1, no.
11     Q.  If you turn to H-2 --
12     MS. WRIGHT:  I'm sorry.  Could you please
13  repeat what you just asked him?
14     MR. NEKVASIL:  Okay.  That's fine.  That's
15  fine.  That's fine.
16     I asked as of February 11th, 2004, had the
17  Lancorp Financial Fund Business Trust become effective,
18  and the answer was no.
19  BY-MR. NEKVASIL:
20     Q.  If you turn to Page H-2 --
21     MS. WRIGHT:  Which book are we on now?
22     MR. NEKVASIL:  Back on 4, H-2.
23  BY-MR. NEKVASIL:
24     Q.  Can you identify this document for me, sir?
25     A.  It's another business disclosure reporting page.

## 217

1    Q. That's your handwriting on this form?
2    A. It is.
3    Q. Did you submit this form to anyone?
4    A. The only person to whom I would have submitted it
5    would have been ONESCO.
6        MR. LITTLE: Objection. Nonresponsive.
7        MR. CHAIRMAN: Do you recall one way or the
8    other whether you submitted that form?
9        THE WITNESS: I do not.
10       MR. LUKOWSKI: Counsel, there's some stamp
11   markings on the upper right-hand corner of this
12   document. Do you know where those came from?
13       MR. NEKVASIL: I -- I do not.
14       MR. LITTLE: That is part of the
15   electronic -- electronic imaging that ONESCO uses for
16   its documentation, so that stamp would have shown that
17   we received a copy of this from one of the regulators,
18   and that is this document was sent to us by one of the
19   regulators both -- it was the NASD, and once we received
20   it, we would have processed it into the system.
21       MR. LUKOWSKI: I'm looking at -- at H-1, and
22   it seems to be very -- seems to be stamped over. Do you
23   know when that document was marked -- was stamped in by
24   ONESCO?
25       MR. LITTLE: Hold on a second.

## 218

1        April 16th, of '06 was when it was received.
2        MR. CHAIRMAN: That's H-1 as well as H-2?
3        MR. LITTLE: H-1 and H-2 are two separate
4    documents, of course.
5        MR. CHAIRMAN: That's what I thought.
6        MR. LITTLE: H-2, the stamp reflects 2006
7    and, of course, we were subject to an NASD inquiry
8    during that time frame.
9        The document is Bates stamped 01. We're
10   looking to see whether someone can discern that.
11       MR. PRICE: I cannot discern it.
12       MR. LUKOWSKI: Is there another copy
13   floating around?
14       MR. LITTLE: It looks like the stamp is
15   garbled. We don't deny that the one that is marked 01
16   and signed February 11th, 2004 would have been received
17   as part of the registration kit.
18       MR. LUKOWSKI: Okay.
19   BY-MR. NEKVASIL:
20       Q. If you turn, please, to -- I'll get back to that
21   again, later.
22       If you would please turn to Page H-3.
23       MR. CHAIRMAN: While they're talking, on
24   both H-3 and H-4, does that appear to be your signature?
25       THE WITNESS: It is my signature, yes.

## 219

1        MR. CHAIRMAN: Okay. And do you recognize
2    the document on H-3?
3        THE WITNESS: I do.
4        MR. CHAIRMAN: Is that in your handwriting?
5        THE WITNESS: It is.
6    BY-MR. NEKVASIL:
7        Q. Did you submit that form to ONESCO, this personal
8    brokerage attempt disclosure on H-3?
9        A. Yes.
10       Q. Would you agree that this form discloses that you
11   have an account in the name of Lancorp Financial Fund
12   Business Trust with Tricom Equities in Sidney,
13   Australia?
14       A. Correct.
15       Q. Did you sign this form on or about September
16   24th, 2004?
17       A. Yes.
18       Q. Who is Tricom?
19       A. Tricom is a securities firm.
20       Q. Okay. Opposing counsel indicated in his opening
21   that Tricom was a fraud. Was Tricom a fraud?
22       A. No.
23       Q. Was it a broker/dealer?
24       A. Yes.
25       Q. Australia?

## 220

1        A. Correct.
2        Q. Were you holding monies in that account that
3    related to the monies that the -- let me ask you more
4    directly. The investor monies that had been raised as
5    of September 2004 for Lancorp, were they held in this
6    account at Tricom?
7        A. They were, yes.
8        Q. As of September 2004, how much money did you have
9    in this Lancorp Financial Fund Business Trust account
10   with Tricom?
11       A. As I recall, it was a little over 9 million.
12       MR. LUKOWSKI: Where did you send this
13   document to?
14       THE WITNESS: I'm sorry?
15       MR. LUKOWSKI: Where did you send this
16   document to, H-3?
17       THE WITNESS: You know, I've been trying to
18   think about both of these, and I vaguely remember
19   receiving something from ONESCO about an annual
20   disclosure of outside activities that had to be
21   completed. And I don't know if that's when this was
22   sent in as a result of that or not.
23       MR. LUKOWSKI: Okay.
24       MR. GOODMAN: And could I make -- the stamp
25   that you see at the bottom, the ON0135, was produced to

221

1  claimants by ONESCO.  And you remember you all asked me
2  about the date, the stamp, maybe they could answer that
3  question because I think it says 9-29-04 it was
4  received.  You see at the very top?
5          MR. LUKOWSKI:  I do see that.  Is that
6  correct?  Mr. Little, was this document received by
7  ONESCO around -- on 9-24-04?
8          MR. LITTLE:  The form then is found in
9  Volume 4, Exhibit H, Bates stamped 003.  That page would
10  have been received by ONESCO, and it would have been
11  scanned into the system on September 29th.
12          MR. LUKOWSKI:  So it may have been received
13  a little bit earlier?
14          MR. LITTLE:  I can tell you when it was
15  scanned.
16          MR. CHAIRMAN:  Okay.  Well, it was signed
17  the 24th, scanned the 29th.  Do you know about when it
18  got there?
19          MR. NEKVASIL:  We got testimony from other
20  people about when it was received.  I just can't ask him
21  about that.
22          MR. CHAIRMAN:  Okay.  Don't even ask him
23  unless a difference in dates is important, because that
24  five-date span --
25          MR. NEKVASIL:  I understand you're pushing

222

1  me along, Mr. Chairman, and I'll let myself be pushed.
2  BY-MR. NEKVASIL:
3      Q.  If you'll leave that page open, I think you
4  testified, to get back to it, that you said, as of this
5  time approx -- more than $9 million in monies raised
6  from investors in Lancorp Financial Fund Business Trust
7  was sitting in this Tricom account; is that fair to say?
8      A.  Correct.
9      Q.  Would that include all of the money -- all of
10  the --
11          MR. LITTLE:  Objection.  Leading.  Ask the
12  witness a question.
13  BY-MR. NEKVASIL:
14      Q.  Did that include Mr. -- the monies that you
15  received from Mr. Gibson and Mr. Pracht?
16          MR. LITTLE:  Same objection.
17          MR. CHAIRMAN:  I think it's a good
18  objection, but tell us if the monies were in there.
19          THE WITNESS:  Everybody's money who I had
20  received at that point in time on behalf of the trust
21  was there.
22          MR. CHAIRMAN:  Did it include the parties in
23  this case?
24          THE WITNESS:  It included the parties in
25  this case.

223

1          MR. CHAIRMAN:  All three?
2          THE WITNESS:  All three.
3          MR. NEKVASIL:  Mr. Chairman, for
4  clarification, you wouldn't know, we'll actually have
5  testimony that Blandi's money did not come until later.
6  BY-MR. NEKVASIL:
7      Q.  I'm not trying to trick you.  That's a promise.
8  The point is was it your understanding that as of
9  September 27th, 2004 all the money that had been raised
10  in connection with Lancorp Financial Fund Business Trust
11  was in this account?
12      A.  Yes.
13          MR. LITTLE:  Yeah.  I think we have a
14  follow-up with what MR. CHAIRMAN asked.  And I think
15  that it was undisputed that Mr. Blandi's money was not
16  in that account.
17          MR. CHAIRMAN:  But you just mean that any
18  monies collected were in this account, not somewhere
19  else?
20          MR. NEKVASIL:  As of that date.
21          MR. CHAIRMAN:  Right.
22          MR. NEKVASIL:  Obviously someone -- we're
23  not representing that as of that date someone invested
24  later that it was there, but as of that date.
25          MR. CHAIRMAN:  Okay.

224

1          MR. NEKVASIL:  If the panel will leave that
2  page open and turn to your supplemental volume.  Mine is
3  pink.  Yours is gray.  It's the thin volume behind you.
4  And if you can tell you right now, and at the risk of
5  talking, I'll wait for the panel member to get his
6  volume.
7          MR. CHAIRMAN:  What page in the thin volume?
8          MR. NEKVASIL:  I'll help you out here.  If
9  you go to the first blue divider, there's a blue
10  divider, and you go to the very first page after the
11  blue divider.  It has a 01.  Mr. Chairman, normally our
12  pages for every tab are sequentially marked, but what we
13  have here is, first is filing on W-1 for Avenger's Trust
14  and the actual markings start after the first blue
15  binder, just so you know.  So if you go to the first
16  blue tab and we go to Number 1.
17          MR. CHAIRMAN:  Okay.
18  BY-MR. NEKVASIL:
19      Q.  I'm going to ask you whether you can identify for
20  the panel the document that is located on Pages 1
21  through 5.
22          THE WITNESS:  Yes.
23          MR. CHAIRMAN:  What is it?
24          THE WITNESS:  It's a record of the
25  individual investor's monies.

## 225

1    MR. CHAIRMAN:  Is this something you
2    prepared?
3         THE WITNESS:  Yes.
4    BY-MR. NEKVASIL:
5    Q.  Is this a record of individual monies that were
6    being held -- I see the name Tricom on the top of Page
7    1.
8    A.  Yes.
9    Q.  Is this a record of investment monies that were
10   received and sent to Tricom?
11   A.  Correct.
12   Q.  So if you take a look at Page 1, would that be
13   monies received by investors?
14   A.  Yes.
15        MR. CHAIRMAN:  You said received from
16   investors?
17        MR. NEKVASIL:  I'm sorry.  Received from
18   investors.  I apologize.  I said by investors.
19   BY-MR. NEKVASIL:
20   Q.  So if you look at the first Page 6603, does this
21   reflect $30,000 from Lonnie Gibson?  Do you see that on
22   Page 3, on Page 1?
23   A.  Yes.
24        MR. NEKVASIL:  6603, Mr. Chairman.
25   BY-MR. NEKVASIL:

## 226

1    Q.  And if you go to Page 3 right under the 5-12
2    Tricom deposit, 5-14-04, Pracht, $60,000, was that money
3    that was received?
4    A.  Yes.
5    Q.  Was that money that was subsequently deposited in
6    Tricom on May 25, 2004?
7    A.  Yes.
8         MR. NEKVASIL:  On Page 4, Mr. Chairman,
9    9-13-04, was this -- this is the second investment from
10   Mr. Gibson, Mr. Chairman, $30,000 for Gibson.
11   BY-MR. NEKVASIL:
12   Q.  Was that money received by Lancorp Financial Fund
13   Business Trust and deposited in his Tricom account?
14   A.  Yes.
15   Q.  All together is it fair to say that all together
16   between the opening of the Tricom account, and if you
17   look at Page 5, December 10, 2004, approximately $9
18   million was deposited into the Tricom account; is that
19   fair?
20   A.  That's fair.
21   Q.  And that was all of the money as of December 2004
22   that had been raised by Lancorp Financial Fund Business
23   Trust; is that accurate?
24   A.  I believe so.
25   Q.  And so even after you disclosed to ONESCO that

## 227

1    you were maintaining an overseas account in the name of
2    Lancorp Financial Fund Business Trust as of September
3    2004, you deposited another $1.5 million into that
4    account between September 2004 and December; is that
5    fair to say?
6    A.  Well, I can't add that fast, but --
7    Q.  Let me see if I can add it.  And, sir, we're on
8    page --
9    A.  All the monies that's on these pages that came in
10   after the date went to Tricom.
11        MR. NEKVASIL:  If you look on Page 4 where
12   it says 10-7-04, Mr. Gibson, $475,000 was deposited
13   into that account on October 7, 2004.
14   BY-MR. NEKVASIL:
15   Q.  Do you agree?  We're on Page 4.
16   A.  Yes.
17   Q.  On October 12 another $175,000 was deposited in
18   that account.  Is that fair?  Is that right?
19   A.  Yes.
20   Q.  On November 9 another $150,000 was deposited into
21   that account?
22   A.  Yes.
23   Q.  On November 23 another $515,000 was deposited
24   into that account?
25   A.  Yep.

## 228

1    Q.  On page --
2         MS. WRIGHT:  Were monies deposited in
3    anywhere else besides Tricom?  Where were they held if
4    they didn't go to Tricom?
5         THE WITNESS:  When money came in, the
6    first -- if it was a new investor, all the money when it
7    first comes in went into the Bank of America fund
8    account.
9         MS. WRIGHT:  Okay.
10        THE WITNESS:  If it was a new investor, they
11   had to go through the due diligence process.  If it was
12   an existing investor, they were simply credited with the
13   new shares and then the funds were held.  Rather than
14   sending wires every day or every week, I started looking
15   into -- unless the dollars accumulated large
16   denominations once a month, then I would wire the funds
17   to Tricom and then note the effective date of when that
18   money was received there.
19   BY-MR. NEKVASIL:
20   Q.  And, again, I'm not sure I want to -- again, I
21   think it's already in the record that as of December
22   10th, 2004, all the money, all the Lancorp Financial
23   Fund Business Trust money was in this Tricom account?
24        MS. WRIGHT:  Well, the right-hand column
25   essentially reflects the Bank of America less than the

229

1   deposits that go to Tricom. So you have two balances.
2   You've got the Tricom, and then you've got the Bank of
3   America.
4          MR. NEKVASIL: Okay.
5          THE WITNESS: Correct.
6          MS. WRIGHT: So you've got -- what's in the
7   right column is what's being maintained in Bank of
8   America is my understanding.
9          MR. NEKVASIL: Now, which pages are you --
10         MS. WRIGHT: I'm on -- I'm just looking at
11  '04 as an example.
12         MR. LUKOWSKI: All of them.
13         MS. WRIGHT: All of them.
14         MR. LUKOWSKI: Because they're running a
15  count.
16         MS. WRIGHT: Because if you look at the --
17  if you look at the Tricom deposits, it doesn't reflect
18  all of the money that was received before the prior
19  deposit. So the money had to be somewhere.
20         MR. NEKVASIL: I got you.
21         MS. WRIGHT: It's in the Bank of America
22  account.
23         THE WITNESS: Correct.
24         MR. NEKVASIL: I got you. Okay.
25         MS. WRIGHT: So you can't say -- or I'm not

230

1   sure you can say that all the money went to Tricom
2   because some of it was held in Bank of America.
3          MR. GOODMAN: It rolled.
4          MS. WRIGHT: Eventually.
5          MR. GOODMAN: Right. I think you're
6   absolutely correct. You're quite correct.
7          MS. WRIGHT: Okay.
8          THE WITNESS: All of the funds were either
9   at one location or the other.
10         MS. WRIGHT: Okay.
11         THE WITNESS: Bank of America in preparation
12  for a transfer to there.
13         MS. WRIGHT: Right.
14  BY-MR. NEKVASIL:
15     Q. Okay. But when you add -- well, let's clarify
16  this issue. As of December 10, 2004 you had $9,025,000
17  in this Tricom account?
18     A. Correct.
19         MR. CHAIRMAN: And how much was in Bank of
20  America?
21         MR. NEKVASIL: Yeah.
22         THE WITNESS: I'd have to look at the
23  statement as of that date.
24         MR. CHAIRMAN: You can't tell from that?
25         MS. WRIGHT: Looks like 1,085,000.

231

1          THE WITNESS: Well, not necessarily because
2   the amount accredited on the total Tricom account also
3   included an investor, Steven Bennett, who was an
4   Australian investor who had his accounts at Tricom, and
5   his money was just credited to the Lancorp account to be
6   part of the investment activities.
7          MS. WRIGHT: Was his investment significant?
8   How much was his investment?
9          THE WITNESS: Yeah. It was -- I can't
10  remember now, but it was significant, his dollar amount.
11         MS. WRIGHT: I mean, 30,000, $3 million.
12         THE WITNESS: No. His -- several hundred
13  thousand.
14         MR. LUKOWSKI: Well, I -- question. On
15  11-24, the last entry on Page 4, you have Steven --
16         THE WITNESS: Steven (inaudible) his
17  accumulated total, and it didn't come in all at one
18  time, but it accumulated. It was a million 85.
19         MR. LUKOWSKI: And that -- and what happened
20  to that money?
21         THE WITNESS: That money went back to him.
22  It was credited to him and it was sitting in the Tricom
23  account.
24         MR. LUKOWSKI: But that was returned to him.
25         THE WITNESS: Yeah. It was returned to him

232

1   directly there.
2          MR. CHAIRMAN: Because he pulled out of the
3   investment.
4          THE WITNESS: Well, when I pulled out --
5   when I pulled the money back from Tricom, his money
6   stayed there and it went into his account there.
7          MR. LUKOWSKI: Okay.
8   BY-MR. NEKVASIL:
9      Q. So if people wanted to get out of their
10  investment in December 2004, did you give them their
11  money back?
12     A. Yes.
13     Q. If ONESCO had asked you about this Lancorp
14  Financial Fund Business Trust account after receiving
15  this disclosure, would you have told them about your
16  activities in Lancorp Financial Fund Business Trust?
17     A. Absolutely.
18     Q. If they had told you that you were selling an
19  illegal offering or acting improperly, and you should
20  return the investor monies, would you have done that?
21         MR. LITTLE: Wait a minute. Object.
22  Speculation as to what he would have done then as
23  opposed to what he would do now.
24         MR. NEKVASIL: No. I'm asking him. I'm
25  asking him what he would have done if --

233

1     MR. CHAIRMAN:  Do y'all want to hear
2  anything?
3     MS. WRIGHT:  Huh-uh.
4     MR. CHAIRMAN:  Go to the next question.
5  BY-MR. NEKVASIL:
6     Q.  You -- if you go back to H-2 --
7     MS. WRIGHT:  Which volume?
8     MR. NEKVASIL:  Same volume.
9     MR. GOODMAN:  It's the same volume.
10     MS. WRIGHT:  We're off the little one.
11     MR. GOODMAN:  Volume 4, Volume 4.
12  BY-MR. NEKVASIL:
13     Q.  H-2.
14     MR. CHAIRMAN:  It may be the same page
15  you're on.
16     MR. NEKVASIL:  It is.
17     MS. WRIGHT:  The next page.
18  BY-MR. NEKVASIL:
19     Q.  H-2.  I think you testified in response to a
20  question from a panel member that you recollected
21  receiving some sort of request from ONESCO to complete
22  outside business forms on a personal brokerage account
23  form, and that you thought that you might have completed
24  those in connection with that request?
25     A.  Correct.

234

1     Q.  Did you testify to that?
2     A.  Correct.
3     MR. NEKVASIL:  If the panel will turn to --
4     MR. LITTLE:  Let me object because I believe
5  the witness answered that question in response to -- the
6  question was zero to three, the personal brokerage
7  account disclosure form was the question by the panel
8  and what prompted the preparation of that.
9     MR. NEKVASIL:  And that's -- that's actually
10  absolutely inaccurate.  The question for the panel
11  member I think it may have been even been from you,
12  Mr. Chairman, was asking him about both forms.  So we
13  take issue with respondent's objection because it
14  lacks -- it's premised upon an inaccurate foundation.
15     MR. LITTLE:  You can take issue with it, but
16  I know what the question is and the transcript will
17  reflect it.
18     MR. NEKVASIL:  Yeah, yeah.  Well, we take
19  issue --
20     MR. CHAIRMAN:  Okay.  You take issue.  Do
21  you want to make sure we're clear about that?  Ask him
22  again.
23     MR. NEKVASIL:  Yeah.
24     MR. LITTLE:  If we can do it in a
25  non-leading format now.

235

1     MR. NEKVASIL:  Mr. Chairman, I'm actually
2  asking about his --
3  BY-MR. NEKVASIL:
4     Q.  Do you believe that you submitted both H-2 --
5     MR. CHAIRMAN:  When did you get these forms,
6  do you know?  Look at H-2 and H-3 and tell us if you
7  recollect how and when you received those and what, if
8  anything, -- and what you did with them.
9     THE WITNESS:  I don't remember when, but
10  they would have come from an escrow.  That's the only
11  source that would have prompted me to do anything.
12     MR. CHAIRMAN:  And do you remember if you
13  submitted them back to ONESCO?
14     THE WITNESS:  I don't remember specifically,
15  no.
16     MR. CHAIRMAN:  And we've already talked
17  about the stamps at the top that indicates when ONESCO
18  received them from somewhere?
19     THE WITNESS:  Correct.
20     MR. NEKVASIL:  And we have an agreement, Mr.
21  Chairman, I believe, on H-3 that they did receive the
22  form on H-3.  There's no dispute that they received it.
23     MR. CHAIRMAN:  Well, there's no dispute that
24  they received either one.  It's just a matter of when.
25     MR. NEKVASIL:  Well, actually, they dispute

236

1  receiving H-2.
2     MR. CHAIRMAN:  Well, the stamp says you
3  received it at least 5-15-2006.
4     MR. NEKVASIL:  I'm sorry.
5     MR. LITTLE:  Yeah.  We're not disputing that
6  we received it from the NASD as a part of a subsequent
7  investigation, but we're denying that we received it in
8  the May 2004 time frame.
9     MR. CHAIRMAN:  Can we stop for a minute and
10  see what the door is about?
11     VIDEOGRAPHER:  The time is 4:07 p.m.  We're
12  now off the video record.
13     (Thereupon, a break was taken.)
14     VIDEOGRAPHER:  The time is 4:25 p.m.  This
15  begins Tape Number 2.  We're back on the video record.
16  BY-MR. NEKVASIL:
17     Q.  Mr. Lancaster, H-3, why did you submit this form
18  to ONESCO?
19     A.  Because it was necessary.
20     Q.  Why did you believe it was necessary?
21     A.  Again, it seemed to me like I received a request
22  for an update.
23     Q.  I'm going to -- what were you trying to convey to
24  ONESCO by completing this form?
25     A.  Just to make them aware that I have control of

237

1   this account.
2       Q.  On the bottom of this form it says that, and I'm
3   reading, "In accordance with NASD Rule 3050 as well as
4   the terms and conditions of the ONESCO compliance and
5   operations manual, ONESCO will request duplicate account
6   statements directly from your brokerage firm for
7   approval of the account (inaudible);" do you see that?
8       A.  Yes.
9       Q.  Were you aware back in September 2004 that by
10  submitting this form it meant that ONESCO would contact
11  Tricom and get copies of the account statements?
12      A.  Never even occurred to me.
13      Q.  You weren't worried that, well, what if they --
14  what if they get these account statements and learn that
15  I've got the $9 million that they may ask me about?  You
16  weren't worried about that?
17      A.  No.
18      Q.  Why not?
19      A.  Because I wasn't doing anything wrong.  If they
20  needed information or wanted it, I would give it to
21  them.
22      Q.  When you submitted this form to them, were you
23  trying to hide the existence of Lancorp Financial Fund
24  Business Trust from them?
25      A.  Of course not.

238

1       Q.  Now, you mentioned several times that you
2   believed you received some sort of a request from ONESCO
3   for an update.  I'm going to ask -- I'm going to direct
4   your attention -- same volume, Mr. Chairman, K-1, and
5   ask you whether this refreshes your recollection about
6   this update.  Take a second and read that and let me
7   know when you finish.
8       A.  Okay.
9       Q.  Did you receive this from ONESCO?
10      A.  I believe I did.
11      Q.  Is this the update that you're talking about?
12      A.  I think so.
13      Q.  Was there a return envelope with this notice from
14  Weller?
15      A.  As I recall, anything I ever received had a
16  return envelope.
17      Q.  And what was your practice when you received
18  something to fill out that had a return envelope?
19      A.  It had a return envelope.  Complete the forms
20  that were submitted to me and return it in the enclosed
21  envelope.
22      Q.  If you turn to Page 2, you'll see that your name
23  is listed here, I believe we can stipulate, as one of
24  the people whom this notice was sent?
25      A.  Yes.

239

1       Q.  Did you receive a second notice that Weller sent
2   out, which is K-3?
3       A.  I believe I did.
4       Q.  One of the items he refers to is -- he refers to
5   a 2004 compliance questionnaire.  Do you see where
6   that's referred to in K-3?
7       A.  Yes.
8       Q.  And if you turn -- in terms of -- if you turn to
9   page K-12, this is a specimen of such a compliance
10  questionnaire about -- Mr. Lancaster, do you understand
11  what I mean by specimen?
12      A.  Yes.
13      Q.  I'm not representing that you filled this out.
14      A.  I understand.
15      Q.  This is a form that would have been sent to you
16  to be filled out.
17      A.  Okay.
18      Q.  Did you sign or return one of these documents,
19  sir?
20      A.  I believe I did.
21      Q.  Now, if you take a look at Page 18, here's also a
22  specimen of the form that was sent to you.  Do you see
23  that specimen?
24      A.  Yes.
25      Q.  Do you see in the bottom left corner, can you

240

1   read for me -- do you see where it says, "ONESCO 160
2   Revised, 502"?  Do you see that?
3       A.  Yes.
4           MR. NEKVASIL:  Does the panel see where I'm
5   reading from the bottom left corner of Page K-18,
6   "ONESCO 160, Revised 502"?
7           MR. CHAIRMAN:  Yes, sir.
8           MR. LUKOWSKI:  Yes.
9           MS. WRIGHT:  Yes.
10  BY-MR. NEKVASIL:
11      Q.  If you compare that to H-2, do you see the same
12  date on that ONESCO form?  Do you see that date on the
13  bottom left corner of that ONESCO form?  Sir?
14      A.  Yes.
15      Q.  Do you?
16          And I want you to compare that to the other form,
17  which ONESCO admits you did -- they did receive, which
18  is H-1.  That has on the left side a date on the bottom
19  of 1102, not 502, would you agree?
20      A.  Correct.
21      Q.  Is it your belief that H-2 is a completed version
22  of K-18?
23      A.  Yes.
24          MR. LITTLE:  What was your answer, please?
25          THE WITNESS:  Yes.

241

1     MR. NEKVASIL:  Sir, I guess if I asked him
2  whether he ever spoke to Mr. Weller, you'll point out to
3  me that he never spoke to anybody from ONESCO, and I'm
4  wasting your time so I'll move one.
5     MR. CHAIRMAN:  Thank you.
6     MR. NEKVASIL:  I'll rebuke myself if that's
7  the more efficient way of doing it.
8  BY-MR. NEKVASIL:
9     Q.  Okay.  If we go to -- back to your CRD.
10     MR. NEKVASIL:  Claimant's Exhibit 1,
11  Mr. Chairman.
12     MR. CHAIRMAN:  That was the one you passed
13  out?
14     MR. NEKVASIL:  Yes, sir.  Yes, sir.
15     MR. CHAIRMAN:  Okay.
16     MR. NEKVASIL:  If you go to page.
17     MR. CHAIRMAN:  There's a fax page at the top
18  right, if that helps.
19     MR. NEKVASIL:  Yeah.  Okay.  Actually, maybe
20  it may be more confusing.  It's the fourth page of this
21  fax, and it's probably because I'm using the word
22  "page."  Actually, I should probably say fourth paper of
23  this document.
24     MR. LUKOWSKI:  The document says Page 6 on
25  it?  Is that the -- just above that line?

242

1     MR. NEKVASIL:  Yes.  It says -- he's
2  referring to the -- it's a page in the CRD that says
3  Page 6.
4     MR. CHAIRMAN:  Right.  And the fax Page 18
5  to 38?
6     MR. NEKVASIL:  Yes.  And the reason, I'll
7  tell you, Mr. Chairman, is my Page 18 to 38 is very
8  faded and I'm not sure if everybody else has the same
9  problem.
10     MR. CHAIRMAN:  It is faded.
11  BY-MR. NEKVASIL:
12     Q.  Okay.  Your first employment in the securities
13  industry was with First Interstate; is that fair to say?
14     A.  Yes.
15     Q.  And you were there for several months and your
16  position was eliminated?
17     A.  Correct.
18     Q.  Then you went to Stevens, and you were fired for
19  lack of production; is that correct?
20     A.  Our whole department was terminated.
21     Q.  Okay.  Then you went -- if you turn to the next
22  page to B.A. Investment Services?
23     A.  Uh-huh.
24     Q.  Did B.A. Investment Services basically merge into
25  U.S. Bancorp Investments?

243

1     A.  No.
2     Q.  What happened with B.A. Administrative Services,
3  Investment Services?
4     A.  B.A. is Bank of America and Bank of America was
5  taken over by NationsBank.
6     Q.  Okay.  And did you switch employers?
7     A.  Yes.
8     Q.  Now, if you go to Page 2 of your CRD, U.S.
9  Bancorp Piper Jaffray, Inc., "We are terminating" -- by
10  the way, we earlier discussed the fact that before
11  ONESCO, your last employer, was Quick & Reilly for four
12  days.  Now, we're on Page 2 --
13     MR. GOODMAN:  The second page.
14  BY-MR. NEKVASIL:
15     Q.  The second Page 2 --
16     MR. CHAIRMAN:  Page 4?
17     MR. NEKVASIL:  Yeah.
18  BY-MR. NEKVASIL:
19     Q.  Before -- before this four-day stint actually
20  four day stint at Quick & Reilly you were at U.S.
21  Bancorp, right?
22     A.  Correct.
23     Q.  And the U-5 says, "We are terminating Gary
24  Lancaster's registration because he was discharged from
25  our affiliate, U.S. Bank, for failure to follow U.S.

244

1  policies and procedures; is not sales practice related;"
2  do you see that in here?
3     A.  Yes.
4     Q.  Tell the panel what happened at U.S. Bancorp.
5     A.  In regards to what?
6     Q.  Your termination.
7     A.  Relative to termination.
8     MR. CHAIRMAN:  What does this mean, in other
9  words?
10     THE WITNESS:  Okay.  What it means is that
11  the outside -- they -- I initially tried to -- I was
12  approached by Gary McDuff on behalf of a client to do
13  custody services, and I submitted all this information
14  to the compliance people for approval for a custody, and
15  they wouldn't do it in my department.  It was
16  subsequently sent to the commercial institutional
17  division.  I was instructed not to have anything more to
18  do with it.  There was a whole host of negative issues,
19  most of which they would not discuss with me.
20     Subsequent to that a -- I -- an offering or
21  a solicitation for custody services was put together
22  without my knowledge or information by Gary McDuff and
23  was being circulated to solicit custody services.  A
24  copy of which was sent to U.S. Bank.  And they asked me
25  what I knew about it.  I told them I didn't know



245

1  anything about it, and they determined that -- they felt
2  that I could not have not known about it, and that was
3  outside activity that does not conform with their
4  practices and that was the basis for my termination.
5      MS. WRIGHT:  When you say your department,
6  what do you mean by your department?
7      THE WITNESS:  The private banking
8  department.
9  BY-MR. NEKVASIL:
10     Q.  Is this Gary McDuff the same Gary McDuff who was
11 affiliated with you on Lancorp Financial Fund Business
12 Trust?
13     A.  Yes.
14     Q.  And this custodial services, was that -- was this
15 request, was that a similar structure to Lancorp
16 Financial Funds where you were trying to find an entity
17 that would hold the investor money safely and use it to
18 fund trading?
19     A.  It was similar.  At the time they represented a
20 group who owned an offshore bank, so it was a little bit
21 different.
22     Q.  Okay.  You testified earlier -- I'm trying to
23 tread carefully because I don't want MR. CHAIRMAN to
24 point out that I'm asking questions that have been
25 globally answered.

247

1  BY-MR. NEKVASIL:
2      Q.  Was Gary McDuff involved -- you testified earlier
3  Gary McDuff was also involved with Lancorp Financial
4  Fund Business Trust?
5      A.  Correct.
6      Q.  What did his involvement -- sorry to ask you
7  leading questions.  What did his -- what was his
8  involvement with Lancorp Financial Fund Business Trust?
9      A.  He was the initiator of the trust, and we had an
10 agreement between us.  He paid all the legal fees to get
11 the trust established.
12     Q.  Bob Reese, did he refer people to you, to the
13 Lancorp Financial Fund Business Trust?
14     A.  Yes.
15     Q.  Did you find Bob Reese or did Gary McDuff find
16 Bob Reese?
17     A.  Gary McDuff.
18     Q.  Okay.
19         MR. NEKVASIL:  If the panel will turn to --
20 I'm sorry.
21 BY-MR. NEKVASIL:
22     Q.  Some of the -- did some of the investors in
23 Lancorp Financial Fund Business Trust, did they use
24 qualified funds?
25     A.  Yes.

246

1      Heather Renfro, you indicated she was the only
2  person you spoke to at ONESCO that you remember; is that
3  fair to say?
4      A.  Correct.
5      Q.  Did she ask you any questions about this entry on
6  your CRD?
7      A.  No.
8      Q.  Did anybody at ONESCO ask you any questions about
9  your prior employment in the securities industry?
10     A.  No.
11     Q.  I take it, and maybe this is part of your
12 explanation, but they -- you were fired because of this
13 undisclosed outside business activity; is that fair to
14 say?
15     A.  Yes.
16     Q.  I need you to speak up.
17     A.  Yes.
18         MR. CHAIRMAN:  And Gary McDuff was fired,
19 too?
20         THE WITNESS:  No.  He was not part of the
21 bank.
22         MR. CHAIRMAN:  Okay.  Who was he?
23         THE WITNESS:  He was an individual
24 representing a company.
25         MR. CHAIRMAN:  Okay.

248

1      Q.  Who was the person who set up the arrangement
2  with the IRA custodian to hold these -- to open up IRA
3  accounts for those individuals -- I'm sorry.  Let me
4  take a step back.
5      Were IRA accounts set up for those investors who
6  were using qualified funds?
7      A.  Yes.
8      Q.  Were they set up with IRA custodians?
9      A.  Yes.
10     Q.  Who were the IRA custodians?
11     A.  There were several.
12     Q.  Who negotiated or made the arrangement with the
13 IRA custodians to approve this product as something that
14 they would hold?
15     A.  I did.
16     Q.  You did?
17     A.  Yes.
18         MS. WRIGHT:  Do you remember who any of
19 those IRA custodians were?
20         THE WITNESS:  One was First Trust of Onaga.
21 One was -- I can't think of the name now.  It was a
22 company that actually got taken over, big name.  There
23 was three main ones who would accept the fund shares as
24 a viable investment.
25         MR. NEKVASIL:  Was Fiserve [phonetic] one of

249

1    them.
2            THE WITNESS: Fiserve, that's it.
3        MR. NEKVASIL: If the panel would turn to
4    Volume 3, Tab E.
5            MR. CHAIRMAN: Page?
6        MR. NEKVASIL: I have to figure, Mr.
7    Chairman. If I can get the volume -- it's going to --
8    it's going to be Tab E, Subsection 1, Mr. Chairman, and
9    I need to put this back on, again, to get organized.
10   BY-MR. NEKVASIL:
11       Q. If we go to start off with a Tab 3, Mr. Chairman,
12   Page 372, did you receive this $30,000 check from
13   Mr. Gibson?
14       A. Yep.
15       Q. We're on -- I'm sorry.
16           MR. NEKVASIL: We're on -- Mr. Chairman,
17   it's the beginning of Tab 3, the Bates stamped page is
18   372.
19   BY-MR. NEKVASIL:
20       Q. And I take it that you maintained in 2003 an
21   escrow account for Lancorp Financial Fund?
22       A. Correct.
23       Q. And were all investor monies held in that escrow
24   account?
25       A. Yes.

250

1        Q. Until you reached a minimum?
2        A. Correct.
3        Q. And how much was that minimum?
4        A. Five million.
5        Q. And was an the minimum that was reached in May
6    2004 when the investment became effective?
7        A. Yep.
8        Q. If you didn't reach the minimum, did you have the
9    right to cancel the offering?
10       A. Yes. And a number of people did, a number of
11   people asked for their money back before it actually
12   went effective, too, and received their funds back.
13       Q. Were investor monies -- at the time Mr. Gibson
14   made his investment, were investment monies supposed to
15   be secured by some sort of an insurance policy?
16       A. There was an attempt to being made to secure
17   insurance for it.
18       Q. And was that communicated to the investors?
19       A. Yes.
20       Q. As the manager of this fund, you put -- you put
21   together the offering memorandum; is that not fair to
22   say?
23       A. Correct.
24       Q. In your opinion, was this -- was this fact that
25   the money would be insured, was that a material

251

1    component to the offering?
2        A. Sure.
3            MR. LITTLE: Objection as to material as to
4    who.
5            THE WITNESS: It was made as an option. It
6    was not a requirement. It was made as part of the
7    offering for those people who wanted additional
8    insurance with a subsequent fee attached to it. That
9    was never consummated, the insurance never took place.
10       Q. But certainly -- certainly at the that time Mr.
11   Gibson made his investment, investors were informed that
12   this was available to them?
13       A. Yes. And they had the option to select -- to
14   elect it or not elect it.
15       Q. As the person putting together the offering
16   memorandum, did you believe at the time that this
17   availability insurance was a material fact that
18   investors needed to know about and then would consider
19   important?
20       A. Sure.
21           MR. LITTLE: Objection to the form of the
22   question. It's, one, compound and, two, it's asking the
23   witness to speculate as to what his material in the mind
24   of an investor.
25           MR. NEKVASIL: I'm asking him whether he

252

1    considered it material.
2            MR. LITTLE: No. You asked two questions
3    there.
4            MR. CHAIRMAN: Break it up in one small bite
5    at a time.
6    BY-MR. NEKVASIL:
7        Q. Did you consider it a material fact?
8        A. I considered it an important component to be
9    added to the offering.
10       Q. Did you believe that it was important to the
11   investors?
12       A. To those who wanted to select it, absolutely.
13       Q. The availability of it?
14       A. Yes.
15           MR. CHAIRMAN: Well, how many selected it
16   out of how many that didn't?
17           THE WITNESS: Less than a third selected it.
18           MR. CHAIRMAN: Okay. Thank you.
19   BY-MR. NEKVASIL:
20       Q. Now, if you go to Page 375, Mr. Gibson signed
21   this -- actually, if you start on Page 374, you had
22   difficulty obtaining this insurance; is that not fair to
23   say?
24       A. Yes.
25       Q. And you sent this letter on March 12th, 2004 to

253

1  Mr. Gibson?
2      A.  Correct.
3      Q.  And to all of the investors, didn't you?
4      A.  Correct.
5      Q.  What were you trying to convey to them in this
6  letter?
7      A.  Which one?
8      Q.  The March 12th, 2004?
9          MR. GOODMAN:  374.
10         MR. NEKVASIL:  Yeah.
11  BY-MR. NEKVASIL:
12     Q.  Bates stamp Page 374 of Tab E, this March 12th,
13  2004 letter.  What were you trying to convey to them?
14     A.  I was trying to make alternative arrangements to
15  provide security of the funds without purchasing
16  insurance.
17     Q.  Why didn't you send this only to those investors
18  who elected insurance?  If it's your testimony that it
19  was actually optional and only one-third opted for it,
20  why didn't you send this letter to everybody?
21     A.  It was just my profile when I made a
22  communication to investors.
23         MR. CHAIRMAN:  You said you did send this to
24  everybody?
25         THE WITNESS:  I believe so.

254

1  BY-MR. NEKVASIL:
2      Q.  And you indicated in this letter that -- that
3  every -- that every investor could have their -- every
4  investor could get their money back if they wanted; is
5  that not fair to say?
6      A.  Yes.
7      Q.  Whether they had earlier requested insurance or
8  not?
9      A.  Correct.
10     Q.  You indicated in the third paragraph that all
11  they had to do was notify you in writing and they would
12  get their money back?
13     A.  Correct.  And some did.
14     Q.  Were you telling the investors in this letter
15  that you would not proceed with closing the offering
16  until you made certain that you had some alternative
17  arrangement that guaranteed that their money -- that
18  their investment was completely safe?
19     A.  Yes.
20     Q.  Did you ever promise them 120 percent return on
21  their investment?
22     A.  No.
23     Q.  None -- did any of these investors know -- did
24  you ever tell any of these investors that their monies
25  were ultimately invested in MegaFund?

255

1      A.  No.
2      Q.  Go to Page 375.  You testified a minute ago
3  before I moved you back to another page that this was
4  sent to Gibson and he returned it; is that not fair to
5  say?
6      A.  Yes.
7      Q.  This letter was sent to all of the investors?
8      A.  I believe so, yes.
9      Q.  What were you conveying to the investors in this
10  April 5, 2004 correspondence?
11     A.  That insurance was not going to be made
12  available.
13     Q.  Is that all you're conveying to them?
14     A.  And that if they wanted to continue to have their
15  funds remain in the trust, that they needed to sign the
16  form saying they wanted to continue anyway.
17     Q.  Well, in the third paragraph don't you also
18  indicate that you would -- that you had -- you
19  successfully obtained an alternative for the insurance,
20  namely, a bank guarantee on their investment?
21         MR. CHAIRMAN:  Which line?
22         MR. NEKVASIL:  It would be the third
23  paragraph, Mr. Chairman, to that end, "We have
24  successfully negotiated" --
25         MR. CHAIRMAN:  Which line in the third

256

1  paragraph?
2          MR. NEKVASIL:  Third line, far right corner,
3  but you -- I mean, that's the specific line, but I think
4  it's in the -- the whole paragraph is also helpful.
5          MR. LUKOWSKI:  Read it for a minute.
6          MR. NEKVASIL:  Sure.
7          MR. CHAIRMAN:  Why don't we let him read it
8  for a minute and then you can ask him the question.
9          MR. NEKVASIL:  Okay.
10         THE WITNESS:  Yes.
11  BY-MR. NEKVASIL:
12     Q.  So you indicated you would -- that it has been
13  replaced by a bank guarantee that any securities
14  purchased with investor monies would have a liquidation
15  value greater than the amount paid; is that a fair
16  statement?
17     A.  Application of the Custodian Bank, not a specific
18  bank guarantee.
19         MR. CHAIRMAN:  I'm not in the business.
20  What does that mean?
21         THE WITNESS:  Well, a qualified bank would
22  either be an A-rated bank, a top-tier bank or a
23  broker/dealer both of which when you place just cash in
24  them provide security of the cash.  Banks with FDIC and
25  broker/dealers with -- some of them will have specific

257

1  for -- just specific for up to 500,000 and others will
2  insure up for an unlimited amount of cash.  When the
3  funds are placed there, they are secured.
4  BY-MR. NEKVASIL:
5      Q.  You mentioned specific, but I'm going to read
6  what you have here.  "To that end we have successfully
7  negotiated and obtained a valid written obligation from
8  the qualified bank acting as custodian, that any
9  securities which may be purchased must have a
10 liquidation value greater than the amount paid as
11 required by permitted investments described in the
12 memorandum or that such securities liquidations value
13 would be insured by AIG or equivalently related
14 insurance at all times."
15     But this tells me that you're saying that,
16 listen, whatever we buy with your money is either
17 insured or it's secured by a guarantee from this bank,
18 that the liquidation value is greater than what you
19 invested.  That's how I read that.  Am I -- is that
20 inaccurate?
21     A.  That's the essence of it, yes.
22     Q.  Okay.  Who was this qualified bank?
23     A.  The qualified bank was Tricom.  Tricom provided a
24 document that specifically said that the liquidation
25 value of the funds that were held there would never be

258

1  less than the amount that was placed on the deposit.
2      Q.  So that's the broker/dealer that's -- Tricom was
3  the Australian broker/dealer?
4      A.  Correct.
5      Q.  And they provided you with that guarantee?
6      A.  Yes.
7      Q.  Got you.
8          MS. WRIGHT:  That guarantee was not to the
9  individual investors, but to the trust as a whole?
10         THE WITNESS:  To the trust.
11         MR. NEKVASIL:  Correct.
12         THE WITNESS:  And all the funds that
13 belonged to the trust that were held there was
14 guaranteed never to have a liquidation less than 100
15 percent than what was put on -- placed on deposit.
16 BY-MR. NEKVASIL:
17     Q.  Did that guarantee cover the investor monies that
18 had been placed in the trust?
19     A.  Yes.  Correct.
20     Q.  Those -- did some investors at this point in time
21 indicate that they wanted to withdraw their
22 subscription?
23     A.  A few did.
24     Q.  Did they get -- did you give them their money
25 back?

259

1      A.  Yes.
2      Q.  And I know I kind of skipped around sequentially,
3  but if you turn to the next page, 376, did you send this
4  letter to Mr. Gibson when he made his -- when he sent
5  you his original check?
6      A.  Yes.
7      Q.  Again, a check would have been sent to you, not
8  to Mr. Bob Reese; is that fair to say?
9      A.  Correct.
10     Q.  Did Bob Reese hold any investor monies for you?
11     A.  No.
12     Q.  What was Bob Reese's -- we heard Bob Reese's name
13 in respondent's opening statement.  What was Bob Reese's
14 role in connection with Gibson and these other
15 claimants?
16     A.  He was a referral source for investors.
17         MR. CHAIRMAN:  What did Bob Reese do for a
18 living?
19         THE WITNESS:  He sold insurance, I think.
20         MR. CHAIRMAN:  And he referred investors to
21 you?
22         THE WITNESS:  Yeah.  He -- I didn't -- I
23 didn't know Bob Reese, per se.  I was introduced to Bob
24 Reese by Gary McDuff.
25         MR. CHAIRMAN:  Do you know what the

260

1  relationship was with Gary McDuff?
2          THE WITNESS:  I do not.
3          MR. CHAIRMAN:  Did he -- why did Bob Reese
4  do this?  Did you take him to dinner and let him play
5  golf or something?  Why is he doing this?
6          MS. WRIGHT:  Was he compensated for
7  referrals?
8          THE WITNESS:  He was -- I'm sure he was
9  being compensated or had some kind of compensation
10 arrangement with Gary McDuff.
11         MR. CHAIRMAN:  But you don't know what it
12 was?
13         THE WITNESS:  I do not.
14 BY-MR. NEKVASIL:
15     Q.  You -- isn't it true that your understanding was
16 that the limited monies back its investment -- that you
17 did receive from MegaFund before it collapsed, that part
18 of that money was sent by you to an entity in Mexico
19 called MexBank, and it was that entity that would
20 compensate Reese; is that accurate?
21     A.  That was my presumption, yeah.
22     Q.  Now --
23         MR. LUKOWSKI:  Was McDuff -- excuse me.  Was
24 McDuff being compensated?
25         THE WITNESS:  McDuff was being compensated

## 261

1  to the degree that our arrangement was that -- because
2  he had -- he was supposed to have had the connections to
3  bring the paper that would initiate the transactions to
4  generate the profit, that the first 22 percent of all
5  the funds that -- all of the earnings that could be made
6  would be paid to the trust.
7      MR. LUKOWSKI:  Okay.
8      THE WITNESS:  And there would be a sharing
9  arrangement between Lancorp Financial Group, which was
10  me, and McDuff for anything that the fund earned over 22
11  percent.
12     MR. LUKOWSKI:  Okay.
13     MR. CHAIRMAN:  This was 22 percent annual
14  return?
15     THE WITNESS:  Correct.  It was all based on
16  performance.
17     MR. CHAIRMAN:  Where did the money come from
18  to get to Reese -- when did either one of these people
19  get money the first time?
20     THE WITNESS:  At the end of the first
21  quarter with the payouts that were received from
22  MegaFund, I thought they were earnings payout.  So the
23  amount that was above the 22 percent threshold on that
24  quarter was divided and payments sent.
25     MR. CHAIRMAN:  And how many quarters did you

## 262

1  get in your funds from MegaFund?
2      THE WITNESS:  Three.  One quarter we had
3  three months.
4      MR. LUKOWSKI:  What was the compensation?
5  The first 22 percent of return was supposed to go where?
6      THE WITNESS:  To the fund.
7      MR. LUKOWSKI:  To the fund.  Okay.
8      And that would be then distributed to the
9  investors and anything over 22 percent --
10     THE WITNESS:  Correct.
11     MR. LUKOWSKI:  -- would go to the trustees?
12     THE WITNESS:  Right.
13     MR. LUKOWSKI:  As fees 100 percent of
14  everything over 22 percent?
15     THE WITNESS:  Correct.
16     MR. LUKOWSKI:  Okay.
17  BY-MR. NEKVASIL:
18     Q.  How did you arrive at the 22 percent?
19     A.  That to me was a minimum amount that I wanted to
20  make sure the investors earned.
21     Q.  The investors weren't promised a 22 percent
22  return?
23     A.  No.
24     Q.  You never told them, hey, this is a 22 percent
25  deal?  You never told them.

## 263

1      A.  No.
2      Q.  Okay.  That was a -- a figure that you picked?
3      A.  That was a number that I picked that I wanted to
4  be making a paper performance and that the investors got
5  paid first.
6      Q.  And just -- is it true that you actually received
7  two payments from MegaFund?
8      A.  Two payments in that.  I can't remember which
9  months.
10     Q.  Two payments?
11     A.  Two payments that were made.
12     Q.  Of $500,000; is that not fair to say?
13     A.  Correct.
14     Q.  And 60 percent was kept by you of which you paid
15  the investors 20 percent of your 60 and 40 percent went
16  through MexBank to McDuff and his people; is that a fair
17  statement?
18     A.  I don't remember the exact numbers, but something
19  close to that.
20     Q.  Why didn't you pay Reese a commission directly
21  for referring people to you?
22     A.  Because I didn't initiate Reese, and I was not
23  going to compensate -- there was no provision in the
24  private placement memorandum for the trust to make
25  compensation for broker/dealers or investor referral

## 264

1  orders or anything of the like.
2      Q.  Was that the only reason you did not compensate
3  Reese directly?
4      A.  Well, I also felt like -- that, I mean, paying
5  compensation to a non-licensed person could be a
6  potential problem.
7      Q.  By non-licensed, you mean, non-securities
8  license?
9      A.  Non-securities license, correct.
10     Q.  Unlike him you had a license at that time?
11     A.  Correct.
12     MS. WRIGHT:  Where in all of this voluminous
13  material is a copy of the memorandum, offering
14  memorandum?
15     MR. NEKVASIL:  It would be in Volume 1, Tab
16  B.  Give me one second, ma'am, and I'll pull it up.
17     And Volume 1, Tab B, Bates stamped Page 74,
18  ma'am.  B-74 onward is the memorandum and the trust
19  agreement and whatnot.
20     MR. CHAIRMAN:  Run me through that again.
21  1-B?
22     MR. NEKVASIL:  B-74.
23     MR. CHAIRMAN:  Page 74.
24     MR. NEKVASIL:  Sir, I have a couple
25  questions and it would be a good time to break or should

265

1    I wait until the panel looks at this.  I don't want to
2    be -- ask my questions while the panel is reading these.
3            MR. CHAIRMAN:  I think that's a good idea.
4    One of the panel members apparently knows how to read
5    these and figure out what they say.
6            MS. WRIGHT:  I didn't say that.  It's fine
7    with me to keep going.  At least I know where this is
8    and I can look at this if we need to.
9            MR. NEKVASIL:  Okay.  And I'm not trying to
10   interfere with what you're doing.
11           MS. WRIGHT:  No.
12           MR. NEKVASIL:  Okay.
13   BY-MR. NEKVASIL:
14       Q.  And Page 377, we're still on -- we're still on
15   individual claims.  We're still on Volume 3, Tab E, Page
16   377.
17           The Lancorp Financial Fund became officially
18   effective in May 14, 2004; is that true?
19       A.  Correct.
20       Q.  Before May 14th, 2004, you had the right to
21   simply tell the investors you're not going to proceed
22   with this offering; isn't that not fair to say?
23       A.  Yeah.  That's correct.
24       Q.  Now, Reese referred investors to you.  Whose
25   responsibility was it to send them the offering

266

1    memorandum?
2        A.  Me.
3        Q.  After Reese referred the investors to you and you
4    sent them the offering memorandum, was Reese supposed to
5    play any other role in the sales process?
6        A.  No.
7        Q.  Who was -- whose responsibility was it to get the
8    person to sign the subscription agreement after they
9    received the memorandum and to receive it from them?
10       A.  That's me.
11       Q.  So you, -- actually, for all these Lancorp
12   investments, you closed the deal; is that fair to say?
13   That was your responsibility?
14       A.  Yes.
15       Q.  And in that regard with respect to Mr. Blandi --
16           MR. NEKVASIL:  If the panel will turn to
17   Volume 2, Tab -- we're in the same volume, which is 3,
18   go to E-176.
19           E-176, Mr. Chairman.  Same volume, which is
20   the one we were on, sir, which was Volume 3-E.
21           MS. WRIGHT:  170?
22           MR. CHAIRMAN:  Is it right after 2?
23           MR. NEKVASIL:  Yeah.  It's the first page
24   after Tab 2.
25           MR. CHAIRMAN:  Thank you.

267

1            MR. LUKOWSKI:  Why didn't you say so?
2    BY-MR. NEKVASIL:
3        Q.  176, did you send this letter to Mr. Blandi?
4        A.  Yes.
5        Q.  And was this letter sent while you were still a
6    licensed broker with ONESCO?
7        A.  Yes.
8        Q.  And, again, like all your other investor
9    correspondence, this was -- copies of this were kept in
10   your West Linn office; is that not fair to say?
11       A.  Yes.
12       Q.  Did you have telephone conversations with
13   Mr. Blandi in November 2004 concerning Lancorp Financial
14   Fund Business Trust?
15       A.  I had numerous conversations with him.  I can't
16   verify the exact date.
17       Q.  Okay.  Does this letter refresh your recollection
18   that you actually spoke with him about this investment
19   in November of 2004?
20       A.  Yes.
21       Q.  And if you turn the page to 177, did you send him
22   this second letter --
23       A.  Yes.
24       Q.  -- on November 10th, 2004?
25       A.  Correct.

268

1        Q.  To further refresh your recollection, you had
2    discussions with him concerning a Lancorp Financial Fund
3    Business Trust offering in November of 2004?
4        A.  Yes.
5        Q.  And in those discussions, would you have -- did
6    you discuss with him the terms of the offering?
7        A.  Sure.
8        Q.  Did you tell him in those conversations that his
9    investment would be safe?
10       A.  I always explain to every investor how their
11   money was protected.
12       Q.  And it would be fair to say that --
13       Q.  How it would be held.
14       Q.  I'm sorry?
15       A.  How it would be held.
16           MR. LITTLE:  Objection.
17           The answer was nonresponsive.  The question
18   was what conversations he had with this particular
19   claimant, and the witness testified as to what he spoke
20   about in general.
21           MR. NEKVASIL:  That's not true.
22           MR. CHAIRMAN:  Well, just hang on a minute
23   because we got to -- yes, ma'am?
24           (Off the record.)
25           MR. NEKVASIL:  My specific question to him

269

1  was, did you tell Mr. Blandi in those conversations that
2  his investment would be safe.
3        MR. CHAIRMAN:  Let him answer it again,
4  then.  Did you?
5        THE WITNESS:  I can't say specifically.  I
6  do not remember the content of all of the conversations
7  that I had.  If the question came up regarding how the
8  money was held or how safe their funds were, then I
9  would describe the provision in the memorandum that
10 addressed specifically how the funds are to be held.
11 BY-MR. NEKVASIL:
12       Q.  You testified earlier that your responsibility
13 was to close the deal once Reese referred the investor
14 to you.  Didn't you testify to that a couple minutes
15 ago?
16       A.  Yes.
17       Q.  And so as part of your general practice, when you
18 sent an investor the offering memorandum, did you hope
19 that he would ultimately invest, he or she?
20       A.  That was the whole purpose, was to have an
21 investor invest in the fund.
22       Q.  And as part of your general practice in your
23 personal conversations with an investor at the time that
24 you would send them the offering memorandum, would it be
25 part of your general practice to tell them what a good

270

1  deal this was?
2        A.  That was not my role nor was it my profile to
3  tell them what a great deal this was.
4        Q.  Would it be -- was it a part of your practice to
5  describe the features of the offering?
6        A.  Absolutely.
7        Q.  And would those features include either insurance
8  or some sort of a bank commitment or guarantee?
9        A.  How the funds were to be held and -- that would
10 be correct.
11       Q.  That was a part of your normal practice?
12       A.  Absolutely.
13       MR. CHAIRMAN:  Was that done?
14       THE WITNESS:  With Mr. Blandi?
15       MR. CHAIRMAN:  With anybody, any of the
16 investors.
17       THE WITNESS:  Only if they asked
18 specifically.  My conversations with people would call
19 me --
20       MR. CHAIRMAN:  I didn't mean the
21 conversation, but was it -- were the funds protected
22 through insurance or a bank guarantee?
23       THE WITNESS:  They never were protected by
24 insurance.  Insurance never came to fruition.
25       MR. CHAIRMAN:  Was he ever protected by a

271

1  bank guarantee?
2        THE WITNESS:  Well, you have to define what
3  bank guarantee is.
4        MR. CHAIRMAN:  You tell me.
5        THE WITNESS:  To me, the funds were either
6  held in a bank, in an A-rated bank.  That's why Bank of
7  America was selected, or held at a broker/dealer in a
8  cash account.  So to the degree that those institutions
9  provided protection of the funds on behalf of trust,
10 they were protected.
11       MR. CHAIRMAN:  Okay.  And when did that end
12 in this lost?  There's an implication these monies were
13 lost; isn't that correct?
14       THE WITNESS:  Yes.
15       MR. CHAIRMAN:  Then how did that happen and
16 what happened to your guarantee for this protection?
17       THE WITNESS:  Well, the protection ceased by
18 the person at MegaFund taking the funds out without
19 notifying or without permission and in violation of the
20 contractual agreement.
21       MR. CHAIRMAN:  They took the money out of
22 the bank account?
23       THE WITNESS:  Out of the bank account.
24       MR. LUKOWSKI:  Whose bank account?
25       THE WITNESS:  Out of the bank account of

272

1  MegaFund.
2        MR. LUKOWSKI:  So you delivered the trust
3  funds to MegaFund?
4        THE WITNESS:  To MegaFund at Wells Fargo.
5        MR. LUKOWSKI:  Okay.  And at that point it
6  was MegaFund's account, correct?
7        THE WITNESS:  Correct.
8        MR. LUKOWSKI:  And you had no control over
9  that account, correct?
10       THE WITNESS:  I had no direct control.  In a
11 way I was kind of like an investor in the fund in that I
12 could demand the money back at any time.  I received
13 letters from two separate attorneys saying that money
14 was being held at JPMorgan Chase.  That it would be
15 secured and insured, and that I could command it at any
16 time that I wanted it.
17       MR. CHAIRMAN:  What did you expect MegaFund
18 to invest in?
19       THE WITNESS:  MegaFund was doing the same
20 kind of thing that Lancorp was doing amongst others, to
21 doing repos and the like.  The funds that were supposed
22 to -- Lancorp funds were supposed to be used in the
23 manner described in the prospectus.
24       MR. CHAIRMAN:  Which was?
25       THE WITNESS:  Was with -- was doing --

### 273

1  trading on bond, but doing it on a much larger scale.
2  So instead of just 5 million, MegaFund was purportedly
3  going to put together between 15 and 100 million to do
4  it, so there would be more transactions and the deals
5  would be larger.
6       MR. LUKOWSKI: When did MegaFund's deal
7  become effective?
8       THE WITNESS: MegaFund had already -- was
9  already underway in -- when I sent the money for the
10  fund. It had already been in effect for months.
11      MR. CHAIRMAN: Did MegaFund invest in these
12  bonds and I presume their safety net or guarantee goes
13  away?
14       THE WITNESS: That was -- it was not suppose
15  to go away, no.
16      MR. CHAIRMAN: I mean, do the banks assure
17  funds that are invested in bonds?
18       THE WITNESS: No. But the way that the bond
19  trade was to take place was he didn't hold the bond. He
20  had an expression of interest of someone who wanted to
21  buy a specific bond, amount of bonds, and you purchase
22  the bond and you sold it for a small -- same kind of
23  bond trading that they did institutionally in the bank.
24      MR. CHAIRMAN: I guess I don't know enough
25  about this stuff.

### 274

1      MS. WRIGHT: Well, I think it would be
2  helpful to the panel to go back to the memorandum, which
3  I was just looking at, and have Mr. Lancaster please
4  explain from the purposes of the memorandum, not
5  MegaFund, and how you explain to investors how the money
6  was going to be utilized. What was the investment
7  strategy of the trust?
8       THE WITNESS: The investment strategy of the
9  trust was to buy bond and sell it the same day for the
10  spread, so the money actually never left. It was
11  same-day transaction.
12  BY-MR. NEKVASIL:
13    Q. But I think he's -- but the feature of your
14  offering was that the investment principle would
15  actually always be --
16    A. Always remained in the institution, correct.
17    Q. So the investment principle would not be used to
18  pay for the bond. It wouldn't leave the account. It
19  always stayed in the account safe. Wasn't that your
20  investment strategy?
21    A. Correct.
22    Q. Unlike your typical investment.
23    So the -- somehow the money in the account would
24  be used to fund the transaction, but the money would not
25  leave the account and the principle would never be at

### 275

1  risk; isn't that your understanding of how this
2  transaction would work?
3    A. Correct.
4    Q. And is that how you described it to the
5  investors?
6    A. Yes.
7    Q. And so it's --
8      MR. CHAIRMAN: Okay. Is that possible?
9      MS. WRIGHT: That seems to conflict with the
10  written statement in the memorandum, and so I'm trying
11  to get to --
12      MR. NEKVASIL: I understand.
13      MS. WRIGHT: And is this the appropriate
14  time or do you want to deal with that later?
15      MR. NEKVASIL: I mean, I don't mind now
16  addressing the conflict between what he's describing and
17  what's in the memorandum. I mean, I'm not disputing
18  that there is a conflict. I know what the investors
19  were told and he's testified to what they were told.
20      MS. WRIGHT: Well, in the -- I'm in Volume
21  1, Tab B, Page 104, which is Page 25 of the offering
22  memorandum.
23      MR. NEKVASIL: What page, ma'am?
24      MS. WRIGHT: I'm on Page 104 of Tab B, which
25  is also Page 25 of the offering memorandum.

### 276

1      MR. NEKVASIL: Okay. All right.
2      MS. WRIGHT: At the bottom of the page where
3  it's describing investment strategy, and then at the top
4  of Page 105 if Mr. Lancaster would please read --
5  because then it says, "put in its simplest terms," which
6  to me this is a summary of what this was about.
7      THE WITNESS: You want me to read it?
8      MS. WRIGHT: Please.
9      THE WITNESS: "Put in its simplest terms,
10  the business of the trust is to make available financial
11  resources or balance sheet, if you will, to the
12  financial institution, which desires to provide an
13  accredited facility to a customer in the form of a
14  permitted investment in excess of the financial
15  institution's limits to do. So we will receive a fee
16  for the financial institution for providing the
17  availability of our financial resources to the financial
18  institution."
19      MS. WRIGHT: Now, is that the same -- does
20  that mean the same thing that you just said in your own
21  words a minute ago that we're going through the spread
22  on the bond?
23      THE WITNESS: In effect, yes.
24      MS. WRIGHT: Well --
25      MR. CHAIRMAN: No comments.

---

277

1       MS. WRIGHT:  Because the prior paragraph
2   talks about the fact that at times the financial
3   institutions don't have the resources they need to do
4   certain investment techniques.  And this is a way where
5   you give them the money to do that and you get back a
6   fee for, quote/unquote, lending them their money, and
7   that's -- that's not -- investing in bonds, scope or a
8   spread, can you explain the discrepancy there or help me
9   understand how those two are related?
10      THE WITNESS:  No, I can't.
11      MS. WRIGHT:  Okay.
12      MR. NEKVASIL:  If I can help.  If you look
13  on Page 74, ma'am, the first paragraph --
14      MR. LUKOWSKI:  Is that Bates Number 74?
15      MR. NEKVASIL:  Yeah.  Bates stamped Page 74.
16  We were already on 104.  They've got Page 74, the second
17  sentence.  "Our investment objective involves the
18  issuance of forward commitments."
19      MS. WRIGHT:  I hadn't gotten there yet.
20      MR. GOODMAN:  It's the first page of the
21  memorandum itself.
22      MR. LUKOWSKI:  Right.  And we're on the
23  first page.
24      MR. GOODMAN:  At -- nearly at the top where
25  it says, "Lancorp."

---

278

1       MR. NEKVASIL:  "Forward commitments to large
2   financial institutions (inaudible) debt securities
3   (inaudible) discount, which satisfied these criteria."
4   So what was --
5       MS. WRIGHT:  You have to define forward
6   commitment.
7   BY-MR. NEKVASIL:
8   Q.  Yeah.  I was going to say describe to the panel
9   in simple English what your understanding was of forward
10  commitment.
11  A.  Okay.  My understanding, and maybe it will help
12  explain a little of this, is this was not my creation.
13  This was brought to me as a template of a fund that had
14  already been in existence that had unwound and being
15  essentially duplicated.  The forward commitment would be
16  made to -- from an institution or whomever, that they
17  needed to buy X amount of bonds and they needed to be a
18  certain grade and in a certain price.  So if you could
19  get them at that -- within the price frame that they --
20  you got a forward commitment from somebody that they
21  would buy that you could provide, then you could do what
22  was called delivery versus purchase.  So you wouldn't
23  have to actually make a commitment on the bond, but the
24  buyer would actually take delivery and pay for the bond.
25  Q.  Have you actually used this strategy before?

---

279

1   A.  I have not, no.
2   Q.  You have not.
3       But in this offering memorandum you falsely tell
4   the investors that you have, don't you?
5       MS. WRIGHT:  Yes, you do.
6       THE WITNESS:  Yeah.  I claimed that --
7   BY-MR. NEKVASIL:
8   Q.  And that's on page -- bottom of -- and that's the
9   same page the panel directed you to, bottom of Page of
10  104, and that's why you have me confused.  It's under
11  "Investment Strategy," bottom of Page 104.
12      MR. CHAIRMAN:  Which line?
13      MR. NEKVASIL:  Starting with the line
14  "although."
15      MR. CHAIRMAN:  You're going to have to just
16  walk me to the line almost every time.  I got the
17  paragraph.  What line?
18      MR. NEKVASIL:  Okay.  We're on the bottom of
19  Page 104, a section called investment strategy with a
20  heading called "General" and the fourth line starting
21  with the word "although."
22      "Although the trust does not participate in
23  any transactions utilizing the business strategies
24  described in this memorandum, Gary L. Lancaster, one of
25  the trustees, has participated in numerous strategies

---

280

1   utilizing such" -- "has participated in numerous
2   transactions utilizing such strategy in his previous
3   positions as an officer of several financial
4   institutions, which enables him to gain the necessary
5   knowledge while developing significant business contacts
6   that many institutions who regularly participate in the
7   communication of the debt securities offerings."
8       So this statement in the memorandum is
9   false; is that not fair to say?
10  A.  It's false to the degree that I never actually
11  conducted a transaction.
12  Q.  So it's --
13  A.  Yes.
14  Q.  And you gave this false information to the
15  investors?
16  A.  Yes.
17  Q.  You didn't really understand what this -- you
18  really didn't understand how this money would be used,
19  did you?
20  A.  I didn't have an in-depth knowledge of everything
21  that was in the memorandum.
22  Q.  And you didn't understand how the investment
23  money would be used, did you?  That's a specific
24  question.
25  A.  I thought I did in the way that I described it.

281

1    MR. CHAIRMAN: Who gave you this plan?
2    THE WITNESS: This was given to me -- this
3    was provided for me through an attorney in Texas.
4    BY-MR. NEKVASIL:
5    Q. The attorney that was referred to you by Gary
6    McDuff?
7    A. Yes.
8    MR. CHAIRMAN: So Gary McDuff led you to
9    this?
10   THE WITNESS: Yes.
11   MR. CHAIRMAN: And did he -- did he give you
12   any evidence that it had ever been successful anywhere
13   else?
14   THE WITNESS: He showed sheets and printouts
15   and the like.
16   MR. LUKOWSKI: I'm not -- without disclosing
17   anything that you may have said to the attorney in
18   Texas, did you actually speak to the attorney in Texas?
19   THE WITNESS: Oh, yes. Absolutely. He
20   drafted this whole thing.
21   BY-MR. NEKVASIL:
22   Q. Just to follow the sequence of the money, is it
23   fair to say that at least as of the time that you were
24   fired by -- oh, at the time you were fired by -- okay.
25   Were you fired by ONESCO?

282

1    A. I was just terminated, yeah.
2    Q. Did you resign?
3    A. No.
4    Q. How did you discover that you were terminated by
5    ONESCO?
6    A. I just received notification of termination.
7    MR. CHAIRMAN: How did you receive it?
8    Telex, phone call, letter?
9    THE WITNESS: I got a letter.
10   MR. CHAIRMAN: Okay.
11   BY-MR. NEKVASIL:
12   Q. How soon after you sent ONESCO that form, the
13   form which disclosed -- according to your testimony, the
14   form which disclosed Lancorp Financial Fund Business
15   Trust, that form in the outside personal account, how
16   soon after that did you receive the letter saying that
17   you were terminated?
18   MR. LITTLE: Objection as to which form
19   you're talking about.
20   MR. NEKVASIL: I'm talking about the --
21   MR. CHAIRMAN: Restate it because I missed
22   it anyhow.
23   MR. NEKVASIL: Okay.
24   BY-MR. NEKVASIL:
25   Q. How soon after you sent the two forms back to

283

1    ONESCO, the ones that you believe -- you testified that
2    you believed you received from Peter Weller?
3    A. Uh-huh.
4    Q. That second outside business disclosure form and
5    the personal account form, how soon after that did you
6    receive the letter back saying that you were terminated?
7    MR. LITTLE: Objection.
8    The documents the witness is talking about
9    or that Counsel is talking about now have two different
10   dates on it. One is in May. One of them is in
11   September, and he's trying to suggest they were sent
12   back at the same time, and there's been no evidence of
13   that put in the record.
14   MR. NEKVASIL: Actually, that's not --
15   BY-MR. NEKVASIL:
16   Q. Do you believe that you sent them back at the
17   same time, those two forms that you received from
18   Weller?
19   A. I don't remember. I have no specific memory of
20   sending them together.
21   Q. Okay. Okay.
22   MS. WRIGHT: Were they -- they were dated
23   differently.
24   MR. NEKVASIL: Excuse me?
25   MS. WRIGHT: They were different dates --

284

1    MR. NEKVASIL: There was May and September.
2    May for the outside business and September.
3    MR. LUKOWSKI: Can I ask you a question
4    about the offering memorandum? You told us about how
5    the fees were supposed to work, and I'm looking at Page
6    80, and there's a fee table and synopsis. And --
7    MR. CHAIRMAN: Bates stamp 80?
8    MR. LUKOWSKI: Bates stamp 80.
9    And I don't see anything in here about 22
10   percent.
11   THE WITNESS: No. That's not in the
12   memorandum.
13   MR. LUKOWSKI: Well, where is it?
14   THE WITNESS: That was a -- the structure
15   was set up -- an agreement was drafted between Lancorp
16   Financial Fund Business Trust and Lancorp Financial
17   Group where Lancorp Financial Fund Business Trust
18   retained Lancorp Financial Group to do the investment
19   side, to do the investment on the -- on their behalf.
20   MR. LUKOWSKI: Doesn't that have to be
21   disclosed to the investors?
22   THE WITNESS: I didn't even consider that at
23   the time.
24   BY-MR. NEKVASIL:
25   Q. Now, this termination notice -- by the way, this



285

1  strategy, this strategy that we talked about here, was
2  this the same strategy that Gary McDuff was trying to
3  have -- trying to get your employer, U.S. Bank, to serve
4  as custodian for when you were working at U.S. Bank?
5      A. I never -- it's got to be similar, but I never
6  saw a specific strategy outlined.
7      Q. Yeah. But didn't you have to discuss -- you were
8  the one who actually ushered Gary McDuff through to the
9  two different departments of the bank, didn't you?
10     A. Yes. It was very -- it was very similar in
11 description, but I never received any documents. All of
12 that went out of my hand.
13     Q. Okay. But I didn't ask you whether you received
14 documents. I asked you whether the strategies were
15 similar, and is your testimony yes?
16     A. Yes.
17     Q. Now, try -- my -- is it -- so the money was -- is
18 it true that as of December 2004, at the beginning of
19 December 2004, all of the money raised by Lancorp
20 Financial Fund Business Trust was either in a Tricom
21 account, most of it, and there was a little bit left
22 about a million dollars in Bank of America; is that not
23 fair to say?
24     A. Sounds right.
25     Q. And the Tricom account had this written agreement

287

1      Volume 4. Volume 4, Tab J, Page 184?
2      MR. LUKOWSKI: J-184.
3      MR. NEKVASIL: Yeah.
4      MR. LUKOWSKI: Last page.
5      MR. NEKVASIL: Yeah. The last page of the
6  tab, Mr. Chairman. I know you would say that -- it's
7  the last page of Tab J.
8  BY-MR. NEKVASIL:
9      Q. Is this a notice -- what is this document?
10     A. Notice of termination.
11     Q. Is that the document that -- did that come out of
12 the blue?
13     A. Yes.
14     Q. And if you go back to -- and it's dated January
15 6th, 2005.
16     A. Right.
17     Q. If you go back to same volume, Tab H-3, Tab H,
18 Page 3, were there any written communications from you
19 and ONESCO between September 24th, 2004 when you sent
20 them this Lancorp Financial Fund Business Trust account
21 disclosure and your termination on January 6th, 2005?
22     A. No.
23     Q. And obviously no contact?
24     A. No contact.
25     MR. NEKVASIL: Mr. Chairman, this is

286

1  that -- was it Mr. Rosenburg who signed on behalf of
2  Tricom?
3      A. Right.
4      Q. Said that your money would be safe?
5      A. Right.
6      Q. And you had your account in the name of Lancorp
7  Financial Fund Business Trust at Bank of America?
8      A. Correct.
9      Q. December 10th, when you moved all of the money
10 out of Tricom, did it go into your account at -- the
11 Bank of America account? Did it go back into the --
12     MR. CHAIRMAN: Where did it go?
13     THE WITNESS: It went to Bank of America.
14     MR. CHAIRMAN: Bank of America.
15 BY-MR. NEKVASIL:
16     Q. So as of the time you were fired, let go by
17 ONESCO, all of the investor monies was sitting in your
18 Bank of America Lancorp account?
19     A. Correct.
20     Q. Had not been spent yet?
21     A. That's correct.
22     Q. The termination notice -- just the last question,
23 sir, I know it's getting late, last question. We can
24 put aside Volume 3.
25     Are you okay?

288

1  probably a good breaking point.
2      MR. CHAIRMAN: Okay.
3      VIDEOGRAPHER: The time is 5:21 p.m. This
4  concludes Tape Number 2. We're now off the video
5  record.
6
7      (Arbitration concluded.)
8      - - - - -

289

CERTIFICATE

1

2

3

4          I, Melinda M. Ross, do hereby certify that as
5      such Reporter I took down in Stenotypy all of the
6      proceedings had in the foregoing transcript; that I have
7      transcribed my said Stenotype notes into typewritten
8      form as appears in the foregoing transcript; that said
9      transcript is the complete form of the proceedings had
10     in said cause and constitutes a true and correct
11     transcript therein.

12

13

14

15

16         Melinda M. Ross, RPR, CCR-2614
17         within and for the State of Georgia

18

19

20

21

22

23

24

25

1

NASD ARBITRATION

JEFFREY L. PRACHT, JOHN BLANDI,
individually and as trustees to TTEE
to the WHITE HORSE TRUST, et al.,

              Claimants,

        vs.                    FILE NO. 07-00948

O.N. EQUITY SALES COMPANY
commonly know as ONESCO,

              Respondent.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

VIDEOTAPED ARBITRATION HEARING

          February 5, 2008
              9:00 a.m.

       Midtown Proscenium Center
    1170 Peachtree Street, Suite 1200
            Atlanta, Georgia

       Melinda M. Ross, RPR, CCR-2614

2

APPEARANCES OF COUNSEL

On behalf of the Claimants:
GOODMAN & NEKVASIL, P.A.
KALJU NEKVASIL, ESQ.
JOEL A. GOODMAN, ESQ.
14020 Roosevelt Boulevard, Suite 808
Clearwater, Florida  33762
727.524.8486
727.524.8786 fax

On behalf of the Respondent:
ZEIGER, TIGGES & LITTLE, L.L.P.
MARION H. LITTLE, ESQ.
3500 Huntington Center
Columbus, Ohio  43215
614.365.9900
614.365.7900 fax
little@litohio.com

Also Present:
JAY LUKOWSKI - ARBITRATOR
ROBERT LEITCH - ARBITRATOR
JENNIE WRIGHT - ARBITRATOR
JAY BLEY
JOHN PINTO
BILL PRICE

3

1    Videotaped Arbitration Hearing
2          February 5, 2008
3
4        MR. CHAIRMAN:  Yes, sir, we have some
5    preliminary matters?
6        MR. GOODMAN:  Yes.  Just one.  One of the
7    issues that I believe you did, Mr. Chairman, raised is
8    who decides the issue of arbitrability, and I think at
9    one point you had mentioned and hopefully we
10   successfully pointed out that that was for the courts to
11   decide.  Late yesterday, faxed to me was another
12   decision, and I will give it to Counsel.  Involving --
13   may I?
14       THE COURT:  Yes, please.
15       MR. GOODMAN:  Thank you.
16       MR. NEKVASIL:  It just came down.
17       MR. GOODMAN:  These same issues.  It says
18   January 30th, but it wasn't -- we had never got it until
19   late last night.  And if you go, Mr. Chairman, and the
20   panel members, to Page 3 you'll see a heading that says,
21   "Preliminary Issues and Applicable Legal Standards."
22   This is a challenge to arbitrability by ONESCO in court
23   in the federal district court.  And it says, "In a
24   threshold matter, the court must ascertain who should
25   properly decide the question of arbitrability.  In the

4

1    absence of a clear and expressed agreement between the
2    parties to arbitrate, the question of arbitrability
3    should be decided by the court, not the arbitrators."
4    And it goes on down below.
5        "Even when two parties have no explicit
6    written agreement to arbitrate NASD Rule 101 -- 10101
7    and 10301, now codified, can bind any NASD members who
8    arbitrate certain claims with third parties citing these
9    15" -- now there's six 16 cases.  "ONESCO does not
10   dispute that its membership in the NASD constitutes an
11   agreement to arbitrate all disputes contemplated by the
12   NASD rule."
13       As you -- that issue, then, I want to make
14   clear is addressed.  If you go to Page 4, several
15   important points.  And the court makes findings at
16   Number 4.  The court finds ONESCO's arguments
17   unsupported by the facts.  In fact, much of the conduct
18   underlined in the arbitration claims occurred after
19   March 23, '04 when Lancaster became a registered rep
20   with ONESCO.  The court notes that the following
21   relevant acts and events took place between April and
22   November 2004 during Lancaster's tenure with ONESCO.
23       One, the terms of the Lancorp private
24   placement offering were materially altered.
25       Two, Lancaster sent the Stouts [phonetic] a

## 5

1   letter seeking confirmation of subscription offering
2   them an opportunity to obtain return of all funds.
3        Three, the Stouts confirmed the previous
4   subscription.
5        Four, the Stouts committed further funds to
6   additional investments in the Lancorp Fund.  Similar to
7   this one, right?
8        Five, the sale of the offering was finalized
9   in addition -- excuse me -- finalized in addition prior
10  to the Lancorp closing in May 2004 when the funds
11  invested in the Stouts and the private placement were
12  held by Lancaster.  The record, thus, establishes the
13  Stouts customer relationship with Lancaster continued
14  during his tenure with ONESCO.
15       As you go on, you go up to the upper
16  right-hand corner and the court makes a finding as did
17  all 15 court decisions we gave to you.  Therefore, the
18  court finds the Stouts qualified as customers under the
19  NASD rule.
20       If you go down to Number 5, and I've
21  highlighted some things that I want to bring to your
22  attention, five.  In addition, the court notes that the
23  Stouts have alleged that ONESCO was liable for the
24  arbitration claims based on its own acts or admissions.
25  The Stouts specifically alleged, as we did here,

## 6

1   negligent supervision by ONESCO of Lancaster during his
2   association.
3        The Eleventh Circuit, and remember I brought
4   to your attention that Eleventh Circuit decision of
5   MultiFinancial versus King earlier.  The Eleventh
6   Circuit has reason, thus, follows, quote, "The NASD
7   requires its members supervise the activities of the
8   associated persons as part of their business.
9   Consequently, the claims of negligent supervision
10  satisfied the code's second arbitration condition citing
11  MultiFinancial respectfully."
12       And then the conclusion, the court finds --
13  "For these reasons the court finds the dispute arose in
14  connection with activities of the associated person
15  and" -- "and in connection with the business of ONESCO."
16  If you will, I just spotted certain important points,
17  but I think it was relevant to what we had previously.
18       MR. CHAIRMAN: I didn't mean to give y'all
19  undue concern yesterday.
20       MR. GOODMAN: I'm sorry?
21       MR. CHAIRMAN: I did not mean to give y'all
22  undue concern.
23       MR. NEKVASIL: You don't, Mr. Chairman.
24  Actually, we were very comfortable with the panel, and
25  we know you're just playing it safe and making sure we

## 7

1   keep the record.
2        MR. LUKOWSKI: Yeah.  I think at some point,
3   you know, probably by the end of the week I would
4   probably like to see briefs on very limited issue
5   because you guys are -- my impression is you're focusing
6   on one issue.  You're focusing on a different issue, and
7   I kind of want you to respond to the issues that are
8   raised in the post briefs, but I think we can wait for
9   all of that until the end of the week to address legal
10  issues that have to be raised at some point later.  I
11  think we ought to just go as far as we can on the
12  evidentiary issues and legal issues later.
13       MR. CHAIRMAN: Do you want to respond, Mr.
14  Little?
15       MR. LITTLE: Yes.  Let me briefly respond
16  because I don't understand why this is being interjected
17  now, but if we're going to point out something in these
18  decisions, let's point out the obvious.
19       I believe the court expressly says we're not
20  making any determination on the merits.  And what
21  they're trying to suggest is that somehow there is a
22  collateral estoppel effect, a preclusive effect to these
23  decisions.  And we all know from law school there are
24  several elements to collateral estoppel.  The first is
25  there is a determination on the merits.

## 8

1        Now, if the court says there's no
2   determination on the merits, you never get past square
3   one on the collateral estoppel analysis.  The other
4   thing the court points out is that there was no hearing,
5   there was no discovery.  Rather, the court bases its
6   decision on an affidavit that these attorneys procured
7   from Mr. Lancaster and submitted to the court.  This
8   panel will make a determination as to the veracity of
9   Mr. Lancaster's statements.  That's something for you to
10  do at the conclusion.  And I'll keep limit my remarks at
11  this point.
12       MR. NEKVASIL: Okay.
13       MR. LUKOWSKI: One of the things that
14  eventually may have to come to grips with in deciding
15  this is the court made several -- noted several factual
16  items that it used in determining that the claim was
17  arbitrable.  There were five elements cited on Page 4.
18       The question I have to -- and I don't want
19  an answer now because I think it's something you're
20  going to have to address later.  The question is,
21  assuming that we were to factually find that those
22  elements, all five elements are satisfied at least with
23  respect to one of the claimants, or two or all three of
24  them, whether the legal principle set forth by the court
25  would be binding upon this panel.  And I don't want an

9

1    answer now because it's something that I think needs to
2    be briefed by both parties, and I think that we as a
3    panel will hopefully figure out some specific questions
4    to ask you to address some time before the next
5    sessions. That's why --
6        MR. GOODMAN: I do have to respond, and I'll
7    tell you why it's important to what Mr. Little says.
8    See, here's a fact, when this case was filed and answer
9    was filed challenging arbitrability, that was right in
10    the answer, if you will. Then ONESCO decided to go into
11    a court and say we don't have to be here and before the
12    NASD arbitration.
13        Courts have to look at certain preliminary
14    facts presented by a plaintiff. In this case, ONESCO
15    was the moving plaintiff in the case. They said the
16    argument was fundamental. There was no customer
17    relationship to get here. You can't go to arbitration
18    unless there's an agreement in certain preliminary
19    facts. Not liability, preliminary facts. And the
20    courts made a finding based on should we be here.
21        Now, I'm not suggesting, and I don't want
22    you to take it in any other way, that we are saying, oh,
23    they have determined liability. You're just superfluous
24    and should not. I'm not suggesting that, and, please,
25    anything I said or have inferred I did not mean that,

10

1    and I'm not. So hopefully that's clear.
2        But to get from Point A to Point B, should
3    we be here, there had to be a certain set of facts upon
4    which to draw a legal conclusion.
5        Those facts are embodied here and in the 15
6    different cases that we've given to you, this being
7    number 16 in the list. And those preliminary facts are
8    really two-fold. Number one, are the investors
9    customers of the firm who have a right to invoke the
10    Rule 10301? They said yes.
11        Two, what is the business of the firm? What
12    is the business of the firm? Does it relate to this
13    claiming supervision? Yes. Did they make a
14    determination that this was properly supervised or not,
15    no. So I'm not suggesting that they made a
16    determination that there was a failure. There was just
17    a claim of supervision for which you all, which you all
18    have to make the determination, and I'm not suggesting
19    otherwise. And, hopefully, the two doesn't get mixed
20    again.
21        Is it arbitrable? Were they customers who
22    have a right to bring here the issues we have brought
23    here, which includes supervision. Not that they have
24    resolved that issue. So that's really the seminal
25    issue, to get to Door 1 you go to Door 2, but there were

11

1    facts. The court can't make a legal conclusion without
2    some known facts. So, that's it.
3        MR. LUKOWSKI: I think that, you know, this
4    is legal argument that should be addressed at an
5    appropriate time. We read your pretrial submissions and
6    I think that there are some interesting legal issues
7    that have to be addressed. I don't think we need to do
8    it during the course of the next four days at all.
9    We're here. We're taking evidence, and I think we ought
10    to just go forward and take the evidence and we'll deal
11    with the legal issues later.
12        MR. LITTLE: And I don't want my silence as
13    a suggestion as accepting anything that Mr. Goodman just
14    said, because I would have a fairly detailed response,
15    but I understand your comment that you would like to
16    proceed, which I think is what we should be doing.
17        MR. LUKOWSKI: You can take a standing
18    notation that I assumed that you object to everything or
19    have to everything Mr. Goodman said and vice versa.
20        MR. LITTLE: Now, when he said good morning,
21    I agree with that.
22        MR. NEKVASIL: How do you know he means good
23    morning?
24        MR. CHAIRMAN: We'll accept it on face
25    value.

12

1        Are you all ready to proceed and continue
2    with examination?
3        MR. NEKVASIL: Yes.
4        MR. CHAIRMAN: Okay. Are you ready?
5        VIDEOGRAPHER: This is Tape Number 1 in the
6    matter of the arbitration between Jeffrey L. Pracht,
7    John Blandi, individually, and as trustee of the White
8    Horse Trust and Lonnie L. Gibson, claimants, versus the
9    O.N. Equity Sales Company, respondents.
10        The time is 9:11 a.m. Will the reporter
11    please swear the witness.
12        MR. LUKOWSKI: The witness has already been
13    sworn.
14    EXAMINATION.
15    BY-MR. NEKVASIL:
16    Q. For the purposes of the videotape, please
17    identify yourself again.
18    A. Gary L. Lancaster.
19    Q. Mr. Lancaster, would you agree that you testified
20    yesterday that U.S. Bank, your employer before ONESCO,
21    fired you for failing to fully disclose the extent of
22    your relationship with Gary McDuff?
23    A. Not entirely, no.
24    Q. Okay. What part of that do you agree with and
25    what part of it do you not agree with?

## 13

1    A. The information that Gary McDuff put together
2  that was provided to them by a third party was the
3  result.
4    Q. Okay. Did the bank inform you -- did the bank
5  fire you?
6    A. Yes.
7    Q. Did they explain to you why they fired you?
8    A. Yes.
9    Q. What did they tell you?
10   A. They told me that -- that was considered outside
11 activity and violation of their rules and regulations,
12 and that was the basis for termination.
13   Q. What did the rules and regulations say about
14 outside activities?
15   A. That you had -- they had to be approved by them,
16 disclosed and approved by them.
17   Q. So is it fair to say that the bank took the
18 position that you did not fully disclose your outside
19 business activity with McDuff?
20   A. Correct.
21   Q. Prior to the bank terminating you, did the bank
22 ever instruct you to stop any dealings with McDuff?
23   A. Yes.
24   Q. Did the bank also take the position during the --
25 at the firing that you violated an expressed directive

## 14

1  by them to stop dealing with McDuff?
2    A. Yes.
3    Q. So there really were two things: The failure to
4  fully disclose the extent of your outside business
5  relationship with McDuff and violating the expressed
6  directive of the bank; is that a fair summary?
7    A. Yes.
8    Q. During this firing process, did the bank give you
9  any information about McDuff?
10   A. Very little.
11   Q. What was that very little information -- I want
12 the panel to hear from you, not me. What was that very
13 little information the bank gave you about McDuff?
14   A. The only information they gave to me about him
15 was that he had a criminal background.
16   Q. Did they tell you what that criminal background
17 was?
18   A. They did not specify.
19   Q. Did you discuss the matter with Mr. McDuff --
20   A. I did.
21   Q. -- at that time?
22   A. I did.
23   Q. What did you ask him or what did he tell you?
24   A. I asked him what was this, you know, what the
25 story was, and he explained the scenario where he was

## 15

1  the principle of a mortgage company and there was some
2  kind of inappropriate loan action that he was found
3  guilty of.
4    Q. Found guilty of.
5      Was this a misdemeanor or a felony?
6    A. It was a felony.
7    Q. You said that he pleaded guilty to a felony or
8  was he convicted? I'm sorry.
9    A. I don't remember.
10   Q. So you knew he was a convicted felon?
11   A. Yes.
12   Q. Did he receive any jail time?
13   A. As I understand it, he did.
14   Q. He told you that?
15   A. Yes.
16   Q. How long did he spend in jail?
17   A. I don't remember.
18   Q. He didn't tell you about 18 months?
19   A. That sounds right.
20   Q. If I -- you wouldn't -- if I pointed to you an
21 SEC deposition, which said -- in which he said under
22 oath that he told you he spent 18 months in the federal
23 pen; would that -- does that refresh your memory at all?
24   A. Yes. That sounds right.
25      MR. NEKVASIL: Trying to save time,

## 16

1  Mr. Chairman.
2  BY-MR. NEKVASIL:
3    Q. Any other charges against Mr. McDuff? Did he
4  tell you about any other charges against him?
5    A. There was something about -- something he did as
6  a teenager, and that's --
7    Q. Was there a burglary?
8    A. I don't remember it being a burglary.
9    Q. Does this Gary McDuff have a company that he used
10 at that time in 2002 -- let's say 2002 and 2003, did he
11 have a company that he used?
12   A. He represented Secured Clearing.
13   Q. Secured Clearing?
14   A. Right.
15   Q. And so is it fair to say that you then -- that
16 this convicted felon was the person who found Mr. Reese
17 for you; is that fair to say?
18   A. Yes.
19   Q. He found -- did he find the other people who
20 refer -- I know Reese -- you testified yesterday Reese
21 referred most of the Lancorp Financial Fund Business
22 Trust investors to you, but there were several other
23 sales agents, weren't there?
24   A. There were some other people that referred.
25   Q. Referred investors to you, like Tom Bandick

17

1    [phonetic], for example?
2    A. Yeah. Tom Bandick was one.
3    Q. Okay. Did this convicted felon also find those
4    people for you?
5    A. I presume so. I don't know where they came from.
6    Q. Now, your money went to -- the investor monies
7    went to -- in 2004, the investor monies were held at
8    Tricom; is that fair to say?
9    A. Yes.
10   Q. Why were they sent to Tricom?
11   A. For the purpose of conducting transactions.
12   Q. Was the money to be held safely in a Tricom
13   account?
14   A. Yes.
15   Q. And used to somehow secure these forward
16   commitments that other institutions would engage in?
17   A. Correct.
18   Q. Was there a person who was supposed to do the
19   trading?
20   A. The actual trading was going to occur within
21   Tricom.
22   Q. Okay. Have you ever heard of the name Dick
23   Bazell [phonetic]?
24   A. Dick Bazell. There was a David Bazell.
25   Q. David Bazell?

18

1    A. Yeah.
2    Q. Who is he?
3    A. He was the contact person who was responsible for
4    arranging for the trade to occur.
5    Q. Who found this Mr. Bazell for you? Did you find
6    Mr. Bazell?
7    A. No. He was introduced to me by Gary McDuff.
8    Q. So this convicted felon not only found the
9    salesman for you, but he also found the trader who was
10   going to do the trading while the money was in a Tricom
11   account?
12   A. Correct.
13   Q. Now, did Tricom have any relationship to Dick
14   Bazell -- to David Bazell? I'm sorry. I keep using the
15   word Dick.
16   A. Not that I know of.
17   Q. Tricom is a real brokerage firm?
18   A. Correct.
19   Q. Like in ONESCO?
20   A. Yes.
21   MR. CHAIRMAN: I'm confused a little bit.
22   Does David Bazell work for Tricom?
23   THE WITNESS: No.
24   MR. CHAIRMAN: So he's an intermediary
25   between you and Tricom?

19

1    THE WITNESS: Yes.
2    MR. CHAIRMAN: Did you ever have any direct
3    contact with Tricom?
4    THE WITNESS: I spoke with Lance Rosenburg
5    [phonetic] a number of times.
6    MR. NEKVASIL: I can clear that up.
7    MR. CHAIRMAN: Maybe you can explain.
8    MR. NEKVASIL: I believe I can.
9    BY-MR. NEKVASIL:
10   Q. You said you set up an account directly with
11   Tricom?
12   A. Yes.
13   Q. Did you complete the new account forms and
14   actually open an account with Tricom?
15   A. Yes.
16   Q. Was the account in your -- in the name of Lancorp
17   Financial Fund Business Trust?
18   A. Yes.
19   Q. Were you the sole person who controlled the
20   account?
21   A. Yes.
22   Q. Did Dick Bazell play any role in setting up that
23   account at Tricom?
24   A. No.
25   Q. None at all?

20

1    A. No.
2    Q. So, first of all, he was not, would you agree, an
3    intermediary between you and Tricom in setting up the
4    account; is that fair to say?
5    A. Not in setting up the account, correct.
6    Q. Okay. So was Dick Bazell the person --
7    MS. WRIGHT: David.
8    MR. CHAIRMAN: David.
9    BY-MR. NEKVASIL:
10   Q. David. I'm sorry.
11   Was David Bazell the person who actually Gary
12   McDuff found who would actually do the trading --
13   A. Yes.
14   Q. -- using the money in the account?
15   A. He was the person from whom the security
16   transactions would come from.
17   Q. Did David -- did David --
18   MR. CHAIRMAN: I just couldn't hear you.
19   THE WITNESS: He was supposed to be the
20   source of the transaction.
21   MR. WRIGHT: So he had discretion on the
22   account?
23   THE WITNESS: No. Nobody had discretion on
24   the account. The specific instruction was to Tricom.
25   MS. WRIGHT: But how -- if he's not an

## 21

1  employee of Tricom and he doesn't have discretion on the
2  account, then how could he --
3       THE WITNESS: He was supposed to be the
4  contact person, as I understood it. He was a part of
5  some group that they were going to be the ones who were
6  able to bring the paper to Tricom that was going to be
7  traded.
8  BY-MR. NEKVASIL:
9     Q. Did -- okay.
10     Did David Bazell have any kind of power over
11  the -- over your account at the Lancorp Financial Fund
12  Business Trust account at Tricom?
13     A. No.
14     Q. He had no power of attorney?
15     A. No.
16     Q. No discretionary authority?
17     A. No.
18     Q. He was not on the account?
19     A. No.
20     Q. Did he have any right to touch the money?
21     A. No.
22     Q. And I know I'm using a -- could anybody get
23  access to any of the money of that account?
24     A. Nobody had any right to access the money, but me.
25     Q. Did Tricom find David Bazell or did McDuff find

## 22

1  David Bazell for you?
2     A. Gary McDuff found David Bazell.
3     Q. Gary?
4     A. Right.
5     Q. Okay. Now, explain to -- explain -- and I take
6  it that it's your position -- by the way, is Tricom a
7  brokerage firm that one can find on the Internet today?
8     A. Yes.
9     Q. Okay. So, if, for example, you want -- if you
10  Google -- want to Google and type in Tricom, you could
11  find this broker/dealer; is that fair to say?
12     A. Yes.
13     Q. Now, was Lance Rosenburg the president of Tricom?
14     A. President and principle principal owner.
15     Q. Did you enter into any kind of condition to
16  opening an account directly with Tricom? Did you enter
17  into any kind of agreement with Tri -- with Mr.
18  Rosenburg on behalf of Tricom that your money would
19  be -- that the investor monies would be kept safely
20  there?
21     A. Yes.
22     Q. Did David Bazell play any role in negotiating
23  that agreement?
24     A. No.
25     Q. Now, if David Bazell had no right to access the

## 23

1  money in the account at all, how could that money be
2  used by him to fund trading?
3     A. It was not going to be used by him. Nobody would
4  have access to the money at Tricom but me.
5     Q. Okay. Explain to me mechanically, because I
6  don't understand, mechanically how was the trading
7  supposed to work.
8     A. The trading was supposed to work by David Bazell
9  and he had a connection with the UK group that was
10  supposed to be part of Secured Clearing. They were
11  going to be the ones who generated the paper that would
12  be brought to Tricom that would be traded on.
13     Q. Who would -- who would actually -- if he had no
14  power over the account, who would be the one doing the
15  trading of the paper at Tricom?
16     A. Lance Rosenburg. He was the only one that had
17  authority.
18     Q. He had authority over your money?
19     A. No. He was the only one who could do the
20  transaction.
21     Q. Okay. So if David Bazell brought paper to Tricom
22  and if Tricom bought and sold it using it's money, how
23  do the Lancorp Financial Fund Business Trust investors
24  benefit? In other words, why would Lance Rosenburg, if
25  he's got -- had bought some paper from Bazell and sold

## 24

1  it to a third party and made a profit, why would he
2  share that money with the Lancorp Financial Fund
3  Business Trust investors if their money wasn't being
4  used and if they weren't exposed to any risk?
5     A. Because they were getting a commission for
6  executing the trade.
7       MR. CHAIRMAN: Tricom was getting your
8  commission?
9       THE WITNESS: Correct.
10       MR. CHAIRMAN: I guess he's -- I think he's
11  asking why would Tricom share any of that money with
12  your group.
13       THE WITNESS: Because the understanding was
14  that all of that -- the paper that was even brought to
15  Tricom was for the purpose of being able to execute the
16  Lancorp funds.
17       MS. WRIGHT: But who -- so did you make
18  those decisions as to whether or not this paper was
19  accepted or -- or did Lance Rosenburg make those
20  decisions and did he, therefore, have discretion over
21  the funds?
22       THE WITNESS: Well, he didn't have
23  discretion without clearing it with me first.
24       MS. WRIGHT: So he would call you and say we
25  have this deal and you said, yes, go ahead and do it?

## 25

1    THE WITNESS: Yes. But only if it's
2  conformed.
3    MS. WRIGHT: Exactly.
4    MR. CHAIRMAN: What was going to happen if
5  the trade lost money? Who was going to take the loss?
6    THE WITNESS: Well, it was supposed to be a
7  scenario where there would be a simultaneous buy and
8  sell to another purchaser. So there was no holding of
9  the bond. It was supposed to be a same-day trade.
10 BY-MR. NEKVASIL:
11   Q. Now, did any of these trades -- I mean, when you
12 answered the question for the arbitrator about these
13 phone calls, are you speaking practically or
14 theoretically? In other words, did any trades actually
15 happen at that point?
16   A. No trades occurred.
17   Q. So Mr. Rosenburg never called you and said I want
18 to -- what about buying this paper or buying that paper?
19   A. Correct.
20   Q. The money was at Tricom for -- didn't you open
21 the account in March 2004?
22   A. I believe that's correct.
23   Q. And you closed it in December 2004?
24   A. Yes.
25   Q. No trades occurred?

## 26

1    A. No trades occurred.
2    Q. The money just sat there?
3    A. Yes.
4    Q. And it was returned to your Bank of America
5  account in West Linn, Oregon?
6    A. Correct.
7    MR. NEKVASIL: If the panel will please turn
8  out -- turn to Volume -- pull out Volume 1, Tab B, B-74.
9    MR. CHAIRMAN: 74?
10   MR. NEKVASIL: Yes, sir.
11 BY-MR. NEKVASIL:
12   Q. Before I ask you questions about this document,
13 B-74, why did you move the money back from Tricom to
14 your Bank of America account?
15   A. Because it became apparent that no trades were
16 going to occur. I talked to Lance Rosenburg and he
17 didn't think any were going to occur either.
18   Q. What was the basis --
19   MR. CHAIRMAN: I'm sorry. He didn't
20 think --
21   THE WITNESS: He didn't think that there was
22 going to be any paper -- he didn't think there was going
23 to be any executable trades either.
24 BY-MR. NEKVASIL:
25   Q. What was the basis -- tell the panel discussions

## 27

1  with them. What led to that conclusion?
2    A. Well, nothing was occurring. No trades were
3  taking place, didn't appear that any were going to.
4  Investors wanted to know what was happening. I had to
5  tell them nothing was happening, and so I just requested
6  to have the money sent back.
7    MS. WRIGHT: Were you earning interest on
8  that account.
9    THE WITNESS: I thought I was, but I
10 earned -- the interest that was supposed to be earned on
11 it never occurred.
12 BY-MR. NEKVASIL:
13   Q. So the answer is no?
14   A. Correct. There was no interest earned on it.
15   Q. Did you ever meet this David Bazell?
16   A. No.
17   Q. Did you ever talk to him on the phone?
18   A. Yes.
19   Q. How many times?
20   A. Numerous.
21   Q. Did he ever provide you with any documentation of
22 the strategy that he had intended to employ with the
23 investor funds?
24   A. No.
25   Q. Now, did you -- did you in this offering -- this

## 28

1  is the offering memorandum that you gave to all of the
2  investors in the Lancorp Financial Fund Business Trust,
3  this offering memorandum that appears beginning on B-74;
4  is that fair to say?
5    A. Yes.
6    Q. That would include all the claimants in this
7  case?
8    A. Yes.
9    Q. Is it anywhere in this memorandum discussed that
10 you have a -- that you had a business relationship with
11 Gary McDuff who was a convicted felon?
12   A. No.
13   Q. Does Gary McDuff's name appear at all in this
14 offering memorandum?
15   A. No.
16   Q. Does it at all disclose in this offering
17 memorandum that you were going to pay money that would
18 be routed to McDuff and to the referring agents that he
19 found for you?
20   A. No.
21   Q. Is it discussed -- and I take it this is the same
22 convicted felon McDuff who ultimately found MegaFund for
23 you; is that fair to say?
24   A. Yes.
25   Q. Is it at all discussed at all in this offering

29

1  memorandum that your investment strategy really consists
2  of having this convicted felon, Mr. McDuff, find a
3  trader for you?
4     A. No.
5     Q. Isn't that the reality that that was your
6  investment strategy?
7     A. Yes. He was responsible for finding the
8  investments.
9         MR. GOODMAN: Can you keep your voice up,
10 sir?
11 BY-MR. NEKVASIL:
12    Q. Finding the investments?
13    A. Right.
14    Q. So Mr. McDuff found the -- this convicted felon
15 found the referring agents for you and he found the
16 investments for you?
17    A. Correct.
18    Q. Wouldn't that be material information? Won't
19 that be important for the investors to know, sir?
20    A. Yes.
21    Q. If you were an investor, wouldn't you want to
22 know that information?
23    A. Yes.
24    Q. Why didn't you disclose it to these claimants,
25 sir?

30

1     A. I have no reason.
2     Q. Well, if you agree it was important for them to
3  know and you would want to know it if you were them, can
4  you explain that with your response that you have no
5  reason? I don't understand that.
6     A. I can't explain why I didn't do it.
7     Q. Did you testify yesterday in response to a
8  question from the chairperson that you --
9         MR. LUKOWSKI: Let's not go -- let's not ask
10 questions that way about what he did yesterday.
11        MR. NEKVASIL: Okay. So should I just -- if
12 I, as a predicate, refer to his testimony yesterday, I
13 shouldn't do it? Just ask him the same question again?
14        MR. LUKOWSKI: Just ask him the same
15 question.
16        MR. NEKVASIL: Okay.
17 BY-MR. NEKVASIL:
18    Q. Do you know firsthand how Mr. Reese was
19 compensated?
20    A. I do not.
21    Q. Do you know firsthand the mechanism by which Mr.
22 Reese was compensated?
23    A. No.
24        MR. NEKVASIL: If the panel will please turn
25 to Volume 6, Tab U, Page 545. You can put Volume 1

31

1  away.
2         MS. WRIGHT: 545?
3         MR. NEKVASIL: Ma'am, 6, U, 545, and if the
4  panel could first turn to 543 so I could give the panel
5  a framework for the questions.
6  BY-MR. NEKVASIL:
7     Q. Prior to MegaFund's collapse, were the MegaFund
8  investments actually made in January, February 2005?
9     A. I don't remember the exact dates, but their -- I
10 thought it started in February.
11    Q. February -- okay. I may be wrong. February of
12 2005?
13    A. Yes.
14    Q. Okay. Did you receive any payments from MegaFund
15 before the investment collapsed?
16    A. Yes.
17    Q. How many?
18    A. I received two payments.
19    Q. Two.
20        MR. NEKVASIL: If the panel will turn to
21 Page U, 543.
22 BY-MR. NEKVASIL:
23    Q. Can you identify this document?
24    A. Yes. It's a check from MegaFund.
25    Q. For $500,000?

32

1     A. Correct.
2     Q. Prior to receiving this check, did you have any
3  discussions with Gary McDuff concerning how people like
4  Mr. Reese would be compensated and how Mr. McDuff would
5  be compensated?
6     A. Regarding the investment in MegaFund?
7     Q. Yeah. Regarding this payment.
8     A. Just the agreement that I already had with
9  Secured Clearing and Gary McDuff.
10    Q. Well, that's my point. I guess, if you turn to
11 Page 545, is this -- did you receive this --
12    A. Yes.
13    Q. Is this an e-mail or a fax or a letter? I can't
14 tell. It looks like a fax, actually. Is this a fax
15 that you received?
16    A. I don't remember how I received it, but I
17 received it.
18    Q. And is it from -- the Gary, is that -- the one
19 that was addressed to Gary, is that you?
20    A. Yes.
21    Q. And the Gary that signs it under all the best; is
22 that Gary McDuff?
23    A. Yes.
24    Q. Can you please explain to the panel what this
25 document says?

33

1    A. It's the division of profit sharing between
2  Lancorp and Secured Clearing.
3    Q. Okay. So what was that division? Explain it to
4  us, please. What was the division?
5    A. The division was the splitting of the profits, if
6  there were any, in excess of 22 percent that would be
7  earned by the fund.
8    Q. Could you repeat that? I'm sorry.
9    A. It was a division of the profits, if there were
10  any, above 22 percent by utilizing the Lancorp funds.
11    Q. Does this reflect how the $500,000 reflected on
12  U-543 was divided?
13    A. Yes.
14    Q. And did your -- did Lancorp group receive 64.833
15  percent of this fund -- of this payment?
16    A. Yes.
17    Q. Is this Lancorp group -- is that Lancorp
18  Financial Group, L.L.C.?
19    A. Yes.
20    Q. That's the same business that was disclosed by
21  you to ONESCO in February 2004; is that fair to say?
22    A. Correct.
23    Q. Same business entity?
24    A. Yes.
25    Q. And 35.166 went to an entity called MexBank?

34

1    A. Yes.
2    Q. And who had paid Secured Clearing. Is Secured
3  Clearing McDuff?
4    A. Yes.
5    Q. And then it says, "McDuff would pay Dividends,
6  Inc. who pays dividends to its shareholders. The
7  shareholders are the managers of the investment base."
8      Who are they referring to?
9    A. I don't know who is involved in Dividends, Inc.
10    Q. You did not, at that time, have an understanding
11  as to who the managers of the investment base is?
12    A. My presumption was it was people like Bob Reese.
13    Q. How do you reconcile this arrangement on paper
14  with your testimony a minute ago that you didn't really
15  know firsthand how people like Reese were to be paid?
16    A. I never saw anybody paid. And nobody's name is
17  listed anywhere. My presumption was that that was the
18  case.
19      I guess my understanding of when you say
20  "firsthand knowledge," that I would see payment and know
21  they got payment and that didn't occur.
22    Q. Now, I have 64.833 percent of 500,000 is
23  $324,165. Would you agree with that?
24    A. Okay.
25    Q. Was that the amount of the $500,000 first payment

35

1  that went to Lancorp Financial Group, L.L.C.?
2    A. Yes.
3    Q. How much of that money went -- was -- I take that
4  then you then allocated some of that money to the
5  investors and Lancorp Financial Fund Business Trust and
6  you kept the rest; is that a fair statement?
7    A. Yes.
8    Q. How much was allocated to the Lancorp Financial
9  Group -- how much was allocated to the investors and how
10  much did you keep of this 324,165?
11    A. The amount of 22 percent was credited to -- I
12  aggregated -- a prorated 22 percent was allocated to the
13  fund and the rest was divided by the two entities.
14    Q. Is it 22 percent of 324,165?
15    A. Yes. The amount that was paid to Lancorp.
16    Q. So that would mean the investors got 71 -- that
17  would mean that you allocated $71,316.03 of this 324,165
18  to the investors?
19    A. That sounds right.
20    Q. And you kept a little bit more than 250,000 -- to
21  be exact, $252,848.70 stayed with Lancorp Financial
22  Group, L.L.C., which was you; is that fair to say?
23    A. The records are somewhere. I can't -- I don't
24  know the exact numbers.
25    Q. Well, did any of the -- did this $252,000

36

1  balance, did any of it go to any person or entity other
2  than Lancorp Financial Group, L.L.C.?
3    A. No.
4    Q. Did you disclose at all this compensation
5  arrangement to the investors?
6    A. No.
7    Q. If you go to Page 544 --
8      MR. LUKOWSKI: I have a quick question about
9  545.
10      MR. NEKVASIL: Yes, sir?
11      MR. LUKOWSKI: Who was -- who was the Norman
12  who was referred to in the first paragraph?
13      THE WITNESS: Norman Reynolds.
14      MR. LUKOWSKI: And who was he?
15      THE WITNESS: He was the attorney that
16  drafted the private placement memorandum and who was the
17  counsel for all of Lancorp.
18      MR. LUKOWSKI: Was he also Mr. McDuff's
19  attorney?
20      THE WITNESS: Yes.
21      MR. LUKOWSKI: Mr. Reynolds was the lawyer
22  who Mr. McDuff found for you; is that fair to say?
23      THE WITNESS: Yes.
24      MR. LUKOWSKI: So he found the lawyer, he
25  found the agent and he was to find the trader for you?

---

### 37

1    THE WITNESS: Correct.
2    BY-MR. NEKVASIL:
3    Q. 544, is this a wire for the second payment?
4    A. Yes.
5    Q. Is it fair to say that what happens is the reason
6    the second payment was only 324,145 instead of 500,000
7    is that with respect to the second payment of the amount
8    that went to MexBank was taken off the top?
9    A. Yes.
10   Q. Is that the arrangement after the first payment
11   on all subsequent ones, you would just get a wire for
12   the amount that was due to Lancorp Financial Group,
13   L.L.C.?
14   A. Correct.
15   Q. That was the arrangement?
16   A. Yes.
17   Q. And was this second payment of $324,165 on or
18   about April 26th, 2005, divided between Lancorp
19   Financial Group, L.L.C. and the investors in the same
20   way that the first payment was?
21   A. Yes.
22   Q. The investors received 22 percent of this?
23   A. Yes.
24   Q. And you kept -- you kept a little bit more than
25   $250,000?

---

### 38

1    A. I don't think that's the total for two
2    consecutive months was $250,000 each.
3    Q. How much was it?
4    A. I don't remember. The total -- as I recall, the
5    total that Lancorp kept was a little over 300,000.
6    MS. WRIGHT: For the two payments?
7    THE WITNESS: For the two payments.
8    MR. CHAIRMAN: Did Lancorp keep the 22
9    percent or the amount after the 22 percent?
10   THE WITNESS: The amount after the 22
11   percent.
12   MR. CHAIRMAN: So 22 percent went through to
13   the investors?
14   THE WITNESS: Went to the investors and
15   Lancorp retained the rest.
16   MR. LUKOWSKI: And 22 percent of the amount
17   that Lancorp received out of 500,000, correct?
18   THE WITNESS: Yes. Correct.
19   MR. CHAIRMAN: And did they actually receive
20   payments for that?
21   THE WITNESS: They were -- all other
22   accounts were credited or the ones who requested to have
23   the earnings paid to them in a distribution received
24   distribution.
25   MR. CHAIRMAN: So some people did receive

---

### 39

1    distribution?
2    THE WITNESS: Yeah.
3    MR. CHAIRMAN: So this happened two
4    consecutive months?
5    THE WITNESS: Correct.
6    BY-MR. NEKVASIL:
7    Q. And if you go to Page U-524, can you identify the
8    document that appears on U-524 and goes from U-524 to
9    529?
10   A. It's the joint venture agreement that Lancorp
11   signed with MegaFund.
12   MR. CHAIRMAN: With MegaFund. Okay.
13   BY-MR. NEKVASIL:
14   Q. And is that your signature on Page 529?
15   A. Yes.
16   Q. Now, you signed it on behalf of Lancorp Financial
17   Group, L.L.C.; is that not fair to say?
18   A. Yes.
19   Q. So were you personally the manager of Lancorp
20   Financial Fund Business Trust or was Lancorp Financial
21   Group, L.L.C. the manager?
22   A. Lancorp Financial Group, L.L.C. became the
23   manager.
24   Q. The same entity disclosed on your February 2004
25   disclosure forms to ONESCO?

---

### 40

1    A. Yes.
2    Q. And so this agreement was actually signed by you
3    on January 31, 2005 and signed by Mr. Lightner
4    [phonetic]for MegaFund on February 2; is that fair to
5    say?
6    A. Correct.
7    Q. How many times did you meet Mr. Lightner?
8    A. Never met him face-to-face.
9    Q. There's a document that I forgot to ask you about
10   a minute ago.
11   MR. NEKVASIL: If the panel will turn to
12   Page 546. Actually, if the panel could go back to 545
13   first.
14   BY-MR. NEKVASIL:
15   Q. In this communication to you, McDuff also
16   references a letter that he attached, which basically
17   explains that Secured Clearing was assigning its
18   interest to a MexBank; is that fair to say?
19   A. Yes.
20   Q. Was there such a letter attached?
21   A. I don't recall.
22   Q. If you turn to page -- to 546 and 547, does this
23   refresh your recollection?
24   A. Yes.
25   Q. As of this time, did you ever personally have any

## 41

1 dealings with MexBank?
2 A. No.
3 Q. Never heard of them before McDuff brought them to
4 your attention?
5 A. No.
6 Q. Now, did you read -- did you receive this letter?
7 A. I did.
8 Q. Did you read it at the time?
9 A. Yes.
10 Q. What did this letter tell you?
11 A. It just told me that all of the rights of Secured
12 Clearing were being assigned and all future benefits, if
13 any, was to be sent to MexBank instead of Secured
14 Clearing.
15 Q. You understood at all times, is it not fair to
16 say, that -- I'm looking at Page 547 -- that Mr. McDuff
17 was a director of Secured Clearing Corporation?
18 A. Correct.
19 Q. Now, with respect to the first payment, the
20 entire $500,000 was sent to you, and was it your
21 responsibility to forward to MexBank that 35.166 percent
22 that would go to Secured Clearing and Dividends, Inc.?
23 A. Yes.
24 Q. Did you do that?
25 A. Yes.

## 42

1        MR. NEKVASIL:  If the panel will turn to
2 Page 551 and 552.
3 BY-MR. NEKVASIL:
4    Q. I'm going to ask if you could identify pages
5 U-551 and U-552.
6    A. Yes.
7    Q. Can you identify that, please?
8    A. One is the wiring instructions and the other is
9 the actual wire, copy of the actual wire.
10   Q. For MexBank's share of the initial payment from
11 MegaFund?
12   A. Correct.
13       MR. LUKOWSKI:  What was MexBank's role in
14 this?
15       THE WITNESS:  They had no role other than
16 they were -- they were now assigned all of the benefit
17 that Secured Clearing was entitled to.  So instead of
18 making payments to Secured Clearing, it was going to
19 MexBank.
20       MR. LUKOWSKI:  Okay.
21 BY-MR. NEKVASIL:
22   Q. Well, you testified -- Reese asked you to pay him
23 a fee for referring investors to him, right?
24   A. Yes.
25   Q. And you refused?

## 43

1    A. I did.
2    Q. Why?
3    A. Because the fund did not allow for concessions to
4 brokers or salespeople or to any solicitation.
5    Q. Okay.  That's the only reason?
6    A. That was the primary reason, yes.
7    Q. Did Reese have a securities license?
8    A. No.
9    Q. Did that concern you at all in terms of paying
10 him?
11   A. Well, I knew that as a non security licensed
12 person, he couldn't be compensated for anything relative
13 to a security.
14   Q. Did that play a role at all in your decision not
15 to pay him?
16   A. That was a factor, but that wasn't a primary
17 role.
18   Q. Did you refer him to McDuff and say if you want
19 to get paid, you got to work that out with McDuff?
20   A. Yes.
21   Q. And did Reese -- did you have subsequent
22 discussions with Reese about this company called
23 Dividends, Inc.?
24   A. No.
25       MS. WRIGHT:  Can I can ask a question about

## 44

1 MegaFund?  That was in February of '05?
2        THE WITNESS:  Uh-huh.
3        MS. WRIGHT:  And how much was put into
4 MegaFund initially?
5        THE WITNESS:  I think 5 million was the
6 first installment.
7        MS. WRIGHT:  Okay.  And then subsequent?
8        THE WITNESS:  There were several
9 subsequent -- or two subsequent contributions.  I don't
10 remember the exact amounts.
11       MS. WRIGHT:  You don't remember.
12       Then what was the total that went into
13 MegaFund?
14       THE WITNESS:  Seems to me like it was 9
15 million.
16       MS. WRIGHT:  Of the 10 million.  Were you --
17 there was -- all of the money then essentially went into
18 MegaFund?
19       THE WITNESS:  The lion's share of it.  I
20 can't remember the exact amount, the bulk of it.
21       MR. CHAIRMAN:  So of these two $500,000
22 payments were based on that $5 million --
23       THE WITNESS:  Based on the five, correct.
24       MR. CHAIRMAN:  So you get 10 percent per
25 month?

## 45

1    THE WITNESS: Correct.
2    BY-MR. NEKVASIL:
3    Q. With the checks -- check that you received from
4    MegaFund, was it drawn on the same check -- same account
5    that was used to -- was it drawn on the same account in
6    which your initial -- the $500,000 check from MegaFund,
7    was it drawn on the same account that was used to
8    deposit the initial $500,000 investment from Lancorp
9    Financial Fund Business Trust?
10    A. I can't remember.
11    Q. You didn't (inaudible) --
12    A. No.
13    Q. You never -- did you ever explain to any of the
14    investors this investment in MegaFund, what was
15    happening?
16    A. No.
17    Q. Why not?
18    A. At the time I didn't feel it was necessary.
19    MR. NEKVASIL: If the panel can turn to
20    Respondent's exhibit book Volume -- we're done with this
21    volume for now. Respondent's exhibit book Volume 3, Tab
22    101-B.
23    MR. CHAIRMAN: I'm sorry, Volume 3, Page
24    again?
25    MR. NEKVASIL: 101-B, sir. B, like in boy.

## 46

1    Volume 3, Tab 101 and there's an A and a B. I'm sorry.
2    Sir, it's Volume D of Respondent's books.
3    MR. GOODMAN: The white one.
4    MS. WRIGHT: There's a Tab 100.
5    MR. NEKVASIL: But it's actually 101. It's
6    101. You don't have a 101 in your book?
7    MR. CHAIRMAN: Is this the January 6th
8    letter?
9    MR. NEKVASIL: Yes.
10    MR. LUKOWSKI: What are we on?
11    MR. LITTLE: Hold on a second.
12    MR. LUKOWSKI: 101-B?
13    MR. NEKVASIL: 101-B, like in boy, sir.
14    MR. LUKOWSKI: Okay.
15    BY-MR. NEKVASIL:
16    Q. I'm going to ask you to identify the document
17    that appears on pages -- Bates stamped pages Lancaster
18    2889 and 2890 in Tab 101-B of Respondent's hearing
19    notebooks.
20    What is this document?
21    A. It's a response document to NASD, I think.
22    Q. At some point in time in 2005, did the NASD
23    contact you and ask you questions concerning your
24    dealings with Lancorp Financial Fund Business Trust?
25    A. Yes.

## 47

1    Q. Did they ask you questions concerning your
2    employment at ONESCO?
3    A. I'm sure they did. I don't remember.
4    Q. Is this a letter that you wrote in response to
5    one of the inquiries from NASD?
6    A. Yes.
7    Q. And are the statements in this letter accurate?
8    A. To the best of my knowledge, yes.
9    Q. Stay on Page 1 first. I think a panel member
10    asked about when were the investments made to MegaFund.
11    Were there three -- Page 1 indicates, by the way,
12    that there were a series of deposits in Tricom in Item
13    Number 5; is that correct?
14    A. Yes.
15    Q. Is that a correct listing?
16    A. Looks like it.
17    Q. And as of December -- it indicates that in
18    December of 2004 you received all of your money back
19    from this Australian broker/dealer; is that fair to say?
20    A. Yes.
21    Q. And were they out of the picture?
22    A. Yes.
23    Q. So Tricom and David Bazell were out of the
24    picture?
25    A. Correct.

## 48

1    Q. And is this an accurate reflecting of the
2    MegaFund investments?
3    A. Yes.
4    Q. This $5 million -- I'm sorry.
5    A. 9,285,000.
6    Q. 9,365,000. That was the total amount sent to
7    MegaFund?
8    A. Yes.
9    Q. And, again, you received those two payments, one
10    I believe in March 2005 and one in April 2005?
11    A. Yes.
12    Q. Lancorp Financial Group, L.L.C. received two
13    payments from MegaFund and that was it?
14    A. Correct.
15    Q. Did these -- did this 9,365,000 -- this
16    $9,365,000 reflect the totality of all Lancorp Financial
17    Fund Business Trust monies that had been raised as of
18    May 4, 2005?
19    A. I believe so.
20    Q. Okay. So any of Lancorp Financial Fund Business
21    Trust investors from who you have received monies prior
22    to May 4, 2005 ultimately went into MegaFund; is that an
23    accurate statement?
24    A. I believe that's correct.
25    Q. Now, turn to page -- next page. Can you read

49

1    aloud Item Numbers 10 and 11?

2        A.  "Disclosure was submitted to Ohio National

3    Financial Services.  Shortly after submission of

4    disclosure I received notice of termination."

5        Q.  Did you write this?

6        A.  Yes.

7        Q.  Were these statements something that were

8    prompted by our law firm?

9        A.  I had never heard of you at the time this letter

10   was written.

11       Q.  So as of January 6th, 2006, you had never heard

12   of our law firm?

13       A.  No.

14       Q.  Did any of the claimants prompt you to make this

15   statement to the NASD on January 6th, 2006?

16       A.  No.

17       Q.  When you talk about -- was this in response to --

18   I see that you have numbers 1 through 12.  Was this in

19   response to specific questions by the NASD?

20       A.  Yes.

21       Q.  Were questions 10 and 11, did they relate to the

22   issue of whether you gave notice to ONESCO?

23       A.  Yes.

24       Q.  Which -- when you indicated (inaudible)

25   disclosures submitted to Ohio National Financial

50

1    Services, was that an accurate statement?

2        A.  Yes.

3        Q.  What disclosure are you referring to?

4        A.  To my -- the form that I submitted to them.

5        Q.  Which --

6        A.  My business form, outside business form.

7        Q.  Which form?  We've seen two forms in the record.

8    The February 2004 one, which mentions Lancorp Financial

9    Group, L.L.C. and one dated May 2004 that mentions

10   Lancorp Financial Fund Business Trust, which one were

11   you referring to in this letter?

12       A.  I'm referring to every disclosure that I

13   submitted to ONESCO.

14          MR. CHAIRMAN:  Well, who is Ohio National

15   Financial Services?

16          THE WITNESS:  I guess I was thinking that

17   was ONESCO.

18          MR. CHAIRMAN:  Okay.  I'm just -- haven't

19   got all the names down.

20          MR. NEKVASIL:  ONESCO is the broker/dealer.

21   I think the insurance company is called the Ohio

22   National Life; is that correct?

23          MR. GOODMAN:  The parent company is Ohio

24   National Financial with the subsidiary being the

25   respondent here.

51

1          MR. LITTLE:  I'm not sure you have that

2    correct.

3          MR. PRICE:  That's not correct.

4          MR. CHAIRMAN:  Does it make sense to go

5    ahead and correct it and tell us now?

6          MR. PRICE:  From a corporate structure

7    standpoint the Ohio National Financial Services is --

8    well, there's a whole structure, Ohio National Mutual

9    Holdings Company is the parent of all, Ohio National

10   Financial Services, which is a subsidiary.  Ohio

11   National Life Insurance Company is a subsidiary of that

12   and ONESCO is a separate subsidiary of Ohio National

13   Life Insurance Company, The Ohio National Life Insurance

14   Company.

15          MS. WRIGHT:  And was there an actual copy of

16   the questions that were asked that there was a response

17   to?

18          MR. NEKVASIL:  I don't have those, but we

19   have some other communications that I'm going to take

20   you to that may shed light on these answers.

21          MR. LITTLE:  To answer your question, when

22   the documents were produced by Mr. Lancaster, we did not

23   find that letter.

24          MR. NEKVASIL:  We don't have that one, but

25   we -- we're taking you to other paperwork.

52

1          MR. LITTLE:  That is the document that we've

2    marked as Respondent's Exhibit 101-B.  If you look in

3    the lower right-hand corner, it has a Bates stamp

4    Lancaster 2889 and 2890, which reflects this in the

5    document we received from Mr. Lancaster in response to a

6    subpoena issued by the chair in this case.  The

7    materials that were produced to us in response to the

8    subpoena did not include the proceeding in NASD

9    correspondence.

10   BY-MR. NEKVASIL:

11       Q.  Turn to Volume 4, Tab J, please.

12          MR. LUKOWSKI:  Which book is --

13          MR. NEKVASIL:  If we turn to claimant's

14   Volume 4, Tab L, if you would turn to Pages 49 and 50 of

15   Tab L, please.

16          MR. LUKOWSKI:  What page?  I'm sorry.

17          MR. CHAIRMAN:  49.

18          MR. NEKVASIL:  49.  Actually, if you start

19   at Page L-51.  It's the last page of Tab L,

20   Mr. Chairman.

21   BY-MR. NEKVASIL:

22       Q.  During the NASD's investigation, did you provide

23   them with this form?

24       A.  Yes.

25       Q.  You provided the NASD with this form?

## 53

1     A. Yes.
2     Q. Did you tell the NASD that you gave this form to
3  ONESCO?
4     A. I don't remember.
5     Q. To refresh your recollection, if you go to Page
6  L-49, this is a two-page letter that begins in L-49 and
7  ends with L-50. By the way, do you see the name Jody
8  Larson on Page L-50? Do you see the name on Page L-50?
9  If you could turn the page. Do you see the name Jody
10  Larson?
11     A. Yes.
12     Q. Is that the person with the NASD who you were
13  dealing with?
14     A. Yes.
15     Q. Is that the same Larson that's referenced in
16  Exhibit 101-B of Respondent's book, the communication I
17  asked you about a minute ago, is that the same person?
18     A. Yes.
19     Q. If you take a look at this letter, which is
20  addressed -- it's dated February 8th, 2006 and it's
21  addressed to ONESCO, it states in Item Number 2 of the
22  second paragraph, "Mr. Lancaster stated that he provided
23  the firm with the enclosed outside business disclosure
24  form dated May 3, 2004. (Inaudible) when the firm
25  received the form."

## 54

1     Does this statement from Ms. Larson refresh your
2  recollection whether or not you told her that you gave
3  the form on Page K-51 to ONESCO?
4     A. Yes.
5     Q. Did you?
6     A. Apparently I did.
7     Q. You told her that?
8     A. Yes.
9     Q. So you gave her this form and told her that you
10  gave it to ONESCO?
11     A. Correct.
12     Q. Did you know our law firm at the time?
13     A. No.
14     Q. Did our law firm prompt you to say this?
15     A. If I didn't know you, how was that possible?
16     Q. Did the claimants prompt you to say that?
17     A. No.
18     Q. Did any investor prompt you to say it?
19     A. No.
20     Q. If you go back -- if you go to page -- why did
21  you represent to the NASD that you submitted the form on
22  Page K-51 to ONESCO?
23     A. Because I went through my files with every form
24  that I have and made copies and submitted it.
25     Q. Did you believe at the time you made this

## 55

1  representations to the NASD, do you believe that you
2  had, in fact, submitted the form to ONESCO as you told
3  Ms. Larson?
4     A. Correct.
5     MR. CHAIRMAN: Do you still believe that?
6     THE WITNESS: I'm less certain about it now,
7  but I didn't keep very good track of things. I was
8  responsive, not proactive. I didn't do a good job at
9  all on keeping track of my securities-related items.
10  BY-MR. NEKVASIL:
11     Q. Well, when you spoke to Ms. Renfro and joined
12  ONESCO, did she tell you that you needed to keep good
13  files?
14     A. I don't recall.
15     Q. Did she have any discussions with you about what
16  the standard of conduct ONESCO expected from you?
17     A. I don't think so.
18     Q. If you go to Page K-47 --
19     MR. LUKOWSKI: K-47?
20     MS. WRIGHT: I don't have a K-47.
21     MR. NEKVASIL: I'm sorry. Same tab. L-47.
22  I apologize.
23  BY-MR. NEKVASIL:
24     Q. I want you to look at this document, which is on
25  L-47 and please identify it.

## 56

1     A. It's a response letter to Jody Larson.
2     Q. Can you read aloud Item Number 3, please? Okay.
3  Sir, first, did you send this letter to Ms. Larson?
4     A. Yes.
5     Q. Can you read aloud Item Number 3?
6     A. "I called O.N. Equity Sales Company and inquired
7  as to what I needed to do to disclose my activity in the
8  fund. I spoke to Heather Renfro who indicated she would
9  find out and provide me with the necessary information.
10  After a period of time I was sent a one-page form to
11  complete and return. The date on the form shows May
12  3rd, 2004. I did not receive any further
13  communications.
14     Q. At the time you made this statement to the NASD,
15  did you believe it was correct?
16     A. Yes.
17     Q. Did you at that time have a recollection of a
18  telephone conversation with Ms. Renfro?
19     A. I know I had a telephone conversation with her
20  because I initiated it.
21     Q. So at the time you wrote this letter, you had a
22  specific recollection of the telephone conversation
23  that's referenced in Item Number 3 of this letter?
24     A. Yes.
25     MR. LUKOWSKI: When was that telephone

57

1  conversation, shortly before -- in relationship to this
2  May 3rd form?
3          THE WITNESS:  I have no idea.
4  BY-MR. NEKVASIL:
5      Q.  I'm going to direct your attention to Page L-28.
6  This is a letter to the NASD, if you turn to Page 33,
7  signed by Mr. Bley, who's here today, the chief
8  compliance officer of ONESCO, okay.  And, Mr. Lancaster,
9  I'm going to direct your attention to the sentence that
10  begins at the bottom of Page L-29.
11          MR. NEKVASIL:  Mr. Chairman, it's the last
12  line of Page L-29.
13  BY-MR. NEKVASIL:
14      Q.  "Mr. Lancaster's claim now was apparently
15  prompted by claimants that he submitted the disclosure
16  form in May 2004 is false."
17          Did the claimants at any time prompt you to tell
18  anybody or represent that you submitted this May form?
19      A.  No.
20      Q.  Did my law firm at any time prompt you to tell
21  the NASD that you submitted that form?
22      A.  No.
23      Q.  Were you deposed by the SEC on March 25, 2006?
24      A.  Yes.
25      Q.  Did the SEC ask you whether you gave notice to

58

1  ONESCO of your involvement in the Lancorp Financial Fund
2  Business Trust?
3      A.  I don't remember.
4      Q.  Let me see if I can refresh your memory.
5          MR. NEKVASIL:  Mr. Chairman, go to Volume 6
6  of Tab U.  Let's start at Page 258.
7          MR. LUKOWSKI:  268?  Did you say 268?
8          MR. NEKVASIL:  I'm sorry.  258, I said.
9          MR. LUKOWSKI:  258.
10          THE WITNESS:  Tab what?
11  BY-MR. NEKVASIL:
12      Q.  Tab U.  Volume 6, Page 258.
13          If you start on Page 258, would you agree that on
14  Saturday, March 25, 2006 you were deposed by the SEC?
15      A.  Yes.
16      Q.  And was it at the Law Office of Quilling &
17  Salander [phonetic] in Dallas, Texas?
18      A.  Yes.
19      Q.  And was that the receiver for MegaFund and for
20  Lancorp?
21      A.  That was the receiver for Lancorp Financial Funds
22  and Lancorp Financial Group.
23      Q.  So would you agree that a receiver was initially
24  appointed from MegaFund and the scope of the
25  receivership was ultimately expanded to include Lancorp

59

1  Group, L.L.C. and Lancorp Financial Fund Business Trust?
2      A.  Okay.  That's probably correct.
3      Q.  And you would agree that you were under oath at
4  the time of this SEC deposition?
5      A.  Yes.
6      Q.  You considered it important to tell the truth to
7  the SEC?
8      A.  Absolutely.
9      Q.  And would you agree on Page 264, Line Number 18,
10  that you were reminded that you were under oath?
11      A.  Yes.
12      Q.  I'm going to direct your attention to Page 268,
13  Line 19.  Can you read that aloud beginning with --
14  until I tell you when to stop.  268, Line 19.
15      A.  "When you provided to O.N. Equity Sales Company."
16      Q.  No.  It's Line 19 on Page 268.  Starts with the
17  words "for either."
18      A.  "For either of these firms of which you are
19  associated aware of your investment with the Lancorp
20  investment."
21      Q.  Keep going.  Just keep reading until I tell you
22  to stop.
23      A.  "O.N. Securities, yeah.  O.N. Securities I gave
24  them notification of Lancorp, but never received a
25  response from them."

60

1      Q.  Keep going.
2      A.  "When you say that you gave them notification of
3  Lancorp, what does that mean?
4          I completed a disclosure form about outside
5  activity to the licensing department."
6      Q.  Go on.
7      A.  "Do you have a copy of the disclosure form?
8          I don't have it with me.
9          Provided it to whom?
10          Either to you or Mike.
11          And you said Mike.  You're talking about
12  Mr. Quilling?
13          Mike Quilling.  Hold on.  I take it back.  It
14  could be that I provided it to one of the inquiries that
15  I received.
16          That being said, would you mind providing me with
17  another copy?
18          No.
19          And for the record, are you keeping a
20  written list of the documents that you've agreed to
21  provide me?
22          Yes, I am.
23          When you provided it to O.N. Equity Sales
24  Company, what was their response?
25          I never received a response of any kind of

## 61

1    any kind.
2              Why did you (inaudible.)
3              The only thing that I ever received that
4    (inaudible) provided to them was a termination notice."
5        Q.  Next question and answer, please.
6        A.  "So you provided that to them and then you
7    received a termination notice?
8        Correct.
9        What was the length of time between those two
10   events?
11       I can't remember exactly.  Two or three months
12   maybe or less."
13       Q.  Okay.  That's good enough for now.
14       Questions for you are, first of all, this
15   termination notice, are you referring to the letter that
16   we discussed yesterday, the letter that you got in the
17   mail in January saying you're no longer with us?
18       A.  Correct.
19       Q.  Okay.  When you gave this testimony to the SEC,
20   was it accurate testimony at the time?
21       A.  To the best of my knowledge, yes.
22       Q.  Was -- this was almost two years ago, March 25,
23   2006?
24       A.  Yes.
25       Q.  Was it much closer to the events at issue than

## 62

1    today chronologically?
2        A.  Say that again.
3        Q.  You would agree that March 25, 2006 was a lot
4    closer to May 2004 than February 2008?
5        A.  Yeah.
6        Q.  Now, you mentioned that you gave it to the
7    licensing department.  Who did you mean by the licensing
8    department?
9        A.  Well, that's -- I guess that's just who I
10   presumed it was going to.
11       Q.  Who did you give it to?
12       A.  Again, I put it in an envelope.
13       Q.  Was it an envelope addressed to Peter Weller as
14   you alluded to yesterday or was it sent to Heather
15   Renfro?
16       A.  I don't know to whom it was addressed to
17   specifically.  I never paid any attention.  When I got a
18   form a request form, I filled out the form.  An envelope
19   was enclosed.  I just put it in there.  I didn't pay any
20   attention to whom specifically it was being sent to.
21       Q.  So it could have been sent to either Ms. Renfro
22   or Mr. Weller?
23       A.  Yes.
24       MR. CHAIRMAN:  It was a preaddressed --
25       THE WITNESS:  Preaddressed envelope, right.

## 63

1        MR. LUKOWSKI:  When you got forms from
2    ONESCO to fill out, was there usually some type of cover
3    letter with it?
4        THE WITNESS:  Usually, yeah.
5        MR. LUKOWSKI:  Is there a cover letter in
6    this case?
7        THE WITNESS:  I don't remember.  I didn't
8    keep any cover letters for the most part.  It seems like
9    the things I received could be taken care of in short
10   order and I could just complete whatever was necessary
11   and send it.
12       MR. LUKOWSKI:  You would keep a copy of what
13   you sent?
14       THE WITNESS:  Keep a copy of what I sent in
15   the file.
16       MR. LUKOWSKI:  But not keep a copy of what
17   was sent to you?
18       THE WITNESS:  Would not keep a copy --
19   BY-MR. NEKVASIL:
20       Q.  Volume 3, Tab G.  Turn to Page 22.
21       MS. WRIGHT:  This part of the notebook is
22   not cooperating.
23       MR. NEKVASIL:  I have to deal with that all
24   the time.
25   BY-MR. NEKVASIL:

## 64

1        Q.  I'm going to ask you whether or not you signed
2    this declaration that's on G-23?
3        A.  Yes.
4        Q.  This declaration contains information that you
5    gave to our law firm?
6        A.  Correct.
7        Q.  Information that we then put on paper and sent to
8    you?
9        A.  Yes.
10       Q.  Did our law firm ever ask you to make statements
11   that were false?
12       A.  No.
13       Q.  Did you indicate to us at any point in time that
14   the information on this form was inaccurate?
15       A.  No.  This is -- to the best of my recollection,
16   correct.
17       Q.  So as of December 3, 2007, you believe that all
18   items on this form -- in this statement were accurate?
19       A.  Correct.
20       Q.  I'll give the panel a chance to read it and then
21   I'll have some questions for you.
22       MR. LITTLE:  Let me object because it's a
23   little bit inappropriate if -- typically what you do is
24   you ask the witness a question.  If the intent is to now
25   impeach their witness with this affidavit, I think

---

65

1  that's what they're trying to do, but it's unclear at
2  this point in time, but simply to put in written
3  testimony is inappropriate.
4        MR. NEKVASIL: I'm asking, number one, to
5  refresh his recollection, and it may lead to
6  impeachment. I'm about to ask him some questions that
7  may lead to impeachment. I'm about to ask him some
8  questions that may be impeaching.
9        MR. LITTLE: Then the proper course of
10  action would have the witness read the written summary
11  and see if it refreshes the witness's memory as opposed
12  to trying to introduce it as a piece of evidence. Put
13  it in contrast, I could have written summaries of all
14  our witnesses' testimonies put together as well, have
15  them sign it and put it in a notebook.
16        MR. GOODMAN: Well, put it differently,
17  he's --
18        MR. CHAIRMAN: Hang on. Why don't you
19  just --
20        MR. NEKVASIL: I want him -- I'm having
21  him -- I thought --
22        MR. CHAIRMAN: You're asking him to read it,
23  right?
24        MR. NEKVASIL: Yeah. I'm asking him to read
25  it.

---

66

1        MR. CHAIRMAN: Okay. Let him read it and
2  then you can ask him questions about it.
3        THE WITNESS: Okay.
4  BY-MR. NEKVASIL:
5     Q. Is Item Number 5 accurate?
6        MR. LITTLE: That's not refreshing someone's
7  memory. That's asking them to go through and confirm a
8  document. If he wants to ask him whether that refreshes
9  his memory, that would be appropriate.
10  BY-MR. NEKVASIL:
11     Q. Does this refresh your memory concerning the
12  circumstances surrounding your completion of the May 3,
13  2004 dated outside business disclosure form?
14     A. Yes.
15     Q. Is this an accurate statement of the
16  circumstances surrounding your May 3, 2004 form?
17     A. I believe so.
18        MR. LITTLE: Objection. Same objection.
19  We're creating a videotape and no one knows what we're
20  talking about.
21        MR. NEKVASIL: Actually -- Mr. Chairman, we
22  actually do. It's G-22 and 23. I'm about to ask him
23  more questions.
24        MR. LUKOWSKI: Well, are you offering this
25  document into evidence?

---

67

1        MR. NEKVASIL: Yes, sir.
2        MR. LITTLE: Well, I'll reiterate my
3  objection. I think there's a protocol for asking the
4  questions in the first place. I'm not suggesting that
5  you can't impeach the witness with it at some point in
6  time. I may impeach him with the document as well, but
7  I think you have to lay the foundation first.
8        MR. NEKVASIL: Sir, actually he's -- okay.
9  He has -- I asked him whether or not he signed this
10  form. I asked him whether it's accurate, whether the
11  information is accurate. He has said, yes. I want it
12  entered into evidence. I've established the basis for
13  this. He can actually cross-examine him about it, he
14  can impeach him, but it doesn't mean it's not a valid
15  piece of evidence.
16        MR. CHAIRMAN: As to evidence, I assume all
17  the notebooks are in unless there's a specific objection
18  at the time they were addressed. So I assume all the
19  notebooks were admitted into evidence unless there's a
20  specific objection at the time they're addressed.
21        MR. LITTLE: No. That would be incorrect
22  because the notebooks that have been assembled by the
23  claimants in this case are -- there's multiple
24  duplications of the same document within -- it's several
25  notebooks. There are a number of documents in here that

---

68

1  I don't think that will ever be authenticated for
2  purposes of this hearing.
3        I think there's a number of documents that
4  will not have any relevance to these proceedings. So by
5  the fact that I'm allowing them to go through it, I
6  assume that they intend to offer a particular document
7  that's in their exhibit notebook at the conclusion of
8  their case. If they're going to lay the appropriate
9  foundation for the admission of that exhibit, I'm not
10  doing their job for them.
11        MR. NEKVASIL: Sir, we have a problem with
12  that because in one of their prehearing orders, which we
13  have a right to rely on, the respondent got challenged.
14  You indicated that the way you were going to handle this
15  hearing was that if the parties -- every document that
16  the parties reference in testimony you're going to deem
17  admitted unless there's a challenge for it. And now he
18  is basically rewriting your order and saying he doesn't
19  agree with that.
20        To me, the proper protocol is if you
21  disagree with the chairperson's order, you alert the
22  parties to it at the beginning of the hearing and say I
23  want to operate under different ground rules and you
24  hear oral arguments.
25        And so I have a -- first of all, a problem

## 69

1  with him now challenging your order indirectly after a
2  day of testimony already.
3      MR. LITTLE:  It's not the appropriate
4  protocol, but more fundamentally.  I assume that counsel
5  knows how to create an evidentiary basis for the
6  submission of an exhibit.
7      There's -- we went through these notebooks
8  last night.  You made the point early on that --
9  fellows, why don't you get together and try to avoid
10  duplicate copies.  And I proceeded under the assumption
11  because of the way we organized our respective cases,
12  there may be some duplication of the documents, but when
13  you go through the notebooks that have been put together
14  by the claimants, there's duplications from notebook to
15  notebook.  And I can't tell you why it was organized
16  that way.  I don't have an understanding, but I'm not
17  stipulating to the submission of notebooks in this
18  particular form.
19      If they have a particular exhibit they want
20  to have authenticated, I hope for goodness at some point
21  during this case they're having it authenticated.
22      MR. NEKVASIL:  Mr. Chairman?
23      MR. LUKOWSKI:  Can we step out for a second?
24      VIDEOGRAPHER:  The time is 10:21 a.m.  This
25  concludes Tape Number 1.  We're now off the video

## 70

1  record.
2      (Thereupon, a break was taken.)
3      MR. NEKVASIL:  And for Respondent's
4  edification, it's in Volume 1, Tab B, Pages 9 and 10.
5      MR. CHAIRMAN:  Item 20, if I remember,
6  right?
7      MR. NEKVASIL:  Yeah.  And what happened --
8  if you first look at B-7, Mr. Little was clearly present
9  during this preliminary scheduling order.  Item Number
10  20 is crystal clear.  It says, "Admission of evidence,
11  all documents specifically referred to a testimony will
12  be deemed admitted into evidence without laying of
13  foundation in the absence of a specific objection raised
14  at the time the document was first used or referred to."
15      Now, if Mr. Little had an objection to this,
16  using his term that he seems to really use a lot, the
17  correct protocol, the professional way to handle it
18  would be to challenge it with you at that time and
19  change it.  Instead, he waits a day and a half and now
20  raises it, and, frankly, indirectly questions me saying,
21  well, you know, a real lawyer would know how to admit
22  evidence.  You're doing it wrong.  I can handle the
23  personal attacks, but --
24      MR. CHAIRMAN:  Wait a minute.  Just hang on.
25  You don't have to go through all of that.

## 71

1      MR. NEKVASIL:  I have to rely on this.
2      MR. CHAIRMAN:  I know.  And we're going to
3  continue to do this.
4      My general approach -- and we may have to
5  refine this later, but my general approach is to admit
6  documents, and if somebody wants to make an objection
7  unless it's truly, extremely -- don't expect me to say
8  anything other than it's admitted for what it's worth.
9  And generally use it as a tool of a flag to flag the
10  panel to pay attention to a particular document that
11  should not be given much credit or not be given much
12  weight, rather than to expect us to leave it out of the
13  evidence.
14      MR. PRICE:  If I may just -- I think our
15  objection was really to -- what is included in these
16  exhibits, for example, Exhibit K, is like 20 different
17  documents, and he refers to one document within those 20
18  documents.  We're saying you shouldn't accept the whole
19  exhibit, only what they've referred to as a reasonable
20  thing to accept, and they should have to parse out what
21  they have referred to because that wouldn't be
22  appropriate if it wasn't referred to in the arbitrary
23  hearing.
24      MR. CHAIRMAN:  Hang on.  We may have to
25  address the documents in the notebooks not addressed to

## 72

1  further, but what we are going to be asking y'all for at
2  the end is to -- if you want us to be paying attention
3  to particular documents to give us a list of those and
4  exchange that with each other before the next hearing
5  with a list in here so far.  And just because as you
6  probably don't (inaudible) matter, there is no panel
7  member who is going to read all of these notebooks.  So
8  if you really want us to pay attention to it, you need
9  to flag it.
10      Now, what we haven't -- what we haven't
11  talked about, and I don't know whether we really have an
12  answer to yet, is whether we will -- you want us really
13  to use the things you don't mention as evidence.
14  Because, obviously, we can flip through here, and we may
15  find something that's for or against your case in these
16  other documents.  And so you need to think about whether
17  you want us to consider any of those others or whether
18  you want those pulled out and thrown in the trash.
19      MR. NEKVASIL:  The order is quite clear.  It
20  says, "documents referred to."  I referred to Pages K-19
21  and 20.
22      MR. CHAIRMAN:  Wait, wait, wait.  You don't
23  have to restate that.
24      MR. NEKVASIL:  I won't restate it.
25      MR. CHAIRMAN:  He can read that.  He can

73

1   read that. He understands that. If he had a
2   misunderstanding before, he's now clear.
3       MR. GOODMAN: And to the extent you've said
4   about what about the ones you haven't been -- you made,
5   we have provided these three separate sets for you all
6   to look at, review as you deem. You may say, you know
7   what, here's a document that doesn't help claimants and
8   I consider it --
9       MR. CHAIRMAN: You don't have to argue about
10  that. The panel needs to address that amongst
11  themselves.
12      MR. GOODMAN: Okay. Exactly.
13      MR. CHAIRMAN: If you do -- at some point
14  later if you want to make a statement or not I would
15  think I'd rather address all the unmentioned documents
16  in the notebooks and then we'll let you do that.
17      MR. LITTLE: Well, I want to make a point on
18  the record. We can drag in 15,000 pieces of paper and
19  put it on your desk. It's not the task of the
20  arbitration panel to rifle through those. If there are
21  documents the panel -- the parties respectfully think
22  they're important to the panel, it's incumbent upon us
23  to present those to you. Just because he throws
24  something in a notebook, if they don't refer to it for
25  the witness, from my vantage point, that's not an

74

1   exhibit that you should consider as part of the evidence
2   in this case.
3       MR. NEKVASIL: Sir, typically -- I don't
4   want to argue, but typically what we've done in these
5   big, long hearings, the last one we just finished which
6   was six weeks over two years, is the panel asked us,
7   along with closing arguments, to give them a notebook of
8   specific documents. Obviously documents that were
9   referenced, that they deem really important and that
10  they wanted the panel to look at. The panel reserved
11  the right, of course, to look at everything that was
12  admitted, i.e., referenced in testimony, but you can
13  reference a lot of documents. But the critical ones,
14  you know, have them for the panel.
15      MR. CHAIRMAN: And I think that's basically
16  the same thing I said. We're going to --
17      MR. NEKVASIL: And we understand that.
18      MR. CHAIRMAN: The only question is the
19  documents that are not referenced to.
20      MR. LITTLE: We understand.
21      MR. NEKVASIL: Mr. Chairman, we do -- before
22  we continue with our questions for the witness, we do
23  renew our request that Pages G-22 -- are we back? No.
24  We're on the record. We don't need the videotape.
25      Are we on the video?

75

1       MR. CHAIRMAN: Are we on the video yet?
2       VIDEOGRAPHER: No.
3       MR. NEKVASIL: We're on the record.
4       MR. CHAIRMAN: But we're on the record.
5       MR. NEKVASIL: We do renew our request that
6   Document Number G-22 and G-23 be entered into evidence.
7   We have verified with the witness that he signed this
8   document. He's explained it's his words, that he
9   believes this is accurate, and we would like it admitted
10  into evidence.
11      MR. LUKOWSKI: He never said it was his
12  words.
13      MR. NEKVASIL: I'm sorry. Well --
14      MR. LUKOWSKI: He never said that.
15      MR. NEKVASIL: Okay. He actually -- he
16  testified that this -- these were things that he told
17  our law firm that we put on paper and gave back to him
18  to sign. That's exactly what he said. And I said to
19  him is there anything on here that's inaccurate. Did we
20  ask you to say something that was inaccurate? And the
21  answers were no. Maybe I'm saying that differently than
22  you are.
23      MR. LUKOWSKI: I understood -- I understood
24  that they were accurate. I just want to make sure
25  that --

76

1       MR. NEKVASIL: We drafted it for him
2   based on --
3       MR. LUKOWSKI: Thank you.
4       MR. CHAIRMAN: Mr. Little, anything you want
5   to say?
6       MR. LITTLE: I think in terms of the
7   admissibility of an exhibit, that's something the panel
8   will determine at the conclusion of the case. We have
9   identified it, and I certainly intend at this point,
10  given the panel's leeway in allowing them to use it to
11  cross-examine the witness on it.
12      MR. CHAIRMAN: Certainly.
13      MR. NEKVASIL: So we understood that there
14  was an actual objection, otherwise, I wouldn't have
15  raised it at the time, Mr. Chairman.
16      MR. LITTLE: I'm sorry. My preliminary
17  objection --
18      MR. CHAIRMAN: I think the objection was for
19  the way you're using the document rather than the
20  admissibility of the document.
21      Mr. Little, is it correct that you're more
22  objecting to how he's using the document rather than its
23  admissibility?
24      MR. LITTLE: Yeah. I think it was
25  inappropriate in terms of the in which you approach the

77

1 witness with the document in terms of either
2 cross-examination or refreshing someone's memory.
3        MR. NEKVASIL: Mr. -- are we on?
4        VIDEOGRAPHER: We're not. Would you like to
5 be on?
6        MR. NEKVASIL: Yes.
7        MR. CHAIRMAN: Now, you can put the video
8 back on.
9        VIDEOGRAPHER: The time is 10:44 a.m. This
10 begins Tape Number 2. We're back on the video record.
11 BY-MR. NEKVASIL:
12    Q. In this declaration -- by the way, do you agree
13 that this declaration was signed by you only
14 two-and-a-half months ago?
15    A. Correct.
16    Q. Much more recent in time than the statements you
17 gave to the NASD in your SEC deposition; would you
18 agree?
19    A. Correct.
20    Q. In Item Number 5 you make some specific
21 representations about this May 3rd form; is that
22 correct?
23    A. Correct.
24    Q. In terms of why you believe you completed it in
25 conversations with Renfro?

78

1    A. Yes.
2    Q. Are they accurate?
3    A. To the best of my recollection, yes.
4    Q. Well, one of the items you reference -- you
5 reference a on-line CLE course that you took in May
6 2004. Do you see the reference on Number 5?
7    A. Yes.
8        MR. NEKVASIL: If the panel will leave this
9 volume open and go to this declaration and go to Volume
10 4, Tab J, page -- I think it's 131.
11 BY-MR. NEKVASIL:
12    Q. Did you take a CLE course while you were with
13 ONESCO?
14    A. Yes.
15    Q. Did you take --
16        (Phone interruption.)
17    Q. Did you take it on or about June 1, 2004?
18    A. Yes.
19    Q. How could the CLE course you took on June 1, 2004
20 have prompted you to complete a form that you, according
21 to this declaration, completed on or about May 3, 2004?
22 Can you explain that to the panel?
23    A. No. Obviously I couldn't have. My recollection
24 was incorrect.
25    Q. Your recollection on what issue?

79

1    A. On the declaration that around May 4 I took the
2 CLE course that prompted me.
3    Q. So --
4        MR. LITTLE: Let me just make a comment,
5 Mr. Chairman. This is why we did not want to provide
6 our notebooks in advance because now they saw the
7 cross-examination that was coming through this witness
8 that showed that, in fact, it was put in the declaration
9 and, in fact, false. And that's why we did not want to
10 put this in front of -- give to counsel in advance.
11        MR. NEKVASIL: I have an objection to this.
12        MR. CHAIRMAN: And that's something you can
13 make in argument.
14        MR. NEKVASIL: Mr. Chairman -- Mr. Chairman,
15 that is personally offensive to me.
16        MR. CHAIRMAN: Just don't go there. We
17 don't need this.
18        MR. NEKVASIL: If he's implying that I don't
19 know how to do my job. I need his documents to tell me
20 what I'm doing. I mean, I'm not making those comments
21 about him.
22        MR. CHAIRMAN: I didn't take that
23 implication.
24        MR. NEKVASIL: Okay. I'll simply represent
25 to you that nothing in his documents have prompted me to

80

1 go along these lines of questions. And I don't need his
2 assistance in my case. And that's why, Mr. Chairman,
3 that this J-131 is part of our claimant's hearing
4 exhibit book.
5        MR. LITTLE: The document of which --
6        MR. LUKOWSKI: Okay. Guys. Come on guys.
7 Come on.
8        MR. CHAIRMAN: Let's get on with the
9 evidence.
10 BY-MR. NEKVASIL:
11    Q. So if the CLE course did not prompt you to send
12 the form in, what did?
13    A. I don't know.
14      This is a reoccurring problem for me, is -- and I
15 said this before. My memory is very bad, and my biggest
16 concern is that I make declarations that I believe to be
17 correct that aren't, and I don't remember them, and I
18 don't know what I can do about that. This is a very
19 good example.
20    Q. Questions about your personnel file.
21        MR. NEKVASIL: If the panel could put aside
22 Tab G for now. Put aside Volume 3. Let's go to Volume
23 4, Tab J, Page 79.
24        MS. WRIGHT: What volume?
25        MR. NEKVASIL: Volume 4, Tab J, Page 79.

---

## 81

1  BY-MR. NEKVASIL:
2      Q.  Can you identify this document, this J-79?
3      A.  It's a copy of the registered representatives
4  sales contract.
5      Q.  Do you see where it says -- at the top left
6  corner it has your name, approval date and it then says
7  "resident sales coordinator, Kerry Lawing," do you see
8  that?
9      A.  Yes.
10     Q.  Did you notice that at the time?
11     A.  I don't remember.  I don't even remember signing
12 this document, but that's my signature.
13     Q.  Did anyone at ONESCO ever inform you that the
14 term "resident sales coordinator" is their internal term
15 to describe the direct supervisor?
16     A.  No.
17     Q.  Did anyone at ONESCO tell you that this document
18 constituted, according to them, their official
19 notification to you that Mr. Lawing was your direct
20 supervisor?
21     A.  No.
22     Q.  What does the term "resident sales coordinator"
23 mean to you?
24     A.  Someone's who's on staff at the office who
25 oversees sales.

## 82

1      Q.  Go back to Page 75 and 76, please, same Tab J.
2  This is the letter that you received from a Pauline
3  Jones identified as a supervisor in ONESCO's contracting
4  and license department, right?
5      A.  Looks like it.
6      Q.  Okay.  It says on the top of Page 2, "Annual
7  requirements for ONESCO representatives," do you see
8  that?
9      A.  On top of where?
10     Q.  On top of page -- on top of the second page of
11 the letter, you're right, which is Bates stamped page
12 J-76.  Do you see where this, "Annual requirements for
13 ONESCO representatives"?
14     A.  Yes.
15     Q.  One of the items it says is, "compliance
16 meeting"?
17     A.  Yes.
18     Q.  Did you ever attend an ONESCO compliance meeting?
19     A.  No.
20     Q.  This CLE course you took, that was an NASD
21 requirement; is that not fair to say?
22     A.  Yes.
23     Q.  So it was not a training program by the firm?
24     A.  Correct.
25     Q.  Did ONESCO ever offer you any type of training?

## 83

1      A.  Not that I remember.
2      Q.  Maybe I should ask it clearer.  Did you ever
3  receive any type of training --
4      A.  No.
5      Q.  -- on compliance matters while you were at
6  ONESCO?
7      A.  No.
8          MS. WRIGHT:  Did you receive the compliance
9  manual?
10         THE WITNESS:  No.
11         MS. WRIGHT:  Well, then can you explain on
12 Page 124 of that same section this compliance manual
13 questionnaire?
14         THE WITNESS:  What part?
15         MR. NEKVASIL:  124 and 125.
16         THE CHAIRMAN:  Same letter J. 125.
17         THE WITNESS:  Okay.  And what was the
18 question?
19         MS. WRIGHT:  The question is:  Can you
20 explain how you were able to complete this questionnaire
21 if you had not received the compliance manual?
22         THE WITNESS:  No.  I don't remember
23 receiving a manual.
24         MS. WRIGHT:  Is that your handwriting and
25 your signature?

## 84

1          THE WITNESS:  That is my handwriting and my
2  signature, yeah.
3          MR. LUKOWSKI:  Would you have any source of
4  information with which to put in these responses other
5  than the compliance manual?
6          THE WITNESS:  Not that I'm aware of, no.
7  This is, again, one of my points.  I don't remember
8  receiving a manual.  I don't have one that I can find,
9  but clearly I had to have received it to complete this.
10         MR. NEKVASIL:  In that regards, may I?
11 BY-MR. NEKVASIL:
12     Q.  Leave that page open and turn to Volume 5, Tab Q.
13 Volume 5, Tab Q, Pages 114 and 115.  Actually, if you
14 start with Page 102 first.
15         MR. LUKOWSKI:  This is a document that was
16 produced by ONESCO?
17         MR. NEKVASIL:  Right.  Yes.
18         MR. LUKOWSKI:  What's the date on that?
19 BY-MR. NEKVASIL:
20     Q.  Do you see where it says on Q-102, it says,
21 "ONESCO Compliance Operations Manual," do you see that?
22     A.  Yes.
23     Q.  Dated February 2004, do you see that?
24     A.  Yes.
25     Q.  Several months before you completed this

## 85

1  questionnaire?
2      A. Yes.
3      Q. Okay. Do you see in the top of the
4  questionnaire, left corner it actually says, "The
5  following questions are based on information contained
6  in the ONESCO Compliance and Operations Manual," do you
7  see that?
8      A. Where are you talking about?
9      Q. Back to J-124.
10     A. Okay.
11     Q. Wouldn't you agree that in J-124 in the first
12  paragraph it refers to the -- exactly to the same
13  manual, the compliance operations manual?
14     A. Yes.
15     Q. And, now, I direct your attention to item
16  number -- where it says Section 3.09. I think it's on
17     Q. This is on -- we're still on J-124, item number --
18         MR. NEKVASIL: It's the fourth bullet, Mr.
19  Chairman, Section 3.09.
20  BY-MR. NEKVASIL:
21     Q. Do you see that?
22     A. I don't know where you're at.
23     Q. J-124, look at the --
24         MR. CHAIRMAN: This is on the compliance
25  manual questionnaire.

## 86

1          MR. NEKVASIL: Yeah.
2  BY-MR. NEKVASIL:
3      Q. Do you see where it references Section 3.09,
4  "provides examples of prior three transactions;" do you
5  see that?
6      A. Yes.
7      Q. If you compare that to Q-114, if you look under
8  3.09, the second paragraph, it looks like what you've
9  done is basically copied verbatim what's in the second
10  paragraph of 3.09, would you agree?
11     A. 3.09, oh, I see. Yes.
12     Q. Does this refresh your recollection that you must
13  have received this ONESCO compliance operations manual
14  dated February 2004?
15     A. Yes. And I think I already said that.
16     Q. Now that your memory is refreshed, did you
17  actually read the manual or simply go to the sections of
18  the questionnaire and fill out what you're supposed to?
19     A. I don't recall ever having read the manual
20  completely. So I can only presume that I must have gone
21  to the appropriate section to complete the form.
22         MR. LITTLE: Let me object. The witness has
23  already testified he has no recollection as to what he
24  did or did not do. And so it's inappropriate for him to
25  simply make these presumptions at this point.

## 87

1          MR. NEKVASIL: Mr. Chairman, actually all I
2  did was refresh his recollection.
3          MR. CHAIRMAN: You said -- that's right, but
4  go to the next question.
5          MR. NEKVASIL: Yeah.
6  BY-MR. NEKVASIL:
7      Q. Now, did you understand -- if you look at Section
8  3.09, now let's just focus on Q-114. You can put the
9  questionnaire aside.
10     Do you understand, looking at this document now,
11  that it forbids all selling away transactions that are
12  affected without getting a written approval from the
13  firm?
14     A. Yes.
15     Q. Did you understand that back in February 2004?
16     A. I never even thought about it.
17     Q. Well, this -- looking at this 3.09, does this
18  forbid you solely from engaging in private securities
19  transactions on approval with people who have accounts
20  with ONESCO or does it forbid you from selling
21  unapproved securities to anybody?
22         MR. LITTLE: Let me object to the form of
23  the question because it gives it a one or two and there
24  may be a three. Also, object in this particular area to
25  leading examination. I think if he wants to get answers

## 88

1  from the witness on this type of examination, he needs
2  to ask open-ended questions.
3          MR. NEKVASIL: Mr. Chairman, I'm asking him
4  for his knowledge, what the rules says.
5          MR. CHAIRMAN: Just ask him if he knows what
6  the rule says about a certain topic.
7          MR. NEKVASIL: Okay.
8  BY-MR. NEKVASIL:
9      Q. What is this section telling you about private
10  securities transactions and what you're forbidden from
11  doing?
12         MR. LITTLE: I'll object to the extent that
13  you're asking him to do anything other than read it.
14         MR. NEKVASIL: No. I'm asking him what his
15  understanding of what 3.09 is.
16         MR. LITTLE: No.
17         MR. NEKVASIL: I'm asking him what his
18  understanding of --
19         MR. CHAIRMAN: Let him finish his objection.
20         MR. LITTLE: Yeah. Stop interrupting me for
21  a moment. Okay.
22     One of the things that has happened here is
23  he's now had the witness testify -- he's impeached his
24  own witness as to whether he ever received the
25  compliance manual, and now the position they're taking

## 89

1  is that they want him to interpret something he doesn't
2  even remember reading, and that's inappropriate.
3       MR. NEKVASIL:  Let's take it step by step.
4  Mr. Chairman, I have to respond.  He said, first of all,
5  I'm impeaching my own witness.
6       He was an ONESCO agent who we have
7  subpoenaed here to appear.  He is here not voluntarily,
8  but pursuant to a subpoena.  He is not our own witness.
9  What you see now is another effort to somehow take their
10 agent and make him somehow an agent of my law firm or an
11 agent of claimants', which is contrary to their
12 supervisory responsibility back then, and it's a
13 strategy.  So I object to these continued very careful
14 studied characterizations of this person here under
15 subpoena as claimant's witness.  That's just false and
16 he knows it.
17      Secondly, I'm asking him -- now I have a
18 right to impeach him, and I plan to continue impeaching
19 him, this former ONESCO broker.  I hope -- you know, I
20 hope to continue impeaching him.  I'm asking him -- I
21 have impeached him.  I'll be planning to frankly to
22 (inaudible) those questions before the panel member
23 asked him, which is fine.  I was going to impeach him
24 about the manual, and I'm going to ask him about what
25 his understanding of the rule is now and what is his

## 90

1  understanding of the rule is then.  Those are perfectly
2  legitimate questions.
3       He does not like those questions because
4  Respondent is attempting to argue that the firm has no
5  duty with respect to these people because they did not
6  have accounts, which would mean if you follow the
7  conclusion that the firm would have procedures which say
8  you cannot sell away to ONESCO clients.  But the firm
9  would not care about what you do with other people
10 because that's not part of their supervision.
11 Therefore, they're not going to have rules against it.
12 That's why he is objecting to the question because it
13 goes to the substantive issue of what they're saying on
14 paper what their duty is.
15      Remember, I told you that you need to judge
16 ONESCO by the duty they assumed during the time by their
17 procedures, not by what they now claim is their legal
18 duty.  You'll hear legal arguments at closing, but right
19 now see what they've put in them now.
20      Did they say, for example, we have a duty to
21 make sure you don't sell unapproved products to our
22 clients, account holders but for anyone else, we don't
23 care?  So they say that there us is it broader.  Because
24 if it's broader, I'll argue in closing that's part of
25 the duty they assume, and it shows their real duty.

## 91

1       So that's really what's going on here with
2  the objection.  I have a right to ask him what his
3  knowledge is of this rule now of his prohibition,
4  whether his prohibition limits him solely to selling
5  unapproved securities to people who have accounts with
6  ONESCO or whether it's broader than that, whether that's
7  his understanding now or whether now that his memory has
8  been refreshed, is that his understanding back then.  I
9  have a right to ask him those questions and his answer
10 will be his answer.
11      MR. LITTLE:  My objection to the question
12 was based on the fact that it's inappropriate.  But
13 let's be very clear.  In this particular case the
14 claimant's counsel has procured from this witness no
15 less than four affidavits.  And what we have heard this
16 morning is that the affidavits in several instances are
17 flat out false.  That's what we've been told.
18      So they have put a witness on the stand with
19 false affidavits.  We're going to cross-examine that for
20 quite a while this afternoon.  We're going to enlighten
21 the panel as to what, in fact, has happened as to the
22 witness that they have previously secured statements
23 from when the documents we've already produced to them
24 show that the affidavits were false when they were
25 executed.  That's their witness.

## 92

1       But here's what we're talking about today.
2  The issue of duty, that's determined by the courts in
3  the case law we've presented.  What are we talking about
4  from an evidentiary standpoint?  Well, they've laid a
5  foundation of zero at this point.  The witness has said
6  he has no recollection reading this.  Other than reading
7  it now he doesn't have an understanding of this, and so
8  if they want to ask him questions as to whether or not
9  he had a recollection back then, on something he has
10 already testified he doesn't remember, I don't know how
11 you can do that.
12      And it's inappropriate for him to try to
13 speculate and guess this afternoon -- excuse me, this
14 morning -- as to something he doesn't have a foundation
15 on.  They need to lay a foundation for this witness if
16 they're going to ask those type of questions, and they
17 have not.  That's not a question of the legal arguments
18 that we want to advance later.  That's a simple matter
19 of how to examine a witness.
20      MR. NEKVASIL:  Mr. Chairman, I --
21      MR. CHAIRMAN:  We're going to treat the
22 document as speaking for itself, and you don't need to
23 ask him anything about what he thinks it means today.
24 If you want to ask him what, if anything, he recollects
25 if he does understanding that he already made some

93

1 statements about not recollecting very much, but you can
2 ask him about that. And if it contradicts each other,
3 it's argument, or argument anyway.
4 BY-MR. NEKVASIL:
5   Q. Looking at J-124. At the time that you completed
6 this questionnaire, did you understand what these
7 sections of the manual were telling you?
8   A. I don't recall reading enough to pay any
9 attention to it. I was completing the necessary
10 required form.
11   Q. Did you know in March 2004 or April 2004 that
12 ONESCO had a prohibition that forbade you from selling
13 unapproved securities to anybody?
14   A. I never even thought about it, so I would have to
15 say I had no idea.
16   Q. Did Heather Renfro, the only person at ONESCO you
17 spoke to, you testified to, did she ever discuss with
18 you the compliance manual?
19   A. No. Not to my recollection, no.
20   Q. I'm sorry.
21   A. Not to my recollection, no.
22   Q. I didn't mean to cut you off. It was a pause.
23     Did she ever discuss with you your understanding
24 of firm procedures?
25   A. No.

94

1   Q. Did anyone from ONESCO attempt --
2     MR. NEKVASIL: I know we dealt with the
3 speaking, Mr. Chairman. This is a different question.
4 BY-MR. NEKVASIL:
5   Q. Anyone at ONESCO attempt to reach you to discuss
6 with you your understanding of the firm's procedures?
7   A. No.
8   Q. And anyone from ONESCO attempt to reach you to
9 discuss with you your experience in the securities
10 industry and your knowledge of the securities industry
11 rules?
12   A. No.
13   Q. Did you ever fail to return any telephone calls
14 that you got from ONESCO?
15   A. Not that I remember.
16   Q. Did you ever fail to return -- fail to respond to
17 any e-mails that you got from ONESCO?
18   A. I don't think so.
19   Q. Did you ever receive a form from ONESCO with a
20 return envelope and you simply blew it off, didn't
21 respond?
22   A. I would not do that. That would --
23     MR. CHAIRMAN: Does that mean you don't
24 specifically remember, but your practice would be to --
25     THE WITNESS: My practice would be to

95

1 respond immediately to anything I received.
2     MR. CHAIRMAN: But you don't specifically
3 remember one way or the other?
4     THE WITNESS: No.
5 BY-MR. NEKVASIL:
6   Q. This form is -- there's a home office principal
7 signature on Page 125. Do you see where the blank is?
8   A. Yes.
9   Q. Did the firm ever return to you one that was
10 countersigned by somebody at the firm?
11   A. Not that I'm aware of.
12   Q. Did anyone at ONESCO ever tell you -- give you
13 the identity of the home office principle principal who
14 was supposed to sign the form?
15   A. No.
16   Q. Anyone at ONESCO ever explain to you why this
17 form was not signed?
18   A. No.
19   Q. And what the role was of the person who was
20 supposed to sign the form?
21   A. No.
22     MR. NEKVASIL: Mr. Chairman, we've asked --
23 we would like to note for record that we've asked
24 Respondent -- we don't have a signed -- a copy of this
25 compliance questionnaire that's signed by a home office

96

1 principal. We would like --
2     MR. CHAIRMAN: Does that exist?
3     MR. LITTLE: Well, because as we've told
4 Counsel now countless times --
5     MR. CHAIRMAN: Don't give me the preface.
6 Does it exist?
7     MR. LITTLE: It's electronically notated.
8 They have the records in the notebook showing where the
9 home principle principal reviewed the forms. It's in
10 their own notebooks.
11     MR. NEKVASIL: Sir, we actually -- sir, we
12 disagree with the overall representation, but I'm asking
13 them would they agree that they did not produce this
14 form? It does say here home office --
15     MR. CHAIRMAN: He just answered that and he
16 said that it's electronic and there's no signature; is
17 that correct?
18     MR. LITTLE: It's an electronic signature on
19 a docketing system. That's what they've been told time
20 and time again.
21     MR. CHAIRMAN: Don't tell me about the time
22 and time again. I just want to know the answers. I
23 don't want to hear about ya'll's past fights.
24     MR. NEKVASIL: Sir, we have the (inaudible)
25 docketing system. My understanding is that it's not

97

1    that there's an electronic signature on this form that
2    they're maintaining some other electronic record that
3    involves a signature, and I want to make sure that I
4    understand what they're talking about.
5         MR. LITTLE:  We'll have someone come in and
6    testify how a paperless system is structured for an
7    electronic docket.
8         MR. CHAIRMAN:  Thank you.
9         MR. NEKVASIL:  Sir, we also would like one
10   matter clarified that occurred last night that I believe
11   was inaccurately stated on the record.
12        Do you recall that I took that -- that
13   Respondent was -- I was questioning the witness about
14   some important documents, and they had those numbers at
15   the top with the date.  And I -- let's make sure.  I
16   believe Respondent indicated that those were the dates
17   they were received by ONESCO, and my position is that's
18   inaccurate.  Those would be dates that they're scanned
19   in, but not dates they're received.
20        In fact, there's a different received date
21   on a lot of them.  A lot of them were stamped in, for
22   example, received February 26th, but the scan-in date is
23   April or May.  Scan-in date and received date are two
24   different things.  So I would like there to be a clear
25   record or stipulation that that date we're talking about

98

1    is a scanned date, not a received date.
2         MR. LUKOWSKI:  Mr. Little, is somebody
3    testifying explaining how these documents are scanned
4    and dated?
5         MR. LITTLE:  We'll have someone do that,
6    but -- it's pretty simple.  But Counsel's right.  We
7    pointed out the one document shows a scan date of
8    whatever it was.  It could have been received two days
9    before the scan date.
10        MR. NEKVASIL:  Or a month or two before.  Or
11   a month or two before.
12        MR. LITTLE:  I doubt that, not when the
13   document is signed a week before the scan date.
14        MR. CHAIRMAN:  Well, if it becomes
15   important, let's pick a document and go to it.
16        MR. NEKVASIL:  Okay.  I'm just saying --
17        MR. CHAIRMAN:  We understand there's a
18   difference between the two dates.
19        MR. NEKVASIL:  We have documents.
20        MR. CHAIRMAN:  You said that you have
21   documents that have many dates before.
22        MR. NEKVASIL:  Yes.
23        MR. CHAIRMAN:  And if it becomes important,
24   you can --
25        MR. LITTLE:  I assume he'll be able to ask

99

1    questions to the witnesses at some point.
2         MR. NEKVASIL:  If you'll turn to Page J-65,
3    Mr. Chairman.
4    BY-MR. NEKVASIL:
5    Q.  Is that your signature that appears on J-67?
6    A.  Yes.
7    Q.  Is this a document that you signed in connection
8    with the completing of the preliminary packet of forms
9    that you received from Heather Renfro?
10   A.  Yes.
11   Q.  Okay.  Do you see where Item Number 1 on Page 65,
12   second sentence of Item Number 1, "A registered
13   representative may not sell any securities to any
14   members of the public unless the sales are placed to
15   ONESCO."
16        Did you read that provision?
17   A.  When I completed these forms, I am certain that
18   all I did was go to the signature page, fill them out
19   and completed it as fast as possible and returned them.
20   Q.  Your registration fees with ONESCO when you
21   joined, did you pay them?
22   A.  I don't recall.
23   Q.  Let's go to Page 74, please.  The answer to your
24   question is, no.
25        J-74, is this a check for your registration fee?

100

1    You initially joined -- or you transferred fee when you
2    initially joined ONESCO?
3    A.  I don't see where it says that, but --
4    Q.  Do you see where it says on top "transfer fee,"
5    top left corner it says transfer fee?
6    A.  Okay.  Yes.
7    Q.  $85, do you see that?
8    A.  Yes.
9         MR. CHAIRMAN:  What does that mean to you?
10   What does that mean to you, if anything?
11        THE WITNESS:  It would mean it's a fee that
12   was paid to transfer my license.
13        MR. CHAIRMAN:  From where to where?
14        THE WITNESS:  From a previous broker/dealer
15   to O.N. Equity.
16   BY-MR. NEKVASIL:
17   Q.  And is that -- if you go to Page J-73, does that
18   assist you in determining what your fee is?
19   A.  Yes.
20   Q.  So this fee, transfer fee for your securities
21   license move to ONESCO was paid for by Universal
22   Underwriters?
23   A.  Yes.
24   Q.  How do you reimburse Universal Underwriters for
25   this fee?  Why are they paying this fee for you?  What

## 101

1  are you giving them in return?
2      A.  Nothing.  I was an employee.
3      Q.  Universal Underwriters is not a broker/dealer,
4  right?
5      A.  Correct.
6      Q.  So if you generate -- you communicated that one
7  of your reasons you joined, one of them, was the hope
8  that you might generate some 401K business?  You
9  couldn't share the commissions with them because they're
10 not a broker/dealer, right?
11     A.  Correct.
12     Q.  So you have no idea how Universal Underwriters
13 would benefit from this arrangement?
14     A.  No.
15     Q.  Okay.  During the period between March 2004 and
16 let's say October 2004, most of your time was spent on
17 Lancorp Financial Fund Business Trust; is that fair to
18 say?
19     A.  Yes.
20     Q.  Did you do any work for Universal Underwriters
21 between March and October 2004?
22     A.  Up until the time that I -- well, yes, in fact, I
23 have to correct that statement then.  The majority of my
24 work was not being spent on the fund.  I was a full-time
25 employee and engaged full time in my activities as

## 102

1  selling commercial property, casualty insurance for
2  Universal.
3      Q.  Even between March and October of 2004 when you
4  were -- when you were processing these additional $4.5
5  million in transactions and communicating with the
6  earlier investors as well?
7      A.  During the entire time that I was employed there,
8  I maintained my level of activity.
9      Q.  When did you resign from Universal Underwriters?
10     A.  I don't remember.  I'm sure you've got a
11 document.
12     Q.  Go to Page 168, please.
13     A.  Which volume?
14     Q.  J-168.
15     A.  So we're done with Volume 5; is that what you're
16 saying?
17     A.  No.  We're still on the same -- no.  We're in
18 Volume 4.  The same volume that -- I'm sorry.  We're in
19 Volume 4, Tab J, Page 168.  I apologize.
20         Do you work for Universal Underwriters out of
21 your house or did you use a separate office?
22     A.  I was assigned to an office in Seattle, but I
23 seldom went there.
24     Q.  You were assigned to an office in Seattle, but
25 you worked from day to day out of your house in West

## 103

1  Linn, Oregon?
2      A.  Correct.
3      Q.  Is West Linn near Portland?
4      A.  It's a suburb of Portland.
5      Q.  Suburb of Portland.
6         Okay.  Did you -- to refresh your -- does the
7  second e-mail on Page 168 at the bottom where it starts
8  with "Hi, Lynn," does this refresh your recollection
9  concerning when you resigned from Universal
10 Underwriters?
11     A.  Yes.
12     Q.  When was it?
13     A.  Effective November 1st, 2004.
14     Q.  You sent the e-mail on October 12th?
15     A.  Yes.
16     Q.  Did you, between October 12th and November 1,
17 continue to making a full schedule, work schedule for
18 Universal Underwriters?
19     A.  No.
20     Q.  No?  Did you say no?
21     A.  I don't recall.
22     Q.  Would it be fair to say that at least between
23 October --
24         MR. CHAIRMAN:  Well, which is it?  You don't
25 recall or no?

## 104

1          THE WITNESS:  I don't recall.
2          MR. CHAIRMAN:  Okay.
3          THE WITNESS:  Probably not.
4  BY-MR. NEKVASIL:
5      Q.  So at that time you were full-time working for
6  Lancorp Financial Fund; is that fair to say?
7      A.  Yes.
8      Q.  While you resigned from Universal Underwriters,
9  why didn't you resign from ONESCO also?
10     A.  Never occurred to me.
11         MR. CHAIRMAN:  Pardon?
12         THE WITNESS:  It never occurred to me to
13 resign from ONESCO.
14 BY-MR. NEKVASIL:
15     Q.  Well, I thought you indicated earlier that the
16 tie to ONESCO, aside from your concern about maintaining
17 your license, which you testified to, was that you were
18 going to be calling on automobile businesses for
19 Universal Underwriters to offer them commercial property
20 casualty insurance?
21     A.  That was my job at Universal.
22     Q.  And that you were hoping to get 401K business for
23 them.  If you stopped working for Universal
24 Underwriters, how did you have any hope of generating
25 business for ONESCO?

## 105

1    A. I didn't.
2    Q. So would it be fair to say that as of October
3  2004 you literally were just parking your license at
4  ONESCO; is that a fair statement?
5    A. I just didn't pay any attention to it. I was not
6  producing any business activity.
7    Q. Top of the page.
8        MR. CHAIRMAN: Which page?
9        MR. NEKVASIL: Same page. Top of Page
10 J-168.
11       MR. CHAIRMAN: Thank you.
12 BY-MR. NEKVASIL:
13   Q. This is an e-mail that was produced to us by
14 Universal Underwriters pursuant to a subpoena, actually
15 Respondents -- you see the UU-33? That's Respondent's
16 marking. They subpoenaed it and they gave it to us?
17   A. Uh-huh.
18   Q. It doesn't mean it's Respondent's document. It
19 just means it's a document they got from Universal
20 Underwriters.
21   A. Okay.
22   Q. At the top it indicates that someone was going to
23 go to Portland to retrieve company property. Did
24 somebody come to visit you and retrieve Universal
25 Underwriters's properties from you?

## 106

1    A. I actually took it to Seattle.
2    Q. You took it to Seattle.
3        Well, did anybody from ONESCO, after you got this
4  notice in the mail in January, did anybody contact you
5  or talk to you about visiting you and retrieving any
6  ONESCO materials you might have, such as the compliance
7  manual, any stationary, business cards, anybody ever
8  attempt to arrange to visit with you?
9    A. No.
10   Q. During the period between March and October of
11 2004, how much money did you earn each month from
12 Universal Underwriters? I know it's a very narrow
13 question. Between -- I asked you about 2003.
14       Between March and October 2004, how much money
15 did you earn from Universal Underwriters?
16   A. I don't remember. I was paid every month based
17 on the book of business and a minimum guarantee.
18   Q. Can you give us a range?
19   A. Somewhere in the $5,000 a month range.
20   Q. When you took the CLE course, the NASD charged a
21 fee to take that course, didn't they?
22   A. I'm sure they did.
23   Q. Was that fee also, again, paid for you by
24 Universal Underwriters?
25   A. It was paid by either Universal or ONESCO. It

## 107

1  was paid by somebody other than me.
2        MR. NEKVASIL: Same tab, Mr. Chairman, J,
3  Page 129.
4  BY-MR. NEKVASIL:
5    Q. Does this refresh your recollection concerning
6  how your -- J-129, does this document refresh your
7  recollection concerning who paid for your continuing
8  education fee?
9    A. I have no recollection. I have never seen this
10 before. This is the first time I have seen this. So I
11 guess it just speaks for itself. I have no
12 recollection.
13   Q. Okay. Again, would your answer be the same here?
14 You have no idea how Universal Underwriters would be
15 financially compensated for making these payments to
16 ONESCO?
17   A. Correct.
18   Q. You wouldn't know the handwriting on this page,
19 129, would you?
20   A. No.
21       MR. NEKVASIL: Just give me a second,
22 Mr. Chairman.
23 BY-MR. NEKVASIL:
24   Q. Did Ms. Renfro inform you that in October 2007 --
25 did Ms. Renfro inform you that in October 2004 she sent

## 108

1  the e-mails to the compliance department asking that
2  your registration be terminated because you were no
3  longer affiliated with Universal Underwriters?
4    A. No.
5        MR. LITTLE: Objection. That misstates the
6  record.
7        MR. CHAIRMAN: Why don't you turn to J-135.
8        MR. NEKVASIL: Actually, Respondent's
9  counsel is correct. I said October 2004. It's actually
10 November 2004.
11 BY-MR. NEKVASIL:
12   Q. Go to 135. Did Ms. Renfro ever inform you that
13 she sent an e-mail to Pauline Jones who is in charge of
14 licensing for ONESCO in their main office saying that
15 you needed to be terminated by ONESCO because you left
16 Universal Underwriters? Did she ever tell you that?
17   A. No.
18       MR. CHAIRMAN: Did you ever hear from Ms.
19 Renfro about your termination?
20       THE WITNESS: No.
21       MS. WRIGHT: How did you find out that you
22 were terminated?
23       THE WITNESS: The letters that I received
24 affecting my termination.
25 BY-MR. NEKVASIL:

---

109

1    Q. Was that Page J-184? Is that the notice you're
2  talking about?
3    A. Yes.
4    Q. Is this the notice -- is this also a letter that
5  you referred to with the SEC -- in your testimony before
6  the SEC where you said you sent in that disclosure form
7  and some time thereafter you received a letter in the
8  mail of them terminating you? Is this the letter that
9  you're referring to?
10   A. Yes.
11      MR. LUKOWSKI: I'm confused. The e-mail
12  that Ms. Renfro sent, which is 135, refers to his being
13  terminated in "our system." And is she acting for
14  Lawing Financial Group or is she acting for ONESCO or
15  both?
16      MR. NEKVASIL: The testimony will be that
17  Pauline Jones was the contracting and licensing
18  principal for ONESCO in their main office. She had
19  nothing to do with it.
20      MR. LUKOWSKI: I'm asking about Heather
21  Renfro. Was she working on behalf of ONESCO at that
22  point?
23      MR. LITTLE: She works in Lowing's office,
24  and she will testify -- you'll hear her testimony and
25  she'll testify as to when they believe he was being

---

110

1  terminated and thereafter.
2      MR. NEKVASIL: Let me point out,
3  Mr. Chairman --
4      MR. LUKOWSKI: Okay. As long as it's going
5  to be clarified later.
6      MR. NEKVASIL: Yeah. We're going to be
7  getting into it, too, with the witness. We'll be
8  calling her. It doesn't make her our witness, but we
9  will be calling her.
10      MR. LUKOWSKI: I understand.
11      MR. NEKVASIL: I'd like to move to a last
12  area. Can we take a bathroom break or something?
13      MR. CHAIRMAN: If you need to, yeah.
14      VIDEOGRAPHER: The time is 11:28 a.m. We're
15  now off the video record.
16      (Thereupon, a break was taken.)
17      VIDEOGRAPHER: The time is 11:41 a.m. We're
18  back on the video record.
19  BY-MR. NEKVASIL:
20    Q. Mr. Lancaster, during 2004, did you pay yourself
21  or Lancorp Financial Group, L.L.C. any fees out of the
22  money that was raised from the investors in the Lancorp
23  Financial Fund Business Trust.
24    A. Only those transactions that were already
25  discussed.

---

111

1    Q. I'm talking about in 2004.
2    A. 2004.
3    Q. The two MegaFund transactions were in 2005. 2004
4  the money is at Tricom with a little bit at Bank of
5  America and it all goes back to the Bank of America,
6  Lancorp Financial Fund Trust account?
7    A. I don't recall paying myself a fee, no.
8    Q. You didn't pay yourself a fee?
9    A. I don't recall.
10   Q. Does that mean you could of and you don't
11  remember or does it mean you definitely didn't? You
12  don't remember either way?
13   A. I don't remember either way.
14   Q. Okay.
15      MR. NEKVASIL: If the panel can look at -- I
16  have a question about your U-4. If the panel will turn
17  to Volume 4, Tab J, Page 90. Also, if the panel will
18  turn to Volume 6, Tab S, Page 168.
19  BY-MR. NEKVASIL:
20   Q. First of all, if you take a look at J-90 at the
21  top -- actually, it starts at the bottom of Page J-89.
22  My question is: Would you not agree that that's a
23  disclosure that appears of your other business
24  activities on your ONESCO U-4? It's the disclosure
25  appears on Page J-89 and 90.

---

112

1      MR. NEKVASIL: Mr. Chairman, the U-4 starts
2  on Page 83.
3      THE WITNESS: Yes to 89 and 90. It starts
4  on 83, yes, yes.
5  BY-MR. NEKVASIL:
6    Q. Okay. Now, if you -- if you look at the U-4 that
7  begins on Page S-163, do you recognize the handwriting
8  on Page S-163?
9      MR. LITTLE: The witness doesn't have the
10  correct notebook.
11      MR. NEKVASIL: Leave that -- leave that --
12  leave Notebook Number 4, please, on Page J-90.
13      MR. CHAIRMAN: Leave that one open and then
14  add a notebook to it.
15  BY-MR. NEKVASIL:
16    Q. And then grab Notebook Number 6 and turn to Tab S
17  and go to Page 163, please.
18    A. Okay.
19    Q. Is -- if you look at 163 through 166, my question
20  is: Is it your handwriting on -- actually, from 163
21  through 168, and I'm asking is it your handwriting on
22  these pages?
23    A. It is.
24    Q. Is this a U-4 you completed, boy, four years
25  earlier in 2000 when you were living in Vancouver,

---

113

1   Washington?
2      A.  Four years earlier?
3      Q.  Yeah.  In other words, you completed on January
4   14 of 2000, which is four years before you joined
5   ONESCO?
6      A.  I don't think I -- I wasn't in Vancouver,
7   Washington four years ago.
8      Q.  Okay.  And it does say office employment, so
9   maybe you weren't living there.
10      My question is:  Is that your signature there on
11   Page J-168?
12      A.  Yes.
13      Q.  Is that your signature on J-167?
14      A.  Yes.
15      Q.  Is this the U-4 that you signed on January 14th,
16   2000?
17      A.  Yes.
18      Q.  Is that four years before you completed your U-4
19   for ONESCO?
20      A.  Yes.
21      Q.  And is that your handwriting on Page 168?
22      A.  Yes.
23      Q.  Now, if you compare this disclosure, the outside
24   business disclosure that you did in 2000 with the ones
25   with -- for ONESCO, would you agree that it's identical

---

114

1   exact except for the last sentence of the ONESCO U-4
2   which says, "Universal Underwriters not investment
3   related in property casualty/sales and service"?  Can
4   you compare the two and let me know whether you agree
5   with that conclusion?
6      MR. LUKOWSKI:  What are we comparing?
7      MR. NEKVASIL:  We're comparing the -- his
8   outside business disclosure on the -- we're comparing --
9   okay.  We're comparing S-168 with J-89, 90, that
10   disclosure under other business.
11      MR. LUKOWSKI:  Okay.
12      THE WITNESS:  It's not word for word, but
13   it's substantially the same other than this one says,
14   "Universal Underwriters not investment related in
15   property/casualty sales."
16   BY-MR. NEKVASIL:
17      Q.  Okay.  When you say not word for word -- I asked
18   you -- I understand that it's the last -- the last
19   sentence on the ONESCO U-4 is different.  On the earlier
20   part you said it's not word for word.
21      A.  Oh, okay.  Right.  I didn't see the "I am the."
22   It appears to be identical.
23      Q.  Would you agree it's word for word identical
24   except for the last sentence of the U-4 disclosure for
25   ONESCO which discloses Universal Underwriters?

---

115

1      A.  Yes.
2      Q.  Which is obviously also on your February 2004
3   outside business disclosure form that you gave ONESCO,
4   right?
5      A.  Correct.
6      Q.  Now, who completed that last sentence on your U-4
7   with ONESCO which says, "Universal Underwriters/not
8   investment-related/property casualty/sales and service."
9   Who put that language down there?
10      A.  I don't recall.
11      Q.  Can you tell the panel whether it was you or not?
12      A.  I cannot.  I don't remember.
13      Q.  The bottom line is whoever did that simply
14   took -- simply repeated the information from your 2000
15   disclosure and just added that last sentence; can we
16   agree on that?
17      A.  That's what it looks like.
18      Q.  Have you spoken to ONESCO's attorney before, Mr.
19   Little?
20      A.  I think I spoke to him once or twice on the phone
21   regarding receiving the -- sending me -- sending the
22   information to him.
23      Q.  Okay.  Did you ever speak to anybody else from
24   his office?
25      A.  No.

---

116

1      Q.  Did you ever refuse to speak to him?
2      A.  No.
3      Q.  Did you send documents to his office?
4      A.  I did.
5      Q.  How many pages would you say it was about?
6      A.  Thousands.
7      Q.  Thousands.
8      Did you send them without a subpoena?  You sent
9   them voluntarily?
10      A.  Yes.
11      Q.  Did you ever indicate to him that you wouldn't
12   cooperate with him?
13      A.  No.
14      Q.  Did you ever tell him that you're not his
15   witness?
16      A.  No.
17      MR. CHAIRMAN:  Next question.
18      MR. NEKVASIL:  Okay.
19   BY-MR. NEKVASIL:
20      Q.  Has ONESCO sued you anywhere for violating any of
21   their procedures while you were with ONESCO?
22      A.  Not at this time.
23      Q.  They have not sued you or filed an arbitration
24   claim against you or filed a third-party claim against
25   you?  They have not done that yet?

---

117

1      A. Not as of this date.
2      Q. Did you ever tell any of the claimants that the
3   Lancorp Financial Fund Business Trust was not an
4   approved product of ONESCO?
5      A. No.
6      Q. Did you ever tell any of the investors that
7   Lancorp Financial Fund Business Trust was not an
8   approved product of ONESCO?
9      A. No.
10         MS. WRIGHT: Did you ever tell the claimants
11   that you were employed by ONESCO?
12         THE WITNESS: No. It was my understanding
13   that I did not need to have a securities license to
14   manage the fund, and I knew that it would only be a
15   question of time from the termination of Universal
16   Underwriters that ONESCO would require a minimum amount
17   of production from me or otherwise my securities license
18   would be terminated. At that point, I really gave very
19   little thought or consideration to my securities
20   license, whatsoever.
21   BY-MR. NEKVASIL:
22      Q. Did you ever tell any of the investors that you
23   had a securities -- any of the Lancorp Financial Fund
24   Business trust investors that you had a securities
25   license?

---

118

1      A. I don't remember specifically, but it is
2   possible.
3      Q. If you turn to Volume 1 --
4         MR. LUKOWSKI: Are we through with both four
5   and six?
6         MR. NEKVASIL: Yes. We may be through with
7   them, period.
8         Volume 1, Tab B. If you give me a second.
9   BY-MR. NEKVASIL:
10      Q. If you go to the prospectus, which is B-74, how
11   much of this prospectus offering memorandum -- how much
12   of this private placement memorandum was prepared before
13   you got involved?
14      A. All of it.
15      Q. So this -- you walked into a situation where they
16   would provide you with -- where Gary McDuff, this
17   convicted felon, would provide you with the salesman,
18   the trader and the actual vehicle, the memorandum?
19      A. Correct.
20         At the time that the People's Avenger Fund
21   attempted to (inaudible) filing for the those efforts
22   ceased, then the decision was made to do a private
23   placement fund instead and the trust -- the memorandums
24   were prepared by Norman Reynolds, the attorney in Texas.
25      Q. When did he prepare it?

---

119

1      A. I don't remember exactly.
2      Q. Did you play any role in preparing it?
3      A. Only to provide my personal information.
4      Q. And I want to talk about that personal
5   information, if you give me one second.
6         MR. NEKVASIL: One second, Mr. Chairman. I
7   had it marked.
8         Okay. His personal information, B-94, B-94.
9   Under executive officers and trustees there is a second
10   paragraph from the bottom of that section, before the
11   section, Mr. Chairman, it says, "Committees of the board
12   of trustees."
13   BY-MR. NEKVASIL:
14      Q. Did that -- did you provide him with that
15   section?
16      A. No.
17      Q. It says, "Gary L. Lancaster spent the majority of
18   his professional career." Did you provide him with that
19   bio on you?
20      A. I provided my resume and information about me and
21   this was prepared for me.
22      Q. Okay. As to the time this memorandum was -- this
23   indicates that you were -- that you were at the time of
24   the -- at the time of -- this indicates that at the time
25   it was prepared you were employed with U.S. Bancorp; is

---

120

1   that fair to say?
2      A. Yes.
3      Q. Well, at the time this memorandum was prepared,
4   were you employed with U.S. Bancorp still?
5      A. I believe so. I don't remember the exact date.
6      Q. Was it actually -- I know it was dated March 17,
7   '03, but was it prepared March 17, '03?
8         MS. WRIGHT: No. Actually --
9   BY-MR. NEKVASIL:
10      Q. You don't know when this was prepared. Was it
11   prepared in 2002 or 2003, for example?
12      A. I do not because I had no role in this
13   preparation.
14      Q. At the time that this was prepared, were you
15   licensed with ONESCO?
16      A. No.
17      Q. You said no?
18      A. I don't think so, no.
19      Q. Now, are you -- I checked. I couldn't find it,
20   but it could be my error. It indicates in the last
21   paragraph that you were registered with the -- with the
22   SEC as the investment advisor.
23         Are you a registered investment advisor with the
24   SEC?
25      A. I am not.

---

121

1    Q. You're not?
2    A. I was when I was an employee at Bank of America.
3    Q. But Bank of America was the company that you were
4    with before you went to U.S. Bank; am I right?
5    A. Correct.
6    Q. That's a different bank?
7    A. Correct.
8    Q. And I think you were with U.S. Bank from 2000 to
9    2002; is that fair to say?
10   A. Sounds right.
11   Q. So if you were registered with the SEC as an
12   investment advisor, that registration would have ended
13   when you left Nations Bank in 1999?
14   A. It was still Bank of America then.
15   Q. I'm sorry. Bank of America. I apologize. Bank
16   of America.
17       So this is an inaccurate statement?
18   A. It is, but I didn't know it was. I -- again, I
19   got my securities licenses only as a requirement of my
20   employment. Getting a designation was also something
21   that the banks wanted all of the -- all of us in our
22   department to do. And so I took the exams. I had the
23   designation. To be perfectly honest, I didn't know the
24   scope of what it meant or that it required additional
25   appointments or licensing or anything. I had the

---

122

1    designation and that's -- so I thought once you're an
2    RA, you're always an RA.
3    Q. When you joined ONESCO, did you know more about
4    the industry than you know now?
5    A. No.
6    Q. You weren't more knowledgeable back then, were
7    you?
8    A. I was only knowledgeable to the degree that I was
9    able to pass the exams.
10   Q. Okay. Did you ever review this memorandum?
11   A. Only briefly. Norman Reynolds, being the expert,
12   I relied on him to make sure everything was done
13   correctly.
14   Q. Did you read every page of this memorandum ever?
15   A. I'm sure I did at some point, but I couldn't say
16   when, and I wouldn't remember hardly any of it.
17   Q. You just said, of course, did you not, that the
18   information about your background, you being the manager
19   of this fund, was important to investors; would you not
20   agree with that?
21   A. Sure.
22   Q. Let's put this book aside and go to Volume 3, Tab
23   E now. Now, I have a brief question about the claimant.
24   Now, Mr. Pracht.
25       MR. PRACHT: Yes.

---

123

1        MR. NEKVASIL: No. The question is for him.
2    You'll have plenty of time to talk later, sir.
3    BY MR. NEKVASIL:
4    Q. You would agree on E-1 that Mr. Pracht signed a
5    document affirming his subscription on May 11th, 2004,
6    did you receive this document?
7    A. Yes.
8    Q. Now, would you not agree in looking at E-2 that
9    Mr. Pracht used IRA monies to an IRA account would
10   establish him with First Trust Company of Onaga?
11   A. Yes.
12   Q. Who set up that account?
13   A. I referred all of the investors to the respective
14   trustees to set up their own account. I couldn't set it
15   up for them.
16   Q. Okay. You were the one with the relationship
17   with First Trust Company of Onaga? You established a
18   relationship with them?
19   A. Correct. I'm the one who referred them.
20   Q. Did you request that First Trust Company of Onaga
21   list its asset as an IRA account approved asset?
22   A. Yes.
23   Q. And you obtained their approval?
24   A. Correct.
25   Q. Reese was not involved at all in that process or

---

124

1    was he?
2    A. He wasn't involved in this process, but I think
3    that this trust company was a name he gave me as someone
4    who might be a prospective custodian.
5    Q. He may have referred you to them?
6    A. Right.
7    Q. Now, you mentioned that there was an insurance
8    coverage option. If you'll turn to Page E-13.
9    A. Yes.
10   Q. Did you receive this page from Mr. Pracht?
11   A. I did.
12   Q. In it he's both requesting and declining the
13   coverage?
14   A. Yes.
15   Q. Did you -- did you understand from this page
16   exactly what he wanted?
17   A. No.
18   Q. Did you ask him about it?
19   A. I don't recall. I'm sure I did because I
20   couldn't give it to him one way or the other without it.
21   Q. Well, for those investors who requested insurance
22   coverage, did they receive some sort of a certificate
23   from you or some sort of a, I guess, evidence that they
24   would have this insurance coverage?
25   A. No. Because, number one, the fund was not

---

### 125

1  effective.
2      Q.  I understand.
3      A.  And until it became effective and the insurance
4  coverage has been acquired, there was no means by which
5  to do that and that didn't happen.
6      Q.  Did you keep any records of which investors
7  requested insurance coverage and who didn't?
8      A.  Oh, yes.
9      Q.  Was this the record or was there some internal
10  record that you kept on your own?
11      A.  There was an internal record of who -- initially
12  of who wanted it.
13      Q.  Well, how did you ultimately classify Mr. Pracht?
14  Did you classify him as someone who wanted insurance or
15  someone who didn't?
16      A.  I don't remember.
17      Q.  Did you ever classify him?
18      A.  I don't remember that either.  My thinking is
19  that I would have unless I heard from him, otherwise,
20  and got other confirmation that he wanted the coverage
21  as opposed to not wanting it.
22      Q.  Why?
23      A.  Because I just would rather error on the side if
24  I didn't have confirmation of having him elected rather
25  than not elected and wanted it.  But all of it would

---

### 126

1  have been reconfirmed at the time the insurance was
2  acquired.
3      Q.  I'll direct your attention to E-184.  Well,
4  actually, E-2.  Actually, I have a question for you.
5          If you turn to E-75 first, I'm going to ask you
6  did you receive this document from Mr. Pracht?
7      MS. WRIGHT:  What page?
8      MR. NEKVASIL:  E-75.
9      THE WITNESS:  Yes.
10  BY-MR. NEKVASIL:
11      Q.  Did you receive Page E-75 from Mr. Pracht?
12      A.  I believe so.
13      Q.  Whose handwriting -- whose number is that under
14  Mr. Pracht, the 410-213-2240?  Whose handwriting is
15  that?
16      A.  I don't know.
17      Q.  Not yours?
18      A.  No.
19      Q.  Now, let's go to Page E-284.
20      A.  This is --
21      Q.  Would you agree that this is a subscriber's page
22  from Mr. Blandi, one of the claimants in this case?
23      A.  Yes.
24      Q.  Did you receive this page?
25      A.  Yes.

---

### 127

1      Q.  This page asks certain questions designed to
2  determine whether he's an accredited investor or not,
3  would you agree?
4      A.  Yes.
5      Q.  Asked him for his annual income, net worth and
6  asked him if he's an accredited investor?
7      A.  Yes.
8      Q.  Did you take any steps to verify these
9  disclosures with him?
10      A.  No.
11      Q.  Did you have any procedure to verify the
12  disclosures that any of the investors made concerning
13  whether or not -- did you have a petition to verify any
14  disclosures that any of the investors made with response
15  to these particular questions on Page E-284?
16      A.  No.
17      Q.  And this was your -- were these the only
18  questions you asked to determine whether or not they
19  were accredited?
20      A.  I believe so.
21      Q.  Based upon these disclosures, would you have
22  labeled Mr. Blandi as an accredited investor?
23      A.  Yes.
24      Q.  Now, if you go to Page E-184, did you send this
25  letter to Mr. Blandi?

---

### 128

1      A.  Yes.
2      Q.  What does this letter say?
3      A.  It says, "I'm confirming that he is not an
4  accredited investor."
5      Q.  Okay.  Well, what led to this?  I mean, he sends
6  you a paper, which on its face, according to you, would
7  state that he is an accredited investor, then you're
8  letter is saying he's not?
9      A.  Must have been a conversation.
10      Q.  About?
11      A.  About him -- with him about him not being an
12  accredited investor.
13      Q.  Was there an explanation, then, concerning why
14  those entries were on the form?
15      A.  Which entries?
16      Q.  About his net worth, his income?
17      A.  No.  I didn't -- wasn't concerned about it
18  because the fund allowed for a percentage of
19  nonaccredited investors.  So if he misstated his --
20  being an accredited investor or as long as there was
21  still room for a nonaccredited investor it was not an
22  issue.
23      Q.  Now, after you sent -- or the investors were sent
24  to you by Reese and you sent out the memorandum and you
25  closed the deal, as you indicated yesterday, was Reese

## 129

1  supposed to play anymore role in your dealings with your
2  investors?
3      A.  No.
4      Q.  Was their only future contact supposed to be
5  directly with you?
6      A.  Correct.
7      Q.  Go to 185, please.  This is an e-mail from you to
8  Mr. Blandi.  Do you agree, on the top of 185?
9      A.  Yes.
10     Q.  And it mentions a JA in customer service?
11     A.  Uh-huh.
12     Q.  And if you go to Page 208, wiring instruction, it
13  mentions a JA in customer service?
14     A.  Yes.
15     Q.  Who is that JA?
16     A.  There was no JA.  JA was me.  I was the customer
17  service person.
18     Q.  Why did you put the initials JA instead of your
19  initials?
20     A.  To provide the appearance of staff.
21     Q.  Was there a staff?
22     A.  No.
23     Q.  Did you ever tell -- did you ever tell the
24  investors that you had no staff?
25     A.  No.

## 130

1      Q.  So all e-mails that were sent out that have
2  Lancorp Financial Fund Business Trust, the sender, are
3  those all e-mails from you?
4      A.  Yes.
5      Q.  No other person?
6      A.  No.
7          MR. NEKVASIL:  We're almost done.  If you
8  can bear with me.  I try to take seriously your request
9  to try and finish by lunch, that would be a good
10  breaking point.  And I will comply with that.
11  BY-MR. NEKVASIL:
12     Q.  If you can please turn to Volume 6, Tab S.  Okay.
13  Before the Lancorp Financial Fund money, let's go to
14  Page S-11.  Your Lancorp Financial Fund -- Fund -- your
15  Lancorp Financial Fund Business Trust fundraising
16  efforts began in 2003, would you agree?
17     A.  Yes.
18     Q.  Before the money moved in ONESCO -- before the
19  money, excuse me, moved to Tricom, did you maintain an
20  account at U.S. Bancorp Piper Jaffray?
21     A.  Yes.
22     Q.  In the name -- in the name of this fund?
23     A.  Correct.
24     Q.  And were the investor monies that were received
25  in 2003, were they put in that account?

## 131

1      A.  Yes.
2      Q.  Were all of them put in an account or just some
3  of them?
4      A.  All monies received on behalf of the investors
5  were placed into the account.
6      Q.  And did they go from there to Bank of America and
7  then at Tricom?
8      A.  Yes.
9      Q.  And this account that appears on Page 11, is this
10  the account that was set up?
11     A.  Yes.
12     Q.  And what -- were the brokers on the account King
13  & Chikowski [phonetic]?
14     A.  Yes.
15     Q.  Did you tell them in April of 2 -- wasn't U.S.
16  Bancorp an affiliate of U.S. Bank that had fired you in
17  2002?
18     A.  Piper Jaffray was a wholly owned entity of U.S.
19  Bancorp.
20     Q.  And wasn't that an affiliate of U.S. Bank, which
21  fired you in 2002?
22     A.  Yes.
23     Q.  Did you tell King & Chikowski, by the way, I was
24  fired in 2002 for my involvement with Gary McDuff and
25  now I'm doing this Lancorp fund with him in 2003?  Did

## 132

1  you tell him that?
2      A.  No.
3      Q.  Did you tell him any of the circumstances
4  surrounding your termination?
5      A.  No.
6      Q.  Did they know it, in your opinion?
7      A.  No.
8      Q.  Looks like you maintained this account.  If you
9  go to Page 27, you maintained this account until August
10  of 2003 and then it was closed, do you agree?
11     A.  Yes.
12     Q.  Was it your intent when you opened this account
13  to keep the money in this account at U.S. Bancorp until
14  you reached the 5 million minimum?
15     A.  Yes.
16     Q.  In fact, these brokers signed an agreement to
17  serve as the escrow agent for that People's Avengers
18  Fund, which never came off the ground; is that not fair
19  to say?
20     A.  Correct.
21     Q.  Did they sign such an agreement with respect to
22  the Lancorp Financial Fund?
23     A.  No.  I made the determination that a specific
24  escrow account wasn't necessary, that simply setting up
25  a brokerage account in the name of the fund would

133

1  suffice.
2      Q.  At least as of the beginning of April 2003,
3  okay -- August 2003, your plan was to continue to keep
4  this escrow account --
5      A.  Yes.
6      Q.  -- or business account for Lancorp Financial and
7  Business Trust with U.S. Bancorp and Piper Jaffray until
8  you reached a minimum?
9      A.  Correct.
10     Q.  But at the end of August the account was
11 terminated; is that not fair to say?
12     A.  Yes.
13     Q.  Your plans changed?
14     A.  Plans didn't change, just the banks where the
15 money was held changed.
16     Q.  Well, the money got moved out.  The account got
17 closed?
18     A.  Yes.
19     Q.  Why?
20     A.  Because I had been interviewed by -- I don't
21 remember what -- it was some on-line service about the
22 filing of the People's Avenger Fund and it was
23 questioned about the investment profile and the like,
24 and whatever report that person put on-line evidently
25 was picked up by the compliance department with

134

1  Lancorp's name on it, and they -- and they were
2  instructed to not deal with the fund.
3      Q.  It was picked up by the compliance department of
4  U.S. Bancorp Piper Jaffray, right?
5      A.  I believe so.
6      Q.  That's the same broker/dealer that you were
7  registered with that terminated you when you were fired
8  by U.S. Bank, right?
9      A.  Correct.
10     Q.  That was one of your employers during the three
11 years -- three years preceding your employment at
12 ONESCO, right?
13     A.  Correct.
14         MR. NEKVASIL:  I need a minute to grab a
15 document, so maybe this -- do you need to change the
16 tape now?
17         VIDEOGRAPHER:  The time is 12:17 p.m.  This
18 concludes Tape Number 2.  We're now off the video
19 record.
20         (Off the record.)
21         VIDEOGRAPHER:  The time is 12:19 p.m.  This
22 begins Tape Number 3.  We're back on the video record.
23 BY-MR. NEKVASIL:
24     Q.  What specific -- so are you saying that the
25 compliance department required that your account be shut

135

1  down?
2      A.  That was the general upshot that I got from the
3  brokers.
4      Q.  The two brokers?
5      A.  Yes.
6      Q.  What -- what specifically did they tell you?
7      A.  Just that they had been notified of some issue
8  with compliance regarding information that was found on
9  the Internet, and they had been asked to have me close
10 the account.
11     Q.  And the information on the Internet related to
12 you; is that not fair to say?
13     A.  It related to information -- yeah, well, to me
14 and information I discussed with whoever this reporter
15 was.
16     Q.  December 2004, the money was back at Bank of
17 America and sat without earning interest in the 9
18 million plus at Tricom for many months, no deals had
19 been done.
20     A.  Correct.
21     Q.  Were investors getting frustrated?
22     A.  Yes.
23     Q.  December 2004, you sent out a letter that if
24 people want their money back, you would give it to them?
25     A.  Yes.

136

1      Q.  Did several people take you up on it?
2      A.  Yes.
3      Q.  And did you return their money?
4      A.  Yes.
5      Q.  Did you refuse to return anyone's money in
6  December of 2004?
7      A.  No.
8          MS. WRIGHT:  Approximately how much did you
9  return?
10         THE WITNESS:  I don't remember.  It wasn't a
11 substantial amount relative to the total.
12 BY-MR. NEKVASIL:
13     Q.  Did any of the investors -- when you sent out the
14 letter in December of 2004, you were not aware, I take
15 it, of the Pennsylvania inquiry?
16     A.  No.
17     Q.  Therefore, you did not -- it's not in the letter,
18 but you didn't mention it orally to anybody?
19     A.  No.
20     Q.  Did any of the investors who requested their
21 money back after receiving a December of 2004 letter
22 indicate that they were aware of this Pennsylvania
23 investigation?
24     A.  No.
25     Q.  You received a U-5 from ONESCO, they sent you --

## 137

1  they terminated you and didn't they send you a copy of
2  your U-5?
3    A.  Yes.
4    Q.  Did you look at it when you received it?
5    A.  Yes.
6    Q.  Sir, we're almost done.
7      MR. NEKVASIL:  I believe I have only one or
8  two questions left, but I really -- I really am
9  concerned about -- I know we wanted a clean break for
10 lunch.  I'm concerned about tendering the witness.
11     MR. CHAIRMAN:  Don't be.  You go ahead and
12 ask your questions.  If something important comes up
13 later, I'll let you ask it.
14     MR. NEKVASIL:  Okay.
15 BY-MR. NEKVASIL:
16   Q.  Volume 4, Tab J.
17     MR. NEKVASIL:  If the panel will turn to
18 Page 184, the very last page.
19     MR. CHAIRMAN:  Last page again?
20     MR. NEKVASIL:  Yeah.  The last page again.
21 BY-MR. NEKVASIL
22   Q.  In the first paragraph it references that a copy
23 of your U-5 termination report was enclosed with the
24 letter, right?
25   A.  Yes.

## 138

1    Q.  If you'll turn with me to Page J-159 -- well,
2  actually, I have the wrong page here.
3      MR. CHAIRMAN:  159 is a U-5.  I don't know
4  which one you want.
5      MR. NEKVASIL:  No.  That's an amendment,
6  Mr. Chairman.  Okay.  It would be Page 137.  I'm sorry,
7  Mr. Chairman.  The other one was an amendment later.
8      MR. CHAIRMAN:  Okay.
9  BY-MR. NEKVASIL:
10   Q.  If you look at Pages 137 through 140, is this a
11 copy of the U-5 that you received?
12   A.  Yes.
13   Q.  And all of the answers are reflected, no.  Do you
14 agree?
15   A.  Yes.
16   Q.  I think we're in 7-A.  Did you see where it says
17 investigation disclosure?
18   A.  Yes.
19     MR. NEKVASIL:  It's on Page 138,
20 Mr. Chairman.  The number is 7-A.  Do you see that?  It
21 says, "Currently is or a termination was (inaudible)
22 subject of an investigation or proceeding by a domestic
23 or foreign governmental body or (inaudible) organization
24 businesses."  The question was answered, no.  Would you
25 agree?

## 139

1    A.  Correct.
2    Q.  There's no reference to any Pennsylvania
3  investigation in this U-5, is there?
4    A.  No.
5    Q.  Under 7-B, "Internal Review Disclosure,"
6  currently is or a termination was individual under
7  internal review for fraud or wrongful taking of property
8  or violating investment-related statutes, regulations,
9  rules" --
10     MR. LITTLE:  I don't think the court
11 reporter can pick up any of that.
12     MR. LUKOWSKI:  The document speaks for
13 itself.  You have to ask the witness what the document
14 says.
15 BY-MR. NEKVASIL:
16   Q.  There's no indication with respect to 7-B that
17 you were under any internal review at the time of your
18 termination, is there?
19   A.  No.
20   Q.  Did you receive any other -- any other
21 notification from ONESCO other than this U-5 when they
22 sent you your termination letter?
23   A.  Yes.  I received a letter requesting return of
24 materials and to pay a termination fee.
25   Q.  Did you do that?

## 140

1    A.  I did.
2    Q.  Obviously -- last question.  And your date of
3  termination was January 3, 2005, is that fair to say, if
4  you look at the top of 138?
5    A.  Yes.
6      MR. NEKVASIL:  Mr. Chairman, I have -- I
7  have no further -- actually -- well, actually one last
8  question, Mr. Chairman.
9  BY-MR. NEKVASIL:
10   Q.  Going back to 137 where it says, "Reason for
11 termination.  Terminated with prior company."  Prior to
12 January 3, 2005, did you receive any notice that you
13 were terminated by Ohio National Life Insurance Company?
14   A.  Not that I recall.
15   Q.  Anyone ever tell you that you were terminated for
16 lack of production?
17     MR. NEKVASIL:  Mr. Chairman, no further
18 questions.  Again, if I missed something that's
19 important, if you would give me that discretion down the
20 road to ask it.  It doesn't have to be right away after
21 lunch.  It could be during a redirect.
22     MR. CHAIRMAN:  I'll give both people that
23 option as long as it's not abused.
24     MR. GOODMAN:  Mr. Chairman, the only
25 issue -- I know we're about to go to lunch -- is this,

---

141

1  and I'm -- Mr. Little and I agreed to split the cost of
2  airfare, housing costs to have Mr. Lancaster here. We
3  both wanted him here. So it's a split cost. And his
4  original plans, flight plans were to return this
5  afternoon and obviously we know we're going into
6  tomorrow, but like all things, you got to call the
7  airlines. And given that I need some indication from
8  Mr. Little when he'll be done so I can rebook. I mean,
9  you can only -- you can rebook -- at some point we just
10  got to know, and I think this is a good time since his
11  flight was scheduled to leave at 6:00.
12       MR. CHAIRMAN: Did ya'll buy full price
13  tickets?
14       MR. GOODMAN: Full price --
15       MS. WRIGHT: Where are you flying to?
16       THE WITNESS: Portland.
17       MR. CHAIRMAN: There's probably only two
18  flights available anyway.
19       MS. WRIGHT: Yeah.
20       MR. CHAIRMAN: We can go off the record.
21       VIDEOGRAPHER: The time is 12:29 p.m. We're
22  now off the video record.
23       (Thereupon, a break was taken.)
24       VIDEOGRAPHER: The time is 1:35 p.m. We're
25  back on the video record.

---

142

1       MR. CHAIRMAN: Mr. Little, if you would like
2  to proceed with the cross-examination, please go ahead.
3       EXAMINATION.
4  BY-MR. LITTLE:
5       Q. Thank you.
6       For purposes of the record, this is Marion Little
7  representing ONESCO.
8       Mr. Lancaster, if you would turn to Tab 1 in the
9  notebook that is in front of you, and first turn to the
10  exhibit -- you'll notice in the lower right-hand corner
11  it's marked Respondent's Exhibit Number 1. If you turn
12  behind Tab 1, you'll find Exhibit Number 1. There you
13  go.
14       And you recognize that as a draft of a form in
15  two filings for the People's Avenger Fund Business
16  Trust --
17       A. Correct.
18       Q. -- this was a document that was going to be
19  submitted to the Federal Securities & Exchange
20  Commission?
21       A. Yes.
22       MR. NEKVASIL: Mr. Chairman, again, I'm
23  going to -- Respondent's counsel made a big point about
24  leading questions. Even though he's on
25  cross-examination this was their broker.

---

143

1       MR. CHAIRMAN: He's just setting the
2  preliminary stuff down. Don't go into a fight yet.
3       MR. NEKVASIL: Okay.
4  BY-MR. LITTLE:
5       Q. And this was an effort by you to register a
6  public fund with the SEC, correct?
7       A. Correct.
8       Q. Your legal counsel at that point in time was
9  Norman Reynolds?
10       A. Correct.
11       Q. And he is -- his name and address is reflected on
12  the first page of the document?
13       A. Yes.
14       Q. And in addition you were also identified as the
15  agent for service with respect to this offering?
16       A. Yes.
17       Q. And the address there is the address that you
18  held in Oregon at that point in time?
19       A. Correct.
20       Q. And also the same address you lived at in Oregon
21  in 2004?
22       A. Yes.
23       Q. The -- if we turn to the third -- excuse me, the
24  page of the exhibit marked Receiver 03248, and you see a
25  description of the lower right-hand corner what's been

---

144

1  marked 03248. Have you found that?
2       A. Okay.
3       Q. You see there a description of what was going to
4  be the criteria for the debt securities being offered as
5  part of this offering?
6       A. Yes.
7       Q. And that is similar to what was also the criteria
8  for the Lancorp Business Fund Trust?
9       A. Correct.
10       Q. If we then look at the middle paragraph, it's
11  going to be the fourth one from the bottom where it
12  says, "We are selling a minimum of 200 priority units
13  for $5 million and a maximum of 60,000 priority units
14  for $1.5 million;" do you see that?
15       A. Yes.
16       Q. And it also references that these priority units
17  were going to be offered through U.S. Bancorp Piper
18  Jaffray as an underwriter?
19       A. Yes.
20       Q. And as part of the proposed offering of that for
21  the People's Avenger Fund, your expectation was that
22  U.S. Bancorp Piper Jaffray would, in fact, serve as the
23  underwriter for the entire offering, was it not?
24       A. Yes.
25       Q. And if you turn to the page marked 03249, you see

## 145

1 (inaudible) in the middle of the page U.S. Bancorp Piper
2 Jaffray?
3    A. Yes.
4    Q. Now, as part of this public offering, it was your
5 expectation then that there would be a broker/dealer
6 associated with this?
7    A. Yes.
8    Q. And just in terms of some other preliminary
9 information about this fund, if you turn to the page
10 that is marked Receiver 03252, just to walk the panel
11 through this a little bit, where it says, "Information
12 Regarding the Fund," what was identified as the fund's
13 address?
14    A. My home address.
15    Q. And then if we could next turn to the page that
16 is marked Receiver 03257, please. Where it says,
17 "Limited Operating History," who is identified as the
18 trustee for the People's Avenger Fund?
19    A. I am.
20    Q. And when we look at the -- under the heading
21 "Irrevocable Subscriptions," does it indicate that the
22 methodology by which an investor would purchase an
23 interest in this fund would be pursuant to an
24 irrevocable subscription agreement?
25    A. Yes.

## 146

1    Q. And, in fact, a similar approach was followed
2 with respect to Lancorp Business Fund Trust, was it not?
3    A. Correct.
4    Q. Now, if we turn to the page marked RAC 03259 and
5 we look under the heading "Subscription Procedures," to
6 whom were the investors to draft their checks?
7    A. U.S. Bancorp Piper Jaffray.
8    Q. For the benefit of the People's Avenger Fund
9 Business Trust?
10    A. Correct.
11    Q. The checks would not have been prepared for --
12 excuse me -- issued to any limited liability company
13 that you own, correct?
14    A. Correct.
15    Q. It would have been to the broker/dealer?
16    A. Correct.
17    Q. Now, if we look, then, at that page marked RAC
18 03260, please, under the heading "General," and, again,
19 it indicates that you were the one who actually formed
20 the People's Avenger Fund Business Trust, correct?
21    A. Correct.
22    Q. Sir, this particular fund ultimately was not
23 successful, was it?
24    A. Correct.
25    Q. You were unsuccessful in having it registered

## 147

1 with the Securities Exchange Commission?
2    A. Correct.
3       MS. WRIGHT: Excuse me. You were or you
4 were not?
5       MR. LITTLE: You were unsuccessful.
6       MS. WRIGHT: You were unsuccessful?
7       THE WITNESS: Correct.
8       MR. NEKVASIL: Why would -- why did it not
9 go forward? There could be many reasons --
10       MR. CHAIRMAN: You can have a chance to
11 follow-up.
12       MR. NEKVASIL: He is their former broker. I
13 know he's in cross, but these are all --
14       MR. CHAIRMAN: I know, but you can ask that
15 question when he finishes or if he doesn't ask it first,
16 but we don't interrupt.
17       MR. NEKVASIL: Sir, I was simply yesterday
18 very limited in the form of the questions that I could
19 ask at Respondent's request.
20       MR. CHAIRMAN: Partly because you're on the
21 record.
22       Go ahead.
23       MR. LITTLE: Thank you. Mr. Chairman, let
24 me proceed.
25 BY-MR. LITTLE:

## 148

1    Q. With respect to the efforts that were undertaken
2 in this, it was Gary McDuff that asked you to
3 participate in the People's Avenger Fund?
4    A. Correct.
5    Q. And the concept was that you would manage the
6 fund yourself?
7    A. Yes.
8    Q. And that you would be the one responsible as to
9 whether the fund invested or elected not to invest in a
10 particular investment, correct?
11    A. Correct.
12    Q. And the reason that Mr. McDuff communicated to
13 you in this concept is that there was, as he represented
14 to you, a similar fund in England that had the name
15 Avenger's Trust Fund that was in the process of being
16 wound down?
17    A. Correct.
18    Q. And the concept was that these investors who
19 participated in that fund would migrate from it to the
20 fund that you would then manage?
21    A. Correct.
22    Q. Now, if we then look at the page of Exhibit 1
23 that is marked 03273, and I take it that it was
24 indicated that you had served as the chairman of the
25 board of this particular trust?

## 149

1    A. Correct.
2    Q. And if we turn to the very next page, which has
3  the Bates stamped -- Bates stamp -- excuse me -- RAC
4  03274, you in addition would have served as a
5  chairman -- the chairman, chief executive officer and
6  president of this trust?
7    A. Correct.
8    Q. And the concept is to the extent the trust had an
9  employee, that would be you?
10   A. Correct.
11   Q. Now, if we turn to Tab 2 of Respondent's exhibits
12 and if you would look at Exhibit 2, that is a
13 certificate of the business trust indicating that the
14 People's Avenger business trust was actually formed
15 on December 9th, 2002, right?
16   A. Correct.
17   Q. And that that was filed with the Secretary of
18 State for the State of Nevada?
19   A. Yes.
20   Q. I take it that at no point in time did the State
21 of Nevada indicate to you that there were any issues as
22 to the appropriateness of this trust?
23   A. No.
24   Q. Now, there were also a number of other documents
25 that would have been created incidental to the formation

## 150

1  of this trust?  For example, if you turn to Respondent's
2  Exhibit Number 5.
3     As part of the preparation for moving forward
4  with the People's Avenger Business Fund Trust, there was
5  actually drafts of a certificate of trust for you, was
6  there not?
7    A. Yes.
8    Q. And in each case you would have been identified
9  as the trustee?
10   A. Correct.
11   Q. And Respondent's Exhibit 5 is a copy of one of
12 such drafts in the certificate of trust for the People's
13 Avenger Fund Business Trust, is it not?
14   A. Correct.
15   Q. In fact, in terms of all the documentation that
16 you saw with the People's Avenger Fund Business Trust, I
17 take it you would have been the signatory for all of
18 those documents?
19   A. Yes.
20   Q. That is, for example, there were not any other
21 employees or agents of that trust, to your knowledge,
22 that would have exercised any type of signature
23 authority?
24   A. Correct.
25   Q. Now, if we then look at Exhibit 6, please,

## 151

1  Respondent's Exhibit 6, is this a copy of a draft
2  agreement and declaration of trust of the People's
3  Avenger Fund Business Trust?
4    A. Yes.
5    Q. And it says at the top that we're talking about
6  it being in Portland, Oregon; is that correct?
7    A. Correct.
8    Q. And the time frame here is December 2002, right?
9    A. Correct.
10   Q. And, again, you were identified as the trust?
11   A. Yes.
12   Q. Now, if we could then turn to Respondent's
13 Exhibit Number 7.  This is the first amended agreement
14 and declaration of trust in the People's Avenger Fund
15 Business Trust, is it not?
16   A. Yes.
17   Q. And this shows that there's still activity
18 occurring in the month of December 2002 as it related to
19 this proposed trust?
20   A. Correct.
21      MR. CHAIRMAN:  Mr. Little, are you going to
22 be just reiterating that he's the only guy that's
23 involved with this program?
24      MR. LITTLE:  No.  There's some important
25 dates we're going to focus on.

## 152

1      MR. CHAIRMAN:  Okay.
2  BY-MR. LITTLE:
3    Q. So in terms of the dates that are referenced in
4  the first awareness clause, there is a date of December
5  7th, is there not?
6    A. Yes.
7    Q. And then the second awareness clause is December
8  9th?
9    A. Yes.
10   Q. And is it fair to say that during the months of
11 December 2002 as both the president and chief executive
12 officers as well as the trustee of the People's Avenger
13 Trust, you were still actually trying to form that
14 entity?
15   A. Yes.
16   Q. That would have included, if you look at
17 Respondent's Exhibit A, the drafting of a -- excuse me.
18 A.
19   A. A.
20   Q. A drafting of a charter of the audit committee of
21 a board of directors of the People's Avenger Business
22 Fund -- Business Fund Trust?
23   A. Yes.
24   Q. This is a document that you would have had
25 assistance in drafting?

## 153

1    A. Yes.
2    Q. Now, if we look then at Respondent's Exhibit 9 in
3  terms of the evolution of this particular trust in the
4  December 2002 time frame, it would have also included
5  the drafting of bylaws; is that right?
6    A. Yes.
7    Q. And these are bylaws that would have been put in
8  place or was anticipated being in place in at least no
9  later than December of 2002?
10    A. Yes.
11    Q. If we then look at Exhibit 10, please, we talked
12  a little bit about this earlier, but the form of
13  document that an investor would sign in order to reflect
14  the investor's intent to purchase an interest in that
15  trust would have been by execution of a subscription
16  agreement?
17    A. Correct.
18    Q. And Respondent's Exhibit 10 is an example of that
19  type of subscription agreement?
20    A. Yes.
21    Q. And the -- just so we're clear, the entity with
22  whom the investor would have been contracting with would
23  have been the People's Avenger Fund Business Trust?
24    A. Correct.
25    Q. Now, there were some questions about this subject

## 154

1  earlier, so let's go to Respondent's Exhibit 11, please.
2    Is this a letter of -- excuse me, a fax of
3  February 7th, 2003 from you to Norman Reynolds?
4    A. Yes.
5    Q. And, again, he's the attorney who was assisting
6  both with respect to the People's Avenger Fund as well
7  as ultimately Lancorp Business Fund Trust?
8    A. Correct.
9    Q. If we look at the second page of the exhibit
10  there and the Bates stamp 07051, this is a proposed
11  escrow agreement for the People's Avenger Fund Business
12  Trust, is it not?
13    A. Correct.
14    Q. And the trust agreement would have been with U.S.
15  Bancorp?
16    A. Yes.
17    Q. This is after a date, I take it, in February 2003
18  in which you had been terminated from Piper Jaffray?
19    A. Yes.
20    Q. And if I understand it, at least through February
21  7, 2003, you are continuing to make efforts as it
22  relates to move forward with the People's Avenger Fund
23  trust?
24    A. Correct.
25    Q. And is it fair to say that through roughly

## 155

1  November of 2003 -- excuse me, 2002, through at least
2  February of 2003 the efforts to go forward with that
3  trust were ongoing?
4    A. Correct.
5    Q. Now, if we could then look at Respondent's
6  Exhibit Number 12. At some point in time the decision
7  was made to no longer go forward with the -- a publicly
8  registered trust?
9    A. Yes.
10    Q. And the decision was to go forward with a
11  nonregistered trust?
12    A. Correct.
13    Q. And the nonregistered trust would be the Lancorp
14  Financial Fund Business Trust, correct?
15    A. Correct.
16    Q. And am I right that Respondent's Exhibit 12
17  reflects that that trust was formed in the State of
18  Nevada on March 3, 2003?
19    A. Yes.
20    Q. And that was your intention to form it at that
21  particular point in time?
22    A. Yes.
23    Q. Now, if you could look at Respondent's Exhibit
24  13, please.
25    A. 13?

## 156

1    Q. Yes, please.
2    A. Okay.
3    Q. That is a copy of a declaration of trust for the
4  Lancorp Financial Fund Business Trust March 3, 2003, is
5  it not?
6    A. Yes.
7    Q. And if we look at the very last page of the
8  document that bears the Bates stamp Lancaster 1471, that
9  is your signature, correct?
10    A. Yes.
11    Q. And you are characterized as the initial trustee
12  for this particular trust document?
13    A. Yes.
14    Q. Is it fair to say that at all points in time you
15  were the only trustee of the Lancorp Financial Fund
16  Business Trust?
17    A. Yes.
18    Q. And that is true from March 3, 2003 until it's --
19  to the date it finally expired?
20    A. Yes.
21    Q. Now, in addition to serving as the trustee, you
22  were also an employee of the trust, were you not?
23    A. Yes.
24    Q. And if we could -- before we go on to the next
25  exhibit, still looking at Respondent's Exhibit 13

157

1  turning to Page Lancaster 1455, do you have that page in
2  front of you?
3      A. I do.
4      Q. In terms of the management of the trust, it says,
5  "The business and affairs of the trust shall be managed
6  by or under the discretion of the trustees," correct?
7      A. Yes.
8      Q. And so in terms of who would have the
9  responsibility for the business and affairs of the
10 Lancorp Business Fund Trust, that would have been you?
11     A. Correct.
12     Q. And if we could then turn to Respondent's Exhibit
13 14, is that a copy of a March 5, 2003 consent of board
14 of trustees in lieu of a special meeting of the board of
15 trustees for the Lancorp Financial Fund Business Trust
16 that you signed?
17     A. Yes.
18     Q. And as part of this, there was a resolution by
19 which you were elected as the chairman, president and
20 chief executive officer of the trust?
21     A. Correct.
22     Q. And then Larry Lancaster -- I take it, who is
23 your brother?
24     A. Yes.
25     Q. Was elected as the vice president and secretary

158

1  of the trust?
2      A. Correct.
3      Q. Other than yourself and your brother, were there
4  any other officers or trustees associated with the
5  Lancorp Financial Fund Business Trust at any point in
6  time?
7      A. No.
8      Q. If you could please then turn to Respondent's
9  Exhibit 15. One of the other documents that would have
10 been created with respect to the going forward on the
11 Lancorp Financial Fund Business Trust was a certificate
12 of trust?
13     A. Yes.
14     Q. And if we look to see -- what is the business
15 address that is provided for the trustee in Paragraph 3?
16     A. 400 West 8th Street, Suite 204, Vancouver,
17 Washington.
18     Q. And the later documents then made it clear it
19 should be in what state?
20     A. Washington.
21     Q. So at all points in time and all the documents
22 that were created with respect to the Lancorp Business
23 Fund Trust, did you use an address other than your
24 personal residence?
25     A. I don't think so.

159

1      Q. Look at Exhibit 16, please, Respondent's Exhibit
2  16. You also would have had bylaws of the Lancorp
3  Financial Fund Business Trust created?
4      A. Yes.
5      Q. And this is a copy of such bylaws?
6      A. Yes.
7      Q. Now, is it fair to say that incidental to you
8  moving forward in the Lancorp Business Fund Trust, that
9  in addition to an attorney, you would have engaged other
10 professionals?
11     A. Yes.
12     Q. So if we look at Respondent's Exhibit 17, can you
13 tell us whether that is a March 11, 2003 correspondence
14 by which you as the trustee are entering into an
15 engagement letter with an accounting firm?
16     A. Yes.
17     Q. And this would have been with respect to the
18 audit of the financial statements of Lancorp Financial
19 Fund Business Trust?
20     A. Correct.
21     Q. Because those audited financial statements would
22 have been attached to the private placement memorandum?
23     A. Yes.
24     Q. If we then look at Respondent's Exhibit 18, is
25 that a copy of the independent auditor's report that

160

1  Lancorp Financial Fund Business Trust received for the
2  trust as of March 10, 2003?
3      A. Yes.
4      Q. I take it, then, in terms of moving forward, by
5  March of 2003 the Lancorp Financial Fund Business Trust
6  was, from your perspective, prepared to move forward in
7  accepting subscription agreements?
8      A. Yes.
9      Q. And if we look at Respondent's 19, this is a copy
10 of the private placement memorandum for the Lancorp
11 Financial Fund Business Trust, is it not?
12     A. Correct.
13     Q. If we look in the very bottom of the page, it
14 says -- does it say the effective date of this
15 memorandum is March 17th, 2003?
16     A. Yes.
17     Q. And was that your understanding as to when the
18 trust was effective?
19     A. Yes.
20     Q. Now, if we could then look to see a couple things
21 relating to the activities of the trust. If you look at
22 the second page, it's marked 002, the concept of the
23 trust here is there would be no more than 100 investors?
24     A. Yes.
25     Q. And of those 100 investors no more than 35 could

---

161

1    be nonaccredited?
2        A.  Correct.
3        Q.  Did you make efforts to track whether you had the
4    number of accredited versus nonaccredited investors?
5        A.  Yes.
6        Q.  And during the time in which you were managing
7    the trust, can you tell us whether or not that
8    proportionality was maintained?
9        A.  Yes.
10       Q.  Now, if we look at the last -- second to the last
11   full paragraph on Page 2 of Respondent's Exhibit 19,
12   does that set forth the expectations as to the investors
13   who would be purchasing an interest in this trust?
14       A.  The highlighted portions at the bottom here?
15       Q.  Yes.
16       A.  Yes.
17       Q.  So to the extent a person was not an accredited
18   investor, did they, as part of the subscription process,
19   have to represent to you that they were sophisticated
20   and a well-informed investor?
21       A.  Yes.
22       Q.  And they were able to understand and utilize the
23   information contained in the private placement
24   memorandum?
25       A.  Yes.

---

162

1        Q.  And that they would have the knowledge and
2    experience and financial and business matters to
3    evaluate the merits and the risk of this investment?
4        A.  Yes.
5        Q.  And they would also have to represent to you that
6    they had the financial strength and experience in the
7    transactions of this nature, correct?
8        A.  Correct.
9        Q.  To the extent an investor was unwilling to make
10   those representations, did you accept their subscription
11   agreements?
12       A.  If they were unwilling?
13       Q.  Yes.
14       A.  No.
15       Q.  So all the investors who purchased an interest in
16   the Lancorp Business Fund Trust made those
17   representations and you accepted them?
18       A.  Correct.
19       Q.  And that would include the claimants in this
20   case?
21       A.  Yes.
22       Q.  Now, if we could then turn to what is marked as
23   Page 12, Bates stamped Page 12 of Respondent's Exhibit
24   19, we'll go back to that in a moment.  Excuse me.
25           If you will turn your attention, then, first to

---

163

1    Page 41 of Respondent's Exhibit 19, as part of the
2    private placement memorandum, there were a number of
3    attachments that were provided to each of the
4    prospective investors?
5        A.  Yes.
6        Q.  And one of them would have been a subscriber data
7    sheet?
8        A.  Correct.
9        Q.  And then the introductions to the subscribers?
10       A.  Yes.
11       Q.  The purchase -- purchaser representative
12   questionnaire?
13       A.  Yes.
14       Q.  And accredited investor letter?
15       A.  Yes.
16       Q.  And a subscription agreement?
17       A.  Yes.
18       Q.  Would you have had the expectation of each the --
19   excuse me -- each of the investors returning those
20   documents to you as part of the purchase process?
21       A.  Yes.
22       Q.  And then if we could turn -- just to walk the
23   panel through this, turn to Page 43 of Respondent's
24   Exhibit 19, this is a example of the subscriber's data
25   sheet that you expected the investors to complete to

---

164

1    reflect their financial status?
2        A.  Yes.
3        Q.  And then if we went -- excuse me -- turn to Page
4    45 of the same exhibit.  One of the additional exhibits
5    here is -- excuse me -- enclosures is the instructions
6    of subscribers on how to specifically fill out these
7    forms?
8        A.  Yes.
9        Q.  And then if we turn to Page 47, 47 and 48 of
10   Respondent's Exhibit 19 is a two-page document that
11   would reflect or would require to the investors to
12   answer certain questions?
13       A.  Yes.
14       Q.  Exhibit -- excuse me, Page 50 of the same exhibit
15   would have been an accredited investor letter that to
16   the extent someone satisfied certain financial
17   requirements and had achieved the status of an
18   accredited investor, they could sign this letter?
19       A.  Yes.
20       Q.  And then that would be something that you would
21   factor in in terms of monitoring the ratios of the
22   investors in the particular trust?
23       A.  Correct.
24       Q.  And then, finally, if we look at the pages marked
25   52 through 56, that is the subscription agreement that

165

1  the investors would have to execute as a requirement to
2  purchasing an interest in the Lancorp Financial Fund
3  Business Trust?
4      A.  Correct.
5      Q.  Were there any exceptions made for the investors?
6      A.  Exceptions?
7      Q.  That is, did every investor have to execute this
8  document?
9      A.  Yes.
10     Q.  Were there any exceptions to that?
11     A.  Not to my knowledge.
12     Q.  And, to your knowledge, was -- were the terms of
13 this subscription agreement as found in Respondent's
14 Exhibit 19 ever amended and modified?
15     A.  No.
16     Q.  The interest that would have been purchased by
17 the customers would have been an interest in the Lancorp
18 Financial Fund Business Trust, correct?
19     A.  Correct.
20     Q.  Not any type of limited liability company?
21     A.  No.
22     Q.  Okay.  And if we look at the first page of the
23 subscription agreement, the address that they would have
24 sent this information would have been where?
25     A.  400 West End Street in Vancouver.

166

1      Q.  Okay.  And if we look in Section 1 under
2  "Subscription," the last sentence it says, "The shares
3  are being offered by the trust subject to the terms and
4  conditions of this confidential memorandum."
5          MR. CHAIRMAN:  Page?
6          MR. LITTLE:  I'm sorry, 52.
7          MR. CHAIRMAN:  Okay.
8          MR. LITTLE:  First paragraph.
9  BY-MR. LITTLE:
10     Q.  "The shares are being offered by the trust
11 subject to the terms and conditions of the confidential
12 memorandum in the subscription agreement, the
13 undersigned hereby here revoke with offers to purchase,"
14 then there's a blank, "shares and therefore tenders to
15 the trust," and then there's A through D.
16     Was it your expectation that when the investors
17 executed this agreement, that they would honor it?
18     A.  Yes.
19     Q.  Was it your expectation when the investors
20 executed this document, that they were making an
21 irrevocable agreement to purchase the shares listed in
22 the subscription agreement?
23     A.  Yes.
24     Q.  Now, let's then turn to Exhibit 20-A, please.
25 Again, your understanding is this was going to be

167

1  treated as an unregistered trust?
2      A.  Yes.
3      Q.  And it was your intention to file the requisite
4  Form D notice with the Securities Exchange Commission to
5  advise of a trust existence?
6      A.  Correct.
7      Q.  And at least initially you would have had Counsel
8  involved in that?
9      A.  Yes.
10     Q.  And the counsel involved would have been Norm
11 Reynolds?
12     A.  Correct.
13     Q.  If we look at the first page of 20-A, and that is
14 a copy of a letter you were copied on by Norm Reynolds
15 to the United States Securities and Exchange Commission?
16     A.  Correct.
17     Q.  Showing that the Form D for the Lancorp Financial
18 Fund Business Trust was submitted some time in May of
19 2003?
20     A.  Yes.
21     Q.  Now, if we could just look at the Form D that
22 follows that letter, and I'd like you to first turn to
23 the last page.  Does that -- sorry.  The third to the
24 last page.  The one that's marked Lancaster 2870.
25     A.  Yes.

168

1      Q.  And we see there that the issuer will be Lancorp
2  Financial Fund Business Trust, correct?
3      A.  Correct.
4      Q.  And the date you signed this was April 3, 2003?
5      A.  Yes.
6      Q.  Right?
7      Now, if we turn to Exhibit 20-B, another Form D,
8  is it clear there, if you look at the third page marked
9  Receiver 1780, that your signatures appear on this
10 document that's dated now May 9, 2003?
11     A.  Yes.
12     Q.  And, finally, if we look at Respondent's Exhibit
13 20-C, and turn to the third to the last page, which is
14 marked Receiver 1785, does that also bear your
15 signature, but it's dated May 16th, 2003?
16     A.  Yes.
17     Q.  Now, after one or more of these documents is
18 submitted to the Securities and Exchange Commission, I
19 take it, then, that you would have also caused your
20 counsel or done it yourself to file the Form Ds with the
21 various state divisions of securities?
22     A.  Correct.
23     Q.  So if we turn to Exhibit 21-A, is 21-A a copy of
24 a letter by your counsel, Norm Reynolds, in which you're
25 copied on to the State of New York Department of Law

169

1    Bureau of Investor Protection Securities, and in that
2    letter enclosing the original two copies of a Form 99
3    and a Form D?
4        A.  Correct.
5        Q.  And this would have been for the Lancorp
6    Financial Fund Business Trust?
7        A.  Correct.
8        Q.  I take it that from your prior testimony, to the
9    extent a purchaser in a particular state bought an
10   interest in a Lancorp Business Fund Trust, you would
11   have made a similar filing in each -- in every state?
12       A.  Yes.
13       Q.  So to the extent there was an investor in the
14   State of Pennsylvania you would have, in fact, made a
15   similar filing in the State of Pennsylvania?
16       A.  Yes.
17       Q.  With the Pennsylvania Division of Securities?
18       A.  Correct.
19       Q.  Now, if we could identify for the record a few
20   more exhibits.  Turning to Exhibit 21-B, is this a copy
21   of your counsel's letter, that is, Norm Reynolds, dated
22   April 7th, 2003 to the Department of Corporations in the
23   State of California, once again, enclosing the Form D?
24       A.  Yes.
25       Q.  And then if we turn to 21-C, is that a similar

170

1    letter by your counsel dated April 7th, 2003, this time
2    to the Florida Department of Financial Securities?
3        A.  Yes.
4        Q.  Just so we're clear, your counsel didn't submit
5    all these, but, rather, at some point in time you
6    started submitting them on your own?
7        A.  Yes.
8        Q.  Let's look at 21-D, then.  Is this a copy of the
9    Form D that your counsel would have submitted to the
10   Arkansas Securities Department in or about April 17th,
11   2003?
12       A.  I see the letter, but I don't see the filing.
13       Q.  Oh, I'm sorry.  Is this a copy of the cover
14   letter?
15       A.  Yeah.
16       Q.  Okay.  And then if we look at 21-E, is this a
17   copy of your counsel's letter to the Illinois Securities
18   Department dated April 7th, 2003, again, forwarding a
19   copy of the Form D for the Lancorp Financial Business
20   Fund Trust?
21       A.  Yes.
22       Q.  Looking at 21-F and G and H and I and J, are
23   those all letters by your counsel submitting these Form
24   Ds to various state divisions of securities?
25       A.  Yes.

171

1        Q.  Now, if we turn back we look -- excuse me -- and
2    we look at Exhibit 22-A -- have you found 22-A?
3        A.  Uh-huh.  Oh, 22, okay.
4        Q.  On some occasions the divisions of securities for
5    the various states had questions, did they not?
6        A.  Yes.
7        Q.  And what 22-A is is a copy of an April 16th, 2003
8    letter from your counsel, again, in which you're copied
9    on responding to certain questions raised by the Oregon
10   Department of Consumer and Business Services; do you see
11   that?
12       A.  Yes.
13       Q.  At any point in time, did any of the state
14   divisions of securities shut you down in any way?
15       A.  No.
16       Q.  Did any of them indicate that you could not do
17   business in their state?
18       A.  No.
19       Q.  Did the State of Maryland indicate that to you?
20       A.  I didn't -- yeah, something was -- there was
21   something about Maryland.  It was -- I don't remember
22   what it was.  It seemed to me like I also have a
23   subscription agreement from one state, and maybe it was
24   Maryland, that I rescinded and sent back.
25       Q.  Okay.  And let's go ahead and look at, if you

172

1    would, to yourself, 22-B, C, D, E, F and G, and if you
2    could verify for the panel these are copies of letters
3    sent by your counsel in which you're copied on to
4    various state divisions of securities reflecting
5    communications regarding the Lancorp Financial Fund
6    Business Trust.
7        A.  Yes.
8            MR. LUKOWSKI:  So B is from the Arkansas
9    Securities Department?
10   BY-MR. LITTLE:
11       Q.  Or correspondence from the agency to your
12   counsel?
13       A.  Yes.
14       Q.  Is that what those all are?
15       A.  Correct.
16       Q.  Now, at the time -- let's go back to Exhibit 19
17   for a moment.  The private placement memorandum, in
18   March of 2003, you were not -- you did not have your
19   license associated with any broker/dealer, did you?
20       A.  No.
21       Q.  And you did not believe you needed to be
22   associated with a broker/dealer to participate in this
23   private placement memorandum when it was issued in March
24   of 2003?
25       A.  Correct.

## 173

1    Q.   And I take it from your testimony you did not
2  believe you needed to be associated with a broker/dealer
3  at any point in time in order to participate in a
4  Lancorp Financial Fund Business Trust?
5    A.   Correct.
6    Q.   It's fair to say that when we look at
7  Respondent's Exhibit 19, that ONESCO's name does not
8  appear anywhere in that document?
9    A.   Correct.
10   Q.   And it's fair to say that in each of the
11 subscription agreements that the investors would have
12 executed, ONESCO's name does not appear?
13   A.   That's correct.
14   Q.   And it's also fair to say that at no point in
15 time did you share any form of documentation with any
16 investor that contained ONESCO's name, did you?
17   A.   I did not.
18   Q.   Now, if we look at Page 12 of the private
19 placement memorandum under "Internal Management," it
20 indicates "The trust will not be managed like a typical
21 closed-in investment company.  The trust will be
22 internally managed by the trustees and will not have a
23 separate investment advisor," correct?
24   A.   Correct.
25   Q.   And, in fact, if we then turn to the page that is

## 174

1  marked 17, in Respondent's Exhibit 19, the private
2  placement memorandum, it's made very clear at the top
3  that there will be no broker/dealer associated with this
4  private placement, correct?
5    A.   Correct.
6    Q.   And you never would have suggested to the
7  investors something different than what's set forth in
8  black and white in this private placement memorandum,
9  right?
10   A.   Correct.
11   Q.   You never would have suggested to them at any
12 time that there was a broker/dealer involved, correct?
13   A.   Correct.
14   Q.   You never would have suggested to them at any
15 point in time that ONESCO was involved in any way, would
16 you?
17   A.   Correct.
18   Q.   Now, if we then look, for example, at your
19 description on Page 20 of the private placement
20 memorandum, when we have the description that is found
21 there as to your professional background, is it fair to
22 say that you do not identify yourself as being currently
23 associated with any broker/dealer, do you?
24   A.   I do not.
25   Q.   In fact, what you emphasize in your description

## 175

1  is your experience in the banking industry; is that
2  correct?
3    A.   Correct.
4    Q.   And I take it that to the extent you spoke to any
5  investors, you didn't emphasize to them any of your past
6  licenses with the -- excuse me -- the NASD, did you?
7    A.   No.
8    Q.   Did you at any point in time ever indicate to a
9  broker that you were associated with the NASD?
10   A.   No.
11   Q.   Or that you held a license with the NASD?
12   A.   No.
13   Q.   Did any investor ever ask you whether you had a
14 license with the NASD?
15   A.   No.
16   Q.   None of the investors ever suggested to you that
17 it made any difference in their mind whether or not you
18 were associated with a broker/dealer, did they?
19   A.   No.
20   Q.   Now, if we look at -- going back to the People's
21 Avenger Fund, Tab 1, we'll just put it in contrast, and
22 turning to the -- the page with Bates stamp Receiver
23 03248, again, to put this in contrast, this is a
24 situation in which you anticipated having a
25 broker/dealer involved, right?

## 176

1    A.   Correct.
2    Q.   But when we flip back to Exhibit 19 in the
3  private placement memorandum for the Lancorp Business
4  Fund Trust, no such expectation?
5    A.   Correct.
6    Q.   If we then turn then back to 20-A, the Form D
7  filings, we have three different ones.  Looking at
8  Exhibit 20-A, turning to the page marked 2867, Lancaster
9  2867, who do you identify as the broker/dealer
10 associated with this Reg D filing?
11   A.   Not applicable.
12   Q.   So when the federal form asked you to identify a
13 broker/dealer, your answer was there was none?
14   A.   Correct.
15   Q.   If we look at the preceding page marked 2866,
16 this particular documentation identifies you as the
17 promoter -- beneficial owner, executive officer and
18 director of the Lancorp Fund Business Trust, does it
19 not?
20   A.   Yes.
21   Q.   It does not indicate that the L.L.C. is
22 associated with the trust in any way, does it?
23   A.   No.
24   Q.   And if we then turn, please, to 20-B, again,
25 let's look at the page marked Receiver 1 -- 01779, on

177

1  this different -- the form is dated on a different date.
2  Again, you have not identified any broker/dealer, have
3  you?
4      A.  I have not.
5      Q.  Look at 20-C, looking at the page marked Receiver
6  01784, again, no broker/dealer is identified?
7      A.  That would have been consistent on every filing.
8      Q.  And, in fact, in every filing made with the SEC,
9  you've held yourself out as being the chief executive
10  officer, the promoter, the beneficial owner, the agent
11  and the employee of this trust, did you not?
12     A.  Correct.
13     Q.  And, in fact, when all of these Reg Ds were then
14  sent out to the various state regulators, you would have
15  made the same representation, first, there's no
16  broker/dealer involved, correct?
17     A.  Correct.
18     Q.  And, two, you were the promoter, originator,
19  beneficial owner, employee and chief executive officer
20  of that trust?
21     A.  Yes.
22     Q.  Now, let's then turn our attention, please, to
23  Respondent's Exhibit 23.  Is that a copy of an August
24  12th, 2004 correspondence that you sent to a Glenn
25  Mitchell in Maryland?

179

1      Q.  And that's a time in which you were associated
2  with ONESCO?
3      A.  Yes.
4      Q.  So at the time you were associated with ONESCO it
5  was your belief that at no point in time would ONESCO
6  have any association with this trust, correct?
7      A.  Correct.
8      Q.  Is it fair to say that at no point in time did
9  you submit to ONESCO any of the subscription agreements
10  that had been executed by the investors?
11     A.  Correct.
12     Q.  And at no point in time did you remit to ONESCO
13  any of the monies you had collected with respect to
14  these investments?
15     A.  Correct.
16     Q.  And at no point in time did you open up any
17  customer accounts with ONESCO for the benefit of any of
18  the investors who purchased a unit in this trust?
19     A.  Correct.
20     Q.  One of the things that you would have at ONESCO
21  is something called a new customer account form?
22     A.  Yes.
23     Q.  And to the extent a customer was going to have a
24  relationship with ONESCO, you understood that the
25  customer would have to complete this customer account

178

1      A.  Yes.
2      Q.  And Mr. Mitchell, I take it, from the text of the
3  letter, had, in fact, previously purchased an interest
4  in the trust?
5      A.  Yes.
6      Q.  And what you're saying is when you had received a
7  notification from the securities division of the State
8  of Maryland that there must be a broker/dealer or
9  issuing agent that will effect transactions of the
10  securities in the State of Maryland, correct?
11     A.  Yes.
12     Q.  So what Maryland communicated to you is, you
13  could not sell any units in this trust in the State of
14  Maryland unless there was a broker/dealer involved?
15     A.  Correct.
16     Q.  And what you understood at that point in time is
17  that you had no broker/dealer involved?
18     A.  Correct.
19     Q.  And because you had no broker/dealer involved,
20  you told Mr. Mitchell you had to return his money?
21     A.  Correct.
22     Q.  And so we're clear, the date in which you told
23  him that there was no broker/dealer involved was August
24  12th, 2004?
25     A.  Correct.

180

1  form?
2      A.  Yes.
3      Q.  And that to the extent a security was being
4  transacted through ONESCO, you understood that
5  transaction would, in fact, have to be recorded first on
6  your blotter [phonetic] and then on the books and
7  records of ONESCO, did you not?
8      A.  Yes.
9      Q.  And none of the investors who purchased any
10  interest in the Lancorp Business Fund Trust ever
11  completed an ONESCO -- an ONESCO application, did they?
12     A.  Correct.
13     Q.  They never completed any type of suitability
14  determination that ONESCO would have otherwise required?
15     A.  Correct.
16     Q.  And they otherwise did not remit any monies made
17  payable to ONESCO?
18     A.  Correct.
19     Q.  All of the checks that would have been issued
20  would have been in the name, that is, by the issuer,
21  would have been in the name of the trust; is that
22  correct?
23     A.  Yes.
24     Q.  You can't think of any single reason why the
25  investors who bought an interest in this trust would

## 181

1   have any reason to believe ONESCO was involved, correct?
2        MR. NEKVASIL: I can't think of any single
3   reason why the investors would believe that. I asked --
4   I asked lots of questions about the investors' beliefs.
5   He objected. You sustained.
6        It's unfair for Respondent to object to
7   questions that I asked and then when you ask them -- and
8   then asked the same questions himself. I just want a
9   level playing field, Mr. Chairman.
10       MR. CHAIRMAN: What's the question again?
11       MR. LITTLE: It's a different question.
12       MR. NEKVASIL: Mr. Chairman, he said --
13       MR. CHAIRMAN: Just let him answer.
14       MR. LITTLE: It's a different question. He
15   would -- he kept asking questions about an investor's
16   state of mind, and I'm asking the question about whether
17   he's aware of any information that would have given rise
18   to that understanding or impression.
19       MR. NEKVASIL: He said --
20       MR. CHAIRMAN: Well, he rephrased the
21   question.
22       MR. NEKVASIL: Well, actually giving rise to
23   it, he's asking -- he's still asking about state of
24   mind. Is there anything that you would have done that
25   would have given rise to a state of mind --

## 182

1        MR. GOODMAN: In somebody else's --
2        MR. NEKVASIL: In somebody else's -- in the
3   name of that -- that they were dealing with ONESCO.
4        Mr. Chairman, my problem is he --
5        MR. CHAIRMAN: I won't sustain it so be
6   quiet.
7        Go to the next question.
8   BY-MR. LITTLE:
9    Q. Sir, did you ever give anyone any reason to
10   believe ONESCO was associated in any way with the
11   business fund trust?
12       MR. NEKVASIL: I'm not -- I'm going to -- I
13   don't mind -- I object again. I don't mind if he says
14   did you tell anybody that you were with ONESCO or to say
15   did you give anyone any reason to believe. You're still
16   asking about their beliefs. Any question asking about
17   the third -- the other party's state of mind is
18   inappropriate and he specifically objected -- sir, he --
19       MR. CHAIRMAN: I'm going to let him go with
20   this one.
21       MR. LITTLE: I think your last answer was --
22   he answered the question, but the answer was that --
23       THE WITNESS: The answer was no.
24   BY-MR. LITTLE:
25    Q. You gave them no reason?

## 183

1    A. I gave them no reason to --
2        MR. GOODMAN: If I could move to strike, and
3   I'll tell you why.
4        MR. LITTLE: Excuse me. Excuse me. One
5   attorney per witness.
6        MR. CHAIRMAN: This is an arbitration.
7   There's no strike. You've got your objection on the
8   record.
9        MR. GOODMAN: Yeah. Well, one point is that
10   he, meaning Mr. Lancaster, has testified. He said to
11   people if he was a securities salesman. Now, how that's
12   interpreted by other people is --
13       MR. CHAIRMAN: Take it down and
14   cross-examine on it.
15       MR. GOODMAN: Okay. But he's already
16   testified to that. So it's not fair to say did he give
17   any. And, in fact, I agree, obviously, that he's now
18   asking for state of mind of other people and what was
19   said.
20       MR. NEKVASIL: I accept your ruling, Mr.
21   Chairman. It's just not fair for Respondent to ask for
22   one playing field when I'm questioning the witness and
23   then move it over to the other. If you grant it --
24       MR. CHAIRMAN: I'm going to try to be
25   balanced, but --

## 184

1        MR. NEKVASIL: I know you're trying to. I
2   know you're trying to be balanced.
3        MR. CHAIRMAN: You can -- you can be as --
4   you can argue all of these points thoroughly in your
5   closing or, if necessary, before.
6        MR. LITTLE: And I assume the rule is that
7   the attorney who is conducting the examination should
8   make the objections so we don't have a tag team routine.
9        MR. CHAIRMAN: We're not going to do tag
10   team, for the most part. This isn't federal court here.
11   BY-MR. LITTLE:
12    Q. Okay. And without responding to the
13   characterization, is it fair to say that you can't think
14   of anything you did, Mr. Lancaster, which would have
15   left anyone with the belief --
16       MR. CHAIRMAN: Why don't you say, would you
17   please, given him any -- did he have any intention to
18   give anybody any --
19       MR. LUKOWSKI: You've already asked the
20   question.
21       MS. WRIGHT: The question is asked and
22   answered.
23       MR. LUKOWSKI: Let's move on.
24       MR. LITTLE: I was trying to get his answer,
25   but that's fine.

---

185

BY MR. LITTLE:

1 Q. Sir, did ONESCO ever give you business cards?

2 A. No.

3 Q. Did you ever have any ONESCO signage?

4 A. No.

5 Q. Did you ever have any ONESCO correspondence?

6 A. No.

7 Q. Did they give you anything with the ONESCO

8 letterhead?

9 A. No.

10 Q. You were asked about all the documentation that

11 you maintained at your home office. Did you ever

12 invest -- excuse me -- invite any of the investors to

13 your home office?

14 A. No.

15 Q. So at no point in time did anyone go into your

16 home and see anything with the name ONESCO on it?

17 A. Correct.

18 Q. Let's then turn to Respondent's Exhibit 24,

19 please. Is this a summary of investments that started

20 in April of -- excuse me -- April 2003?

21 A. Yes.

22 Q. And so just so we understand the time frame or

23 timeline, a Francis Benio [phonetic] would have

24 purchased an interest in the trust in April of 2003?

---

186

1 A. Correct.

2 Q. And then the amount would have been $175,000?

3 A. Yes. It wouldn't necessarily have been a single

4 purchase at this point. It could have been an

5 accumulative purchase because there were a number of

6 investors who purchased additional shares along the way.

7 Q. Okay. Does that reflect that Mr. -- or I'm

8 sorry -- France Benio would have accumulated that amount

9 of purchases by April 8th, 2003?

10 A. Correct.

11 Q. So the date shows at least the last day by which

12 an investor would have purchased his or her interest in

13 an -- in the Lancorp Business Fund Trust?

14 A. Correct.

15 Q. And in the right-hand column does that show the

16 accumulative total?

17 A. Yes.

18 Q. So if we turn to the next page, please --

19     MR. LUKOWSKI: Can I just ask you one

20 question? I'm looking at Page 909 and, for instance, I

21 see two investments by the same investor. One on 56 and

22 one on 510, Mihalivitch [phonetic].

23     Is that consistent with what you just

24 described, Mr. Lancaster?

25     THE WITNESS: As I recall, keeping qualified

---

187

1 money and nonqualified money separate was something I

2 did accounting wise. But, no, if it was not a qualified

3 account, it would not be consistent that I would have

4 two entries.

BY MR. LITTLE:

6 Q. Did you have a number of investors who had both

7 qualified and nonqualified accounts?

8 A. Yes.

9 Q. Okay. And just so we know, looking at the page

10 marked 908, how much did you -- how much had you

11 collected by February 2nd, 2004?

12 A. Looks like 2,855,000.

13 Q. And that's roughly when -- if you go down a

14 couple entries, you see Norman Prinz [phonetic], also

15 February 2nd, 2004?

16 A. Yes.

17 Q. Is it fair to say that you had at that point in

18 time received purchases from the investors that totalled

19 a little bit in excess of $3 million?

20 A. Correct.

21 Q. In February 2004 is when you would have submitted

22 your registration application to ONESCO?

23 A. Yes.

24 Q. If we then look to March 3, 2004, which is

25 roughly -- we'll go through it in a moment -- when you

---

188

1 executed the electronic U-4 with ONESCO --

2 A. Yes.

3 Q. -- how much had been accumulated in investors

4 money by that point in time?

5 A. $3,575,000.

6 Q. Okay. Now, if you could then turn to 25-A,

7 please. What does this summary depict for the panel?

8 A. It depicts the investor's share amount and in

9 some cases crediting of earnings.

10 Q. If you look at Page 1232 of the exhibit and you

11 look in the column under "From the State," do you see

12 where it says, "PA," Page 1232?

13 A. Yes, okay.

14 Q. PA would signify Pennsylvania?

15 A. Uh-huh.

16 Q. And this would show the various Pennsylvania

17 investors?

18 A. Yes.

19 Q. And so Christopher Charters would have been an

20 investor out of the State of Pennsylvania?

21 A. Yes.

22 Q. And Henrietta Charters?

23 A. Correct.

24 Q. And then there appears to be a number of members

25 of the Charters' family, do you see that?

189

1    A. Yes.
2    Q. And if we go to -- if we look at the dates in
3  which the deposits are identified here taking
4  Christopher Charters at the top, you see a July 9, 2004
5  deposit?
6    A. Yes.
7    Q. Does that mean that in terms of your Form D
8  filings you would have at some point in time submitted
9  that to the Pennsylvania Division of Securities?
10    A. Yes.
11    Q. And you would have done that before or
12  contemporaneously with the purchase?
13    A. Yes.
14    Q. If -- if we could please then turn to 25-B.  Is
15  that a transaction summary with respect to the
16  investors?
17    A. Yes.
18    Q. And if we look under transaction descriptions,
19  there is referencing -- references to quarter earnings?
20    A. Uh-huh.
21    Q. What is that?
22    A. That was the distribution of earnings that was
23  paid to investors.
24    Q. So if we turn to the page Bates stamped Lancaster
25  1247 and if you go to Michael Benkurt [phonetic] and you

190

1  go across and see a transaction of 9-30-2003?
2    A. Uh-huh.
3    Q. Do you see that?
4    A. Yes.
5    Q. What's the transcription -- what's -- excuse
6  me -- what is the transaction that occurred on
7  9-30-2003?
8    A. 9-30, it's an interest payment.
9    Q. So I take it that prior to your registration with
10  ONESCO you would have also, in addition to having
11  collected nearly $3 and a half million from the
12  investors, also would have been paying them interest on
13  their purchases?
14    A. Correct.
15    Q. Now, let's change notebooks for a moment.  If I
16  could have you look at Volume 2 of Respondent's
17  Exhibits.
18      MR. LITTLE:  Excuse me for a second,
19  Mr. Chairman.
20  BY-MR. LITTLE:
21    Q. I take it that before you sought employment with
22  ONESCO, you had already secured certain security
23  licenses, had you not?
24    A. Yes.
25    Q. And prior to submitting your registration

191

1  application, you held a Series 6 and 7?
2    A. Yes.
3    Q. But also a 63 and 65?
4    A. Correct.
5    Q. Did you also hold various licenses with state
6  departments of insurance?
7    Q. And would that be in Oregon and Washington?
8    A. Yes.
9    Q. Were there other states in which you were
10  licensed as well?
11    A. For short periods of time California, Idaho, and,
12  I think, Nevada, but I'm -- I can't remember for sure.
13    Q. Okay.  And at some time in the fall of 2003 you
14  also secured employment from Universal Underwriters?
15    A. Correct.
16    Q. If you could turn to Respondent's Exhibit 27-A,
17  please.  Is that an application that you submitted to
18  Universal Underwriters Group on or about October 13th,
19  2003?
20    A. Yes.
21    Q. And you were seeking an account executive
22  position with that company?
23    A. Correct.
24    Q. Excuse me -- Universal Underwriters Group is

192

1  based in Kansas City?
2    A. Correct.
3    Q. And that is a company that, among other things,
4  sells casualty insurance to automotive industry
5  companies?
6    A. Correct.
7    Q. One of the things that you would have had to
8  disclose if you look at Page 3 of the exhibit is your
9  past employment record?
10    A. Yes.
11    Q. And I believe -- I take it that when you
12  submitted this application you believed it was accurate
13  in all respects?
14    A. Yes.
15    Q. Now, if we look, then, at Exhibit 27-B, please, I
16  take it that this is a copy of an October 21, 2003
17  letter from Universal Underwriters Group confirming your
18  acceptance of a position of employment?
19    A. Correct.
20    Q. And you're -- under their system, you're going to
21  be paid a bi-weekly rate of compensation of $1,000 and
22  some change, if you will?
23    A. Correct.
24    Q. And then you would be eligible for commissions?
25    A. Right.

193

1    Q. And your start date with that company was going
2  to be October 27th, 2003?
3    A. Correct.
4    Q. I take it that before they extended an offer to
5  you, you were subject to an interview process?
6    A. Yes.
7    Q. And I take it that before the extended offer to
8  you, you were also subject to a psychological
9  examination, were you not?
10   A. Yes.
11   Q. If you look at the second page of the exhibit,
12  did you also have to confirm to Universal that you had
13  received a copy of the code of business ethics and
14  conduct?
15   A. Yes.
16   Q. Now, if we could then turn to page -- excuse
17  me -- Exhibit 27-C, Universal also had you sign off on
18  acknowledgement indicating your receipt of its handbook?
19   A. Correct.
20   Q. And the expectation communicated to you what you
21  were expected to review that handbook and comply with
22  it, correct?
23   A. Yes.
24   Q. Look at Respondent's Exhibit 27-D. Is that a
25  copy of an employment agreement you signed with

194

1  Universal on or about October 27th, 2003?
2    A. Yes.
3    Q. And your signature appears on the second page of
4  the document?
5    A. Yes.
6    Q. Now, you continued, then, with Universal from the
7  end of October of 2003 until roughly November 1, 2004?
8    A. Yes.
9    Q. And if we look at 27-E, just to confirm this,
10  27-E would have reflected your resignation e-mail,
11  correct?
12   A. Correct.
13   Q. They didn't terminate you, did they?
14   A. No.
15   Q. You voluntarily resigned from Universal?
16   A. Correct.
17   Q. Did you give Universal any reason to doubt you in
18  any way?
19   A. No.
20   Q. And until you resigned, if I understand your
21  testimony, you would have worked full-time for that
22  company?
23   A. Yes.
24   Q. Trying to sell casualty insurance?
25   A. Correct.

195

1    Q. Now, if we turn to Exhibit 27-F, is it also fair
2  to say that in conjunction with your employment with
3  Universal, you also maintained various licenses with the
4  Oregon Division of Securities -- excuse me -- Oregon
5  Department of Insurance?
6    A. Yes.
7    Q. And is 27-F a form that you prepared on or about
8  April 2004 and submitted to the Oregon [inaudible] and
9  consumer and Business Services?
10   A. Yes.
11   Q. And on the form that you would have submitted to
12  Oregon, you understood you had an obligation to provide
13  honest and accurate information as to your business
14  activities, correct?
15   A. Yes.
16   Q. In addition, if we look at 27-G, in addition to
17  having your license renewed in Oregon during the same
18  time frame, you would have had your license renewed in
19  the State of Washington, correct?
20   A. Correct.
21   Q. Your expectation was when you were at Universal
22  is that you would be selling insurance?
23   A. Yes.
24   Q. Okay. You did not go to Universal to simply have
25  a place to say I work, but I'm not doing anything?

196

1    A. No.
2    Q. Okay. And, in fact, when you were at Universal
3  you also applied so that you could sell the products of
4  various insurance companies, did you not?
5    A. Yes.
6    Q. So if we look at Exhibit 27-H, one of the
7  companies that you would have sought approval from would
8  have been Fortis, correct?
9    A. Yes.
10   Q. And if you look at the second page of that
11  document, that bears your signature on April 15th, 2004,
12  correct?
13   A. Correct.
14   Q. That's a company, then, that you were authorized
15  to place insurance sales for?
16   A. Correct.
17   Q. Was it also fair to say if we look at 27-I, that
18  you would have been authorized to sell insurance for
19  Blue Cross Blue Shield?
20   A. Yes.
21   Q. And is it true that in terms of your ability to
22  sell these insurance products, that would have been true
23  during the entire time frame you were registered with
24  ONESCO with the exception of your termination on
25  November 1, 2004 for Universal?

197

1     A. Correct.
2     Q. Now, just a couple more before we have to break
3  for the tape.
4        If you look at 27-J, 27-K, and 27-L, are those
5  additional companies that you also were authorized to
6  sell insurance for?
7     A. Yes.
8     Q. And so that would have been Pacific Life. It
9  would have been -- and MetLife as well?
10    A. Yes.
11        MR. LITTLE: Mr. Chairman, I have been told
12  the tape is nearly exhausted, so if we could stop here.
13        MR. CHAIRMAN: Sure. Why don't we take a
14  10-minute break so we can change that.
15        VIDEOGRAPHER: The time is 2:38 p.m. this
16  concludes Tape Number 3. We're now off the video
17  record.
18        (Thereupon, a break was taken.)
19        VIDEOGRAPHER: The time is 2:57 p.m. This
20  begins Tape Number 4. We're now on the video record.
21        MR. CHAIRMAN: Please proceed.
22        MR. LITTLE: Thank you, Mr. Chairman.
23  BY-MR. LITTLE:
24    Q. Before we broke, Mr. Lancaster, we were chatting
25  about your status with Universal prior to February 2004.

198

1  I take it that prior to submitting your registration
2  with ONESCO you owned a company that is an L.L.C. called
3  Lancorp Financial Group, L.L.C.?
4     A. Correct.
5     Q. And that is a company from which you had
6  historically sold insurance, correct?
7     A. Correct.
8     Q. As well as serviced various 401K plans?
9     A. And the sale of annuities.
10    Q. And the sale of annuities.
11        And you needed a securities license for you to
12  continue some of those lines of business, did you not?
13    A. No. Not outside -- not for Lancorp, no.
14    Q. Okay. To the extent that you were successful in
15  selling a 401K product to a commercial client that you
16  were servicing at Universal, you thought it would be
17  beneficial to have a securities --
18    A. Yes.
19    Q. And the reason, in fact, you did submit your
20  registration to ONESCO is in order to allow you to sell
21  401K plans and life to commercial clients, correct?
22    A. Correct.
23    Q. You also -- if we look at Respondent's Exhibit
24  33, would have -- excuse me, I misspoke. Respondent's
25  Exhibit 28, would have completed an application and

199

1  submitted it to the Ohio National -- excuse me -- Ohio
2  National Financial Services, correct?
3     A. Yes.
4     Q. And if we look in the upper right-hand corner,
5  where it says, "The Ohio National Life Insurance
6  Company," do you see that?
7     A. Yes.
8     Q. And if we work our way down in the right column
9  where it says, "for the sell of life and annuity
10  products only"?
11    A. Yes.
12    Q. Do you see that?
13    A. Yes.
14    Q. Do you understand your application was for the
15  sale of life and annuity products only?
16    A. Yes.
17    Q. Okay. And I take it that when you submitted this
18  on or about February 2nd, 2004, your intention was to be
19  as honest and forthright with the companies as possible?
20    A. Yes.
21    Q. As part of the registration process with ONESCO,
22  ONESCO requested that you complete a number of
23  documentations?
24    A. Yes.
25    Q. And you understood that ONESCO would be reviewing

200

1  the materials that you completed?
2     A. Yes.
3     Q. You understood that ONESCO would be relying upon
4  the accuracy of what you submitted?
5     A. Yes.
6     Q. And at no point in time did you give ONESCO cause
7  to believe that the information that you were submitting
8  as part of the registration application process was
9  inaccurate?
10    A. Correct.
11    Q. And given that you held securities licenses
12  already, you did not have to apply for newer licenses --
13  excuse me -- new licenses through ONESCO, did you?
14    A. I did not.
15    Q. You had already successfully prepared for and
16  passed a number of tests through the NASD?
17    A. Correct.
18    Q. And you had no reason to believe you had not been
19  properly licensed by the NASD?
20    A. Correct.
21    Q. And you never suggested to ONESCO that you were
22  incapable or competent to perform the responsibilities
23  of someone who held the licenses that you did with the
24  NASD?
25    A. Correct.

## 201

1  Q. And at no point in time did you give ONESCO
2  reason to believe that -- strike that.
3      At the time you submitted your registration
4  application with ONESCO, you had not been subject to any
5  type of customer complaint, had you?
6  A. Had not.
7  Q. And that's true both before the NASD as well as
8  with respect to your insurance licenses, correct?
9  A. Correct.
10 Q. And no one had ever suggested to you that you had
11 committed any sales practice violation?
12 A. Correct.
13 Q. And you had never been suspended by any
14 regulatory body; is that correct?
15 A. Correct.
16 Q. And that includes the state departments of
17 insurance, right?
18 A. Correct.
19 Q. That included the NASD, correct?
20 A. Correct.
21 Q. You had never been censored or reprimanded by any
22 governmental or self-regulatory body?
23 A. Correct.
24 Q. And you never disclosed any information to ONESCO
25 that suggested that you're incapable or unable to

## 202

1  fulfill the obligations of a licensed rep?
2  A. Correct.
3  Q. Or that you were incapable or unwilling to comply
4  with the rules and regulations as promulgated by ONESCO?
5  A. Correct.
6  Q. Now, when we look, then, at Respondent's Exhibit
7  33, this is the outside business activity disclosure
8  page that you completed on or about February 11th, 2004?
9  A. Correct.
10 Q. You understood this was a mandatory document that
11 you had to execute as part of your registration
12 application?
13 A. Correct.
14 Q. And that you understood as part of your
15 historical licensing a registered representative had an
16 affirmative duty to disclose broker/dealer -- excuse
17 me -- disclose outside business activity to the
18 broker/dealer, correct?
19 A. Correct.
20 Q. If we look at Question 13, you see at the top
21 where it says, "Are you currently engaged in any other
22 business either as proprietor, partner, officer,
23 director, employee, trustee, agent or otherwise," do you
24 see that?
25 A. Yes.

## 203

1  Q. And you disclosed two entities, did you not?
2  A. Yes.
3  Q. The first one was Universal Underwriters Group?
4  A. Correct.
5  Q. And you indicated there that you were engaged in
6  full-time employment, did you not?
7  A. Correct.
8  Q. The second one that you disclosed was the Lancorp
9  Financial Group, L.L.C., correct?
10 A. Correct.
11 Q. And at no point -- excuse me -- on this document
12 you did not disclose the existence of the trust that had
13 been formed a year earlier of which you served as the
14 president and was an employee of as well as the fact
15 that it had raised $3 and a half million?
16 A. Correct.
17 Q. Is it fair to say that at no point in time during
18 the registration process did you disclose to ONESCO the
19 existence of something called the Lancorp Business Fund
20 Trust?
21 A. Correct.
22 Q. And at no point in time during that process did
23 you indicate to them that you were engaged in any type
24 of securities transaction?
25 A. Correct.

## 204

1  Q. Now, if we look then -- and that's February 11th,
2  2004. If you would turn your attention to Exhibit 44,
3  did you receive a letter from ONESCO on or about March
4  3, 2004 requesting that you complete your U-4 on-line?
5  A. Yes.
6  Q. And what you were to do was to review the U-4 to
7  ensure its accuracy and then once accepted it -- excuse
8  me -- if accurate, then go through and approve the form?
9  A. Correct.
10 Q. If we look, then, at Respondent's Exhibit 45,
11 this is a copy of the electronic U-4 that you would have
12 reviewed and approved as part of this process?
13     MR. NEKVASIL: Mr. Chairman, this is the
14 form that you would have looked at and approved as part
15 of the process. Now, we're on to important testimony
16 here, and aside from the fact that it's a compound --
17 it's a compound and leading question. You either looked
18 at it and approved and all asking for a yes or no
19 answer, Mr. Chairman. I realize he's questioning him
20 second.
21     MR. CHAIRMAN: Why don't you just break it
22 up for us.
23 BY-MR. LITTLE:
24 Q. Sir, is this a form that you reviewed?
25 A. Yes.

205

1  Q.  And did you approve it?
2  A.  Yes.
3  Q.  And if you look at the second to the last page of
4  the exhibit, the one with Bates stamped ONN119.  Do you
5  see your signature on the document?
6  A.  Yes.
7  Q.  And the date of approval would have been -- of
8  your approval of the document would have been March 4th,
9  2004?
10  A.  Correct.
11  Q.  Now, when you disclosed the L.L.C. on Exhibit 33,
12  just keep your hand for a moment on 45.  If you look at
13  Exhibit 33, then, when you described the Lancorp
14  Financial Group, L.L.C., you did not disclose this
15  entity as participating in any type of private
16  securities transaction, did you?
17  A.  I did not.
18  Q.  You did not disclose it as having any type of
19  affiliation or association with the Lancorp Business
20  Fund Trust, did you?
21  A.  Correct.
22  Q.  And I take it that at no point in time in the
23  preparation of Exhibit 33 or the preparation of Exhibit
24  45, would you have disclosed the existence of the trust,
25  correct?

206

1  A.  Correct.
2      MR. CHAIRMAN:  Not would he have, but did
3  he?
4  BY-MR. LITTLE:
5  Q.  Did you.  Excuse me.
6      And, in fact, it was never your intention as part
7  of the process of executing Respondent's Exhibit 33 and
8  45 to disclose the existence of the trust to ONESCO, was
9  it?
10  A.  Correct.
11  Q.  If you look at -- going back to Exhibit 45, and
12  looking at the page in the lower right-hand corner
13  marked 113 -- go one page before that.  You're on 114.
14  A.  Oh.
15  Q.  If you turn to 113, you see there's the question
16  again, "Are you currently engaged in any other business
17  either as proprietor, partner, officer, director,
18  employee, trustee, agent or otherwise, do you see that?
19  A.  Yes.
20  Q.  And, again, when you approve the U-4, the only
21  descriptions provided is "I am president of Lancorp
22  Financial Group, L.L.C.  LFG receives commissions from
23  existing life insurance annuities and 401K plans
24  (additions, rollovers, etc.), address 1382 Lane Court,
25  West Linn, Oregon 97068."  And then, "LFG was previously

207

1  a sole proprietor, DBA, Lancaster Insurance established
2  in 1973," do you see that?
3  A.  Yes.
4  Q.  In fact, this L.L.C. preexisted the formation of
5  the trust, did it not?
6  A.  It did.
7  Q.  And, in fact, it preexisted the existence of the
8  trust by over a decade?
9  A.  Yes.
10  Q.  And you also said that "Approximately 10 hours
11  per year devoted to LFG none of which is conducted
12  during securities training hours, duties including
13  reviewing annual statements and monitoring insurance
14  companies, submission statements to the 401K
15  administrators annually and completing documents for
16  additions, rollovers, et cetera."  Do you see that?
17  A.  Yes.
18  Q.  That's the type of activity that, to the extent
19  you can sell a 401K plan to a commercial client, it
20  would have been helpful for you to have your license
21  with ONESCO, correct?
22  A.  Yes.
23  Q.  And I take it that in providing that description
24  there, you never intended to communicate that somehow
25  the L.L.C. was associated in any way with a trust that

208

1  was engaged in an unregistered securities offering?
2  A.  Correct.
3  Q.  Now, if we then turn to Exhibit 46, Respondent's
4  Exhibit 46, this is the handwritten U-4 that you
5  prepared for a prior employer back in 2000, correct?
6  A.  Yes.
7  Q.  And if we look at the third -- excuse me -- the
8  page marked PJ-047, you'll see where that bears your
9  signature?
10  A.  Yes.
11  Q.  And, in fact, when we go to the last -- second to
12  the last page, PJ-049, there is a description of the
13  L.L.C. provided that I think you confirmed earlier is
14  identical to that found on the ONESCO electronic version
15  that you approved?
16      MR. CHAIRMAN:  Mr. Little, I know you're
17  trying to be very efficient, but is it possible to skip
18  the documents we've already been over?  I think we've
19  talked about this one before.
20      MR. LITTLE:  I think we did as part of their
21  case.  I certainly have not talked about it.
22      MR. CHAIRMAN:  Well, if it's been -- it
23  doesn't sound like you're bringing out any differences,
24  bringing more emphasis to the same question.  If I'm
25  wrong, go ahead.  If not, try to skip over it.

## 209

1      MR. LITTLE: Yeah. We'll continue to try to
2   move forward as quickly as possible.
3   BY-MR. LITTLE:
4      Q. So in terms of the description you provided of
5   the L.L.C., you had been consistent in 2000 to 2004,
6   correct?
7      A. Correct.
8      Q. And at each point in time you never suggested
9   that it was involved in any type of private securities
10  transaction?
11     A. Correct.
12     Q. Will you look at Respondent's Exhibit 47, please?
13  Is it fair to say that when you were associated with
14  Piper Jaffray that that company also would have
15  required, from a compliance standpoint, for you to
16  prepare certain documentation?
17     A. Yes.
18     Q. And is the first page of Respondent Exhibit 47 a
19  document that you received from compliance for U.S.
20  Bancorp on or about September 22nd, 2000?
21     A. Yes.
22     Q. And then if you could turn to the next page,
23  please, PJ-030, one of the things compliance provided
24  you in September 22nd of 2000, and this is compliance
25  for Piper Jaffray, was a document that enclosed your

## 210

1   U-4, correct?
2      A. Yes.
3      Q. And it would have required you to update it to
4   the extent that there were any changes?
5      A. Right.
6      Q. And they also would have provided you a copy of
7   their compliance manual via the Internet, correct?
8      A. Correct.
9      Q. And you understood it was your obligation to read
10  that and understand it?
11     A. Yes.
12     Q. Now, is it fair to say that when you were
13  associated with Quick & Reilly in December of 2002, you
14  did not disclose to Quick & Reilly the existence of the
15  People's Avenger Trust?
16     A. Correct.
17     Q. And so you would have not have prepared an
18  outside business disclosure report and submitted it to
19  Quick & Reilly disclosing that there was a trust form
20  that you were serving both as the trustee of as well as
21  a -- the president and CEO?
22     A. Correct.
23     Q. And is it fair to say that to the extent their
24  activities undertaking for Lancorp Business Fund Trust
25  in that same time frame, you likewise would not have

## 211

1   disclosed that to Quick & Reilly?
2      A. Correct.
3      Q. Now, if we look back, then, at Respondent's
4   Exhibit 28, the application you submitted on the -- for
5   the Ohio National Financial Services --
6      A. Uh-huh.
7      Q. If you turn -- just looking at the first page
8   marked 30?
9      A. Yes.
10     Q. And it says, "Give a complete business" -- excuse
11  me. "Give complete business experience with your last
12  four employers or for the last 10 years." Did you see
13  that?
14     A. Yes.
15     Q. And when you filled that out, for example, you
16  would have identified you had been employed by U.S. Bank
17  and had been -- your last compensation would have been
18  $200,000, right?
19     A. Correct.
20     Q. But when we look at it, what you say is the basis
21  for your separation was bank takeover?
22     A. Yes.
23     Q. And you indicated that your supervisor was no
24  longer there, correct?
25     A. Correct.

## 212

1      Q. It's fair to say that when you filled out this
2   form, you did not disclose that at that point in time
3   you were serving as the president and employee of the
4   Lancorp Business Fund Trust as well, did you?
5      A. Correct.
6      Q. Now, when we look at Exhibit 27-A, your
7   application to Universal Underwriters, turning to the
8   page marked UU-27 where once again you were asked in
9   October of 2003 to disclose your present or last
10  employer. And it says, "Include" in some caps, "all
11  work." And, again, you didn't disclose to Universal
12  that you had association with the Lancorp Business Fund
13  Trust, did you?
14     A. Correct.
15     Q. Now, if we look, then, back at Respondent's
16  Exhibit 27-D, your employment agreement with Universal,
17  please, Paragraph 4, do you see where it says,
18  "Exclusive Services"?
19     A. What page?
20     Q. 27-D?
21     A. 27.
22     MR. CHAIRMAN: Respondent's Exhibit 27-D or
23  UU-30?
24     MR. LITTLE: 27-D.
25  BY-MR. LITTLE:

## 213

1  Q. Okay. And if you look at Paragraph 4, do you see
2  where it says, "Employees shall devote his entire
3  business activity to the business of employer. Any and
4  all insurance business at any time or times procured by
5  employee while employed by employer is and shall be the
6  permanent and exclusive property for employer for
7  employer's exclusive benefit. Without the written
8  consent of employer employee shall not, during the term
9  of this agreement, engage in any other business activity
10 whether or not such business activity is pursued for a
11 gain, profit or other advantage or act as an employee,
12 officer, director or consultant for any other insurance
13 company, agency or brokerage firm," do you see that?
14     A. Yes.
15     Q. Now, you understood that Universal approved your
16 association with ONESCO, correct?
17     A. Correct.
18     Q. But, to your knowledge, at no point in time did
19 Universal approve you engaging in any form private
20 securities transaction, did they?
21     A. Correct.
22     Q. At no point in time did Universal approve you in
23 any way of serving as an employee or a trustee of the
24 Lancorp Business Fund Business Trust, correct?
25     A. Correct.

## 214

1  Q. And at no point if time prior to your separation
2  from Universal did you disclose your involvement with
3  respect to the trust, did you?
4     A. Correct.
5     Q. And so you proceeded during the course in 2004 in
6  violation of your employment agreement with Universal,
7  did you not?
8     A. Correct.
9     Q. Look at Exhibit 27-F again, please. The form
10 submitted with the Department of Consumer and Business
11 Services for the State of Oregon. If you look, then, at
12 the page marked UU-66, Item Number 7, "Account for all
13 of your" -- excuse me. "Account for all of your time
14 employed, unemployed and as a full-time student during
15 the past five years." This is Question 7. Again, you
16 didn't disclose to the State of Oregon that you were
17 engaged with respect to this trust, did you?
18     A. Correct.
19     Q. And then if we could turn to 27-H, your
20 application with Fortis. If we turn to the second page
21 marked UU-166, the question is posed, are you engaged in
22 any business other than or in addition to selling
23 insurance, and what was your answer?
24     A. No.
25     Q. And the date you signed this form was April 15th,

## 215

1  2004?
2     A. Correct.
3     Q. And so the information you provided to Fortis as
4  part of this application process was, in fact,
5  inaccurate, wasn't it?
6     A. Yes.
7     Q. It was inaccurate because you were engaged in the
8  trust activities?
9     A. Correct.
10     Q. And so we can agree that as part of the time
11 frame of 2000 to 2004 you failed to make adequate
12 disclosures on your application to Ohio National
13 Financial Services, right?
14     A. Yes.
15     Q. You failed to make adequate disclosures on your
16 application to Universal?
17     A. Yes.
18     Q. And you failed to make adequate disclosures to
19 the state of Oregon, did you not?
20     A. Yes, sir.
21     Q. Now, let's then turn, please, to Exhibit 34,
22 Respondent's Exhibit 34. You understood that the
23 document entitled "General Prohibitions" was another
24 document that ONESCO required that you execute as part
25 of the registration process?

## 216

1     A. Yes.
2     Q. And you understood that unless you executed this
3  document to -- your registration application would not
4  be approved?
5     A. Correct.
6     Q. And if you look at the third page, again, the
7  date of that document is February 11th, 2004?
8     A. Correct.
9     Q. Now, when we look at the first page -- oh, I'm
10 sorry. If you look at the last page over the signature,
11 that is Page 5406, the date is February 11th, 2004. And
12 right above that it says, "Acknowledgement and
13 Acceptance of the ONS -- ONESCO General Prohibitions,"
14 right?
15     A. Yes.
16     Q. And you understood that by signing this document,
17 you were acknowledging to ONESCO both your review of
18 this documentation as well as to the acceptance of the
19 terms?
20     A. Yes.
21     Q. Now, one of the terms when we look on the first
22 page of Respondent's Exhibit 34, Paragraph 1, is that
23 you would not engage in a securities transaction with
24 members of the public except on behalf of ONESCO, right?
25     A. Correct.

## 217

1    Q. And, in fact, it says, "A registered rep may not
2 sell any securities to any members of the public unless
3 the sales are placed through ONESCO." Do you see that?
4    A. Yes.
5    Q. All the sales that you made to the investors in
6 the Lancorp Business Fund Trust were, in fact, placed
7 outside of ONESCO, were they not?
8    A. Yes.
9    Q. And, in fact, you had engaged in security
10 transactions with members of the public outside of
11 ONESCO?
12    A. Correct.
13    Q. And you did so then in violation of General
14 Prohibition Number 1, did you not?
15    A. Yes.
16    Q. Number 2 says, "You will not guarantee a customer
17 against loss in any securities account." Do you see
18 that?
19    A. Yes.
20    Q. That was one of the other obligations you had
21 agreed to undertake?
22    A. Yes.
23    Q. I take it that as part of the private placement
24 memorandum where it talks about preservation and
25 principle, the representation you made to the investors

## 218

1 is that their principle was always safe?
2    A. Correct.
3    Q. And that there would never be a loss in their
4 account, correct.
5    A. Correct.
6    Q. And so you violated Number 2 of the General
7 Prohibition set forth in Respondent's Exhibit 34, did
8 you not?
9    A. Yes.
10    Q. Number 3, you would not receive any form of
11 payment, et cetera, et cetera, of any kind from any
12 source other than ONESCO without prior written approval
13 of ONESCO. And in response to the chair's question, you
14 already agreed that you never received any prior written
15 approval from ONESCO for you to engage in any private
16 securities transaction, correct?
17    MR. GOODMAN: I object. Mr. Lukowski had
18 said, don't preface it with the questions that if the
19 chair asked it or not -- you said earlier.
20    MR. CHAIRMAN: It's been one time out of an
21 hour.
22    MR. GOODMAN: Right. And I'm just saying
23 hopefully that is going to be the same for both sides.
24    MR. LITTLE: Hopefully the next objection
25 will be from the attorney handling the --

## 219

1    MR. NEKVASIL: Well, it's just a matter of
2 fairness.
3    MR. CHAIRMAN: Don't argue with him. Talk
4 to me. Not him.
5    But go ahead.
6 BY-MR. LITTLE:
7    Q. Sir, we're clear that you never received written
8 approval from ONESCO?
9    A. Correct.
10    Q. In fact, you never received any form of approval
11 whether it's verbal or written, correct?
12    MR. CHAIRMAN: Would it be fair to state
13 that -- and can y'all stipulate that he did not disclose
14 this trust relationship with anybody except with people
15 he was telling it to about any of these other employers
16 or entities that we've been talking about all day so we
17 don't have to go through each one of these individually?
18    MR. NEKVASIL: Well, Mr. Chairman, we can't
19 stipulate that he did not send that May form that's
20 dated May 2004 to ONESCO. He has given varying
21 testimony on that point as to whether --
22    MR. CHAIRMAN: Where is that document?
23    MR. NEKVASIL: It's the -- it's the second
24 outside business disclosure form.
25    MR. CHAIRMAN: Well, except for that, can

## 220

1 you --
2    MR. GOODMAN: 4-H. Sir, it was this one.
3    MR. NEKVASIL: That's the one of
4 controversy.
5    MR. CHAIRMAN: This is the one they don't
6 admit they had received?
7    MR. NEKVASIL: Yeah. That's the one that
8 there's been a lot of testimony about. Remember, I took
9 him to the SEC testimony, NASD and all that. Other than
10 the --
11    MR. CHAIRMAN: Except for this?
12    MR. NEKVASIL: Except for this form.
13    MR. GOODMAN: Stipulate to what?
14    MR. CHAIRMAN: We can reform the stipulation
15 so we don't have to go through every document, every
16 entity if they don't do a disclosed information to -- is
17 there a way from there?
18    MR. LITTLE: I've covered those already.
19    MR. GOODMAN: On the other hand, sir -- on
20 the other hand, sir, he did -- see, he did. On
21 September -- he did -- it says and they received it, the
22 Lancorp.
23    MR. LITTLE: We'll get to that in a moment.
24    MR. CHAIRMAN: Okay.
25 BY-MR. LITTLE

221

1    Q. Sir, if we look, then, at the General
2  Prohibitions where it says in Number 4, "Do not publish,
3  circulate or broadcast any advertisements related to the
4  securities business without the prior written approval
5  of ONESCO," is it fair to say that when you distributed
6  the copies of the private placement memorandum and the
7  subscription agreement to investors, you did not first
8  seek ONESCO's written approval?
9    A. Correct.
10    Q. And so you violated Rule Number 5 of the General
11  Prohibitions?
12    A. Yes.
13    Q. And when we look at Number 6, it says, "Not
14  distribute correspondence to clients that pertains to
15  solicitation or execution of securities transactions
16  without first receiving written approval from an
17  appropriately designated ONESCO principal."  I take it
18  that when you sent correspondence to -- and you've seen
19  some of it in claimant's notebooks.  When you sent
20  correspondence to an investor, you did not first seek
21  the approval of ONESCO before transmitting that
22  correspondence?
23    A. Correct.
24    Q. And so you violated Rule 6?
25    A. Yes.

222

1    Q. Number -- turning to the next page, 5405, the
2  next prohibition Item Number 13 says you will not open
3  discretionary accounts.  I take it that -- and we
4  established this earlier, I believe, but as the trustee
5  you, in fact, exercised 100 percent discretion over the
6  funds in the trust, did you not?
7    A. Yes.
8    Q. And in the capacity of exercising 100 percent
9  discretion you violated Rule 13 of the General
10  Prohibitions, did you not?
11    A. Yes.
12    Q. If we look at Number 22, which says, "Not use any
13  form of general solicitation or general advertising in
14  connection with offers to sell sales of or solicitations
15  of offers to purchase any unit interest in any direct
16  participation program approved by ONESCO, other than the
17  original memorandum and materials specifically approved
18  by ONESCO or private sponsors to the ONESCO product
19  availability list," you would agree that rule as well
20  was violated by your conduct as it related to the trust?
21    A. Yes.
22    Q. Looking at 26 where it says, "Not maintained
23  other employment, received other forms of compensation
24  without giving advance written notice to ONESCO."  Is it
25  fair to say that you had, in fact, occupied such

223

1  positions with the trust without providing the
2  appropriate notice to ONESCO?
3    A. Yes.
4    Q. Let's turn from the next page, please, Paragraph
5  29 says, "You will not participate in any private
6  transactions of a nature which could be interpreted in
7  any manner to involve the creation to sell or marketing
8  a security without having first obtained written
9  approval and the consent of ONESCO."
10    Sir, is it fair to say that you violated that
11  rule as well?
12    A. Yes.
13    Q. Is it fair to say that with respect to each of
14  the General Prohibitions we've just covered and set
15  forth in Respondent's Exhibit 34, you violated it during
16  the entire time you were associated with ONESCO?
17    A. Yes.
18    Q. Now, let's look, then, at Respondent's Exhibit
19  53, please.  Is this a copy of the representative sales
20  contract that you signed with ONESCO?
21    A. Yes.
22    Q. And if we look at the first page of the document,
23  where we see that the name is Gary Lancaster, right?  It
24  says Overland Park?
25    A. Yes.

224

1    Q. Now, when you signed the document you didn't
2  notice that that error had been made in terms of your
3  location?
4    A. No.
5    Q. Okay.  But it shows your effective date was going
6  to be March 23, 2004, correct?
7    A. Correct.
8    Q. And it identifies, in fact, your resident sales
9  coordinator was Kerry Lawing, does it not?
10    A. Correct.
11    Q. Now, was there ever a point in time in which you
12  sought information from Lawing -- Mr. Lawing that he
13  failed to provide it to you?
14    A. No.
15    Q. Okay.  And at no point in time you contacted him
16  and said I have a question as to whether what I'm doing
17  is appropriate or not?
18    MR. CHAIRMAN:  Don't we have testimony that
19  there's no contact at all?
20    MR. LITTLE:  I'm asking him whether he
21  initiated the contact.
22    MR. CHAIRMAN:  Well -- and nobody was on the
23  other end of the phone; is that what you mean?
24    MR. LITTLE:  Well, the question is
25  initiation.

---

225

1          MR. NEKVASIL:  Well, the testimony that I
2    was shut off during -- once --
3          THE WITNESS:  I initiated no contact with
4    Lawing, whatsoever.
5    BY-MR. LITTLE:
6          Q.  Let's look at the second page of the exhibit, the
7    one bearing the stamp ONESCO 0101.  If you would,
8    please, turn to Paragraph 6 where it says in the last
9    sentence, "The representative shall not solicit
10   securities through or otherwise make business use of
11   mailings, advertisements or other media relating to
12   securities unless the contents there have previously
13   been approved in writing by ONESCO;" do you see that?
14         A.  Yes.
15         Q.  You violated that provision of your contract, did
16   you not?
17         A.  Yes.
18         Q.  If you look at the next page, the one that's
19   bearing the Bates stamp 0102, looking at Subparagraph
20   8-C where it says, "The representative shall not
21   directly or indirectly participate in securities sales
22   activities for any person, firm or corporation other
23   than ONESCO without first obtaining ONESCO's written
24   consent."  Do you see that?
25         A.  Yes.

---

226

1          Q.  You violated that provision of your contract as
2    well, did you not?
3          A.  Yes.
4          Q.  And at no point in time did you communicate to
5    ONESCO that it was your intention to violate your
6    contract, did you?
7          A.  No.
8          Q.  At no point in time did you disclose to them that
9    you were violating your contract, did you?
10         A.  Correct.
11         Q.  Or that you were violating the general
12   prohibitions?
13         A.  Correct.
14         Q.  Now, if we could look, then, at Respondent's
15   Exhibit 54.  This was a compliance manual questionnaire
16   that you were asked questions about earlier?
17         A.  Yes.
18         Q.  And another document that ONESCO specifically
19   required that you complete?
20         A.  Correct.
21         Q.  And we are in agreement, then, you did, in fact,
22   receive from ONESCO the compliance manual?
23         A.  Yes.
24         Q.  And at no point in time did you contact ONESCO
25   saying I don't understand the provisions of the

---

227

1    compliance manual?
2          A.  No.
3          Q.  And if we look at Respondent's Exhibit 54 that is
4    written out in your own handwriting, you never suggested
5    to ONESCO that you did not understand the questionnaire
6    that you were completing?
7          A.  Correct.
8          Q.  Including the provision on the first page,
9    Section 309, where you identified a private placement
10   memorandum as an example of a private securities
11   transaction, right?
12         A.  Right.
13         Q.  Now, let's go back, if we could then, to
14   Respondent's Exhibit 35.  One of the other documents
15   that ONESCO asked you to complete as part of the
16   registration process was a personal brokerage account
17   disclosure?
18         A.  Yes.
19         Q.  And so the ones marked Exhibit 35 is your
20   disclosure of an account with U.S. Bancorp Piper
21   Jaffray, isn't it?
22         A.  Correct.
23         Q.  The account you disclosed did not have any
24   association, whatsoever, with the trust, did it?
25         A.  Correct.

---

228

1          Q.  In fact, that was a retirement account?
2          A.  Yes.
3          Q.  And you understood that ONESCO would then have
4    the options, should it so elect, to request copies of
5    duplicate statements for your retirement, correct?
6          A.  Yes.
7          Q.  Now, if we look, then, at Respondent's Exhibit
8    36, please, this is another form of personal brokerage
9    account statement -- excuse me -- disclosure forms that
10   you executed in or about February 2004, and this one is
11   with respect to Scott Trade, correct?
12         A.  Correct.
13         Q.  Once again, it is your personal account?
14         A.  Yes.
15         Q.  And this was a qualified fund, was it not?
16         A.  Correct.
17         Q.  And this qualified fund that you disclosed did
18   not have any association with the trust, did it?
19         A.  Correct.
20         Q.  Is it fair to say that as part of the
21   registration process you did not disclose to ONESCO any
22   accounts anywhere in which monies were being held as
23   part of the trust activities?
24         A.  Correct.
25         Q.  Sir, let's turn to Volume 3, and that would be

229

1   Exhibit 81, Volume 3, please.  So, sir, Respondent's
2   Exhibit 81 is a copy of the May 3, 2004 other business
3   disclosure recording page that we discussed earlier?
4       A.  Yes.
5       Q.  And at the top this one -- and I take it the
6   dates you would have executed would have been May 3,
7   2004, right?
8       A.  Correct.
9       Q.  You wouldn't have executed it in July and then
10  just backdated it to May 3, 2004?
11      A.  No.
12      Q.  And here is the -- the description includes a
13  Lancorp Financial Fund Business Trust, does it not?
14      A.  Yes.
15      Q.  Okay.  Now, at the top it says, "Initial."  Do
16  you see where there's a box marked?
17      A.  Yes.
18      Q.  Okay.  And we are clear that you are not
19  submitting this form to say, oh, the L.L.C. I disclosed
20  earlier, in fact, described the trust activity, correct?
21      A.  Correct.
22      Q.  And, in fact, when we looked at the February 2,
23  2004 outside business disclosure reporting page, we can
24  both agree that there's nothing in that disclosure that
25  from your standpoint would have revealed any

231

1       A.  That's what I said, yes.
2       Q.  What happens as part of your regulatory
3   requirement is that periodically you will go to an NASD
4   facility, walk up to a computer and you have to take a
5   test?
6       A.  Correct.
7       Q.  And what you indicated in your affidavit is that
8   because you took that test, that's what caused you to
9   then submit this form, right?
10      A.  That's what I said, yes.
11      Q.  And the statement found in your affidavit is, in
12  fact, inaccurate?
13      A.  That's correct.
14      Q.  You, in fact, took this NASD test in June of
15  2004?
16      A.  Yes.
17      Q.  And if you had taken it in June of 2004, we're in
18  agreement it could not have caused you to execute a
19  document on May 3, 2004?
20      A.  Correct.
21      Q.  So in terms of the elimination of the
22  possibilities, we know it was not anything that was done
23  with the NASD or as part of your continuing education,
24  which would have prompted you to submit this form?
25      A.  Correct.

230

1   relationship between the L.L.C. and the trust, correct?
2       A.  Correct.
3       Q.  And there's nothing in that disclosure that would
4   have suggested that you engaged in any inappropriate
5   conduct?
6       A.  Correct.
7       Q.  And there's nothing in that disclosure that from
8   your vantage point would have given ONESCO any reason to
9   have pause?
10      A.  Correct.
11      Q.  Now, when we look at this particular form, if you
12  note in the -- let me ask you this:  We heard your
13  testimony yesterday and today.  Can you tell the panel
14  whether, in fact, you ever sent this to ONESCO?
15      A.  I cannot say that for a fact that I did.  It was
16  in my file and that's why this was provided because it
17  was in my file.
18      Q.  So you wouldn't have a recollection of who, if
19  anyone, you would have sent this to and the manner in
20  which you would have sent it?
21      A.  No.
22      Q.  We'll talk about the affidavits in a moment, but
23  your one affidavit says the reason that you signed this
24  is because you had attended a seminar conducted by the
25  NASD, correct?

232

1       Q.  Is it also fair to say that looking at the center
2   of this document, very bottom, you were asked questions
3   about where it says in the lower left-hand corner
4   "ONESCO 160, Revision 5-2002;" do you see that?
5       A.  Yes.
6       Q.  And you were asked about that, but in the center
7   of the document it says Page 7, doesn't it?
8       A.  Oh, yes.
9       Q.  Okay.  And keeping that open, let's look back at
10  Exhibit 33 for a moment, in Volume 2.  And it's fair to
11  say that when you look at that version in this former
12  document, it does not have a Page 7 in the middle, does
13  it?
14      A.  It does not.
15      Q.  In fact, it has a completely different document
16  number?
17      A.  It does.
18      Q.  In the lower left-hand corner?
19      A.  Correct.
20      Q.  Okay.  And when we look at -- back at Exhibit
21  81 --
22          MR. CHAIRMAN:  Can you restate that last
23  question about the different document number?
24          MR. LITTLE:  Sure can.
25          If you go back to Exhibit 33 --

---

233

1        MR. CHAIRMAN:  Same number, just a different
2   date; is that correct?
3        MR. LITTLE:  Yeah.  It says one is
4   ONESCO160RAV502.  The second one is ONESCO160RAV1102.
5        MR. CHAIRMAN:  Yeah.
6   BY-MS. LITTLE:
7        Q.  And one document has a Page 7.  That's Exhibit
8   81, right?
9        A.  Correct.
10       Q.  And Respondent's Exhibit 33 does not have a page
11   number.  And do you recall questions as to whether or
12   not you would have completed this form after receiving
13   the annual compliance questionnaire?
14       A.  Yes.  That's what my thinking was that this --
15   that was -- must have been what caused me to complete
16   the form.
17       Q.  Let's look at Respondent's Exhibit 109-A, which
18   is in Volume 3.  And you were asked questions about the
19   same version of this document in the claimant's file.
20   But what is the date in which this memo is issued
21   indicating here's your copy of the 2004 ONESCO
22   compliance questionnaire?
23       A.  July 9th, 2004.
24       Q.  So assuming the memo is July 9, 2004, we can
25   agree that you would not have received a copy of the

---

234

1   annual compliance questionnaire until some date after
2   that?
3        A.  Correct.
4        Q.  And, in fact, let's look at the second bullet of
5   this July 9th, 2004 memo.  It says, "The personal
6   brokerage account disclosure form."  It says Page 6, and
7   the other business disclosure reporting form, Page 7,
8   are included for those who have any new information to
9   disclose; do you see that?
10       A.  Yes.
11       Q.  And so we can agree that if you, in fact, filled
12   out that form, based upon the compliance questionnaire,
13   you did it after July 9th and you went back and
14   backdated the date you signed, what has been marked as
15   Respondent's Exhibit 81?
16       A.  That would appear to be correct.
17       Q.  And if we just look at an example --
18       MR. CHAIRMAN:  Do you have any recollection
19   one way or the other or are you just going by the
20   documents?
21       THE WITNESS:  I'm just going by the
22   documents.  It was speculation on my part as to what
23   would have inspired me to complete this form at this
24   time.
25   BY-MR. LITTLE:

---

235

1        Q.  And, in fact, sir, as you sit here today, after
2   having seen this document, you don't have any reason to
3   believe that it was the annual compliance manual that
4   would have caused you to complete that form?
5        A.  Correct.
6        Q.  If we look at 109-D, an example of the ONESCO
7   annual compliance questionnaire for 2004, if you could
8   turn to Page 7.
9        MR. GOODMAN:  I apologize, what tab?
10       MR. LITTLE:  D.
11       MR. GOODMAN:  D, as in David?
12       MR. LITTLE:  Yes.
13   BY-MR. LITTLE:
14       Q.  And if you turn to Page 7, do you see an example
15   of another business disclosure reporting page?
16       A.  Yes.
17       Q.  And, in fact, the lower left-hand corner and the
18   page number is identical to the one that has been marked
19   as Respondent's Exhibit 81, correct?
20       A.  Correct.
21       Q.  Sir, isn't it fair to say that some time in
22   December of 2005 you had received an inquiry from the
23   NASD about a customer complaint being made relating to
24   the Lancorp Business Fund Trust?
25       A.  I don't remember the dates.

---

236

1        Q.  Let's look at a couple documents and see if they
2   refresh your memory.
3        If you would, please, look at Respondent's
4   Exhibit 99 --
5        A.  Okay.
6        Q.  -- which is a December 14th, 2005 letter to
7   ONESCO.  And what it references is if you look at the
8   third page of the exhibit, a copy of a complaint that
9   was submitted by a John and Carolyn Claisia [phonetic]
10   relating to the Lancorp Financial Fund Business Trust --
11       A.  Yes.
12       Q.  -- did you receive a copy of that some time in
13   late 2005?
14       A.  Yes.
15       Q.  And, in fact, was that the first customer
16   complaint you had received or had been advised by a
17   regulator had been received relating to the Lancorp
18   Business Fund Trust?
19       A.  Yes.
20       Q.  Now, if we look at Exhibit 101-A --
21       MS. WRIGHT:  101-A?
22       MR. LITTLE:  101-A, please.
23   BY-MR. LITTLE:
24       Q.  Okay.  This is a letter that you sent to Jody
25   Larson, the special investigator for the NASD?

237

1    A. Yes.
2    Q. And it's regarding a customer complaint by John
3  and Carolyn Claisia, that's what you referenced at the
4  top?
5    A. Yes.
6    Q. And what you said in the first paragraph was the
7  fund did not engage in any solicitation of potential
8  investors, correct?
9    A. Correct.
10   Q. That is, the investors were referred to the fund
11 by Secured Clearing Corporation who had been the primary
12 referring source for a previous fund that shared a
13 similar investment strategy and it was directly involved
14 in the creation of Lancorp Fund, correct?
15   A. Correct.
16   Q. And investment advisors with whom they had had a
17 previous relationship also (inaudible) potential
18 investors?
19   A. Correct.
20   Q. And you referenced Mr. Reese, right?
21   A. Yes.
22   Q. And Mr. Reese, in fact, had been the principle
23 referral source for investors in this fund, correct?
24   A. Correct.
25   Q. It was Mr. Reese, according to your letter to the

238

1  NASD, that was responsible for conducting the
2  solicitations?
3    A. Correct.
4    Q. And if we look back, then, at Respondent's
5  Exhibit 25-C in Volume 1, please -- are you looking at
6  25-C?
7    A. Yes.
8    Q. Okay. 25-C is a summary you procured, which
9  identifies the referral source for the investors?
10   A. Correct.
11   Q. And so looking at the first page of 25-C under
12 the heading "Referred By," we you see where we have the
13 name Reese, Reese, Reese, and it goes on. And then we
14 have a fellow by the name of McDuff and Herring
15 [phonetic], for example, on the first page?
16   A. Yes.
17   Q. If we look at the second page, the soliciting
18 person is --
19       MR. GOODMAN: I object. The heading -- he's
20 misreading. The heading, if you look on Page 1, it
21 says, "Referred By." He's misreading. He's putting a
22 word there that didn't. He said solicited -- soliciting
23 body and, you know, it says what it says, and I think he
24 should refer to what it says.
25       MR. CHAIRMAN: Be precise.

239

1        MR. LITTLE: I was being precise, and have
2  we figured out which counsel is going to object now.
3        MR. NEKVASIL: We have not been tag teaming.
4        MR. CHAIRMAN: You really should let him do
5  it since he's been conducting the examination.
6  BY-MR. LITTLE:
7    Q. Looking at the second page, again, across the
8  board it's Mr. Reese, is it not?
9    A. Correct.
10   Q. And looking at the third page, it's Mr. Reese
11 with the exception of someone at the bottom named Don,
12 right?
13   A. Yes.
14   Q. And you can leap through the rest of the pages,
15 but for the most part, the person you identified as the
16 referral source for these investors was Mr. Reese?
17   A. Correct.
18   Q. And you understood as you represented to the NASD
19 that it was Mr. Reese who was serving as the advisor who
20 solicited these clients?
21   A. Correct.
22   Q. Now, if we look at Number 3, it says, "I called
23 O.N. Equity Sales Company and inquired as to what I
24 needed to do to disclose my activity in the fund;" do
25 you see that?

240

1    A. Yes.
2    Q. And then it goes on, it says, "I spoke to Heather
3  Renfro who indicated that she would find out and provide
4  me with the necessary information. After a period of
5  time I was sent a one-page form to complete and return.
6  The date shows May 3, 2004. I did not receive any
7  further communications."
8       Do you see where it says, "I was sent a one-page
9  form to complete and return"?
10   A. Yes.
11   Q. You didn't say you actually returned it, did you?
12   A. No.
13   Q. And, in fact, you didn't return it?
14   A. Apparently not.
15   Q. At the time that you were responding to the NASD,
16 is it fair to say that MegaFund had already imploded?
17   A. Yes.
18   Q. And at this point in time you had been subject to
19 no less than two depositions by the SEC?
20   A. Yes.
21   Q. And at that point in time you understood that the
22 receiver was instituting various civil actions?
23   A. Yes.
24   Q. And, in fact, various criminal actions, criminal
25 prosecutions were being undertaken --

241

1     A.  Correct.
2     Q.  -- were they not?
3     A.  Correct.
4     Q.  And you were insecure as to whether or not you
5  would have a criminal indictment rendered against
6  yourself, weren't you?
7     A.  Yes.
8     Q.  To the point that you went back and completed
9  what was marked as Respondent's Exhibit 81, didn't you?
10    A.  It appears to be so.
11    Q.  You, in fact, did not execute that on May 2nd,
12  but you executed that at a much later date only after
13  the MegaFund transaction imploded, right?
14    A.  That's correct.
15        MS. WRIGHT:  I want to hear that again,
16  please, your question.
17        MR. LITTLE:  Isn't it fair to say that the
18  May 2, 2004 outside business disclosure form that is
19  marked as Respondent's Exhibit 81 was executed by you
20  only after the MegaFund transaction imploded?
21        MS. WRIGHT:  Which date was --
22        MR. LITTLE:  July 2005.
23  BY-MR. LITTLE:
24    Q.  And, in fact, what your --
25        MR. CHAIRMAN:  You think that's correct?

242

1        THE WITNESS:  I think that's probably
2  correct.
3        MR. CHAIRMAN:  Do you have any memory of it?
4        THE WITNESS:  Only vaguely, and I don't
5  remember sending the form in.
6        MR. CHAIRMAN:  But you think you completed
7  it, to the best you can remember?
8        THE WITNESS:  Best I can remember.
9  BY-MR. LITTLE:
10    Q.  You completed it after the fact?
11        MR. NEKVASIL:  He actually said he did not
12  know.
13        MS. WRIGHT:  I want him to say it.  That's
14  why I asked him.
15        MR. LUKOWSKI:  Let's just testify and not
16  have Counsel, you know, say what he said and you can ask
17  him in cross-examination on the record.
18        MR. LITTLE:  Thank you.
19  BY-MR. LITTLE:
20    Q.  Sir, did you post date that document after the
21  fact?
22    A.  I can't remember specifically, but I think I
23  probably did.
24    Q.  And the reason you did is because you were
25  fearful of a criminal prosecution, right?

243

1     A.  I don't specifically recall thinking that, no.
2     Q.  You were fearful that something was going to
3  happen to you, right?
4     A.  Yes.
5     Q.  And, in fact, the NASD ultimately disagreed with
6  the information you provided in what's marked as Exhibit
7  101-A, didn't they?
8     A.  I don't know what you're referring to.
9     Q.  Well, let's look then at --
10    A.  101-A?
11    Q.  Excuse me.  Let's look at Respondent's Exhibit
12  106.
13        MR. NEKVASIL:  Mr. Chairman, we're going to
14  object to his -- the question which says the NASD
15  disagreed with what you said.  Because nowhere in this
16  document does it say whether he submitted that form or
17  he didn't submit that form.  This document is enforcing
18  action against him for not disclosing the transactions.
19  And do you recall that opposing counsel made a point in
20  saying in his opening that if you wanted to do the
21  transaction it's not sufficient to disclose that form.
22  You've got to disclose the specific transactions you
23  want to execute and get approval.
24        So this disciplinary action does not
25  constitute a statement by the -- conclusion by the NASD

244

1  whether or not he submitted that form.  It represents
2  the conclusion that he did not give the firm the proper
3  notice under the rule, which is stipulated, which would
4  be here are the names of the people I want to set the
5  trade for.  Here's the dollar amount.  Here's the date,
6  et cetera, et cetera.  So for that we disagree with that
7  question.
8        MR. LITTLE:  We'll go through the document.
9        MR. CHAIRMAN:  We'll let the document speak
10  for itself and rephrase the question.
11  BY-MR. LITTLE:
12    Q.  If we look at the second to the last page of the
13  document that is marked Respondent's Exhibit 106, your
14  signature appears on that document?
15        MR. CHAIRMAN:  What's the ON number?
16        MR. LITTLE:  17, excuse me.
17        THE WITNESS:  Yes.
18  BY-MR. LITTLE:
19    Q.  And you signed that on August 10, 1996?
20        MR. CHAIRMAN:  2006.
21        MR. LITTLE:  Excuse me, 2006, sorry.
22        THE WITNESS:  Yes.
23  BY-MR. LITTLE:
24    Q.  And what reads above that is, "I certify that I
25  have read and understand all the provisions of this AWC

245

1  and have been given a full opportunity to ask questions
2  about it and that no offer, threat, inducement or
3  promise of any kind other than the terms set forth in
4  here has been made to induce me to submit it," correct?
5      A. Yes.
6      Q. And if we look, then, at Bates Page 12, the one
7  having the caption NASD letter of acceptance, waiver and
8  consent; do you see that?
9      A. Yes.
10     Q. Looking at Paragraph 3 where it says, "If
11 accepted"?
12     A. Yes.
13     Q. You understood that if this form was accepted by
14 the NASD, it would become part of your permanent
15 disciplinary record, did you not?
16     A. Yes.
17     Q. And that it would be available through the NASD
18 public disclosure program?
19     A. Yes.
20     Q. And the NASD could make public announcements
21 concerning this agreement?
22     A. Yes.
23     Q. And that you would not take any action or make or
24 permit to be made any public statements including in
25 regulatory filings and otherwise is (inaudible) direct

246

1  or indirect in any finding in the AWC or create the
2  impression that the AWC is without factual basis"?
3      A. Correct.
4      Q. Is that what you agreed to?
5      A. Yes.
6      Q. Look at the next page, please, bearing page
7  Number 13?
8      A. Okay.
9      Q. And it's fair to say what it listed was accurate
10 that you had entered the securities industry in June of
11 1996, right?
12     A. Yes.
13     Q. That you were associated with ONESCO from March
14 23, 2004 through January 3, 2005?
15     A. Yes.
16     Q. And at the time of this you did not have any
17 association with any other broker/dealers, did you?
18     A. Correct.
19     Q. And, in fact, where it says, "Lancaster has not
20 been the subject to prior disciplinary history by the
21 NASD," that was accurate as well, correct?
22     A. Correct.
23     Q. Let's look at the next page, Page 14 with the
24 heading "Private Securities Transactions, NASD Conduct
25 Rules 2010 and 3040;" do you see that?

247

1      A. Yes.
2      Q. And it says that from March 23, 2004 through
3  January 3, 2005, Lancaster participated in the sales of
4  a little bit less than $5 million worth of shares in
5  Lancorp Financial Fund Trust through a private placement
6  memorandum, correct?
7      A. Correct.
8      Q. And that was accurate, wasn't it?
9      A. Yes.
10     Q. If we then look at the page that is marked
11 "ONESCO 16," Item Number 2, it says, "Lancaster failed
12 to provide written notice of his participation in the
13 securities transactions to O.N. Equity," right?
14     A. Correct.
15     Q. And that was accurate?
16     A. Yes.
17     Q. And you understood that the punishment that you
18 received by entering into this stipulation was that you
19 were permanently barred from having any association with
20 any NASD member in any capacity?
21     A. Yes.
22     Q. And I take it that you took this very seriously
23 at the time you entered into this agreement?
24     A. Absolutely.
25     Q. You did not take it lightly because you

248

1  understood that from never -- forevermore you would
2  never have association as a licensed member with any
3  other broker/dealer?
4      A. Correct.
5      Q. You also understood that this would become part
6  of a public record that would be available to anyone who
7  checked your CRD record, correct?
8      A. Yes.
9      Q. Now, you were asked some questions about whether
10 or not the location of your address had been properly
11 disclosed, that is, where your ONESCO office was, and I
12 believe you testified it was in Oregon, correct?
13     A. Correct.
14     Q. Is it fair to say that at no point in time did
15 any of the investors profess confusion to you in terms
16 of how to locate you?
17     A. No.
18     Q. Is it fair to say that in all of the documents
19 that you provided the investors, you identified your
20 Oregon home address as your location?
21     A. Yes.
22     Q. Did the NASD indicate that they had any issues
23 and problems in locating you?
24     A. No.
25     Q. Did the SEC indicate that they had any problems

249

1  or issues in locating you?
2      A.  No.
3      Q.  Did the receiver appointed by the court indicate
4  there were any problems in contacting you?
5      A.  No.
6      Q.  Did anyone ever indicate that they were somehow
7  disadvantaged by the clerical error that occurred in
8  identifying what your address was on the --
9      A.  No.
10         MR. NEKVASIL:  Mr. Chairman, we move to
11  strike the question -- the answer because of the
12  question which characterizes a clerical error.
13         MR. CHAIRMAN:  We'll just note that you, you
14  know, object and there's no striking in an arbitration
15  record anyway.
16         MR. NEKVASIL:  That's fine.
17  BY-MR. LITTLE:
18      Q.  And, sir, the document that identified
19  incorrectly your address was, in fact, a document you
20  signed?
21      A.  Yes.
22      Q.  That is the form that said here's the wrong
23  address was signed by you?
24      A.  Correct.
25      Q.  And you just didn't catch it either, did you?

250

1      A.  Correct.
2      Q.  And if you had caught it, you would have told
3  someone?
4      A.  Yes.
5         MR. CHAIRMAN:  Do you have an estimate of
6  how much more time you need?
7         MR. LITTLE:  I have plenty of questions.  I
8  was just trying to find the next exhibit.  Sorry to
9  disappoint you.
10         MR. CHAIRMAN:  How about planning a break in
11  about 15 minutes?
12         MR. LITTLE:  That's fine.
13  BY-MR. LITTLE:
14      Q.  Is it fair to say, sir, that with respect to --
15  just so we're clear, you represented to the NASD that
16  you did not solicit the investors, correct?
17      A.  Correct.
18      Q.  And what you understood the way the system worked
19  is others would solicit the investors and bring them to
20  you?
21      A.  Correct.
22      Q.  And that you would then manage the monies in the
23  account?
24      A.  Correct.
25      Q.  And so it was up to Gary McDuff or Mr. Reese to

251

1  make the solicitations?
2      A.  Correct.
3      Q.  And in terms of Mr. Reese, is it fair to say that
4  you did not know much, if anything, about his
5  background?
6      A.  Correct.
7      Q.  You understood that he sold insurance?
8      A.  Yes.
9      Q.  And did some financial planning?
10      A.  He had clients that he advised in some capacity.
11      Q.  Okay.  But other than that you were not familiar
12  with his background?
13      A.  Correct.
14      Q.  To the extent Mr. Reese made presentations to
15  customers, is it fair to say that you would not have
16  participated in those presentations?
17      A.  Correct.
18      Q.  To the extent that he was sending literature to
19  the investors, that's not something you would have been
20  copied on?
21      A.  Correct.
22      Q.  Okay.  And is it fair to say that what you really
23  expected Mr. Reese to do is that to the extent he
24  solicited any investors, that he was to do so consistent
25  with the private placement memorandum?

252

1      A.  Yes.
2      Q.  And that given that the private placement
3  memorandum indicated there was no broker/dealer
4  involved, you had every reason to believe that Mr. Reese
5  would not disclose to any investors that there was a
6  broker/dealer involved?
7      A.  Correct.
8      Q.  And, to your knowledge -- did Mr. Reese ever
9  contact you and say, oh, by the way, I'm telling people
10  that there's a broker/dealer involved?
11      A.  No.
12      Q.  Or that people were relying upon your licenses?
13      A.  No.
14      Q.  Let's then, if we could, turn to Exhibit 82-A.
15  One of the accounts that you would have held would have
16  been one at Piper Jaffray in your name, correct?
17      A.  Yes.
18      Q.  And if we look at 82-A, in the middle where it
19  says, "name of current employer," it actually identifies
20  the O.N. Equity Sales Company, do you see that?
21      A.  Yes.
22      Q.  And this is the account -- that was your
23  retirement account, wasn't it?
24      A.  Yes.
25      Q.  So if we look, then, at Exhibit 82-B, and, again,

253

1  we're talking about Account 5562, if we look at
2  account -- your June 2004 statement, it shows that in
3  Account 5562 this is how much you had in your retirement
4  plan?
5      A. Correct.
6      Q. And this is the type of account statement you
7  anticipated would be provided to Lancaster as a result
8  of the -- excuse me -- to ONESCO as a result of the
9  February 2004 disclosure of the existence of this
10 account?
11     A. Correct.
12     Q. If we then turn to what's marked as 82-C, again,
13 this shows no activity, does it?
14     A. Correct.
15     Q. And if you would go, then, through 82-D, E, F, G,
16 H, and confirm for us that these are the account
17 statements for your personal retirement plan statement
18 that you anticipated would be given to ONESCO?
19     A. Correct.
20     Q. And none of the trust funds for those
21 statements -- none of the trust funds would have been
22 transferred through this account?
23     A. Correct.
24     Q. Now, let's, then, look at Exhibit 83. And
25 turning to Exhibit 83-A, you also had an account in the

254

1  name of the Lancorp Financial Group, L.L.C.?
2      A. Yes.
3      Q. And the account number at the top just for
4  shorthand was 8898, correct?
5      A. Yes.
6      Q. And your signature is found at Page 148 of 838,
7  isn't it?
8      A. Yes.
9      Q. Now, this particular account does not disclose
10 that you had any association with another broker/dealer,
11 does it?
12     A. No.
13     Q. And this is not an account statement that you
14 anticipated would have been sent to ONESCO, right?
15     A. Correct.
16     Q. If we look at 83-B in the typed out provision --
17 or version of the account profile and look in the middle
18 of the page where it says, "NASD class," and, in fact,
19 it says, "Not an employee of a brokerage firm or a
20 relative one or in another class monitored by the NASD,"
21 right?
22     A. Correct.
23     Q. Now, if we then look at 83-D --
24     A. I guess I don't have a tab for that. What is it?
25     Q. 83-D?

255

1      A. I don't have a D tab. So what --
2      Q. I'm sorry. It's 174.
3      A. Okay.
4      Q. That is a December 2000 account statement for the
5  Lancorp Financial Group, L.L.C. bearing the stamp 8898?
6          MR. NEKVASIL: Mr. Chairman, I'm going to
7  object. First of all, the minor technical one they said
8  December 2000 and it's December 2002.
9          The second, Mr. Chairman, I want to object
10 to this whole line of questioning because unlike the IRA
11 account this account was opened years before he joined
12 ONESCO. So, of course, he's not going to put on the
13 account in 2002 that he's affiliated with ONESCO because
14 this account, Mr. Chairman, was open in 2002. So
15 they -- I know there's no intent on his part to mislead
16 the panel, but I don't understand (inaudible) the
17 question. If you go back to page --
18         MR. CHAIRMAN: What's the relevance of this?
19         MR. LITTLE: I'm going to walk you through
20 the account statements and show you the flow of the
21 money.
22         MR. NEKVASIL: Okay. But, Mr. Chairman, I
23 object to the line of questions. Is he asking
24 specifically -- I asked him a series of questions on
25 this about not disclosing to ONESCO. That's got nothing

256

1  to do with the flow of money and this account was opened
2  in December of 2002.
3          MR. CHAIRMAN: Okay. Your point is taken.
4  Let's get on with --
5          MR. LITTLE: We're going to get there --
6          MR. CHAIRMAN: Well, try to get there fast.
7          MR. LITTLE: -- if we can make our way.
8  BY-MR. LITTLE:
9      Q. This particular account -- in fact, if we look at
10 83-E, which has the Bates stamp 180, was, in fact,
11 opened for a very short period of time because the money
12 was transferred out, wasn't it?
13     A. Yes.
14     Q. And then -- so let's turn to 84-A. This is an
15 account statement -- and by the way, the amount in the
16 last account was $41,000?
17     A. Correct.
18     Q. Let's look at 84-A. This account has the name
19 Lancorp Financial Fund Business Trust, right?
20     A. Yes.
21     Q. And the account number there is 5560 up in the
22 upper right-hand corner?
23     A. Yes.
24     Q. Now, this one, the date is March 31, 2003, right?
25     A. Yes.

257

1      Q. And just so we're clear, in the middle of it,
2  again, not an employee of a brokerage firm or
3  (inaudible) of another class monitored by --
4          MR. NEKVASIL: Mr. Chairman, in March 2003
5  he was not affiliated with a broker/dealer. I, again,
6  object to this questioning. This has nothing to do with
7  paper flow. He's trying to plant in your mind some
8  insinuation that he disclosed this IRA account in 2004,
9  but didn't disclose these two accounts with them when
10 they were opened and closed before he joined ONESCO.
11 Remember the testimony --
12         MR. CHAIRMAN: Mr. Little, why don't you
13 tell us where you're trying to go with this.
14         MR. LITTLE: Well, I'm going to ask him the
15 next question, did he ever amend that.
16         MR. CHAIRMAN: Ever amend this?
17         MR. LITTLE: Amend the disclosure
18 (inaudible) he was associated with a broker/dealer.
19         MR. NEKVASIL: Mr. Chairman, I object to
20 that. Because I believe this is the account that the
21 testimony is that was closed in August of 2003 after the
22 compliance director for U.S. Bancorp Piper Jaffray saw
23 on the Internet an issue with Gary Lancaster and the
24 Avenger Fund, and he did not join ONESCO until March
25 2004. This is misleading.

258

1          MR. CHAIRMAN: Is that right?
2          MR. LITTLE: It's not misleading.
3          MR. CHAIRMAN: No. About the facts, about
4  the opening and closing. I didn't mean --
5          MR. LITTLE: No. I'm walking -- there were
6  several accounts. We have to walk you through them so
7  you can see them.
8          MR. NEKVASIL: I object. He's walking them
9  through this account. I'm sorry. He's walking through
10 this account.
11         MR. LITTLE: He can do his
12 cross-examination --
13         MR. NEKVASIL: No. But, Mr. Chairman,
14 that's misleading to you --
15         MR. CHAIRMAN: Hang on. Hang on.
16         MR. LITTLE: I understand he's excited on
17 this, but I'd like to get through the examination. I
18 sat patiently as he went through this.
19         MR. CHAIRMAN: I don't need that. I don't
20 need that. Just tell me what this is about and where
21 you're going with it.
22         MR. LITTLE: Yeah. As on this particular
23 one -- excuse me. As on this particular one, again,
24 we're going to show the movement of money from this
25 account, and it goes up to -- let me get the date for

259

1  you. We're up to a million dollars.
2          MR. CHAIRMAN: Go to where?
3          MR. LITTLE: In July of 2003.
4          MR. CHAIRMAN: Why don't you go to where it
5  moves.
6          MR. NEKVASIL: Mr. Chairman, he doesn't mean
7  moves. What he really means is -- he means to say that
8  he actually wanted to show you how the account grew to a
9  million before it was closed at the request of the
10 compliance department, which is already in evidence. I
11 don't have an objection. If he repeats that testimony
12 with you during an objection and saying, well, you don't
13 disclose that he was with a -- you were with a
14 broker/dealer. You don't amend that disclosure knowing
15 that the account was closed in 2003. The only basis for
16 those two questions is to plant a thought in your
17 mouth -- mind that he should have disclosed that.
18         MR. LUKOWSKI: Why don't you also assume for
19 the fact that we're reasonably sophisticated and that we
20 understand difference in dates and that you can
21 certainly point those out to us, and I think my personal
22 preference that would be --
23         MR. NEKVASIL: I mean no insinuations on the
24 contrary.
25         MR. CHAIRMAN: I'm sure you will be able to

260

1  articulate your explanation very well.
2          MR. NEKVASIL: The idea is to get the facts
3  to you, though.
4          MR. CHAIRMAN: I know.
5          MS. WRIGHT: It's not putting anything in my
6  mind. I'm -- you know, I can figure out what's going
7  on. Let him go through what he wants to do.
8  BY-MR. LITTLE:
9      Q. Sir, looking for the exhibits that are behind
10 Exhibit 84, does that show that that account grew from
11 roughly $5,000 until we get to roughly a million dollars
12 in August of 2003?
13     A. Correct.
14     Q. And then those monies were transferred out, were
15 they not?
16     A. Yes.
17     Q. Then look at --
18         MR. LUKOWSKI: Stop for a second, please.
19 On 84-A, there's -- you've got boxes checked, over $5
20 million. What does that have to do with anything?
21         MR. LITTLE: I don't have those boxes
22 checked.
23         MR. LUKOWSKI: On 84-A?
24         MR. LITTLE: No. That's not my checks.
25         MR. LUKOWSKI: I know. I'm saying that it's

261

1  on the original document.
2          MR. LITTLE:  Okay.
3          MR. LUKOWSKI:  I'm not saying it's anything
4  you did.
5          MR. LITTLE:  You want me to ask the question
6  with the witness, then?
7          MR. LUKOWSKI:  Please.
8  BY-MR. LITTLE:
9      Q.  Okay.  Sir, it was anticipation that there would
10  be money from the trust flowing into the -- this
11  particular account?
12     A.  Correct.
13     Q.  That is, the money for the account was going to
14  be held in an account name actually in the name of the
15  trust?
16     A.  Correct.
17         MR. LITTLE:  Is that sufficient?
18         MR. LUKOWSKI:  Yes.  Thank you.
19  BY-MR. LITTLE:
20     Q.  Okay.  By the way, Counsel asked -- or maybe
21  commented reason this account was shut down is because
22  Piper Jaffray took issue with the activity that was
23  being engaged in.
24         MR. NEKVASIL:  I object, Mr. Chairman.  I --
25  didn't -- the witness testified -- he said Counsel said.

262

1  The witness testified right before the lunch break
2  that -- I asked him why was -- was it his expectation to
3  keep this account open until it reached 5 million, yeah.
4  Well, obviously it changed and closed in August of 2003.
5  Why?  He said because the compliance department asked
6  the brokers to shut it down because they saw something
7  on the Internet --
8          MR. CHAIRMAN:  Okay.  Well, let's -- he just
9  said you repeated that.
10         MR. LITTLE:  He just repeated it five
11  minutes ago.
12         MR. CHAIRMAN:  He didn't say you gave
13  testimony.  He said you repeated that and that's what he
14  had testified to.
15  BY-MR. LITTLE:
16     Q.  Sir, did Piper Jaffray amend your U-5 at any
17  point in time to disclose the activity associated with
18  the Lancorp Financial Fund Business Trust?
19     A.  Not to my knowledge.
20         MR. LITTLE:  I understand the tape is about
21  out.  We need to take a break.
22         MR. CHAIRMAN:  You need a tape break?
23         MR. LITTLE:  Yeah.
24         VIDEOGRAPHER:  The time is 4:13 p.m.  This
25  concludes Tape Number 4.  We're now off the video

263

1  record.
2          (Thereupon, a break was taken.)
3          VIDEOGRAPHER:  The time is 4:30 p.m.  This
4  begins Tape Number 5.  We're back on the video record.
5  BY-MR. LITTLE:
6      Q.  Would you turn to Respondent's Exhibit 85-A,
7  please.  And there's a reference there to Lancorp
8  Financial Group, L.L.C., counselor, FBO, International
9  Capital Institute.  What's the International Capital
10  Institute?
11     A.  I don't know.
12     Q.  If you look at the account statement 85-B -- I'm
13  sorry, the account profile, again, there's a reference
14  to International Capital Institute.  Do you know what
15  that is?
16     A.  I don't.  It must be just a description of a kind
17  of an account it is.
18     Q.  Look at 85-D, does that show that this particular
19  account was -- had $5 million transferred into it in the
20  month of May 2003?
21         MR. CHAIRMAN:  B or D?
22         MR. LITTLE:  D, as in David.
23  BY-MR. LITTLE:
24     Q.  Now, what I'm trying to understand is the last
25  account that was in Series 84 that was closed out in

264

1  August 2003, in terms of moving of money, that's 2003.
2  You add another account in Piper Jaffray that would have
3  then contained another $5 million?
4      A.  Yes.
5      Q.  And if we look at 85-F, did you sign 85-F?
6      A.  Yes.
7      Q.  And it says, "As per our conversation, please
8  wire 100 percent of the funds from account 49748902 to
9  the International Capital Institute account at Salomon,
10  Smith Barney"?
11     A.  Yes.
12     Q.  And then it gives an account number?
13     A.  Correct.
14     Q.  Does that refresh your recollection as to what
15  that account was?
16     A.  It does.
17     Q.  And what was that account?
18     A.  This was an account set up specifically for a
19  contact, if you will, of Gary McDuff who was going to
20  participate in the trading.  There was a specific bond
21  trader who was with one of the big east coast firms who
22  came out, and I forgot his name now.  He was actually
23  going to execute the trade.  This was a custody account
24  set up for him to do that.
25     Q.  Was this pre Tricom?

265

1     A. Yes.
2     Q. Okay. And was this a broker/dealer in terms of
3  it was maintained at Smith Barney?
4     A. The -- the account that the money came into U.S.
5  Bank was Smith Barney -- in the Smith Barney account
6  owned by International Capital Institute. That's the
7  client.
8     Q. Did you contain to -- continue to maintain
9  control of the monies placed in the Smith Barney
10 account?
11    A. No. No trading occurred. The guy didn't get it
12 done and so the client requested his money back, and I
13 already had the money sent back to his account.
14       MS. WRIGHT: Excuse me. I'm having a hard
15 time hearing because this fan is on. Did you say the
16 money that went into this account, this 5 million or so,
17 was from a potential client?
18       THE WITNESS: It was from a client who
19 wanted to participate who transferred his money into the
20 account and in anticipation of the trading would begin
21 to occur that was -- a bond trader from -- and I forget
22 now -- one of the big named broker/dealers on the east
23 coast who actually came out and who I met with who was
24 going to actually to do the trading for them, the
25 client. It never happened. The money sat in the

266

1  account. He then said, well, if nothing's going to
2  happen, then send the money back.
3        MR. LUKOWSKI: Does this have anything to do
4  with Lancorp Business Trust?
5        THE WITNESS: No.
6        MR. CHAIRMAN: So this is an independent
7  separate $5 million.
8        THE WITNESS: Totally separate transaction.
9        MR. CHAIRMAN: And the money went in and
10 out, no loss, no gain?
11       THE WITNESS: Nothing happened. The guy
12 said give it back so I sent it back to him.
13 BY-MR. LITTLE:
14    Q. And when did you send the money back?
15    A. I ordered it on this date, so I didn't -- I
16 didn't send it.
17    Q. Oh, I'm sorry. So the money originally came from
18 Smith Barney --
19    A. Came from Smith Barney into this account. It sat
20 there for a period of time. When nothing happened, he
21 asked for it back and I requested to have the funds sent
22 back to the original Smith Barney account that it came
23 from.
24    Q. Fine.
25       Now, let's look then, if we could, at

267

1  Respondent's Exhibit 86. And that's the document
2  entitled, "Personal Brokerage Account Disclosure Form"?
3     A. Yes.
4     Q. That you signed on or about September 24th, 2004?
5     A. Correct.
6     Q. Now, was it your testimony earlier that this also
7  came from the annual compliance questionnaire?
8     A. That is what I'm thinking. I can't say that with
9  absolute certainty.
10    Q. If you look at the middle of the page, did you
11 see there's no Page 6?
12    A. Correct.
13    Q. And you can confirm for your own benefit, but if
14 you go back at 109-D and look at the personal brokerage
15 account disclosure form bearing the Bates stamp 10412,
16 do you see the Page 6 there? It's 10412.
17    A. Under what tab?
18    Q. Behind Tab 109-D.
19    A. 109-D.
20    Q. Turn to Page 6 of that.
21    A. What's the ON number?
22    Q. 10412?
23    A. 412, okay.
24    Q. Okay. Do you have that?
25       And that's a copy of a Personal Brokerage Account

268

1  Disclosure Form?
2     A. Yes.
3     Q. And this particular version has a Page 6?
4     A. Yes.
5     Q. The one that was distributed with the compliance
6  manual. But the one you filled out in September did
7  not, in fact, have that?
8     A. Correct.
9     Q. Now, is it fair to say that the Lancorp Financial
10 Fund Business Trust was not a personal account of yours?
11    A. Correct.
12    Q. And if we look at Rule 3050 behind Respondent's
13 Exhibit 88, looking at the -- turning to the second
14 page, sir. We're looking at 3050, Subparagraph C where
15 it says, "Obligations of associated persons concerning
16 an account with a member." Do you see that language?
17    A. Yes.
18    Q. And it says, "A person associated with a member
19 prior to opening an account are placed in an initial
20 order for the purchase or sale securities with another
21 member shall notify both the employer member and the
22 executing member in writing of his or her association
23 with the other member provided however that if the
24 account was established prior to the association of the
25 person with the employer member, the associated person

## 269

1 shall notify both members in writing promptly after
2 becoming so associated;" do you see that?
3    A.  Yes.
4    Q.  And, sir, is it fair to say that when we look at
5 Exhibit 86 again, that, in fact, the Tricom account that
6 you described as not being personal in nature, had
7 actually been opened prior to September of 2004?
8    A.  Yes.
9    Q.  In fact, if we could look at what's been marked
10 as Exhibit 87-B, is this a copy of a March 18th, 2004
11 fax that you sent to Australia regarding this new
12 account?
13    A.  Correct.
14    Q.  And attached to what you provided was the client
15 and account details?
16    A.  Yes.
17        MR. NEKVASIL:  What number was that?  I'm
18 sorry.
19        MR. LITTLE:  This is Exhibit 87-B.
20        MR. NEKVASIL:  Okay.  I missed the B.  I
21 apologize.
22        MR. CHAIRMAN:  And that's a fax to
23 Australia?
24 BY-MR. LITTLE:
25    Q.  Is that a fax to Australia?

## 270

1    A.  Yes.
2    Q.  It reflects your fax stamp at the top, does it
3 not?
4    A.  Yes.
5    Q.  And it shows that you faxed it on March 18, 2004?
6    A.  Correct.
7    Q.  And the account name you put was Lancorp
8 Financial Fund Business Trust?
9    A.  Yes.
10    Q.  Okay.  If we then look at the last page of the
11 document, does that bear your signature?
12    A.  It does.
13    Q.  And on the second to the last page of the
14 document, does it show the agreements March 18th, 2004?
15    A.  Yes.
16    Q.  This is the time in which you would have just
17 started your registration with ONESCO?
18    A.  Correct.
19    Q.  And is it fair to say you did not disclose the
20 existence of this account at the time it was created in
21 March of 2004?
22    A.  Correct.
23    Q.  If we then, please, look at what's been marked as
24 Exhibit 87-A.  Take a moment and look through those
25 statements and confirm for us that those are the account

## 271

1 statements for the Tricom account you maintained in
2 Australia.
3    A.  They are.
4    Q.  And those account statements show activity
5 occurring prior to September 2004, do they not?
6    A.  Yes.
7    Q.  And, in fact, if we then go to Respondent's
8 Exhibit 101-B, that's the letter to the NASD you dated
9 January 6th, 2006, where in Paragraph 5 you itemized the
10 monies being sent starting in April 2004 to Tricom?
11    A.  Correct.
12    Q.  And it looks like with the exception of the last
13 two installments -- excuse me, with the exception of the
14 October 7, 2004 payment, or transfer, all of the money
15 placed in Tricom account had been sent there prior to
16 your execution of the personal disclosure
17 brokerage/dealer form; is that right?
18    A.  Which was what date?
19    Q.  September 24.
20    A.  Correct.
21    Q.  And, sir, when you filled out the Lancorp
22 Financial Fund Business Trust -- excuse me -- when you
23 filled out Respondent's Exhibit 86, it was not your
24 intention to disclose that as a private securities
25 transaction, was it?

## 272

1    A.  No.
2    Q.  And, in fact, it was not your intentions to ask
3 ONESCO to basically approve all the activity occurring
4 in that account, correct?
5    A.  Correct.
6    Q.  What you did is disclose in the account simply
7 the existence of the account?
8    A.  Correct.
9    Q.  And as you sat here today, is it your testimony
10 you don't understand why you would have submitted it
11 during that time frame some six months after the fact?
12    A.  I don't remember what initiated me to send it.
13    Q.  But in terms of your intent, you did not view
14 this as a request to ONESCO to approve any type of
15 private securities transaction?
16    A.  No.
17    Q.  Now, is it -- sir, is it fair to say that with
18 respect to the Tricom account, those monies would have
19 been moved in December of 2004?
20    A.  That sounds correct.
21    Q.  And if we could go back, please, to -- before we
22 do that, you were shown some letters previously about
23 the Pennsylvania Division of Securities making some
24 inquiries?
25    A.  Yes.

273

1    Q. And just so we're clear on the dates, if you turn
2  to Respondent's Exhibit 93, it says September 3, 2004 on
3  that letter from Pennsylvania?
4    A. Yes.
5    Q. And then if you turn to the next one -- I'm
6  sorry -- Respondent's Exhibit 95, another letter from
7  Pennsylvania Division of Securities with a date of
8  September 15th, 2004, is it your testimony that you did
9  not submit that form on September 24 because you had
10  been contacted by the Pennsylvania Division of
11  Securities?
12    A. Yes. I would have remembered that.
13    Q. Sir, is it fair to say that --
14    MS. WRIGHT: I'm sorry. I did not hear that
15  answer.
16    THE WITNESS: I said I would have remembered
17  that.
18    MS. WRIGHT: Okay.
19  BY-MR. LITTLE:
20    Q. But you don't otherwise have any explanation as
21  to why you submitted that form on September 24?
22    A. I did not.
23    Q. Sir, with respect to Pennsylvania, when you
24  submitted the Form D to Pennsylvania's division of
25  securities, did they at any point in time tell you that

274

1  notice filing was insufficient or inadequate in any way?
2    A. Not that I recall.
3    Q. And do you have any recollection of Pennsylvania
4  advising you that you could not move forward with this
5  unregistered securities sales within the state?
6    A. No.
7    Q. At any point in time did they contact you and say
8  we're investigating you with respect to the activities
9  of the Lancorp Business Fund Trust?
10    A. No.
11    Q. And so they never issued any type of cease and
12  desist letter to you?
13    A. No.
14    Q. Or otherwise took any action against you,
15  whatsoever?
16    A. Not that I know of.
17    Q. Did Pennsylvania ever indicate to you that they
18  had received a customer complaint concerning you?
19    A. Did they notify me of that?
20    Q. Yes.
21    A. Not that I remember.
22    MR. NEKVASIL: Can he -- can we make sure
23  the witness keeps speaking up. I'm having a problem
24  hearing him.
25    MS. WRIGHT: It's this fan thing that's on.

275

1  It's difficult.
2    MR. CHAIRMAN: And I know you don't want to
3  shout in his ear, but --
4    THE WITNESS: I don't remember receiving
5  anything from Pennsylvania.
6  BY-MR. LITTLE:
7    Q. Okay. Let's -- if we could go back to Volume 1,
8  please.
9    MR. CHAIRMAN: Page?
10  BY-MR. LITTLE:
11    Q. If you would turn to Exhibit 26-A, please. Is
12  this a letter of December 6th, 2004 that you would have
13  sent to all of the investors?
14    A. Yes.
15    Q. And if we look at the second paragraph of the
16  letter it says, "As of Friday December 3rd, it has been
17  confirmed that the information that has been provided to
18  me by the syndication group of which Lancorp Financial
19  Fund is a participant has been misleading and, in fact,
20  not accurate relative to Lancorp.
21    The fact is that Lancorp Financial Fund may not
22  have participated in the underwriting activity of the
23  syndicating group during the third quart ending in
24  September 30, 2004. It is recently certain that Lancorp
25  Financial Fund would not have participated in any

276

1  underwriting activity in the syndicating group during
2  the fourth quarter ending December 31, 2004."
3    Is the reference there to the money that was
4  being held at Tricom?
5    A. Yes.
6    Q. And what you communicated to the investors is
7  that, in fact, Lancorp Financial Business Fund Trust had
8  received misleading information as to what was going on
9  with respect to that investment?
10    A. Yes.
11    Q. And, in fact, that is something you would have
12  communicated to each investor?
13    A. Yes.
14    Q. And I take it, you were disappointed with the
15  fact that you personally had been mislead?
16    A. Yes.
17    Q. And you thought that was inappropriate?
18    A. Correct.
19    Q. And did you -- if you look, then, at the second
20  page, the one bearing the Bates stamp Lancaster 4076.
21  The first paragraph says, "The news is not all bad,
22  however, I have made contact with the principal of a
23  major securities firm with who I have a previous
24  relationship and have reached an agreement to be a
25  participant with that firm.

## 277

1    Part of that agreement is the guarantee of full
2    participation in all the underwriting activities.  I
3    expect the necessary documents to be executed during the
4    month of December with this fund participation to begin
5    in January 2005;" do you see that?
6        A.  Yes.
7        Q.  What was the broker/dealer you were referring to
8    there?
9        A.  That was a broker/dealer called the Aurora Group
10   in the UK.
11           MR. CHAIRMAN:  The what?
12           THE WITNESS:  It was a group called -- I
13   forget what the original company name was.  They were
14   taking over -- I think it was Jackson Baton [phonetic]
15   and they were taken over by another company that was
16   called the Aurora Group and they were a broker/dealer in
17   the UK.
18           MR. NEKVASIL:  I'm having a problem hearing.
19   Is it Aurora?  I'm sorry.
20           MR. CHAIRMAN:  Aurora Group.  How do you
21   spell that name?
22           THE WITNESS:  I think it was A-U-R-O-R-A.
23   BY-MR. LITTLE:
24       Q.  Now, if we look at the next paragraph, it says,
25   "As an investor, you now have the following choices:

## 278

1    Remain in the fund and redeem your shares"?
2        A.  Yes.
3        Q.  So after you advised the investors that there had
4    been some inappropriate conduct with respect to the
5    disposition of the funds, you gave them the option?
6        A.  Yes.
7        Q.  And was that option granted to each of the
8    investors?
9        A.  Yes.
10       Q.  So if we look at Exhibit 26-B, is this simply a
11   form of the type of letter you would have sent to each
12   of the investors describing the same information found
13   in 26-A?
14       A.  Yes.
15       Q.  Now, some of the investors accepted your
16   invitation, did they not?
17       A.  They did.
18       Q.  So if we look at 26-C?
19           MR. GOODMAN:  26?
20           MR. LITTLE:  26-C, please.
21           MR. GOODMAN:  Excuse me.
22   BY-MR. LITTLE:
23       Q.  Is this a request by one of the investors in
24   December of 2004 to withdraw funds?
25       A.  Yes.

## 279

1        Q.  And just so we're clear, if you look at 26-D,
2    also it's dated in September 2004, it appears this is
3    another investor who has elected to withdraw the funds?
4        A.  Yes.
5        Q.  Did some of the investors actually withdraw their
6    funds and put them back in?
7        A.  Yes.  I don't remember how many, but some, yes.
8        Q.  Let's look at Exhibit 26-E.  And this is a
9    request from someone -- one of the investors, I take it,
10   on December 17th --
11       A.  Yes.
12       Q.  -- 2004 asking for the return of the money?
13       A.  Yes.
14       Q.  And after that you would have sent -- if we look
15   at 26-F, a letter of January 18th, 2005 to all
16   investors, right?
17       A.  Yes.
18       Q.  And January 18 is after you had been terminated
19   from ONESCO?
20       A.  Yes.
21       Q.  Okay.  And this says, "I hope this communication
22   finds it all as well with you.  As promised, this is an
23   update from my last letter.  I still do not have an
24   adequate explanation as to why the funds did not
25   participate in the earnings activity in the last two

## 280

1    quarters of 2004.  At this point I do not have an
2    expectation of receiving one.
3        Further, I have no expectation the fund will
4    receive any earnings that should have been paid to the
5    fund."
6        And then the next paragraph, "I am currently
7    waiting for the first contracts, which are expected to
8    be received soon, I am requiring direct written
9    contracts so there will not be a reoccurrence of the
10   previous issues going forth."
11       When you say the "direct written contracts,"
12   that's the written direct contract with MegaFund, isn't
13   it?
14       A.  No.
15           MR. CHAIRMAN:  With who?
16           THE WITNESS:  This was the --
17           MR. CHAIRMAN:  I didn't hear who was --
18           MR. LITTLE:  I said it was MegaFund.
19           MR. CHAIRMAN:  MegaFund.
20           MR. LITTLE:  And he said no.
21           THE WITNESS:  No.  This was the anticipation
22   of having an agreement drawn up with the Aurora Group,
23   and I was going to demand in writing the same kind of
24   guarantees that I had from Tricom.
25   BY-MR. LITTLE:

281

1    Q.  You never did receive that, did you?
2    A.  No.
3    Q.  So what was proposed in December and January of
4    2005 never occurred?
5    A.  That's correct.
6    Q.  And what the investors know, though, is that in
7    January 2005 you still have not secured a viable
8    investment alternative for them?
9    A.  Correct.
10   Q.  And when you're communicating this in January
11   2005, it is after you have left ONESCO?
12   A.  Yes.
13   Q.  Now, if you look at 26-H, please.  So it
14   continues after you left ONESCO that investors are
15   asking for the return of the money such as 26-H?
16   A.  Yes.
17   Q.  Where we have someone on January 24, 2005, a
18   Kerry Robertson asking for the return of their money?
19   A.  Yes.
20   Q.  And you returned it, did you not?
21   A.  Correct.
22   Q.  And if you look at 26-I, a Lisa Hoffman
23   [phonetic], January 24th, 2005, returning -- requesting
24   the return of the money?
25   A.  Yes.

282

1    Q.  That identical -- identical document, it is then
2    sent by Louise Robrez [phonetic] in 26-J, correct?
3    A.  Yes.
4    Q.  And then if we look at 26-P, as in Paul, after
5    you left a message, these investors, some of them, just
6    the ones we identified, made an election to come back
7    into the fund?
8    A.  Correct.
9    Q.  Did they not?
10   A.  Yes.
11   Q.  So 26-P is an example of investors who had
12   previously withdrew their funds but elected to come back
13   in?
14   A.  Yes.
15   Q.  And it's fair to say that what you wanted the
16   investors to do when you communicated that there had
17   been this inappropriate conduct, was to make a choice.
18   Stay in or stay out?
19   A.  Correct.
20   Q.  And if they told you they were out, they were
21   out, right?
22   A.  Yes.
23   Q.  And if they stayed in, they were in?
24   A.  Correct.
25   Q.  Now, what occurred between February 11th, 2005

283

1    when people were getting back in and the correspondence
2    of January is that at that point in time you entered
3    into an agreement with MegaFund?
4    A.  Yes.
5    Q.  So if we go to 26-L, please, and -- I'm sorry, I
6    should have a better copy.  Go to 26-N.  I apologize.
7         MS. WRIGHT:  Excuse me?
8         MR. LITTLE:  26-N, as in Nancy.
9    BY-MR. LITTLE:
10   Q.  What happened is that you received a letter from
11   the -- it was represented to be the general counsel of
12   MegaFund making certain representations to you, correct?
13   A.  Correct.
14   Q.  And that's February 5, 2005?
15   A.  Correct.
16   Q.  And then after you received that is when you
17   entered into the joint venture agreement that was
18   discussed earlier?
19   A.  Correct.
20   Q.  And under that joint venture agreement, all of
21   the monies that you currently had as well as collected
22   in the future for the investors were to be placed in
23   MegaFund?
24   A.  Correct.
25   Q.  And then you would have the special compensation

284

1    arrangement that you described in which a maximum of 20
2    percent of the returns would be sent to the trust with
3    the balance split between you and Secured Clearing?
4    A.  Correct.
5    Q.  And then the bank in Mexico?
6    A.  And subsequent to the bank.
7    Q.  So after you secured that deal, if you look at
8    26-O, you say, "It is my belief that good communication
9    is important for a good relationship."
10        This is a letter you would have sent to all of
11   your investors, right?
12   A.  Uh-huh.
13        MR. CHAIRMAN:  Can you verbalize your
14   response?
15        THE WITNESS:  Yes.
16   BY-MR. LITTLE:
17   Q.  "With that in mind, even though my last letter
18   indicated I would notify you only if the documents were
19   not executed by the end of January, I wanted to let you
20   know that, in fact, the necessary documents are in place
21   and Lancorp Fund is now prepared to engage in the
22   investment activity as was anticipated," correct?
23   A.  Correct.
24   Q.  And then if you turn to 26-Q, this is the
25   confirmation letter from Stan Lightner [phonetic] to you

## 285

1    indicating that there has been a confirmation of the
2    execution of a joint venture agreement in which $5
3    million will be placed in MegaFund?
4        A.  Correct.
5        Q.  And after the MegaFund investment, then you have
6    investors, for example, if you turn to 26-R, 26-F, that
7    elect to come back into the fund?
8        A.  Yes.
9            MS. WRIGHT:  So was there communication with
10   the investors between 2-17-05 and, for example, that
11   letter of February 22nd regarding -- the 2-17-05 letter
12   from MegaFund talks about the return --
13           MR. CHAIRMAN:  It's Q.
14           MR. LITTLE:  26-Q.
15           MS. WRIGHT:  26-Q.  And this letter, for
16   example, from Louis Robrez was dated February 22nd, '05,
17   was there communication --
18           THE WITNESS:  No.
19           MS. WRIGHT:  -- between that date and when
20   he elected to come back in?
21           THE WITNESS:  No.
22   BY-MR. LITTLE:
23       Q.  The communication had been in the 26-O letter of
24   February 8th, 2005.
25           MS. WRIGHT:  February what?

## 286

1            MR. LITTLE:  8th.  That's 26-O?
2            MR. NEKVASIL:  That's O.  That's the ones --
3    the MegaFund letter was just to Lancorp, not to the
4    investors.
5            MS. WRIGHT:  Okay.
6    BY-MR. LITTLE:
7        Q.  So if we then turn -- so in terms of the -- just
8    keeping this straight -- if we go to 26-T.  When you say
9    the joint venture, this is the joint venture agreement
10   that was signed, correct?
11       A.  Correct.
12       Q.  "This joint venture is hereby entered into by and
13   between the Lancorp Financial Group, L.L.C. in MexBank,"
14   right?
15       A.  Correct.
16       Q.  And that's February 2, 2005?
17       A.  Right.
18       Q.  What you decided to do in February 2005 is use
19   the L.L.C. as the mechanism for entering into the
20   special fee agreement with MegaFund, correct?
21       A.  Correct.
22       Q.  Okay.  And previously you had not used the L.L.C.
23   for that purpose?
24       A.  Correct.
25       Q.  Prior to this, the L.L.C. had not been used with

## 287

1    respect to the activities of the trust?
2        A.  Correct.
3        Q.  It's only after you left the employment -- excuse
4    me -- the registration and association with ONESCO that
5    you used the Lancorp Financial Group, L.L.C. in any
6    capacity with the trust?
7        A.  Correct.
8        Q.  Now, is it fair to say that you would have
9    concluded that there was something wrong with the
10   MegaFund investment in May, as early as May of 2005?
11       A.  Yes.
12       Q.  And the SEC action was July of 2005?
13       A.  Yes.
14       Q.  And you would have received calls from the
15   investors who saw press releases about the SEC's
16   lawsuit?
17       A.  Yes.
18       Q.  And I take it that you did not immediately
19   contact the investors regarding the concerns you had
20   with the ability to recover the MegaFund investment?
21       A.  No.
22       Q.  You did not, right?
23       A.  I did not.
24       Q.  And, in fact, you delayed contacting the
25   investors for a period of time, correct?

## 288

1        A.  Yes.
2        Q.  And what you decided to do is even though there
3    was an issue with MegaFund and there had been a
4    receivership filed you continued to accept money from
5    investors?
6        A.  Yes.
7        Q.  And so even though you were put on notice that
8    there were issues, that did not stop you from moving
9    forward, did it?
10       A.  No.
11           MR. CHAIRMAN:  Where did that money go?
12           THE WITNESS:  That money was in Bank of
13   America.
14           MR. CHAIRMAN:  So it never got to MegaFund?
15           THE WITNESS:  It never got to MegaFund.
16           MR. CHAIRMAN:  Was it returned to the
17   investors?
18           THE WITNESS:  It was turned over to the
19   receiver.
20   BY-MR. LITTLE:
21       Q.  And just so -- for the benefit of the chair, the
22   $2 million -- how much was it, $2 million that was
23   collected after MegaFund's investments?
24       A.  Yes.
25       Q.  And that $2 million was placed actually in an

289

1   account that you were not exercising control over it,
2   was it?
3       A. Correct. But I didn't know that.
4       Q. What you found out is you had put the money in
5   another bank account that was being controlled by
6   someone you did not control?
7       A. Correct.
8       Q. And that money was in jeopardy, wasn't it?
9       A. Yes.
10      Q. And after the SEC appointed a receiver, the
11  receiver had to go back and recover that $2 million?
12      A. Yes.
13      Q. And when the $2 million was recovered by the
14  receiver, it was not paid back to the particular
15  individuals who had put the money in after MegaFund, was
16  it?
17      A. No.
18      Q. The money that was put in at that point in time
19  was then put in a pot for distribution to all of the
20  investors of the trust, was it not?
21      A. Correct.
22      Q. And so for those people who had put in the $2
23  million after MegaFund, what they received back as a
24  result of the receivership's -- receiver's action, was
25  simply a partial return of the money that had been lost?

291

1       A. Yes.
2       Q. And that's when the MegaFund activity occurred?
3       A. Correct.
4       Q. And that's after the investors had to make a
5   decision as to whether they wanted to stay in or get
6   out?
7       A. Correct.
8       Q. Now, if you then look at Exhibit 25-A, please --
9   which was identified earlier to describe dates in which
10  funds were received, if you turn to the page marked
11  Lancaster 1237 and you look at the bottom four lines --
12  that is four lines from the bottom where it says Peter
13  Weiss [phonetic]?
14      A. Yes.
15      Q. And if you look to see what the date is for
16  Mr. Weiss' deposit we see a date of -- is it 8-16, 2005?
17      A. Yes.
18      Q. Is that one of the investors who you would have
19  continued to receive -- or excuse me, take money from
20  after the disclosure of the issues with MegaFund?
21      A. Yes.
22      Q. And after the SEC lawsuit had been filed?
23      A. Yes.
24      Q. In fact, what you had done in the time frame of
25  the summer of 2005 if we look at 26-G, you had -- excuse

290

1       A. Yes.
2       Q. Is it also fair to say that somewhat soon after
3   the receiver -- excuse me, the SEC had filed its suit
4   you were contacted by the receiver?
5       A. Yes.
6       Q. And the receiver asked you questions about what
7   had happened with these funds?
8       A. Yes.
9       Q. And despite the contact with the receiver, you
10  continued to take money from the investors?
11      A. I don't remember specifically those dates.
12      Q. Is it fair to say that you continued to accept
13  money from investors at least through August of 2005?
14      A. I don't know the exact date, but that sounds like
15  it's probably correct.
16      Q. Let's look at Exhibit 25-D for a moment.
17          MR. CHAIRMAN: I'm sorry?
18          MR. LITTLE: 25-D, as in dog.
19  BY-MR. LITTLE:
20      Q. Is that another schedule that you prepared?
21      A. Yes.
22      Q. And what it reflects is that as to those investor
23  monies that you still had after the money was returned
24  from Tricom, you identified as the new effective date
25  for the investment activity as February 1, 2005?

292

1   me. I'm sorry.
2          MS. WRIGHT: 26-G?
3          MR. LITTLE: G.
4          THE WITNESS: 26-G is one of the filings.
5   BY-MR. LITTLE:
6       Q. This is for Form D for Lancorp Financial Fund
7   Business Trust, Roman Numeral II, right?
8       A. Correct.
9       Q. And so what had happened is that you had already
10  satisfied the -- that is, at some point in the summer of
11  2005, you were moving forward with actually developing a
12  second fund?
13      A. Correct.
14      Q. That would then have additional investors?
15      A. Correct.
16      Q. In fact, you continued with respect to the
17  Lancorp Financial Fund Business Trust to activity after
18  the SEC action was filed?
19      A. Yes.
20          MR. LUKOWSKI: What is the date of this
21  document?
22          MR. LITTLE: I don't have a -- it's not
23  signed.
24  BY-MR. LITTLE:
25      Q. But just so we're clear, from your standpoint,

293

1  this is activity that is occurring in the summer of
2  2005?
3        MR. CHAIRMAN: Mr. Lancaster, I think he's
4  directing that to you.
5        THE WITNESS: Oh, yes.
6  BY-MR. LITTLE:
7     Q. And, sir, just so we're clear, what ultimately
8  shut down --
9        MR. NEKVASIL: Mr. Chairman, I'm going to
10 object because if you take a look -- he can ask him any
11 question he wants about what happened when, but if you
12 look at this Document G, if you go to Page 972, you can
13 see that this document -- if you look at Page 973 -- it
14 appears on the date of January 18th, 2005.
15       Now, he can get the witness to say even
16 though it says January 18th, 2005, I sent it out
17 yesterday, but the documents speaks for itself in terms
18 of the date. So I object for him to rely upon this
19 document as a basis for testimony about Lancorp Fund
20 II's activities in the summer of 2005.
21       MR. LITTLE: Well, look at the page marked
22 971. Sir, that also has a December 13th, 2007 date on
23 it.
24       MR. NEKVASIL: Sir, we don't mind him asking
25 about the December 13th, 2007 date because he asked the

294

1  witness about that date.
2        MR. CHAIRMAN: You should ask him about all
3  the dates so we can hear what was going on.
4        MR. LITTLE: This was an activity that was
5  continuing in December 13, 2007.
6        MR. NEKVASIL: Mr. Chairman, I couldn't hear
7  the question that well.
8        MR. CHAIRMAN: We'll just ask him to repeat
9  the question.
10       MR. LITTLE: 2007. If you look at Page 971,
11 the calendar year there is 2007, but that's not
12 accurate.
13       MR. GOODMAN: If he could look at it. Let
14 the witness look at the page.
15       THE WITNESS: That's an incorrect date.
16 BY-MR. LITTLE:
17    Q. I'm sorry. Your answer to that question?
18    A. That's an incorrect date.
19    Q. Okay. So tell us in terms of your
20 recollection --
21       MR. LUKOWSKI: How about 973?
22       MR. LITTLE: 973.
23 BY-MR. LITTLE:
24    Q. Sir, there's a date of January 18th, 2005. Do
25 you know if this was not submitted to the SEC at that

295

1  time?
2     A. I don't remember.
3     Q. It's not?
4        MR. CHAIRMAN: It was never submitted?
5        THE WITNESS: I don't remember.
6        MR. LITTLE: Right.
7        THE WITNESS: I do not remember submitting
8  it. I don't remember the date it was submitted. It's
9  not signed, so I must not have submitted it.
10       MR. CHAIRMAN: Did you ever submit it?
11       THE WITNESS: I don't remember submitting
12 it. I would have kept a copy when my signature had been
13 submitted, so I don't know.
14 BY-MR. LITTLE:
15    Q. Actually, it --
16       MR. NEKVASIL: I renew my objection to using
17 this document as the basis for testimony about
18 activities in July -- in the summer of 2005 after the
19 SEC action in July.
20       MR. CHAIRMAN: It's noted, and we'll try to
21 figure it out.
22       MR. LITTLE: Here's a couple follow-up
23 questions.
24 BY-MR. LITTLE:
25    Q. In fact, wasn't there a private placement

296

1  memorandum created for Lancorp Financial Fund Business
2  Trust, too?
3     A. Yes.
4     Q. And were there any differences between that
5  private placement and the one for Trust 1 other than the
6  names?
7     A. No.
8     Q. And was -- can you tell the panel whether or not
9  you were distributing the private placement memorandum
10 for Trust II in the summer of 2005?
11    A. Yes.
12    Q. And wasn't it only in the fall of 2005 that a
13 receiver was appointed for the Lancorp Financial Fund
14 Business Trust?
15    A. Yes.
16    Q. And isn't that the activity, that is, the
17 appointment of the receiver, that ultimately brought to
18 an end your collection of money from investors?
19    A. Yes.
20    Q. Let's look at -- in fact, let's look at 26-DD,
21 please.
22    A. 26-DD.
23    Q. Yes. You find it?
24    A. Okay.
25    Q. If we look at 26-DD, is that an e-mail that you

## 297

1  would have sent to a Julie Faulk [phonetic] on or about
2  August 15, 2005?
3      A. Yes.
4      Q. And what is the subject of the e-mail?
5      A. Attachment of the private placement memorandum.
6      Q. For which fund?
7      A. For fund two.
8      Q. If we look at the paragraph -- "Attached is the
9  PPM on the Lancorp Financial Fund II;" do you see that?
10     A. Yes.
11     Q. What does PPM refer to?
12     A. Private placement memorandum.
13     Q. And so in terms of documentary evidence, this is
14 a document showing that, in fact, you were raising funds
15 for the Lancorp Financial Fund, II, in August of 2005?
16     A. Yes.
17     Q. The money that was going to be raised for Fund II
18 would have been deposited with whom?
19     A. It was undetermined at that time, but it was
20 scheduled to go to the brokerage firm in New York.
21         MR. CHAIRMAN: To what firm? I just
22 couldn't hear you. To what firm?
23         THE WITNESS: I'm trying to think of the
24 name now.
25         MR. NEKVASIL: He said a brokerage firm in

## 298

1  New York.
2  BY-MR. LITTLE:
3      Q. Is that a firm associated with a Robert Tringham
4  [phonetic]?
5      A. Yes.
6      Q. And did you find out that Mr. Tringham, in fact,
7  was not dealing fairly as it related to those funds?
8      A. I did eventually, yes.
9      Q. And did you find out that he had secreted those
10 funds into an account that you cannot control?
11     A. I did.
12     Q. And that is the account, when we refer to it, as
13 the one in which the receiver for the fund had to
14 recover those funds?
15     A. Correct.
16     Q. Now, look at -- I apologize. If we could look at
17 Respondent's Exhibit 75, please, in Notebook Number 2.
18 You testified earlier about there being someone
19 contacting you from an Internet service?
20     A. Yes.
21     Q. And as a result of that contact, did you believe
22 this Internet service had inaccurately described what
23 the business was of the L.L.C.?
24     A. Yes.
25     Q. Is Exhibit 75 a draft letter stating what your

## 299

1  position is as to the involvement of the L.L.C.?
2      A. Yes.
3      Q. And if we look at the second paragraph, do you
4  where it says there are a number of inaccuracies that I
5  feel compelled to address in your article. "Lancorp
6  Financial Group does not now, nor has it in the past,
7  owned, controlled or had any affiliation with any
8  private placement fund including the Avenger Fund"?
9      A. Correct.
10     Q. And is it fair to say that was a true statement
11 until February 2005 when you first used the L.L.C. to
12 have an involvement with MegaFund?
13     A. Correct.
14     Q. Then if we could look at Respondent's Exhibit 80,
15 please. You had applied for registration with American
16 Fidelity Assurance Company?
17     A. Correct.
18     Q. And what Exhibit 80 is, is an NASD U-5
19 termination form you had received from American Fidelity
20 Assurance Company?
21     A. Yes.
22     Q. And if we could turn to the second page of the
23 exhibit, which has the Bates stamp AF9. It identifies
24 your name, does it not?
25     A. Yes.

## 300

1      Q. And then if we look at the second page, it
2  indicates you were terminated from this broker/dealer?
3      A. Yes.
4      Q. This is a broker/dealer that would have been
5  after ONESCO, correct?
6      A. Yes.
7      Q. And the basis that is described in the U-5 for
8  your termination is your inaccurate disclosure of your
9  past employment?
10     A. Yes.
11     Q. And, in fact, American Assurance had asked you
12 about what investment -- excuse me -- what activity you
13 had participated in with respect to the Lancorp Business
14 Fund Trust?
15     A. I don't recall that question at all.
16     Q. If you would look at Respondent's Exhibit 78.
17     A. 78?
18     Q. And if you look at the bottom, it looks like
19 there was three e-mails here. Do those e-mails reflect
20 communication between you and representatives of
21 American Fidelity Assurance Company?
22     A. Yes.
23     Q. And if you look at the bottom, it says, "Gary,
24 your U-4 indicated that you had pending customer
25 complaints currently under review by the NASD. The

301

1  disclosures for the two complaints provide an
2  (inaudible) detail and a sketchy description.  Please
3  provide written details and exactly what occurred, when
4  each event occurred and any other facts surrounding the
5  complaint;" do you see that?
6      A.  Yes.
7      Q.  And then your response was, "I was the investment
8  advisor for a private placement closed end mutual fund
9  from February to August of 2005, I engaged the funds
10  under a one-year contract with an investment company.
11  The investment company placed the funds under the
12  control of a trader who subsequently misappropriated the
13  funds;" do you see that?
14      A.  Yes.
15      Q.  In fact, that statement was inaccurate, wasn't
16  it?  Your association with the Lancorp Business Fund
17  Trust was not limited from February to August of 2005,
18  was it?
19      A.  Where does it say that?
20      Q.  In the paragraph it says, "I was the investment
21  advisor for" --
22      A.  I see.
23      Q.  -- "mutual funds from February to August of
24  2005;" do you see that?
25      A.  Yes.

302

1      Q.  And, in fact, that statement that you were
2  providing to registration for American Fidelity
3  Assurance Company was, in fact, inaccurate?
4      A.  It was -- yes, it was incomplete.  I was
5  responding to the time frame that involved where the
6  customer complaints came in.
7      Q.  And what American Assurance found is that that
8  had been an inaccurate disclosure of your past
9  employment and they terminated registration with you,
10  didn't they?
11      A.  Yes.
12      Q.  Sir, relating to your termination -- I'm sorry.
13  Let me find your U-4.  With respect to your termination
14  from Piper Jaffray, is it fair to say that Piper Jaffray
15  itself did not terminate you for reasons other than
16  those related to U.S. Bancorp?
17      A.  Yes.
18      Q.  That is because U.S. Bancorp terminate you, you
19  were automatically terminated from Piper Jaffray?
20      A.  Correct.
21      Q.  And because of the nature of the relationship as
22  an employee of U.S. Bancorp, you would -- as part of
23  some of your services have your license with Piper
24  Jaffray?
25      A.  Correct.

303

1      Q.  Now, if -- did Piper Jaffray ever -- if someone
2  had asked you, well, what was this about, would you have
3  explained to them that, in fact, you had been terminated
4  from U.S. Bancorp for reasons unrelated to anything you
5  had done?
6          MR. NEKVASIL:  Excuse me.  Mr. Chairman, I
7  asked the questions yesterday about if they had
8  contacted you, would you have done A, would you have
9  done B, and he objected to it saying it's improper and
10  I'm asking him to speculate about it.  And you agreed
11  with him, and I was forbidden to ask if they had done
12  this would you have given the money back.  If they had
13  done that, and he objected to that.  So it's --
14  Mr. Chairman, I'm asking for some consistency here.
15          MR. CHAIRMAN:  Restate the question or move
16  on.
17  BY-MR. LITTLE:
18      Q.  Sir, when we think it -- when we go back and we
19  know that your employment ended with Piper Jaffray on
20  September 25, 2002, is it fair to say that that
21  termination occurred prior to undertaking any activity
22  with the -- for the Lancorp Business Fund Trust?
23      A.  I can't remember.
24      Q.  Was it the case that the Lancorp Business Fund
25  Trust was, in fact, 2003?

304

1      A.  Yes.
2      Q.  And maybe I can help you out.  If you look at
3  Volume 1, Exhibit 3, are the subsections of Exhibit 3
4  various billing statements --
5      A.  Yes.
6      Q.  -- from legal counsel for work done as it related
7  to, first, the People's Avenger Fund?
8      A.  Yes.
9      Q.  And if we look -- and then Lancorp Business Fund
10  Trust?
11      A.  Correct.
12      Q.  And if we look at Exhibit 3-A where it says the
13  work that was done is 12-31-02, that's the work on the
14  registration statement?
15      A.  Yes.
16      Q.  Do you recall having any contact with counsel
17  prior to 12-31-02 regarding the People's Avenger Fund?
18      A.  No.
19      Q.  Can you tell us whether or not your termination
20  from U.S. Bancorp had anything to do with Lancorp
21  Business Fund Trust?
22      A.  No.
23      Q.  Can you tell us --
24          MR. CHAIRMAN:  You can't tell us or it
25  didn't?

305

1    THE WITNESS:  No.  It did not.  I can't tell
2  you and, yes, it did not.
3  BY-MR. LITTLE:
4    Q.  And you can't tell us that your termination from
5  -- excuse me -- from U.S. Bank -- excuse me -- U.S.
6  Bancorp and Piper Jaffray had nothing to do with your
7  involvement with the People's Avenger Fund?
8    A.  Correct.
9       MR. LITTLE:  This would be a good time to
10  break, Mr. Chairman.
11      MR. CHAIRMAN:  You're talking about for the
12  evening?
13      MR. LITTLE:  Yes.
14      VIDEOGRAPHER:  The time is 5:25 p.m.  This
15  concludes Tape Number 5.  We're now off the video
16  record.
17         (Arbitration concluded.)
18              - - - - -
19
20
21
22
23
24
25

307

1            CERTIFICATE
2
3
4    I, Melinda M. Ross, do hereby certify that as
5  such Reporter I took down in Stenotypy all of the
6  proceedings had in the foregoing transcript; that I have
7  transcribed my said Stenotype notes into typewritten
8  form as appears in the foregoing transcript; that said
9  transcript is the complete form of the proceedings had
10  in said cause and constitutes a true and correct
11  transcript therein.
12
13
14
15
16    Melinda M. Ross, RPR, CCR-2614
17    within and for the State of Georgia
18
19
20
21
22
23
24
25

306

1            I N D E X
2
3  EXAMINATION                    13
4  BY-MR. NEKVASIL
5  EXAMINATION                    143
6  BY-MR. LITTLE
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 1

ARBITRATION TRIBUNALS OF THE
NATIONAL ASSOCIATION OF
SECURITIES DEALERS, INC.

In the Matter of the Arbitration Between:
JEFFREY L. PRACHT, JOHN
BLANDI, INDIVIDUALLY AND
AS TRUSTEE OF THE WHITE
HORSE TRUST, AND LONNIE L.
GIBSON,

        Claimants,

        vs.            Case No. 07-00948

THE O.N. EQUITY SALES
COMPANY,

        Respondent.
~~~~~~~~~~~~~~~~~~~~~~~
VIDEOTAPED ARBITRATION HEARING
VOLUME III

February 6, 2008
9:00 a.m.

Suite 1200, Midtown Proscenium Center
1170 Peachtree Street
Atlanta, Georgia

Kelly S. Lawrence, CCR-B-1625

## 2

APPEARANCES OF COUNSEL

On behalf of the Claimants:
GOODMAN & NEKVASIL, P.A.
KALJU NEKVASIL, Esq.
JOEL A. GOODMAN, Esq.
Suite 808
14020 Roosevelt Boulevard
P.O. Box 17709
Clearwater, Florida 33762
727.524.8486
727.524.8786 Fax
gn.law@verizon.net; jag.gn@verizon.net

On behalf of the Respondent:
ZEIGER, TIGGES & LITTLE, LLP
MARION H. LITTLE, Esq.
3500 Huntington Center
Columbus, Ohio 43215
614.365.9900
614.365.7900 Fax
little@litohio.com

OHIO NATIONAL FINANCIAL SERVICES
WILLIAM C. PRICE, Esq.
One Financial Way
Cincinnati, Ohio 45242
513.794.6078
513.794.4645 Fax
william_price@ohionational.com

Also Present:
Mr. Jeffrey L. Pracht
Mr. John Blandi
Mr. Lonnie L. Gibson
Mr. John Pinto
Mr. Jay Bley

Videographer:
Mr. Adam C. Kowzun

## 3

1    Videotaped Arbitration Hearing Volume III
2        February 6, 2008
3
4        THE VIDEOGRAPHER:  This is tape number one
5    in the matter of the arbitration between Jeffrey
6    L. Pracht, John Blandi, individually and as
7    trustee of the White Horse Trust, and Lonnie L.
8    Gibson, claimants, versus The O.N. Equity Sales
9    Company, respondent.
10        This is being taken Wednesday, February
11    6th, 2008.  The time is 9:13 p.m.  We're now on
12    the video record.
13        CHAIRMAN LEITCH:  A.m., I hope.
14        THE VIDEOGRAPHER:  A.m.  Sorry.
15        CHAIRMAN LEITCH:  It's all right.
16        THE VIDEOGRAPHER:  We're now on the video
17    record.
18        CHAIRMAN LEITCH:  Go for it.  Back to
19    Mr. Little, please.
20        MR. LITTLE:  Thank you, Mr. Chairman.
21    GARY L. LANCASTER, having been previously duly
22    sworn, was examined and testified as follows:
23        CROSS-EXAMINATION
24    BY-MR.LITTLE:
25        Q.    Mr. Lancaster, if you would, look back at

## 4

1    Respondent's Exhibit 25-D, which is found in volume
2    one of respondent's exhibits, please.
3        A.    Okay.
4        Q.    D as in dog.
5        A.    Oh.
6        MR. NEKVASIL:  Numbers what?
7        MR. LITTLE:  25-D, D as in dog.
8        THE WITNESS:  Yes.
9        Q.    (By Mr. Little)  Just a moment so that
10    everyone else can catch up.
11        When we broke yesterday, we were
12    discussing, in part, the effective date for the
13    investment which coincided with your placement of the
14    funds in February of 2005 in Megafund, remember that?
15        A.    Yes.
16        Q.    And I take it that as of February 1, 2005,
17    none of the monies that had been invested in Lancorp
18    Business Fund Trust had been lost at that point?
19        A.    Correct.
20        Q.    And the losses ultimately all arose as a
21    result of the Megafund investments?
22        A.    Correct.
23        Q.    That occurred after February 1, 2005?
24        A.    Correct.
25        Q.    If I could then have you please look at



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:    877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

5

1  volume two of respondent's exhibits, and turn your
2  attention, please, to Respondent's Exhibit 64.
3      A.   Yes.
4      Q.   And I believe we spoke earlier that you
5  had tendered your resignation to Universal
6  Underwriters in October of 2004?
7      A.   Correct.
8      Q.   And then you received, if we look at
9  Respondent's Exhibit 64, a termination notice from
10  ONESCO on or about January 6, 2005, correct?
11      A.   (Witness nods head affirmatively.)
12      Q.   Is it fair to say that you were not
13  surprised by your termination?
14      A.   Correct.
15      Q.   You anticipated that once you severed your
16  relationship with Universal your relationship with
17  ONESCO would likewise be terminated?
18      A.   Yes.
19      Q.   You were asked some questions by counsel
20  on examination as to whether or not there had been a
21  request by ONESCO for you to return any
22  ONESCO-related materials.
23          Could I direct your attention to the third
24  paragraph of Respondent's Exhibit 64. Do you see the
25  language where it says, "Please return all ONESCO

7

1      Q.   And that the losses that occurred with
2  respect to the claimants in this case all occurred
3  after your separation from ONESCO?
4      A.   Yes.
5          MR. LITTLE:  Now, if I can have the
6  panel's indulgence, I'm going to try to do this
7  without stretching the microphone.
8          CHAIRMAN LEITCH:  If you want that on the
9  video, why don't you bring it closer to him.  If
10  you don't, it's okay.
11          MR. LITTLE:  I don't think -- I don't
12  think we can get it on the video because of the
13  head shot.  It's fairly tight.
14          CHAIRMAN LEITCH:  He can move it in or out
15  wherever you want it, so it's just up to you
16  whether you want it.
17          PANELIST LUKOWSKI:  The videographer
18  indicates that he could pull out so that you can
19  get both Mr. Lancaster and the chart in the
20  frame.
21          MR. LITTLE:  Let me see if I can try that.
22  Can you hear me without the microphone?
23          THE COURT REPORTER:  Yes.
24          MR. LITTLE:  The question is:  Can you
25  hear me on the video?

6

1  items, including forms, manuals, stationery, and
2  business cards, to your resident sales coordinator or
3  directly to our office"?
4      A.   Yes.
5      Q.   And do you understand as you see that now
6  that, in fact, ONESCO had requested that you return
7  all ONESCO-related materials at the time of your
8  termination?
9      A.   Yes.
10      Q.   And if you look at the very bottom,
11  there's some handwriting.  But do you recall having a
12  conversation without any -- excuse me, with anyone at
13  ONESCO in which you confirmed for them that you
14  would, in fact, return ONESCO-related materials?
15      A.   Yes.  My handwriting is at the bottom.
16  Apparently, I talked to Pauline somebody.
17      Q.   And, sir, is it fair to say that by the
18  end of January 2005 you had, in fact, returned all
19  materials relating to ONESCO?
20      A.   Correct.
21      Q.   Is it also fair to say then that the
22  effective date for the investments, February 2nd,
23  2005, occurred after your separation of registration
24  with ONESCO?
25      A.   Yes.

8

1          THE VIDEOGRAPHER:  She's listening to the
2  video, as well.
3          THE COURT REPORTER:  Yes.
4          MR. LITTLE:  Oh, okay.
5          THE VIDEOGRAPHER:  I just don't have as
6  good of headphones as she does.
7          (Discussion off the record from 9:18 a.m.
8  to 9:19 a.m.)
9          MR. LITTLE:  Let's just take a moment to
10  see if that even comes on the video.  Does it or
11  is it just too small?
12          THE VIDEOGRAPHER:  I can see it, but I
13  don't know how well you'd be able to read it on
14  a TV.
15          MR. LITTLE:  Okay.
16          CHAIRMAN LEITCH:  Can you focus and just
17  go back and forth?
18          THE VIDEOGRAPHER:  Yeah, I can do that.  I
19  can go back and forth.
20          MR. LITTLE:  Why don't you just focus on
21  the board for five seconds, ten seconds.
22          THE VIDEOGRAPHER:  (Complies with
23  request.)
24          MR. LITTLE:  Okay.  Thank you.
25      Q.   (By Mr. Little)  And, Mr. Lancaster, I



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

9

1  believe we confirmed that you signed the AWC with the
2  NASD on September 5, 2006?
3      A.   Yes.
4      Q.   And you would have signed an affidavit
5  that was tendered to you by claimants' counsel in
6  June of 2007?
7      A.   Yes.
8      Q.   Let's look at claimants' exhibits, volume
9  three, tab G.
10         PANELIST LUKOWSKI:  Tab?
11         MR. LITTLE:  Tab G.
12         PANELIST LUKOWSKI:  That's under 82?
13         MR. LITTLE:  Volume three of claimants'
14     notebook, tab G.  It says, "The Declaration of
15     Gary Lancaster."
16         CHAIRMAN LEITCH:  Tab G.  Wrong color.
17  Wrong color.
18         PANELIST LUKOWSKI:  No, I'm in three.
19         CHAIRMAN LEITCH:  Go to respondent's.
20         PANELIST LUKOWSKI:  Claimants'.
21         CHAIRMAN LEITCH:  Claimants'.  I'm sorry.
22         MR. LITTLE:  Tab G.
23         PANELIST LUKOWSKI:  Right.
24      Q.   (By Mr. Little)  And the pages that are
25  Bates stamped one through three reflect a declaration

10

1  that you signed on or about June 18, 2007?
2      A.   Yes.
3      Q.   And to whom did -- who prepared this for
4  you?
5         CHAIRMAN LEITCH:  Well, tell us how it
6  came about to be, how it came to be.
7         THE WITNESS:  It came to be.  I was called
8  by claimants' attorneys and asked if I would
9  provide a statement of fact on specific items,
10  which were reduced to writing and sent to me.
11      Q.   (By Mr. Little)  And if we look at
12  paragraph eight of the June 18, 2007, affidavit, and
13  you see the language in the second sentence:  "When I
14  knew that the Lancorp Fund offering would be going
15  forward, I called ONESCO to determine how to disclose
16  this information.  I received a one-page form from
17  ONESCO, which I returned to ONESCO in May 2004.  I
18  told ONESCO on this disclosure form that I would be
19  starting Lancorp Fund as a private placement fund on
20  May 14, 2004."
21         Sir, we are in agreement now that that
22  statement is, in fact, inaccurate?
23      A.   Yes.
24      Q.   And if we then turn to the third page of
25  the affidavit, paragraph nine, where it says, "The

11

1  Lancorp offering became effective on May 14, 2004;"
2  do you see that language?
3      A.   Yes.
4      Q.   In fact, sir, the offering first became
5  effective in March of 2003, did it not?
6      A.   Oh, yes.
7      Q.   So that statement was inaccurate?
8      A.   That is inaccurate, correct.
9      Q.   And, in fact, the investment that
10  ultimately gave rise to the losses sustained by the
11  investors, that particular investment became
12  effective in February of 2005?
13      A.   Correct.
14      Q.   And that information is not included in
15  the affidavit of June 18, 2007, is it?
16      A.   Correct.
17      Q.   If we look -- the reference to -- there is
18  a specimen, Exhibit F, attached to the affidavit.
19  And if we could turn to specimen F as it related to
20  the affidavit.
21         CHAIRMAN LEITCH:  Can you give us a Bates
22     number because I don't see --
23         MR. LITTLE:  It's 19.
24         PANELIST WRIGHT:  19.  19.
25         CHAIRMAN LEITCH:  Thank you.

12

1         MR. LITTLE:  Page 19.
2         THE WITNESS:  We're in tab F?
3      Q.   (By Mr. Little)  I'm sorry.  It's -- if
4  you go to page 19 of that same tab.
5      A.   Oh, okay.
6      Q.   The reference in this June 14, 2004,
7  letter that was marked as Exhibit F to the June
8  declaration is referring to the activity that
9  occurred in the Tricom account?
10      A.   Yes.
11      Q.   And that's the activity for which there
12  was no loss?
13      A.   Correct.
14      Q.   Now, if we then go to what is marked as
15  Exhibit B to the declaration and has the Bates stamp
16  number five, this is the letter that was sent to the
17  investors with respect to the insurance, correct?
18      A.   Correct.
19      Q.   And if I recall your testimony on direct
20  examination, the investors had a choice of choosing
21  to have insurance for this particular fund?
22      A.   Correct.
23      Q.   And only about a third of them elected
24  that type of coverage?
25      A.   Yes.



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

13

1    Q.   And, in fact, that coverage never existed?
2    A.   Correct.
3    Q.   And what you communicated in April 2004
4  is, in fact, there would be no coverage?
5    A.   Correct.
6    Q.   As a practical matter, what you told the
7  investors in this letter is that even though there
8  would be no insurance coverage, you alternatively
9  would have security through the bank, the bank
10  holding the monies?
11    A.   Correct.
12    Q.   So in terms of preserving principal, there
13  was no material difference in what had existed prior
14  to April 5, 2004, and what occurred after April 5,
15  2004?
16    A.   Correct.
17    Q.   And so, functionally, in terms of what the
18  representations were to the investors as to the
19  preservation of the principal, it was -- it was the
20  same at all points in time during the relationship?
21    A.   Correct.
22        MR. NEKVASIL:  Mr. Chairman, I just want
23  to note something for the record.  It's not an
24  objection.  He asked him that it was -- whether
25  it was material or not, and he said no, which

14

1  means he asked him for an opinion about
2  materiality.  Yesterday, when I asked him
3  about --
4        CHAIRMAN LEITCH:  That's for us to decide.
5        MR. NEKVASIL:  Well, no.  Well, no, that's
6  not my point, actually.
7        CHAIRMAN LEITCH:  Okay.
8        MR. NEKVASIL:  Yesterday, when I asked him
9  whether he considered certain terms to be
10  material, opposing counsel objected; and the
11  objection was sustained.  Now, I'll follow his
12  rules.
13        The point is since he's asked him about
14  materiality, when I question him again and say
15  is something material, I don't want opposing
16  counsel to say I object, how would he know
17  whether it's material or not, okay?
18        So I'm -- I guess I'm alerting you to that
19  sequence so we don't have to go back in the
20  record.
21        MR. LITTLE:  No.  My objection yesterday
22  was he was asking as to the state of mind of
23  investors, not as to this witness.  That's a
24  different type of question.
25        MR. NEKVASIL:  That was a separate issue.

15

1        CHAIRMAN LEITCH:  Wait.  Let's not argue
2  about it.  Just go ahead with the questions.
3        MR. LITTLE:  Thank you.
4    Q.   (By Mr. Little)  And as a -- excuse me, I
5  have to think where I was now.
6        So as a practical matter, the only
7  difference between the preservation of principal
8  element to the offering that existed between April --
9  excuse me, prior to April 5, 2004, and what existed
10  after April 5, 2004, is that the investors no longer
11  had to pay for it?
12    A.   Correct.
13    Q.   Now, if we could then turn to -- there was
14  a second affidavit.
15        And just to summarize, with respect to the
16  June 2007 declaration that you signed as it was
17  submitted to you by counsel for the claimants, we
18  would -- you would agree with me that it is
19  inaccurate?
20    A.   Correct.
21        MR. NEKVASIL:  I ask -- I ask that he
22  clarify exactly where he --
23        CHAIRMAN LEITCH:  I think it would be
24  appropriate that if you're going to ask that
25  question to make the general parts of it that

16

1  you're asking are inaccurate --
2        MR. NEKVASIL:  Yeah, because I don't
3  want --
4        CHAIRMAN LEITCH:  I don't think he's -- I
5  don't think you mean, nor do I think he would
6  testify, that it's all inaccurate.  But if I'm
7  wrong, clarify it.
8        THE WITNESS:  No.  That one -- that one
9  provision at the time I completed that, to the
10  best of my recollection, I believe that to be
11  accurate.
12        During the course of providing this
13  information, it has given me rise to question my
14  memory on what exactly occurred with that
15  document and when -- that, in fact, the document
16  may have not ever even been sent, but it was in
17  my file.  And anything that went in my file,
18  typically, was a copy of something that I would
19  have submitted.
20    Q.   (By Mr. Little)  Let's -- thank you for
21  that clarification.  But as you -- as -- just so
22  we're clear, we would agree that paragraph eight is
23  inaccurate of the declaration?
24    A.   I believe that --
25        MR. NEKVASIL:  Mr. Chairman, I object.

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

BROWN & GALLO
LLC

www.browngallo.com

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

17

1   He's asking --
2       MR. LITTLE:  That's what he just
3   testified.
4       MR. NEKVASIL:  -- about the first sentence
5   of paragraph eight.
6       CHAIRMAN LEITCH:  Well, he just asked
7   about the whole paragraph; and if he's going to
8   answer --
9       MR. NEKVASIL:  Okay.  I'm going to ask
10  that the witness --
11      CHAIRMAN LEITCH:  Hang on a second.  Hang
12  on a second.  You'll have to cross-examine him
13  on that.  That was a specific enough question
14  for him to answer if he knows.
15      MR. LITTLE:  Yeah.
16      Q.   (By Mr. Little)  And let's break it down.
17  Let's break it down.
18      PANELIST LUKOWSKI:  Where is it again?
19      Q.   (By Mr. Little)  Looking at paragraph
20  eight of the June 2007 declaration, we can agree that
21  the reference:  "I became a registered representative
22  of The O.N. Equity Sales Company (ONESCO) in March
23  2004," is, in fact, an accurate statement?
24      A.   Yes.
25      Q.   The statement, next, "Before being hired,

18

1   I told ONESCO in February of 2004 that I had an
2   outside business, Lancorp Financial Group, LLC, that
3   sold annuities and insurance," is accurate?
4       A.   Correct.
5       Q.   What is inaccurate is the sentence that
6   follows:  "When I knew that the Lancorp Fund offering
7   would be going forward, I called ONESCO to determine
8   how to disclose this information.  I received a
9   one-page form from ONESCO, which I returned to ONESCO
10  in May 2004.  I told ONESCO on this disclosure form
11  that I would be starting the Lancorp Fund as a
12  private placement fund on May 14, 2004."  That's
13  inaccurate?
14      A.   Correct.
15      Q.   Now, go back then to paragraph nine.
16      A.   (Witness complies with request.)
17      Q.   The sentence, "The Lancorp offering became
18  effective on May 14, 2004," is, in fact, inaccurate?
19      A.   It is.  That was an oversight on my part.
20      CHAIRMAN LEITCH:  Pardon?
21      THE WITNESS:  That was an oversight on my
22  part on that date.
23      CHAIRMAN LEITCH:  Okay.  I just -- thank
24  you.
25      Q.   (By Mr. Little)  And if we then go to

19

1   paragraph four of your June 2007 affidavit where it
2   says, "During 2003 and early 2004, changes in the
3   insurance industry prevented Lancorp from obtaining
4   this insurance and prevented Lancorp from going
5   forward."  Do you see that?
6       A.   Yes.
7       Q.   And can you tell us what the changes were
8   in the insurance industry that prevented Lancorp from
9   obtaining insurance?
10      A.   Well, I was told that they were no longer
11  insuring this kind of activity and, basically,
12  because they could not get a reinsurer to pick up the
13  shortfall, Lloyd's of London and the like, nobody
14  wanted to deal with it anymore.
15      Q.   And who would have provided that
16  information?
17      A.   That would have came from -- I forget now
18  who it was.  Somebody who was doing the investigation
19  for acquiring it that had access to AIG.
20      Q.   And is it fair to say that you would have
21  not had firsthand -- firsthand information as to the
22  accuracy of that statement?
23      A.   That's correct.
24      Q.   So when we look at paragraph five, it
25  says, "In April 2004, I notified all the Lancorp

20

1   investors that a material condition or term of their
2   investment had changed."  Do you see that?
3       A.   Yes.
4       Q.   "I explained to them that Lancorp had
5   replaced the insurance on their proposed investment
6   with a new bank or broker-dealer obligation that
7   would instead guarantee their investment."  Do you
8   see that language?
9       A.   Yes.
10      Q.   Sir, in fact, because there was no real
11  change in terms of the security being provided prior
12  to April and after April 2004, you can't accurately
13  describe that as a material change, can you?
14      A.   I guess not.  It just -- it seemed like a
15  significant change, particularly for those who wanted
16  the assurance that they had bought insurance to
17  protect their investment.
18      Q.   And what you told them is that they didn't
19  even have to pay for the insurance because they would
20  have the preservation?
21      A.   Correct.
22      Q.   And so for those people, they basically
23  received all the preservation they had been promised
24  prior to purchasing their interest without having the
25  additional cost?



Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

www.browngallo.com

21

1    A.    Correct.
2    Q.    Now, let's turn to the affidavit of July
3    4, 2007, which is found in claimants' notebook three,
4    tab G, page 20.  And that is a one-page declaration
5    that you signed on July 4, 2007?
6    A.    Yes.
7    Q.    And, again, to put it in the terms that
8    the chairman asked, how was this -- how did you get
9    from point A to point B in executing this
10   declaration?
11   A.    Again, request by plaintiffs' attorneys to
12   verify these facts.
13   Q.    Did you type up the information that's
14   contained in the declaration?
15   A.    No.
16   Q.    Who typed it?
17   A.    It was prepared for by counsel.
18   Q.    Okay.  Did -- and when it was sent to you,
19   did you revise it in any way?
20   A.    No.
21   Q.    Okay.  And when you were providing these
22   declarations to claimants' counsel, did you withhold
23   any documents from them?
24   A.    No.
25   Q.    To the extent they asked for documents,

22

1    you provided them to them?
2    A.    Absolutely.
3    Q.    Let's look at the second paragraph of the
4    July 4, two seven -- excuse me, 2007 declaration.  It
5    says, "Throughout the time I was associated and
6    licensed with The O.N. Equity Sales Company, I was
7    never advised of the identity of my ONESCO
8    supervisor."
9         And then the next sentence says, "ONESCO
10   never provided me with any of the firm's internal
11   rules or regulations, such as the firm's procedures
12   or compliance manuals."  Do you see that?
13   A.    Yes.
14   Q.    Can we agree that that second sentence is,
15   in fact, inaccurate?
16   A.    Again, I now know that that is an
17   inaccurate statement.  Also, again, at the time that
18   I executed this, that was my recollection.  And I see
19   now that that's incorrect.
20   Q.    And when we look at the previous sentence,
21   it says, "I was never advised of the identify of my
22   ONESCO supervisor."  It is fair to say that you
23   were -- it was disclosed to you in the regional sales
24   contract that, in fact, Mr. Lawing was your
25   residential sales coordinator, correct?

23

1    A.    Yes.  That was on that form, correct.
2    Q.    Now, let's turn to the last affidavit, the
3    one of December 2007 that is found in volume three,
4    tab G at page 22 of claimants' materials.  And this
5    is a two-page declaration that you signed on or about
6    December 3, 2007?
7    A.    Yes.
8    Q.    And, again, would you explain to the panel
9    the mechanics by which this document was prepared and
10   executed?
11   A.    Again, request and preparation by
12   plaintiffs' counsel.
13   Q.    And, again, did you physically type this
14   up?
15   A.    I did not.
16   Q.    Was there a particular attorney that you
17   worked with in preparing these declarations?
18   A.    No.
19   Q.    Who was it that you did have contact with?
20   A.    My only contact was with plaintiffs'
21   attorney.
22   Q.    Which one?
23   A.    I was in contact with both of them, but I
24   think Joel was the primary contact.
25   Q.    Okay.  Let's look then at the declaration

24

1    of December 3, 2007, and focus your attention first
2    on paragraph five where it says, "In approximately
3    May 2004, I took an on-line CLE compliance course
4    arranged for by ONESCO."  Do you see that?
5    A.    Yes.
6    Q.    And you know that's inaccurate because the
7    records that have been produced show that course
8    was taken in June?
9    A.    Correct.
10   Q.    Correct?
11   A.    Yes.
12   Q.    And then --
13        CHAIRMAN LEITCH:  Well, let me ask.  Is
14   the only inaccuracy then the date?  Did you
15   actually take the course?
16        THE WITNESS:  Yes, I took the course.
17        CHAIRMAN LEITCH:  But it was --
18        THE WITNESS:  But I just didn't remember
19   when.
20        CHAIRMAN LEITCH:  So it was in June of
21   2004?
22        THE WITNESS:  Correct.
23        PANELIST WRIGHT:  We've got copies.
24        PANELIST LUKOWSKI:  Yeah, we've already
25   got that.



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

25

1      MR. LITTLE:  Yeah, you've got that
2  document.  But it's --
3      CHAIRMAN LEITCH:  It's already in the
4  record.
5      MR. LITTLE:  Right.
6      CHAIRMAN LEITCH:  I just want to nail it
7  down.
8      Q.    (By Mr. Little)  Let's focus on the next
9  one.  "The study materials led me to believe that my
10  outside business disclosure should be more explicit.
11  Based upon -- excuse me, based on the warnings in the
12  study materials, I wanted to play it safe and make
13  absolutely certain that ONESCO was aware of Lancorp's
14  involvement with Lancorp Financial Fund."
15      "Accordingly, I called Heather A. Renfro,
16  who was working for Lawing Financial Group in
17  Overland Park, Kansas.  I explained to Renfro that
18  Lancorp was involved with the Lancorp Financial Fund
19  investment offering.  I asked her how I should report
20  this to the firm.  She then sent me another blank
21  copy of the other business disclosure reporting page,
22  which is an ONESCO form."
23      "On or about May 3, 2004, I completed this
24  form, disclosing my involvement with Lancorp
25  Financial Fund Business Trust.  I either e-mailed

26

1  this form back to Renfro or mailed it to her office."
2  Do you see that?
3      A.    Yes.
4      Q.    And we can agree that because the form, at
5  least as it was -- it's marked, is May 3, 2004, a --
6  the study materials that you received in June could
7  not have prompted you to have completed that form?
8      A.    That's correct.
9      Q.    And so the second and third sentence of
10  paragraph five of the December 3, 2007, declaration
11  is, in fact, untrue?
12      A.    I know now that -- I now know that to be
13  correct.
14      Q.    And, in fact, based upon our discussions,
15  we understand that the balance of paragraph five is
16  inaccurate?
17      A.    Effective on that date.
18      Q.    Right.  You understand that -- we're in
19  agreement that you did not send the outside business
20  disclosure reporting --
21      A.    Yes.
22      Q.    -- page to ONESCO?
23      A.    But the portion where I talked to Heather
24  Renfro and explained, that part is correct.
25      Q.    So your testimony is --

27

1      CHAIRMAN LEITCH:  Just say that louder,
2  please.
3      THE WITNESS:  I had a conversation with
4  Heather Renfro about what form I needed.  That
5  portion is correct.  But the -- but the --
6      Q.    (By Mr. Little)  Go ahead, please.
7      A.    The date is incorrect.
8      Q.    And, in fact, the statement that you
9  actually sent it is incorrect?
10      A.    Yes.
11      Q.    If we go to paragraph two of your
12  affidavit where it says, "I was terminated by U.S.
13  Bancorp in 2002 for not disclosing the extent of my
14  involvement with Lancorp Financial Group, LLC."  Did
15  you see that?
16      A.    Yes.
17      Q.    And if I understood your testimony
18  correctly yesterday, in fact, your termination from
19  U.S. Bancorp had nothing to do with Lancorp Financial
20  Group, LLC, did it?
21      A.    That was part of their rationale.
22      Q.    Oh, I'm sorry.  Just so we're clear, your
23  termination from U.S. Bancorp had nothing to do with
24  the Business Trust?
25      A.    Correct.

28

1      Q.    Okay.
2      MR. NEKVASIL:  That's fine.
3      Q.    (By Mr. Little)  And so when we look at
4  the balance of paragraph two, at the time of your
5  termination, it says there was a trading program
6  similar to Lancorp Financial Fund Business Trust.  In
7  fact, the only discussion you would have been having
8  at that point in time, if any, would have been with
9  the People's Avengers Trust, right?
10      A.    Okay.  I'm -- I guess I'm not following
11  you.
12      Q.    Let me try to clarify it, please.
13      MR. NEKVASIL:  Mr. Chairman, I know he's
14  on cross, but on this issue I would ask that he
15  not be leading, particularly since the testimony
16  is, from the witness, that he did not get
17  involved with People's Avengers Trust until
18  after he was fired by U.S. Bank, and that's what
19  the chronology -- that's --
20      CHAIRMAN LEITCH:  Hang on in case it's
21  something actually for us.
22      MR. NEKVASIL:  Mr. Chairman, the testimony
23  has been that McDuff had this program he
24  proposed that was similar to Lancorp -- similar
25  to Lancorp Financial Fund Business Trust.  He

BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:    877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

29

1  was fired because he didn't disclose the extent
2  of his involvement with it and he disobeyed
3  their instructions. Afterwards, end of 2002,
4  beginning of two thousand -- he got involved
5  with People's Avengers Trust.
6      Now he's saying to him in one leading
7  question: So, really, this related to People's
8  Avengers Trust. I would ask that he not ask --
9  if he answers it yes, I'll have to take him
10  through all the documents again and refresh his
11  memory.
12      So I'd ask on this point that he not use
13  leading questions and ask him what did -- what
14  did this involve because he's -- he's attempting
15  to ask leading questions that basically
16  eliminate -- they're factually inaccurate and
17  eliminate six hours of questioning which would
18  require me on redirect to take him through all
19  the documents that his lawyer -- the lawyer took
20  him through yesterday showing the time frame,
21  showing when his first discussions with People's
22  Avengers were, showing that they were after he
23  was fired by U.S. Bank. I'll do it if you want,
24  but it's unfair to use the vehicle of a leading
25  question to solicit that kind of a misleading

30

1  answer which is based on an inaccurate factual
2  predicate. That's my representation to you, and
3  that's why I object to that specific question.
4      CHAIRMAN LEITCH: Just --
5      MR. NEKVASIL: And it's not humorous. I'm
6  not -- I don't find this to be a humorous matter
7  at all.
8      CHAIRMAN LEITCH: Okay. Don't -- don't --
9      MR. LITTLE: I find it to be very humorous
10  because of the interruption.
11      CHAIRMAN LEITCH: I don't need any of
12  that. Just be sure that if you do make a
13  leading question it's appropriately based.
14      MR. LITTLE: Well, we are because what
15  we're establishing --
16      CHAIRMAN LEITCH: Well, don't argue about
17  it, just ask the question.
18      MR. LITTLE: Yeah. What we're
19  establishing is that contrary to what it
20  suggests in this declaration, he testified
21  yesterday that, in fact, the termination had
22  nothing to do with the trust.
23      CHAIRMAN LEITCH: Has nothing to do with
24  the business trust.
25      MR. LITTLE: But the implication in the

31

1  declaration -- the implication of the
2  declaration is that it did. And if counsel
3  wants to stipulate --
4      CHAIRMAN LEITCH: We've covered that.
5  He's talking about the sub part of the last
6  question --
7      MR. NEKVASIL: Exactly. If I could --
8      CHAIRMAN LEITCH: -- having to do with
9  People's Avengers Trust --
10      MR. NEKVASIL: Talking about the Avengers
11  Trust --
12      CHAIRMAN LEITCH: I know.
13      MR. NEKVASIL: Okay.
14      MR. LITTLE: If we can have a stipulation
15  that his termination from U.S. Bancorp was not
16  associated in any way with the People's Avenger
17  Fund or the Lancorp Business Fund Trust, I'll
18  accept that stipulation, stop asking questions.
19      MR. NEKVASIL: Mr. Chairman, we don't mind
20  him asking legitimate questions.
21      CHAIRMAN LEITCH: Do you --
22      MR. LITTLE: The answer is we will
23  not -- we still -- we maintain our --
24      CHAIRMAN LEITCH: Do you want to stipulate
25  or not?

32

1      MR. NEKVASIL: No. We will not --
2      CHAIRMAN LEITCH: Okay.
3      MR. NEKVASIL: We maintain our objection
4  to his question which was: This termination
5  related to the People's Avengers Trust, didn't
6  it? When you asked him for clarification, his
7  response is, well, it didn't relate to Lancorp
8  Financial Fund Business Trust. We want a
9  stipulation that covers both.
10      Mr. Chairman, he knows exactly what kind
11  of question he's asking, and his answer was
12  quite deliberate, okay? It's not fair for me.
13  If he's going to ask a question about the
14  People's Avengers Trust and I object to that
15  question, he should either ask a different
16  question or respond to you and explain that that
17  question is proper and here's why that question
18  is proper. That's the proper methodology here.
19  And we believe -- this is not the first time
20  it's happened, and we believe it's unfair for us
21  procedurally.
22      MR. LITTLE: Well, he's saying it's unfair
23  procedurally that now we have affidavits
24  procured by claimants' counsel, put in the
25  exhibit notebooks that we found to be false, and

BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

33

1  he doesn't want us to examine them. That
2  doesn't make any sense to me.
3      CHAIRMAN LEITCH: Ask careful questions
4  about what you want to ask about.
5      MR. LITTLE: I've asked very careful
6  questions.
7      CHAIRMAN LEITCH: Try again. Keep going.
8  Move on.
9      Q.  (By Mr. Little) Let me just ask the
10 question I asked you yesterday, and we'll see if we
11 have the same answer. Is it fair to say that your
12 termination from U.S. Bancorp did not have anything
13 to do with People's Avenger Fund or the Lancorp
14 Business Fund Trust?
15     A.   That is correct.
16     Q.   And, sir, it's also fair to say that the
17 three affidavits that you signed indicating that you
18 would have provided a copy of the outside business
19 activity report to ONESCO were all submitted after
20 the September 2006 AWC with the NASD in which you
21 stipulated that that had not occurred?
22     MR. NEKVASIL: Sir, we object. He did not
23 stipulate. He says in which you stipulated that
24 that did not occur.
25     CHAIRMAN LEITCH: Okay. He didn't -- he

34

1  didn't --
2      MR. NEKVASIL: The AWC was not --
3      CHAIRMAN LEITCH: Stipulation is the wrong
4  word. Just whatever -- just -- I don't -- did
5  they call that document a stipulation?
6      MR. NEKVASIL: Mr. Chairman, that's not my
7  objection. I'm sorry.
8      CHAIRMAN LEITCH: Okay. What is it?
9      MR. NEKVASIL: Okay. My objection is not
10 the term "stipulation."
11     CHAIRMAN LEITCH: Okay. What is it?
12     PANELIST LUKOWSKI: Well, that's what the
13 document says.
14     MR. LITTLE: Yeah. I mean -- yeah. Are
15 we going to sit and argue about everything?
16 Because the document speaks for itself.
17     MR. NEKVASIL: My objection is this: He
18 states that -- that this document constitutes a,
19 forget whatever word, stipulation or finding
20 that he did not give that notice to Heather
21 Renfro. That's not accurate. As he pointed out
22 in the opening --
23     CHAIRMAN LEITCH: All he asked was were
24 these statements after that document was signed
25 with the NASD.

35

1      MR. NEKVASIL: No. No. He then said --
2  he added to it the stipulation -- Mr. Chairman,
3  if she reads the question back, he said, the AWC
4  constituted a stipulation that he did not give
5  the notice to Renfro. That's in the question.
6  I don't mind it being read back.
7      And my point is -- I don't have a problem
8  with word "stipulation," whether it's
9  stipulation or finding. The disciplinary action
10 was that he did not give specific notice of the
11 specific transactions.
12     They said in opening that even if he had
13 given that May notice it would not comply with
14 the rule because the rule requires you give
15 specific notice of each transaction and the
16 information and get approval. So even if
17 Ms. Renfro had concluded -- even if the NASD had
18 concluded that he gave the May 2004 notice, he
19 still would be in violation of the selling away
20 rule.
21     So for him to state that AWC
22 constituted a finding by the NASD that he did
23 not give that form to Renfro is inaccurate.
24 It's a finding that he did not give the firm the
25 proper notice under the rules of the

36

1  transactions, which, clearly, everyone admits he
2  didn't because the rule says you've got to tell
3  them who you're -- who you're selling it to, the
4  date, the amount, the price, and their
5  approval; if they approve it, it's on their
6  books as a transaction.
7      MR. GOODMAN: Look at the AWAC itself.
8      CHAIRMAN LEITCH: Hang on. Hang on a
9  minute.
10     MR. GOODMAN: It says --
11     CHAIRMAN LEITCH: Hang on a minute. We
12 want to talk a minute. You can go off the
13 record.
14     THE VIDEOGRAPHER: The time is 9:46 a.m.
15 We're now off the video record.
16     (Discussion off the record from 9:46 a.m.
17 to 9:48 a.m.)
18     THE VIDEOGRAPHER: The time is 9:48 a.m.
19 We're back on the video record.
20     MR. LITTLE: There's an evolutionary
21 nature with respect to the objections being
22 made. I understand you don't want to hear my
23 response and you're going to give us some
24 instructions at this point in time.
25     CHAIRMAN LEITCH: Yes. Please keep the



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

37

1    questions, if you will, simple and not anything
2    close to compound or -- if you want to ask about
3    whether -- the timing or whatever, is fine. And
4    when you make an objection, we'd like you to
5    make a simple objection and not add your closing
6    argument to it.
7        MR. NEKVASIL: That's fair.
8        MR. LITTLE: We'll make it simple, and the
9    panel can go back and read the documents at the
10   conclusion of this case.
11   Q.   (By Mr. Little) Sir, all of the
12   affidavits that you signed were after you entered
13   into the AWC with the NASD?
14   A.   Correct.
15       MR. LITTLE: I have no further questions.
16   Thank you.
17       MR. NEKVASIL: You want to take a short
18   bathroom break?
19       CHAIRMAN LEITCH: No, I don't mind at all.
20   For ten minutes. We'll start at 10:00.
21       THE VIDEOGRAPHER: The time is 9:49 a.m.
22   We're now off the video record.
23       (A recess was taken from 9:49 a.m. to
24   10:04 a.m.)
25       THE VIDEOGRAPHER: The time is 10:04 a.m.

38

1    We're back on the video record.
2        MR. NEKVASIL: Mr. Chairman, we're going
3    to start with two books. If you could bring --
4    pull them out, and we'll probably be with them
5    for a little bit. Volumes four -- and when you
6    turn out volume four, you can literally turn to
7    H-1 and have that page in front of you or put it
8    to the side so you can refer to it, it's in
9    front of you to refer to it.
10       PANELIST LUKOWSKI: What's the other book?
11       CHAIRMAN LEITCH: And the other book is?
12       MR. NEKVASIL: By the way, it's H-1. I
13   don't think you have the right tab. Do you have
14   the right tab? Do you have H like in
15   hippopotamus?
16       PANELIST LUKOWSKI: Oh, okay. Thank you.
17   REDIRECT EXAMINATION
18   BY-MR.NEKVASIL:
19   Q.   Look at what, sir, would be volume eight,
20   tab W, page -- we'll start with page 314, please.
21   314.
22   A.   What's the other volume?
23   Q.   Volume eight, tab W. The whole volume
24   eight is tab W. And if you go to page 314.
25       CHAIRMAN LEITCH: Which are you going to

39

1    look at first?
2        MR. NEKVASIL: We're actually --
3    Mr. Chairman, if you could do what I'm doing.
4    I'm working from this book eight, and I'm having
5    this book on the side so that this form can be
6    referred to at times.
7        THE VIDEOGRAPHER: Your microphone.
8        MR. NEKVASIL: Yeah, I'll get it. Thank
9    you.
10   Q.   (By Mr. Nekvasil) Do you have -- I'm a
11   little concerned, Mr. Lancaster, that you're again
12   not on the right page. I said W-314. It doesn't
13   look like --
14   A.   Oh, 314.
15   Q.   Are you okay? So, I guess, you're okay?
16   A.   Yeah, I'm okay.
17   Q.   Okay. Because -- do you need some water?
18   A.   No, I'm okay.
19   Q.   These are records we received from the
20   receiver, and I'm going to ask you, do you see on
21   page 314 there's an arrow that says, "Lancaster's
22   Personal Account"? I can represent to you that's
23   from the records we got from the receiver, and it
24   says, "U.S. Bank Account 153605145215." Do you see
25   where I'm reading from?

40

1    A.   Yes.
2    Q.   Did you have in two -- during the period
3    between 2003 -- in the years 2003 and 2004, did you
4    have a personal account at U.S. Bank?
5    A.   Yes.
6    Q.   Is this the account number?
7    A.   Looks like it, yes.
8    Q.   Okay.
9        PANELIST LUKOWSKI: Where are we on the
10   account?
11       CHAIRMAN LEITCH: We're here at the arrow.
12       PANELIST LUKOWSKI: Oh, I'm sorry. I'm
13   sorry. Thank you.
14   Q.   (By Mr. Nekvasil) Was your answer yes?
15   A.   Yes.
16   Q.   Now, we'll turn now, please, to page 318,
17   same tab. Would you not agree, looking at the top of
18   318, that you maintained an account at Bank of
19   America that was in the joint name of Lancorp
20   Financial Group, LLC and LFF Business Trust?
21   A.   In a joint name, I don't think so.
22   Q.   Well, you see both names there?
23       CHAIRMAN LEITCH: Where? Help me out.
24       MR. NEKVASIL: On the very top of page
25   318.



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

41

1       CHAIRMAN LEITCH:  Oh, I see.
2       Q.   (By Mr. Nekvasil)  Lancorp Financial
3  Group, LLC, LFF Business Trust?
4       A.   Yes.
5       Q.   Both of those names appear in this
6  account; is that not fair to say?
7       A.   That's what it shows here.
8       PANELIST WRIGHT:  Are you saying that you
9  don't recall it being a joint account?
10      THE WITNESS:  Okay.  I think I know what
11  this is now.  Then, yeah.  Okay.  Yes.
12      Q.   (By Mr. Nekvasil)  Do you agree with me
13  there was an account in both of those names?
14      A.   Yes.
15      Q.   It refreshes your recollection?
16      A.   Yeah.
17      Q.   And, in fact, just so the panel is clear,
18  if you turn to page 348, you'll see a page from the
19  bank of this account.
20      MR. NEKVASIL:  Just so the panel -- we
21  don't have -- so the panel could see.  It's on
22  page 348.
23      CHAIRMAN LEITCH:  Okay.
24      Q.   (By Mr. Nekvasil)  Do you see on page 348
25  where this is a Bank of America statement in 2005 for

42

1  that account, right?
2       A.   Yes.
3       Q.   And it lists both Lancorp Financial Group,
4  LLC and LFF Business Trust?
5       A.   Correct.
6       Q.   Right?
7       And, now, that is --
8       MR. NEKVASIL:  If the panel will look at
9  H-1, that Lancorp Financial, LLC.
10      Q.   (By Mr. Nekvasil)  Is that the same
11  Lancorp Financial Group, LLC disclosed to you -- by
12  you to ONESCO on H-1?
13      A.   Yes.
14      Q.   Okay.  Now, if we go back to page 318.  Go
15  back to page 318.
16      THE COURT REPORTER:  Sir.  Sir, if you
17  could raise that up above the book.
18      MR. NEKVASIL:  How about here?
19      THE COURT REPORTER:  Thank you, sir.
20      MR. NEKVASIL:  Thank you, ma'am.
21      Q.   (By Mr. Nekvasil)  Did Lancorp Financial
22  Fund Business Trust investor monies go into this
23  account?
24      A.   Yes.
25      Q.   And, in fact, if you take a look on this

43

1  page 318, if you take a look on --
2       MR. NEKVASIL:  Mr. Chairman, I know you
3  like the line.
4       Q.   (By Mr. Nekvasil)  -- one, two, three,
5  four, five, six, seven lines from the bottom, this is
6  a disbursement from this account to Tricom, right?
7       A.   Yes.
8       Q.   So money went from this account that was
9  in the name of Lancorp Financial Group, LLC and LFF
10  Business Trust to Tricom, right?
11      A.   Correct.
12      Q.   April 23, 2004, right?
13      A.   Yes.
14      Q.   Who were you working for on April -- who
15  were you licensed with on April 23, 2004?
16      A.   ONESCO.
17      Q.   And there were other wires.  If you look
18  on page 319, you see the wire to Tricom on 5/12/04?
19      A.   Yes.
20      Q.   For a million twenty-five?
21      A.   Yes.
22      Q.   And remember those periodic wires we took
23  you through?
24      A.   Yes.
25      Q.   All the wires, the 20 to 30 wires which

44

1  all together accumulated -- comes to about $9 million
2  in the Tricom account, were wired from this account?
3       A.   Correct.
4       Q.   Your testimony yesterday that Lancorp
5  Financial Group, LLC was not used in the activities
6  of the trust until Megafund, that was inaccurate,
7  wasn't it?
8       A.   It was inaccurate to the degree that this
9  account was opened by Lancorp for the purposes of
10  being able to earn interest on the fund money.
11      Q.   So at least in connection with holding
12  investor monies and disbursing to Tricom, Lancorp
13  Financial Group, LLC was involved with the business
14  of Lancorp Financial Fund Business Trust; is that not
15  a fair statement?
16      A.   Yes.  Since I'm the principal of both, I
17  don't know that there's any way to separate the two.
18      Q.   Well, why did you testify yesterday in
19  response -- it was a leading question from opposing
20  counsel, but he said so -- he showed you a Megafund
21  document which showed Lancorp Financial, LLC and said
22  so while -- until 2005, Lancorp Financial Group, LLC
23  was not involved in the activities of the trust,
24  isn't that correct, and you said yes.  Why did you
25  answer it that way if you knew the two were



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

45

1    intertwined and you knew Lancorp Financial Group, LLC
2    was involved with Lancorp Financial Fund Business
3    Trust?
4         MR. LITTLE: Let me -- excuse me. Let me
5    object. First, I don't think it's appropriate
6    for counsel to provide characterizations of
7    opposing counsel's questions as part of a
8    prefatory statement to what turns out to be
9    seven questions.
10        MR. NEKVASIL: Actually, it was a leading
11   question he asked.
12        CHAIRMAN LEITCH: Just simplify the
13   question.
14    Q.   (By Mr. Nekvasil) Why did you testify
15   yesterday under oath that Lancorp Financial Group,
16   LLC was not used in the activities of the trust until
17   Megafund?
18    A.   I had forgotten about this account, and I
19   didn't really -- I guess I wouldn't have viewed this
20   as an activity, just opening an account to earn
21   interest for the trust.
22    Q.   Actually, all the investor monies went
23   into this?
24    A.   Into Lancorp Financial Fund account,
25   correct.

46

1    Q.   Into this Lancorp Financial Group,
2    LLC/Lancorp Financial Fund Business Trust account.
3    All the money went into this account and then went
4    from this account to Tricom and received back
5    into this account from Tricom; is that not fair to
6    say?
7    A.   Yes. But I think -- as I recall, it was a
8    sub account that was opened up, and it had separate
9    statements; but they -- they combined everything at
10   Bank of America on all of my accounts, as I recall.
11   I can't remember specifically. They -- at that time,
12   the Lancorp Financial Group activities and their
13   monies was separate from the Lancorp Financial Fund
14   Business Trust. But I simply opened an account.
15   And because my primary account was Lancorp Financial
16   Group, I opened an account in a money market fund so
17   that the Financial Fund Business Trust funds while
18   they were sitting there would -- could create
19   earnings.
20    Q.   Did those two business entities work
21   together, Lancorp Financial Group, LLC and Lancorp
22   Financial Fund Business Trust?
23    A.   Well, I guess -- you mean -- since it's
24   all me, I guess you'd have to say yes.
25        MR. NEKVASIL: In fact, if the panel will

47

1    look on page 321. Mr. Chairman, it's the first,
2    second, third, fourth, fifth, sixth --
3         CHAIRMAN LEITCH: You can use the date if
4    you want to since --
5         MR. NEKVASIL: Yeah. It's 12/10/04,
6    Mr. Chairman.
7         CHAIRMAN LEITCH: Thank you.
8    Q.   (By Mr. Nekvasil) This reflects the $9
9    million being deposited back into the account; is
10   that correct?
11    A.   Yeah.
12    Q.   Now, if you go back to 307, page 307.
13    A.   (Witness complies with request.)
14    Q.   Did you have a separate bank account in
15   2003 and 2004 in the name of Lancorp Financial Group,
16   LLC?
17    A.   Yes.
18    Q.   This is a separate bank account, right?
19    A.   Yes.
20    Q.   And is this the same Lancorp Financial
21   Group, LLC disclosed on H-1?
22    A.   Yes.
23    Q.   And was money used from this account to
24   fund the organizational activities of Lancorp
25   Financial Fund Business Trust?

48

1    A.   Any monies that I would have had to pay
2    would have come out of that account.
3    Q.   For example, if you take a look on page --
4    if you look on the first page, March 24, 2003, this
5    LLC paid to retain the accountant that opposing
6    counsel questioned you about yesterday, Mr. Masters,
7    right?
8    A.   Yes.
9    Q.   The accountant who was going to do an
10   audit on Lancorp Financial Fund Business Trust; is
11   that right?
12    A.   Correct.
13    Q.   And then if you go -- there were a number
14   of filings with various states in 2003; is that not
15   fair to say?
16    A.   Yes.
17    Q.   Filings that related to the activities of
18   Lancorp Financial Fund Business Trust, right?
19    A.   Yes. Correct.
20    Q.   For example, if you take a look at four --
21   actually, 4/4/03, the activities of People -- there
22   was a People's Avenger Fund filing fee paid, right?
23    A.   Yes.
24    Q.   And a Lancorp Financial Fund filing fee,
25   right?



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

49

1    A.   Yes.
2    Q.   So Lancorp Financial Group, LLC was
3    involved with both the formation of People's Avengers
4    Trust and the formation of Lancorp Financial Fund
5    Business Trust; is that not fair to say?
6    A.   Yes.
7    Q.   Paid on -- sir, I'm not going to take you
8    through every entry.  But April 7, 2003, this is a
9    filing -- paying for a filing for the state of Nevada
10   for Lancorp Financial Fund, right?
11   A.   Yes.
12   Q.   These filings, April 11, 2003, to Texas
13   Securities Board, LFF, is that a filing fee for
14   Lancorp Financial Fund?
15   A.   Yes.
16   Q.   This LFF, is that a shorthand for Lancorp
17   Financial Fund Business Trust?
18   A.   Yes.
19   Q.   Same would apply on April 14, 2003?
20   A.   Yes.
21   Q.   Numerous payments on this page for
22   expenses incurred by --
23   A.   Correct.
24   Q.   -- Lancorp Financial Fund Business Trust?
25   A.   Yes.

50

1    Q.   So you were through -- through Lancorp
2    Financial Group, LLC, you were conducting activities
3    for the benefit of Lancorp Financial Fund Business
4    Trust in 2003, right?
5    A.   Yeah.  Lancorp Financial Fund itself did
6    not have a separate checking account and funds to pay
7    for expenses, so I had to incur those myself.
8    Q.   In two -- in the years 2003 and 2004,
9    during the entire time that you were with ONESCO, the
10   funds to pay the operating expenses of Lancorp
11   Financial Fund Business Trust came from Lancorp
12   Financial Group, LLC, the entity that's reflected on
13   H-1; is that not fair to say?
14   A.   Yes.
15   Q.   Stated differently, Lancorp Financial
16   Group, LLC, the outside business that you disclosed
17   to ONESCO, paid for all the expenses of Lancorp
18   Financial Fund Business Trust in 2003 and 2004; is
19   that correct?
20   A.   Yes.
21        MR. NEKVASIL:  Now, let me see if I can --
22   leave those two books open, Mr. Chairman.
23   Mr. Chairman, if you keep this book on the side,
24   the disclosure form, we're going to be working
25   from this book still, but I want you to pull out

51

1    a third book.  I won't go beyond three, I
2    promise you.  And the third book will be volume
3    six, tab U, and the specific pages would be
4    545 -- I'm going to start with 545, 547,
5    Mr. Chairman.
6    Q.   (By Mr. Nekvasil)  Now, if I direct you --
7    do you remember being questioned about pages 545
8    through 547 before?
9    A.   Yes.
10   Q.   Did you indicate that, if you turn to page
11   546, that you had never heard of MexBank, SA before,
12   that this was a -- let me not break -- let me break
13   it down.  Didn't you indicate to me that MexBank, SA
14   de C.V. --
15        MR. NEKVASIL:  I'm reading from the top of
16   546, Mr. Chairman, the first line.
17   Q.   (By Mr. Nekvasil)  -- that this was a bank
18   that was -- that Gary McDuff had dealings with?
19   A.   Yes.
20   Q.   And did you testify yesterday that you
21   didn't know anything about this bank until 2005 when
22   the issue came out about disbursing the first payment
23   from Megafund?
24   A.   Correct.
25   Q.   You had never heard of the bank before?

52

1    A.   I don't remember ever hearing of it
2    before, correct.
3    Q.   Had no dealings with them before at all?
4    A.   No.
5    Q.   And, roughly, in March of 2005, right
6    before the first $500,000 payment, which was March
7    21, 2005, is that when their name first came up to
8    you?
9    A.   That's when Gary McDuff said he wanted
10   to -- he was intending to transfer all of the rights
11   of Secured Clearing to MexBank.
12   Q.   Okay.  Did you ask him who's MexBank?
13   A.   Yeah.  He said it was a correspondent bank
14   of Union Bank of California that he had done business
15   with.
16   Q.   Okay.  If you can go back -- you can leave
17   this open -- put this book away.  Now we're back to
18   the --
19        PANELIST WRIGHT:  We're done with this
20   book?
21        MR. NEKVASIL:  Yes, maybe.  You could put
22   it on the floor.
23   Q.   (By Mr. Nekvasil)  If you go to page 309.
24   A.   Of what?
25   Q.   We're in the volume eight, 309.  309.



www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

53

1      A.    (Witness complies with request.)
2      Q.    Are you there?
3      A.    Yeah.
4      Q.    Were you having financial challenges,
5  Mr. Chairman --
6          MR. NEKVASIL:  I'm sorry, Mr. Chairman.
7      Q.    (By Mr. Nekvasil)  Were you having
8  financial challenges, Mr. Lancaster, in 2004?
9      A.    Yes.
10     Q.    You were?
11     A.    (Witness nods head affirmatively.)
12     Q.    Okay.  So, obviously, you'd remember any
13  large wires into your personal account, for example,
14  to pay for your expenses?  That would be something
15  you'd remember and note, right?
16     A.    Sure.
17     Q.    Okay.
18         CHAIRMAN LEITCH:  Well, let me -- let me
19  clarify that.  Were you having financial
20  challenges personally or with one of these
21  corporations or all of the above or --
22         THE WITNESS:  No, I was -- I had personal
23  income challenges.
24         CHAIRMAN LEITCH:  Okay.
25     Q.    (By Mr. Nekvasil)  In 2004?

54

1      A.    Yes.
2      Q.    Well, if you take a look at this
3  Lancorp -- in September 2004, you were with ONESCO,
4  right?
5      A.    Yes.
6      Q.    In September 2004, that's within the
7  period in which you were having personal financial
8  challenges; is that --
9      A.    Yes.
10     Q.    And I mean no disrespect.  If you take a
11  look at the entry on --
12         MR. NEKVASIL:  Mr. Chairman, we're --
13  it's -- I'll just give you a date.
14         CHAIRMAN LEITCH:  Great.
15         MR. NEKVASIL:  September the 7th, 2004.
16     Q.    (By Mr. Nekvasil)  This MexBank, the very
17  entity that you claim you never heard of until 2005,
18  they wired $52,000 into your account, into your
19  Lancorp account; is that not fair to say?
20     A.    Yes.
21     Q.    That's the exact entity --
22         MR. NEKVASIL:  Mr. Chairman, I can
23  represent to you it says MexBank, SA de C.V.
24  It's the same entity.
25         CHAIRMAN LEITCH:  Uh-huh.

55

1      Q.    (By Mr. Nekvasil)  So you did -- you did
2  know about this entity in 2004?
3      A.    Yeah.  I had forgotten about that
4  altogether.
5      Q.    I see.  And then if you drop down some
6  lines to September 21, 2004, you -- within days
7  thereafter, you withdrew fifty-eight -- bless you.
8  You withdrew $58,000 from the account, and it went
9  into your personal account to pay your living
10  expenses, right?
11     A.    Yes.
12         MR. NEKVASIL:  Does the panel see where
13  I'm reading from?  It's $58,000, 9/21/04, and it
14  says U.S. Bank account, which he established
15  earlier was his personal account.
16     Q.    (By Mr. Nekvasil)  So this account at
17  MexBank bailed you out financially, this wire; is
18  that not fair to say?
19     A.    Yes.
20     Q.    In fact, this wire you received is more
21  money than you earned from Universal Underwriters
22  during the entire calendar year 2004; is that not
23  fair to say?
24     A.    I don't remember what my earnings were.
25     Q.    Well, just so there's no dispute about

56

1  that, we'll just go to W three, three -- same -- let
2  me see if it's the same one.
3         MR. NEKVASIL:  It's the same tab as the
4  bank things, Mr. Chairman, same tab.  Go to page
5  333.  333.  333.
6      Q.    (By Mr. Nekvasil)  This is -- all the
7  money from Universal Underwriters went into your
8  personal account at Net Bank; is that -- is that
9  accurate?
10     A.    Yes.
11     Q.    And so for the entire year 2004, if you
12  subtract the deposit of $1500 towards the bottom
13  where it says "no source" and you subtract the
14  interest, you actually earned $35,946 from Universal
15  Underwriters, right?
16     A.    That looks correct.
17     Q.    So this statement -- by the way, that was
18  your -- other than this money that you generated
19  through Lancorp, this was your only other source of
20  income, right?
21     A.    Yes.
22     Q.    So this wire was substantially more than
23  you received for the entire year --
24     A.    Yes.
25     Q.    -- from Universal Underwriters?



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

57

1    A.   Correct.
2    Q.   And you didn't remember that from them?
3    A.   Yeah, that's true.  I mean, I -- this was
4  the result of a transaction that occurred with David
5  Bessel that I was paid for just during the time that
6  I was dealing with Tricom.
7    Q.   So while the investor monies was in a
8  brokerage account, a brokerage account at Tricom, you
9  received a payment from Bessel?
10   A.   Yes.  And so -- and a distribution was
11  made to the investors.
12   Q.   So --
13        CHAIRMAN LEITCH:  What was that last part
14   again?
15        THE WITNESS:  And earnings were credited
16   to the fund and was paid to investors.
17   Q.   (By Mr. Nekvasil)  So a broker-dealer was
18  associated with Lancorp Financial Fund Business Trust
19  in the sense of investor monies went to Tricom,
20  right?
21   A.   Yes, the money went to Tricom.
22   Q.   As a result of going to Tricom and this
23  trading strategy, investors received distributions
24  and you got paid, right?
25   A.   Correct.

58

1        PANELIST WRIGHT:  Excuse me.  I've got a
2   question.  When the money was at Tricom, there
3   were transactions taking place other than the
4   money just being parked for earnest interest?
5        THE WITNESS:  There was a transaction that
6   occurred shortly after the funds were there, but
7   I'm not certain that it actually occurred
8   directly with Tricom.  I simply got notification
9   that they had conducted a transaction -- this
10   was from David Bessel -- and that the -- the
11   Lancorp share of it, and I forget now what the
12   amount was, was sent; and I credited that -- my
13   portion was separate from that.  The syndication
14   group sent me a check obviously from MexBank.  I
15   had forgotten that.  And a separate check went
16   into the fund, and a distribution was made to
17   all the investors.
18   Q.   (By Mr. Nekvasil)  Didn't you testify a
19  couple of days ago or yesterday --
20        MR. NEKVASIL:  Mr. Chairman, I know -- I
21   think he's -- has he been on here for two days?
22        CHAIRMAN LEITCH:  Well, since he's been
23   here.
24        MR. NEKVASIL:  Since -- yeah.  Let me
25   rephrase.

59

1    Q.   (By Mr. Nekvasil)  Since you -- didn't you
2  testify earlier that no activity occurred at Tricom?
3    A.   Correct.
4    Q.   And, in fact, that was frustrating and
5  that -- and you want -- and you got --
6    A.   Yes.  And this -- this -- there's no
7  record that this activity -- when they sent the --
8  sent the checks, that the activity was actually
9  executed at Tricom.  I got no statements.  Nothing
10  came from there.  Simply notification that my portion
11  of a transaction that occurred was X amount and they
12  sent it to me.
13        CHAIRMAN LEITCH:  Is that this $58,000?
14        THE WITNESS:  Yes.
15        CHAIRMAN LEITCH:  And was any money given
16   to the investors?
17        THE WITNESS:  Yes.  Distribution was made.
18   That's what all of the payouts were that show on
19   the statements, the previous statements.  That
20   interest was paid to the investors.
21        CHAIRMAN LEITCH:  Go ahead.
22   Q.   (By Mr. Nekvasil)  You testified
23  yesterday -- you testified earlier that you were not
24  aware of the mechanics by which Rob -- Bob Reese
25  would be compensated for referring investors to you?

60

1    A.   Not specifically.  I presumed he was being
2  compensated in some fashion by Gary McDuff.
3    Q.   Take a look at -- now we're going to go
4  back to that volume six, tab U, page -- page 21.
5        CHAIRMAN LEITCH:  What page again?
6        MR. NEKVASIL:  21, sir.
7        CHAIRMAN LEITCH:  Thank you.
8    Q.   (By Mr. Nekvasil)  Did you -- did you
9  become aware --
10        MR. NEKVASIL:  I think she's reading from
11   there.
12   Q.   (By Mr. Nekvasil)  Did you become aware
13  that the receiver brought an action against, among
14  other people, Gary McDuff and Robert Reese?
15   A.   Yes.
16   Q.   This is the complaint.  It starts on page
17  21.  And if you go to page 24, paragraph 14, it says,
18  "Similarly, assets from the Lancorp receiver
19  estate" -- do you see where I'm reading from?
20   A.   Yes.
21   Q.   -- "can be traced to various accounts held
22  by the defendants.  On March 29, 2005, Lancorp wired
23  $128,437.5 into MexBank's account, Union Bank of
24  California."  By the way, that was the wire that you
25  did, right?



Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:   404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

www.browngallo.com

61

1    A.    Correct.
2    Q.    You testified about that earlier?
3    A.    Yes.
4    Q.    "Within weeks, $70,000 of these funds were
5    forwarded to an account at CCI."
6         MR. NEKVASIL:  And if you look on -- if
7    you look at paragraph 12 on page 24, it defines
8    CCI as Cash Cards International, Mr. Chairman.
9    It's in paragraph -- it's paragraph 12, the
10   third line from the end of the paragraph.
11        CHAIRMAN LEITCH:  Uh-huh.
12   Q.    (By Mr. Nekvasil)  "Account at CCI.  And
13   McDuff then distributed money to Reese and to Shannon
14   McDuff."  Do you see where it says that?
15   A.    Yeah.  Yeah.
16   Q.    So, basically, what it's explaining is
17   that the money was funneled through a MexBank account
18   into this Cash Cards International, Inc. and then it
19   went to these individuals?
20   A.    Okay.
21   Q.    Have you ever heard of Cash Cards
22   International before?
23   A.    No.
24   Q.    Till today you've not seen this?
25   A.    I have not seen it, but I was asked by --

62

1    at one of my meetings with the SEC if I had heard of
2    them or knew anything about them, and that was the
3    first I had heard of it.
4    Q.    Okay.  That would be in two thousand --
5    you gave two depositions to the SEC in 2005 and 2006.
6    Was that at one of those two --
7    A.    It was one of the two.  That was the first
8    I had heard that name, but I didn't know anything
9    about it, never had -- never heard of it before.
10   Q.    Well, can you explain -- if we go back
11   to -- you can put that aside for a second -- volume
12   eight, tab W, page 309.
13        MR. NEKVASIL:  That's the page we were at
14   a minute ago, Mr. Chairman.  That's the page
15   with the MexBank payments.
16   Q.    (By Mr. Nekvasil)  If you look up to the
17   date of September 25, 2004, during a period when
18   you --
19        MR. NEKVASIL:  Well, let me wait for you
20   to get there, Mr. Chairman.
21        PANELIST WRIGHT:  What date?
22        CHAIRMAN LEITCH:  What date?
23        MR. NEKVASIL:  309.  I'm sorry.  Date
24   would be 8/25/04.
25        CHAIRMAN LEITCH:  Okay.

63

1    Q.    (By Mr. Nekvasil)  Do you see where I'm
2    reading from, 8/25/04?
3    A.    Yes.
4    Q.    Fourth line down.  During a period in
5    which you've testified you were having personal
6    financial problems, you received $5,000 from that
7    very same entity, Cash Cards International.  Do you
8    see that?
9    A.    Yes.
10   Q.    So this entity that you've never -- you
11   never heard of till 2005 was sending you a
12   significant amount of money in 2004 while you were
13   with ONESCO at a time when you were having financial
14   needs; is that not fair to say?
15   A.    Yes.  In fact, at that -- at one
16   particular point, I had notified Gary McDuff that I
17   was not going to be able to continue, that I had --
18   at that time had no income, the program was not
19   progressing, and that I was going to need to drop
20   out.  We then signed a consultant agreement at which
21   time he agreed to pay me $5,000 a month for, I
22   forget, three months or something; and money was
23   wired in.  But I don't ever remember seeing -- I
24   didn't pay any attention to entries on statements.  I
25   didn't -- in fact, I don't recall this showing on the

64

1    bank statement.
2    Q.    Well, this isn't -- do you see where even
3    the running balance increases if you look at that
4    page?
5    A.    Yes.
6    Q.    From fifteen it goes up to twenty?
7    A.    Okay.  I didn't remember that.
8         PANELIST WRIGHT:  I have a question.  Is
9    this information -- this running total on the
10   bank, how was this obtained in the sense of it's
11   not the same as your monthly bank statements?
12        MR. NEKVASIL:  Yeah.  We obtained them.
13   We obtained them from a subpoena to the receiver
14   for his records.
15        PANELIST WRIGHT:  Okay.  So this would not
16   have -- he would not have seen that on a monthly
17   statement?
18        THE WITNESS:  I don't recall ever seeing
19   this --
20        PANELIST WRIGHT:  I mean, it might --
21        THE WITNESS:  -- on a statement.
22        PANELIST WRIGHT:  -- show on a statement
23   that $5,000 came into the account, but not -- it
24   might not have said where.
25        THE WITNESS:  I never saw on a bank

BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

65

1    statement anything that said Cash Cards
2    International.
3        MR. NEKVASIL: But the receiver -- I guess
4    the receiver would have to get it from
5    somewhere, and it's difficult to imagine that
6    there are 400 entries and he'd have to go to 400
7    separate sources to figure out where it came
8    from. But you're right. Do I have the
9    statement from the bank to show that it says
10   Cash Cards? No, I don't.
11       MR. GOODMAN: But if -- he, the receiver,
12   would have done this compilation from the bank
13   records.
14       MR. NEKVASIL: I mean, I can't think of
15   any other --
16       PANELIST WRIGHT: Right. But sometimes on
17   a statement you don't always see what took place
18   behind the scenes. That's my question. Did
19   this show on a monthly statement? And that's my
20   question to you --
21       THE WITNESS: Not that I remember.
22       PANELIST WRIGHT: -- to the best --
23       THE WITNESS: I don't ever remember seeing
24   this on any statement.
25       PANELIST LUKOWSKI: When you got a wire

66

1    transfer into the account, what kind of
2    documentation would you get from the bank?
3        THE WITNESS: I just got a verification
4    that a wire had come in and the amount.
5        PANELIST LUKOWSKI: Did it tell you from
6    where with the wire was coming?
7        THE WITNESS: I don't -- I'm sure it did,
8    but I don't remember.
9        PANELIST LUKOWSKI: I mean, wouldn't you
10   be curious to know where the money was coming --
11       THE WITNESS: Well, I was -- I was
12   expecting it. I was -- I was told by Gary
13   McDuff that I would receive three consecutive
14   wires pursuant to our agreement for my personal
15   expenses.
16       PANELIST LUKOWSKI: Okay. And so do I
17   understand you that you thought that this money
18   was coming from Gary McDuff?
19       THE WITNESS: Yes. In fact, he -- he
20   verified to me ahead of time that it was coming.
21   I got notification. I don't even know if I
22   looked at it. I think I got a call from the
23   bank just saying that the wire had -- because I
24   had asked them to notify me when the wire came
25   in. The wire came in, and I never thought

67

1    anything more of it afterwards.
2        PANELIST LUKOWSKI: Okay. Thank you.
3    Q.   (By Mr. Nekvasil) This consultancy
4    agreement that you executed, that was in 2004 when
5    you were having these personal financial problems?
6    A.   I believe so.
7    Q.   Was that contract between Lancorp
8    Financial Group, LLC and Secured Clearing?
9    A.   Yes.
10   Q.   Would you agree that that contract and the
11   activities that you did pursuant to that contract
12   represented activities that Lancorp Financial Group,
13   LLC was doing for Lancorp Financial Fund Business
14   Trust?
15   A.   Yes. That was at a time when the People's
16   Avenger Fund was not coming together, enormous amount
17   of time had gone by, and with me with no income, and
18   I was ready to give up.
19   Q.   Well, during those months between March
20   2004 and December 2004, each month you generated no
21   commission production for ONESCO?
22   A.   Correct.
23   Q.   Did Heather Renfro call -- anybody else
24   call you --
25   A.   No.

68

1    Q.   -- and ask you what you were doing, how
2    you were surviving?
3    A.   No.
4    Q.   How much money you were generating from
5    Universal Underwriters?
6    A.   No.
7        I'd like to clarify something as -- you
8    know, as things come back to me regarding the
9    distribution from David Bessel. In fact, Lance
10   Rosenberg at Tricom had indicated to me that as part
11   of connecting with this U.K. group to do the
12   transactions that he had sent not just the Lancorp
13   Financial Fund money but other monies of his -- I
14   don't know if it was his personally or his and/or
15   other investors -- to participate in a $50 million
16   transaction of some kind with Citibank, that the
17   funds were, in fact, placed with Citibank for a
18   period of time where there was no activity that Lance
19   Rosenberg could identify was occurring. And he then
20   demanded the money come back to Tricom.
21       It was during the course of that time that
22   the money was at that Citibank in the U.K. or
23   wherever that I was told that a transaction had
24   occurred and that's where that distribution came to
25   me from. Just so -- I just want to clarify where



BROWN&GALLO
                                            LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:  877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

### 69

1  that came from.
2      MR. NEKVASIL:  Now, if the panel could put
3  away the -- that volume.  I'm done with that,
4  with the volume that has the lawsuit with the
5  receiver.  I think that's -- I'm done
6  temporarily with --
7      CHAIRMAN LEITCH:  Volume six?
8      MR. NEKVASIL:  With volume -- with volume
9  six, exactly.  So now you have these two out.
10  But I will ask you to pull another volume, which
11  is -- one second.  If you'd give me a second to
12  make sure I have the right one.
13      Okay.  If -- we're going to be going back
14  and forth.  If you could pull what I'll call the
15  tab W supplement, the small volume.
16      PANELIST LUKOWSKI:  Do we need this volume
17  other than for the disclosure page?
18      MR. NEKVASIL:  Other than for the
19  disclosure page, frankly, no.
20      PANELIST LUKOWSKI:  I think I know what
21  the disclosure page says by now.
22      MR. NEKVASIL:  Okay.  Okay.
23      PANELIST WRIGHT:  What page?
24      MR. NEKVASIL:  If you go to page -- if you
25  go -- after the blue separator -- you should all

### 70

1  have a blue -- like a color-coded thing.  After
2  that, you go to handwritten page 21.
3      Q.   (By Mr. Nekvasil)  Is it fair to say that
4  you maintained yet another account at Bank of America
5  that was solely in the name of Lancorp Financial
6  Group, LLC Client Trust Account?
7      A.   Yes.
8      Q.   What was your idea of a client trust
9  account?
10      A.   That was a segregation of funds for the
11  fund money.  The initial money that came in went into
12  that client trust fund.
13      Q.   Initial money from whom?
14      A.   From investors.
15      Q.   So when -- so the Lancorp Financial Fund
16  Business Trust investors, their money would actually
17  go into a Lancorp Financial Group, LLC trust account,
18  right?
19      A.   Correct.
20      Q.   Wouldn't you agree that's further evidence
21  of a relationship between Lancorp Financial Group,
22  LLC and Lancorp Financial Fund Business Trust?
23      A.   Yeah.  I -- you know, I never mentally
24  looked at it that way because, mentally, I always had
25  it segregated, but absolutely.

### 71

1      Q.   You understand the panel is listening to
2  what you say?
3      A.   Yes.
4      Q.   And they'll be making decisions based upon
5  what you say under oath?
6      MR. LITTLE:  Excuse me.  I don't think we
7  need to have the witness lectured in that
8  fashion.
9      MR. NEKVASIL:  Actually, the problem I
10  have is he made the statement yesterday under
11  oath, important statement --
12      CHAIRMAN LEITCH:  Didn't he answer your
13  question?
14      PANELIST WRIGHT:  Just clarify his
15  statement.
16      CHAIRMAN LEITCH:  It seems to me it was
17  clear that you want to ask a follow-up.
18      Q.   (By Mr. Nekvasil)  So what happens, the
19  money would go into this account?
20      A.   Yes.
21      Q.   And then, is it not fair to say, it would
22  be moved from this account into what I call the joint
23  account, the account that we just reviewed, which is
24  the Lancorp Financial Group, LLC/Lancorp Financial
25  Fund Business Trust account; is that fair to say?

### 72

1      A.   Yes, because the trust account was a
2  noninterest bearing account.  So a separate account
3  was set up so that the funds could be -- once they
4  were cleared, that the investor went through the due
5  diligence process to be accepted, then the money was
6  transferred into the money market account so that
7  some kind of earnings could be made.  And it was the
8  interest that was earned during the time of the
9  accumulation period that was paid out.  On previous
10  pages there was small amounts of interest paid to
11  investors.  That's where that came from.
12      Q.   So just to give you -- the panel an
13  example, if you turn this to -- in this account if
14  you go to page 26, you see, do you not, that on
15  December 9, 2004, the 9,024,975 was wired back into
16  this account from Tricom?  It's dated 12/9/2004.
17      PANELIST LUKOWSKI:  What page is this?
18      MR. NEKVASIL:  It's page -- we're in the
19  small volume, page 26.
20      PANELIST LUKOWSKI:  Right.
21      MR. NEKVASIL:  And if you take a look --
22      CHAIRMAN LEITCH:  Mine only goes to April
23  '04.
24      MR. NEKVASIL:  If you go --
25      CHAIRMAN LEITCH:  Oh --



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:  877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

73

1     MR. NEKVASIL:  These dates are not --
2     CHAIRMAN LEITCH:  -- they're not in order.
3  I see.
4     MR. NEKVASIL:  The dates are not in order.
5  They actually -- on this page it actually goes
6  from --
7     CHAIRMAN LEITCH:  Oh, I see.
8     MR. NEKVASIL:  Okay.  And so -- I should
9  have made that clear.  I apologize.
10    PANELIST LUKOWSKI:  You're referring to
11  the $9 million wire of 12/9?
12    MR. NEKVASIL:  12/9/04.
13    PANELIST LUKOWSKI:  Got it.
14    MR. NEKVASIL:  And the date would be 12/9.
15  And then if you'd compare that to W-318 -- I'm
16  sorry, W three -- I apologize.  W-321.
17    MR. LITTLE:  321?
18    MR. NEKVASIL:  Yeah.  It's in the --
19    PANELIST WRIGHT:  The addendum?
20    PANELIST LUKOWSKI:  The big book.
21    Q.  (By Mr. Nekvasil)  Look in the volume
22  eight.  Volume eight.
23    A.  Okay.
24    Q.  Take a look -- if you take a look on page
25  321, you'll see on 12/10/04 that money was moved from

74

1  the Lancorp Financial Group, LLC Client Trust Account
2  into this Lancorp Financial Group, LLC and Lancorp
3  Financial Fund Business Trust account on December 10.
4     A.  Yes.
5     Q.  Do you agree?
6     A.  Yeah.
7     Q.  Now, was this Lancorp Financial --
8     MR. NEKVASIL:  Does the panel see where
9  I'm reading from?
10    PANELIST LUKOWSKI:  Yes.
11    MR. NEKVASIL:  Okay.  That's --
12    Q.  (By Mr. Nekvasil)  Was this Lancorp
13  Financial Group, LLC Client Trust Account the only
14  source of monies, of deposits for the Lancorp
15  Financial Group, LLC/Lancorp Financial Fund Business
16  Trust account?
17    A.  Yes.  The trust account and the titled
18  joint account was solely funds from the trust.
19    Q.  And so even though you don't call this
20  Lancorp Financial Group, LLC/LFF Business Trust
21  account a client trust account, was it in effect a
22  client trust account?
23    A.  Yes.  It was a money market account.
24    Q.  And all of the money there belonged to the
25  investors?

75

1     A.  That's correct.
2     Q.  Did you have any right to dip into it?
3     A.  No.
4     Q.  And did you dip into it?
5     A.  No.
6     MR. NEKVASIL:  Could we take a two-minute
7  break?  He's going to change the tape, and I'm
8  going to take -- run to the rest room real
9  quick.
10    CHAIRMAN LEITCH:  Sure.
11    THE VIDEOGRAPHER:  The time is 10:45 a.m.
12  This concludes tape number one.  We're now off
13  the video record.
14    (A recess was taken from 10:45 a.m. to
15  10:54 a.m.)
16    THE VIDEOGRAPHER:  The time is 10:54 a.m.
17  This begins tape number two.  We're now on the
18  video record.
19    Q.  (By Mr. Nekvasil)  Before the break, you
20  testified that this Lancorp Financial Group, LLC -- I
21  guess we -- if we could just stay -- look at page 318
22  in the big binder.  We're done with the small binder.
23  You can put that away.
24    You testified that -- we're on 318 -- that
25  this Lancorp Financial Group, LLC/Lancorp Financial

76

1  Fund Business Trust account was in effect a client
2  trust account?
3     A.  Yes.
4     Q.  And the money had to remain safe there, it
5  couldn't be touched by you for any purpose; is that
6  fair to say?
7     A.  Correct.
8     Q.  Let's take a look at let's say page 318,
9  for example.  Do you see where on page 318 there
10  are -- I'll direct your attention to three
11  disbursements.  Do you see where on 4/5/04 there's a
12  disbursement of $2,183?  Do you see that?
13    A.  Yes.
14    Q.  And do you see where on 4/19/04 there's a
15  disbursement of $4,161.81?
16    PANELIST WRIGHT:  What was that first one,
17  please?
18    MR. NEKVASIL:  4/5/04, ma'am.  It's
19  $2,183.
20    Q.  (By Mr. Nekvasil)  Second one would be on
21  4/19/04, $4,161.81.  Do you see that?
22    A.  On what date?
23    Q.  Sir, 4/19/04.
24    A.  Yes.  Okay.
25    Q.  $4,161.81?



BROWN & GALLO
LLC

www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

77

1     A.   Yes.

2     Q.   And then on 4/19/04, $294.67.  Do you see

3  where I'm reading from?

4     A.   Yes.

5     Q.   And then if you go -- take a look at your

6  other account.  If you go to page, let's say, 308,

7  same tab, of course, you see these deposits going

8  into your Lancorp Financial Group, LLC account, your

9  account.  Namely, if you take a look at 4/5/04, do

10  you see the $2,183?  Do you see that?

11     A.   (Witness nods head affirmatively.)

12     Q.   And do you see on 4/19/04, $294.67?

13     A.   Okay.

14     Q.   And 4/19/04, $4,161.81.  Do you see that?

15     A.   Yes.

16     Q.   So money was moved in 2004 from this

17  client trust account into your business operating

18  account?

19     A.   Yes.

20     Q.   And spent; is that not fair to say?

21     A.   Yes.

22     Q.   Was that consistent with your

23  representations to the investors?

24     A.   Yes, because those dollar amounts

25  represented small portions of my fee.  My fee was 50

---

78

1  basis points per quarter of the amount of assets

2  under management.  And I told the investors that the

3  trade off for no upfront fee or no ongoing regular

4  fee was that my fee would be paid -- be paid first

5  out of any earnings that the trust made and the

6  remaining would be disbursed to the investors.

7       So I kept a running total of the fee that

8  was owed to me, and that money was taken out of

9  interest, not out of principal.

10     Q.   Now, is it fair to -- is it fair to

11  characterize your Lancorp Financial Group, LLC

12  account as your business operating account?  Is

13  that --

14     A.   Yes.

15     Q.   That's a fair characterization?

16     A.   Yes.

17     Q.   By the time 2004 ran around, you were not

18  receiving much money in residual commissions, were

19  you?

20     A.   Correct.

21     Q.   That's why you had financial problems?

22     A.   Yes.

23     Q.   In fact, if we go to page 307 -- I'm

24  sorry.  I have the wrong page.  Looks like I have the

25  wrong page.  One second.  I have the wrong account.

---

79

1       How much would you estimate you received

2  in 2004 from insurance residuals?

3     A.   I don't know.

4     Q.   Less than $1,000?

5     A.   I don't know.  It's on my tax return.

6       MR. NEKVASIL:  Give me one second,

7  Mr. Chairman.  I didn't write down the page

8  reference.  I'll find it later.

9       CHAIRMAN LEITCH:  You can make that

10  Mr. Goodman's assignment while you do something

11  else, if you'd like.

12       MR. NEKVASIL:  Yes.  Exactly.  That's what

13  I'm going to do.

14     Q.   (By Mr. Nekvasil)  Now, let's take a look

15  at your CRD.

16       MR. NEKVASIL:  Does the panel have it

17  handy?

18       CHAIRMAN LEITCH:  Is that C-1?  Is that

19  Claimants' 1?

20       MR. NEKVASIL:  Yes, sir.

21     Q.   (By Mr. Nekvasil)  Let's kind of go over

22  your prior background before you joined -- before

23  you -- go to page -- page eight of the CRD.

24     A.   (Witness complies with request.)

25     Q.   Let's look at your prior employment before

---

80

1  O.N. Equity Sales and Universal Underwriters.  Is it

2  fair to say you joined Universal Underwriters about

3  three months or so before you applied to join ONESCO

4  in February 2004?

5     A.   Sounds right.

6     Q.   Before that, you worked for three months

7  at Meridian Home Loans?

8     A.   Yes.

9     Q.   You weren't selling insurance there, were

10  you?

11     A.   No.

12     Q.   So you weren't generating -- you weren't

13  engaged in the type of activity that would provide

14  you with residuals through Lancorp Financial Group?

15     A.   No.

16     Q.   Why did you leave Meridian?

17     A.   Because of their unethical business

18  practices.

19     Q.   Their -- what happened?

20     A.   The manager who was responsible for

21  Portland -- setting up Portland just said blatantly

22  false and untrue things and told -- told people they

23  were going to get certain things in mortgage funding,

24  had them pay for an appraisal only to have the things

25  that he told them to be totally untrue.  When I

---

# BROWN & GALLO

LLC

www.browngallo.com

Telephone:  404.495.0777
Toll Free:    877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

81

1    complained, he told me, "Don't complain." So I said,
2    "I quit."
3        Q.    You left voluntarily?
4        A.    Yeah.
5        Q.    And before then for a period of seven
6    months, you were unemployed, right?
7        A.    Yeah.
8        Q.    Unemployed means unemployed; is that fair
9    to say?
10       A.    Yes.
11       Q.    So for this period you were unemployed,
12   you were not selling insurance products through
13   Lancorp Financial Group and generating residuals; is
14   that a fair statement?
15       A.    Correct.
16       Q.    And, in fact, would it be fair to say that
17   your primary activity between February 2003/August
18   2003, at least, was trying to put Lancorp together?
19       A.    Yes.
20       Q.    By the end of 2002, this People's Avenger
21   Fund -- by the end of 2002, very beginning of 2003,
22   People's Avengers Fund, is that -- had it --
23   basically, had it collapsed by then?  Never --
24       A.    Yeah.
25       Q.    Never went to fruition?

82

1        A.    Correct.
2        CHAIRMAN LEITCH:  By what date was that?
3        MR. NEKVASIL:  Yeah.
4        Q.    (By Mr. Nekvasil)  By what date would you
5    estimate that People's Avengers Fund -- you gave up
6    on People's Avengers Fund?
7        A.    I don't remember exactly.  Just reached a
8    point where I said that's it.
9        CHAIRMAN LEITCH:  Well, in the context of
10   these job things.  Just put it in a timeline
11   with these job listings on here, approximately.
12       THE WITNESS:  I just -- I just don't
13   remember.
14       MR. NEKVASIL:  I'll take this up later.
15       Q.    (By Mr. Nekvasil)  Okay.  Now, before
16   that, if you turn the page, you worked for --
17   actually, it says -- you actually -- it says Quick &
18   Reilly.  You were actually with Quick & Reilly for
19   about three or four days, right?
20       A.    Yeah.
21       Q.    You weren't selling insurance products
22   through Lancorp Financial Group, LLC while you were
23   with Quick & Reilly receiving residuals?
24       A.    Correct.
25       Q.    And before that, you were at U.S. Bancorp?

83

1        A.    Yes.
2        Q.    Were you selling insurance products for
3    U.S. Bancorp?
4        A.    Yes.
5        Q.    Did they allow you to personally take the
6    residuals with you?
7        A.    No.
8        Q.    So you would agree that -- now we're down
9    to at least September of 2000 -- that at least from
10   September 2000 onward you had not engaged in any type
11   of sale of insurance products and annuities that
12   would lead to receiving residuals through Lancorp
13   Financial Group; is that a fair statement?
14       A.    I don't remember specifically.  There's a
15   small number of clients that had annuity rollovers
16   and the like, and I don't remember when they
17   occurred.
18       Q.    Okay.  But I've asked you -- are you --
19   I've asked you about Meridian Home Loans, did you
20   sell any insurance products then.  You said no.
21       A.    Yeah.  I don't recall selling any during
22   that time.
23       Q.    And I asked you when you were unemployed
24   did you sell any then.
25       A.    Yeah.  I don't remember selling any at

84

1    that time.
2        Q.    And I asked you when you were with Quick &
3    Reilly for four days did you sell any then.
4        A.    No.
5        Q.    And when you were at U.S Bancorp, they did
6    not allow you to take and keep the residuals that
7    you --
8        A.    That's correct.
9        Q.    -- did for them?
10       A.    So Lancorp had no activity during that
11   time.
12       Q.    Okay.  Well, what about Bank of America,
13   did they have some deal with you where even though
14   you were an employee you could actually keep
15   residuals later on the sales you did for them?
16       A.    Not for bank-related products, no.
17       Q.    Well, did they allow you to sell insurance
18   products on the side?
19       A.    No.
20       Q.    Okay.  So you'd agree that takes you back
21   to 1997?
22       A.    Yeah.
23       Q.    So is it fair to say that at least for
24   seven and a half years prior to filling out this
25   outside disclosure form for ONESCO you had not



BROWN & GALLO
LLC

www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

85

1  engaged in any outside insurance or annuity sales
2  that would have led to commissions; is that fair to
3  say?
4      A.  Again, there might have been annuity sales
5  during that time that were rollovers, but I don't
6  remember.
7      Q.  You can't point to any?
8      A.  I can't point to any.
9      Q.  I mean -- okay.  I don't want you to
10 speculate.
11     A.  And any that there might have been would
12 have been very small in number.
13     Q.  I don't -- I don't want to know the size
14 of what might have been.  Can you tell the panel
15 specifically that you generated any insurance or
16 annuity production on your own between 1997 and 2004?
17     A.  Not that I can remember.
18     PANELIST WRIGHT:  Could there have been
19 any residuals, though?
20     THE WITNESS:  Most of the business, the
21 annuity business was not residual business, it
22 was one-time commission business.
23     Q.  (By Mr. Nekvasil)  You can't tell the --
24 did you play any role in the preparation of the
25 information that appeared on your ONESCO U-4

86

1  concerning your outside business activities?
2      A.  Are you talking about filling out the
3  form?
4      Q.  Did you fill out -- do you specifically
5  remember filling out the outside business activities
6  section of that form?
7      A.  It was part of the original application
8  process.
9      Q.  Do you specifically remember filling it
10 out?
11     A.  No.
12     MR. NEKVASIL:  Mr. Chairman, we can put
13 these books away and go to volume one, tab B.
14 That's the only book we need out.
15     THE WITNESS:  Finished with the CRD?
16     MR. NEKVASIL:  Yes, sir.  Yeah, we are.
17 Sorry.
18     MR. LITTLE:  I apologize.  What volume,
19 please?
20     MR. NEKVASIL:  Volume one, tab B.
21     PANELIST LUKOWSKI:  B as in boy.
22     MR. NEKVASIL:  B as in boy.  And we'll
23 start with page 74, which I'm sure is a page --
24     PANELIST WRIGHT:  B.
25     PANELIST LUKOWSKI:  B.

87

1      CHAIRMAN LEITCH:  B you said?
2      MR. NEKVASIL:  B like in boy.
3      PANELIST WRIGHT:  I'm sorry.
4      MR. NEKVASIL:  No.  No.  No.  That's fine.
5  It's fine.  74.
6      CHAIRMAN LEITCH:  It's the offering
7  memorandum.
8      MR. NEKVASIL:  Yeah.
9      Q.  (By Mr. Nekvasil)  Now, first of all, do
10 you see on the bottom where it says, "Effective date,
11 March 17, 2003"?
12     A.  Yes.
13     Q.  What does it indicate that this effective
14 date is?  Effective date of what?
15     A.  Effective date of the offering.
16     Q.  The effective date of the memorandum for
17 the offering?
18     A.  Correct.
19     Q.  That's what it indicates, right?
20     A.  Yes.
21     Q.  Does it indicate anything else?
22     A.  No.
23     Q.  Now, if you go to page 90, you testified,
24 do you not agree, earlier that the investors -- Reese
25 would refer the investors to you and it was your job

88

1  to send them the memorandum --
2      A.  Correct.
3      Q.  -- explain the offering, and close the
4  deal?  Didn't you use those words?
5      A.  I did not use the word "close the deal."
6  You used that word.  It was my role to send them the
7  prospectus, answer any questions that they have, and
8  take them through the enrollment process.
9      Q.  Okay.  Was Mr. -- did you assign to
10 Mr. Reese any step -- after you sent them the
11 prospectus -- they couldn't buy it without a
12 prospectus, right?
13     A.  Correct.
14     Q.  Was Mr. Reese authorized to interject
15 himself?
16     A.  No, at no time.
17     Q.  It was you?
18     A.  Correct.
19     Q.  Now, did you explain -- did you explain to
20 them -- when you sent them the offering memorandum,
21 did you explain to them the offering?
22     A.  I only answered questions.  I did not go
23 through the offering with each investor.
24     Q.  Well, you would agree that at least on
25 page 90, second paragraph, it indicates that all the



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:   404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

89

1  investor monies would be held in an interest bearing
2  account at U.S. Bancorp Piper Jaffray; would you not
3  agree?
4      A.   Yes.
5      Q.   That's a broker-dealer?
6      A.   Yeah.
7      Q.   Right?
8           So it would be inaccurate to say that no
9  broker-dealer was associated with the offering; is
10 that not fair to say?
11     A.   Yes.
12     Q.   So monies were supposed to go into this
13 broker-dealer account?
14     A.   Correct.
15     Q.   Did you tell the investors that?
16     A.   Not specifically, no.
17     Q.   Was that important to you to have a
18 brokerage account in which the investor monies went?
19     A.   Sure.  We needed to have an account for
20 the fund.
21     Q.   And from there the monies went into --
22 first, the monies were at U.S. Bancorp Piper Jaffray,
23 and the account was closed, you explained earlier, in
24 August 2003, right?
25     A.   I don't remember the exact date.  Again,

90

1  you're --
2      Q.   Okay.
3      A.   You're testing my memory on stuff that I
4  can't -- I just can't remember.
5      Q.   After the U.S. Bancorp Piper Jaffray
6  account was closed --
7           MR. NEKVASIL:  The record would show it's
8  August 2003, Mr. Chairman.
9      Q.   (By Mr. Nekvasil)  -- the money then made
10 its way beginning of 2004 to Tricom, right?
11     A.   Yes.
12     Q.   Tricom was a brokerage firm?
13     A.   Correct.
14     Q.   Was it a bank or a brokerage firm?
15     A.   Broker-dealer.
16     Q.   Okay.  And then from Tricom it comes back?
17     A.   Correct.
18     Q.   So you'd agree at least by this point in
19 time you have two brokerage firms that are touching
20 investor monies; do you agree with that?
21     A.   Yes.
22     Q.   When the money comes back -- and if we
23 leave this volume open because I'll get to it later
24 again.  And then turn to volume three, tab E, page
25 22.

91

1           PANELIST LUKOWSKI:  E what?
2           MR. NEKVASIL:  Tab -- volume three, tab E.
3           CHAIRMAN LEITCH:  Subdivision one?
4           MR. NEKVASIL:  Yeah.  Yes, sir.
5      Q.   (By Mr. Nekvasil)  Now, is this the letter
6  that you sent -- I think opposing counsel asked you
7  about it -- where you told investors to either stay
8  in or get out, make up your mind?
9      A.   Yes.
10     Q.   In this letter, do you relay any positive
11 news to the investors?
12     A.   Yes.
13     Q.   Is that positive news reflected in the top
14 paragraph on the second page?
15     A.   Yes.
16     Q.   It says, "The news is not all bad,
17 however.  I have made contact with the principal of a
18 major securities firm with whom I've had a previous
19 relationship and have reached an agreement to be a
20 participant with that firm.  Part of that agreement
21 is the guarantee of full participation in all of its
22 underwriting activities.  I expect the necessary
23 documents to be executed during the month of December
24 with fund participation to begin in January 2005."
25     A.   Yes.

92

1      Q.   So now you're disclosing to the investors
2  the existence really of a third broker-dealer; is
3  that not fair to say?
4      A.   Correct.
5      Q.   First, you had money being at U.S.
6  Bancorp?
7      A.   Yeah.
8      Q.   Then you have the account at Tricom?
9      A.   Yes.
10     Q.   Now you have this third broker-dealer?
11     A.   Correct.
12     Q.   Did you tell the investors at all that
13 this broker-dealer -- I believe in response to a
14 question from a panel member you said it was
15 overseas.  Did you tell them it was an overseas
16 broker-dealer?
17     A.   No.
18     Q.   Why did you give them this positive
19 information in this letter when they're -- sorry.
20 Did you give them this information so that they could
21 consider it when they were making a decision whether
22 to stay in or get out?
23     A.   Yes.
24           PANELIST LUKOWSKI:  What was the name of
25 the broker-dealer?



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

93

1     THE WITNESS:  What's that?
2     PANELIST LUKOWSKI:  What was the name of
3  the broker-dealer?
4     THE WITNESS:  It was the broker-dealer for
5  this Aurora Group that was previously Jackson
6  Batten.
7     PANELIST LUKOWSKI:  Okay.
8     Q.   (By Mr. Nekvasil)  Were you hoping that
9  with -- that by including this information the
10  investors would agree to stay in the deal?
11    A.   I just wanted them to get the current
12  information that I had that looked very good.
13    Q.   You had no hope either way?  You couldn't
14  care less?
15    A.   Well, sure, I want people to say.  Don't
16  want people to leave.
17    Q.   This offering was really -- in December
18  2004, you had already left Universal Underwriters.
19  You were generating no production for ONESCO.  This
20  offering was your only source of money, right?
21    A.   Correct.
22    Q.   And by -- I imagine -- is it fair to say
23  by December 2004 your financial situation was acute?
24    A.   Well, it was becoming that way, yes.
25    Q.   Yeah.  So does that refresh your memory

94

1  concerning whether or not you really wanted investors
2  to stay in so the deal could go forward?
3     A.   I was anticipating the deal was going
4  forward, and, sure, I want investors to stay.
5     Q.   Well, did this -- did ultimately Lancorp
6  Financial Fund Business Trust enter into this
7  agreement with this securities firm?
8     A.   No.
9     Q.   Did you ever send the investors a letter
10  telling them that this didn't happen, that there's no
11  securities firm involved -- by the way, this
12  guarantee of full participation in all its
13  underwriting activities, was that a guarantee from
14  the securities firm?
15    A.   Yes.
16    Q.   Did you tell them that there was no longer
17  a guarantee from this securities firm of full
18  participation in all its underwriting activities?
19  Did you tell them that?
20    A.   No.
21    MR. NEKVASIL:  Bless you.  Bless you.  In
22  fact, Mr. Chairman, if we can leave this page
23  open and go to respondent's book, volume one,
24  tab 26.
25    PANELIST WRIGHT:  Which one?

95

1     MR. NEKVASIL:  Volume one, ma'am.  Volume
2  one of respondent's books.  It's tab 26.
3     CHAIRMAN LEITCH:  Oh, respondent's tab?
4     MR. NEKVASIL:  Respondent's.
5     PANELIST WRIGHT:  Where?
6     MR. NEKVASIL:  It's --
7     CHAIRMAN LEITCH:  Respondent's.
8     PANELIST WRIGHT:  I know.  But what page?
9     MR. NEKVASIL:  26.  And it's sub F.  26
10  was tough for me to see.  The actual tab is in
11  the right -- top right corner.  It took me about
12  ten minutes to find it last night.  And that was
13  late, granted, but it wasn't easy to spot.
14    THE WITNESS:  I don't see where you're at.
15    MR. NEKVASIL:  Are you -- you're in the
16  wrong volume.
17    THE WITNESS:  Volume one.
18    MR. LITTLE:  You need to turn to volume
19  one --
20    THE WITNESS:  Volume one.
21    MR. NEKVASIL:  Leave my book on that.
22    THE WITNESS:  Oh, the white book.
23    PANELIST WRIGHT:  What tab?
24    PANELIST LUKOWSKI:  F.
25    MR. NEKVASIL:  F.

96

1     Q.   (By Mr. Nekvasil)  Now, if I can direct
2  your attention back again to this volume three, the
3  page we were on a minute ago, this December 6th,
4  2004, letter.  You've got this --
5     MR. NEKVASIL:  I'm sorry, panel.
6     Q.   (By Mr. Nekvasil)  You've got this
7  December 6th, 2004, letter telling the investors --
8  all of them, right?  It was sent to all the
9  investors, including the claimants?
10    A.   Yes.
11    Q.   -- that there's a major securities firm
12  involved, that you were going to be a participant
13  with that firm, and that this securities firm is
14  going to guarantee full participation in underwriting
15  activities, right?
16    A.   Yeah.
17    Q.   The next communication you sent to all the
18  investors, was that 26-F?  Didn't you testify to that
19  yesterday?
20    A.   In your book?
21    MR. LITTLE:  It's volume one, tab 26-F.
22    THE WITNESS:  Can you give it again?  Oh,
23  26-F.  Okay.  There we go.  Yes.
24    Q.   (By Mr. Nekvasil)  This is the next
25  communication you sent to the investors, right?



BROWN & GALLO
                                    LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

97

1    A.    Yes.
2    Q.    Would you agree this is the last
3  communication that you sent to the investors before
4  the Megafund investment?  We've seen no other
5  communication.  Opposing counsel --
6    A.    I think not.  I think that's correct.
7    Q.    Well, in this communication you tell them
8  that you expect to receive -- you're waiting for the
9  first contract --
10        MR. NEKVASIL:  I'm reading from the second
11  paragraph, Mr. Chairman, first line.
12    Q.    (By Mr. Nekvasil)  "I am currently waiting
13  for the first contracts, which are expected to be
14  received soon."  And you tell -- you state that
15  there, right?
16    A.    Uh-huh.
17    Q.    Do you indicate at all -- by this point in
18  time, you had already decided to go with Megafund, is
19  that not fair to say, by January 18th?
20    A.    I don't recall the exact date.
21    Q.    Well, wasn't the Megafund agreement
22  entered into February 1?
23    A.    Yes.
24    Q.    Does that refresh your recollection?
25    A.    Okay.

---

98

1    Q.    Does it?
2    A.    Yes.
3    Q.    So by January 18th, had you decided to go
4  with Megafund?
5    A.    Yes.
6    Q.    You didn't tell the investors, did you,
7  that now they're no longer -- you're no longer going
8  to do this deal with this major securities firm,
9  instead they're going with Megafund?  You didn't tell
10  them that, did you?
11    A.    No.
12    Q.    You could have?
13    A.    Yes.
14    Q.    Why not?
15    A.    I don't know.
16    Q.    It never -- you never communicated to the
17  investors about Megafund until several months after
18  the SEC came in; is that a fair statement?
19    A.    Yes.
20    Q.    Now, you were involved in a -- you
21  testified yesterday -- in another deal in 2003.  You
22  remember when opposing counsel asked you questions
23  about this Lancorp Financial Fund Educational
24  Institute Account where it took five million in it?
25    A.    Yes.

---

99

1    Q.    There was a $5 million account at U.S.
2  Bancorp Piper Jaffray, right?
3    A.    Yes.
4    Q.    And the money stayed there?
5    A.    Yes.
6    Q.    And the deal never happened?
7    A.    Right.
8    Q.    And the money went to a Salomon Brothers
9  account?
10    A.    Correct.
11    Q.    So you have a brokerage firm involved in
12  that transaction?
13    A.    Yes.
14    Q.    Is that a fair statement?
15    A.    Yes.
16    Q.    Now, opposing counsel asked you about some
17  investments that you actually -- an investment plan
18  that you actually put together after the SEC action.
19  Do you recall that?
20    A.    Yes.
21    Q.    He pointed out to you that the SEC comes
22  in in July of 2005 and you're still basically
23  peddling investments.  He pointed that out, right?
24    A.    Yes.
25    Q.    He mentioned that the investments went

---

100

1  into an account that you did not have control over?
2    A.    Ultimately, yes.
3    Q.    And the receiver had to become involved?
4    A.    Yes.
5    Q.    He didn't ask -- well -- the money went --
6  that money went into an account with the firm called
7  Max International, right?
8    A.    Correct.
9    Q.    Max International was an NASD member firm,
10  right?
11    A.    Correct.
12    Q.    And so money was being held in an account
13  with that member firm, right?
14    A.    Correct.
15    Q.    And the SEC had the receiver to come in
16  and grab the money from that account?
17    A.    Yes.
18    Q.    So you had a broker-dealer involved with
19  that transaction, as well?
20    A.    Yes.
21    Q.    So is it fair to say that in all three
22  investment -- investment plans that you implemented,
23  Lancorp Financial Fund Business Trust, the deal with
24  that one person that fell through, the five million,
25  and this fall of -- fall of 2005 deal, there was a

---



Telephone:  404.495.0777
Toll Free:  877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

101

1  broker-dealer involved in some manner in every one of
2  those deals?
3      A.   Yes.
4      Q.   Now, did you tell any of the investors
5  that you had a securities license?
6      A.   I don't recall telling any of them.
7          PANELIST WRIGHT:  Tell who, please?
8      Q.   (By Mr. Nekvasil)  Did you tell any of the
9  Lancorp Financial Fund Business Trust investors that
10 you had a securities license?
11     A.   Not that I remember.
12     Q.   Okay.  Is the answer no?
13     A.   Not that I recall.  I can't say with
14 absolute certainty, but I do not recall having told
15 any investors that I was securities licensed.
16     Q.   Okay.  So didn't you testify two --
17 several days ago that you only told -- you did tell
18 them but only if they asked?
19     A.   And I don't know that that occurred.  I
20 said if I would have disclosed that I had a license,
21 it would only have been as a response to somebody
22 asking me.
23     Q.   Did you receive E&O coverage when you were
24 at ONESCO?
25     A.   Yes.

103

1  regarding Megafund.
2          CHAIRMAN LEITCH:  Go ahead.
3          THE WITNESS:  And that is that the
4  funds -- the documentations I received in
5  affirmation from the corporate attorney was that
6  those funds were going to be held in a JP Morgan
7  account at the broker-dealer in the same fashion
8  that all the other monies were going to be held.
9  First went to Wells Fargo.  From Wells Fargo to
10 JP Morgan.  And had the same guarantee of
11 principal as every other attempt I made to
12 engage.
13     Q.   (By Mr. Nekvasil)  If you go to -- if you
14 go to volume six, tab U, page six.
15         CHAIRMAN LEITCH:  One second.
16         MR. LITTLE:  Volume six, tab U.
17         CHAIRMAN LEITCH:  Volume six, tab U, page?
18         MR. NEKVASIL:  Six.
19         CHAIRMAN LEITCH:  Six.
20     Q.   (By Mr. Nekvasil)  Did you give this
21 document to Mr. Reese?
22     A.   Yes.
23     Q.   Mr. Reese wanted some assurance that you
24 had E&O coverage that would cover you in connection
25 with your activities on behalf of Lancorp Financial

102

1      Q.   Did you believe that that E&O coverage
2  covered Lancorp Financial Fund Business Trust?
3      A.   I did.
4      Q.   You did?
5      A.   I did.
6      Q.   And so when investors called you and said
7  do you have E&O coverage, you said yes; is that not
8  fair to say?
9      A.   Yes.
10     Q.   And the E&O coverage that you were
11 referring to in those conversations with Lancorp
12 Financial Fund Business Trust investors was the E&O
13 coverage you had through ONESCO?
14     A.   Yes.
15     Q.   In fact, you even gave a copy of an
16 insurance -- E&O insurance certificate to Mr. Reese,
17 didn't you?
18     A.   I did.
19     Q.   Mr. Reese asked you whether you had E&O
20 coverage, didn't he?
21     A.   Yes.
22     Q.   And you gave him an E&O certificate from
23 Ohio National, didn't you?
24     A.   I did.
25         I'd like to make an additional point

104

1  Fund Business Trust; is that fair to say?
2      A.   Yes.
3      Q.   And you gave him this form?
4      A.   I did.
5      Q.   And do you see where it says that it
6  covers a period between April 1, 2004, and April 1,
7  2005?  Do you see that?
8      A.   Yes.
9      Q.   Do you see where it says, "Description:
10 life agent plus financial products"?
11     A.   Yes.
12     Q.   Was it your belief that this plus
13 financial products included Lancorp?
14     A.   Yes.
15     Q.   Did you pay extra to obtain coverage for
16 financial products?
17     A.   I did.
18     Q.   So you had the option of obtaining
19 insurance coverage that would just cover -- I mean,
20 of obtaining E&O coverage that just would cover
21 insurance and E&O coverage that would include
22 financial products?
23     A.   Correct.
24     Q.   Did you elect the financial products
25 coverage because of Lancorp?



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

105

1    A.   Yes.
2    Q.   At the time that the SEC came in, did you
3  believe that you were covered by insurance?
4    A.   I did.
5    Q.   So when the SEC came in, you felt that,
6  okay, if there were all these lawsuits, you know,
7  it's okay because I have E&O coverage?
8    A.   Correct.
9    Q.   Did you tell any of the investors that you
10  had E&O coverage?
11   A.   I don't remember specifically.
12   Q.   Either way?
13   A.   Either way.  I think -- I think there was
14  one investor who asked, and I don't remember who that
15  was; and I told him that I had it.
16   Q.   You told him you had it?
17   A.   Yeah.
18   Q.   And was this the insurance you were
19  referring to --
20   A.   Yes.
21   Q.   -- or thinking about?
22   A.   Correct.
23   Q.   Are you still involved with Lancaster
24  Libations?
25   A.   No.

106

1    Q.   Did that end a while ago?
2    A.   That ended when I went to San Diego.
3    Q.   What year was that?
4    A.   '99.
5    Q.   '99.  Okay.
6        MR. NEKVASIL:  If the panel will again go
7  back and turn to volume four, tab H, page one.
8  I'm sorry.  I'm sorry.  Volume four, tab J.
9    Q.   (By Mr. Nekvasil)  If you turn to tab J,
10  page 83, this is your U-4 from ONESCO; would you
11  agree?
12   A.   Yes.
13   Q.   And on page 104, you mention an outside
14  business activity called Lancaster Libations, right?
15   A.   Yes.
16       CHAIRMAN LEITCH:  What page again?
17       MR. NEKVASIL:  104, sir.
18   Q.   (By Mr. Nekvasil)  You mention --
19       MR. NEKVASIL:  It's the -- 104, the
20  section called 13, other business, Mr. Chairman,
21  and it's four lines from the bottom.
22   Q.   (By Mr. Nekvasil)  Now, you and your wife
23  had not been involved with Lancaster Libations, I
24  think your testimony was, since 1999, right?
25   A.   I believe that's correct.  Whenever the

107

1  date was that I left to go to San Diego.
2    Q.   Okay.  And is that why you did not put
3  Lancaster Libations on your ONESCO February 2004
4  form, which the firm admits it did receive?
5    A.   Yes.
6    Q.   So, really, what you have here, except for
7  the last entry of Universal Underwriters, are just
8  entries from a 1999/2000 U-4; is that not fair to
9  say?
10   A.   Yes.
11   Q.   Anybody at ONESCO ask you whether or not
12  these disclosures were current?
13   A.   No.
14   Q.   Anyone ever ask you whether or not you
15  still were involved with, for example, Lancaster
16  Libations?
17   A.   No.
18   Q.   Now let's go to respondent's volume one,
19  tab 15.
20   A.   Volume one, tab what?
21   Q.   Volume one, tabs -- tab 15.
22   A.   Tab 15.
23   Q.   Respondent's book.  I'm sorry.  I should
24  have been more clear.  Do you recall respondent's
25  counsel asking you to identify tab 15 yesterday?

108

1    A.   Yes.
2    Q.   He also took you to tab 16, right?
3    A.   Yes.
4    Q.   Well, you produced, is it fair to say,
5  about 5,000 sheets of paper for respondent's counsel?
6    A.   Yes, thousands.
7    A.   It was on disk, right?
8    A.   Yes.
9    Q.   You did it voluntarily?
10   A.   Yes.
11   Q.   Mr. Little didn't have to subpoena you --
12   A.   No.
13   Q.   -- or tell you he was going to subpoena
14  you?
15       And it included both documents that you
16  used and drafts, right?
17   A.   Correct.
18   Q.   So as you sit here right now, if you look
19  at tab 15, for example, is it signed on page 699 by
20  you?
21   A.   No.
22   Q.   So, really, as you sit here today, do you
23  really know whether or not this is an accurate
24  reflection of the -- accurate copy of the certificate
25  of trust that you ultimately executed?



BROWN & GALLO
LLC

www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

109

1    A.   It was all prepared by legal counsel.  I
2 can't say with absolute certainty, but no one else
3 prepared it but him.
4    Q.   No.  No.  I'm asking you -- I'm not asking
5 who prepared it.  I'm asking whether this particular
6 copy -- can you tell the panel that you actually
7 signed this particular document here?
8    A.   Not without studying it, but I -- I have
9 no reason to believe that I didn't.
10    Q.   Would that same answer apply to tab 16?
11    A.   Yes.
12    PANELIST LUKOWSKI:  Does anybody actually
13 have the signed versions?
14    MR. NEKVASIL:  We may have the signed
15 version of one -- I think one of them may be
16 attached to the prospectus -- offering
17 memorandum.
18    MR. LITTLE:  Yeah.  One should be attached
19 to the private placement --
20    MR. NEKVASIL:  The other one, the bylaws,
21 I have not seen a signed version.  That's why
22 I'm -- he testified -- he was identifying
23 yesterday.  I want to make sure what the basis
24 was he was identifying.
25    PANELIST WRIGHT:  So it is feasible that

110

1 this could have been a draft and maybe something
2 had been changed that would be very -- it could
3 be minor, it could be major, but you can't swear
4 that this is the actual one that you signed?
5    THE WITNESS:  No.  But, you know -- my
6 correspondence back and forth with Norman
7 Reynolds was such that had he made any changes
8 he certainly would have notified me.
9    Q.   (By Mr. Nekvasil)  Well, let me -- in that
10 regard, let me follow up on that if you don't mind.
11 Same volume.
12    PANELIST WRIGHT:  If it's in here, can we
13 just clarify which was the signed one?
14    THE WITNESS:  To the best of my knowledge,
15 all of these exhibits are the identicals to the
16 ones that I executed.
17    MR. NEKVASIL:  I was going to do it at the
18 lunch break.  This is a pretty big document.  I
19 will clarify it.
20    Q.   (By Mr. Nekvasil)  If you go to tab 19,
21 page 52.
22    A.   (Witness complies with request.)
23    PANELIST LUKOWSKI:  Is this the same
24 document we were looking at in claimants'
25 exhibits that we've been keeping open?

111

1    MR. NEKVASIL:  No.  No.  If you turn --
2 actually, page -- it's 52.  I said turn to tab
3 19, go to page 52.
4    PANELIST LUKOWSKI:  I understand.  I just
5 want to -- I understand, but we've been keeping
6 this Lancorp Financial Fund Business Trust
7 private placement memorandum open and --
8    MR. NEKVASIL:  You could put -- you
9 could --
10    PANELIST LUKOWSKI:  Are these the same
11 documents?
12    MR. NEKVASIL:  I've not compared -- that's
13 a good question.  You could put the other
14 notebook away for now, I guess.  I've not
15 compared -- this is the one that respondent --
16    PANELIST LUKOWSKI:  You have no reason to
17 believe that they're different, do you?  I mean,
18 I assume that these were produced.
19    MR. NEKVASIL:  Let me see something.
20    PANELIST LUKOWSKI:  Whose Bates numbers
21 are these on the bottom of Exhibit 19?
22    MR. LITTLE:  You are looking at
23 Respondent's Exhibit 19?
24    PANELIST LUKOWSKI:  Yeah.
25    MR. LITTLE:  This is a copy of the

112

1 document that's been filed in federal court, and
2 we simply put pagination on this so it's easy
3 for you to locate the document.
4    PANELIST LUKOWSKI:  Okay.  Fine.
5    MR. NEKVASIL:  I believe it's identical to
6 the one in the offering memorandum.  But since
7 they'd use this to question the witness, I
8 didn't want there to be an issue later that I'm
9 using the wrong document to question the witness
10 with.
11    PANELIST LUKOWSKI:  That's fine.
12    Q.   (By Mr. Nekvasil)  Do you recall opposing
13 counsel asking you about this subscription agreement?
14    A.   Yes.
15    Q.   Do you recall him directing your attention
16 to the very top of this document where it shows an
17 address of Vancouver, Washington?
18    A.   Yes.
19    Q.   This one is unsigned.  This is a draft
20 subscription agreement, right?
21    A.   Yes.
22    Q.   Let's compare it to the ones that the
23 claimants actually signed.  If you leave this open
24 and you go to volume three, tab E, page eight.
25    PANELIST LUKOWSKI:  E-8?

# BROWN & GALLO
LLC

www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

113

1    MR. NEKVASIL:  E like in egg, eight.
2    PANELIST LUKOWSKI:  Thank you.
3    MR. NEKVASIL:  And I'm comparing it to tab
4  19, page 52.
5    CHAIRMAN LEITCH:  Give me the one in
6  volume --
7    MR. NEKVASIL:  Yes, sir.
8    CHAIRMAN LEITCH:  -- three again.
9    MR. NEKVASIL:  E-8.  It's -- well, it's in
10  the first tab of E.  It's Bates stamped page
11  eight, but they're all sequential anyway.
12    CHAIRMAN LEITCH:  E, page eight.  Tab one,
13  page eight.  Okay.
14    Q.  (By Mr. Nekvasil)  First of all, wouldn't
15  you agree that the one that the claimant signed --
16  and, by the way, if you turn the page, you'll see a
17  signature on page 14, Mr. Pracht.
18    A.  Okay.
19    Q.  This one has your West Linn, Oregon
20  address on page eight, right?
21    A.  Yes.
22    Q.  Doesn't have this Vancouver, Washington
23  one; is that fair to say?
24    A.  Correct.
25    Q.  The actual subscription agreements that

114

1  you used with the investors, not drafts, had your
2  West Linn address, right?
3    A.  Correct.
4    Q.  That's the same business location as the
5  one that you identified to ONESCO as being your
6  business location for them, right?
7    A.  Correct.
8    Q.  And if you go through this, you will see
9  that we have on -- if we turn to page E-13, you'll
10  see on page E-13 an SB-11.
11    A.  (Witness complies with request.)
12    Q.  Is this document on the subscription
13  agreement that respondent's counsel asked you about?
14  Look at page 52 and tab 19, and I'm going to ask you,
15  is that page part of the draft?
16    A.  I thought we were on 13.
17    Q.  Look at page 13, which is the one he
18  signed.
19    A.  Uh-huh.
20    Q.  I'm asking you to direct your attention to
21  the subscription agreement that respondent's counsel
22  questioned you about, which begins on tab 19, page
23  52.
24    PANELIST LUKOWSKI:  Just -- I also note
25  that there's a difference in dates in Claimant's

115

1  Exhibit E, which is the signed document, and on
2  page SB-10 of that.  There's a 2004 date that is
3  printed on the date.  The actual date is
4  handwritten in.  And on respondent's exhibit,
5  it's obviously an earlier version since it's got
6  2003 printed in.  So, obviously, there's some
7  change.
8    MR. NEKVASIL:  Yeah.
9    Q.  (By Mr. Nekvasil)  I guess my point is you
10  can't -- you can't really tell the panel that the --
11  I mean, you don't know whether the subscription
12  agreement that respondent's counsel asked you about,
13  which begins on tab 19, page -- whether it was used
14  with anybody?
15    A.  I guess not.  I'm not sure what the point
16  is.
17    Q.  I'm asking you to answer questions.  I'm
18  not asking you to figure out the point for me.
19    A.  All I can tell you is what was signed and
20  what was sent and what was received.
21    Q.  In that regard, you would agree that by
22  the end of two thousand -- certainly by May 2004 you
23  knew there would be no insurance provided, right?
24    A.  Yeah.
25    Q.  Well, we discussed the fact that the

116

1  offering memorandum was sent to Mr. Blandi in 2004.
2  I introduced some letters last time?
3    A.  Yes.
4    Q.  Go to page 294.
5    CHAIRMAN LEITCH:  Of what?
6    MR. NEKVASIL:  Same -- same tab, E.
7    MR. GOODMAN:  Claimants'.
8    MR. NEKVASIL:  Claimants' tab E, page 294.
9    Q.  (By Mr. Nekvasil)  You accepted
10  Mr. Blandi's subscription.  He actually completed the
11  paperwork and returned it in 2005, right?
12    A.  Yeah.
13    Q.  March 20, 2005?
14    A.  Yeah.
15    Q.  He requested insurance coverage?
16    A.  Yes.
17    Q.  This insurance coverage was no longer
18  available?
19    A.  Yes.
20    Q.  Did you tell him that?
21    A.  I don't remember.
22    Q.  Would that have been important information
23  for you to impart to him in your opinion?
24    A.  Of course.
25    Q.  You can't tell the panel that you told him



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

117

1    that there was no insurance, can you?
2        A.   I cannot.
3        Q.   If you turn to -- if you -- you can put
4    these books away.  If you turn to the small volume,
5    W-S, page 11.  It's -- remember, it's page 11 after
6    the cover thing.
7            PANELIST LUKOWSKI:  Is that after the
8        blue --
9            MR. NEKVASIL:  Yes.  Blue divider.  Yes,
10       sir.
11           THE WITNESS:  Is this the right one?  Is
12       this the right one?  Is it this folder?  Where
13       are you looking at?
14       Q.   (By Mr. Nekvasil)  Page 11.
15       A.   Page 11.  Okay.
16       Q.   Yeah.  You received this e-mail from
17   Norman Reynolds?
18       A.   Yes.
19       Q.   Does this e-mail relate to the Internet
20   references to Lancorp Financial Group, LLC that led
21   U.S. Bancorp Piper Jaffray to close your account --
22       A.   Yes.
23       Q.   -- Lancorp accounts?
24       A.   Yes.
25       Q.   Now, you also had contemplated prior to

---

118

1    Lancorp that you would do a public offering called
2    People's Avengers Trust; is that right?
3        A.   People's Avengers Fund.
4        Q.   You're right.  I apologize.  And U.S.
5    Bancorp Piper Jaffray would have been -- was supposed
6    to be the underwriter for that?
7        A.   Correct.
8        Q.   Did they pull their involvement with the
9    underwriting, also?
10       A.   Yes.
11       Q.   As a result of this publicity?
12       A.   Yes.
13       Q.   This was -- what is this Ignites site that
14   it appeared in?  Could you describe that site to me?
15       A.   I have no idea.  I got a phone call out of
16   the blue from somebody at this Ignites who had seen
17   the registration and wanted to have more information
18   about the fund.
19       Q.   Then it got on the Internet and U.S.
20   Bancorp Piper Jaffray saw it.  You testified to that?
21       A.   Correct.
22       Q.   Did the SEC also see it?
23       A.   Not that I know of.
24       Q.   Well, it's referencing that -- if you look
25   at -- if you look at the end of this e-mail, it says,

---

119

1    "For your information, I've talked with the SEC
2    examiner."  Do you see where I'm reading from?
3        A.   Oh, I see.
4        Q.   He was not surprised that you were
5    misquoted.  Now, do you know whether the SEC saw this
6    Internet information concerning --
7        A.   I don't know.  I didn't talk to an SEC
8    examiner, and I didn't.  So I have no knowledge.
9        Q.   Again, in that -- this Internet
10   information would have referenced Lancorp Financial
11   Group, LLC; is that a fair statement?
12       A.   It was referencing People's Avenger Fund,
13   the filing.
14       Q.   Did it also mention Lancorp Financial
15   Group?
16       A.   I don't recall.
17       Q.   Well, if you -- you seem to be -- you seem
18   to be --
19       A.   Okay.  Yes.  Okay.  It did.  Clearly, it
20   did.
21       Q.   Because you're saying in the third
22   paragraph that you want some errors corrected in the
23   article, right?
24       A.   Yes.
25       Q.   And one of the errors would be, I guess,

---

120

1    representation that Lancorp Financial Group, LLC had
2    an affiliation with this Avengers Fund, right?
3        A.   Correct.  Correct.
4        Q.   So that must have been -- is it a
5    reasonable conclusion that that was in the article?
6        A.   Yes.
7        Q.   You would agree, by the way, that when
8    you -- for these investors like Pracht who used IRA
9    money, you set up the -- you set up the accounts as
10   the IRA custodian; is that --
11       A.   I did not set the accounts up.
12       Q.   Okay.  You negotiated the arrangement with
13   the IRA custodian by which the investments were
14   approved?  I'm sorry.
15       A.   Correct.
16       Q.   And then the money was sent from the IRA
17   custodian into your Lancorp Financial Group, Inc.
18   Client Trust Account?
19       A.   Yes.
20       Q.   And then it went to that joint account?
21       A.   Correct.
22       Q.   Now, let's -- let me look at these --
23           MR. NEKVASIL:  This is the last area,
24       Mr. Chairman.  Please bear with me.  I'm almost
25       done.



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

121

1    Q.   (By Mr. Nekvasil)  Let's look at these
2  declarations.
3       PANELIST WRIGHT:  Where are we?
4       MR. NEKVASIL:  Volume three, tab G.  If
5  you can turn to G-1.  And the only other volume
6  that I'm kindly going to ask you to pull out
7  would be -- we're going to look at the offering
8  memorandum, too -- volume one, tab B.
9       PANELIST WRIGHT:  What page?
10      MR. NEKVASIL:  Just so we're -- we're
11  starting on page 74, which is the first page
12  just so you can see the source of the page I'm
13  turning you to, and then we would turn to page
14  83.
15      Q.   (By Mr. Nekvasil)  Now, would you not
16  agree, if you look at page 83 and the nature of the
17  offering -- take a second and read it.  You don't
18  have to read it aloud, but read it; and let me know
19  you finished reading it.  Just the paragraph that
20  says, "The nature of the offering."
21      A.   Okay.
22      Q.   So let's take an investor, let's say, who
23  signs a subscription agreement in 2003, which is
24  before you joined ONESCO.  That money was going to an
25  escrow account; is that fair to say?

122

1      A.   Correct.
2      Q.   And Lancorp Financial Fund Business Trust
3  reserved the right to terminate the deal, not close
4  it, merely terminate it and return investor monies?
5      A.   Correct.
6      Q.   So at any point in time until the initial
7  closing date, Lancorp Financial Fund could terminate
8  the investor monies; is that a fair statement?
9      A.   Correct.
10      Q.   So let's take Mr. Gibson who, the records
11  show, tendered his check for his first investment of
12  June 2, 2003.  You have his subscription agreement
13  and his money, but you have a right -- Lancorp
14  Financial Fund Business Trust had the right to
15  terminate the deal at any time before closing?
16      A.   Correct.
17      Q.   It's also -- is it also reflected -- if
18  you take a look on page 90.  Take a second.  You
19  don't have to read it aloud.  But the third full --
20  the fourth full paragraph on page 90, starting with,
21  "At any time before or after the initial closing
22  date."
23      A.   Yes, got it.
24      Q.   Lancorp Financial Fund Business Trust had
25  the right to terminate the offering, right?

123

1      A.   At any time.
2      Q.   Okay.  Now let's take a look at G-1.  Keep
3  the memorandum open, though.  G-1.
4       First of all, prior -- prior to -- these
5  declarations were prepared by my law firm; is that
6  not an accurate statement?
7      A.   Yes.
8      Q.   Prior to each declaration being sent to
9  you, was there a conversation with you by someone in
10  our office?
11      A.   Yes.
12      Q.   And in that conversation, you were asked
13  certain questions?
14      A.   Yes.
15      Q.   And were you then given the declaration to
16  sign?
17      A.   Yes.
18      Q.   Based upon the conversation?
19      A.   Correct.
20      Q.   At the time you signed each of these
21  declarations, did you believe that they were accurate
22  at the time?
23      A.   I did.
24      Q.   And is it -- and I take it -- was this --
25  was this information that you relayed to our law firm

124

1  during these conversations?
2      A.   Yes.
3      Q.   Okay.  Let's -- I want to -- I want to see
4  what your belief is now.  Let's take the first
5  declaration, G-2 -- I'm sorry, G-1, paragraph two.
6  Is that an accurate statement now, paragraph two?
7       I'm trying to figure out, Mr. Lancaster,
8  which paragraphs are in your opinion accurate now and
9  which ones aren't, okay?  That's the exercise we're
10  going through now.
11      Is paragraph two accurate in your opinion?
12      A.   Yes.
13      Q.   What about paragraph three?
14      A.   Yes.
15      Q.   What about paragraph four?
16      A.   Yes.
17      Q.   Now let's take a look at this Exhibit A.
18      PANELIST WRIGHT:  What page?
19      MR. NEKVASIL:  It is --
20      THE WITNESS:  Page four.
21      MR. NEKVASIL:  -- page four.
22      Q.   (By Mr. Nekvasil)  Did you send this
23  letter to all the investors?
24      A.   Yes.
25      Q.   In this letter you informed the investors



Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

www.browngallo.com

125

1  that you could not obtain the -- you were having
2  difficulty, excuse me, obtaining the insurance and
3  that you were looking for some sort of a guarantee of
4  their funds to replace; is that a fair statement?
5      A.  Yes.
6      Q.  You did send this letter?
7      A.  Yes.
8      Q.  Is there anything about paragraph four --
9  let's go back to page one -- that is inaccurate?
10     A.  No.
11     Q.  Take a look at paragraph five.
12     A.  (Witness complies with request.)
13     Q.  I want you to take -- Mr. Lancaster, I
14  want you to take your time and read it, okay?  I
15  don't want you to feel any pressure.  There's no
16  clock on you.  And after you read paragraph five, I
17  want you to take a second and read Exhibit B
18  carefully.
19     A.  Yes.
20     Q.  Why don't you take a second, though, and
21  read it just so you're comfortable.  I know you
22  hadn't seen it in a while.  Just take a second and
23  read it.
24     A.  Yes, it's the same for all the ones that I
25  sent out.  It's the exact same.

126

1      Q.  Is exhibit -- so is paragraph five
2  accurate?
3      A.  Paragraph five is accurate.
4      Q.  In fact, if you look at B -- now, take a
5  look at B, the first paragraph.  Remember this issue
6  of effective date?  Page five, top paragraph.
7  "Pursuant to the requirements of the Lancorp
8  Financial Fund Business Trust -- private placement
9  memorandum supplied at the time of your subscription,
10  this is your formal notice that the fund has reached
11  the final stages of underwriting.  Participation
12  agreements and will go effective in the coming days."
13  Is that the term you used?
14     A.  That's the term I used for having reached
15  the five million for the fund.
16     Q.  So the fund could close?
17     A.  The fund could close, correct.
18     Q.  Until this point, you had the right to
19  disband the offering?
20     A.  I had the right to disband at any time.
21     Q.  Are you saying in this letter that you're
22  giving the investors an option now before closing to
23  get out?
24     A.  Yes.
25     Q.  Is it fair to say that when the investors

127

1  gave you their subscription agreement it was at the
2  time they gave it to you irrevocable, so they were
3  committed to the deal, but you weren't, you could
4  disband it before closing?
5      A.  I had the authority to do anything along
6  those lines.  So I could authorize the withdrawal at
7  any time.
8      Q.  So even though their subscription
9  agreements were irrevocable at the time, you're
10  saying to them, if you want out now before closing,
11  I'm letting you out?
12     A.  Yes.
13     Q.  And you explain in the third paragraph
14  that one of the reasons is because of recent -- look
15  in the first sentence -- recent statutory amendments
16  in the insurance industry, right?
17     A.  (No response.)
18     Q.  Now, take a look at -- let's go back to
19  this declaration.  And I want you to take your time
20  and look at paragraph six.  I'm going to ask you is
21  there anything in paragraph six that's inaccurate?
22     A.  That's correct.  That's accurate.
23     Q.  Is it accurate?
24     A.  Yes.
25     Q.  Is paragraph seven accurate?

128

1      A.  Yes.
2      Q.  The first two sentences of paragraph
3  eight, are they accurate?
4      A.  Yes.
5      Q.  Now, look at paragraph nine.  Based upon
6  your use of the word "effective" in Exhibit B -- take
7  a look at Exhibit B again, first paragraph.  See in
8  Exhibit B where you say -- turn to Exhibit B, which
9  is page five.  Page five, Exhibit B.  You see in the
10  first paragraph you use the word "effective"?
11     A.  Yes.
12     Q.  Do you see where it says, "This is your
13  formal notice that the fund has reached the final
14  stages of underwriting.  Participation agreements
15  will go effective in the coming days"?  Do you see
16  that?
17     A.  Yes.
18     Q.  You testified a minute ago that your
19  understanding of the term "effective" would mean that
20  it would close then?
21     A.  Yes.
22     Q.  Based upon your understanding of the word
23  "effective," is paragraph nine accurate?
24     A.  Based on comparing it to the letter -- to
25  the letter, it says it was dated April 5th, yes.  It



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:  877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

### 129

1 appears correct.  It appears correct.
2     Q.   Well, the letter says -- and maybe this
3 will help you.  If you take a look at --
4     A.   I also sent a letter out announcing the
5 effective date.
6     Q.   Yeah.  Take a look at -- focusing on the
7 word "effective," take a look at page 19.
8         MR. NEKVASIL:  If the panel will look at
9 Exhibit F, page 19.
10        THE WITNESS:  Yes.
11    Q.   (By Mr. Nekvasil)  The first sentence of
12 the paragraph, "It is with great pleasure that I'm
13 able to announce that the Lancorp Financial Fund has
14 officially become effective as of May 14, 2004."
15    A.   Yes.
16    Q.   Based upon your use of the word -- term
17 "effective," is paragraph nine accurate?
18    A.   Yes.  Correct.
19    Q.   Is paragraph ten accurate?
20    A.   Yes.
21    Q.   Go to -- go to page 22.  This would be
22 Bates stamped pages -- for the record, G-22 and 23 is
23 the declaration pages, December 3, 2007.
24        Is paragraph two accurate?
25    A.   Yes.

### 130

1     Q.   By the way, just in terms of chronology,
2 am I correct that this trading idea that McDuff had
3 where he wanted the bank to serve as custodial
4 services, it was structured similar to Lancorp
5 Financial Fund Business Trust, but it was not Lancorp
6 Financial Fund Business Trust, you agree?
7     A.   Correct.
8     Q.   And this was pre this People's Avenger --
9     A.   Yes.
10    Q.   -- Fund?  Okay.
11    A.   Correct.
12    Q.   So you had McDuff's deal while you were at
13 the bank, then you had the People's Avenger Fund
14 effort, then you had Lancorp Financial Fund Business
15 Trust?
16    A.   Correct.
17    Q.   Is that an accurate sequence?
18    A.   Yes.
19    Q.   Paragraph two -- I'm sorry.  Is paragraph
20 three correct?  Take your time.
21    A.   That is correct.
22    Q.   Now, take a look at -- I want you to look
23 at paragraph four, and I want you to look at
24 Exhibit A.  Take your time.  I'm going to ask you
25 whether or not it's correct, but I want you -- first,

### 131

1 before you answer, I want you to -- I want you to
2 look at -- read paragraph four and actually look at
3 Exhibit A.
4     A.   Yes.
5     Q.   It's accurate?
6     A.   Yes.
7     Q.   Now, we're going to come back to
8 paragraphs five and six.  Look at paragraph seven.
9 Take a second.  Look at paragraph seven and look at
10 Exhibit C.  I'm going to ask you is that accurate.
11 Take your time.  Read the paragraph and look at
12 Exhibit C.  I don't want you to just respond without
13 reading.
14    A.   The only thing I can't say with absolute
15 certainty is that it was actually sent to Renfro
16 because it would have been, again, an envelope,
17 return envelope situation.  But she was the contact
18 person, the person I called to ask for it.
19    Q.   What you're saying is that with respect to
20 paragraph seven you know you submitted that form,
21 which is the brokerage account form, but you don't
22 know if you actually sent it to Renfro?
23    A.   Correct.
24    Q.   So with the exception of the sentence that
25 says, "I also sent this form to Renfro," is paragraph

### 132

1 seven accurate?
2     A.   Yes.
3     Q.   Paragraph eight, is that accurate?  I want
4 you to take your time and read the paragraph and look
5 at Exhibit D.
6     A.   I think that's accurate with the exception
7 that it's -- the documents that have been produced
8 here that I did have contact with other people at
9 Lawing.
10    Q.   You mean like the --
11    A.   The gal who sent me the letter and the
12 like.  There were other people that sent
13 correspondence.
14    Q.   So what you're saying is there's other --
15 that you may have received -- that you believe you
16 received correspondence from the people at Lawing's
17 offices?
18    A.   There's a couple of people there that --
19 for example, the closing person -- that I sent the
20 materials and --
21    Q.   Pauline Jones?
22    A.   Pauline Jones.  And there was another
23 name.
24    Q.   Okay.  Other than that --
25    A.   The only person I remember actually

# BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

133

1  speaking to and having direct contact with other than
2  those letter correspondences was Renfro.
3      Q.   With the exception of that qualification,
4  that you may have had written communications, such as
5  the termination letter, from other people at ONESCO,
6  other than that qualification, is paragraph eight
7  accurate?
8      A.   To the best of my knowledge, that's
9  accurate.
10     Q.   Paragraph nine, is that accurate?
11     A.   Yes.
12     Q.   Paragraph ten, is that accurate?
13     A.   That's correct.
14     Q.   Let's look briefly at paragraphs five and
15  six.  Paragraph five -- you did take -- by the way,
16  you did take an on-line CLE course, didn't you?
17     A.   I did.
18     Q.   But would you agree that the actual course
19  was in June 2004?
20     A.   Yes.
21     Q.   So the first -- is the first sentence
22  correct except you change May to June?
23     A.   Yes.
24     Q.   Now, did you receive study materials for
25  that course?

---

134

1      A.   I don't believe so.  It was just an
2  on-line course.
3      Q.   Got you.
4      A.   I don't recall receiving materials.
5      Q.   So it would be fair to say that the second
6  and third sentences of that paragraph five are
7  inaccurate?  I said inaccurate.
8          PANELIST WRIGHT:  Are you questioning the
9  study materials?
10         THE WITNESS:  The study material was the
11  on-line material --
12         MR. NEKVASIL:  Yeah.
13         THE WITNESS:  -- not written material.
14         PANELIST WRIGHT:  The study materials are
15  on-line.
16         MR. NEKVASIL:  Yeah.  What I'm saying is
17  the second sentence says, "Study materials led
18  me to believe."  So I'm saying that that's
19  inaccurate because --
20         PANELIST WRIGHT:  Okay.  Okay.
21         MR. NEKVASIL:  -- if it was filled -- if
22  he took it in June 2004, it couldn't have led --
23         THE WITNESS:  Well, it's inaccurate as of
24  May 2004, but it's accurate regarding the
25  material that has to be covered when you take

---

135

1  the course.
2      Q.   (By Mr. Nekvasil)  What you're saying is
3  that the material that you -- that you took the
4  course did tell you that you had to make explicit
5  outside business disclosures?
6      A.   Yes.  That was part of the compliance
7  material that you have to study and go through and
8  answer questions for.  That's all part of that
9  on-line course for compliance, is part of that.  It's
10  just not a -- in a book.
11     Q.   But you can't say as you say here that it
12  was what led you to fill out that form because the
13  dates don't match; you agree with that?
14     A.   Correct.
15     Q.   Okay.  What about the conversation with
16  Heather Renfro?
17     A.   Yes, I did call and asked for an
18  additional form.
19     Q.   Did you receive it?
20     A.   I believe I did.
21     Q.   Did you call after the course?
22     A.   Yes, I believe I did.
23     Q.   I take it that with respect to the last
24  two sentences of paragraph five you really can't say
25  for sure that you mailed it back; is that -- is

---

136

1  that --
2      A.   That is correct.  I cannot say that.
3      Q.   So you know -- you know you spoke to
4  her --
5      A.   Yes.
6      Q.   -- and asked for the form?
7          And you received it, and you know you
8  filled it out?  But --
9      A.   It was in my file.  But I can't say that I
10  sent it, no.
11     Q.   So the last two sentences of paragraph
12  five are inaccurate?
13     A.   Right.
14     Q.   I'm sorry, wrong.  The last sentence of
15  paragraph five which says, "I either e-mailed this
16  form back to her or mailed it to her office," that's
17  incorrect; is that a fair statement?
18     A.   Yeah.  It says, "On or about May 3rd," so
19  that -- from that point on, it is not correct.
20     Q.   Okay.  So you know -- you completed the
21  form, but you don't know when; is that a fair
22  statement?
23     A.   Yes.
24     Q.   It's dated May 3, but you don't know
25  exactly when?

---



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

137

1    A.   Correct.
2    Q.   So that -- so the second to last sentence
3  of paragraph five is correct except for the reference
4  to the date being May 3, 2004?
5    A.   From the beginning where it says, "On or
6  about May 3rd," that portion down, I cannot say is
7  accurate.
8    Q.   Okay.  Well, in that sentence it does say,
9  "I completed the form."  Did you complete the form?
10   A.   Yes, I completed the form.
11   Q.   Okay.  Paragraph six --
12       CHAIRMAN LEITCH:  Let me go back to those
13  last two sentences.  Am I clear that you --
14  you're sure you completed the form?
15       THE WITNESS:  I have a copy -- a copy of
16  the form was in my file.
17       CHAIRMAN LEITCH:  This right here?
18       THE WITNESS:  And that's the one that
19  you've got, yes.
20       CHAIRMAN LEITCH:  So you completed it?
21       THE WITNESS:  Yes.
22       CHAIRMAN LEITCH:  But you're not clear
23  about the date?
24       THE WITNESS:  About the date when I
25  completed it or that I --

138

1        CHAIRMAN LEITCH:  Or whether you --
2        THE WITNESS:  -- or that I actually sent
3  it in, correct.
4    Q.   (By Mr. Nekvasil)  And paragraph six, if
5  you strike the words "in my May 2004 disclosure of
6  Lancorp Financial Fund" since you're not positive you
7  sent it in, is that sentence otherwise correct --
8    A.   Yes.
9    Q.   -- which says, "I never heard back from
10  Renfro or anyone else at ONESCO concerning my
11  February 2004 disclosure of Lancorp"?
12   A.   Correct.
13   Q.   Is that correct?
14   A.   Correct.  I recall not -- do not recall
15  having heard anything from anyone.  The only thing I
16  remember receiving after that was termination notice.
17   Q.   You understand when I say Lancorp, the
18  definition of Lancorp, which is in paragraph two, is
19  Lancorp Financial Group, LLC?  That's what I'm
20  referring to when I say Lancorp.  I'm making clear we
21  have a record on that.
22       MR. NEKVASIL:  I notice it will take -- is
23  there -- Joel, was there one more?  Oh, I'm
24  sorry.  There's one last -- five minutes.
25  Mr. Chairman -- well, he says I have five

139

1  minutes.  I think I'm going to finish in five
2  minutes if you let me please forge ahead.
3        CHAIRMAN LEITCH:  Sure.
4    Q.   (By Mr. Nekvasil)  On this paragraph --
5  look at G-20.  This is the last affidavit.
6    A.   (Witness complies with request.)
7    Q.   I want you to look at item number two.
8  You agree that the last sentence of paragraph two is
9  inaccurate, which says, "ONESCO never provided me
10  with any of the firm's internal rules or regulations
11  to the firm's" -- that's inaccurate; would you --
12   A.   I now know that to be inaccurate, correct.
13   Q.   What about the first sentence?
14   A.   Never being advised about a supervisor?
15   Q.   Yeah.  Were you ever told Lawing is your
16  supervisor?
17   A.   I do not recall ever being told, but that
18  did appear on the form.
19   Q.   You mean the term that says, "Resident
20  sales coordinator"?
21   A.   Yes.
22   Q.   Did you notice that name on the form?
23   A.   No.  I didn't pay any attention.
24   Q.   Did anyone ever tell you that the term
25  "resident sales coordinator" is an internal term at

140

1  ONESCO which defines supervisor?  Did anyone ever
2  tell you that?
3    A.   No.  And I had never heard that term
4  before.
5    Q.   What about paragraph three, is that
6  accurate?
7    A.   That is correct.
8    Q.   What about paragraph four?  Take a look at
9  Exhibit A and take your time.
10   A.   Yes.
11   Q.   Is that accurate?
12   A.   That is accurate.
13   Q.   What about paragraph five?
14   A.   Yes.
15       PANELIST LUKOWSKI:  I have a question
16  about paragraph four going through here.  You
17  say that if ONESCO had instructed you to stop
18  selling Lancorp offering you would have
19  immediately done so.  Why would you have done
20  that?  You weren't making any money from ONESCO,
21  were you?
22       THE WITNESS:  Well, again, we're talking
23  about, you know, hindsight here.  But if they
24  had told me that what I was doing was illegal,
25  inappropriate, and that there were severe,

BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:   404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

## 141

1    negative consequences to it, I would have
2    stopped immediately.  I more than likely would
3    have then called Norman Reynolds to ask him for
4    verification of that.  And if he concurred, then
5    that would have terminated it for me right then.
6         PANELIST LUKOWSKI:  Well, if ONESCO had
7    just told you you didn't disclose this other
8    project you were working on to us and we don't
9    want you selling any outside products because we
10   can't control it and they didn't give you any
11   information about whether it was a problem
12   project or whether there was any legal issues
13   involved, would you still have dropped the
14   Lancorp project and stayed with ONESCO?
15        THE WITNESS:  If I had thought -- if in my
16   mind that there was no -- that I was still not
17   doing anything wrong, creating any -- you know,
18   doing anything illegal or the like, I would have
19   continued.
20        PANELIST LUKOWSKI:  You would have
21   continued with the project?
22        THE WITNESS:  Sure.
23        PANELIST LUKOWSKI:  Okay.  Thank you.
24        THE WITNESS:  Because I was advised I
25   didn't need a license to manage the fund, but

## 142

1    there was no reference to anything else.
2         PANELIST LUKOWSKI:  Right.  So as I
3    understand you, you would have only stopped
4    selling Lancorp offering if somebody from ONESCO
5    or somebody else tells you that there were legal
6    issues or financial issues that were red flags;
7    is that right?
8         THE WITNESS:  Right.  That told me I was
9    violating whatever, you know, codes or so on.
10   Then I would have verified that and then that --
11   for me, I would have terminated it.
12        PANELIST LUKOWSKI:  Thank you.  I'm sorry.
13   Q.    (By Mr. Nekvasil)  2004, you were pretty
14   busy.  You were getting questions from investors,
15   potential investors and investors, right?
16   A.    Yes.
17   Q.    Sending memoranda to them then?
18   A.    Yes.
19   Q.    Having questions asked back of you?
20   A.    (Witness nods head affirmatively.)
21   Q.    You were having frequent communications
22   with Reese and the other agents?
23   A.    The only frequent communication was with
24   Reese.  The others, they kind of came and went and
25   were gone.

## 143

1    Q.    You sent out the subscription agreements.
2    The subscription agreements came back.  You had to
3    review them, right?
4    A.    Yes.
5    Q.    You had to have these bank accounts keep
6    track of the money?
7    A.    Yes.
8    Q.    You had five or six bank accounts, money
9    moving back and forth?
10   A.    Yes.
11   Q.    All these state registrations?
12   A.    Yes.
13   Q.    This arrangement in 2004 with Tricom?
14   A.    (Witness nods head affirmatively.)
15   Q.    Right?
16   A.    Yes.
17   Q.    Money back, money forth with Tricom.  Had
18   dealings with Gary McDuff in 2004?
19   A.    Yes.
20   Q.    Had to deal with him about the trader in
21   Australia with Tricom?
22   A.    Yes.
23   Q.    I take it were there other possible
24   traders he discussed with you, other investment
25   opportunities he discussed with you?

## 144

1    A.    Yes.
2    Q.    So you had frequent conversations with him
3    about investment options; is that --
4    A.    Yes.
5    Q.    -- a fair statement?
6    A.    Correct.
7    Q.    You had dealings, of course, with
8    Reynolds?
9    A.    Yes.
10   Q.    Is it fair to say that this Lancorp
11   Financial Fund Business Trust venture occupied most
12   of your time in 2004?
13   A.    You might be surprised to hear me say
14   this, but it did not take an exorbitant amount of
15   time.  There were only a hundred investors at the
16   end.  So on a daily basis I only had to deal with
17   very few people, and it was not till the end of the
18   day where I sent out the memorandums to those who had
19   requested it.  Everything that was done was -- you
20   know, I did it on the computer.  It really didn't
21   take that much time on a daily basis.  Cumulative,
22   it -- you know, I don't know what it added up to.
23   But on a daily basis, it was not extraordinarily
24   labor intensive.
25   Q.    And your wife, she was not working in

# BROWN & GALLO
### LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

145

1  2004, right?
2      A.  Correct.
3      Q.  Unfortunately, she's had some health
4  issues?
5      A.  Yes.
6      Q.  And I'm sorry to hear that precluded her
7  from working.  So you were supporting her, too?
8      A.  Yes.
9          MR. NEKVASIL:  No further questions.
10         CHAIRMAN LEITCH:  Do you expect and need
11  to ask any further questions?
12         MR. LITTLE:  Oh, I do.
13         CHAIRMAN LEITCH:  Do you have an
14  anticipated time?
15         MR. LITTLE:  Probably an hour or so.
16         CHAIRMAN LEITCH:  Shall we break for lunch
17  first?
18         MR. LITTLE:  Whatever the panel's
19  preference is.
20         MR. NEKVASIL:  I mean, I'd like to break
21  for lunch.  I mean, I want to get over with the
22  witness, but I would like to eat to keep my
23  faculties about me.
24         PANELIST WRIGHT:  Me, too.
25         CHAIRMAN LEITCH:  1:15, then?

146

1          MR. PRICE:  Off the record?
2          CHAIRMAN LEITCH:  Yes.  Thank you.
3          THE VIDEOGRAPHER:  The time is 12:13 p.m.
4  This concludes tape number two.  We're now off
5  the video record.
6          (A lunch recess was taken from 12:13 p.m.
7  to 1:21 p.m.)
8          THE VIDEOGRAPHER:  The time is 1:21 p.m.
9  This begins tape number three.  We're now back
10  on the video record.
11         MR. LITTLE:  Thank you.
12  RECROSS-EXAMINATION
13  BY-MR.LITTLE:
14      Q.  Mr. Lancaster, let me follow up with one
15  of the questions posed to you by the panel at the
16  conclusion of the re-direct.
17          You were asked the question:  Would you
18  have done something differently.  Is it fair to say
19  that you still proceeded with the Lancorp Business
20  Fund Trust even though U.S. Bank had told you to stay
21  away from Gary McDuff?
22      A.  Yes.
23      Q.  And that you elected to continue with the
24  Lancorp Business Fund Trust even though you knew
25  Mr. McDuff had a criminal record?

147

1      A.  Yes.
2      Q.  And that he had been convicted of a
3  felony?
4      A.  Yes.
5      Q.  And that he had, in fact, served time in
6  prison?
7      A.  Yes.
8      Q.  And you also continued to proceed forward
9  with the Lancorp Business Fund Trust even though U.S.
10  Bank had terminated you because of something Gary
11  McDuff had done?
12      A.  Yes.
13      Q.  Is it fair to say that with respect
14  to your --
15         MR. NEKVASIL:  I apologize, Mr. Chairman.
16  Fourth question.  Yeah.  They terminated him
17  because of something Gary McDuff had done.
18  There's been no evidence as to exactly which one
19  of them did what.  The bank terminated him, they
20  told him, because he failed to fully disclose an
21  outside business activity and because he did not
22  comply with an expressed directive.  Those are
23  things he did.  That's why the bank terminated
24  him.
25         MR. LITTLE:  Actually, the testimony has

148

1  been from this witness -- and the panel has it,
2  so, hopefully, we don't have constant
3  interruptions.  But the answer that was given
4  previously was that it was Mr. McDuff who had
5  shared information with the bank and because of
6  Mr. McDuff's actions the -- Mr. Lancaster, the
7  witness, was terminated.  And he --
8          CHAIRMAN LEITCH:  Go ahead with your
9  question.  Go ahead with your question.
10         MR. LITTLE:  Thank you.
11      Q.  (By Mr. Little)  So you elected to
12  continue with the trust activities, again, despite
13  the fact you had been terminated for something
14  Mr. McDuff had done?
15      A.  Yes.
16      Q.  Is it also fair to say that with respect
17  to at least the initial startup of the Lancorp --
18  excuse me, Lancaster Business Fund Trust, you had the
19  advice of counsel?
20      A.  Yes.
21      Q.  And your counsel had not advised you that
22  there was anything inappropriate with the trust
23  activities?
24      A.  Correct.
25      Q.  And at no point in time during the


BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

149

1  existence of the trust did you receive instructions
2  from your counsel to shut down its activities?
3      A.   Correct.
4      Q.   And I take it that to the extent anyone,
5  including ONESCO, had raised a question as to the
6  propriety of the trust, you would have raised that
7  issue with your counsel?
8      A.   Correct.
9      Q.   And you would have followed your counsel's
10 advice in that regard?
11     A.   Correct.
12     Q.   And at least at the time in which it was
13 ultimately shut down, your counsel had not instructed
14 you to take any such action, had he?
15     A.   Correct.
16     Q.   You kept, in fact, going forward with the
17 Lancaster -- excuse me, Lancorp Business Fund Trust
18 even though the money that had been placed at Tricom
19 had not, much to your disappointment, earned any
20 dividends or return?
21     A.   Yes.
22     Q.   And you continued to continue with the
23 Lancorp Business Fund Trust even after you advised
24 the investors you had been disappointed in this
25 regard?

150

1      A.   Yes.
2      Q.   You continued to go forward with the
3  Lancaster Business Fund Trust after learning that, in
4  fact, the Megafund transaction was, in fact,
5  fraudulent?
6      A.   I continued after the SEC investigation
7  began.  It was a period of time before it became
8  evident that it was fraudulent to me.
9      Q.   It was evident to you in the spring of
10 2005 that, in fact, what Megafund had promised you
11 was not being delivered?
12     A.   That's correct.
13     Q.   In fact, the monthly returns that were
14 expected, excuse me, or promised by Megafund were not
15 being paid?
16     A.   Correct.
17     Q.   And despite that, you continued to move
18 forward with the activities?
19     A.   Yes.
20     Q.   And you continued to move forward with the
21 activities of this trust after the receiver had been
22 appointed?
23     A.   Yes.
24     Q.   And after you had been contacted by the
25 receiver?

151

1      A.   Yes.
2      Q.   And, in fact, we're clear that the only
3  time the activities associated with this trust
4  finally came to conclusion is when a court-appointed
5  receiver took over?
6      A.   Correct.
7      Q.   Let's look at volume one of the claimants'
8  exhibits, please.  And if I could direct your
9  attention to tab B, page 11.
10         PANELIST LUKOWSKI:  B as in boy?
11         MR. LITTLE:  B as in boy, yes.  Excuse me,
12 I have the wrong page.  Page -- it's -- yeah.
13 It's page 90.  It's Bates stamped 90; although,
14 it's page 11 of the private placement
15 memorandum.  I apologize.
16     Q.   (By Mr. Little)  So looking at tab B, turn
17 to what's Bates stamped page 90.
18     A.   Is this the Bates stamp you're talking
19 about?
20     Q.   Yes.  You have the page.  You were asked
21 questions about the second paragraph from the top on
22 page 90 where it says, "Until we have received and
23 accepted subscriptions for at least 1,000 investor
24 shares totaling $5 million, all proceeds received
25 from the sale of the shares will be deposited into an

152

1  interest bearing escrow account at U.S. Bancorp Piper
2  Jaffray."  And it gives the address.
3      A.   Correct.
4      Q.   And that's defined as the escrow agent,
5  correct?
6      A.   Yes.
7      Q.   Is that the account that you talked about
8  earlier this morning that was the escrow account?
9      A.   Yes.
10     Q.   Was that held at a bank?
11     A.   The initial one was at U.S. Bank, yes.
12     Q.   Right.  It was at a bank as opposed to a
13 broker-dealer?
14     A.   Correct.
15     Q.   So when -- there's a reference to Piper
16 Jaffray in the second paragraph, but we're clear that
17 the monies that are being held in trust are at a
18 bank?
19     A.   Correct.
20     Q.   And then if we look at the immediate page
21 91, which is page 12 of the private placement
22 memorandum, you have up at the top -- page to your
23 right -- where it specifically advises that there
24 will not be a broker-dealer involved?
25     A.   Correct.



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

153

1    Q.    You were also asked a question about page
2    83, Bates stamp 83 of the private placement
3    memorandum, again, behind tab B, volume one of
4    claimants' exhibits where it says, "Nature of the
5    offering"?
6    A.    (Witness nods head affirmatively.)
7    Q.    Do you see that?
8    A.    Yes.
9    Q.    Where it says, "This offering is a best
10   efforts and a minimum/maximum offering by the trust
11   without the assistance of any broker-dealer or any
12   other selling agent"?
13   A.    Correct.
14   Q.    Were you expecting a broker-dealer to
15   assist in any way with respect to this trust
16   activity?
17   A.    Only what would be required for actually
18   executing a trade.
19   Q.    That is, to the extent the trust engaged
20   in a securities transaction, that transaction would
21   be conducted through a broker-dealer?
22   A.    Correct.
23   Q.    And that would be a transaction that you
24   would effectuate --
25   A.    Correct.

154

1    Q.    -- as the trustee?
2    A.    Correct.
3    Q.    But, otherwise, a broker-dealer would not
4    be involved in the --
5    A.    No.
6    Q.    -- processing of the trust?
7    A.    Correct.
8    Q.    Or its activities?
9    A.    Yes.
10   Q.    And you never suggested to the investors
11   otherwise, did you?
12   A.    Correct.
13   Q.    Now, if we then look -- keep that notebook
14   in front of you, please.
15   A.    (Witness complies with request.)
16   Q.    Now, I want you to turn to volume one of
17   claimants' notebook.
18        MR. NEKVASIL:  We're in volume one.
19        MR. LITTLE:  Volume one -- excuse me,
20   volume one of respondent's notebook. Thank you.
21   Q.    (By Mr. Little)  And turn to tab 19 when
22   you have that.  Bless you.
23        MR. NEKVASIL:  Hold on one second, okay?
24        MR. LITTLE:  Take your time.
25        CHAIRMAN LEITCH:  Which page or sub tab

155

1    or --
2        MR. LITTLE:  It's tab 19, Exhibit 19.
3        CHAIRMAN LEITCH:  Which page number?
4        MR. LITTLE:  If you would first turn your
5    attention to what is marked as Bates stamp 51,
6    please.  And, actually, let's back up a few
7    pages and -- from where it first -- go to page
8    Bates stamped 41.  And we talked about this in
9    terms of the index where we have SB-1, SB-2,
10   four, five, and six.
11       MR. NEKVASIL:  Mr. Little, excuse me.  Are
12   you -- I'm not trying -- are you talking about
13   41 in this binder or the other one?
14       MR. LITTLE:  I'm talking about
15   respondent's exhibit -- volume one.
16       MR. NEKVASIL:  Okay.
17       MR. LITTLE:  Exhibit 19.
18       MR. NEKVASIL:  When you said go back to
19   41, I wasn't sure which book.
20       MR. LITTLE:  That's fine.
21       MR. NEKVASIL:  The other book we had open,
22   too.  Sorry.
23       MR. LITTLE:  I understand that.
24       MR. NEKVASIL:  Okay.  41.
25   Q.    (By Mr. Little)  And you were asked

156

1    questions whether or not the form relating to the
2    insurance election was included in this materials,
3    and I believe you testified that it was not.  Let's
4    then take a look back at the copy of the private
5    placement memorandum included in the claimants'
6    notebook.  Again, you have it in front of you.  It's
7    volume one, tab B, and this time let's turn to page
8    117.
9    A.    (Witness complies with request.)
10   Q.    And if you would, leaf through these
11   materials included in the claimants' notebook with
12   respect to the private placement memorandum, starting
13   at page 117 and then moving forward.  Do you likewise
14   not see any reference to an insurance election?
15       PANELIST WRIGHT:  Could you please repeat
16   what you just said?
17   Q.    (By Mr. Little)  Would you likewise
18   confirm for us that you do not see any reference to an
19   insurance election?
20   A.    Correct.
21   Q.    Is it the case that a number of the
22   investors were not even offered the right to pay
23   additional funds for insurance?
24   A.    Yes.
25       MR. GOODMAN:  Mr. Chairman, can I object?



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:  877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

157

1  I'll tell you why.
2      MR. LITTLE:  No.  Excuse me.
3      CHAIRMAN LEITCH:  Whisper in his ear.
4      MR. NEKVASIL:  Mr. Chairman, we would --
5  respondent included -- here's a point I have to
6  raise.  This -- he keeps -- this exhibit is part
7  of respondent's answer.  It's in our book, but
8  it's a document they provided.  He's taking --
9  we believe it's appropriate for him to first ask
10  him whether he recognizes this document and
11  these pages before asking him to draw conclusion
12  from that.
13      So I don't mind if he asks him leadingly,
14  well, does that mean blank because you said he
15  can ask any questions, but I would like for him
16  to identify this document because he did get it
17  from respondent.  It's claimants' book, but I
18  don't want you to think it's claimants'
19  document.
20      CHAIRMAN LEITCH:  Where did the document
21  come from?
22      MR. LITTLE:  What they put in their
23  notebook, I'm not going to -- who knows what
24  source there is.
25      PANELIST LUKOWSKI:  Where is a document

158

1  that --
2      MR. LITTLE:  But the private placement
3  memorandum -- and here's an easier --
4      MR. NEKVASIL:  Let me object --
5      PANELIST LUKOWSKI:  Hold on a second.
6  Hold on a second.
7      MR. LITTLE:  Yeah.  Let's -- here's an
8  easier example if you want it.  Go to claimants'
9  notebook, volume three.
10      PANELIST LUKOWSKI:  I just want to know
11  where exhibit 19 came from.
12      MR. LITTLE:  Oh, exhibit 19 was a document
13  that was produced to us at same point in time by
14  Mr. Lancaster.
15      PANELIST LUKOWSKI:  Thank you.
16      MR. LITTLE:  If we could then turn to
17  claimants' notebook, volume three.  And if I
18  could direct your attention to, I believe it is,
19  tab three.
20      PANELIST WRIGHT:  There's no tab three.
21      MR. LITTLE:  E-3, excuse me.  Tab E-3.
22      MR. NEKVASIL:  Excuse me, Mr. Chairman?
23  Sorry.  Sorry about -- in response to a question
24  by the panel -- by a panel member, opposing
25  counsel represented that tab 19 came from

159

1  Mr. Lancaster's documents.  If you turn to tab
2  19, respondent's counsel will admit that all the
3  documents that they received from Lancaster bear
4  a stamp that they added to them, such as LAN
5  blank, LAN -- I'll give you an example.  If you
6  turn to tab --
7      PANELIST LUKOWSKI:  Okay.  I understand.
8  Is that correct?
9      MR. LITTLE:  Yeah.  I'll make it clear
10  because it's been -- it's been misstated in this
11  case.  We served a subpoena that had been issued
12  by the Chair.  In response to that subpoena in
13  December of 2007, we received documents from
14  Mr. Lancaster.  And, in fact, we received
15  thousands of documents at that point in time.
16  Those documents all bear that Bates stamp, the
17  ones that were received in response to the
18  subpoena.
19      But he also produced to us, not all of his
20  files, but some of his files in the spring after
21  we saw the first statement of claim.  And as
22  part of that production, he produced the
23  document.  The document that you see is the one
24  that has been filed in the litany of federal
25  court actions.  It's the one that was provided

160

1  to us by Mr. Lancaster.
2      PANELIST LUKOWSKI:  Has this been
3  identified -- has this document been identified
4  through the federal court actions?
5      MR. LITTLE:  It's been identified earlier
6  in these proceedings by Mr. Lancaster.
7      PANELIST WRIGHT:  Which document?
8      MR. GOODMAN:  Mr. Lukowski --
9      MR. LITTLE:  But it's --
10      PANELIST LUKOWSKI:  Are there any --
11      CHAIRMAN LEITCH:  What's material --
12  what's the point?  What's the point of all these
13  questions?
14      PANELIST WRIGHT:  What are we getting to?
15      MR. LITTLE:  Yeah.  I'm going to show you.
16  If you look --
17      CHAIRMAN LEITCH:  Please tell us.  Don't
18  show us.  Tell us.
19      MR. LITTLE:  Well, you're going to see
20  that Mr. Gibson's materials that are included in
21  the claimants' notebook does not include an
22  election for insurance.  That's where I would
23  like to get to.
24      CHAIRMAN LEITCH:  Well, why don't you just
25  ask him --



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

161

1    MR. LITTLE: Well, he doesn't know. But
2  if they want to stipulate that it's not in
3  there, that's fine. Do we have a stipulation
4  with Mr. --
5    CHAIRMAN LEITCH: Why are you asking him
6  about it?
7    MR. LITTLE: He's the one that's been
8  asked questions all day about these subscription
9  packages.
10    MR. NEKVASIL: We can certainly agree that
11  we have not -- I've not seen for Mr. Gibson,
12  unlike Mr. Blandi, the insurance election form;
13  and, therefore, I don't recall producing it. I
14  don't believe we produced it to respondent.
15  It's not in their book. I mean, I think that's
16  a fact. I can't argue the fact.
17    MR. GOODMAN: We produced all that he has.
18    CHAIRMAN LEITCH: Okay. So there's not
19  one for Mr. Gibson in the materials?
20    MR. LITTLE: Yeah.
21    MR. GOODMAN: Yes, in the material.
22  Doesn't mean that one didn't exist, but there is
23  not one. This is what he has.
24    CHAIRMAN LEITCH: Couldn't we ask
25  Mr. Gibson about that at the right time?

162

1    MR. LITTLE: Well -- and we've also asked
2  for documents in -- we've asked for these type
3  of documents, as well, from Mr. Lancaster, as
4  well. And so the question to him is:
5    Q.   (By Mr. Little) Sir, to the extent that
6  Mr. Gibson had executed an election form for
7  insurance, is that something you would have produced
8  to my firm in response to the subpoena issued by the
9  Chair in December of 2007?
10    CHAIRMAN LEITCH: Do you know the answer
11  to that, Mr. Lancaster?
12    THE WITNESS: I'm sorry, say it again.
13    Q.   (By Mr. Little) If, in fact, you had a
14  copy of an election form that had been executed by
15  Mr. Gibson with respect to insurance, is that a
16  document that you would have produced in response to
17  the subpoena issued by the panel chair?
18    A.   Absolutely. It would have been part of
19  his file, and I produced all the records of every
20  file of every investor.
21    MR. LITTLE: Thank you.
22    PANELIST WRIGHT: So to clarify for me,
23  please, there were some investors who did not
24  have the insurance option?
25    THE WITNESS: Correct.

163

1    PANELIST WRIGHT: Can you say half and
2  half? most? none?
3    THE WITNESS: I can't remember. At the
4  time that the insurance -- it was clear it was
5  not going to become available, that portion of
6  the subscription agreement was removed from
7  future private placement memorandums that went
8  to investors.
9    PANELIST WRIGHT: Thank you.
10    Q.   (By Mr. Little) And, in fact,
11  Mr. Gibson's subscription agreement was executed in
12  2003. That's before, obviously, your April 2004
13  letter. Is it the case that -- I believe you told us
14  earlier -- was it -- you thought only 33 percent of
15  the investors had actually elected to take the
16  insurance?
17    A.   I just made a guess.
18    Q.   Have no reason to believe it's higher or
19  lower, you just don't know?
20    A.   I don't know.
21    Q.   Now, with respect to the -- we've had a
22  description earlier today about the bank accounts,
23  and you described a trust account and then an
24  operating account, correct?
25    A.   Correct.

164

1    Q.   And the operating account, if I understand
2  your testimony, had two names on it?
3    A.   The operating account had one name on it,
4  Lancorp Financial Group.
5    Q.   Okay. And can you tell us whether or not
6  the existence of that account would have been
7  disclosed to ONESCO in any of the, for example,
8  brokerage disclosure forms?
9    A.   Not in a brokerage disclosure form, but it
10  was a bank account.
11    Q.   It was -- it was a bank account. So you
12  would have not disclosed it as a personal brokerage
13  account, correct?
14    A.   Yes.
15    Q.   And with respect to the operating account,
16  it, likewise, was a banking account, was it not?
17    A.   All of those accounts were bank accounts.
18    Q.   And that would have not been disclosed as
19  a personal brokerage account to ONESCO?
20    A.   Correct.
21    Q.   Is it fair to say that with respect to the
22  LLC, if I understood your testimony, you treated the
23  LLC as yourself?
24    A.   Yes.
25    Q.   Okay. And other than the fact you used it



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

165

1  for banking operations, was your intent to have the
2  LLC involved in any other function with the trust
3  prior to Megafund?
4      A.    No.
5      Q.    If we look then at respondent's -- excuse
6  me, claimants' exhibit book six, tab U, 21.
7          PANELIST WRIGHT:  What volume?
8          MR. LITTLE:  Six, please.  Claimants'
9  volume six, tab U, page 21.
10     Q.    (By Mr. Little)  You were asked questions
11 earlier about the lawsuit filed by the receiver
12 against Gary McDuff.  Turn your attention to the
13 third page of the complaint and the one bearing the
14 Bates stamp 24.
15     A.    (Witness complies with request.)
16     Q.    And if we look at paragraph 12 where it
17 says, "Gary McDuff was one of Leitner's associates
18 who helped solicit new investors.  He was
19 instrumental in recruiting contributions from Lancorp
20 Financial Business Fund Trust."  Do you see that?
21     A.    Yes.
22     Q.    "Which became Megafund's largest
23 investor"?
24     A.    (Witness nods head affirmatively.)
25     Q.    Do you see that?

---

167

1      Q.    Let's take a look, then, if we could, at
2  volume two of respondent's exhibits, please.  And if
3  you would look at Exhibit 45, which you previously
4  identified as the electronic U-4.
5          MR. GOODMAN:  I'm sorry, this is your
6  volume two?
7          MR. LITTLE:  Yes.  Tab 45, please.
8          THE WITNESS:  Yes.
9          PANELIST LUKOWSKI:  Wait a minute.
10     Q.    (By Mr. Little)  If we look at the page
11 marked O&N 0114 in the lower right-hand corner.  You
12 were asked questions about Lancaster Libations.  That
13 was a nonprofit company, was it not?
14     A.    Correct.
15     Q.    It was basically a wine club?
16     A.    Yes.
17     Q.    And you can't think of any reason that
18 would have caused anyone any particular concern?
19     A.    No.
20     Q.    Did you give it any cause when you
21 certified the descriptions, U-4 was accurate that you
22 should take action to delete that?
23     A.    No.
24     Q.    Just didn't give it any thought?
25     A.    No.

---

166

1      A.    Yes.
2      Q.    And so the short term abbreviation used
3  for the trust in paragraph 12 of the receiver's
4  complaint is Lancorp, correct, on the third line?
5      A.    Yes.  Lancorp Financial Fund Business
6  Trust is being referred to as Lancorp, yes.
7      Q.    Okay.  And so in terms of the description
8  made throughout the balance of paragraph 12 as to who
9  sent money to -- who sent money to Megafund, it
10 always would have been the Lancorp Financial Fund
11 Business Trust according to this complaint?
12     A.    Yes.
13     Q.    Is it also fair to say that in your
14 dealings with the investors you would not have
15 disclosed to them the name of the LLC as being on any
16 accounts?
17     A.    Correct.
18     Q.    Okay.  And is it also fair to say that --
19 when the investors sent their checks to you for the
20 Lancorp Financial Fund Business Trust, who did you
21 tell them to make as the payee?
22     A.    Lancorp Financial Fund Business Trust.
23     Q.    And when checks were issued to the
24 investors, who was supposed to send the check?
25     A.    Lancorp Financial Fund Business Trust.

---

168

1      Q.    If we look then at -- back at Respondent's
2  Exhibit 33 contained in that same volume, and if
3  we go to -- this is the February 11, 2004, other
4  business disclosure reporting page.  If we go back to
5  the top where it asks the question about are you
6  currently engaged, et cetera, the parenthetical says,
7  "Please exclude noninvestment-related activity, which
8  is exclusive of charitable, civic, religious, or
9  fraternal, and it's recognized as tax exempt,"
10 correct?
11     A.    Yes.
12     Q.    And I take it that you viewed the
13 Lancaster Libations, excuse me, as a tax exempt
14 fraternal item?
15         MR. NEKVASIL:  Mr. Chairman, we object
16 because the evidence in the record is that he
17 stopped that business in 1999 when he moved to
18 California.  So asking him how he viewed a
19 company that was defunct for five years in 2004,
20 it's misleading.  It assumes facts not in the
21 record.  Lancaster Libations, he says --
22         CHAIRMAN LEITCH:  You got into it before.
23 Let him go ahead and ask questions.
24         MR. LITTLE:  Yeah.  And I'm going to
25 object because the panel has already

---



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

169

1    admonished --
2         CHAIRMAN LEITCH:  What are you objecting
3    to?
4         MR. LITTLE:  Because you've already
5    admonished him before that we should stop with
6    the speaking objections and making his closing
7    argument as part of a speech.
8         CHAIRMAN LEITCH:  Go on with your
9    question.
10        Q.   (By Mr. Little)  Sir, is it fair to say
11   that that is simply a nonprofit fraternal association
12   you had?
13        A.   Yes.
14        Q.   And when we look at item number two,
15   Lancorp Financial Group, LLC and you have listed two
16   hours a month of time -- do you see that?
17        A.   Yes.
18        Q.   Okay.  You've listed that because you
19   clearly intended to pursue opportunities for 401K
20   activity, didn't you?
21        A.   Sure.
22        Q.   Not because you thought you were going
23   to -- this would somehow disclose a private
24   securities transaction, right?
25        A.   I had no specific thought other than to

170

1    disclose it in the proper fashion.
2         Q.   And proper fashion is when you say this is
3    a company that's engaged in life, health, and
4    annuities?
5         A.   Correct.
6         Q.   You were asked questions about the status
7    of your financial status -- excuse me, your financial
8    status during your tenure with ONESCO.  Is it fair to
9    say that given your full-time employment with
10   Universal you did not anticipate receiving
11   substantial sums of money from ONESCO?
12        A.   No.  I had no expectations of anything
13   because there was no history to even make a guess.
14        Q.   That is, to the extent you could be
15   successful in participating in a 401K sell, that
16   would be great?
17        A.   Yes.
18        Q.   But you did not expect to earn five, ten,
19   15,000, whatever the amount is per month from ONESCO?
20        A.   I had no expectations whatsoever.
21        Q.   Your expectation was that during this time
22   frame you would support yourself and your family from
23   your employment at Universal Underwriters?
24        A.   Correct.
25        Q.   Now, I take it -- excuse me.  And, sir, in

171

1    terms of your expectations as it related to ONESCO,
2    you understood you had an obligation to achieve
3    certain minimum production levels?
4         A.   I knew that was the case with
5    broker-dealers, but I didn't know what that was.
6         Q.   And if you didn't achieve your minimum
7    production levels, you would expect to be terminated?
8         A.   That's correct.  I -- that was a new
9    revelation to me because I paid no attention to --
10        Q.   And, in fact --
11        CHAIRMAN LEITCH:  When did that become new
12   to you or when did you figure that out?
13        THE WITNESS:  I don't recall.  But I
14   remember somebody else talking about they were
15   being required to have minimum production or
16   they were going to have their license
17   terminated, and that was from somebody else that
18   I heard this, another licensed person.  That was
19   the first time I had heard about it.
20        CHAIRMAN LEITCH:  Do you know in what
21   context or where this other licensed person was?
22        THE WITNESS:  No, because it just --
23        CHAIRMAN LEITCH:  Was it at Universal
24   or --
25        THE WITNESS:  It could have been -- no, I

172

1    don't remember specifically.  It just sticks in
2    my mind that that was something that -- you
3    can't park your license anymore, that they're
4    requiring minimum production or licenses are
5    terminated.  It was something along that line.
6    I really didn't pay much attention.
7         Q.   (By Mr. Little)  You understood you could
8    not park your license?
9         A.   It was my understanding that there were --
10   you could not park a license anymore, that that
11   was -- that action was going to be taken.
12        PANELIST WRIGHT:  When do you think that
13   you -- that occurred to you or you heard that?
14        THE WITNESS:  I just really can't
15   remember.
16        PANELIST WRIGHT:  I mean, you joined the
17   firm in February.  Was it in March, April, May,
18   or was it in December -- I mean November?
19        THE WITNESS:  I would think that it's most
20   likely that I heard it from one of the Universal
21   reps who was talking about their licenses being
22   moved around, those who were in the same
23   situation as me, but their license was not
24   placed anywhere.
25        Q.   (By Mr. Little)  When you started with

BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

173

1    ONESCO, you would have understood that it was
2    improper to park your license there, correct?
3       A.  Yes.
4       Q.  That is, to simply go somewhere and not
5    generate any productivity?
6       A.  Yes.
7       Q.  Okay.
8          CHAIRMAN LEITCH:  Restate that question
9    for me.
10         MR. LITTLE:  Sure.
11      Q.  (By Mr. Little)  When you started with
12   ONESCO, it was your understanding you could not park
13   your license?
14      A.  Based on the information that was relayed
15   to me from -- and I don't remember who -- that that
16   was the case.
17      Q.  And, in fact, it wasn't your intention to
18   simply park --
19         CHAIRMAN LEITCH:  You told -- you just
20   told a member of the panel you didn't have a
21   clue when it was.
22         THE WITNESS:  And I don't.  I'm just
23   saying that I think that the conversation --
24   that's where that part of the conversation came
25   is from there.

174

1          PANELIST WRIGHT:  I mean, was it when you
2    started?  Because his question was when you
3    started at ONESCO did you know that.
4          THE WITNESS:  Oh.
5          PANELIST WRIGHT:  So did you have this
6    conversation before or after you started?
7          THE WITNESS:  I'm pretty sure it had to
8    occur before because --
9          PANELIST WRIGHT:  Okay.
10         THE WITNESS:  -- there would be no other
11   reason for that conversation to come up.
12         PANELIST WRIGHT:  Okay.
13         PANELIST LUKOWSKI:  But you don't have any
14   recollection, any specific recollection?
15         THE WITNESS:  I have no specific
16   recollection.
17      Q.  (By Mr. Little)  And it would not have
18   been your expectation to go to ONESCO and do
19   something improper, right?
20      A.  Correct.
21      Q.  So it would not have been your expectation
22   to go there and simply park a license?
23      A.  No.  They -- you know, the idea was that
24   we have a natural market for doing 401K's and that
25   would involve securities and that would be a viable

175

1    way to meet minimums.
2       Q.  If you go to Exhibit 48-B, as in bravo,
3    Respondent's Exhibit 48-B.
4          PANELIST WRIGHT:  48?
5          MR. LITTLE:  48, yes, please.
6          THE WITNESS:  (Complies with request.)
7       Q.  (By Mr. Little)  The handwriting that
8    appears on the document about the lower quarter of
9    it, do you recognize that?
10      A.  Yes.
11      Q.  Whose handwriting is that?
12      A.  That's mine.
13      Q.  And what did you write on this exhibit?
14      A.  "Confirmed."
15      Q.  And the checkmarks that are next to the
16   bullets that are under the heading "Please verify
17   that you've received the following items," are those
18   your checkmarks?
19      A.  Yes.
20      Q.  And so you put a checkmark next to
21   "compliance and operations manual"?
22      A.  Yes.
23      Q.  Okay.  And did you put a checkmark next to
24   "central office file folder"?
25      A.  Yes.  I put a checkmark beside all of the

176

1    items listed.
2       Q.  Including the one that says, "Minimum
3    production requirements"?
4       A.  Ah.  Yes.
5       Q.  And so at the inception of your
6    relationship with ONESCO, you understood that there
7    were minimum production requirements?
8       A.  Yes.
9       Q.  And if you did not satisfy them,
10   ultimately you would be terminated?
11      A.  Yes.
12      Q.  And I take it then --
13         PANELIST WRIGHT:  Excuse me.  How did
14   you -- if -- this letter was addressed to you in
15   Overland Park, Kansas, so how did you receive
16   this letter?
17         THE WITNESS:  It would have been forwarded
18   to me in part of Universal's mail.  Every week I
19   got a big envelope with mail that came --
20         PANELIST WRIGHT:  Okay.  Thank you.
21         THE WITNESS:  -- from the corporate
22   office.
23      Q.  (By Mr. Little)  And then at some point in
24   time you would have wrote "confirmed" on this and
25   returned it to ONESCO?



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:   404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

177

1    A.   Yes.
2         PANELIST LUKOWSKI:  Would you have sent it
3    to ONESCO, or would you have sent it back to
4    Overland Park, Kansas?
5         THE WITNESS:  I just -- again, it probably
6    came in that envelope.  I can't say for sure.
7         PANELIST LUKOWSKI:  Okay.  Fine.
8    Q.   (By Mr. Little)  And so taking from at
9    least March 23, 2004, the effective date of your
10   registration, you would have understood parking was
11   inappropriate and there would be minimum requirements
12   you would have to achieve to remain at ONESCO?
13   A.   Yes.
14   Q.   And you never communicated to anyone at
15   ONESCO that it was not your intentions to try to
16   achieve those production levels?
17   A.   No.
18   Q.   And you never suggested to anyone at
19   ONESCO that you were there to park your license?
20   A.   No.
21   Q.   And I take it that with respect to your --
22   the registration process, did you give ONESCO
23   permission to conduct a credit background search on
24   you?
25   A.   Yes.

179

1    right?
2    A.   Yes.
3    Q.   And if you look at the top upper
4    right-hand corner, what is the issue date?
5    A.   January 28, '05.
6    Q.   And so you provided Mr. Reese an insurance
7    policy that would have been issued after you left any
8    type of association with ONESCO?
9    A.   Yes.
10   Q.   Okay.  And the -- if we look under the
11   companies affording -- affording the coverage in the
12   upper right-hand box, the company that is providing
13   this coverage is American Automobile Insurance
14   Company?
15   A.   Yes.
16   Q.   Okay.  It wasn't a policy issued, for
17   example, by ONESCO?
18   A.   No.
19   Q.   Okay.  And it wasn't a policy even issued
20   by Ohio National Life Insurance Company, was it?
21   A.   Correct.
22   Q.   This was a policy that you had obtained
23   from another company, in fact, after you left the
24   association with ONESCO?
25   A.   Correct.

178

1    Q.   Were you provided a copy of that report?
2    A.   I don't recall.
3    Q.   Do you -- can you tell the panel whether
4    in the first quarter of 2004 you had had any
5    bankruptcies filed -- bankruptcy petitions?
6    A.   I never have.
7    Q.   Did you have any outstanding judgment
8    liens?
9    A.   No.
10   Q.   And did you have existing problems with
11   creditors?
12   A.   No.
13   Q.   Okay.  So in terms of your credit history,
14   was it clean at the time --
15   A.   Yes.
16   Q.   -- of the preregistration process?
17   A.   Absolutely.
18   Q.   Let's go back then, if we could, to
19   respondent's volume -- excuse me, claimants' volume
20   six.  Claimants' volume six.  And turn to tab V, as
21   in Victor.  I'm sorry.  It's U.  Sorry.  Tab U, page
22   six.
23   A.   (Witness complies with request.)
24   Q.   You were asked whether you provided
25   Mr. Reese a copy of the certificate of insurance,

180

1    Q.   Now, you were asked some questions --
2         PANELIST LUKOWSKI:  Hold on.  Can you
3    clarify this for me?  It says the insured is the
4    agent of Ohio National Life Insurance Company.
5    You were not an agent of Ohio National Life
6    Insurance?
7         THE WITNESS:  I was -- yes, I was
8    appointed by them because the health insurance
9    and life insurance that Universal Life sold to
10   their customers was underwritten by them.
11        PANELIST LUKOWSKI:  Okay.  And --
12        THE WITNESS:  Or some of them was.
13        PANELIST LUKOWSKI:  -- did you cease to be
14   an agent for Ohio National Life Insurance
15   Company on the -- when you were terminated by
16   ONESCO?
17        THE WITNESS:  I didn't receive termination
18   from them at that time, no.
19        PANELIST LUKOWSKI:  Did you receive
20   termination subsequently from Ohio National
21   Life?
22        THE WITNESS:  You know, I don't recall
23   receiving a termination notice from them.
24        PANELIST LUKOWSKI:  Was this an insurance
25   policy that you paid for personally?



BROWN&GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

181

1      THE WITNESS: Yes.
2      PANELIST LUKOWSKI: And was there a
3  program at Ohio National Life pursuant to which
4  you could obtain this type of insurance?
5      THE WITNESS: Yes. By being an agent of
6  Ohio, you had access to errors and omissions
7  coverage through this company.
8      PANELIST LUKOWSKI: Okay. So -- and do I
9  understand that the business of Ohio National
10  Life Insurance Company had nothing to do with
11  the broker-dealer business of ONESCO?
12      THE WITNESS: Correct.
13      PANELIST LUKOWSKI: Separate business?
14      THE WITNESS: Yes.
15      Q. (By Mr. Little) And would you have
16  received a solicitation from American Automobile
17  Insurance for this insurance coverage in the fourth
18  quarter of 2004?
19      A. I don't know if I would have received a
20  solicitation. I probably made an -- I'm certain that
21  I probably made an inquiry and -- for an application.
22      Q. That's fine. You were asked some
23  questions as it related to the investor subscription
24  agreements and the ability to basically dissolve the
25  trust if the monies were not raised by a certain

182

1  date.
2      A. Right.
3      Q. Did I understand your testimony that it
4  was your position you reserved the right to dissolve
5  the trust at any point in time?
6      A. Yes.
7      Q. And other than ultimately the receiver
8  taking control, did you ever take any steps to
9  dissolve the trust?
10      A. No.
11      MR. LITTLE: If I could have a moment,
12  please. If I could have a moment, I just want
13  to check something.
14      I have no further questions. Thank you.
15      MR. NEKVASIL: About five or ten minutes
16  limited solely, of course, to new issues he's
17  raised, obviously.
18      MR. LITTLE: We're having -- just so I --
19  from my planning standpoint, how many --
20      CHAIRMAN LEITCH: If it's limited to new
21  material that you brought out, I'll let him
22  ask --
23      MR. NEKVASIL: Yeah. Absolutely. It's
24  limited to new, and I'm presuming after this --
25  I mean, if he asks new questions again --

183

1      CHAIRMAN LEITCH: Okay.
2      MR. NEKVASIL: Limited just to new issues.
3  FURTHER EXAMINATION
4  BY-MR.NEKVASIL:
5      Q. Do you recall opposing counsel asking you
6  a couple of minutes ago whether or not -- saying
7  isn't it true that Lancorp Financial Group's
8  involvement with Lancorp Financial Fund Business
9  Trust was limited to banking and operations issues
10  and you said yes? Do you recall that question and
11  answer?
12      A. Yes.
13      Q. Let's just take a look at that.
14      MR. NEKVASIL: If the panel will please
15  turn to volume eight, tab W. I think the whole
16  tab is -- help me find eight, will you?
17      Q. (By Mr. Nekvasil) Go to page, let's say,
18  for example, 363.
19      A. (Witness complies with request.)
20      Q. Wouldn't you agree this is, for example,
21  an e-mail to Reynolds involving the People's Avengers
22  Trust in the end of 2002?
23      A. Yes.
24      Q. Agree?
25      And you actually did this through Lancorp

184

1  Financial Group, right?
2      A. Correct.
3      Q. If you go to page 382.
4      A. (Witness complies with request.)
5      Q. Would you agree that this relates to the
6  escrow agreement that was set up with People's
7  Avengers Fund right before it was aborted --
8      A. Yes.
9      Q. -- and it went in -- and you started Lancorp
10  Financial Fund Business Trust?
11      A. Yes.
12      Q. Again, you use stationery, it looks like
13  stationery, of Lancorp Financial Group, LLC, right?
14      A. Yes.
15      Q. So were you conducting these activities on
16  behalf of Lancorp Financial Group, LLC; is that not
17  fair to say?
18      A. I guess you could say that. I have no fax
19  letterhead created for the fund. So in terms of
20  paying bills and doing that kind of thing with this
21  kind of correspondence, it all would have been on
22  Lancorp letterhead.
23      Q. So you had no -- never set -- you never
24  set up any letterhead for Lancorp Financial Fund
25  Business Trust?



BROWN&GALLO
LLC
www.browngallo.com

Telephone: 404.495.0777
Toll Free:  877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

---

185

1     A.   Other than the statements, but I didn't
2  set up -- I don't believe I set up a separate fax
3  form.
4     Q.   Okay.  So all faxes that you sent relating
5  to Lancorp Financial Fund Business Trust irrespective
6  of the nature would have been with faxes that were
7  Lancorp Financial Group, LLC; is that a fair
8  statement?
9     A.   I think so, yes.
10    Q.   It would not be limited solely to faxes
11 that related to financial and --
12    A.   No.  It would have been -- it would have
13 been used universally on everything I was doing.
14    Q.   Go to 395.
15    A.   (Witness complies with request.)
16    Q.   I'm going to ask you, will you confirm
17 that this is not a fax?  It's not a fax?
18    A.   That's an e-mail.
19    Q.   So would you agree that also with respect
20 to all e-mails relating to Lancorp Financial Fund
21 Business Trust irrespective of the nature of the
22 e-mail you used e-mails that said Lancorp Financial
23 Group?
24    A.   Yeah.
25    Q.   Is that a fair statement?

---

186

1     A.   Yeah.
2     Q.   So even if it did not involve, to use
3  opposing counsel's words, banking and operations
4  matters, all dealings that you had that you sent via
5  e-mail relating to Lancorp Financial Fund Business
6  Trust would have been using Lancorp Financial Group?
7     A.   Yeah.  That was my e-mail address, yeah.
8     Q.   W-404.  Same tab, page 404.  You
9  specifically -- you specifically asked Reynolds to
10 add a broker-dealer to the Lancorp Financial Fund
11 private placement memorandum as an entity that could
12 serve as a qualified bank; is that not a fair
13 statement?
14    A.   Yes.
15    Q.   And you did that using Lancorp Financial
16 Group letterhead, right?
17    A.   Yeah.
18    Q.   And, in fact, if you just keep that page
19 there.
20       MR. NEKVASIL:  And if the panel will turn
21 in volume one, tab B.
22       PANELIST WRIGHT:  What page?
23       MR. NEKVASIL:  Page 74.
24    Q.   (By Mr. Nekvasil)  74, second bullet.
25 This is the prospectus -- the offering memorandum --

---

187

1  this is the confidential private placement
2  memorandum; would you agree?
3     A.   Yes.
4     Q.   The second bullet talks about a qualified
5  bank that would actually be involved in the actual
6  trading; is that not fair to say?
7     A.   Yes.
8     Q.   This was a bank that would not just serve
9  as an escrow agent but would be involved in the
10 trading?  It's the second bullet.
11       PANELIST LUKOWSKI:  Wait a second.  Where
12 is it?
13       MR. NEKVASIL:  "On the date of delivery to
14 the trust, the securities" --
15       CHAIRMAN LEITCH:  Where are you reading
16 from?
17       MR. NEKVASIL:  I'm sorry, it's page 74,
18 the second bullet talking about, I guess we'd
19 call it, the investment strategy.
20       THE WITNESS:  Yes, it says, "Qualified
21 bank."
22       PANELIST WRIGHT:  Wait just a moment.
23       CHAIRMAN LEITCH:  Why don't you ask him to
24 read the part you want us to know.
25    Q.   (By Mr. Nekvasil)  Yeah.  Why don't you

---

188

1  read the second bullet and explain to -- explain what
2  you believe it means, so I'm not speaking for you.
3     A.   "On the date of delivery to the trust, the
4  securities are subject to one or more of the
5  irrevocable purchase orders obtained by the trustees
6  on behalf of the trust, which obligate qualified
7  creditworthy third-party subscribers acceptable to a
8  qualified bank and the trustee to purchase the
9  securities for an amount greater than the amount to
10 be withdrawn by the trustees from the trust upon
11 delivery of such securities; B, have a yielded
12 maturity at least 350 basis points higher per annum
13 than a ten-year U.S. treasury securities market rate
14 on such date; or C, provide a yield to maturity of
15 200 basis points higher per annum than the market
16 rate for such security class on the day of delivery,
17 whichever is greater."
18    Q.   Okay.  My first question is are you
19 talking here about the escrow agent, the U.S.
20 Bancorp, or are you talking about something else
21 here?
22    A.   When I'm talking about qualified bank, the
23 qualified bank that's going to actually execute the
24 trade as broker-dealer.  A bank can't execute a
25 trade.

---

# BROWN & GALLO

LLC

www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

189

1    Q.   So when you -- so you contemplated that a
2  broker-dealer would execute these transactions; is
3  that a fair statement?
4    A.   Yeah.  They would have to.
5    Q.   And is there a definition of qualified
6  bank in this memorandum?
7    A.   I think --
8         PANELIST LUKOWSKI:  If there is, would you
9  point it out?
10        MR. NEKVASIL:  Yeah, I am.  I wasn't
11  trying to be snide.  I was just trying -- I was
12  taking a deep breath.
13    Q.   (By Mr. Nekvasil)  Page 157.  I direct
14  your attention to the first full paragraph on page --
15  well, this is -- by the way, this is part of the
16  trust that is -- if you look at page 78, it's
17  incorporated in the memorandum.  I don't -- I want to
18  make sure you know what I'm looking at.
19         The last sentence of the first full
20  paragraph, can you read that one, the term "qualified
21  bank"?
22    A.   "Qualified bank means selected by the
23  trustees which satisfies all the following criteria:
24  Such bank maintains a rating of at least A-1-B."
25    Q.   It's on page 157, the first full paragraph

190

1  starting with: "The qualified bank."
2    A.   I'm sorry.
3    Q.   I'll read -- the last sentence to that
4  paragraph says, "The term qualified bank shall also
5  include any registered broker-dealer, primary
6  securities firm with self-clearing and fed wire
7  capabilities, provided such firm has a Fitch rating
8  of A plus or better and maintains SIPC (Securities
9  Investor Protection Corporation) insurance coverage
10  or equivalent coverage."
11         So you're saying that the term
12  "investment bank" -- "qualified bank" that appears on
13  page one of the offering memorandum includes
14  brokerage firms?
15    A.   Yes.
16    Q.   In any event, you would agree, going back
17  to this page 404, that you had a discussion with
18  Reynolds about broker-dealers and banks in some
19  context in connection with the offering?
20    A.   Yes.
21    Q.   And you used Lancorp Financial Group
22  e-mails?
23    A.   Yes.
24    Q.   You're going beyond, do you not agree,
25  banking and operations, you're talking about things

191

1  that relate to the offering itself, the mechanics of
2  the offering; is that not fair to say?
3    A.   Yes.
4    Q.   How the deal would be structured as
5  presented in the offering memorandum?
6    A.   Right.
7         PANELIST LUKOWSKI:  Did a business trustee
8  even exist prior to the formation -- prior to
9  the completion of the private offering
10  memorandum?
11         THE WITNESS:  They were done in a
12  sequential manner.  I don't remember which came
13  first.
14    Q.   (By Mr. Nekvasil)  Now, put those -- put
15  those books away.  Let's go, please, to volume four,
16  tab H, page one.
17    A.   (Witness complies with request.)
18    Q.   You completed this form in February 2004,
19  right?
20    A.   Yes.
21    Q.   Did you testify earlier during my first
22  redirect that Lancaster Libations was put to bed
23  roughly in 1999 when you moved to California?
24    A.   Yes.
25    Q.   So did you not disclose it on this form

192

1  because, as respondent's counsel alluded, it was a
2  nonprofit entity or because it no longer existed as
3  of the end of 1999?
4    A.   Because it no longer existed.
5    Q.   And you indicated that when you filled out
6  this form -- you expressed just opposing counsel the
7  thought that you were just trying to fill it out in
8  proper fashion; is that fair to say?
9    A.   Yes.
10    Q.   So looking at the disclosure for Lancorp
11  Financial Group, LLC, you checked off -- where it
12  says, "Investment related business," you checked off
13  "yes" instead of "no" as you did for Universal
14  Underwriters because you felt that was part of
15  filling it out in proper fashion; is that your
16  understanding?
17         MR. LITTLE:  Excuse me.  I believe this is
18  well beyond the re-re-re --
19         CHAIRMAN LEITCH:  Is this based on new
20  material he brought up?
21         MR. NEKVASIL:  He -- I never asked him
22  why, and he asked him why; and he got the words
23  "proper fashion."
24         CHAIRMAN LEITCH:  Okay.
25    Q.   (By Mr. Nekvasil)  Now --

BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

193

1        MR. LITTLE:  We can go back all day, I
2    guess.
3        MR. NEKVASIL:  I can't be intimidated.
4    Q.   (By Mr. Nekvasil)  You mentioned -- a
5    panel member asked you about the insurance and about
6    when were you terminated from Ohio National, and you
7    indicated to him that you didn't know; is that fair
8    to say?
9    A.   Yes.
10   Q.   Well, let's look at your U-5.
11       MR. NEKVASIL:  If the panel will look at
12   volume four, tab J, page -- it's page 137.
13   Q.   (By Mr. Nekvasil)  It indicates under --
14   by the way, on the reason for termination, it doesn't
15   indicate that you were terminated for nonproduction,
16   does it?  Look under three, "Full termination."  You
17   see where it says, "Reason for termination: Other"?
18   A.   Yes.
19   Q.   Does it indicate that you were terminated
20   for lack of production?
21   A.   No.
22   Q.   It indicates you were terminated with the
23   parent company?
24   A.   Correct.
25   Q.   Who was the parent company?  What's your

194

1    understanding of the parent company?
2    A.   Of ONESCO?
3    Q.   Yeah.
4    A.   The only other name --
5        CHAIRMAN LEITCH:  Did you have any idea
6    what this meant?
7        THE WITNESS:  I presumed it was because of
8    my termination with Universal Underwriters.
9        CHAIRMAN LEITCH:  Okay.
10       PANELIST LUKOWSKI:  Is this something you
11   prepared?
12       THE WITNESS:  No.  This was the U-5 that's
13   sent to me after termination.
14   Q.   (By Mr. Nekvasil)  So you believe that
15   Universal Underwriters was a parent company for
16   ONESCO?
17   A.   No.  I never paid any attention to this.
18   I knew it was coming, so I made no reference to it at
19   all.
20   Q.   So you're saying you had no
21   understanding -- okay.  I know you prepared a form,
22   so I'm not going to ask you about the reason it was
23   put there.
24       But my question is did you have -- and I
25   guess when the U-5 came you never looked at it; is

195

1    that what you're saying?
2    A.   Correct.  I just filed it.
3    Q.   Okay.  Did you have an understanding when
4    you were at ONESCO -- obviously, you were also
5    licensed to sell insurance through Ohio National?
6    A.   Yes.
7    Q.   What was your understanding of the
8    relationship between Ohio National and ONESCO?
9    A.   I don't remember.  They were related in
10   some fashion.  What exactly that was, I don't
11   remember.
12   Q.   You don't -- did you know back then or you
13   don't -- or you knew and you don't remember what you
14   knew?  I mean, I guess I'm confused.  Did you know at
15   the time?  Did you understand at the time?
16   A.   I understood they were connected.  But in
17   terms of who's parent and who is subservient, that, I
18   didn't know.
19   Q.   I'll ask somebody else about that.
20   A.   I knew Universal was not a parent of any
21   of these.  They were wholly owned by Zurich.
22       MR. NEKVASIL:  Mr. Chairman, we have no
23   further questions.
24       MR. LITTLE:  Volume two of respondent's
25   exhibits, Exhibit 26-A, respondent's exhibits.

196

1    Respondent's exhibits.  That's the wrong
2    notebook.
3        MR. NEKVASIL:  Respondent's exhibits,
4    you're right.
5        MR. LITTLE:  26-A, volume two.
6        MR. NEKVASIL:  Volume --
7        PANELIST WRIGHT:  Volume one.
8        MR. NEKVASIL:  Volume one.
9        MR. LITTLE:  Oh, I'm sorry.  I misspoke.
10       MR. NEKVASIL:  Can you give me a second to
11   get volume one out?
12       MR. LITTLE:  Take your time.
13       PANELIST LUKOWSKI:  Which of the many
14   subparts?
15       MR. LITTLE:  26-A.
16   FURTHER EXAMINATION
17   BY-MR.LITTLE:
18   Q.   26-A, please.
19   A.   Oh, 25.
20   Q.   You previously identified this as a
21   December 6th, 2004, correspondence sent to the
22   investors.  What's the company identified on the
23   letterhead?
24   A.   Lancorp Financial Fund Business Trust.
25   Q.   When you communicated with investors, what



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:    877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303

197

1   was the name of the company that you used?
2       A.   Lancorp Financial Fund Business Trust.
3       Q.   Turn to Respondent's Exhibit 26-F.
4       A.   (Witness complies with request.)
5       Q.   Previously identified this as an e-mail of
6   January 18, 2005.  What is the -- who is the
7   addressee on this?
8       A.   Lancorp Financial Fund.
9       Q.   And who is this from?
10      A.   From -- oh, it's -- yeah, Lancorp
11  Financial Fund.
12      Q.   And did you at some point secure a
13  separate e-mail address for the trust?
14      A.   Yes.
15      Q.   And when you communicated with the
16  investors, which e-mail address did you use?
17      A.   As far as I know, I used the Lancorp
18  Financial Fund, but I could have easily used Lancorp
19  Financial Group, too.
20      CHAIRMAN LEITCH:  Could have easily used?
21      THE WITNESS:  Lancorp Financial Group.  I
22  could have used either one in correspondence.
23  If I wasn't paying attention and clicked the
24  wrong selection, it could have gone from either.
25      Q.   (By Mr. Little)  If you were paying

198

1   attention, which address did you intend to send
2   e-mails from?
3       MR. NEKVASIL:  If you were paying
4   attention, which one did you intend to send?
5       CHAIRMAN LEITCH:  Isn't the point -- isn't
6   the point that there are some things that look
7   like letterhead that have the fund on it?
8       MR. LITTLE:  The point is the
9   correspondence counsel referred to earlier shows
10  communication in 2003 as part of the creation of
11  the trust, and what I'm pointing out to you is
12  the two -- the correspondence actually to the
13  investors.
14      Q.   (By Mr. Little)  Sir, when you
15  communicated to investors, what was your expectation
16  as to how you wanted to -- which company you wanted
17  to have identified?
18      A.   Lancorp Financial Fund.
19      Q.   And that was the trust?
20      A.   Correct.
21      MR. LITTLE:  I have no further questions.
22  Thank you.
23      CHAIRMAN LEITCH:  Can this witness be
24  excused?
25      MR. NEKVASIL:  Yes.  I have no --

199

1       CHAIRMAN LEITCH:  Excuse me, that --
2       MR. NEKVASIL:  I mean, we have no further
3   questions.
4       CHAIRMAN LEITCH:  No further questions of
5   the parties I was saying.  I've got to ask my
6   colleagues if they want to ask questions.
7       PANELIST LUKOWSKI:  Mr. Lancaster, have
8   you been sued by anyone in connection with this
9   investment?
10      THE WITNESS:  Not yet.
11      PANELIST LUKOWSKI:  What is the status of
12  the SEC investigation, if any?
13      THE WITNESS:  I don't know what their
14  complete investigation is.  It's -- as far as I
15  know, it's still ongoing.
16      PANELIST LUKOWSKI:  Have you been notified
17  by anyone from any U.S. attorney's office that
18  you're a target?
19      THE WITNESS:  Yes.
20      PANELIST LUKOWSKI:  And when were you
21  notified of that fact?
22      THE WITNESS:  I can't remember exactly.  A
23  month ago.
24      PANELIST LUKOWSKI:  A month ago?
25      THE WITNESS:  (Nods head affirmatively.)

200

1       PANELIST LUKOWSKI:  Are you represented by
2   criminal counsel?
3       THE WITNESS:  No.  I have no funds to hire
4   counsel.
5       PANELIST LUKOWSKI:  What do you do for a
6   living now?
7       THE WITNESS:  Right now I'm selling
8   driveways.
9       CHAIRMAN LEITCH:  I just didn't hear you.
10      THE WITNESS:  I'm selling driveways.
11      PANELIST WRIGHT:  I don't have any.
12      CHAIRMAN LEITCH:  None.  You can be
13  excused.  Thank you very much.
14      THE VIDEOGRAPHER:  Off the record?
15      CHAIRMAN LEITCH:  Yes, please.
16      THE VIDEOGRAPHER:  The time is 2:21 p.m.
17  This concludes tape number three.  We're now off
18  the video record.
19      MR. NEKVASIL:  Take a break before the
20  next witness.
21      CHAIRMAN LEITCH:  Yes.  A full 15-minute
22  break before the next witness.
23      (A recess was taken from 2:21 p.m. to
24  2:52 p.m.)
25      CHAIRMAN LEITCH:  Good afternoon, sir.



BROWN & GALLO
LLC
www.browngallo.com

Telephone:  404.495.0777
Toll Free:   877.495.0777
Facsimile:  404.495.0766

2700 Centennial Tower
101 Marietta Street
Atlanta, Georgia 30303